

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 0 2 2011

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Georgia Latino Alliance for Human Rights;
Service Employees International Union; Southern
Regional Joint Board of Workers' United;
DREAM Activist.org; Task Force for the
Homeless; Asian American Legal Advocacy
Center; Alterna; Coalition of Latino Leaders;
Instituto de Mexico, Inc. of Atlanta; Coalition for
the People's Agenda; Paul Bridges; Benjamin
Speight; Everitt Howe; Paul J. Edwards; Sharon
Gruner; Jane Doe #1; Jaypaul Singh; Ernesto
Piñon; John Doe #1; John Doe #2; and Jane Doe
#2,

         Plaintiffs,

v.

Nathan Deal, Governor of the State of Georgia, in
his official capacity; Samuel S. Olens, Attorney
General of the State of Georgia, in his official
capacity; Clyde L. Reese, III, Commissioner of
the Department of Human Services of the State of
Georgia, in his official capacity; Mike Beatty,
Commissioner of the Department of Community
Affairs of the State of Georgia, in his official
capacity; and Falecia Stewart, Executive Director
of the Housing Authority of Fulton County
Georgia, in her official capacity,

         Defendants.



Civil Action File No.

1:11-cv-1804

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## CLASS ACTION

1

## PRELIMINARY STATEMENT

1.      This action challenges Georgia's comprehensive immigration law, House Bill 87 ("HB 87," attached as Exhibit A).  In HB 87, Georgia creates a punitive and comprehensive immigration system that, among other things: (1) authorizes state and local law enforcement officers to investigate the immigration status of individuals who do not carry one of a limited set of documents prescribed by the state, and to arrest individuals on suspicion that they have violated federal civil immigration laws (Section 8); (2) creates new criminal immigration laws specific to and wholly administered by the State of Georgia (Section 7); (3) denies public benefits to anyone unable to provide one of several enumerated documents that Georgia deems sufficient proof of identity (hereinafter "qualifying identity documents") (Section 17); and (4) outlaws the use of consular identification cards, which several foreign governments issue to their citizens, for any official purpose (Section 19).

2.      Governor Nathan Deal signed HB 87 on May 13, 2011.  The law is scheduled to take effect on July 1, 2011, excepting the benefits provision (Section 17) and the ban on consular identification cards (Section 19(c)), which are scheduled to take effect on January 1, 2012.

3.     If allowed to take effect, HB 87 will significantly harm Georgians, and particularly Georgians of color, for at least three reasons:

4.     First, as confirmed by law enforcement officials in Georgia and elsewhere, HB 87 will subject Georgians—including countless U.S. citizens and non-citizens who have permission from the federal government to remain in the United States—to unlawful interrogations, searches, seizures, and arrests and will result in widespread racial profiling. All Georgians, and particularly those of color, will be compelled to carry additional paperwork prescribed by the State of Georgia at all times. This is because HB 87 makes individuals who do not carry the prescribed documentation subject to lengthy investigations into immigration status that last over 80 minutes on average under the best case scenario. This documentation requirement amounts to a state alien registration scheme incorporated into Georgia criminal procedure.

5.     Second, HB 87 will cause countless Georgians—including U.S. citizens and non-citizens with federal permission to remain in the United States—to be erroneously deprived of the public benefits that they need and are lawfully entitled to receive. These deprivations will force individuals and families, including those with young children, to be without food and shelter, simply due to an inability to produce a qualifying identity document.

6.   <u>Third</u>, HB 87 will thwart the ability of potentially hundreds of thousands of Georgians to conduct basic daily tasks with ease—such as gaining admission to a state building or enrolling a child in public school—by prohibiting the use of their consular-issued identification for any "official purpose."

7.   HB 87 constitutes a sweeping and comprehensive state scheme regulating immigration and the conditions under which immigrants can reside in Georgia. The state system includes provisions: creating new state documentation requirements that transform ordinary police encounters into immigration status investigations; inventing new *state* immigration crimes; restricting the ability of U.S. citizens and lawful immigrants to obtain benefits that they are entitled to under federal law; invalidating documentation that foreign governments offer to their own citizens; and addressing many other issues relating to non-citizens' presence and activities in Georgia, including the transportation of suspected unauthorized immigrants by law enforcement officials, the availability of bail to non-citizens in criminal proceedings, and the creation of a new public body to oversee and enforce several of HB 87's provisions.

8.   The State of Georgia's intent to displace federal immigration authority is apparent not only from the scope and design of HB 87's immigration regulations,

but also from the express statements of the members of the Georgia General Assembly who drafted and supported the law.

9.     HB 87 interferes with the core federal interests of setting a uniform national immigration scheme and speaking for the entire nation in conducting foreign relations with other nations.  The President of the United States directly invoked these federal interests in condemning HB 87 on April 26, 2011:  "It is a mistake for states to try to do this piecemeal.  We can't have 50 different immigration laws around the country.  Arizona tried this and a federal court already struck them down."  *See* Matthew Bigg, "Obama criticizes new Georgia immigration law," REUTERS, Apr. 26, 2011.

10.    HB 87 is unconstitutional in myriad ways.  It violates the Supremacy Clause and core civil rights and liberties secured by the U.S. Constitution— including the Fourth Amendment's right to freedom from unreasonable searches and seizures, the Right to Travel, and the Fourteenth Amendment's guarantees to equal protection and due process under the law.  It also violates separation-of-powers safeguards in the Georgia Constitution.

11.    The Plaintiffs in this action will suffer serious and irreparable violations of their constitutional rights and civil liberties if HB 87 is allowed to take effect. The individually named Plaintiffs bring this action on behalf of themselves and a

class of all others similarly situated to obtain preliminary and permanent injunctive relief and a declaration that HB 87 is unconstitutional.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims under the U.S. Constitution, which are brought both directly and under 42 U.S.C. §§ 1981 and 1983.

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights and to secure equitable or other relief for the violation of those rights.

14. This Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367 because it is so related to the federal claims that it forms part of the same case or controversy under Article III of the U.S. Constitution.

15. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure Rule 57.

16. Venue is proper in this District under 28 U.S.C. § 1391(b). Defendants are sued in their official capacity and their residences are all located within this

District and this Division.  All of the events giving rise to this Complaint occurred

within this District.

## PARTIES

### Organizational Plaintiffs

17.    Plaintiff **Georgia Latino Alliance for Human Rights** ("GLAHR") is a

statewide, grassroots membership organization founded in 1999 that emphasizes

community outreach to immigrant communities in Georgia in order to ease their

transition into a new culture.  One key way that GLAHR achieves its goal of

easing transition into a new culture is by educating the community about city

ordinances of which they would otherwise be unaware.  Other GLAHR functions

include: providing leadership training, conducting community organizing for

immigrants' rights, holding community forums on a range of issues, and hosting

monthly meetings on issues facing the Georgia immigrant community.  If

implemented, HB 87 would harm GLAHR by causing the organization to divert

significant resources away from activities central to its mission.  For example, if

HB 87 takes effect, GLAHR will no longer be able to conduct education around

local ordinances, and instead will have to focus all of its educational efforts on

determining the effects of HB 87 and educating its members about it.

7

18.     Since HB 87 passed, GLAHR has experienced a steep drop in attendance at its events and meetings, by both its members and other interested community participants.  Members have reported that they are too afraid to attend these events because they believe that they will be targeted by the police based on their ethnic appearance.

19.     GLAHR's ability to pursue its mission is directly threatened by implementation of HB 87.  To carry out its mission, GLAHR provides transportation for its members to activities and forums related to the organization's activities and goals.  GLAHR provides this transportation for all of its members, some of whom are undocumented.  GLAHR will need to continue to provide transportation for its members if HB 87 takes effect and, therefore, would be subject to criminal liability under the law.  In addition, to advance its mission, GLAHR often assists individual immigrants to remain in the state by advocating on their behalf with detention centers or by helping them find attorneys.  These vital organizational activities would also expose GLAHR to criminal liability if HB 87 is implemented.  Finally, GLAHR's members have already been subject to increased stops and interrogation by police since HB 87 passed based on their Latino appearance and/or English language ability.  Because many of GLAHR's members lack the identity documents prescribed by HB 87, they will be harmed if

8

HB 87 takes effect by being subjected to increased police scrutiny, interrogation, and detention.

20.    Plaintiff **Service Employees International Union** ("SEIU") is one of the largest labor organizations in the world, representing 2.2 million men and women who work primarily in the public sector and in the janitorial, health services, long-term care, and security industries.  Many of SEIU's members are recent immigrants to the United States and many of its members come from racial minority groups.  SEIU has long called for and worked toward comprehensive reform of U.S. immigration laws.  Another priority for SEIU is fighting discrimination against minorities, women, and other groups in the workplace and society in general.  In Georgia, SEIU has a local affiliate, the Southern Regional Joint Board of Workers' United.  This affiliate represents about 4,000 employees, of whom approximately 60 percent are members.  These employees work in 28 different work sites across the state with about 75 percent residing in the Atlanta metropolitan area.  Between 15 and 20 percent of the employees the Joint Board represents are Latino and the majority of the remainder are other racial minorities. In Georgia, SEIU works in partnership with the Southern Regional Joint Board and other groups to combat discrimination and mobilize for immigration reform at the national level.

21.    The implementation of HB 87 will have a severe impact on SEIU's organizational mission.  Some of SEIU's Latino members or their families have already been subjected to stops by local law enforcement where they have been asked to produce proof of immigration status.  SEIU will be harmed if HB 87 is implemented because its minority members will be even more likely to be stopped, detained, arrested, and questioned by state and local police.  This will cause hardship for members of SEIU.  In addition, SEIU will be harmed if HB 87 is implemented because its members and potential members, regardless of nationality and immigration status, will refrain from exercising their rights to attend rallies, demonstrations, and union meetings or to engage in leafleting or other traditional labor activities because of the possibility of being stopped by police under HB 87. This will significantly affect the ability of SEIU to protect its existing members.  In addition, the Latino community is one of the fastest growing in the states and is heavily represented in the industries in which Workers' United is concentrated— manufacturing, industrial laundries, and distribution.  Finally, HB 87 has created a fear of government officials and has already led to reluctance on the part of members of this community to join the union and to take the perceived risk of supporting new organizing in unorganized workplaces, where the National Labor Relations Board is often involved.  SEIU joins this lawsuit to preserve its ability to

organize new members and to protect the rights and interests of its members and prospective members.

22.     Plaintiff **Southern Regional Joint Board of Workers' United** ("Joint Board") is a labor union and an affiliate of Plaintiff SEIU.  The Joint Board represents approximately 4,000 workers in Georgia.  Over 15 percent of the Joint Board's Georgia membership is Latino.  The primary mission of the Joint Board is to organize, represent, and empower employees in Georgia.  In addition, the Joint Board works in partnership with SEIU and other groups to combat discrimination and mobilize for immigration reform at the national level.

