## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| Georgia Latino Alliance for Human Rights, *et al.*, | ) ) ) |
|  | ) |
| Plaintiffs, | ) |
|  | )   Case No. 1:11-cv-1804-TWT |
| v. | ) |
|  | ) |
| Governor Nathan Deal, *et al.*, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................iii

INTRODUCTION .................................................................................... 1

FACTUAL BACKGROUND ....................................................................... 2

    Sections 8:  Immigration Enforcement by State and Local Officers ............. 3

    Section 7:   New State-Based Criminal Immigration Offenses .................... 5

    Section 19:  Restrictions on Identification Documents for Official
    Purposes ...................................................................................... 6

ARGUMENT .......................................................................................... 6

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........ 7

      A.    HB 87 Violates the Supremacy Clause............................................ 7

        1.    HB 87 Unconstitutionally Regulates Immigration ......................... 7

        2.    HB 87 Unconstitutionally Conflicts with Federal Law ............... 14

          a.    HB 87 Conflicts with Federal Limitations on State and Local ........
             Officers' Authority to Enforce Immigration Laws ...................... 16

          b.    HB 87 Creates New State Immigration Crimes In Conflict With
             Federal Law............................................................................. 20

          c.    HB 87's *De Facto* Alien Registration Law Conflicts With Federal
             Law and Will Result in Unlawful Harassment of Lawfully Present
             Aliens ..................................................................................... 26

          d.    HB 87 Places an Impermissible Burden on Federal Resources
             and Interferes With Federal Immigration Enforcement............... 28

      B.    HB 87 Violates the Fourth Amendment ........................................ 31

        1.    The Immigration Status Investigations Authorized By HB 87 Will
          Cause Unlawful Detentions....................................................... 32

        2.    HB 87's Documentation Requirement Cannot Substitute for a
          Probable Cause Determination.................................................... 34

        3.    The Practical Effects of HB 87's Arrest Provisions are Serious ...... 36

      C.    HB 87 Violates the Constitutional Right to Travel.......................... 36

D.    HB 87 Violates the Separation-of-Powers Safeguards of the Georgia Constitution .......................................................... 41

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF HB 87 IS ALLOWED TO GO INTO EFFECT ............................................. 44

III.    THE BALANCE OF HARMS STRONGLY FAVORS THE ISSUANCE OF AN INJUNCTION ...................................................... 48

IV.    AN INJUNCTION IS IN THE PUBLIC INTEREST ......................... 49

CONCLUSION ............................................................. 50

# TABLE OF AUTHORITIES

## Cases

*ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272(S.D. Fla. 2008) ........ 7, 25

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) ................................. 9

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) .......................................... 13

*Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898 (1986) .................................... 37

*Austin v. New Hampshire*, 420 U.S. 656 (1975) ......................................... 39, 40

*Bigelow v. Virginia*, 421 U.S. 809 (1975) ........................................................ 39

*Bonito Boats v. Thunder Craft Boats,* 489 U.S. 141 (1989) ............................. 31

*Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260 (11th Cir. 2000) ....................... 15

*Chamber of Commerce v. Edmonson*, 594 F.3d 742 (10th Cir. 2010) ............. 49

*Chy Lung v. Freeman*, 92 U.S. 275 (1876) ...................................................... 12

*Collins v. Brewer*, 727 F. Supp. 2d 797 (D.Ariz. 2010) ................................... 45

*Crandall v. Nevada*, 73 U.S. 35 (1868) ............................................................ 40

*Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363 (2000) ............. 13, 15, 23

*DeCanas v. Bica*, 424 U.S. 351 (1976) ....................................................... passim

*Denson v. United States*, 574 F.3d 1318 (11th Cir. 2009), *cert. denied*,
    130 S. Ct. 3384 (2010) ................................................................................. 7

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ......................................................... 37

*Edelman v. Jordan*, 415 U.S. 651 (1974) ........................................................ 37

*Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141 (2001) .............................. 28

*Fla. Businessmen for Free Enterprise v. Hollywood*, 648 F.2d 956
    (5th Cir. 1981) ............................................................................................ 49

*Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987) ................................... 29

*French v. Pan Am Express, Inc.*, 869 F.2d 1 (1st Cir. 1989) ........................... 25

*Gonzales v. City of Peoria,* 722 F.2d 468 (9th Cir. 1983) ............................... 18

*Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir. 1984) ............ 45

*Grodzki v. Reno*, 950 F. Supp. 339 (N.D. Ga. 1996) ....................................... 45

*Hall v. Thomas*, 753 F. Supp. 2d 1113 (N.D. Ala. 2010) ...............................22

*HCA Health Servs. v. Roach*, 265 Ga. 501 (1995)............................................42

*Henderson v. Mayor of the City of New York*, 92 U.S. 259 (1876)...................12

*Hines v. Davidowitz*, 312 U.S. 52 (1941)....................................................passim

*Hodgers-Durgin v. De la Vina,* 199 F.3d 1037 (9th Cir. 1999) ........................18

*Howell v. State*, 238 Ga. 95 (1976) ..................................................................43

*John Doe No. 1 v. Ga. Dep't of Pub. Safety*, 147 F. Supp. 2d 1369
(N.D. Ga. 2001) ...........................................................................................39

*KH Outdoor, LLC v. Trussville*, 458 F.3d 1261 (11th Cir. 2006) ......... 44, 48, 49

*Long v. State*, 202 Ga. 235 (1947) ...................................................................43

*Martinez-Medina v. Holder*, __ F.3d __, 2011 WL 855791
(9th Cir. Mar. 11, 2011) ........................................................................ 17, 18

*Mays v. Hosp. Auth. of Henry County*, 582 F. Supp. 425 (N.D. Ga. 1984).......47

*McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998).....................7

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992)............................. 44, 46

*Muehler v. Mena*, 544 U.S. 93 (2005).............................................................32

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
22 F.3d 546 (4th Cir. 1994) ........................................................................47

*Nat'l Abortion Fed'n v. Metro. Atlanta Rapid Transit Auth.*, 112 F. Supp. 2d
1320 (N.D. Ga. 2000)..................................................................................49

*North Dakota v. United States*, 495 U.S. 423 (1990) .....................................31

*Pace v. CSX Transp., Inc.*, 613 F.3d 1066, 1068 (11th Cir. 2010)...................15

*Plyler v. Doe*, 457 U.S. 202 (1982)............................................................. 8, 23

*Pro-Choice Network of W.N.Y. v. Project Rescue W.N.Y.*, 799 F. Supp. 1417
(W.D.N.Y. 1992) .........................................................................................47

*Pub. Utils. Comm'n of Cal v. United States*, 355 U.S. 534 (1958) ..................31

*Quinchia v. U.S. Att'y Gen.*, 552 F.3d 1255 (11th Cir. 2008)..........................13

*Saenz v. Roe*, 526 U.S. 489 (1999)..................................................................37

*Schenck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357 (1997)....................47

*Scott v. Roberts*, 612 F.3d 1279 (11th Cir. 2010) ........................................ 44, 49

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ............................................... 37, 39

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) ...................................... 15

*Sprint Corp. v. Evans*, 818 F. Supp. 1447 (M.D. Ala. 1993) ........................... 26

*Sundberg v. State*, 234 Ga. 482 (1975) ..................................................... 42, 43

*Terry v. Ohio*, 392 U.S. 1 (1968) .............................................................. 32, 45

*Toll v. Moreno*, 458 U.S. 1 (1982) ................................................................... 8

*United States v. Arizona*, __ F.3d __, 2011 WL 1346945
   (9th Cir. Apr. 11, 2011) ..................................................................... passim

*United States v. Arizona,* 703 F. Supp. 2d 980 (D. Ariz. 2010) ....................... 10

*United States v. Encarnacion*, 239 F.3d 395 (1st Cir. 2001) ........................... 18

*United States v. Holloman,* 113 F.3d 192 (11th Cir. 1997) .............................. 32

*United States v. Madrigal-Valadez*, 561 F.3d 370 (4th Cir. 2009) ................... 18

*United States v. Pruitt,* 174 F.3d 1215 (11th Cir. 1999) .................................. 32

*United States v. Purcell*, 236 F.3d 1274 (11th Cir. 2001) ................................ 32

*United States v. Sokolow*, 490 U.S. 1 (1989) ................................................. 32

*United States v. Tapia*, 912 F.2d 1367 (11th Cir. 1990) .................................. 34

*United States v. Urrieta*, 520 F.3d 569 (6th Cir. 2008) ................................... 18

*Villas at Parkside Partners v. City of Farmers Branch*, 701 F. Supp. 2d 835
   (N.D. Tex. 2010) ............................................................................... 12, 50

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ....................................................... 13

**Statutes and Regulations**

8 U.S.C. § 1101 ............................................................................................ 15

8 U.S.C. § 1103(a)(10) ........................................................................... 16, 17

8 U.S.C. § 1252c ..................................................................................... 16, 17

8 U.S.C. § 1304(d) ....................................................................................... 26

8 U.S.C. § 1324 .................................................................................... passim

8 U.S.C. § 1357(a)(2) ................................................................................... 19

8 U.S.C. § 1357(g) ............................................................................ 17

8 U.S.C. § 1357(g)(1) ....................................................................... 16

8 U.S.C. § 1357(g)(10) ..................................................................... 17

8 U.S.C. § 1357(g)(3) ....................................................................... 17

8 U.S.C. § 1357(g)(5) ....................................................................... 17

N.M. Admin. Code § 18.19.5.12(D) ................................................ 38

N.M. Stat. Ann. § 66-5-9(B) (1978) ................................................ 38

O.C.G.A. § 16-11-200 .................................................................. 5, 20

O.C.G.A. § 16-11-201 ............................................................ 5, 20, 23

O.C.G.A. § 16-11-201(a)(1) ............................................................. 22

O.C.G.A. § 16-11-202 .................................................................. 5, 21

O.C.G.A. § 17-5-100(b) ........................................................... passim

O.C.G.A. § 17-5-100(e) ................................................................ 5, 18

O.C.G.A. § 17-5-100(c) ................................................................ 4, 33

O.C.G.A. § 35-1-16(d) ....................................................................... 5

O.C.G.A. § 40-5-1(15) ...................................................................... 38

O.C.G.A. § 40-5-20 ........................................................................... 34

O.C.G.A. § 42-4-14(c) ...................................................................... 29

O.C.G.A. § 50-36-2(a) ........................................................................ 6

O.C.G.A. § 50-36-2(b) ............................................................. 4, 6, 41

O.C.G.A. § 50-36-2(c) ...................................................................... 41

O.C.G.A. § 50-36-2(d) ........................................................................ 6

Wash. Rev. Code § 46.20.035(3) ..................................................... 38

**Other Authorities**

Brief for the Respondents, *Zadvydas v. Davis*, (No. 99-7791) ........... 13

Ga. Const. Art. I, § II, Para. III. ..................................................... 42

Ga. Const. Art. III, § I, Para. I. ....................................................... 42

# INTRODUCTION

Plaintiffs move for a preliminary injunction barring the enforcement of Georgia's Illegal Immigration Reform and Enforcement Act of 2011 ("HB 87"). Most of HB 87 is currently scheduled to take effect on July 1, 2011.  The requested injunction is urgently needed to prevent this unconstitutional law from causing irreparable injury to plaintiffs and similarly-situated individuals.

