# EXHIBIT 11

## DECLARATION OF GEORGE GASCÓN

I, GEORGE GASCÓN, hereby declare:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

1. I am currently the District Attorney of San Francisco, California. I was appointed to this position on January 9, 2011.

2. Prior to assuming the role of District Attorney, I was the Chief of the San Francisco Police Department, a post I held from August 1, 2009 to January 9, 2011. I have over 32 years of law enforcement service, including: 3 years' service as the Chief of the Mesa Police Department in Mesa, Arizona; and 28 years as a member of the Los Angeles Police Department, beginning as a patrol officer and working my way up through the ranks to Assistant Police Chief, a position that I held for approximately 4 years.

3. I currently sit on the Board of Directors of the Council of State Governments' Justice Center and was formerly on the Board of Directors for the Police Executive Research Forum and the California Peace Officers' Memorial Foundation.

1

4. I received a Juris Doctor Degree from Western State University, College of Law and I am currently an active member of the California State Bar.

5. Additionally, I am a graduate of the FBI's National Executive Institute and a member of the Harvard University Kennedy School of Government's Executive Session on Policing and Public Safety.

6. I have published articles on the subject of police accountability, community policing, police training, and hiring practices.

7. I have read and reviewed Georgia's new immigration enforcement law, HB 87, and I make this declaration based on over 32 years of law enforcement experience.

8. If HB 87 is implemented I believe it will decrease community safety and increase mistrust of police for a number of reasons. First, because HB 87 leaves it to the discretion of the individual officer whether to investigate the immigration status of individuals routinely encountered in the field, HB 87 creates an unacceptable risk that officers will make arbitrary decisions about when to conduct immigration status checks based on nothing more than physical appearance, perceived race/ethnicity, or manner of speaking of the individual. The combination of provisions in HB 87 that invite law enforcement officers to conduct immigration status checks and other

2

provisions of HB 87 that incentivize law enforcement participation in immigration enforcement, such as those found in Section 9, create an environment in which racial profiling, pretextual stops, and other constitutional violations are likely to occur. I believe that officers who want to ensure that they comply with the law will naturally exercise their maximum authority under HB 87 by conducting immigration status checks on all individuals stopped, detained, or arrested, where they believe, based on physical appearance or otherwise, that the person is undocumented.

9. If HB 87 goes into effect, there will be an increase in the incidents of pretextual stops of individuals of color in Georgia, as some law enforcement officers will use pretextual reasons to stop or question individuals they believe to be in the United States illegally. HB 87's requirement that immigration status inquiries only follow probable cause to believe an individual has committed a criminal violation does little to guard against the likelihood of increased pretextual stops. This is because an officer motivated by racial or ethnic discrimination or by race-based stereotypes of what an illegal immigrant looks like can easily find a pretext for stopping an individual, for example by following a car until a minor traffic violation occurs. Under the provisions of Section 8, even minor traffic violations such

3

as failure to come to a complete stop qualify to permit an officer to inquire about a person's immigration status.  HB 87 also creates immunity for officers who elect to enforce immigration laws under the HB 87's other provisions, which further increases the risk that officers will engage in racial profiling or pretextual stops.

10. By encouraging Georgia law enforcement officers to check immigration status in the course of their regular policing duties, immigrant and minority communities will be reluctant to contact the police because of fear that such contact will lead to investigations into immigration status.  As a result of the fear that HB 87 will create, fewer victims of and witnesses to crime will come forward and call the police out of fear that doing so will result into investigations into immigration status of the victim/witness, his or her family members, neighbors or other persons close to him or her, perhaps leading to their deportation.  When police officers lack the trust and cooperation of the community members they are sworn to protect, this undermines public safety for the entire community.

11. HB 497 will drive a wedge between immigrant communities and the police and the alienation that will result will not be limited to cases where the victim of or witness to the crime is undocumented.  In a great many cases,

4

individuals live in mixed status households and neighborhoods, meaning that some members of the household or neighborhood are U.S. citizens or otherwise have legal immigration status while others do not have legal status. HB 87's provisions encouraging police inquiry into immigration status will dissuade even community members with lawful status from contacting the police out of fear of deportation of a family or community member.

12. The resulting harm to public safety will impact all communities in Georgia because it creates a vacuum in law enforcement. Criminal elements in Georgia will feel emboldened to commit crimes by the belief that they have less reason to fear being reported by victims and witnesses in immigrant communities. This will also make immigrant communities a target of criminal activity and potentially other communities closely located or otherwise connected to immigrant communities.

13. HB 87 will also decrease community safety by diverting police resources away from the primary mission of fighting serious and violent crimes in favor of pursuing enforcement of civil immigration laws. Georgia police officers simply cannot take on the added responsibility to enforce federal

5

immigration laws without taking substantial time away from priorities that are more central to a local law enforcement agency.

14. This is especially true under HB 87 because taking on the added responsibility of enforcing immigration laws will necessarily prolong stops and detentions while the officer attempts to verify the individual's immigration status. HB 87 encourages officers to investigate the immigration status of individuals they stop who cannot produce one of five enumerated identity documents. Under Section of HB 87, if an officer has probable cause that even a minor criminal violation has occurred, such as a traffic offense, the officer may investigate the person's immigration status if he or she is unable to provide one of a few identification documents listed in this provision. Although the officer can only initiate the stop upon a finding of probable cause of a criminal violation, HB 87 allows the officers to extend the stop without any suspicion of further criminal activity in violation of well settled constitutional principles.

15. Thus, HB 87 will result in the unconstitutionally prolonged detention of individuals, including U.S. citizens and individuals with legal immigration status, while officers inquire about immigration status. The duration of detentions resulting from HB 87 is likely to be significantly prolonged

because immigration status is not something that can be readily verified in the field. In most cases, it will require Georgia police officers to call the Law Enforcement Support Center of the Department of Homeland Security to verify status, a process which takes an extended period of time. The time spent investigating immigration status is time taken away from investigating and preventing violent and serious crimes.

16. HB 87 also prohibits the use of consular-issued identity documents for any official purposes. This provision is likely to undermine law enforcement activities in Georgia. Consular identity documents (or "matriculas") are routinely used by law enforcement officials to verify the identity of an individual stopped. The Mexican matricula, in particular, is widely used. In my experience, the Mexican matricula is a very secure document and is easy for law enforcement officers to verify in the field because it has a unique bar code on the back that we can easily scan to verify the cardholder's identity and basic information. HB 87 deprives Georgia law enforcement officers of this secure and simple way to verify the identity of individuals they encounter.

17. In my opinion, HB 87 is extremely harmful for law enforcement departments in Georgia. It invites officers to engage in racial profiling and

7

pretextual arrest and will undermine public safety by causing communities to distrust the police and diverting policing resources from the goal of ensuring public safety. HB 87 will turn regular police encounters into prolonged investigations into immigration status and will make every day policing duties more difficult to accomplish.

I declare under penalty of perjury of the laws that the foregoing is true and correct. Executed this 7th day of April 2011 in San Francisco, California.

District Attorney George Gascón

8