# EXHIBIT 12

# **DECLARATION OF EDUARDO GONZALEZ**

I, EDUARDO GONZALEZ, hereby declare:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

1. I began my law enforcement career with the Miami-Dade Police Department in Miami, Florida in 1965. In 1986, I was appointed Deputy Director of the Department, a position which I held until 1992.

2. In 1992, I was appointed Chief of Police for the City of Tampa Police Department, Tampa, Florida, a position I held until 1993.

3. In 1993, I was appointed by President William J. Clinton as Director of the United States Marshals Service. I served in this position until my retirement in 1999.

4. I hold an Associate Degree in Police Science, a Bachelor's degree in Criminal Justice and am a graduate of the FBI's National Executive Institute, the FBI National Academy and the Senior Management Institute for Police.

5. I have served for four years as a Commissioner with the Commission on Accreditation for Law Enforcement Agencies.

1

6. In March 2004, I was contracted by the Alexandria Group of MPRI to serve as the Independent Monitor for a Memorandum of Agreement between the Prince Georges County Police Department and the U. S. Department of Justice to address compliance with requirements of a Memorandum of Agreement regarding the county's police department practices.

7. The duties and responsibilities of that position included enforcement of the terms of the agreement through quarterly site visits, meeting with both parties on a monthly basis to resolve areas of concern, issuing a quarterly report detailing Prince George's County progress or lack thereof, and providing technical assistance as required. The monitoring was successfully concluded in January of 2009.

8. In November, 2009, I joined the monitoring team enforcing two Consent Judgments regarding the City of Detroit's police force—one for use of force and one related to corrections practices.

9. I have read Georgia's HB 87 and based on my extensive experience in law enforcement, specifically as a police chief and independent monitor, I have several concerns with this law.

10. First, by enlisting local police in the business of federal immigration enforcement, HB 87 will sever the relationship between the police and

2

immigrant communities. HB 87 directs law enforcement officers to utilize "any reasonable means available to determine the immigration status" of individuals in the course of carrying out their regular policing duties. As a result, immigrant and minority communities will be reluctant to contact the police because of fear that such contact will lead to investigations into immigration status. This will mean that fewer witnesses to or victims of crimes, such as domestic violence, will call the police because doing so could result in investigations into the immigration status of the victim, his or her family members, neighbors, or other persons close to the victim, perhaps leading to their deportation. HB 87 will threaten public safety because it will drive a wedge between immigrant communities and the police.

11. As a result of community distrust of the police, Georgia law enforcement will have a much more difficult time doing their job. Effective policing, and investigating and solving serious crimes, rely on partnership with the local community. HB 87 undermines this partnership by making every contact with Georgia law enforcement a potential referral to ICE for deportation. The provisions of HB 87 that attempt to dispel the notion that enforcement of this statute will preclude the immigrant community from assisting law enforcement in the investigation of crime are simply ineffective. HB 87

3

provides that "[n]o person who in good faith contacts or has contact with a state or local peace officer … for the purpose of acting as a witness to a crime, to report criminal activity, or seek assistance as a victim to a crime shall have his or her immigration status investigated based on such contact…" This does not adequately guard against HB 87's chilling effect on the reporting of crime because there is no penalty for officers who improperly investigate the immigration status of witnesses to or victims of crime. Moreover, I don't believe that such language will overcome the fear of police that HB 87 will create in the immigrant community because of the law's overriding message to immigrant communities that the police now have additional policing duties and authority – to investigate immigration status.

12. My experience has also shown that it can be extremely difficult to gain the trust of immigrant communities even without measures such as HB 87 in place because the countries from which many immigrants originate have a history of abusive police practices. It takes considerable time and effort to gain the trust of these communities and laws like HB 87 only serve to undo that hard work by alienating immigrant communities and causing them to fear the police.

4

13. The distrust of law enforcement that HB 87 will engender will occur regardless of whether or not community members have legal status because immigrant families and communities are typically made up of both those with lawful status and those without. Even individuals with lawful status may fear contacting the police out of concern that such contact could result in the deportation of a family or community member.

14. HB 87 also undermines public safety because it diverts scarce law enforcement resources away from the primary goal of investigating and solving serious crimes in favor of pursuing enforcement of civil immigration laws, a federal responsibility, which local law enforcement officers are not properly trained to engage in. Police officers in Georgia simply cannot take on the added responsibility of immigration enforcement without sacrificing substantial time that would otherwise be spent pursuing priorities more central to a local law enforcement agency. The resulting harm to public safety will not only impact immigrant communities, but all communities in Georgia.

15. HB 87 will also result in the unconstitutionally prolonged detention of individuals, including U.S. citizens and individuals with legal immigration status, while officers inquire about their immigration status. Although HB

5

87 initially bases immigration status inquiries on a predicate criminal investigation there is no qualification on the kind of criminal investigation that can trigger immigration status inquiries—allowing police to inquire into immigration status in the most minor of investigations.  In addition, a lawful detention must last no longer than necessary to effectuate the purpose of the stop.  An officer must have suspicion of further criminal activity to continue the detention beyond the original purpose of the stop.  However, HB 87's provisions allow officers to extend the duration of a stop without any suspicion of wrongdoing, much less criminal activity.   Under HB 87, if an officer has "probable cause to believe that a suspect has committed a criminal violation," the officer may seek to verify the individual's immigration status when the individual is unable to present one of five enumerated forms of identification.  However, failing to produce one of the specified forms of identification is not evidence of crime.  Nevertheless it can subject an individual to prolonged detention, in fact, Georgia law enforcement officers are instructed to use "any reasonable means" to determine the immigration status of the individual.  This will inevitably lead to prolonged stops because immigration status cannot be readily determined in the field.   The criminal checks routinely run in the field do not reveal

6

information about an individual's immigration status and contacting ICE or another appropriate federal agency will add significant time to the duration of the stop. Prolonging the stop without suspicion of criminal activity, as allowed for here, is unconstitutional.

16. I believe HB 87 will also lead to an increase in the incidents of pretextual stops of individuals of color in Georgia, as some law enforcement officers will use pretextual reasons to stop or question individuals they believe to be in the United States illegally. An officer motivated by racial or ethnic animus or by race-based stereotypes about what an illegal immigrant looks like can easily find a pretext for stopping an individual. HB 87 only requires that the officer have probable cause to believe that the individual has committed a criminal violation, no matter how minor the alleged criminal violation is. Thus failure to signal for a turn or failure to come to a complete stop would provide sufficient basis for an officer to initiate an immigration status inquiry.

17. In addition, because HB 87 leaves the decision of whether to investigate immigration status up to the discretion of individual law enforcement officers, it creates an unacceptable risk that officers will rely on an individual's physical appearance or manner of speaking in determining when

to exercise this discretion. HB 87 does not provide any guidance or training to enable Georgia law enforcement officers to enforce it without coming into conflict with well established constitutional prohibitions against the use of race, color, or national origin.

18. In my opinion HB 87 is extremely harmful for local police departments in Georgia because it will cause immigrant communities to fear interaction with the police, it will divert policing resources from the goal of ensuring public safety, and it will lead to racial and ethnic profiling thereby undermining the integrity of the profession.

19. I declare under penalty of perjury of the laws that the foregoing is true and correct. Executed this 31st day of May 2011 in _Miami, Dade County, Florida_.

Eduardo Gonzalez

8