23.     The Joint Board will be harmed by HB 87 because its minority members, including U.S. citizens and lawful immigrants, are likely to be unlawfully stopped, detained, arrested, and questioned by state and local police after HB 87 goes into effect.  This will cause hardship for members of the Joint Board.  In addition, the Joint Board will be harmed if HB 87 is implemented because its members and potential members will refrain from exercising their rights to attend rallies, demonstrations, and union meetings or to engage in leafleting or other traditional labor activities because of the possibility of being stopped by police under HB 87.

24.     Members have already told the Joint Board that they have faced additional police scrutiny and questioning since HB 87 was passed.  They believe

this additional police scrutiny was based solely on their ethnic appearance and/or English speaking ability. This discriminatory treatment by law enforcement will significantly impede the ability of the Joint Board to protect its current members and to organize new members. Some members of the Joint Board lack the identity documents required by HB 87 or do not regularly carry these documents with them when traveling through the state, and are therefore at risk of lengthy detention and investigation under the new law.

25.     The Joint Board will also be harmed if HB 87 is implemented because employers in the state will refrain from hiring members and potential members of the Joint Board that they believe look or sound "foreign" out of a fear that they will be subject to increased liability under HB 87. This will have a serious impact on the ability of the Joint Board to recruit new members. The Joint Board will also be harmed if HB 87 takes effect because of the provision criminalizing the transporting of undocumented immigrants. This provision will have a chilling effect on the Joint Board's efforts to give rides to people attending union meetings and other events. The Joint Board will have a more difficult time organizing transportation to these key union activities because people will be afraid to associate with someone whose racial/ethnic appearance might result in getting the driver stopped for a minor traffic offense leading to further police scrutiny and

possible criminal prosecution under the law.  In addition, if HB 87 is implemented, the Joint Board will need to spend significant new time educating members and potential members about the law.  This will divert the Joint Board's resources from other core organizational priorities.  The Joint Board joins this lawsuit to preserve its ability to organize new members and to protect the rights and interests of its members and prospective members.

26.     Plaintiff **DREAM Activist.org** (DREAM) is a multicultural, migrant-youth-led movement to pass the DREAM Act, also known as the Development, Relief, and Education for Alien Minors Act.  The DREAM Act is a bipartisan bill that seeks to address the situation faced by many young students who were brought to the United States as young infants.  Under the most recent version of the DREAM Act, students with good moral character who came to the United States at age 15 or younger at least five years before the date of the legislation's enactment would qualify for "conditional permanent resident status" upon acceptance to college, graduation from a U.S. high school, or being awarded a GED in the United States or have served in the armed forces.  DREAM is a national membership based organization with DREAM Act student members all over the country, including Georgia.  DREAM provides campaign support to DREAM Act students facing removal from the United States in Georgia and all across the country.

27.     If HB 87 takes effect, DREAM members are at risk of being subject to

prolonged immigration status checks even if they are authorized by the federal

government to remain in the United States.  DREAM has members, including

Georgia members, who have been granted deferred action by federal immigration

authorities.  Deferred action is a discretionary decision not to arrest or deport a

person for immigration purposes.  Deferred action is often granted for one year

time periods, but can be renewed.  However, the temporary and indefinite nature of

deferred action means that a DREAM Act student granted deferred action would

not be automatically eligible to obtain identity documents in Georgia, and such

students often spend months out of each year with no identification while they wait

for new documentation to prove that the federal government has extended their

deferred action grant.  Under HB 87, these students are likely to be caught up in

prolonged immigration status checks although they are authorized to remain in the

United States.  DREAM members, including Georgia DREAM members, may also

benefit from a private immigration bill introduced by a local Senator or House of

Representative preventing their removal from the United States.  Upon

introduction of a private bill, a DREAM Act student's removal is delayed at least

until the end of the congressional session.  A DREAM Act student with a private

bill introduced may not have proof that the bill was introduced or an officer may be

confused as to whether a DREAM Act student with a private bill can remain in the United States.  Under HB 87, Georgia DREAM Act students with a private bill introduced but not passed in either the House or Senate may be targeted and arrested under the law.

28.    If HB 87 takes effect, DREAM will be harmed in other ways, as well. DREAM harbors undocumented students in houses within the State of Georgia and provides transportation to undocumented students with and without deferred action grants.  DREAM will continue to do so even if HB 87 takes effect.  DREAM also has planned and will continue to plan conferences and training sessions in Georgia that bring together undocumented students nationwide.  Under HB 87, these actions could be considered assisting, transporting, and harboring undocumented students in Georgia which would expose DREAM members to criminal liability.

29.    Plaintiff **Task Force for the Homeless** (TFH) has served the needs of homeless men, women, and children in the Atlanta area for thirty years.  Today, TFH is a non-profit organization that offers a homeless shelter that provides evening meals, a recovery program, a Resident Volunteer Program, a Transitional Housing Program, an emergency assistance hotline, support services, a day service center, permanent housing placement assistance, employment placement and assistance, computer classes, an art studio and gallery, a bike shop, a roof garden,

15

and occasional transportation for residents. TFH serves more than 500 people a day—men, women, and children, including undocumented immigrants—in its shelter, resident volunteer programs, and transitional housing programs. TFH provides its services to all, without regard to their immigration status.

30. Since HB 87 has been enacted, TFH has diverted resources from other organizational priorities to educate its volunteers and residents about the law. Volunteers and residents alike are fearful that HB 87 will have a serious impact on people of color statewide. If HB 87 takes effect, TFH will have to divert additional resources from priority areas to provide education about the law.

31. If HB 87 takes effect, TFH will be harmed in several ways. First, TFH will be exposed to criminal liability for continuing to conduct emergency shelter and services core to its mission without regard to the immigration status of those it serves. Second, TFH has assisted victims of racial profiling with filing complaints in the past. If HB 87 takes effect, it will be more difficult for TFH to help the increased number of victims of racial profiling. In addition, TFH volunteers and residents—nearly all of whom are homeless—seldom carry the identity documents prescribed by HB 87. If HB 87 takes effect, these members would be unable to establish their identity to the satisfaction of local law enforcement and would face additional police scrutiny and detention while officers attempt to verify their

immigration status.  Moreover, TFH provides transportation to its residents

occasionally without checking their immigration status; HB 87 will make any

future service of that kind risky.

32.    TFH also encourages its residents to apply for food stamps and public

housing assistance to which they are entitled.  Currently, this process does not

consume significant TFH staff time.  But because many TFH residents lack the

most common forms of identity documents, and in some cases lack any ID, the

new HB 87 requirement that applicants for public benefits present qualifying

identity documents will cause many TFH residents and clients who are otherwise

eligible for food stamps to be denied.  Food stamps are essential for many TFH

residents, and TFH will have to prioritize creating instructions and providing

assistance for those who are turned away, including providing more direct food

assistance.  This diversion of resources will be a major impediment to TFH

residents' access to essential services, and to TFH's work in other areas.  TFH also

tries to place individuals in public housing or to assist them in obtaining Section 8

housing vouchers when possible.  Given that HB 87 creates the same identification

restrictions for public housing as for food stamps, TFH will be overburdened by

requests from residents for help with overcoming problems caused by these new

document requirements, including the time-consuming process of obtaining

qualifying identity documents. Because fewer of TFH's residents will have access to food stamps and public housing assistance they will, by necessity, require additional food and housing assistance directly from TFH. They will remain homeless for longer and longer periods of time.

33.    Plaintiff **Asian American Legal Advocacy Center** is the first not-for-profit law center focused on Asian Americans, Pacific Islanders, and Asian-ethnic refugees in Georgia and the Southeast. AALAC's mission is to protect and promote the civil, social, and economic rights of Asian Americans through public policy, legal education, community organizing and leadership development. AALAC's programs include immigration, youth and juvenile justice, language access, economic development, voter engagement and civic participation, and small business issues. AALAC reaches approximately 3,000 people on an annual basis through its community forums and multilingual educational materials. It provides bilingual materials in Chinese, Korean and Vietnamese. Since the passage of HB 87, AALAC has exhausted staff and organizational resources to respond to the law's impact the Asian American communities, immigrant communities, and small businesses. For example, along with its community partners, AALAC helped to gather 4,000 signatures provided by Korean American residents of Gwinnett County urging key legislatures to vote no to HB 87. HB 87

has already and will continue to impact AALAC's ability to satisfy its mission because members of its community are looking to AALAC for guidance on the impact of the law on their day-to-day lives.

34.     Plaintiff **Alterna** is a faith-based, non-profit organization that was founded in 2006 and provides a variety of social services, primarily to the Latino immigrant community in LaGrange, Georgia.  Alterna is guided by the biblical teaching to love our neighbors and care for the marginal and vulnerable among us and it focuses on providing accompaniment, advocacy, and hospitality to and on behalf of those in need.  Alterna's services include:  providing crisis intervention case management for families and individuals experiencing legal, medical, employment, or family-related crises; accompanying clients to medical, government, or school appointments; accompanying clients to appointments to apply for public benefits such as food stamps, income verification and Medicaid; sponsoring English-language classes; delivering community education on a range of issues; maintaining a housing facility near the immigration detention center in Lumpkin, Georgia for family and friends visiting detainees; providing transitional housing for families and individuals experiencing crises; advocating on immigration issues including detention conditions for immigrant detainees; and hosting educational trips to Guatemala with a focus on social justice.  Alterna has

three staff members and several volunteers.  Alterna does not check the

immigration status of its clients, but is aware that many of its clients and their

family members are undocumented immigrants.

35.    If HB 87 takes effect, Alterna will be harmed in several ways.  First,

Alterna will be exposed to criminal liability for continuing to conduct services core

to its mission—including transporting clients to various appointments and running

its housing facility near the Lumpkin detention center and its transitional housing

facility.  Alterna is aware that many of the clients it transports to critical

appointments or allows to use its housing facilities are undocumented.  Second,

Alterna has already experienced a significant drop in attendance at events as well

as a decrease in clients since HB 87 passed.  Indeed, Alterna has already been

forced to cancel some of its English-language classes.  This decrease in attendance

and demand for services is directly attributable to fear resulting from the new law;

many immigrants are too afraid to drive to any events out of fear of being stopped

by law enforcement.  If HB 87 takes effect, Alterna will suffer an even steeper

decline in attendance and demand for services.  Third, Alterna has had to alter its

programming since HB 87 passed.  Clients are showing up for events or services

with questions about their rights under the new law and Alterna has had to divert

resources to answer these questions, which detracts from the ability to provide services more central to Alterna's mission such as English-language instruction.

36.     Plaintiff **Coalition of Latino Leaders** ("CLILA") is a not-for-profit, volunteer-based membership organization in Dalton, Georgia that was founded in 2006.  CLILA's mission is to develop competent, caring Latino grassroots leadership with the skills necessary to address the critical issues facing the Northwest Georgia Latino community.  CLILA has approximately 150 members and about 1,000 participants in various CLILA events throughout the year.  CLILA provides the following services:  advocacy and community organizing for immigrants' rights; citizenship classes; English-language classes; Homework Club for children whose parents do not speak English; computer classes; and assistance in completing applications for legal residency and naturalization.  CLILA also hosts community meetings on issues affecting the Latino community, provides educational information on various topics, and works on voter registration and education for the Latino community.  In addition, CLILA identifies children, and sometimes parents, who are eligible for food stamps and instructs families on how to apply for these benefits.  CLILA provides programs and services for the community living primarily in Whitfield and Murray counties.  Its members are Latino immigrants, mainly from low-income families.  CLILA accepts all

members without regard to their immigration status, but is aware that approximately 60 percent of its members are undocumented immigrants.