With HB 87, Georgia has greatly overstepped its constitutional bounds.  The law violates the Supremacy Clause of the Constitution by attempting to wrest core immigration regulation functions from the federal government and conflicting with federal law in multiple ways.  As the President of the United States has publicly stated, HB 87 is "a mistake. . . . We can't have 50 different immigration laws around the country. Arizona tried this, and a federal court already struck them down."  Obama criticizes new Georgia immigration law, Reuters, Apr. 26, 2011, attached as Ex. A to Decl. of Molly Lauterback; *see United States v. Arizona*, __ F.3d __, 2011 WL 1346945 (9th Cir. Apr. 11, 2011).

HB 87 runs afoul of other constitutional protections as well.  Indeed, in its eagerness to single out and punish those it regards as "illegal aliens" the state has created a set of laws that violate the basic rights of citizens and non-citizens alike.  HB 87 violates the Fourth Amendment because it authorizes detention without

sufficient legal justification.  It violates the right to travel of residents of certain

other states by treating them as "unfriendly aliens" in the State of Georgia.  And it

violates Georgia separation-of-powers requirements by allowing an executive

officer to define the content of the state's criminal laws.

All of the requirements for issuance of an injunction are met here.  Plaintiffs

respectfully request that the Court enjoin the enforcement of HB 87 pending a final

ruling on this challenge.

## FACTUAL BACKGROUND

The Georgia General Assembly enacted HB 87 on April 14, 2011.  Touted

by its supporters as a comprehensive response to the perceived "very serious

problem of illegal immigration in the State of Georgia," (Deb. on HB 87 Before

the Senate (Apr. 14, 2011), attached as Ex. B to Lauterback Decl. (remarks of Sen.

Seth Harp)), HB 87's provisions touch on numerous aspects of immigration—from

broadly authorizing state immigration enforcement, to prescribing the immigration-

related documentation persons must carry, to creating criminal prohibitions and

penalties regulating the daily interactions that Georgians have with unauthorized

immigrants, to instituting state-specific immigration-related requirements for

participation in federal government programs, to directly provoking conflict with

foreign nations regarding their legitimate consular activities.  Its most problematic

provisions include the following.[1]

## Sections 8:  Immigration Enforcement by State and Local Officers

Section 8 authorizes Georgia peace officers to demand certain identity

documents and to investigate the immigration status of persons unable to produce

such a document, converting many routine encounters into lengthy and intrusive

immigration status investigations.  Under Section 8, officers are authorized to

demand that any person subject to "any investigation"—*i.e.*, a consensual

encounter, a stop, a detention, or an arrest—produce one of five enumerated types

of identity documents.  O.C.G.A. § 17-5- 100(b).  Only individuals who can

produce a document from this list receive a presumption of lawful status.  *Id.*

The five state-approved identity documents enumerated in Section 8 are: (1)

a "secure and verifiable document" as defined in Section 19 of HB 87; (2) a valid

Georgia driver's license; (3) a valid Georgia identification card; (4) a valid driver's

license from an entity requiring proof of legal presence or a valid identification

---

[1] Section 17 and 18 of HB 87, which impose new requirements on applicants for
federal public benefits as well as related penalties, conflict with federal law and are
also problematic.  Similarly, Section 19 imposes an explicit bar on the use of
consular identification documents for any official purpose.  Because the
implementation of these provisions is delayed, and they do not take effect until
January 2012, Plaintiffs do not address them in this motion, but intend to do so at a
later time.

card issued by the federal government; or (5) a valid driver's license issued to a nonresident by her home state or country accompanied by proof of citizenship or legal residency.  O.C.G.A. §§ 17-5-100(b)(1)-(5).  The statute thus excludes reliance on driver's licenses issued by states such as New Mexico and Washington that do not require proof of legal presence.  In cases where a person does not have a state-approved identity document, he may provide "[o]ther information . . . that is sufficient to allow the peace officer to independently identify [him]."  O.C.G.A. § 17-5-100(b)(6).  The law provides no guidance on what that "other information" might be and thus no direction for peace officers charged with enforcing it.

Where a person cannot provide a state-approved identity document or sufficient "other information," and an officer "has probable cause to believe that a suspect has committed a criminal violation," O.C.G.A. § 17-5-100(b), Section 8 authorizes the officer to "determine [the person's] immigration status" by "any reasonable means available," including by relying on: (1) a "federal identification data base"; (2) "[i]dentification methods authorized by federal law"; (3) electronic fingerprint readers or "similar devices"; or (4) "[c]ontacting an appropriate federal agency."  O.C.G.A. § 17-5-100(c).  These immigration status determination procedures are time intensive and will necessarily and unreasonably prolong ordinary police stops, including stops for speeding and jaywalking. And notably,

Section 8 does not require an officer to have any suspicion that an individual is in the country unlawfully before commencing an immigration status investigation.

Section 8 effectively requires all individuals in Georgia to carry a state-approved identity document in order to avoid the risk of extended police questioning each time they encounter law enforcement.

Section 8 also specifically authorizes peace officers to arrest and detain individuals solely based on suspicion that they are in violation of federal civil immigration laws.  § 17-5-100(e).  Thus, under HB 87, ordinary police will be authorized to make warrantless arrests for civil immigration violations.

## <u>Section 7:   New State-Based Criminal Immigration Offenses</u>

Section 7 creates new state law crimes penalizing "transporting or moving an illegal alien," O.C.G.A. § 16-11-200, "concealing or harboring an illegal alien," § 16-11-201, and "inducing an illegal alien to enter into this state," § 16-11-202. Federal law has long included provisions that address "[b]ringing in and harboring certain aliens."  8 U.S.C. § 1324.  Federal and state laws already grant Georgia law enforcement officers explicit authority to arrest anyone who violates these federal provisions. 8 U.S.C. § 1324(c); O.C.G.A. § 35-1-16(d).  By enacting these new state immigration crimes, HB 87 effectively circumvents the federal government's

definitions and prosecutorial and adjudicatory processes for these federal crimes,

permitting Georgia state officers and prosecutors to impose their own views.

## Section 19:  Restrictions on Identification Documents for Official Purposes

Section 19 of HB 87 creates the "Secure and Verifiable Identity Document

Act," which defines certain documents as "[s]ecure and verifiable document[s]"

that may be used for official purposes.  O.C.G.A. § 50-36-2(a), (b)(3).  The

definition of a "[s]ecure and verifiable document" specifically excludes consular

identification cards.  *Id.* § 50-36-2(b)(3).  Section 19 criminalizes accepting a

document that is not "secure and verifiable" for "any official purpose."  O.C.G.A.

§ 50-36-2(d).  It provides that, "on or after January 1, 2012, no agency or political

subdivision shall accept, rely upon, or utilize an identification document for any

official purpose that requires the presentation of identification . . . unless it is a

secure and verifiable document."  Section 19 delegates to the Attorney General the

authority to determine what constitutes a "secure and verifiable document."

O.C.G.A. § 50-36-2(b)(3) ("Only those documents approved and posted by the

Attorney General . . . shall be considered secure and verifiable documents.").

## ARGUMENT

A preliminary injunction is appropriate if the moving party establishes the

following:  "(1) substantial likelihood of success on the merits; (2) irreparable

injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.   HB 87 Violates the Supremacy Clause

HB 87 violates the Supremacy Clause of the U.S. Constitution in two ways: first, it is a state "regulation of immigration," *DeCanas v. Bica*, 424 U.S. 351, 353-54 (1976), which is categorically prohibited because immigration regulation is exclusively a federal function; and second, it conflicts with federal law by "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  *See also Denson v. United States*, 574 F.3d 1318, 1345 (11th Cir. 2009), *cert. denied*, 130 S. Ct. 3384 (2010); *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1303-04 (S.D. Fla. 2008).

### 1.   HB 87 Unconstitutionally Regulates Immigration

A state law regulating immigration is unconstitutional, regardless of whether Congress has enacted comparable federal statutory provisions, because immigration regulation is "unquestionably *exclusively* a federal power."  *DeCanas*,

424 U.S. at 354 (emphasis added); *see Hines*, 312 U.S. at 66.  The "determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain" constitute direct regulation of immigration exclusively reserved for the federal government.  *DeCanas*, 424 U.S. at 355; *see Toll v. Moreno*, 458 U.S. 1, 11 (1982); *Plyler v. Doe*, 457 U.S. 202, 225 (1982) (states may not engage in "classification of aliens").  Moreover, to withstand constitutional scrutiny a state law relating to immigration must primarily address legitimate local concerns and have only a "purely speculative and indirect impact on immigration."  *DeCanas*, 424 U.S. at 355.  HB 87 is preempted under these standards for three independent reasons:  because it is expressly intended to regulate immigration; because by its design and operation it actually regulates immigration; and because it directly interferes with the core federal interests that the rule against state immigration regulation is designed to protect.