37.    CLILA has already been harmed by the passage of HB 87—most notably due to a drop in attendance for its programs based on members' fears that their association with CLILA will cause them to be identified as undocumented immigrants by law enforcement.  In addition, CLILA's resources, both in terms of funding and staff and volunteer time, have been diverted from organizational priority projects due to the passage of HB 87.  For example, the number of calls CLILA receives daily has increased by 400 percent since HB 87 was passed.  The vast majority of these calls are from community members who have questions about the new law and how it will affect them.  CLILA has been forced to put on hold its citizenship classes in order to respond to this increase in calls and to answer questions about HB 87.  Finally, if implemented, CLILA will face criminal liability under HB 87 because it regularly provides transportation for its members—some of whom are undocumented—to attend events such as citizenship classes or rallies across the state.

38.    Plaintiff **Instituto de Mexico, Inc. of Atlanta** ("Instituto") is a non-profit organization registered in the state of Georgia and based in Atlanta.  The Institute is dedicated to fostering the development of the Mexican community in Atlanta

and to promoting the history and culture of Mexico in the United States. The
Instituto was founded in 2002 and its mission is to promote understanding and to
share Mexican customs and traditions with residents of Atlanta and surrounding
areas. The Instituto places a special focus on educating youth with Mexican
ancestry about their heritage and culture. Another central goal of the Instituto is to
cultivate friendship ties and a mutual understanding of the cultural commonalities
between the United States of America and Mexico. To fulfill its mission the
Instituto organizes cultural programs, which are open to all Atlanta-region
residents without regard to immigration status, nationality, or citizenship. The
Instituto regularly holds large cultural events for the Atlanta community that range
from celebrations for Mexico's Independence Day and the Day of the Dead; a
variety of concerts; conferences; health fairs; expositions; and several educational
and sports events. These events draw attendees from across Atlanta and the rest of
the state and regularly include thousands of participants. Although the Instituto's
events are open to all, the majority of attendees are Latino—including U.S. citizens
and others in lawful immigration status.

39.    If HB 87 is implemented, the Instituto will be harmed because attendance
at its events will drop drastically and this will undermine the Instituto's ability to
achieve its central purpose as an organization—to promote understanding and

educate the public about Mexican cultural heritage.  Already, since HB 87 passed

people have expressed fear of attending Instituto events.  Individuals who regularly

attend Instituto events have expressed that they are afraid to attend these events out

of fear that they will be targeted by local police and will be subject to immigration

status inquiries if they attend large group events with primarily Latino attendees.

The passage of HB 87 has created an intense climate of fear for Latinos in Georgia

and individuals of Latino descent are afraid that any contact with law enforcement

could result in extended interrogation, detention, and arrest regardless of their

lawful immigration status.

40.     Plaintiff **Georgia Coalition for the Peoples' Agenda** ("CPA") is a

Georgia-based coalition of approximately 1000 individual and 50 organizational

members representing a diverse spectrum of issues, interests, and constituencies,

ranging from civil and human rights and women's and young people's rights to

labor relations and environmental justice. CPA defines its mission as improving

the quality of governance in Georgia, creating a more informed and active

electorate, and having responsive and accountable elected officials. CPA tries to

educate the public and encourage their participation through voter registration

drives, town hall meetings and other events that provide information and a forum

to voice community concerns on issues spanning health care, education, labor

relations, the juvenile justice system, monitoring elected officials, and environmental justice, to name a few.

41.    HB 87 will negatively impact CPA's members and organizational activities in several ways.  Some CPA members, including U.S. citizens and individuals who have lawful immigration status, will be unable to provide the required documents for police inspection and will be at risk of being subject to lengthy detentions and investigations. For example, many elderly individuals do not have a Georgia driver's license or other document deemed acceptable under HB 87.  For many families represented by CPA who already struggle to pay their bills and make ends meet, the costs of obtaining these documents will be a great and undue economic burden as well.  In addition, CPA has already received many reports of racial profiling by the local police targeting individuals of color, for example, in a phenomenon known as "driving while black," whereby African-American drivers who are seen driving more expensive cars are routinely stopped by the police for interrogation even when they have not violated any traffic laws. CPA is very concerned that HB 87 will increase and aggravate these incidents of racial profiling and harassment.

42.    CPA also foresees a decrease in participation in its events and programs, such as town hall meetings, because of people's fear of immigration status

investigations authorized by HB 87.  The law will also negatively affect the organization by forcing CPA to divert its time, money, and resources from other important projects, such as initiatives to improve the educational and criminal justice systems, so that it can respond to HB 87.

### Individual Plaintiffs

43.    Plaintiff **Paul Bridges**, a supporter of the Republican Party, is the mayor of Uvalda, Georgia, a town of approximately 600 people in Montgomery County. Because he speaks Spanish and English and is well-known, he often assists with interpretation in schools, doctors' offices, court, and other settings.  He also provides transportation to undocumented individuals so that they can go to the Mexican Consulate in Atlanta, churches, the grocery store, appointments at doctors' and dentists' offices, and soccer tournaments in towns neighboring Uvalda, among other places.  He gives rides to undocumented friends in Georgia on at least a daily basis and will continue to do so in the future.  In addition, Bridges has traveled to Florida to pick up friends, including those who are undocumented, to give them rides to Georgia.  Bridges will continue to do so in the future.  Sometimes he exceeds the speed limit, or forgets to signal when changing lanes, when driving undocumented individuals.

44.    If HB 87 goes into effect, Bridges and the undocumented individuals traveling with him will be at risk of criminal prosecution.  In the past, Bridges has opened his home to undocumented individuals who needed a place to live as they traveled through the area, and he will continue to do so in the future.  If HB 87 goes into effect, he fears that he could be prosecuted for sheltering these individuals in his home.

45.    As mayor of Uvalda, Bridges also wishes to inform the Court of the immense human and economic costs that HB 87 will inflict on his town.  With HB 87, Bridges fears that families with mixed immigration status will be torn apart, as parents who are undocumented get picked up by immigration authorities, leaving their U.S. citizen children without anyone to care for them.  If HB 87 goes into effect, Bridges worries that there simply will not be enough agricultural workers available and this will adversely impact Uvalda businesses and its tax base. Finally, Bridges fears that HB 87 will pose enormous costs to the town for housing those arrested under the law, costs that the town cannot afford.

46.    Plaintiff **Benjamin Speight** is the Organizing Director for the Teamsters Truck Drivers and Helpers Local 728.  Speight protects the rights of all workers, without regard to their immigration status.  He regularly transports undocumented students and other undocumented individuals in his union-issued twelve passenger

van. While driving, he often receives and sends text messages, and sometimes does not come to complete stops at stop signs and drives above the speed limit. Although HB 87 will criminalize Speight's transportation of undocumented individuals, he will continue to do this even if the law takes effect. Speight also will drive the van to organize non-compliance with and targeted opposition to HB 87 both inside and outside the state. As a result of these activities, Speight fears that he will be subject to criminal prosecution under HB 87.

47.    Plaintiff **Everitt Howe** is a retired Lieutenant Colonel in the U.S. Air Force. He currently serves as the Vice President of the Fulton County chapter for Atlantans Building Leadership for Empowerment ("ABLE"), an interdenominational social justice organization composed of 27 congregations, and is a caseworker in a community service program at his church. This program serves about 100 families, including some undocumented immigrants, and offers a variety of services, including providing advice on legal or tax matters, English-language classes, food coupons, and direct financial aid to families and individuals in financial hardship. As part of the program, Howe regularly accompanies and transports families and individuals, including those who are undocumented, to hospital visits or other appointments. In the course of transporting and assisting these individuals, Howe has accidentally run a red light and has had problems with

a troublesome tail light on his car, which make it likely that he will be stopped in the future for minor traffic violations. Howe fears that under HB 87, he could be found criminally liable.

48.    Plaintiff **Paul J. Edwards** is a devout Christian who strongly believes in helping all individuals in his community regardless of their immigration status. His religious beliefs encourage actions that will be labeled as criminal offenses if HB 87 is allowed to take effect. For example, as a part of his religious commitment, Edwards transports people, including those who are undocumented, to places of worship and to locations which provide medical assistance. When transporting individuals, he has on occasion exceeded the speed limit. His activities could subject him to criminal liability for assisting, transporting, and harboring undocumented individuals under HB 87. In addition, Edwards serves as a board member of Plaintiff Alterna and plans events that include housing undocumented individuals, which could be considered criminal harboring under HB 87. If HB 87 goes into effect, individuals in Edwards's community will be even more afraid to drive, and he will be criminally liable for transporting them to church and for non-emergency medical care. Also, HB 87 would make Edwards criminally liable for inviting out-of-state undocumented friends into his home. From personal knowledge and experience, Edwards knows that laws such as HB

87 increase fear within the immigrant community and decrease the likelihood that immigrants—both those with and without legal status—will cooperate with law enforcement, which result in a community-wide decrease in public safety.

49.    Plaintiff **Sharon Gruner** is a graduate student who resides in Dalton, Georgia, and spends her time volunteering with Plaintiff CLILA.  As part of her volunteer work, she regularly drives CLILA members—those with and without legal status—from English classes and meetings, and she will continue to do so. While driving these members, Gruner has sometimes driven over the speed limit or failed to stop completely at a stop sign, and she has been stopped by police about once every three months because of a problem with the tail lights on her car.  To date, she has received warnings during these stops.  But she worries that, following the implementation of HB 87, a routine stop for the tail light problem or other minor traffic violation will result in her being prosecuted for transporting undocumented immigrants.  In connection with her work for CLILA, Gruner also has provided shelter to undocumented immigrants and she will continue to do so in the future.  The fines that Gruner would pay if she is found to be violating HB 87 by harboring or transporting undocumented immigrants are more than she can afford to pay as a graduate student.

50.    Plaintiff **Jane Doe #1** is married to an undocumented immigrant. Her husband is currently participating in physical therapy and sees a doctor regularly as a result of an incapacitating injury he suffered that left him unable to operate an automobile. Jane Doe #1 has primary responsibility for transporting her husband to and from his doctor visits and physical therapy, as well as anywhere else that their family frequents, and has on some occasions exceeded the speed limit, or failed to use her blinker properly. If HB 87 takes effect, she fears arrest by the police for transporting her husband to and from his medical appointments and other locations. She also fears being held criminally liable for harboring undocumented immigrants if she were to invite her undocumented in-laws from Florida to visit with her here in Georgia.