  1. HB 87's plain and stated intent is to regulate immigration, as the law's text and legislative history demonstrate.  HB 87 is entitled the "Illegal Immigration Reform and Enforcement Act," and its stated purposes include, for example, "to provide for offenses involving illegal aliens," "to provide for the investigation of illegal alien status," and "to provide for penalties for failure of agency heads to abide by certain state immigration laws" which are themselves established or

amended by HB 87.  *See* Ga. House Bill 87 (2011) at 1:1, 7-8, 10, 27-28, attached as Ex. 1; *see Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (title of statute is a legitimate guide for legislative interpretation).  The purpose and motivation behind HB 87 is to affect the "entry and stay," *DeCanas*, 424 U.S. at 355, 359, of foreign nationals, especially those whom Georgia believes to be present without federal approval.

The legislative history of HB 87 confirms that it is specifically intended to take over immigration regulation from the federal government.  The law originated from a "Special Joint Committee on Immigration Reform" that was "inspired by the federal government's continued failure to deal with the problem of illegal immigration," and sought to "pick[] up where Washington D.C. has let us down" by drafting legislation to "stem[] the flow of illegal immigration activity in Georgia."  Press Release, Speaker Ralston and Lt. Gov. Cagle Announce the Creation of the Special Joint Committee on Immigration Reform (Sept. 29, 2010), attached as Ex. C to Lauterback Decl.

Many legislators confirmed that they, too, view HB 87 as Georgia stepping into the federal government's shoes.[2]  Senator Seth Harp spoke at particular length:

---

[2] For example, Senator Renee Unterman remarked that, with respect to comprehensive immigration regulation, "[u]nfortunately the federal government won't step up to the plate; the states are having to do it."  Deb. on HB 87 Before

> [I]f you look at the US Constitution there are precious few things that
> our federal government is supposed to do, but one of the things it is
> expressly commanded to do, is to secure our borders and provide for a
> common defense, and I submit to you, Ladies and Gentlemen of the
> Senate, that the federal government has failed miserably in that
> constitutional obligation it has abdicated its responsibility, they have
> walked off the job, and so what are we supposed to do?  We're
> supposed to just throw up our hands and say "Well, the federal
> government is not exercising its responsibilities, so we are just going
> to suffer the consequences."  At a certain point, you have to take
> action, and that's what happened in Arizona. . . . There is no question
> in my mind that adoption of this legislation is going to address in a
> meaningful way, the very serious problem of illegal immigration in
> the State of Georgia.

Deb. on HB 87 Before the Senate at p. 59-61, April 14, 2011;[3] *see* Press Release,

Governor Deal, May 13, 2011, Ex. D to Lauterback (HB 87 "crack[s] down on the

influx of illegal immigrants into our state" in absence of "a federal solution").

---

the Senate at p. 32, Apr. 14, 2011.  Representative Matt Ramsey, a sponsor of the
bill, commented: "If we want to effectively address illegal immigration we can't
wait for our federal government to act – we've got to do it ourselves."  Deb. on HB
87 Before the House at p. 2, Mar. 3, 2011, attached as Ex. E to Lauterback Decl.
Representative Rich Golick likewise remarked, "doing nothing is not an option and
relying to our detriment on a federal government that is not going to do anything
anytime soon is not a realistic alternative. . . . [W]hen we hear someone say it's a
federal issue, let the federal government do it, that's really just a euphemism for do
nothing and that's not an option at this point."  Deb. on HB 87 Before the H.
Comm. on the Judiciary at p. 33-34, Feb. 8, 2011, Ex. F to Lauterback Decl.
[3] Senator Harp was referring to Arizona's SB 1070, the major parts of which have
never gone into effect because they have been enjoined by the federal courts.
*United States v. Arizona*, __ F.3d __, 2011 WL 1346945, at * 4-*10, *15-*19 (9th
Cir. Apr. 11, 2011) (*aff'g* 703 F. Supp. 2d 980 (D. Ariz. 2010)).

Representative Bobby Franklin further remarked: "I don't see anything in the United States Constitution where the states authorize the federal government to have any policy on immigration. Which would mean under the Tenth Amendment that immigration is reserved to the states. Wouldn't you agree, then, that immigration is a state issue, not a federal issue?" Deb. on HB 87 Before the H. Comm. on the Judiciary at p. 17, Feb. 8, 2011. This contention directly conflicts with settled law allocating immigration regulation authority to the federal government.

Thus, HB 87 was not intended to "further[] a legitimate state goal," *Plyler,* 457 U.S. at 225, but rather was enacted as Georgia's attempt to replace federal law and policy with state-crafted solutions.

2.     HB 87's impact on immigration is direct, not "incidental and speculative." HB 87 subjects individuals in Georgia, including U.S. citizens and individuals in a lawful immigration status, to a new set of state-created immigration rules, legal interpretations, and procedures that do not exist in other states, including: (1) state-created requirements to carry certain documentation that establishes citizenship or immigration status; (2) state-authorized interrogations and detentions to investigate immigration status; (3) state and local officials' judgments—independent of federal law, regulation, or policy—about

what immigration violations justify warrantless arrest; and (4) investigation and prosecution by state officials for state-defined immigration crimes.  Thus, HB 87 directly regulates the conditions under which non-citizens may remain in the country—an exclusively federal function.  *DeCanas*, 424 U.S. at 355-56; *see also Henderson v. Mayor of the City of New York*, 92 U.S. 259, 274-75 (1876) (enjoining statute imposing additional local regulations on immigrants); *Villas at Parkside Partners v. City of Farmers Branch*, 701 F. Supp. 2d 835, 855 (N.D. Tex. 2010) (invalidating ordinance requiring non-citizens to demonstrate immigration status prior to renting housing).

Indeed, HB 87 implements precisely what the Supreme Court struck down 70 years ago—the subjection of non-citizens to "indiscriminate and repeated interception and interrogation by public officials" and "the possibility of inquisitorial practices and police surveillance."  *Hines*, 312 U.S. at 66, 74.

3.     HB 87's demonstrated impact on foreign relations requires that it be held invalid.  Historically, one of the main reasons that the federal government has exclusive power to regulate immigration is to prevent states from interfering with U.S. foreign relations through separate regulation of foreign nationals in the United States.  *See Chy Lung v. Freeman*, 92 U.S. 275, 279 (1876); *Henderson*, 92 U.S. at 273; *see also Hines*, 312 U.S. at 64 ("Experience has shown that international

controversies of the gravest moment . . . may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government."). Such concerns are so paramount that "even . . . the likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law."[4] *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003); *see also United States v. Arizona*, __ F.3d __, 2011 WL 1346945, at *22-23 (Noonan, J., concurring) ("Whatever in any substantial degree attempts to express a policy by a single state or by several states toward other nations enters an exclusively federal field."). And the Supreme Court has recognized the "Nation's need to 'speak with one voice' in immigration matters." *Zadvydas v. Davis*, 533 U.S. 678, 700 (2001) (quoting Brief for the Respondents, *Zadvydas*, (No. 99-7791)); *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 379 (2000)  (finding state law imposing foreign trade restrictions preempted for "stand[ing] in the way of Congress's diplomatic objectives").

---

[4] Even individual immigration enforcement decisions can have profound implications for U.S. foreign policy interests.  *See Quinchia v. U.S. Att'y Gen.*, 552 F.3d 1255, 1259 (11th Cir. 2008) ("[I]mmigration cases often involve complex public and foreign policy concerns with which the executive branch is better equipped to deal."); Decl. of James B. Steinberg ¶¶ 19, 21, filed in *United States v. Arizona*, No. 10-CV-1413 (D. Ariz. filed July 6, 2010), Ex. G to Lauterback Decl.

Here, such implications are real.  Foreign governments have expressed concerns that this law will significantly strain diplomatic relations with the United States.  In a press release, the Mexican government criticized HB 87, stating that the law "potentially affects human and civil rights of Mexicans who live in or visit Georgia" and that "[t]he legislators who voted for the law and the Governor of Georgia overlooked the many contributions made by the immigrant community to the state's economy and society, as well as Mexico's importance as its third-largest export market."  The Mexican Government Regrets the Enactment of HB 87 in Georgia, Press Release, May 13, 2011, Mexico City, attached as Ex. H to Lauterback Decl.; *see* Decl. of Abraham F. Lowenthal ¶¶ 11-14, attached as Ex. 2. Such statements reflect the unacceptable strain that HB 87 puts on the United States' relations with foreign nations.

That strain is one reason for the President of the United States' declaration that "[w]e can't have 50 different immigration laws around the country" and his specific condemnation of HB 87 as a "mistake."  *See* Ex. A to Lauterback Decl. HB 87 intrudes on exclusively federal terrain and must be enjoined.

### 2. HB 87 Unconstitutionally Conflicts with Federal Law

HB 87 is also preempted on the additional ground that it conflicts with federal immigration law.  A state law conflicts with federal law when " 'the state

law stands as an obstacle to the accomplishment of the full purposes and objectives' of federal law." *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1269 (11th Cir. 2000) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)).  And even if the state and the federal government share the same concerns, "[t]he fact of a common end hardly neutralizes conflicting means" of addressing those concerns.  *Crosby*, 530 U.S. at 379.  Under the INA, 8 U.S.C. § 1101 *et seq*., Congress has set forth a comprehensive system of immigration laws, regulations, procedures, and policies under which the federal government regulates many of the exact topics covered by HB 87.  The Georgia law directly conflicts with this comprehensive federal scheme by:  (1) superseding federal limitations on the authority of state and local officers to enforce immigration laws, (2) creating new immigration crimes defined and enforced by the state, (3) implementing a de facto state alien registration law, and (4) placing an impermissible burden on federal resources and creating obstacles to the accomplishment of federal priorities.[5]

---

[5] By enacting the Immigration and Nationality Act, Congress has occupied the entire field of immigration enforcement, and thus HB 87 is also subject to statutory "field preemption," which "occurs when federal regulation in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it." *Pace v. CSX Transp., Inc.*, 613 F.3d 1066, 1068 (11th Cir. 2010).

a.    **HB 87 Conflicts with Federal Limitations on State and Local Officers' Authority to Enforce Immigration Laws**

HB 87 broadly authorizes Georgia peace officers to act as immigration agents in direct conflict with federal mandates and limitations.