51.    Plaintiff **Jaypaul Singh**, a U.S. citizen of South Asian descent, permanently resides in the State of Washington. Singh is attending law school and will be residing in Atlanta, Georgia for the summer while he works as a law clerk in the city. He has a driver's license from the State of Washington, which he plans to use as his identification while living in Atlanta. Singh will not have with him any document that is required by HB 87 to prove that he is a U.S. citizen. He generally carries his driver's license with him, but this document will be insufficient under HB 87 because the State of Washington does not verify

immigration status prior to issuing driving licenses. Singh occasionally commits minor infractions, such as speeding, and he has sometimes been stopped by law enforcement officers for this in the past. He is fearful that he could be stopped again for committing a minor infraction while in Atlanta, and that he will be subject to extended detention as the local police try to confirm whether he is a U.S. citizen. If HB 87 goes into effect, Singh will avoid contact with law enforcement and will curtail some of his movement throughout the state to avoid the risk of detention.

52.    Plaintiff **Ernesto Piñon**, a U.S. citizen who is Latino, permanently resides in the State of Washington. He has dark skin and dark hair. He plans to travel to Georgia this year to visit his half-sister and her family, who live in Tucker, Georgia. Piñon has a driver's license issued by the State of Washington, which is the only form of identification he carries when he travels. Piñon has been stopped by police in the past because, he believes, he looks Latino. He is worried that if he travels to Georgia to visit his sister, he will be stopped by police and detained because his Washington driver's license will not be accepted as proof that he is a U.S. citizen and because, due to his skin color and accent, officers will not believe that he is a U.S. citizen. If HB 87 goes into effect, he will be more afraid

to travel in Georgia.  When he visits his sister they will stay inside her home more than they would have before HB 87 to avoid encounter law enforcement officers.

53.    Plaintiff **John Doe #1**, now 19 years old, has been in the United States since he was a young child.  He is a Mexican national who was brought to the United States by his parents when he was about nine years old.  He is a high school graduate who, while in high school, was a member of the Junior Reserve Officers' Training Corps (JROTC) and vice-president of his senior class.  Although he applied to and was accepted at Kennesaw State University, he could not matriculate because he could not afford the tuition and did not qualify for loans or grants because of his immigration status.  Nonetheless, his goal remains to eventually attend college.  If HB 87 goes into effect, John Doe #1 will be afraid to leave his home and participate in community activities as he would otherwise, because of the increased risk that he will be subject to racial profiling.  He has been subject to racial profiling in the past and, because of his dark skin and dark hair, fears that HB 87 will open the door to additional encounters where he is racially profiled.  If HB 87 goes into effect, he will be very afraid to interact with the police, even if he is the victim of or witness to a crime, and he would likely not call the police for fear of being arrested because of his immigration status.

54.     John Doe #1 does not possess any of the documents HB 87 requires as

proof of identification, and his only photo ID is a consular identification card

("matricula") issued by the Mexican Consulate. John Doe #1 has used the

matricula in the past to visit the State Capitol building and would like to continue

doing so in the future, but believes that HB 87 will cause public places to refuse

the matricula as a valid form of ID. Likewise, although his mother and sister have

used their matriculas to establish their parental identity when obtaining Women

Infant and Children ("WIC") services for their U.S. citizen children, he worries

that if HB 87 takes effect, they will no longer be able to access these services,

which in turn will adversely affect the health and well-being of his family

members.

55.     Plaintiff **John Doe #2**, a Mexican national, has lived in Georgia for years

and considers this state his home. He speaks limited English. If HB 87 takes

effect, it will harm John Doe #2 in a number of ways. For example, John Doe #2

does not possess any of the documents required by HB 87 and he is very afraid of

encountering local and state law enforcement officers after HB 87 takes effect. He

has been a victim of racial profiling in the past and now drives as little as possible

because he fears encounters with law enforcement officers. For transportation, he

now relies on his bicycle, walking, or asking friends for car rides. But if HB 87 is

implemented, John Doe #2 fears that officers will stop him even while he is riding his bicycle or walking and subject him to an immigration status check. As a result, if HB 87 takes effect, John Doe #2 plans to stay in his house as much as possible and give up on daily activities, such as walking in the park.  If HB 87 takes effect, John Doe #2 also will have difficulty convincing his friends to give him rides to the grocery store because they will be subject to criminal liability for transporting him.  In addition, John Doe #2 has been robbed several times in the past.  While he has reported these incidents to the police, he may not do so if HB 87 is implemented because he is fearful of getting arrested for lacking the documents required by HB 87.

56.     If HB 87 takes effect, John Doe #2 will also be harmed because he will be prohibited from relying on the matricula consular issued to him by the Mexican government.  John Doe #2 currently uses the matricula consular for identification on a regular basis.  For example, he has used the matricula to open accounts at City Hall for water and electricity service to his home; to seek police assistance when he was the victim of robberies; and for identification at a hospital in Rome.  If HB 87 is implemented, John Doe #2 will not be able to use his matricula consular for these and other official purposes.

57.     Plaintiff **Jane Doe #2**, a Mexican national, is a twenty-three year old Georgia resident. She came to the United States with her parents about twelve years ago. She graduated high school and college in Georgia. About two years ago, she was pulled over by police for a traffic infraction and charged with driving without a license, and then transferred to an Immigration and Customs Enforcement (ICE) detention center and detained for more than a month while awaiting removal from the United States. She was granted deferred action until May 2011. Her deferred action grant has subsequently been extended until May 2012, but she has no paperwork documenting this extension.

58.     When Jane Doe #2 first obtained deferred action, she applied for and obtained a Georgia driver's license. That license expired in May 2011, when her first grant of deferred action ended. Currently, Jane Doe #2 does not have any of the identity documents required by HB 87, nor does ICE issue identity cards or documents to those granted deferred action. Jane Doe #2 cannot apply for a Georgia driver's license now because she has no paperwork to demonstrate to the State of Georgia that she is permitted to remain in the United States. Jane Doe #2 is currently seeking federal work authorization, but that will not be granted for months. Once that is granted, Jane Doe #2 intends to apply for a Georgia's driver's license using her work authorization as proof of federal permission to

remain in the United States.  In the interim period of time, Jane Doe #2 does not have and cannot obtain any of the identity documents required by HB 87.

59.   If HB 87 goes into effect while she lacks a driver's license or other Georgia-issued ID, Jane Doe #2 will be at high risk of detention for immigration status investigation.  Even if she is able to obtain a Georgia driver's license, she will limit her driving to avoid encounters with the police.  In addition, she will avoid interacting with law enforcement officers, even if she is the victim of or witness to a crime for fear of being arrested because of her immigration status.  She will avoid police contact in these circumstances even though she knows that doing so may lead to an increase in crime in the community.

60.   Plaintiff **David Kennedy** is an immigration lawyer in Gainesville, Georgia.  He frequently meets with and gives legal advice to individuals who are undocumented and/or who have violated their immigration status.  He also occasionally drives these individuals to immigration court hearings, and has on some of these occasions exceeded the speed limit or failed to use his blinker properly.  If HB 87 takes effect, Kennedy will be subject to arrest and criminal liability for providing legal advice to his clients and for harboring, transporting, and inducing or enticing them to enter Georgia.

## Defendants

37

61.     Defendant Nathan Deal is the Governor of Georgia.  According to the Georgia Constitution, "[t]he chief executive powers" are "vested in the Governor." Ga. Const. art. 5 § 2, ¶ 1.  Under Georgia law, the Governor "shall provide for the defense of any action . . . the result of which is of interest to the state because of any claim inconsistent with the state's sovereignty, jurisdiction, or rights." O.C.G.A. § 45-12-26.  As such, Defendant Deal is responsible for the enforcement of HB 87 in the State of Georgia and is an appropriate defendant in this case. Defendant Deal is sued in his official capacity.

62.     Defendant Samuel S. Olens is the Attorney General of Georgia. According to the Georgia Constitution, the Attorney General is "the legal advisor of the executive department" and "shall perform such . . . duties as shall be required by law."  Ga. Const. art. 5, § 3, ¶ IV; *see also* O.C.G.A. § 45-15-3 (detailing Attorney General's powers and duties).  As such, Defendant Olens is responsible for the enforcement of HB 87 in the State of Georgia and is an appropriate defendant in this case.  Defendant Olens is sued in his official capacity.

63.     Defendant Clyde L. Reese, III is the Commissioner of the Georgia Department of Human Services.  In this role, Mr. Reese oversees public assistance programs, including the Food Stamp program in Georgia.  Defendant Reese is responsible for implementing and enforcing provisions of HB 87 related to public

benefits provided through the Georgia Department of Human Services.  Defendant

Reese is sued in his official capacity.

64.     Defendant Mike Beatty is the Commissioner of the Georgia Department

of Community Affairs.  The Georgia Department of Community Affairs

administers the Housing Choice Voucher Program.  This is a tenant-based

assistance program that assists low income individuals and families to rent safe,

decent, and sanitary dwelling units in the private rental market.  The program was

created by the Housing and Community Development Act of 1974 and is funded

by the United States Department of Housing and Urban Development (HUD).

Defendant Beatty is responsible for implementing and enforcing provisions of

HB87 related to public benefits provided through the Georgia Department of

Community Affairs.  Defendant Beatty is sued in his official capacity.

65.     Defendant Falecia Stewart is the Executive Director of the Housing

Authority of Fulton County, Georgia.  Defendant Stewart is responsible for

overseeing the operations of the Housing Authority of Fulton County.  The

Housing Authority of Fulton County administers vouchers under the Housing

Choice Voucher Program.  This is a tenant-based assistance program that assists

low income individuals and families to rent safe, decent, and sanitary dwelling

units in the private rental market.  The program was created by the Housing and

Community Development Act of 1974 and is funded by the United States Department of Housing and Urban Development (HUD). The Housing Authority of Fulton County also provides project-based public housing. Defendant Stewart is responsible for implementing and enforcing provisions of HB87 related to public benefits provided through the Housing Authority of Fulton County. Defendant Stewart is sued in her official capacity.

## FACTS

### History and Intent of HB 87

66.     On April 14, 2011, the Georgia General Assembly enacted HB 87, a comprehensive law that touches numerous aspects of immigration regulation. The full text of HB 87 is attached hereto as Exhibit A.

67.     In enacting HB 87, Georgia legislated in an area committed exclusively to the federal government under the U.S. Constitution.

68.     Indeed, Georgia expressly intended not only to intrude into an area of exclusive federal control, but to supplant the federal government in key respects.

69.     The legislative record makes clear that a primary motivating factor in passing this law was the Georgia General Assembly's disagreement with federal immigration policy.