Federal law contains narrow authorizations for state and local police to enforce federal immigration laws in specific circumstances.  First, federal law authorizes state and local officers to enforce two specific criminal immigration offenses.  Under 8 U.S.C. § 1252c, state and local officers may arrest and detain a non-citizen for the federal crime of illegal reentry by a deported felon into the United States, if the federal government provides "appropriate confirmation" of the suspect's status.  And under 8 U.S.C. § 1324(c), federal law allows state and local officers to make arrests for the *federal* immigration crimes of transporting, smuggling, or harboring certain aliens.

Second, Congress has authorized state and local officers to assist with the enforcement of civil immigration offenses in only two specific circumstances.  The U.S. Attorney General may authorize "any State or local enforcement officer" to enforce immigration laws upon certification of "an actual or imminent mass influx of aliens."  8 U.S.C. § 1103(a)(10).  (This provision has never been invoked by the Attorney General.)  Additionally, under 8 U.S.C. § 1357(g)(1), the federal

16

government may enter into written agreements (*i.e.*, "287(g) agreements") with

state or local agencies in order for certain designated officers to exercise delegated

immigration enforcement authority in clearly specified circumstances.  These

officers must first be "determined by the Attorney General to be qualified to

perform [such] functions" and "shall be subject to the direction and supervision of

the Attorney General."  §§ 1357(g)(1), (3).  The written agreement must specify

"the specific powers and duties that may be, or are required to be, exercised or

performed by the individual, [and] the duration of the authority of the individual."

§ 1357(g)(5).[6]

HB 87 goes beyond any Congressional authorization to enforce civil

immigration laws by allowing officers to broadly detain and arrest individuals for

the civil violation of unlawful presence.[7]  HB 87 authorizes peace officers to

---

[6] 8 U.S.C. § 1357(g)(10) further provides that § 1357(g) does not forbid police
from "cooperat[ing] with the Attorney General" in certain aspects of immigration
enforcement.  That provision plainly does not authorize states to pursue their own
policy objectives or enact their own immigration enforcement initiatives that
correct the federal government's alleged failures, as Georgia has here.  Indeed, if §
1357(g)(10) authorized the enforcement at issue here, the specific authorizations
Congress provided in §§ 1103(a)(10), 1357(g)(1)-(9), 1252c, and 1324(c) would be
surplusage.  As the Ninth Circuit has explained, "Congress intended for state
officers to aid in federal immigration enforcement only under particular conditions,
including the Attorney General's supervision."  *United States v. Arizona*, 2011 WL
1346945, at *5.
[7] Being present in the United States without lawful immigration status is not a
crime.  *Martinez-Medina v. Holder*, __ F.3d __, 2011 WL 855791, at *6 (9th Cir.

prolong detentions and undertake custodial immigration investigations when individuals cannot produce a state-approved identity document.  O.C.G.A. § 17-5-100(b).  Section 8 further authorizes peace officers to arrest without warrant anyone they determine to be an "illegal alien."  O.C.G.A. § 17-5- 100(e).  But under federal law, state and local officers are not authorized to detain individuals on such grounds.[8]  Thus, even if a peace officer has received verification from the federal government that a person appears to lack immigration status, the officer may not detain the person solely on that basis.[9]

---

Mar. 11, 2011) ("unlike illegal entry, which is a criminal violation, an alien's illegal presence in the United States is only a civil violation"); *United States v. Madrigal-Valadez*, 561 F.3d 370, 376 (4th Cir. 2009) (no "authority . . . makes the *status* of being in the United States after entering in violation of § 1325(a) a separate crime") (emphasis in original); *United States v. Encarnacion*, 239 F.3d 395, 399 (1st Cir. 2001) (defendant's admission of illegal entry to INS officials did not transform his case from a civil to a criminal case).

[8] *See United States v. Arizona*, 2011 WL 1346945, at *17 ( "states do not have the inherent authority to enforce the civil provisions of federal immigration law."); *Gonzales v. City of Peoria,* 722 F.2d 468, 474 (9th Cir. 1983), *overruled on other grounds by Hodgers-Durgin v. De la Vina,* 199 F.3d 1037 (9th Cir. 1999); *United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) ("local law enforcement officers cannot enforce completed violations of civil immigration law (*i.e.*, illegal presence) unless specifically authorized to do so by the Attorney General under special conditions").

[9] HB 87 is preempted even as to the few Georgia agencies that have 287(g) agreements—the Cobb, Gwinnett, Hall, and Whitfield County Sheriff's Offices and the state Department of Public Safety.  For these agencies, HB 87 improperly creates a source of immigration enforcement authority distinct from the 287(g) agreement and outside of the direction and supervision of federal authorities.

Indeed, Section 8's immigration enforcement authorization is so broad that it permits peace officers to make warrantless civil immigration arrests in circumstances where even *federal* immigration agents could not. *See* 8 U.S.C. § 1357(a)(2). In order to arrest an individual for undocumented presence without a warrant, the arresting federal officer must reasonably believe that the alien is in the country illegally *and* that he is likely to escape before a warrant can be obtained for his arrest. *Id*. HB 87 does not provide these limitations and thus allows for the arrests of non-citizens in circumstances where federal law requires a warrant.

The dangers of HB 87's unconstitutional immigration scheme are particularly acute for the many non-citizens who lack immigration status, and whose continued presence technically violates federal immigration law, yet are allowed to remain in the United States with the knowledge and consent of the federal government. Jane Doe #2 illustrates the problem: she lacks immigration status, but remains in the United States through the favorable exercise of discretion by federal officials in light of the compelling circumstances of her case, including the fact that she came to the country as a child and that Georgia is the only home that she has ever known. Decl. of Jane Doe #2 ¶¶ 2, 6-8, attached as Ex. 3. Although the federal government would have no interest in arresting Jane Doe #2, federal agents could not, if asked, truthfully tell a Georgia peace officer that she is

in a lawful status.  HB 87 authorizes that peace officer to arrest Jane Doe #2 on immigration grounds without a warrant and without regard to the fact that the federal government has already declined to seek her removal.

Because of the structure and operation of federal immigration law, there are countless individuals in Georgia who are in a similar position because they are presently not in lawful status, but are eligible for a form of immigration relief, such as asylum, adjustment of status, or withholding of removal—relief which is fundamental to the proper administration of federal immigration laws.  Some of these individuals are known to the federal government; others will not be identified until they are actually placed in proceedings by the federal government and their cases are adjudicated.  HB 87 is an obstacle to the functioning of this federal statutory scheme.

### b. HB 87 Creates New State Immigration Crimes In Conflict With Federal Law

Section 7 creates three new Georgia-specific immigration crimes: knowingly (1) transporting or moving an illegal alien for the purpose of furthering their illegal presence, O.C.G.A. § 16-11-200; (2) concealing, harboring, or shielding an illegal alien from detection, § 16-11-201; and (3) inducing, enticing,

or assisting an illegal alien to enter into Georgia, § 16-11-202.[10]  These new

provisions impermissibly interfere with the operation of federal immigration law.

Section 1324 of Title 8 of the U.S. Code defines several federal offenses that

appear superficially similar to the new state offenses created by Section 7.  The

federal crimes in § 1324 include knowingly "transport[ing] . . . within the United

States," "conceal[ing], harbor[ing], or shield[ing] from detection," or

"encourage[ing] or induc[ing] . . . to come to, enter, or reside in the United States"

an alien whose entry or presence violates the law.

The superficial resemblance of Section 7 to 8 U.S.C. § 1324 masks

significant differences between the state and federal laws.  For example, § 1324's

"encourage or induce" provisions concern aliens entering the United States—*not*

the movement of non-citizens within the United States; but O.C.G.A. § 16-11-202

criminalizes "induc[ing], entic[ing], or assist[ing]" an "illegal alien" to enter the

state of Georgia, regardless of whether the state is the alien's first destination in the

country or whether she entered the United States twenty years ago in California.

---

[10] The Georgia crimes also require that the accused be acting "in violation of
another criminal offense" or "while committing another criminal offense."  In
many cases the additional offense may be another crime created by Section 7 itself:
for example, a person transporting an undocumented individual from another state
into Georgia may be simultaneously violating §§ 16-11-200 and -202, and under
the state law's broad definition of "harboring," -201 as well.  Moreover, a variety
of other minor criminal offenses, including commonplace traffic offenses, would
suffice to satisfy this element of the definition.

Similarly, § 1324's "harboring" provision is the topic of extensive analysis and interpretation in the federal courts, *see, e.g.*, *Hall v. Thomas*, 753 F. Supp. 2d 1113, 1159 (N.D. Ala. 2010), but Section 7 specifically defines "harboring" as "any conduct that tends to substantially help an illegal alien to remain in the United States in violation of federal law," with limited exceptions determined by the Georgia legislature.  O.C.G.A. § 16-11-201(a)(1).

The most meaningful difference between HB 87 and the federal law that it pays lip service to imitating is not, however, any of the multiple specific differences in the provisions at issue, but the very creation of a separate and independent state system of criminal immigration laws.  These state laws will be enforced by state police and prosecutors and interpreted by state judges—not by their federal counterparts.  Under HB 87, decisions about when to charge a person or what penalty to seek for this conduct would not longer be under control of the federal government.  HB 87 includes no provision for federal discretion and no mechanism to accommodate the immense complexity of federal immigration law. Section 7's resemblance to § 1324 does not make it a "mirror" of federal law.  *Cf.*

*Plyler*, 457 U.S. at 225.  Instead, it allows the state to challenge and "undermine[] the congressional calibration" of federal law and policy.[11] *Crosby*, 530 U.S. at 380.

For example, plaintiff David Kennedy, an immigration lawyer in Gainesville, Georgia, frequently meets with and gives legal advice to individuals who are undocumented and occasionally drives these individuals to immigration court hearings.  Decl. of David Kennedy ¶¶ 2-9, attached as Ex. 4.  He serves a vital role in the federal immigration system by representing parties in administrative proceedings and does not fear prosecution under § 1324.  But HB 87 appears to specifically target immigration lawyers: it exempts an "attorney or his or her employees for the purpose of representing a *criminal defendant*," and conspicuously does not exempt an immigration attorney or other civil attorney, from the definition of the state harboring crime created in O.C.G.A. § 16-11-201.  In putting Kennedy and other immigration lawyers at risk of prosecution, HB 87 interferes with the proper administration of federal immigration law and the rights of individuals in the federal system to counsel (at their own expense).