70.     In September 2010, Lieutenant Governor Casey Cagle and House Speaker David Ralston announced the creation of the "Special Joint Committee on Immigration Reform," a 14-member committee co-chaired by Representative Matt Ramsey and Senator Jack Murphy to draft legislation to "stem[] the flow of illegal immigration activity in Georgia." Speaker Ralston noted that the committee was "inspired by the federal government's continued failure to deal with the problem of illegal immigration and its drain on taxpayer resources in Georgia," and sought to "pick[] up where Washington D.C. has let us down." Press Release, Office of the Lieutenant Governor Casey Cagle, Speaker Ralston and Lt. Gov. Cagle Announce the Creation of the Special Joint Committee on Immigration Reform (Sept. 29, 2010) (available at http://www.georgia.gov/00/press/detail/0,2668,2199618_13010734I_163595867,00.html)

71.     During the debate, multiple legislators expressly stated that they intended for the State of Georgia to wrest control over immigration regulation away from the federal government. For example, Senator Renee Unterman remarked that, with respect to comprehensive immigration regulation, "[u]nfortunately the federal government won't step up to the plate; the states are having to do it." Debate on HB 87 Before the Senate (April 14, 2011) (remarks of Sen. Renee Unterman). Similarly, Representative Matt Ramsey commented: "If we want to effectively

address illegal immigration we can't wait for our federal government to act –we've

got to do it ourselves." Debate on HB 87 Before the House (Mar. 3, 2011)

(remarks of Rep. Matt Ramsey).  Representative Rich Golick also explained that:

"where Congress fails it is inevitable.  It is *inevitable* that states will step into the

breach and lead." Debate on HB 87 Before the House (Mar. 3, 2011) (remarks of

Rep. Rich Golick).  Representative Wendell Willard, the Chair of the House

Judiciary Committee, likewise remarked, "[O]ur federal government has failed on

the issue [of immigration]. . . . it's a federal versus state issue.  When the federal

government displays its inertia over the course of time, states notice that and states

act." Debate on HB 87 Before the H. Comm. on the Judiciary (Feb. 8, 2011)

(remarks of Rep. Wendell Willard).  Representative Willard continued: "Doing

nothing is not an option.  And relying to our detriment on a federal government

that is not going to do anything anytime soon is not a realistic alternative. . . .

[W]hen we hear someone say it's a federal issue, let the federal government do it,

that's really just a euphemism for do nothing.  And that's not an option." *Id.*

Senator Seth Harp also commented:

> [I]f you look at the US Constitution there are precious few things that
> our federal government is supposed to do, but one of the things it is
> expressly commanded to do, is to secure our borders and provide for a
> common defense, and I submit to you, Ladies and Gentlemen of the
> Senate, that the federal government has failed miserably in that
> constitutional obligation it has abdicated its responsibility, they have

walked off the job, and so what are we supposed to do? We're
supposed to just throw up our hands and say "Well, the federal
government is not exercising its responsibilities, so we are just going
to suffer the consequences." At a certain point, you have to take
action, and that's what happened in Arizona. . . . we are not doing
anything but enforcing the federal law on the books that the federal
government refuses to enforce, . . . and that is what this debate is
about. . . . There is no question in my mind that adoption of this
legislation is going to address in a meaningful way, the very serious
problem of illegal immigration in the State of Georgia.

Debate on HB 87 Before the Senate (Apr. 14, 2011) (remarks of Sen. Seth Harp).

Senator Harp was apparently referring to Arizona's SB 1070, the major parts of

which have never gone into effect because they have been enjoined by the federal

courts. *United States v. Arizona*, __ F.3d __, 2011 WL 1346945, at *4-*10, *15-

*19 (9th Cir. Apr. 11, 2011), *aff'g* 703 F. Supp. 2d 980 (D. Ariz. 2010).

72.    Contrary to long-settled law about the federal government's exclusive

role in regulating immigration, multiple legislators expressed the view that the

State of Georgia should regulate immigration on its own without any role, or only a

limited role, for the federal government. For example, Representative Bobby

Franklin remarked: "I don't see anything in the United States Constitution where

the states authorize the federal government to have any policy on immigration.

Which would mean under the Tenth Amendment that immigration is reserved to

the states. Wouldn't you agree, then, that immigration is a state issue, not a federal

issue?" Debate on HB 87 Before the H. Comm. on the Judiciary (Feb. 8, 2011)

(remarks of Rep. Bobby Franklin). Likewise, Representative Ed Setzler commented: "we as a state legislature have to make sure we're closing loopholes and gaps [in federal law] . . . . there are elements in the immigration debate that are specifically state issues that the federal government alone can't handle without some involvement by the legislature." Debate on HB 87 Before the H. Comm. on the Judiciary (Feb. 8, 2011) (remarks of Rep. Ed Setzler).

73. Other legislators observed that HB 87 would create a "police state" in Georgia aimed at immigration enforcement in light of an alleged absence of federal action. *See, e.g.*, Debate on HB 87 Before the Senate (April 14, 2011) (remarks of Sen. Jason Carter) ("one aspect of this bill . . . [is] agreeing to put a police state in force to enforce what is undeniably a broken federal system.").

74. In short, the legislative history leaves no question that the General Assembly enacted HB 87 as a comprehensive solution to the perceived problem of the federal government's failure to regulate immigration to Georgia's liking.

75. In signing the bill, Governor Deal made clear his disapproval of the federal government's immigration policy, stating: "Today, we are taking action to uphold the rule of law. This legislation is a responsible step forward in the absence of federal action." *See* Elizabeth Llorente, *Georgia Governor Signs Strictest Immigration Law in Nation*, Fox News Latino, May 13, 2011, at http://latino.

foxnews.com/latino/politics/2011/05/13/georgia-gov-nathan-deal-expected-sign-arizona-style-law-noon-strictest-nation/#ixzz1NIZeOoUI (statement made at signing ceremony).

### **Key Provisions of HB 87**

76.    The following are some of the key features of HB 87's comprehensive state system of immigration regulation.

**Section 8**

77.    Section 8 of HB 87 authorizes Georgia peace officers to demand certain identity documents of individuals they investigate and to investigate the immigration status of those persons unable to produce such a document during many routine encounters, converting these encounters into lengthy and intrusive immigration status investigations.

78.    Section 8 effectively requires all persons in Georgia to carry one of a prescribed list of identity documents in order to avoid being detained for a prolonged period without legal justification while an officer attempts to determine his or her immigration status in the course of a routine stop or other encounter.

79.    Section 8 fundamentally changes the primary role and day-to-day operations of peace officers. Under Georgia law, peace officers—who include state and local police officers, railroad officers, transportation officers, correctional

officers, and officers affiliated with the Department of Juvenile Justice—are responsible for "enforc[ing] the criminal or traffic laws through the power of arrest and [their] duties include the preservation of public order, the protection of life and property, and the prevention, detection, or investigation of crime." O.C.G.A. § 35-8-2(8)(A). HB 87 undermines these state goals and duties by injecting civil immigration enforcement authority into every stop, detention, or arrest made by peace officers.

80.    Section 8 authorizes peace officers to demand that any person subject to "*any* investigation"—*i.e.*, a consensual encounter, stop, detention, or arrest— produce one of five enumerated types of identity documents. O.C.G.A. § 17-5-100(b) (emphasis added). Only individuals who can produce a document from this list receive a presumption of lawful status. *Id.* Individuals who cannot are subject to a verification scheme unique to Georgia that will subject numerous individuals to lengthy and intrusive immigration status investigations.

81.    The five documents enumerated in Section 8 are: (1) a so-called "secure and verifiable document" as defined in Section 19 of HB 87; (2) a valid Georgia driver's license; (3) a valid Georgia identification card; (4) a valid driver's license from an entity requiring proof of legal presence or a valid identification card issued by the federal government; or (5) a valid driver's license issued to a nonresident by

her home state or country accompanied by proof of citizenship or legal residency. O.C.G.A. §§ 17-5-100(b)(1)-(5). The statute thus excludes reliance on driver's licenses issued by states such as New Mexico and Washington that do not require such proof.

82.     In cases where a person does not have one of the five enumerated documents, he may provide "[o]ther information that is sufficient to allow the peace officer to independently identify [him]." O.C.G.A. § 17-5-100(b)(6). The law provides no guidance whatsoever on what that "other information" might be and thus no direction for Georgia law enforcement officers charged with enforcing it.

83.     Where a person cannot provide an enumerated document or sufficient "other information," Section 8 authorizes the officer to "determine [the person's] immigration status" by "any reasonable means available," including by relying on: (1) a "federal identification data base"; (2) "[i]dentification methods authorized by federal law"; (3) electronic fingerprint readers or "similar devices"; or (4) "[c]ontacting an appropriate federal agency." O.C.G.A. § 17-5-100(c).

84.     HB 87 authorizes this immigration status investigation when an "officer has probable cause to believe that a suspect has committed a criminal violation." O.C.G.A. § 17-5-100(b) (emphasis added). This includes a wide range of

individuals, including a motorist pulled over for a possible traffic ticket (a Class C misdemeanor), or a child in the custody of the Department of Juvenile Justice who throws a significant tantrum (*e.g.*, involving hitting, a Class C misdemeanor).  In each of these instances, HB 87 authorizes immigration status investigations.

85.     The immigration status verification process authorized by HB 87 will greatly prolong ordinary police stops.

86.     The federal government takes over 80 minutes on average to respond to immigration status queries from state and local police—under the best case scenario.  If a manual file review is required in response to an inquiry on an individual, this process can take over two days.  During this time, the civilian would be detained by state or local law enforcement officers, and denied access to bond or release from custody.

87.     If HB 87 goes into effect, many ordinary police encounters will be extended beyond constitutional bounds while police officers investigate immigration status.

88.     For example, peace officers throughout Georgia regularly issue citations for minor offenses such as traffic offenses.  Issuing these citations is a quick process, taking only a matter of minutes, on average.  But these traffic citations constitute criminal violations under Georgia law and open the door to immigration

investigations under section 17-5-100(b) and (c).  Those investigations would substantially prolong detentions for the individuals being investigated.

89.    Immigration status queries also impose a substantial burden on federal authorities, who will be required to respond to an enormous increase in the number of immigration status inquiries because of HB 87 and will have less ability to prioritize among their tasks according to federal regulations and policies.

90.    Moreover, HB 87 opens the door to racial profiling in at least two ways. First, the law authorizes an officer to determine the immigration status of an individual who is unable to provide one of the five identity documents.  O.C.G.A. § 17-5-100(b).  However, the law leaves it entirely up to an officer's individual discretion when to verify the immigration status of a person who is unable to provide one of those identity documents.  This unrestricted discretion systematically ensures that individual officers will engage in discrimination in determining whose immigration status to check based on an individual's appearance, language choice, or English-language ability.

91.    Second, HB 87 invites racial profiling by permitting officers to consider so-called "[o]ther information" that is "sufficient" to establish an individual's identity.  O.C.G.A. § 17-5-100(b)(6).  But the law fails to enumerate any criteria for what "sufficient" "other information" might be.  That determination is also left

entirely to an officer's discretion and increases the likelihood that an officer will engage in discrimination in determining whose "other information" is not "sufficient" based on an individual's appearance, language choice, or English-language ability.