---

[11] The federal government frequently does not prosecute potential § 1324 violations.  For example, from 2001 to 2005 there were, on average, only 10 reported prosecutions under §1324 in Georgia each year, while in 2005 – the latest year for which plaintiffs have been able to obtain statistics—there were only five prosecutions for such conduct.  Transactional Records Access Clearinghouse, Percent of Immigration Criminal Convictions by Lead Charge (2006), available at http://trac.syr.edu/tracins/findings/05/criminal/glawgph05.html.

Likewise, plaintiff Paul Bridges, the Mayor of Uvalda, Georgia, would be criminally liable for providing Spanish-to-English translation services for his friends at church, the grocery store, the doctor's and dentist's office, and soccer tournaments.  Decl. of Paul Bridges ¶¶ 2, 6-10, attached as Ex. 5.   He, along with plaintiffs Benjamin Speight, Everitt Howe, Paul J. Edwards, and Sharon Gruner, could face criminal consequences for giving rides to their friends, neighbors, and fellow parishioners.  Decls. of Benjamin Speight ¶¶ 6-7, attached as Ex. 6; Everitt Howe ¶¶ 5-7, attached as Ex. 7; Paul Edwards ¶¶ 4-8, attached as Ex. 8; Sharon Gruner ¶¶ 3-7, attached as Ex. 9.  Those same criminal consequences would apply to Jane Doe #1, who drives her husband to doctor's appointments and physical therapy following an incapacitating injury that he suffered.  Decl. of Jane Doe #1 ¶ 3, attached as Ex. 10.   For inviting friends into their homes and providing them with a place to stay, Plaintiffs Bridges and Gruner likewise are at risk of criminal prosecution.  Bridges Decl. ¶ 15; Sharon Gruner Decl. ¶ 6.

In this way, Section 7 amounts to a scheme for determining and punishing unlawful presence in the state through the operation of state criminal laws.  As discussed above, the conditions and penalties associated with the entry into and continued presence of non-citizens in the United States are constitutionally reserved to the federal government. *DeCanas*, 424 U.S. at 359.  Yet, Section 7's

criminalization of routine and innocuous conduct is at odds with Congress's careful choices in federal immigration law and the federal government's use of its discretion to employ these statutes in a way that is harmonious with, rather than destructive of, the overall statutory scheme. *See ABC Charters, Inc.*, 591 F. Supp. 2d at 1301 ("What is a sufficient obstacle is determined by examining the federal statute and identifying its purpose and intended effects.").

It is worth emphasizing that under § 1324, Georgia law enforcement officers already have the authority to arrest individuals for violation of that federal law.  If Georgia really wanted simply to enforce federal law in this area, it could arrest violators and turn them over to the federal government for prosecution.  But Georgia has decided, instead, to create its own independent state crimes to be administered in its own state system, out of apparent dissatisfaction and disagreement with federal law.  The Supremacy Clause permits no such unilateral state vetoes. And "the threat of 50 states layering their own immigration enforcement rules on top of the INA also weighs in favor of preemption."  *United States v. Arizona*, __ F.3d __, 2011 WL 1346945, at *10 (9th Cir. Apr. 11, 2011); *see, e.g.*, *French v. Pan Am Express, Inc.*, 869 F.2d 1, 6 (1st Cir. 1989) (If the states were free to regulate in the area of aviation, "a patchwork of state laws . . . some in conflict with each other, would create a crazyquilt effect."); *Sprint Corp.*

*v. Evans*, 818 F. Supp. 1447, 1457-58 (M.D. Ala. 1993) ("To allow each state to impose its own duties and requirements governing the interstate transmission of material by common carriers would result in precisely the type of piecemeal regulation that Congress wanted to avoid in passing the Act.").

> ### c.  HB 87's *De Facto* Alien Registration Law Conflicts With Federal Law and Will Result in Unlawful Harassment of Lawfully Present Aliens

Section 8 effectively requires all individuals who are stopped on suspicion of any criminal activity (including traffic violations and other misdemeanors) to produce a document that presumptively establishes lawful presence in the United States.  O.C.G.A. § 17-5-100(b).  By requiring individuals to present one of these specified documents, Georgia has created its own alien registration system.  *Cf.* 8 U.S.C. § 1304(d) (federal alien registration statute).  HB 87 effectively requires all individuals in Georgia to carry a state-approved identity document in order to avoid extended police questioning each time they encounter law enforcement.  Those who do not possess or do not happen to be carrying one of the identity documents preferred by Georgia will be treated as suspected illegal aliens and at risk of prolonged detention.

The Supreme Court has already held that state alien registration and documentation schemes are broadly preempted.  In *Hines*, the court invalidated

Pennsylvania's Alien Registration Act, which required, among other things, that every alien 18 years or over to receive a state alien identification card, carry it at all times, and show the card whenever it may be demanded by an officer.  312 U.S. at 56.  The Court found that,

> Having the constitutional authority so to do, [Congress] has provided *a standard for alien registration in a single integrated and all-embracing system* in order to obtain the information deemed to be desirable in connection with aliens. When it made this addition to its uniform naturalization and immigration laws, it plainly manifested *a purpose to do so in such a way as to protect the personal liberties of law-abiding aliens through one uniform national registration system, and to leave them free from the possibility of inquisitorial practices and police surveillance.*

*Id*. at 74 (emphasis added).

HB 87's *de facto* documentation requirement is particularly problematic because many foreign nationals who reside in the United States with the permission of the United States do not possess or have readily available documentation that is acceptable under HB 87.  These categories of foreign nationals include those with deferred action, such as Plaintiff Jane Doe #2, travelers visiting from countries participating in the Visa Waiver Program, and individuals with temporary protected status or who have applied for visas as victims of crimes.  Jane Doe #2 Decl. ¶ 6; Decl. of Michael Aytes ¶¶ 17, 19, 21, filed in *United States v. Arizona*, 10-CV-1413 (D. Ariz. filed July 7, 2010) (copy

attached as Ex. I to Lauterback Decl.).  The number of individuals in these

situations is significant.  In fiscal year 2009, more than 14 million aliens were

admitted under the Visa Waiver Program, Decl. of David V. Aguilar ¶ 24, filed in

*United States v. Arizona*, No. 10-CV-1413 (D. Ariz. filed July 6, 2010) (copy

attached as Ex. J to Lauterback Decl.), and DHS estimates that up to 200,000

individuals were eligible for temporary protected status based solely on the

designation of Haiti due to last year's earthquake, Steinberg Decl. ¶ 19.  Such

increased police intrusion into the lives of these lawfully present aliens, among

others, is impermissible.  *See DeCanas*, 424 U.S. at 358, n.6 ("Of course, state

regulation not congressionally sanctioned that discriminates against aliens lawfully

admitted to the country is impermissible if it imposes additional burdens not

contemplated by Congress.").

> ### d.  HB 87 Places an Impermissible Burden on Federal Resources and Interferes With Federal Immigration Enforcement

HB 87 is also preempted because it imposes an impermissible burden on

federal resources that creates "obstacle[s] to the accomplishment and execution of

the full purposes and objectives of Congress."  *Hines*, 312 U.S. at 67; *see Egelhoff*

*v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 150 (2001) (holding that "differing state

regulations affecting an ERISA plan's 'system for processing claims and paying

benefits' impose 'precisely the burden that ERISA pre-emption was intended to avoid.'") (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 10 (1987)).

Sections 8 and 13 will directly undermine federal immigration enforcement priorities by vastly increasing the number of immigration status verification queries to the federal government.  In addition to the immigration queries authorized by Section 8, Section 13 mandates that a verification request be submitted to the federal government for every suspected foreign national— regardless of whether they are suspected to be unlawfully present or not—who is confined for any period of time in a county or municipal jail and who does not have documents on hand to establish immigration status.  O.C.G.A. § 42-4-14(c). As discussed above, a large number of foreign nationals will be unable to readily demonstrate their lawful status, and HB 87 authorizes an immigration investigation that includes querying the federal government in each of these cases.

HB 87's across-the-board approach to immigration enforcement thus undermines the federal government's ability to focus on its priorities, including the apprehension of the most dangerous aliens.  Decl. of David C. Palmatier ¶ 18, filed in *United States v. Arizona*, No. 10-CV-1413 (D. Ariz. filed July 6, 2010) (copy attached as Ex. K to Lauterback Decl.); Decl. of Daniel H. Ragsdale ¶ 41, filed in *United States v. Arizona,* No. 10-CV-1413 (D. Ariz. filed July 7, 2010) (copy

attached as Ex. L to Lauterback Decl.).  The federal Law Enforcement Support
Center ("LESC"), which is responsible for responding to immigration status
queries from law enforcement agencies, has experienced "continuous and dramatic
increases" in immigration status determination queries over the past four years.
Palmatier Decl., ¶ 9.  The verification process at the LESC is time-intensive and
takes, on average, over 80 minutes even for simpler cases.  *Id.* at ¶ 8.  In some
cases, where a review of the individual's physical file is required, the review may
take two days or more.  *Id.* at ¶ 11.  In addition, the LESC is unable to verify the
status of most U.S. citizens, since their records are not contained in the LESC
databases.  *Id.* at ¶ 19.  The additional queries created by HB 87, combined with
the already time-intensive verification process, will necessarily strain the federal
government's resources.

Following congressional guidance, the "LESC [has] prioritize[d] its efforts
in order to focus on criminal aliens and those most likely to pose a threat to their
communities," and the increase in requests attributable to HB 87 creates a
significant risk that the federal government will be forced to shift resources away
from its priorities.  Palmatier Decl. ¶ 7.  Like the enjoined provisions of Arizona's
SB 1070, HB 87 "is inconsistent with the discretion Congress vested in the

Attorney General to supervise and direct State officers in their immigration work according to federally-determined priorities." *Arizona*, 2011 WL 1346945, at *8.