92.   HB 87 also authorizes peace officers to arrest and detain individuals solely on the basis that they are suspected to be in violation of federal civil immigration laws.  Section 8 provides that "[i]f . . . a peace officer receives verification that [a] suspect is an illegal alien" during an investigation into his immigration status also provided for under this section, "such peace officer may take any action authorized by state and federal law, including . . . detaining such suspected illegal alien."  O.C.G.A. § 17-5-100(e).

93.   Peace officers throughout Georgia face institutional pressure to enforce all laws to the fullest extent possible.

94.   Under HB 87, numerous peace officers will be compelled to exercise their authority to carry out immigration status checks during routine encounters with civilians, even for minor offenses such as traffic violations.

95.   HB 87 is designed to and will in fact result in peace officers detaining individuals for the purpose of carrying out immigration status checks where they otherwise would not have done so.

96.    Notably, HB 87's immigration investigation and arrest provisions suffer from the same constitutional defects as provisions in Arizona and Utah's similar immigration laws, which have been preliminarily enjoined by the federal district court in Arizona and the Ninth Circuit, and temporarily enjoined by the federal district court in Utah, respectively. *United States v. Arizona*, 703 F. Supp. 2d 980, 1006 (D. Ariz. 2010), *aff'd*, __ F.3d __, 2011 WL 1346945, at * 4-*10, *15-*19 (9th Cir. Apr. 11, 2011); *Utah Coalition of La Raza v. Herbert*, No. 11-cv-401, slip op. (D. Utah May 11, 2011).

**Section 7**

97.    In Section 7, HB 87 creates new state law crimes that penalize, with fines and/or imprisonment, "transporting or moving an illegal alien," O.C.G.A. § 16-11-200; "concealing or harboring an illegal alien," § 16-11-201; and "inducing an illegal alien to enter into this state," § 16-11-202.

98.    Federal law already establishes penalties for transporting and harboring illegal aliens, and inducing illegal aliens to enter the United States. 8 U.S.C. § 1324(a). Moreover, federal and state law already grants Georgia law enforcement officers explicit authority to arrest anyone who violates these federal provisions. 8 U.S.C. § 1324(c); Ga. Code § 35-1-16(d).

99.    Georgia passed its own version of these provisions in HB 87 precisely to bypass the federal government's prosecutorial and adjudicatory processes for these federal crimes and impose its own views in these areas.

100.   The new state immigration crimes created by HB 87 criminalize routine behavior undertaken on a daily basis by U.S. citizens and those with legal status in Georgia.  Because of HB 87, Georgians—such as Plaintiffs Bridges, Kennedy, Speight, Howe, Edwards, Gruner, and Jane Doe #1—who give a lift to a neighbor, a client, or fellow congregant or invite a friend or family member to visit from out of state, are subject to prosecution, fines, and incarceration if state authorities decide that they knew the other person was an "illegal alien" within the meaning of the Georgia criminal code.

**Section 17**

101.   Section 17 of HB 87 limits public benefits to those individuals able to provide a "secure and verifiable" identity document appearing on a list to be specified and posted by the Attorney General.  Ga. Ann. Code § 36-50-1(e).  But countless Georgians—both U.S. citizens and non-citizens with permission from the federal government to remain in the United States—who need and are entitled to receive public benefits in Georgia will  not have a qualifying identity document. Low-income citizens disproportionately lack identity documentation, including

these qualifying identity documents.  For example, among non-citizens, many victims of abuse petitioning for immigration relief under the federal Violence Against Women Act, victims of human trafficking, individuals granted withholding of deportation or removal, or Cuban or Haitian entrants will not have a qualifying identity document.

102.   If implemented, HB 87 will force numerous Georgians to be deprived of critical public benefits erroneously.  These deprivations will force individuals and families, including those with young children, to be without food and shelter.

**Section 19**

103.   Section 19 of HB 87 creates the "Secure and Verifiable Identity Document Act."

104.   Section 19 defines certain documents as "Secure and verifiable document[s]."  The definition of "secure and verifiable document" specifically excludes "a Matricula Consular de Alta Seguridad, matricula consular card, consular matriculation card, consular identification card, or similar identification card issued by a foreign government regardless of the holder's immigration status" (hereafter "consular identification cards" or "matriculas").

105.   Consular identification cards are issued by foreign governments as a way to provide their nationals a secure and verifiable form of identification.

106.   Section 19 criminalizes using a consular identification card for "any official purpose." O.C.G.A. 50-36-2(d).  It provides that, "[u]nless required by federal law, on or after January 1, 2012, no agency or political subdivision shall accept, rely upon, or utilize an identification document for any official purpose that requires the presentation of identification . . . unless it is a secure and verifiable document." *Id.*

107.   The section exempts certain persons from liability for the acceptance of documents not considered to be "secure and verifiable," including "[a]n attorney or his or her employees for the purpose of representing a *criminal defendant*." *Id.* (emphasis added).

108.   Under this provision, countless Georgians—including security guards, immigration lawyers, school officials, and public workers—risk criminal liability for allowing a person to use a consular identification card to identify herself, even if she is in the country lawfully.

### Comprehensive Federal Immigration System

109.   The federal government has exclusive power over immigration matters. The U.S. Constitution grants the federal government the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3.  In addition, the

Supreme Court has held that the federal government's power to control immigration is inherent in the nation's sovereignty.

110. Congress has created a comprehensive system of federal laws regulating and enforcing immigration in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 *et seq.*

111. The extensive statutory scheme created by the INA leaves no room for supplemental state immigration laws.

112. The federal government has also issued numerous regulations, policies, and procedures interpreting the provisions of the INA and has established large and complex administrative apparatuses to carry out its mandate.

113. The INA carefully calibrates the nature (criminal or civil) and degree of penalties applicable to each possible violation of its terms.

114. The INA contains complex and exclusive procedures for determining immigration and citizenship status, deciding whether the civil provisions of the immigration laws have been violated, and determining whether an individual may lawfully be removed from the United States.

115. Under the INA, a non-citizen's immigration status commonly may be subject to change over time. A non-citizen who enters the United States with authorization, with a student visa for example, may remain in the country past his

period of authorized stay and thus no longer be in status. (Alternatively, he may overstay his original visa yet remain in status, for example, if he is eligible to change into a different visa classification.) Conversely, a non-citizen who enters the United States without authorization, for example by crossing into the country by foot while evading border authorities, may subsequently gain lawful status, such as through a successful asylum application or U-visa application.

116.   The fluidity of immigration status is a fundamental feature of federal immigration law; it is a direct and unavoidable consequence of the system of immigration regulation that Congress has prescribed to accommodate many important national interests including, for example, the nation's humanitarian and international-law obligations regarding asylum seekers.

117.   Under federal law, there is no single, readily ascertainable category or characteristic that establishes whether a particular person may or may not remain in the United States. The answer to that question is a legal conclusion that can only be reached through the processes set forth in the INA and may depend on the discretionary determinations of federal officials.

118.   There are many non-citizens who are present in the United States without formal permission who would not be removed if placed in federal removal proceedings or who actually have temporary permission from the federal

government to be in the United States. For example, an individual without federal

immigration status may be eligible for a form of immigration relief, such as

asylum, adjustment of status, or withholding of removal. Some of these

individuals are known to the federal government; others will not be identified until

they are actually placed in proceedings by the federal government and their cases

are adjudicated. In addition, some individuals, such as those granted Temporary

Protected Status due to turmoil or natural disasters in their native countries, have

permission to be in the United States, but are unlikely to have one of the

enumerated identity documents under HB 87.

119. The fact that some persons have permission to remain in the United

States without having a formal immigration status or despite being technically

removable is also a fundamental feature of federal immigration law and the system

of immigration regulation that Congress has prescribed. It accommodates many

important national interests including, for example, Congress's desire to allow

certain individuals to obtain relief from removal, and statutory limits on the

detention of individuals ordered removed, *see Zadvydas v. Davis*, 533 U.S. 678

(2001).

120. Given these complexities, federal agencies do not and cannot determine

definitively, in response to a demand from a state or local official, whether an

individual is subject to removal.  *Cf.* O.C.G.A. § 17-5-100(e).  And, it is equally

impossible to make a determination of whether an individual is lawfully able to

remain in the United States based upon a search of the federal databases that are

checked for an immigration status query.  Such determinations involve complex

questions of fact and law and are made through a federal administrative and

judicial process that may take years.  Moreover, the federal government often

exercises its prosecutorial discretion not to pursue removal in order to prioritize

certain cases for action.  At best, federal agencies can respond to a query with a

snapshot of what they believe to be an individual's current immigration status,

which may not correspond to the ultimate finding on whether she is subject to

removal.  Thus, not all inquiries to the federal government regarding immigration

status yield a clear response.  Pls.' Mot. for Prelim. Inj., Ex. 3, *U.S. v. Arizona*, No.

10-1413 (D. Ariz., July 7, 2010).

121.   As of June 2010, inquiries into the federal database took an average of 81

minutes to process and in some cases took two days or more when a review on an

individual's file was required.  *Id.*

122.   Furthermore, determining whether a person is a citizen of the United

States can be a complex and counterintuitive process.  U.S. citizens are not

required to carry documentary proof of their citizenship.  There is no national

database that contains information about every U.S. citizen. Some people are actually unaware of their U.S. citizenship because they may have acquired U.S. citizenship at birth by operation of law due to their parents' citizenship, despite not being born in the United States. *See, e.g.*, 8 U.S.C. § 1433. Others obtain citizenship automatically when their parents become naturalized U.S. citizens. *See, e.g.*, 8 U.S.C. § 1431.

123. HB 87's creation of a state immigration system fundamentally conflicts with the INA's statutory scheme, impermissibly encroaches on the federal government's exclusive power to regulate immigration, and will lead to erroneous determinations and unlawful detention by state and local officials.

124. Moreover, HB 87 conflicts with and is preempted by provisions of the INA that set forth comprehensive federal schemes addressing the participation of state and local law enforcement in immigration enforcement.

125. Mere presence inside the United States without federal immigration status is not a criminal offense. Rather, it is a civil violation under federal immigration law.

126. State and local law enforcement officers have no general authority to enforce federal civil immigration law. Federal law specifically authorizes state officers to assist in immigration enforcement only in narrowly defined

circumstances, and otherwise reserves immigration enforcement authority to the federal government.

127. Section 1357(g) of Title 8 of the U.S. Code allows the federal government to "enter into a written agreement with a State, or any political subdivision" to carry out "function[s] of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g). These agreements are commonly referred to as "287(g) agreements" after the section of the INA in which they are codified. Such agreements, however, may be entered into only if the federal government determines the state officers are "qualified to perform a function of an immigration officer," *id.*, and the federal government must train and supervise each officer who is authorized under such an agreement. Currently, only 4 of Georgia's 159 counties—the Cobb County Sheriff's Office, the Gwinnett County Sheriff's Office, the Hall County Sheriff's Office, and the Whitfield County Sheriff's Office—have agreements pursuant to this statutory provision, as does the Georgia Department of Public Safety. *See* U.S. Immigration and Customs Enforcement, Fact Sheet: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act.