Finally, the Court should consider the cumulative impact of other states passing similar legislation. *See, e.g., Bonito Boats v. Thunder Craft Boats,* 489 U.S. 141, 161 (1989) (considering "[t]he prospect of all 50 States establishing similar [rules]" in finding law preempted); *accord North Dakota v. United States*, 495 U.S. 423, 458 (1990) (Brennan J., concurring in part and dissenting in part) (finding state legislation preempted in part because difficulties presented "would increase exponentially if additional States adopt equivalent rules" and noting that such a nation-wide consideration was found "dispositive" in *Pub. Utils. Comm'n of Cal.*, 355 U.S. 534, 545-46 (1958). This concern is far from speculative. Georgia is the fourth state to have passed far-reaching immigration enforcement measures and a fifth, Alabama, has now followed suit. Although the similar state laws that preceded HB 87 are either currently enjoined or not yet in effect, the actual implementation individually and, in particular, when aggregated, will further burden the federal government's immigration priorities. Palmatier Decl. ¶ 7.

## B.    HB 87 Violates the Fourth Amendment

Section 8 authorizes the prolonged detention of individuals solely to verify their immigration status, based on their failure to produce a state-approved identity

document—conduct which does not provide suspicion of, or probable cause to believe a person is engaged in any unlawful conduct.  By allowing such detention without suspicion of wrongdoing, much less criminal activity, Section 8 violates the Fourth Amendment.

      **1.**    **The Immigration Status Investigations Authorized By HB 87 Will Cause Unlawful Detentions**

Bedrock Fourth Amendment law permits a brief investigatory stop if an officer has "a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  The stop, however, "must be limited to the time necessary to effectuate the purpose of the stop." *United States v. Pruitt,* 174 F.3d 1215, 1220 (11th Cir. 1999).  Once the purpose of the initial stop has been effectuated, the stop "may not last 'any longer than necessary to process the [original] violation' unless there is articulable suspicion of other illegal activity." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing *United States v. Holloman,* 113 F.3d 192, 196 (11th Cir. 1997)); *see also Muehler v. Mena*, 544 U.S. 93, 100-01 (2005) (holding that officers may ask questions unrelated to the original purpose of the stop as long as such questioning does not unreasonably prolong the stop).

Section 8 provides that when an officer stops an individual based on probable cause to believe the person is engaged in criminal activity, if the person fails to provide the officer with a state-approved identity document that HB 87 deems to be sufficient proof of immigration status, the officer may, based only on the lack of such a document, investigate and "determine" the person's immigration status.  O.C.G.A. § 17-5-100(b).

HB 87 does not set any time limits on the immigration status investigations that it authorizes, and these investigations are generally lengthy.[12]  On average, ICE takes more than 80 minutes to provide a response to an officer via telephone. Palmatier Decl. ¶ 8.  Additionally, immigration status inquiries to ICE do not necessarily provide accurate or definite results.  For example, in Arizona almost 10,000 of the 80,000 request for immigration status verification received during 2009 produced an indeterminate answer, which would require DHS to search additional databases and even paper files in an attempt to resolve the inquiry.[13]  *See* Palmatier Decl. ¶¶ 12, 19.

---

[12] Section 8 authorizes an officer to "determine immigration status" by "any reasonable means available," including by relying on: (1) a "federal identification data base"; (2) "[i]dentification methods authorized by federal law"; (3) electronic fingerprint readers or "similar devices"; or (4) "[c]ontacting an appropriate federal agency."  O.C.G.A. § 17-5-100(c).

[13] Where a database search is inconclusive, it may take up to two days to conduct a search through paper files.  Palmatier Decl. ¶ 11.  Additionally, either a database or

Thus, in many cases, and especially in those numerous encounters that otherwise ordinarily would be resolved with a citation or warning from a police officer, *see* Decl. of George Gascón ¶ 14, attached as Ex. 11; Decl. of Eduardo Gonzalez ¶ 15, attached as Ex. 12; Decl. of Lewis Smith ¶ 14, attached as Ex. 13, the immigration status investigation authorized by HB 87 will be the *only* basis for continuing to detain a person for a significant period of time.  By allowing such detentions without additional suspicion of any unlawful conduct, Section 8 violates the Fourth Amendment.  *See*, *e.g.*, *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990) (finding that officer's further investigation of a lawfully stopped driver unlawfully prolonged the detention because of lack of suspicion of criminal activity beyond a speeding citation).

### 2. HB 87's Documentation Requirement Cannot Substitute for a Probable Cause Determination

Critically, the lack of a state-approved identity document does not give rise on its own to any suspicion of unlawful activity.  Gonzalez Decl. ¶ 15; Gascón Decl. ¶ 14.  While in Georgia it is unlawful to drive without a valid driver's license, O.C.G.A. § 40-5-20, HB 87 does not limit prolonged investigation and

---

paper file search may not produce any definitive information or any information at all, especially for many U.S. citizens.  The fact that a person does not appear in ICE databases could equally mean either that the person is a U.S. citizen or is a non-citizen who entered without inspection, depending on whether the person was born in the United States.  *Id*. ¶ 12.

detention to that circumstance.  Gonzalez Decl. ¶ 16; Gascón Decl. ¶ 9.  For

example, persons driving in Georgia with a valid New Mexico or Washington

driver's license (which are issued pursuant to those states' laws without a

requirement of evidence of lawful immigration status), including Lawful

Permanent Residents or U.S. citizens like Plaintiffs Singh and Piñon, would be

unable to produce a state-approved identity document when stopped.  Decl. of

Ernesto Piñon ¶ 7, attached as Ex. 14; Decl. of Jaypaul Singh ¶ 4, attached as Ex.

15.  Similarly, pedestrians and passengers in vehicles are not required by law to

carry any identification document, but would be subject to additional investigation

under Section 8 if they do not possess or have on them a state-approved identity

document.  As a result, HB 87 subjects even U.S. citizens and lawful immigrants to

prolonged detention pending immigration status verification.  Gonzalez Decl. ¶ 15;

Gascón Decl. ¶ 15.

As discussed above in Section I(A)(2)(c), many foreign nationals authorized

to be in the United States do not possess or have readily available qualifying

identity documents required under § 17-5-100(b)(1-5), or any other documentation

that would demonstrate their immigration status, such as to prevent being subjected

to additional investigation under Section 8.  For example, Plaintiff  Jane Doe #2's

presence in the United States is known to the federal authorities and while she has

no formal immigration status, federal authorities have decided to allow her to remain in the United States until at least May 2012 through deferred action. However, she does not possess paperwork documenting her situation.  Jane Doe #2 Decl. ¶ 7.  Individuals like her would be subject to prolonged detention under HB 87, even though they are not subject to immediate removal by federal authorities and there is no evidence of criminal activity justifying any additional investigation.

### 3.   The Practical Effects of HB 87's Arrest Provisions are Serious

HB 87 will cause widespread and significant Fourth Amendment violations if allowed to go into effect.  Section 8's authorization for police to undertake immigration investigations applies to situations in which an officer has probable cause to believe a person is committing any criminal violation, regardless of how minor.  Gonzalez Decl. ¶ 15; Gascón Decl. ¶ 14.  In Georgia, all traffic violations, including minor violations such as speeding, failure to properly signal a turn, or jaywalking, are criminal violations.  *See generally* Georgia Code Title 40. Therefore, a wide variety of traffic violations will become occasions for unlawfully prolonged detention to investigate immigration status if HB 87 goes into effect.

### C.   HB 87 Violates the Constitutional Right to Travel

By subjecting individuals traveling in Georgia to prolonged stops if they do not have a qualifying identity document, even if they have valid driver's licenses,

HB 87 violates the fundamental right to travel.  The Supreme Court has long "recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement."  *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974).  The Supreme Court has repeatedly held that the right is fundamental. *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902-03 (1986) (plurality). A state law infringes on the right to travel if it uses " 'any classification which serves to penalize the exercise of that right' " even in an "indirect manner," *Soto-Lopez*, 476 U.S. at 903 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 340 (1972)), or treats residents of other states as "unfriendly alien[s]" rather than "welcome visitor[s]," *Saenz v. Roe*, 526 U.S. 489, 500 (1999).  If either condition is met, the law must be analyzed under strict scrutiny and invalidated unless the state can satisfy the "heavy burden of proving that it has selected a means of pursuing a compelling state interest which does not impinge unnecessarily on constitutionally protected interests."  *Soto-Lopez*, 476 U.S. at 911.

HB 87, on its face, burdens and penalizes certain out-of-state travelers' exercise of the right to travel.  As discussed above, Section 8 allows a peace officer

to verify an individual's immigration status when the individual is unable to produce "a valid Georgia driver's license" or certain other documents that "require[] proof of legal presence in the United States before issuance."  O.C.G.A. § 17-5-100(b).[14,15]   Many people travel with a valid driver's license as their only form of identification, yet some states—currently New Mexico and Washington— issue driver's licenses without requiring proof of federal immigration status.[16] Thus, although Georgians can use their driver's licenses to avoid an immigration determination, travelers from certain other states, including people from New Mexico and Washington, such as Plaintiffs Piñon and Singh, cannot use their valid state driver's licenses for the same purpose.  Instead, those out-of-state travelers will face additional scrutiny by Georgia peace officers and will be effectively

---

[14] In order to receive a driver's license in Georgia, individuals must demonstrate that they are "either a United States citizen or an alien with legal authorization from the U.S. Immigration and Naturalization Service." O.C.G.A. § 40-5-1(15).
[15] Although Section 8 contains an exception if a person provides other information sufficient for an officer to independently identify them, O.C.G.A. § 17-5-100(b)(6), Section 8 provides no guidance on what information suffices under this section and entrusts such determinations entirely to an officer's discretion, leaving individuals who do not have adequate identification at constant risk of detention.
[16] N.M. Stat. Ann. § 66-5-9(B) (1978); N.M. Admin. Code § 18.19.5.12(D) (allowing foreign national to obtain driver's license with federal tax identification number and valid foreign passport or Matricula Consular card); Wash. Rev. Code § 46.20.035(3) (allowing use of "other available documentation," on a discretionary basis, for issuance of driver's license); Lauterback Decl. Ex. M (Washington Department of Licensing rules allowing issuance of driver's license if resident provides valid foreign passport or other identification).

required to obtain and carry additional documentation acceptable under HB 87 while traveling in Georgia.  *See* Singh Decl. ¶¶ 2, 5; Piñon Decl. ¶¶ 2, 7.  This burden will force Plaintiff Singh to limit his driving in Georgia if HB 87 takes effect.  *See* Singh Decl. ¶ 6.  Although the right to travel does not guarantee access to any "single mode of transportation," *John Doe No. 1 v. Ga. Dep't of Pub. Safety*, 147 F. Supp. 2d 1369, 1375 (N.D. Ga. 2001), HB 87's burden on travelers from Washington and New Mexico applies regardless of mode of travel and in fact reaches beyond transportation.  According to its plain language, Section 8 applies to any peace officer investigation, whether the investigation occurs on MARTA, on the sidewalk, following a routine traffic stop, or in someone's home.  O.C.G.A. § 17-5-100; *see also* Singh Decl. ¶ 4.