128. HB 87 violates the U.S. Constitution by granting state and local law enforcement officers authority to make immigration determinations, civil arrests,

and investigations without and outside of the authority provided by a 287(g) agreement.  In addition, two of the four counties in Georgia with current 287(g) agreements limit state officers to making immigration status inquiries of individuals who are already in local jails.  HB 87's provisions authorizing immigration status investigation and determination by all law enforcement officials in the field conflicts with the limited manner in which the federal government has allowed Georgia law enforcement agencies to engage in the enforcement of federal immigration law.

129.   The other provisions in federal law authorizing state or local participation in immigration enforcement are also carefully constrained.  Federal immigration statutes expressly authorize state and local police to make arrests for exactly two immigration crimes—smuggling, transporting, or harboring criminal aliens, and illegal entry by a previously deported felon.  8 U.S.C. §§ 1324(c), 1252c.  Another provision, 8 U.S.C. § 1103(a)(10), allows the U.S. Attorney General to authorize "any State or local law enforcement officer" to enforce immigration laws upon certification of "an actual or imminent mass influx of aliens," but no such certification has ever occurred.

Case 1:11-cv-01804-TWT   Document 1   Filed 06/02/11   Page 62 of 82

130.   Congress's intent that state and local officers are generally prohibited from enforcing civil immigration laws is clear both from the statutory scheme and from the statements of its members.

## Federal Law on Public Benefits

131.   Federal law governs the rules and procedures for verifying eligibility for federally funded food stamps and federally subsidized housing.

132.   Federal law governing food stamps (the Supplemental Nutrition Assistance Program, "SNAP"), for example, mandates that states accept any documents that reasonably establish an applicant's identity.  7 C.F.R. § 273.2(f)(1)(vii), implementing 7 U.S.C. § 2020(e)(3).  The federal regulations prohibit the state from requiring any specific document as verification of identity. *Id.*  Where documentary evidence is unavailable, the federal rules allow a collateral contact communication between the SNAP agency and a third party that can reasonably be relied upon to verify identity.  *Id.*  This flexibility enables the country's most vulnerable citizens—including those who due to homelessness, disability, or incapacity, or to having fled domestic violence, may lack the most secure or reliable forms of identity documentation—to participate in a program that prevents hunger.

62

133.   Federal laws governing federally subsidized housing programs do not mandate inspection of identification documents, but require that state and local agencies administering programs obtain and verify the Social Security Number (SSN) of citizens and immigrants who assert an eligible status.  42 U.S.C. § 3543; 24 C.F.R. § 5.216.  Verification of the applicant's SSN is independent from the verification of citizenship or immigration status and serves multiple purposes, including establishing identity.  States may not impose an additional eligibility requirement for these programs that is not authorized by, and is inconsistent with, federal rules.

134.   In addition, federal housing law prohibits the imposition of any liability upon state and local government officials for implementing the federal system governing immigrant eligibility for housing in a manner consistent with the rules and regulations of the Department of Housing and Urban Development.  42 U.S.C. § 1436a(f)(1); 24 C.F.R. § 5.526.  This verification system does not include an independent identity document requirement.  The civil and criminal sanctions established by Section 18 directly conflict with these federal regulations and the federal government's goal of ensuring access to the federal benefits for all eligible persons.

## HB 87 Interferes with the Federal Government's Interests in a Uniform Immigration System and Adversely Affects Foreign Relations

135.  HB 87 interferes with the federal government's interests in setting a uniform federal immigration scheme, as well as in conducting foreign relations with other nations.

136.  As noted *supra*, the President of the United States directly criticized HB 87 on this basis on April 26, 2011.

137.  Georgia's immigration scheme will undermine federal immigration enforcement priorities by subjecting countless individuals in Georgia to detention and referral to federal immigration officials without regard for whether they would fit within federal immigration enforcement priorities.

138.  In addition, because immigration policy is inextricably intertwined with foreign relations, Georgia's attempt to regulate immigration through HB 87 will have an adverse impact on the United States' ability to conduct foreign relations. HB 87 will undermine the ability of the U.S. government to speak with a single voice about immigration, including communicating to foreign nations what their nationals can expect when they come to visit or reside in the United States.  State attempts to interfere with these inherently federal issues can have severe impacts on foreign relations.

64

139.   Indeed, HB 87 has already affected the foreign relations of the United States' foreign relations by upsetting a key ally.  The Consul General of Mexico in Atlanta has publicly and forcefully criticized HB 87 twice: on March 4, 2011, just after the House of Representatives passed an earlier version of the bill, and on April 15, 2011, when HB 87 passed the Senate.  In the latter statement, the Consul General expressed his concern that HB 87 "could have negative consequences on the human and civil rights of Mexican nationals living in [Georgia] . . . ."  Press Release, Consulate General of Mexico in Atlanta reiterates its concern over the approval of an immigration bill in Georgia (Apr. 15, 2011).

### HB 87 Promotes Racial Profiling and Endangers Georgians

140.   HB 87 promotes an environment of rampant racial profiling by state and local law enforcement officials.  The law leaves immigration status investigation to the discretion of individual officers.  As a result, law enforcement officers will make decisions about whether to investigate a person's immigration status based on the way she looks or speaks.  Law enforcement officers will investigate the immigration status of individuals they believe look or sound foreign.

141.   Law enforcement officials across the country have stated that HB 87 cannot be implemented in a race-neutral fashion and will inevitably lead law enforcement officers to rely inappropriately on race, ethnicity, and English-

language ability in making decisions about whom to subject to additional scrutiny with questions regarding their immigration status.

142.   Implementation of HB 87 will have a significant negative impact on the ability of local law enforcement officers to protect immigrant communities and mixed-immigration status communities and families, *i.e.*, those that include individuals with and without legal status.  Because immigrants will avoid the police out of fear that any interaction could lead to immigration status inquiries, Georgia law enforcement officers will not get the assistance they need to prosecute crimes.

## **Consular Identification Documents**

143.   Consular identification documents ("CIDs") are issued by governments around the globe.  These CIDs serve several important purposes including providing expedient means for local law enforcement to identify individuals as well as helping facilitate nations' obligations under the Vienna Convention on Consular Relations, to which the United States is a signatory.

144.   Under the Vienna Convention, a foreign national arrested or detained in the United States must be notified of their detention without delay.  *See* Vienna Convention on Consular Relations, art. 36, Apr. 24, 1963, [1970] 21 U.S.T. 77, T.I.A.S. No. 6820.

145.   The U.S. State Department has recognized the utility of CIDs in the facilitation of its treaty obligations under the Vienna Convention. *See* Hearing on the Federal Government's Response to Consular Identification Cards Before the House Subcommittee on Immigration, Border Security, and Claims, House Committee on the Judiciary, 108th Cong. 44-45, at 114 (Jun. 26, 2003) (statement of Roberta Jacobson) (available at: http://commdocs.house.gov/committees/judiciary/hju87813.000/hju87813_0f.htm (last visited May 24, 2011)).

146.   CIDs are also widely used for identification purposes with financial institutions, law enforcement agencies, and state and local governments in the United States.

147.   There have been over 200,600 CIDs issued by the consulate of Mexico in Georgia since 2006.

148.   Mexican law and regulations outline a detailed process for the issuance of these CIDs, which are referred to as "matriculas." These Mexican CIDs may only issue after an individual has produced an official Mexican identity document; a Mexican birth certificate or another official document establishing their Mexican nationality; and documentation of their residence in a particular area of the United States. These documents may not be issued by mail, but must be issued in-person by Mexican consular officials. Applicants for Mexican CIDs are also

photographed and fingerprinted and all of the documents used to establish their

eligibility for a consular ID are scanned and stored in a central database by the

Mexican government. In addition, the card itself has several security features

making the CID very difficult to forge. First, these CIDs expire within five years

of issuance. Second, the card has several physical features making it difficult to

forge, including a photo of the cardholder, the cardholder's signature, a unique bar

code, optical character recognition, and an ultraviolet logo. Finally, local law

enforcement officials are able to scan and verify the contents on the Mexican CID

when they stop cardholders in the field.

149. CIDs have routinely been accepted as proof of identification in a wide

range of public settings in Georgia. For example, parents enrolling children in

Georgia public schools must present photo identification and CIDs have been

widely accepted for this purpose. Similarly, admission to state buildings such as

the State Capitol requires presentation of photo identification, and CIDs have

routinely been accepted.

## CLASS ACTION

150. The Individual Plaintiffs bring this action on behalf of themselves and all

other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a)

and 23(b)(2). The class, as proposed by Plaintiffs, consists of all persons:

(a)     who as a result of their race, national origin, customary

language, accent, or lack of enumerated identity documents are

or will be subject to investigation of their citizenship or

immigration status pursuant to the provisions of HB 87; or

(b)     who are or will be deterred from living, associating, or

traveling with immigrants in Georgia because of the provisions

of HB 87; or

(c)     who are or will be deterred from traveling into or

through the State of Georgia because of the provisions of HB

87; or

(d)     who will be unable to secure public benefits for which

they are otherwise eligible, due to the qualifying identity

document provisions of HB 87; or

(e)     who are or will be barred from using their validly issued

consular identification documents for any official purpose

where identification is required because of the provisions of HB

87.

151.   The requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2) are met here, in that the class is so numerous that joinder of all members is impracticable.

152.   There are questions of law and fact common to the proposed class, including: (1) whether HB 87 is preempted by the U.S. Constitution and federal law; (2) whether HB 87 violates the Fourth Amendment of the U.S. Constitution; (3) whether HB 87 infringes on the Right to Travel of members of the proposed class; (4) whether HB 87 violates the Equal Protection clause of the U.S. constitution; (5) whether HB 87 violates the Due Process clause of the U.S. Constitution; and (6) whether HB 87 violates the separation-of-powers clause of the Georgia Constitution.  These questions predominate over any questions affecting only the Individual Plaintiffs.

153.   The claims of the Individual Plaintiffs are typical of the claims of the proposed class.

154.   All of the Individual Plaintiffs will fairly and adequately represent the interests of all members of the proposed class because they seek relief on behalf of the class as a whole and have no interests antagonistic to other members of the class.  The Individual Plaintiffs are also represented by *pro bono* counsel, including the ACLU of Georgia, the ACLU Foundation, the National Immigration

Law Center, the Southern Poverty Law Center, the Asian Law Caucus, Federal &

Hasson, LLP, Kuck Immigration Partners, LLC, and G. Brian Spears, who

collectively have extensive expertise in class action litigation, including litigation

regarding the rights of immigrants and constitutional law.  Finally, Defendants

have acted and will act on grounds generally applicable to the class in executing

their duties to enforce HB 87, thereby making appropriate final injunctive relief

with respect to the class as a whole.

## DECLARATORY AND INJUNCTIVE RELIEF

155.   An actual and substantial controversy exists between Plaintiffs and

Defendants as to their respective legal rights and duties.  Plaintiffs contend that

they face an imminent threat of harm if HB 87 is enforced, and that this law

violates the U.S. and Georgia Constitutions, federal law, and state law.  Defendants

are obligated to enforce this law unless it is found to be illegal.