While frequently invoked with regard to residency requirements, *see*, *e.g.*, *Shapiro*, 394 U.S. at 622, the right to travel reaches more broadly than simply guaranteeing access to benefits for new residents to a state.  *See*, *e.g.*, *Austin v. New Hampshire*, 420 U.S. 656, 666-67 (1975) (striking down tax that discriminatorily applied to out-of-state commuters); *Bigelow v. Virginia*, 421 U.S. 809, 824 (1975) (prohibiting ban on advertising abortion services that required out-of-state travel).  Rather, it has long been recognized that the right to travel guarantees that "all citizens of the United States . . . must have the right to pass and

repass through every part of [the United States] without interruption, as freely as in our own States." *Crandall v. Nevada*, 73 U.S. 35, 49 (1868).

HB 87 further violates the right to travel because it pressures other states to legislate in response so that their citizens do not face discriminatory treatment in Georgia. *See Austin*, 420 U.S. at 666-67 (explaining that such pressure on other states "compounds" the constitutional violation). In addition, HB 87 burdens the ability of other states to enact driver documentation policies akin to those in New Mexico and Washington by creating a penalty for those states' residents who travel in Georgia. *See id.* at 666. By creating a discriminatory classification for travelers from certain states, HB 87 interferes with those states' sovereign power to regulate issuance of their own driver's licenses.

HB 87's differential treatment of travelers based on their state's driver's license policies cannot withstand strict scrutiny because it is not narrowly tailored to the purpose of the law—immigration regulation and enforcement, *see supra* Section I(A)(1)—even if such a purpose could be deemed a compelling state interest (which it is not). HB 87 penalizes all travelers carrying driver's licenses from certain states, including U.S. citizens and lawfully present immigrants, and subjects them to investigation and prolonged detention to which people with

licenses from Georgia and other states are not subject.  This discrimination violates the right to travel.

### D.   HB 87 Violates the Separation-of-Powers Safeguards of the Georgia Constitution

The sweeping discretion delegated to the Attorney General by Section 19 of HB 87 violates the Georgia Constitution's separation-of-powers guarantee. Section 19 prohibits the acceptance of an identification document that is not "a secure and verifiable document" by any agency or political subdivision for "any official purpose," O.C.G.A. § 50-36-2(c), and criminalizes the knowing and willful acceptance of such a document in violation of that code.  Critically, Section 19 unconstitutionally delegates to the Attorney General the authority to determine what conduct is prohibited or unlawful by granting him virtually unfettered discretion to decide what constitutes a "secure and verifiable document." O.C.G.A. § 50-36-2 (b)(3) ("Only those documents approved and posted by the Attorney General . . . shall be considered secure and verifiable documents.").

Although Section 19 defines a "secure and verifiable document" as "a document issued by a state or federal jurisdiction or recognized by the United States government and that is verifiable by federal or state law enforcement, intelligence, or homeland security agencies," *id*., it provides no guidance as to the meaning of these requirements.  Instead, Section 19 places the ultimate decision as

to what documents shall be considered "secure and verifiable" solely with the Attorney General's unreviewable discretion.  Moreover, the Attorney General's list is exclusive: no matter what authority issues a given document, and no matter how easy it is to verify, if it is not on the Attorney General's list it is not a "secure and verifiable document" under Georgia law.

The Georgia Constitution prohibits precisely this type of delegation.  "The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others . . . ."  Ga. Const. Art. I, § II, Para. III. Legislative power lies exclusively with the General Assembly and cannot be delegated to the Attorney General.  *See id.*; Ga. Const. Art. III, § I, Para. I.  The Attorney General only has "the power to adopt rules and regulations to carry into effect a law already passed."  *HCA Health Servs. v. Roach*, 265 Ga. 501, 502-03 (1995) ("[An executive's] authority can extend only to the performance of the latter administrative function, as it has no constitutional authority to legislate.").

The Georgia Supreme Court has struck down legislation that, like HB 87, purports to delegate the General Assembly's legislative authority.  In *Sundberg v. State*, 234 Ga. 482 (1975), the Court found that legislation that declared certain chemicals to be "controlled substances," but empowered the State Board of

Pharmacy to thereafter augment the law's original list of prohibited chemicals, was an unconstitutional delegation of power.  The Court explained that "while the General Assembly may delegate certain powers to the executive branch of government in order to carry out the law as enacted by the General Assembly," the General Assembly could not "delegate . . . the authority to determine what acts (the possession of such substances) would constitute a crime."  *Id.* at 484.

Section 19 of HB 87 suffers from the same constitutional defect by expanding the purported authority of the Attorney General beyond that of merely "carrying out the law" to the role of determining the very conduct that will either be lawful or unlawful.  *See id.*; *Long v. State*, 202 Ga. 235 (1947) (delegation to counties of authority to set speed limits unconstitutional); *Howell v. State*, 238 Ga. 95 (1976) (statute providing that "[a]ny person or corporation who shall violate any of the rules or regulations promulgated by the commission [of Natural Resources] shall be guilty of a misdemeanor" was an "unconstitutional delegation of legislative authority" to the commission.).  By delegating to the Attorney General the power to determine which documents are "secure and verifiable," and which by exclusion are prohibited from use by public officials and agencies, HB 87 violates the Georgia Constitution's separation of powers doctrine.

## II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF HB 87 IS ALLOWED TO GO INTO EFFECT

Plaintiffs will suffer irreparable harm if HB 87 is not enjoined.  "An injury is irreparable if it cannot be undone through monetary remedies" or "if damages would be difficult or impossible to calculate."  *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (citations and quotations omitted).  Harm resulting from the enforcement of a law that violates the Supremacy Clause is generally irreparable, *see, e.g.*, *Morales v. Trans World Airlines*, 504 U.S. 374, 381 (1992); *Arizona*, 2011 WL 1346945, at *19, as are other constitutional harms that are intangible in nature, *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

If HB 87 goes into effect, it will immediately subject numerous plaintiffs and members of plaintiff organizations to the risk of unconstitutional and extended detention while police officers investigate immigration status.  Decl. of Eliseo Medina ¶ 8, attached as Ex. 24; Decl. of Harris Raynor ¶¶ 4-6, attached as Ex. 25. Plaintiffs are a diverse group of individuals and organizations who represent racial minorities, national origin minorities, individuals who speak foreign languages or who have accents when speaking English, and individuals who lack the qualifying identity documents enumerated in HB 87.  If HB 87 takes effect, Plaintiffs will be at risk of discriminatory treatment, unwarranted police scrutiny, prolonged detentions, and arrest every time they come into contact with Georgia law

enforcement.  Several of the individual Plaintiffs have experienced racial profiling in the past, and all of them are worried that if HB 87 goes into effect they will be subjected to repeated stops, questioning, detention, arrest, and even criminal prosecution.  Speight Decl. ¶¶ 7-11; Kennedy Decl. ¶¶ 5-9; Piñon Decl. ¶¶ 5-8; Howe Decl. ¶¶ 5–7, 11; Jane Doe #1 Decl. ¶¶ 3-4, 7-8; Jane Doe #2 Decl. ¶¶ 8-11; Singh Decl. ¶¶ 4, 6-7; John Doe #1 Decl. ¶¶ 8, 10-11, attached as Ex. 16; John Doe #2 Decl. ¶¶ 3-6, 8, attached as Ex. 17; Bridges Decl. ¶¶ 9-16; Edwards Decl. ¶¶ 6-8; Sharon Gruner Decl. ¶¶ 3-8; *see also* Silva America Gruner Decl. ¶¶ 15-17, attached as Ex. 18 (noting same fear in community); Anton Flores Decl. ¶¶ 8-12, attached as Ex. 19 (same); Adelina Nicholls Decl. ¶¶ 12, 14, 18-21, attached as Ex. 20 (same).  These harms are inherently intangible and unquantifiable, and cannot be adequately remedied after the fact.  *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (describing liberty of person as "sacred" right); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) (discriminatory treatment irreparable); *Grodzki v. Reno*, 950 F. Supp. 339, 342 (N.D. Ga. 1996) (unlawful detention irreparable); *Collins v. Brewer*, 727 F. Supp. 2d 797, 813 (D.Ariz. 2010).

Because of the threat of unreasonable searches and seizures and racial profiling and the threat of unlawful criminal prosecutions, Plaintiffs will fear contact with law enforcement if HB 87 goes into effect, and several will fear

reporting crimes to the police or acting as witnesses, thus making them vulnerable targets for criminals and undermining public safety in their communities.  *See* Gonzalez Decl. ¶¶ 10-14; Smith Decl. ¶¶ 9-14; *see also* Jane Doe #2 Decl. ¶ 11; John Doe #1 Decl. ¶ 11; John Doe #2 Decl. ¶ 6; Flores Decl. ¶¶ 10-12; Nicholls Decl. ¶¶ 12, 21; Edwards Decl. ¶ 9.  Some will avoid contact with police altogether if HB 87 goes into effect.  *See* Jane Doe # 1 Decl. ¶ 4; John Doe # 1 Decl. ¶ 11. These harms are quintessential examples of irreparable harm because of their intangible and unquantifiable nature.  *See Trans World Airlines*, 504 U.S. at 381.

Moreover, all Plaintiffs and Georgians will be harmed as local law enforcement resources are diverted away from criminal law enforcement to effectuate HB 87's status-verification and immigration enforcement provisions. *See* Gonzalez Decl. ¶ 14; Smith Decl. ¶¶ 9-14.