156.   In violating Plaintiffs' rights under the U.S. and Georgia Constitutions,

federal law, and state law, Defendants have acted and will be acting under color of

law.

157.   If allowed to go into effect, HB 87 will cause irreparable injury to

Plaintiffs.

158.  Plaintiffs have no plain, speedy, and adequate remedy at law against HB 87 other than the relief requested in this Complaint.

159.  If HB 87 takes effect, the Plaintiffs and other individuals of color in Georgia will be subject to unlawful detention, arrest, and harassment including plaintiffs Paul Bridges, Benjamin Speight, Everitt Howe, Paul J. Edwards, Sharon Gruner, Ernesto Piñon, Jaypaul Singh, Jane Does #1 and #2, John Does #1 and #2, and members of the proposed plaintiff class.

160.  If allowed to take effect, HB 87 would also violate the rights of plaintiffs Piñon and Singh, as well as members of the proposed plaintiff class, to travel into and throughout Georgia.

161.  If allowed to take effect, HB 87 would deny the right of members of plaintiffs Georgia Latino Alliance for Human Rights, Coalition of Latino Leaders, and the Task Force for the Homeless, as well as proposed class, to federal public benefits, for which they are otherwise eligible.

162.  If allowed to take effect, HB 87 would also violate the right of plaintiffs John Does #1 and #2, and Jane Doe #2, as well as members of the proposed plaintiff class, to due process and equal protection of law.

163.  In addition, HB 87 will thwart the missions of organizational plaintiffs such as the Task Force for the Homelessness and Alterna by forcing them to divert

their resources towards assisting applicants for benefits and services in overcoming
the new identification impediment, and towards providing direct goods, such as
food and housing assistance, to individuals denied assistance.

164.   In addition, HB 87 will thwart the missions of organizational Plaintiffs
Georgia Latino Alliance for Human Rights, Service Employees International
Union, Southern Regional Joint Board of Workers' United, Alterna, Coalition of
Latino Leaders, Asian American Legal Advocacy Center, Task Force for the
Homeless, DREAM Activist.org, Instituto de Mexico, and the Coalition for the
People's Agenda by forcing them to continue to spend more time and resources on
HB 87 and immigration enforcement matters rather than other pressing
organizational priorities, and by deterring their members from participating in
membership activities.

165.   In doing the things alleged in this Complaint, Defendants will deny
Plaintiffs' rights secured by the U.S. and Georgia Constitutions, federal law, and
state law.

166.   Defendants' enforcement of HB 87 will constitute an official policy of
the state of Georgia.

167.   Plaintiffs are entitled to a declaration that HB 87 is unconstitutional on its
face and to an order preliminarily and permanently enjoining its enforcement.

## CAUSES OF ACTION

## COUNT ONE

## SUPREMACY CLAUSE; 42 U.S.C. § 1983

168.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

169.   The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

170.   HB 87 conflicts with federal laws, regulations and policies, usurps powers constitutionally vested in the federal government exclusively, attempts to legislate in fields occupied by the federal government, imposes burdens and penalties on legal residents not authorized by and contrary to federal law, and unilaterally imposes burdens on the federal government's resources and processes, each in violation of the Supremacy Clause.

171.   Plaintiffs move for relief on this claim directly under the Supremacy Clause and, as an action seeking redress of the deprivation of statutory rights under the color of state law, also under 42 U.S.C. § 1983.

## COUNT TWO

## FOURTH AMENDMENT; 42 U.S.C. § 1983

172. The foregoing allegations are repeated and incorporated as though fully set forth herein.

173. The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures." The Fourth Amendment's guarantees are applied to the States through the Fourteenth Amendment.

174. HB 87 authorizes officers to seize individuals, and prolong seizures, in violation of the Fourth Amendment.

## COUNT THREE

## PRIVILEGES AND IMMUNITIES; RIGHT TO TRAVEL; 42 U.S.C. § 1983

175. The foregoing allegations are repeated and incorporated as though fully set forth herein.

176. The Privileges and Immunities Clause of the U.S. Constitution, Article IV, Section 2, Clause 1, provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

177. Similarly, the Privileges and Immunities Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall make or

enforce any law which shall abridge the privileges or immunities of citizens of the United States."

178.   All residents in the United States enjoy a fundamental right to travel, which has also been held to derive from the Equal Protection Clause of the U.S. Constitution as well as the Commerce Clause.

179.   The constitutional right to travel prevents states from burdening, penalizing, or infringing upon the right to travel, including the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in another state, without a rational or compelling justification.

180.   HB 87 interferes with the rights of out-of-state citizens to travel freely through the State of Georgia without being detained.

## COUNT FOUR

## EQUAL PROTECTION CLAUSE; 42 U.S.C. § 1983

181.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

182.   The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

183. HB 87 impermissibly denies plaintiffs and other individuals lacking one of the preferred identity documents residing or traveling in Georgia the equal protection of the laws.

## COUNT FIVE

### DUE PROCESS CLAUSE; 42 U.S.C. § 1983

184. The foregoing allegations are repeated and incorporated as though fully set forth herein.

185. The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law."

186. HB 87 impermissibly deprives Georgia residents of personal property by rending their consular-issued identity documents useless for any official purpose for which identification is required.

187. There is no legitimate state interest justifying this property deprivation for state residents.

188. As a result, HB 87 deprives plaintiffs and other individuals who regularly use consular-issued identity documents in Georgia of due process under the law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

## COUNT SIX

### 42 U.S.C. § 1981; 42 U.S.C. § 1983

189.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

190.   Section 1981 of Title 42 of the United States Code guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property." Section 1981 also provides that all persons "shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

191.   Section 1981 of Title 42 of the United States Code prohibits discrimination on the basis of alienage, national origin, and race. Section 19 of HB 87 operates in such a manner as to deny access to governmental services and to deny the securing of governmental licenses and to deny entry into contracts with governmental entities on the basis of the national origin of the identification documentation of the presenter of such documentation. Section 7 of HB 87 impermissibly prohibits the exercise of the right of association of citizens of Georgia and the United States on the basis of the alienage of those with whom they wish to associate.

192.   HB 87 impermissibly discriminates against persons within the State of Georgia on the basis of alienage and national origin and race.

## COUNT SEVEN

## VIOLATION OF ARTICLE I, SECTION II, PARAGRAPH 3
## OF THE GEORGIA CONSTITUTION

193.   Section 19 of HB 87, which creates a new Code section, O.C.G.A. 50-36-2 purporting to provide for "Secure and Verifiable Identity Documents," establishes a criminal prohibition against persons who "knowingly accept[] identification documents that are not secure and verifiable documents.  Subsection (f) of the new criminal law delegates to the Attorney General the authority to establish and post a "list of acceptable secure and verifiable documents."  Only those documents approved and posted by the Attorney General are to be considered "secure and verifiable documents."

194.   Article I, Section II, Paragraph III of the Constitution of the State of Georgia provides that:  "The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided."

195.   Delegation of the exercise of the legislative function to define the

elements of any criminal offense to the Attorney General of the State of Georgia

constitutes an unconstitutional delegation of legislative authority.

## **PRAYER FOR RELIEF**

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs

request that the Court:

a.   Assume jurisdiction over this matter;

b.   Declare that HB 87 is unconstitutional in its entirety;

c.   Enjoin Defendants from enforcing HB 87;

d.   Grant Plaintiffs' costs of suit, and reasonable attorneys' fees and other

expenses pursuant to 28 U.S.C. § 1988; and

e.   Grant such other relief as the Court may deem appropriate.


Dated:  June 2, 2011                                Respectfully submitted,[†]

                                                    Naomi Tsu

                                                    *On behalf of Attorneys for Plaintiffs*

Linton Joaquin*                                     Omar C. Jadwat*
Karen C. Tumlin*                                    Andre Segura*
Nora A. Preciado*                                   Elora Mukherjee*
Melissa S. Keaney*                                  AMERICAN CIVIL LIBERTIES UNION

---

[†] Counsel certifies this document has been prepared in accordance with L.R. 5.1.

NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
T: (213) 639-3900
F: (213) 639-3911
*Joaquin@nilc.org*
*Tumlin@nilc.org*
*Preciado@nilc.org*
*Keaney@nilc.org*

Naomi Tsu (GSB No. 507612)
Michelle R. Lapointe (GSB No. 007080)
Daniel Werner (GSB No. 422070)
SOUTHERN POVERTY LAW CENTER
233 Peachtree St., NE, Suite 2150
Atlanta, Georgia  30303
T: (404) 521-6700
F: (404) 221-5857
*naomi.tsu@splcenter.org*
*michelle.lapointe@splcenter.org*
*daniel.werner@splcenter.org*

Mary Bauer (GSB No. 142213)
Andrew H. Turner*
Samuel Brooke*
SOUTHERN POVERTY LAW CENTER
400 Washington Ave.
Montgomery, Alabama 36104
T: (404) 956-8200
F: (404) 956-8481
*mary.bauer@splcenter.org*
*andrew.turner@splcenter.org*
*samuel.brooke@splcenter.org*

Tanya Broder*
Jonathan Blazer*
NATIONAL IMMIGRATION LAW

FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
T: (212) 549-2660
F: (212) 549-2654
*ojadwat@aclu.org*
*asegura@aclu.org*
*emukherjee@aclu.org*

Cecilia D. Wang*
Katherine Desormeau*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
T: (415) 343-0775
F: (415) 395-0950
*cwang@aclu.org*
*kdesormeau@aclu.org*

Chara Fisher Jackson (GSB No. 386101)
Azadeh N. Shahshahani (GSB No.
509008)
ACLU OF GEORGIA
1900 The Exchange, Suite 425
Atlanta, Georgia  30339
T: (770) 303-8111
*cfjackson@acluga.org*
*ashahshahani@acluga.org*

G. Brian Spears  (GSB No. 670112)
1126 Ponce de Leon Ave., N.E.
Atlanta, Georgia 30306

CENTER
405 14th Street, Suite 1400
Oakland, California 94612
T: (510) 663-8282
F: (510) 663-2028
*Broder@nilc.org*
*Blazer@nilc.org*

Sin Yen Ling*
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, California 94111
T: (415) 896-1701  x 110
F: (415) 896-1702
*sinyenL@asianlawcaucus.org*

T: (404) 872-7086
F: (404) 892-1128
*Bspears@mindspring.com*

R. Keegan Federal, Jr. (GSB No. 257200)
FEDERAL & HASSON, LLP
Two Ravinia Drive, Ste 1776
Atlanta, Georgia  30346
T: (678) 443-4044
F: (678) 443-4081

Charles H. Kuck  (GSB No. 429940)
Danielle M. Conley (GSB No. 222292)
KUCK IMMIGRATION PARTNERS
LLC
8010 Roswell Road, Suite 300
Atlanta, Georgia  30350
T: (404) 816-8611
F: (404) 816-8615
*CKuck@immigration.net*
*DConley@immigration.net*

*Attorneys for Plaintiffs*

*Application for admission *pro hac vice* forthcoming