In addition, HB 87's severe burdening of several Plaintiffs' constitutional right to travel threatens further irreparable harm.  Plaintiffs Singh and Piñon will be residing in or plan to soon visit Georgia, and will use out-of-state licenses as their identification.  *See* Piñon Decl. ¶¶ 2-3, 7; Singh Decl. ¶ 2.  Because they lack a qualifying identity document that would protect them from additional inquiry by peace officers, they will be afraid to travel to or drive within Georgia once HB 87 goes into effect, and will suffer irreparable harm due to the limitation on their

freedom of movement and their reduction in travel to avoid police interrogation. *See* Piñon Decl. ¶ 8; Singh Decl. ¶¶ 4-7; *Pro-Choice Network of W.N.Y. v. Project Rescue W.N.Y.*, 799 F. Supp. 1417, 1428, 1430 (W.D.N.Y. 1992) (holding alleged violation of right to travel constitutes irreparable injury), *aff'd and rev'd in part on other grounds by Schenck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357 (1997).

Finally, the organizational Plaintiffs will suffer and are already suffering irreparable harm because they are required to divert organizational resources away from core mission activities to address their members' and clients' concerns about the law and repercussions from its enforcement, and will face diminished membership and clients if the law were to go into effect.  *See* Nicholls Decl. ¶¶ 7-8, 17-18; America Gruner Decl. ¶¶ 9-10; Anita Beaty Decl. ¶¶ 9, 15-16, attached as Ex. 21; Flores Decl. ¶¶ 6, 7, 13; Helen Kim Ho Decl. ¶ 7, attached as Ex. 22; Mohammad Abdollahi Ali-Beik Decl. ¶¶ 4, 6-9, attached as Ex. 23; Decl. of Gabriela Gonzalez-Lamberson ¶ 8, attached as Ex. 26; Medina Decl. ¶¶ 9-10; Raynor Decl. ¶¶ 5, 9-10; *see*, *e.g.*, *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (threat of loss of customers irreparable); *Mays v. Hosp. Auth. of Henry County*, 582 F. Supp. 425, 428 (N.D. Ga. 1984) (same).  The missions of the organizational Plaintiffs have been and will continue to be frustrated as their members will be afraid to gather in

public places, attend marches and meetings, and engage in other advocacy and

organizing activities that might bring them into contact with law enforcement.  *See*

Nicholls Decl. ¶ 9; America Gruner Decl. ¶ 15; Flores Decl. ¶ 13; Ali-Beik Decl.

¶¶ 4, 6-9; Gonzalez-Lamberson Decl. ¶¶ 9-10; Raynor Decl. ¶¶ 5, 9-10.  None of

these harms can be compensated after the fact, making each a quintessential

irreparable injury that justifies an injunction.  *See KH Outdoor*, 458 F.3d at 1272.

## III.   THE BALANCE OF HARMS STRONGLY FAVORS THE ISSUANCE OF AN INJUNCTION

A preliminary injunction will impose only minimal harm on the state of

Georgia because Plaintiffs ask merely for the status quo to be maintained while

serious questions about the law's constitutionality are adjudicated.  This is

precisely the purpose of a preliminary injunction:  "to preserve the status quo and

prevent allegedly irreparable injury until the court [has] the opportunity to decide

whether to issue a permanent injunction."  *Schiavo ex rel. Schindler v. Schiavo*,

403 F.3d 1261, 1262 (11th Cir. 2005).   Any harm to the State in adhering to the

status quo is dramatically outweighed by the immediate and irreparable harms

Plaintiffs will face, outlined above, if HB 87 is allowed to go into effect.

The requested injunction is intended to prevent the implementation of a new

law that would upset the longstanding allocation of authority between state and

federal government regarding the regulation of immigration, intrude on the federal

government's ability to regulate immigration and conduct foreign affairs, and impose irreparable harms on Plaintiffs and the public.  The equities tip sharply in favor of granting a preliminary injunction while the constitutionality of HB 87 is decided.  *See Scott*, 612 F.3d at 1297 ("the public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law"); *KH Outdoor*, 458 F.3d at 1272.

## IV.   AN INJUNCTION IS IN THE PUBLIC INTEREST

The interests of Plaintiffs and the general public are aligned in favor of a preliminary injunction in this case.  The public interest is not served by allowing an unconstitutional law to take effect.  *See Scott*, 612 F.3d at 1297; *KH Outdoor*, 458 F.3d at 1272 ("The public has no interest in enforcing an unconstitutional ordinance."); *Fla. Businessmen for Free Enterprise v. Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981).  Particularly where civil rights are at stake, an injunction *serves* the public interest because the injunction "would protect the public interest by protecting those rights to which it too is entitled."  *Nat'l Abortion Fed'n v. Metro. Atlanta Rapid Transit Auth.*, 112 F. Supp. 2d 1320, 1328 (N.D. Ga. 2000).  And courts have specifically held that enjoining a state statute that is preempted by federal law will serve the public interest.  *See Chamber of Commerce v. Edmonson*, 594 F.3d 742, 771 (10th Cir. 2010); *Villas at Parkside Partners v. City*

*of Farmers Branch*, 701 F. Supp. 2d 835, 859 (N.D. Tex. 2010) ("[T]he public interest favor[s] preserving the uniform application of federal immigration standards."). This is particularly true in the field of immigration, in light of the risk of encroachment on the federal government's relations with foreign countries. *See Hines*, 312 U.S. at 64; *United States v. Arizona*, 2011 WL 1346945, at *21-23.

Without an injunction, Georgia residents and visitors will face enforcement of a statutory scheme that violates the Constitution in numerous respects and presents a grave risk of other harms to the public interest, such as the undermining of public safety as a result of diversion of resources away from criminal investigations.

## CONCLUSION

The motion should be granted.

Dated: June 8, 2011                          Respectfully submitted,[17]

                                             /s/ Michelle Lapointe
                                             Michelle Lapointe
                                             *On behalf of Attorneys for Plaintiffs*

Linton Joaquin (*pro hac vice*)              Omar C. Jadwat*
Karen C. Tumlin (*pro hac vice*)             Andre Segura*
Nora A. Preciado*                            Elora Mukherjee*
Melissa S. Keaney (*pro hac vice*)           AMERICAN CIVIL LIBERTIES UNION
NATIONAL IMMIGRATION LAW                     FOUNDATION
CENTER                                       125 Broad Street, 18th Floor

---

[17] Counsel certifies this document has been prepared in accordance with L.R. 5.1.

3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
T: (213) 639-3900
F: (213) 639-3911
*Joaquin@nilc.org*
*Tumlin@nilc.org*
*Preciado@nilc.org*
*Keaney@nilc.org*

Naomi Tsu (GSB No. 507612)
Michelle R. Lapointe (GSB No. 007080)
Daniel Werner (GSB No. 422070)
SOUTHERN POVERTY LAW CENTER
233 Peachtree St., NE, Suite 2150
Atlanta, Georgia  30303
T: (404) 521-6700
F: (404) 221-5857
*naomi.tsu@splcenter.org*
*michelle.lapointe@splcenter.org*
*daniel.werner@splcenter.org*

Mary Bauer (GSB No. 142213)
Andrew H. Turner*
Samuel Brooke*
SOUTHERN POVERTY LAW CENTER
400 Washington Ave.
Montgomery, Alabama 36104
T: (404) 956-8200
F: (404) 956-8481
*mary.bauer@splcenter.org*
*andrew.turner@splcenter.org*
*samuel.brooke@splcenter.org*

Tanya Broder (*pro hac vice*)
Jonathan Blazer*
NATIONAL IMMIGRATION LAW
CENTER
405 14th Street, Suite 1400

New York, New York 10004
T: (212) 549-2660
F: (212) 549-2654
*ojadwat@aclu.org*
*asegura@aclu.org*
*emukherjee@aclu.org*

Cecillia D. Wang (*pro hac vice*)
Katherine Desormeau (*pro hac vice*)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
T: (415) 343-0775
F: (415) 395-0950
*cwang@aclu.org*
*kdesormeau@aclu.org*

Chara Fisher Jackson (GSB No. 386101)
Azadeh N. Shahshahani (GSB No.
509008)
ACLU OF GEORGIA
1900 The Exchange, Suite 425
Atlanta, Georgia  30339
T: (770) 303-8111
*cfjackson@acluga.org*
*ashahshahani@acluga.org*

G. Brian Spears  (GSB No. 670112)
1126 Ponce de Leon Ave., N.E.
Atlanta, Georgia 30306
T: (404) 872-7086
F: (404) 892-1128

Oakland, California 94612
T: (510) 663-8282
F: (510) 663-2028
*Broder@nilc.org*
*Blazer@nilc.org*

Sin Yen Ling*
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, California 94111
T: (415) 896-1701  x 110
F: (415) 896-1702
*sinyenL@asianlawcaucus.org*

*Bspears@mindspring.com*

R. Keegan Federal, Jr. (GSB No. 257200)
FEDERAL & HASSON, LLP
Two Ravinia Drive, Ste 1776
Atlanta, Georgia  30346
T: (678) 443-4044
F: (678) 443-4081

Charles H. Kuck  (GSB No. 429940)
Danielle M. Conley (GSB No. 222292)
KUCK IMMIGRATION PARTNERS
LLC
8010 Roswell Road, Suite 300
Atlanta, Georgia  30350
T: (404) 816-8611
F: (404) 816-8615
*CKuck@immigration.net*
*DConley@immigration.net*

*Attorneys for Plaintiffs*

*Application for admission *pro hac vice* pending

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorney for Defendants Deal, Olens, Reese, and Beatty, to whom a copy is also being hand-delivered today:

> Devon Orland
> Office of State Attorney General
> 40 Capitol Square, S.W.
> Atlanta, GA 30334-1300
> dorland@law.ga.gov
> *Attorney for Defendants Deal, Olens, Reese and Beatty*

I hereby certify that a copy of the foregoing is being hand-delivered on this date to the following non-CM/ECF participant:

> Falecia Stewart
> Executive Director, Housing Authority of Fulton County
> HAFC Headquarters
> 4273 Wendell Drive
> Atlanta, GA 30336

This 8th day of June, 2011.

/s/ Michelle R. Lapointe