# EXHIBIT 28

# EXHIBIT G

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF ARIZONA, et al., <br><br> Defendants. | Civil Action No. |

### DECLARATION OF JAMES B. STEINBERG

Pursuant to 28 U.S.C. 1746, I, James B. Steinberg, declare and state as follows:

*1.* I am Deputy Secretary of State. I make this declaration based on my personal knowledge and on information I have received in my official capacity.

*2.* I have served as Deputy Secretary of State since January 28, 2009. Immediately prior to joining the Department of State, I served as Dean of the Lyndon B. Johnson School of Public Affairs at the University of Texas at Austin. From 1993 to 1994, I served as Deputy Assistant Secretary of State for analysis in the Bureau of Intelligence and Research, and from 1994 to 1996 as Director of the Department of State's Policy Planning Staff. From December 1996 to August 2000, I served as Deputy National Security Adviser on the staff of the National Security Council. From 2001-2005, I was the President and Director of Foreign Policy Studies at the Brookings Institution in Washington, D.C.

*3.* In my capacity as Deputy Secretary of State, I assist the Secretary of State in

1

the formulation and conduct of U.S. foreign policy and in giving general supervision and direction to all elements of the Department. I have delegated authority to act on behalf of the Secretary of State, and assist the Secretary in representing the United States at international meetings and performing other representational assignments with senior foreign government officials.

4. I have read and am familiar with Arizona law S.B. 1070. I am also familiar with the reactions of foreign governments to the law.

5. As I explain further below, U.S. federal immigration law incorporates foreign relations concerns by providing a comprehensive range of tools for regulating entry and enforcement. These may be employed with sensitivity to the spectrum of foreign relations interests and priorities of the national government. By contrast, Arizona law S.B. 1070 establishes a single, inflexible, state-specific immigration policy based narrowly on criminal sanctions that is not responsive to these concerns, and will unnecessarily antagonize foreign governments. If allowed to enter into force, S.B. 1070 would result in significant and ongoing consequences for U.S. foreign relations.

6. Through the Immigration and Nationality Act ("INA") and other federal laws, the national government has developed a comprehensive regime of immigration regulation, administration, and enforcement, in which the Department of State participates. This regime is designed to accommodate complex and important U.S. foreign relations priorities that are implicated by immigration policy -- including humanitarian and refugee protection, access for diplomats and official foreign visitors, national security and counterterrorism, criminal law enforcement, and the promotion of

U.S. human rights policies abroad. To allow the national government flexibility in addressing these concerns, the INA provides the Executive Branch with a range of regulatory options governing the entry, treatment and departure of aliens. Moreover, foreign governments' reactions to immigration policies and the treatment of their nationals in the U.S. impacts not only immigration matters, but also any other issue in which we seek cooperation with foreign states, including international trade, tourism, and security cooperation. These foreign relations priorities and policy impacts are ones to which the national government is sensitive in ways that individual states are not.

7. By rigidly imposing a singular, mandatory form of criminal immigration enforcement through mandatory verification of immigration status and criminal enforcement of alien registration, S.B. 1070 deviates from the national government's policy of calibrated immigration enforcement. The Arizona law also uniquely burdens foreign nationals by criminalizing work and travel beyond the restrictions imposed by U.S. law. These multiple, interlinking procedural and criminal provisions, adopted in order to enforce an explicit state policy of "attrition through enforcement," all manifest Arizona's intention to globally influence immigration enforcement. S.B. 1070 thereby undermines the diverse immigration administration and enforcement tools made available to federal authorities, and establishes a distinct state-specific immigration policy, driven by an individual state's own policy choices, which risks significant harassment of foreign nationals, is insensitive to U.S. foreign affairs priorities, and has the potential to harm a wide range of delicate U.S. foreign relations interests.

8. Indeed, although it was only adopted in April 2010, is the law of only one

3

state, and has not yet gone into effect, Arizona law S.B. 1070 already has provoked significant criticism in U.S. bilateral relationships with many countries, particularly in the Western Hemisphere, as well as in a variety of regional and multilateral bodies. Foreign governments and international bodies have expressed significant concerns regarding the potential for discriminatory treatment of foreign nationals posed by S.B. 1070, among other issues.

9. By deviating from federal immigration enforcement policies as well as federal rules governing work and travel by foreign nationals, S.B. 1070 threatens at least three different serious harms to U.S. foreign relations. *First*, S.B. 1070 risks reciprocal and retaliatory treatment of U.S. citizens abroad, whom foreign governments may subject to equivalently rigid or otherwise hostile immigration regulations, with significant potential harm to the ability of U.S. citizens to travel, conduct business, and live abroad. Reciprocal treatment is a significant concern in immigration policy, and U.S. immigration laws must always be adopted and administered with sensitivity to the potential for reciprocal or retaliatory treatment of U.S. nationals by foreign governments.

10. *Second*, S.B. 1070 necessarily antagonizes foreign governments and their populations, both at home and in the U.S., likely making them less willing to negotiate, cooperate with, or support the United States across a broad range of important foreign policy issues. U.S. immigration policy and treatment of foreign nationals can directly affect the United States' ability to negotiate and implement favourable trade and investment agreements, to coordinate disaster response arrangements, to secure cooperation on counterterrorism or drug trafficking operations, and to obtain cooperation

4

in international bodies on priority U.S. goals such as nuclear non-proliferation, among other important U.S. interests. The law has already complicated our efforts to pursue broader U.S. priorities. S.B. 1070's impact is likely to be most acute, moreover, among our many important democratic allies, as those governments are most likely to be responsive to the concerns of their constituents and the treatment of their own nationals abroad.

11. *Third*, S.B. 1070 threatens to undermine our standing in regional and multilateral bodies that address migration and human rights matters and to hamper our ability to advocate effectively internationally for the advancement of human rights and other U.S. values. Multilateral, regional and bilateral engagement on human rights issues and the international promotion of the rule of law is a high priority for the United States, and for this Administration. Consistency in U.S. practices at home is critical for us to be able to argue for international law consistency abroad. By deviating from national policy in this area, S.B. 1070 may place the U.S. in tension with our international treaty obligations and commitments and compromise our position in bilateral, regional and multilateral conversations regarding human rights.

12. In all activities relating to U.S foreign relations, including immigration, the United States is constantly engaged in weighing multiple competing considerations and choosing among priorities in order to develop an overall foreign policy strategy that will most effectively advance U.S. interests. The United States likewise is constantly seeking the support of foreign governments through a delicately-navigated balance of interests across the entire range of U.S. national policy goals. Only the national government has

5

the information available to it to be able to appropriately evaluate these choices on a continuing basis in response to fluctuating events on the international stage. Because of the broad-based and often unintended ways in which U.S. immigration policies can adversely impact our foreign relations, it is critically important that national immigration policy be governed by a uniform legal regime, and that decisions regarding the development and enforcement of immigration policy be made by the national government, so that the United States can speak to the international arena with one voice in this area.

13. While isolated state enactments that incidentally touch on immigration may not implicate foreign policy concerns (or may implicate them only slightly), Arizona's law more directly and severely impacts United States foreign policy interests by establishing an alternative immigration policy of multiple, interlinking procedural and criminal provisions, all of which manifest Arizona's intention to globally influence immigration enforcement. As I understand it, Arizona's effort to set its own immigration policy is markedly different from instances in which states and localities assist and cooperate with the federal government in the enforcement of federal immigration laws. When states and localities work in concert with the federal government, the likelihood for conflicts with U.S. foreign policy interests is greatly diminished. When states and localities assist the federal government, and take measures that are in line with federal priorities, then the United States retains its ability to speak with one voice on matters of immigration policy, which in turn enables it to keep control of the message it sends to

foreign states and to calibrate responses as it deems appropriate, given the ever-changing dynamics of foreign relations.

*14.* By contrast, by pursuing a singular policy of criminal enforcement-at-all-costs through, among other things, imposing an extraordinary mandatory verification regime coupled with what is effectively state criminalization of unlawful presence, S.B. 1070 is likely to provoke retaliatory treatment of U.S. nationals overseas, weaken public support among key domestic constituencies abroad for cooperating with the U.S, and endanger our ability to negotiate international arrangements and to seek bilateral, regional or multilateral support across a range of economic, human rights, security, and other non-immigration concerns, and be a source of ongoing criticism in international fora. Arizona's unprecedented effort to set its own, contrary immigration policy predictably conflicts with U.S. foreign policy interests and with the United States' ability to speak with one voice.

## I. U.S. Immigration Law Incorporates Foreign Relations Concerns

*15.* The Secretary of State is charged with the day-to-day conduct of U.S. foreign affairs, as directed by the President, and exercises authority derived from the President's powers to represent the United States under Article II of the Constitution and from statute. As part of these responsibilities, the Department of State plays a substantial role in administering U.S. immigration law and policy, as well as in managing and negotiating its foreign relations aspects and impact. Within the Department of State, the Bureau of Consular Affairs has responsibility for the adjudication and issuance of passports, visas, and related services; protection and welfare of U.S. citizens and interests

7

abroad; third-country representation of interests of foreign governments; and the determination of nationality of persons not in the United States. See 1 Foreign Affairs Manual 250.[1] Several other bureaus within the Department of State, including the Bureau of Population, Refugees and Migration; the Bureau of Human Rights, Democracy and Labor; the Bureau of International Organization Affairs; and all regional bureaus are routinely engaged in negotiations and multilateral diplomatic and policy work in global, regional, and bilateral forums on migration issues. Collectively, the Department of State promotes U.S. policies internationally in this area and bears the burden of managing foreign governments' objections to the treatment of their nationals in the United States.

*16.* U.S. law, and particularly Section 104 of the INA, as amended by the Homeland Security Act, invests the Secretary of State with specific powers and duties relating to immigration and nationality. A 2003 Memorandum of Understanding Between the Secretaries of State and Homeland Security Concerning Implementation of Section 428 of the Homeland Security Act of 2002, ¶ 1(b), provided that the Secretary of Homeland Security would establish visa policy, review implementation of that policy, and provide additional direction as provided in the MOU, while respecting the prerogatives of the Secretary of State to lead and manage the consular corps and its functions, to manage the visa process, and to execute the foreign policy of the United States.

---

[1] The Secretary of State's authorities under the INA are found in various provisions, including §§ 104, 105, 349(a)(5), 358, and 359 (8 U.S.C. §§ 1104, 1105, 1481(a)(5), 1501, and 1502) (visa and other immigration-related laws). The Department also exercises passport-related authorities, including those found at 22 U.S.C. §§ 211a, et seq.

*17.* Our immigration laws, including those administered by the Department of State, are crafted to incorporate and accommodate a wide range of sensitive U.S. foreign relations concerns. Our visa regime, for example, both embodies and permits consideration of U.S. diplomatic, human rights, and other foreign relations interests. To give but a few examples, the INA authorizes the Secretary of State to help determine which diplomats are entitled to diplomatic visas to represent their countries in the United States. INA § 101(a)(15)(A). INA § 243(d) authorizes the Secretary of State to determine the scope of visa sanctions that will be imposed on countries, upon notification from DHS that such countries have denied or unreasonably delayed accepting their nationals back from the United States. The INA also authorizes the Secretary of State to deny visas to aliens whose entry or proposed activity in the United States "would have potentially serious adverse foreign policy consequences." *See* INA § 212(a)(3)(C). During the Honduran constitutional crisis in 2009, the State Department imposed visa restrictions and revoked several visas under this authority to encourage the de facto government to enter into good faith negotiations with deposed President Zelaya. Likewise, under the auspices of INA § 212(f) and Presidential Proclamation 7750, the State Department recently revoked several visas for officials who engaged in or benefited from corruption, in an effort to bring pressure to bear on other countries to investigate and eliminate corruption by their government officials.

*18.* Further, our law provides for the denial of U.S. visas on security and related grounds to aliens who are anticipated to violate U.S. law following entry into the United States and those with a broad range of ties to terrorism, including those with

certain ties to groups that a consular officer or the Secretary of State reasonably believes has engaged in terrorist activity, as defined in the INA, § 212(a)(3)(B). Our visa laws also deny admission and make subject to removal aliens who participated in human rights violations such as genocide or torture.[2] And even the general authority to issue visas requires Department officials to monitor the political, legal, economic, and cultural developments in foreign countries for matters directly relevant to the full range of visa ineligibilities (e.g., economic, demographic, political, ethnicity, criminal, and security issues).

*19.* Finally, under section 244 of the INA, 8 U.S.C. § 1254a, U.S. law also provides for temporary protected status ("TPS"), a temporary immigration status which permits eligible foreign nationals who are already present in the United States to remain in the United States and obtain employment authorization. TPS is available to eligible foreign nationals who, due to armed conflict, an environmental disaster, or extraordinary and temporary conditions in their states of nationality, may face risk to personal safety if returned to that state while such conditions persist. Recent examples include the designation this year of Haiti for TPS following the devastating earthquake in that country, and the extension of Sudan's designation as a result of ongoing armed conflict. DHS administers the program and, pursuant to the statute, routinely consults with the State Department for its views on issues relevant to determinations whether to designate or continue to designate a foreign state or part thereof for TPS, including whether the

---

[2] 8 U.S.C. §§ 1182(a)(2)(G), 1182(a)(3)(E), and 1182(a)(3)(G) (inadmissible); 8 U.S.C. §§ 1227(a)(4)(D)-(4)(F) (removable).

statutory criteria are satisfied in each case.  TPS furthers certain U.S. foreign policy interests by facilitating provision of humanitarian protection to eligible persons who might otherwise be subject to removal to their home countries in times of armed conflict, environmental disasters, or other extenuating and temporary conditions.  The impact of the program can be significant:  DHS estimated that 100,000 to 200,000 individuals were eligible for TPS under the Haiti designation.

## II.    U.S. Immigration Practices Significantly Impact Our Foreign Relations

*20.*  In addition to incorporating foreign relations concerns, the United States' choices with respect to immigration policies and practices also have a significant impact on our foreign relations.  Again using State Department visa processes as an example, the process for visa issuance and denial is of great interest to foreign governments, owing to the direct impact the visa process has on the affairs of their own nationals.  Similarly, domestic processes for arrest, detention, and removal of aliens and other aspects of their treatment in the U.S. are of great interest to foreign governments because of the impact these processes have on foreign nationals and their families.  Aspects of U.S. immigration laws, such as the prohibitions on removal of an individual to a country where it is more likely than not that he would be tortured, and on removal of a refugee to a country where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political affiliation, implement U.S. treaty obligations under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and the 1967 Protocol to the U.N. Convention relating to the Status of Refugees.

11

21.  Given the diplomatic, legal, and policy sensitivities surrounding immigration issues, even small changes in U.S. immigration laws, policies, and practices can provoke a substantial international reaction -- both in the immigration context and across American diplomatic concerns.  It is for this reason that, although federal law recognizes that states and localities may play beneficial roles in assisting in the enforcement of federal immigration law, *see* 8 U.S.C. § 1357(g)(10), the authority to directly regulate immigration has been assigned exclusively to the federal government.

22.  Indeed, countries routinely raise concerns about such changes in bilateral, regional and multilateral arenas.  The exercise of immigration functions can quickly provoke a significant bilateral or multilateral problem that harms U.S. interests if handled without appropriate consideration of relevant foreign policy impacts.  The Department of State is often in the position of interacting directly with foreign governments in managing the impact of these bilateral problems.  For example, decisions regarding the issuance of individual visas to controversial figures, such as leaders of foreign governments with which the United States experiences significant diplomatic tensions, prominent individuals with checkered pasts, and delegates to international bodies, require a full review of U.S. government equities, including foreign policy interests and consideration of international treaties to which the United States is a party.  Requirements that a consular officer adjudicating a visa application obtain a Security Advisory Opinion ("SAO") or Advisory Opinion ("AO") can significantly delay visa processing and create tension, particularly, but not only, when the applicant is a foreign government official or other high profile individual.  The broad terrorism-related provisions in the INA have also

12

been criticized by foreign governments and officials and raised as obstacles to bilateral cooperation.

A. *Reciprocal Harm to U.S. Citizens Abroad*

23. Specifically, U.S. immigration policies and practices can have immediate and substantial impacts on the treatment of U.S. nationals abroad. INA § 221(c), for example, requires the length of validity for visas to be reciprocal as far as practicable. Even relatively non-controversial issues such as the period of validity of a visa and the fees charged are the subject of discussion, negotiation, and agreement among countries and have a direct impact on how other governments treat U.S. citizens who wish to travel abroad. For example, in the recent past, some countries have responded to changes in U.S. visa charges by significantly raising the entry fees charged to U.S. nationals by those countries. The Enhanced Border Security and Visa Entry Reform Act of 2002, which requires the fingerprinting of foreign nationals for the visa application process and in order to enter the United States, was the subject of much criticism by other governments and caused some governments to consider taking reciprocal retaliatory action against U.S. nationals. For example, Brazil reserves the right to require a thumbprint of Americans upon entry into Brazil.

24. In the area of consular services, how we treat foreign nationals who are present in the United States likewise can impact how a foreign government treats U.S. citizens present in its country. For example, the Department of State proactively takes a number of steps to ensure U.S. compliance with our obligation under Article 36 of the Vienna Convention on Consular Relations ("VCCR"), which requires that all foreign

13

nationals in custody in the United States be informed of their option to request to meet with a consular official. The Department does so in important part in order to increase the likelihood that such notification and consular access are provided to U.S. citizens who are detained abroad.

25. Accordingly, the State Department not only considers carefully the foreign policy goals and consequences of its immigration-related decisions, but also the potential impact of those decisions on the reciprocal treatment of U.S. citizens by the relevant foreign government.

B. *Impact in Regional and Multilateral Fora*

26. The situation of foreign nationals within a country, particularly questions relating to the protection of the human rights of migrants, regardless of their immigration status, is a matter of international concern and is addressed by international treaties. The United Nations and regional bodies such as the Organization of American States ("OAS"), a regional intergovernmental organization comprised of all thirty-five States of the Americas, have established institutions and mechanisms for the discussion, examination, and oversight of international migration policy. As a matter of longstanding human rights and humanitarian policy, the United States government strongly supports international efforts to protect migrants, who are typically especially vulnerable to mistreatment and abuse. Accordingly, the United States as a matter of its foreign policy engages actively in regional and multilateral human rights fora, through which the United States promotes respect for human rights (including the human rights of migrants), the rule of law, and respect for other U.S. values.

14

27. As part of the international migration framework, the United States has ratified several global human rights treaties which impose obligations on States Parties regarding the rights of persons, including migrants, within their territories, often without regard to the legal status of a non-national within a State's territory. Such treaties include the International Covenant on Civil and Political Rights, the International Convention on the Elimination of All Forms of Racial Discrimination, and the Convention Against Torture. The United States is party to law enforcement conventions that address multilateral cooperation on immigration issues and the rights of certain migrants, including the United Nations Convention Against Transnational Organized Crime and two of its supplementing Protocols: the Protocol Against the Smuggling of Migrants by Land, Sea and Air and the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children. These protocols require States Parties to protect the rights of smuggled aliens. Other relevant conventions include the 1967 Protocol relating to the Status of Refugees, the Vienna Convention on Consular Relations, and various bilateral Friendship, Commerce and Navigation treaties creating reciprocal treatment obligations toward foreign nationals.

28. Many UN human rights conventions, including those referenced above, establish expert treaty bodies which are responsible for monitoring compliance by reviewing and commenting upon reports from States Parties regarding implementation of their treaty obligations. These expert bodies routinely address immigration and migration-related issues, and criticize states, including the United States, for laws and policies which, in their view, raise questions about unfair, arbitrary, or racially

15

discriminatory treatment of migrants, or other human rights concerns. Such criticisms are public, are often the subject of further discussion in UN bodies, and may be raised directly with the United States in bilateral exchanges with foreign countries.

29. Additionally, the United Nations General Assembly and other UN organs routinely adopt resolutions regarding the human rights and protection of migrants. The UN has also established "special mechanisms" or "independent experts," including special rapporteurs, that investigate and issue reports and make recommendations regarding the human rights of migrants.

30. At the regional level, the OAS has several organs in which issues related to migration policy and the treatment of migrants are raised. Like the UN General Assembly, the OAS General Assembly adopts resolutions on a range of topics including the human rights of migrants. Additionally, within the OAS system, the Inter-American Commission on Human Rights ("IACHR"), which is based in Washington, D.C., promotes respect for human rights, including by issuing statements and reports and holding hearings and adopting findings in response to individual petitions regarding a breach of a Member State's human rights commitments. The IACHR often expresses concern about the treatment of migrants by OAS Member States, including the United States. For example, in addition to recent hearings related to the enforcement of U.S. immigration laws and policies, the IACHR is in the process of preparing a thematic report which we understand will address issues related to enforcement of U.S. immigration laws and policies.

31. Other intergovernmental organizations and international bodies, not

16

specifically focused on issues related to the human rights of migrants, also provide venues in which States address issues related to migration generally, and which often include issues related to the treatment of migrants within a State's domestic legal and policy framework. These include the International Organization for Migration, the Regional Conference on Migration (Western Hemisphere), the UN High Level Dialogue on International Migration and Development, the Global Forum on Migration and Development, the International Labor Organization, the UN Office for Drug Control and Crime Prevention, and others.

*32.* As both a matter of international law and practice, the federal government is held accountable internationally for the actions of state and local authorities regarding our treatment of foreign nationals. International bodies and foreign governments do not typically distinguish between the conduct of the national government and the conduct of an individual state within a federal system. This is starkly evidenced by the United States' experience in cases where state and local government authorities have failed to comply with U.S. obligations under the VCCR to provide consular notification to all foreign nationals in U.S. custody. Failure to provide such notice by state officials has led to three suits by Paraguay, Germany and Mexico against the United States in the International Court of Justice, an advisory opinion sought by Mexico in the Inter-American Court of Human Rights, a petition against the United States in the Inter-American Commission on Human Rights, and bilateral complaints by numerous foreign governments.

*33.* The United States takes seriously allegations that it has failed to adhere to

its international law obligations and foreign policy commitments and engages in these fora to address such claims. Although the government is fully prepared to defend U.S. practices against unjustified claims of human rights shortcomings, criticism from an international body over immigration human rights issues can directly undercut the credibility of U.S. efforts to advance human rights and can lead to significant diplomatic obstacles – both on immigration issues of bilateral concern and on other interests that might be the subject of diplomatic negotiations. As discussed below, in this context, S.B 1070's sweep into subjects left properly to federal direction and control subjects the United States to this criticism while denying the United States the tools to decide for itself whether and how to adjust such policies. The federal government should have to make its defenses or consider appropriate modifications only with regard to policies that are adopted through a considered process that reflects the interests of all the American people, not with regard to the views of one state.

## III.    Arizona Law S.B. 1070's Harm to U.S. Foreign Relations

*34.*  Given the diplomatic and foreign relations sensitivities surrounding U.S. immigration policy generally, and the significant foreign relations consequences that can result from even small changes in these policies, and given that S.B. 1070 purports to impose Arizona's own immigration policy of "attrition through enforcement" through, among other provisions, mandatory verification of immigration status and state criminal enforcement of alien registration, it is not surprising that S.B. 1070 already has provoked significant international controversy. The law elevates the criminal aspect of federal immigration enforcement above all others, threatening state criminal penalties for

18

violations of federal immigration law. United States immigration law – and our uniform foreign policy regarding the treatment of foreign nationals – has been that the unlawful presence of a foreign national, without more, ordinarily will not lead to that foreign national's criminal arrest or incarceration, but instead to civil removal proceedings. This is a policy that is understood internationally and one which is both important to and supported by foreign governments. S.B. 1070 violates this aspect of American immigration law and foreign policy by effectively allowing for criminal sanctions based on unlawful presence alone. It deviates from federal law by imposing mandatory verification of immigration status and criminal enforcement of alien registration, and by criminalizing work and travel by foreign nationals beyond the restrictions imposed by U.S. law. In so doing, the law has already provoked significant negative reaction in U.S. bilateral relationships and in regional and multilateral fora.

35. Such criticism is not without costs. To the contrary, the criticism provoked by the Arizona law threatens at least three direct harms to U.S. foreign relations. As noted above, such a change in immigration policy invariably risks the adoption of harmful reciprocal policies toward U.S. nationals by foreign governments. It also undermines the willingness of foreign states to engage bilaterally and multilaterally with the United States to advance U.S. foreign policy goals, and it erodes the credibility of United States efforts in regional and multilateral intergovernmental bodies to advance human rights.

A. *Impact on Bilateral Relationships*

36. S.B. 1070 has unquestionably generated negative reaction that has damaged

19

the public image of the United States and has thereby undermined the United States' ability to pursue various diplomatic objectives. The law has provoked numerous public criticisms by governments with which the United States maintains important and sensitive diplomatic relations.

37.   In Mexico, S.B. 1070 has precipitated a sharply negative public perception of the attitude toward immigrants in Arizona (and potentially by extension elsewhere in the U.S.), which in turn has negatively affected diplomatic processes with Mexican government officials. The Mexican President, Mexican Cabinet Members, the Mexican Congress, and opinion makers in Mexico all have reacted strongly in response to the law. These voices have also expressed concern about the safety of Mexicans in Arizona.

38.   During his recent visit to Washington, for example, Mexico's President Calderón pointedly criticized the law, both during his joint press conference with President Obama on May 19 and in his address to the United States Congress on May 20. Speaking to the Congress, he emphasized the need for comprehensive immigration reform and focused attention specifically on the Arizona law:

> I am convinced that comprehensive immigration reform is also crucial to secure our common border. However, I strongly disagree with the recently adopted law in Arizona. It is a law that not only ignores a reality that cannot be erased by decree but also introduces a terrible idea: using racial profiling as a basis for law enforcement. And that is why I agree with President Obama, who said the new law "carries a great amount of risk when core values that we all care about are breached." I want to bridge the gap of feelings and emotions between our countries and our peoples. I believe in this. I believe in communications, I believe in cooperation, and we together must find a better way to face and fix this common problem.

39.   President Calderón's criticisms reflect how negatively S.B. 1070 has

affected public attitudes in Mexico toward the United States. A recent poll in Mexico by the Pew Global Attitudes Project, for example, indicates that whereas before the adoption of the Arizona law 62 percent of those polled had a favorable attitude toward the United States and only 27 percent had an unfavorable attitude, following its adoption only 44 percent had a favorable attitude toward the U.S., while 48 had an unfavorable attitude. *See The Arizona Effect on U.S. Favorability in Mexico,* available at www.pewglobal.org. The poll demonstrates that an effort to establish a divergent immigration policy by a single state, which has not yet even gone into effect, nevertheless can significantly harm foreign attitudes toward the United States as a whole. Such effect in turn can seriously undermine support among important Mexican constituencies for Mexico's cooperation with the United States.

*40.* Bolivia's President Morales, Ecuador's President Correa, El Salvador's President Funes and Guatemala's President Colom have also voiced public criticism of the Arizona law. Other governments, including that of Brazil, Colombia, Honduras, and Nicaragua have issued statements criticizing the law. Additionally, the National Assemblies in Ecuador and Nicaragua, and the Central American Parliament based in Guatemala, have adopted critical resolutions or other statements. S.B. 1070 has also been raised with high level U.S. officials by various foreign states on a number of occasions in nonpublic settings.

*41.* Concrete steps also have been taken in response to S.B. 1070. For example, Mexico and El Salvador have issued travel warnings or alerts to their citizens traveling in the United States.

*42.* S.B. 1070 also already has negatively affected other American interests. As a direct result of the Arizona law, at least five of the six Mexican Governors invited to travel to Phoenix to participate in the September 8-10, 2010 U.S.-Mexico Border Governors' Conference have declined the invitation. Although not a formal binational government-to-government meeting, this annual conference is an important venue for improving binational coordination of border issues that inherently involve federal, state, and other levels of government. It is normally attended by most of the 10 U.S. and Mexican state governors, as well as some federal U.S. and Mexican government representatives who serve as technical advisors.

*43.* The Mexican Senate stated it would postpone review of a U.S.-Mexico agreement on emergency management cooperation to address natural disasters and accidents signed on October 23, 2008 because of the new Arizona law.

*44.* Negative effects such as these are only likely to intensify if S.B. 1070 goes into effect.

B. *Impact on Regional and Multilateral Relationships*

*45.* The Arizona legislature's adoption of S.B. 1070 also prompted harsh criticism of the law in human rights forums, demonstrating in practical terms the negative consequences that unilateral action by a single U.S. state can have on U.S. foreign policy interests. The law has diminished our credibility in advocating for human rights compliance abroad by others, and if allowed to go into effect, will continue to do so.

*46.* A number of U.N. and regional intergovernmental organizations and bodies,

22

including those whose mandates explicitly include the promotion of human rights, have criticized S.B. 1070. For example, on May 10, 2010, six UN human rights experts (the Special Rapporteur on the Human Rights of Migrants, the Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia and Related Intolerance, the Special Rapporteur on the Situation of Human Rights and Fundamental Freedoms of Indigenous People, the Independent Expert in the Field of Cultural Rights, the Special Rapporteur on the Right to Education, and the Independent Expert on Minority Issues) issued a joint statement specifically addressing the Arizona law:

> A disturbing pattern of legislative activity hostile to ethnic minorities and immigrants has been established with the adoption of an immigration law [in Arizona] that may allow for police action targeting individuals on the basis of their perceived ethnic origin.... In Arizona, persons who appear to be of Mexican, Latin American, or indigenous origin are especially at risk of being targeted under the law.

> The UN independent experts stressed that "legal experts differ on the potential effects of recent amendments to the immigration law that relate to the conditions for the official detention of suspected illegal aliens," and expressed concern about the "vague standards and sweeping language of Arizona's immigration law, which raise serious doubts about the law's compatibility with relevant international human rights treaties to which the United States is a party."

47. Additionally, in June 2010, at the 14th session of the UN Human Rights Council, the membership body within the United Nations system charged with promoting human rights and addressing situations of human rights violations, many countries criticized laws that criminalize irregular migration and discriminatory practices in the enforcement of immigration laws, and several states explicitly singled out S.B. 1070 for criticism in their plenary remarks.

23

*48.* Within the Inter-American regional system, on April 28, 2010, OAS Secretary General José Miguel Insulza stated that S.B. 1070 "is an issue of concern to all citizens of the Americas" and warned against the possibility of creating an environment of discrimination in the United States, in light of its significant Hispanic population. He added that "the rich tradition we all admire, of recognizing immigrants in the United States has been harmed, undermined." He recognized the efforts of the U.S. government to legislate on the matter in a constructive way, adding,

> This has been a painful moment, difficult for everyone, and it is why we recognize and salute with energy the way in which the government of President Barack Obama has reacted faced with this fact. For our part, we are going to follow up and always act with greater unity of purpose because I believe that all of us here present share the problems this law creates.

Many permanent representatives of OAS Member States also criticized the law both at the Permanent Council in Washington and at the June 2010 OAS General assembly in Lima, Peru.

*49.* Separately, on April 28, 2010, the IACHR voiced its concern over the "high risk of racial discrimination in the implementation of the law" and expressed concern "with the criminalization of the presence of undocumented persons." The IACHR exhorted "U.S. authorities to find adequate measures to modify the recently approved law in the State of Arizona in order to bring it into accordance with international human rights standards for the protection of migrants."

*50.* Finally, on May 4, 2010, heads of government at a summit of the Union of South American Nations ("UNASUR"), which is comprised of Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Guyana, Paraguay, Peru, Suriname, Uruguay, and Venezuela,

24

adopted a statement condemning the law, claiming it could lead to the legitimization of racist attitudes and the latent risk of violence.

51. In short, the passage of Arizona S.B. 1070 has provoked broad-based criticism and concern among U.S. allies in the Western Hemisphere, by human rights experts, and in numerous intergovernmental fora. Nor can such criticism be readily dismissed. Such criticism, particularly when provoked by an independent immigration enforcement policy being pursued by a U.S. state, and which the national government does not control or endorse, affects the United States' standing in bilateral, regional and international relationships, and ultimately the leadership role of the United States as we seek to advance a wide range of policy goals within the international community. It risks retaliatory harms against to the legal rights of U.S. nationals abroad. And it compromises our ability to engage effectively in bilateral, regional and multilateral conversations regarding human rights.

C. *Future Ramifications*

52. If S.B. 1070 were to enter into effect, criticism will likely increase, and the risk of such harms will escalate. The Arizona law could have an increasingly caustic impact on the United States' relations with important regional allies, undermine additional diplomatic arrangements or opportunities for international cooperation, constitute an ongoing irritant in U.S. bilateral, regional and multilateral relationships, and subject the United States to ongoing criticism in international fora.

53. A few such circumstances are readily foreseeable. This fall, for example,

the United States will send a high level U.S. delegation to the UN Human Rights Council's Universal Periodic Review in Geneva, at which the United States will be questioned by other UN Member States regarding our human rights practices. This Universal Periodic Review is conducted once every four years for each UN Member State, and the United States will be presenting for the first time. It is highly likely that the Arizona law will be one of the concerns raised during the questioning by other delegations.

54. Likewise, the United States would undoubtedly be criticized for S.B. 1070 by UN human rights treaty monitoring bodies in the context of U.S. human rights treaty reporting requirements. Within the next two years alone, the United States will be expected to report to both the UN Human Rights Committee and the Committee on the Elimination of Racial Discrimination, and thereafter will be expected to appear before each body to defend the United States' record of human rights compliance. S.B. 1070, if still in effect, would very likely be the subject of criticism before both bodies.

55. If S.B. 1070, Arizona's attempt to set its own immigration policy in pursuit of "attrition through enforcement," were to go into effect, it would directly call into question the ability of the United States to speak with one voice at the international level on issues related to immigration and migration policy. Only the national government is in a position to accurately assess the impact of a policy such as S.B. 1070 on our overall foreign relations agenda and to balance the competing foreign relations considerations involved in the adoption and enforcement of such a law. When the United States incurs criticism of immigration law and policies adopted at the federal level, the United States is

26

normally in a position to review the criticism and determine whether to defend the practices against attack or else to take appropriate action to modify its practices. The United States is also able to develop and implement immigration policy in anticipation of these and other foreign relations concerns. In this case, however, the policy being pursued has not been developed, nor would it be implemented, with sensitivity to the full range of foreign policy information and considerations available to the national government, and the United States is unable to calibrate its immigration and foreign policies to respond effectively to these claims.

*56.* If the several states were each allowed to pursue independent immigration enforcement policies such as the Arizona law, these serious concerns would be multiplied significantly, as the United States could be subjected to a cacophony of competing immigration enforcement priorities and agendas, with little regard for the sensitive diplomatic and foreign relations considerations that immigration policy addresses, and with an extreme adverse impact on the United States' ability to speak with one voice.

*57.* S.B. 1070 – and in particular the mandatory verification regime requirement – thus poses a risk of provoking retaliatory treatment against U.S. nationals by other states, and threatens ongoing adverse consequences for important and sensitive bilateral relationships with U.S. allies such as Mexico, for our regional relations in the western hemisphere, and for our global relations in regional and multilateral institutions. It is likely to hinder our ability to secure the cooperation of other states in efforts to promote U.S. interests internationally across a range of trade, security, tourism, and other interests unrelated to immigration. Finally, it is likely to undermine the United States'

27

ability to engage effectively with the international community to promote the advancement and protection of human rights. Moreover, repairing such harm to international relations and U.S. stature in bilateral, regional and multilateral relationships after the fact can be extremely difficult.

*58.* Accordingly, after having analyzed S.B. 1070, considered how it would interact with existing federal immigration policy and practice, and assessed the international reaction to it, I have concluded that S.B. 1070 runs counter to American foreign policy interests, and that its enforcement would further undermine American foreign policy.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief. Executed the \_\_\_\_\_ day of July, 2010 in Washington, D.C.

James B. Steinberg

# EXHIBIT H



| | |
|---|---|
| INICIO | CONTACTO | DIRECTORIO| MAPA DE SITO |ENGLISH | ww.sre.gob.mx |

- CANCILLERÍA
- REPRESENTACIONES
- POLITICA EXTERIOR
- OPORTUNIDADES EDUCATIVAS
- TRANSPARENCIA Y RENDICION DE CUENTAS
- SALA DE PRENSA

Sala de prensa | Comunicados

- Comunicados
- Discursos
- Versiones estenográficas
- Contacto

Síguenos en

flickr
twitter
facebook
You Tube

## The Mexican Government Regrets the Enactment of HB 87 in Georgia

Friday, May 13 | Press Release # 157 | Mexico City

The government of Mexico regrets the enactment of HB 87 (Illegal Immigration Reform Enforcement Act of 2011) in the state of Georgia (U.S.). The new law criminalizes immigration and may lead to the incorrect enforcement of the law by local authorities.

Its implementation, scheduled for next July 1, potentially affects human and civil rights of Mexicans who live in or visit Georgia.

During the legislative process, the Mexican government, through the Ministry of Foreign Affairs, the Embassy of Mexico in the United States and the Consulate General in Atlanta, expressed its concerns and objections to provisions in this law.

The legislators who voted for the law and the Governor of Georgia overlooked the many contributions made by the immigrant community to the state's economy and society, as well as Mexico's importance as its third-largest export market.

The vision promoted by this law goes against the principles of shared responsibility, trust and mutual respect under which the federal governments of Mexico and the United States have determined to work to address shared challenges in North America.

The Mexican government has developed and implemented a strategy of preventive protection to keep the Mexican population informed of this situation.

Taking into account the legal precedent set by the Ninth Circuit Court of Appeals regarding Arizona law SB 1070, and given the stated intention of U.S. organizations to mount a legal challenge to prevent the law from entering into force, all means available will be used to defend the rights and dignity of the Mexicans in Georgia. In addition, a legal analysis is underway to determine actions that could be taken to assist Mexicans affected by this measure.

A brochure with information on the legislation and practical advice is now available at the Mexican Consulate in Atlanta and on its web page. The Consulate will help explain the scope of this legislation and the rights of all individuals in forums and other events organized by civil society organizations.

The Government of Mexico respects the sovereign right of all countries to decide on the laws that will be applied in its territory. However, it reiterates its firm commitment to provide the assistance and protection that Mexicans should require, to ensure due respect for their fundamental rights, regardless of their immigration status.

Síguenos en Twitter: **@SRE_mx**

SRE - Secretaría de Relaciones Exteriores, Ave. Juárez #20, Col. Centro, CP 06010, Cuauhtémoc, Tel: (55) 3686 - 5100 www.sre.gob.mx

# EXHIBIT I

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, Plaintiff, v. THE STATE OF ARIZONA, et al., Defendants. | Civil Action No. |

## DECLARATION OF MICHAEL AYTES

Pursuant to 28 U.S.C. § 1746, I, Michael Aytes, declare and state as follows:

1.      I am employed by U.S. Citizenship and Immigration Services (USCIS), an agency of the Department of Homeland Security (DHS), as Senior Advisor to the Director of USCIS.  I have been employed in this position since January 2010.  My duties as Senior Advisor include, among other things, directing the USCIS planning effort for comprehensive immigration reform legislation and advising the Director about the direction and progress of USCIS efforts to transform its business processes.  Prior to my current position, I have held a number of executive level positions since 1989 involving immigration benefit management at USCIS and its predecessor before March 2003, the Immigration and Naturalization Service (INS), including serving as: Acting Deputy Director of USCIS between 2008 and 2010 (the highest ranking official in the agency at that time); Associate Director, USCIS Domestic Operations Directorate (2006-2008); Director, Information and Customer Service (1999-2006);  and Assistant Commissioner for Service Center Operations (1989-1997).  I began my federal career with the INS in 1977.  I make this declaration based on personal knowledge of the subject matter

acquired by me in the course of the performance of my official duties and upon information provided to me by personnel with relevant knowledge.

2.      As explained below, there are several situations in which aliens in the United States have been lawfully admitted, or are pursuing a process for obtaining a lawful status under Federal immigration law, but will not have filed an application or other form that has been designated as complying with registration requirements, and will not have been issued a document designated as evidence of registration. Nonetheless, DHS is aware of their presence through the processes provided by federal immigration law and may, in certain cases, have affirmatively decided not to pursue either removal or criminal prosecution.

3.      DHS regulations at 8 C.F.R. § 264.1(a) list certain DHS applications and other forms as registration forms for the purpose of complying with the alien registration requirements in 8 U.S.C. § 1302. DHS regulations at 8 C.F.R. § 264.1(b) designate certain DHS-issued cards and other documents (also referred to in the regulations as "forms") as forms constituting evidence of registration for the purpose of complying with 8 U.S.C. § 1304(d). In this Declaration, the DHS regulations at 8 C.F.R. § 264.1(a) and (b) are referred to as the "registration regulations."

4.      In many cases, aliens who are eligible to apply for a particular immigration benefit may file with USCIS a designated form that also is designated as a registration form in the registration regulations. Once the application is processed and/or approved, the alien is issued a document designated as evidence of registration in the registration regulations. An example of a designated registration form is the Form I-485, Application to Register Permanent Residence or Adjust Status (commonly known as an "adjustment application"). Approval of an adjustment application will result in issuance of a Form I-551 Permanent Resident Card

2

(commonly known as a "green card"). Adjustment applicants are also eligible to file a Form I-765, Application for Employment Authorization, which, if approved, results in the issuance of an Employment Authorization Document (EAD). Both the green card and the EAD are designated as evidence of registration in the registration regulations.

5. However, in a number of specific situations involving aliens within the United States who have been lawfully admitted to the United States or have a pending or approved application for a lawful immigration status, the registration regulations do not designate a DHS form currently in use as a lawful application for registration, do not specifically designate a document issued to the alien as evidence of registration, or both. These situations include, but are not limited to: Certain aliens eligible for relief under the Violence Against Women Act; aliens applying for asylum; aliens applying for "T" or "U" nonimmigrant status; aliens applying for Temporary Protected Status (TPS); and aliens applying for and granted nonimmigrant admission to the United States pursuant to the Visa Waiver Program. The registration regulations do not designate any form as a general "catch-all" that aliens present in the United States who have not otherwise submitted a form described in the regulations may submit to register with DHS. Accordingly, under these circumstances, aliens seeking the various humanitarian immigration benefits described below will not be in possession of a registration document, despite the fact that they have an application for such benefit pending with the federal government and that the federal government is aware of their presence in the United States.

6. **Violence Against Women Act.** The Violence Against Women Act (VAWA) enables certain aliens who have been subjected to battery or extreme cruelty by their U.S. citizen or lawful permanent resident spouse, parent, or child to self-petition for immigration benefits (8 U.S.C. § 1101(a)(51) (defining VAWA self-petitioner)). USCIS granted 6,258 VAWA self

petitions in fiscal year 2009. To file a VAWA self-petition, applicants submit a Form I-360 (Petition for Amerasian, Widow(er), or Special Immigrant), and written confirmation of receipt of the petition is issued by USCIS. Battered aliens who file a VAWA self-petition also receive a notice of action of a prima facie determination by USCIS, which, if positive, may be used to access certain public benefits available to victims of domestic violence. When a VAWA self-petition is approved, the battered alien receives an approval notice. Upon receipt of the approval notice, the battered alien becomes eligible, but is not required, to apply for employment authorization. When the battered alien is eligible to file for adjustment of status, which requires among other things that an immigrant visa number is immediately available, the alien may file the Form I-485 as described above; otherwise, no form or document used in the VAWA self-petition process, including USCIS confirmation of receipt of the Form I-360, is included in the registration regulations.

7. Under current DHS policy, an approved VAWA self-petitioner is placed in deferred action status by USCIS. Deferred action is a form of prosecutorial discretion by which the agency elects not to assert the full scope of its authority. Generally, a grant of deferred action stays immigration enforcement based on convenience to the government, and provides a basis for the alien to apply for employment authorization. This policy provides battered aliens some protection against immigration enforcement such as removal, and allows opportunities such as seeking protective orders against their abusers and cooperating with law enforcement in criminal cases brought against their abusers.

8. Once a battered alien receives notice of approval of the VAWA self-petition and is placed in deferred action, the battered alien may, but is not required to, file a Form I-765 (Application for Employment Authorization), which will result in issuance of an EAD. Current

4

processing times for VAWA self-petitions are 6 months, and current general processing times for EADs are 1.5 months. Therefore, on average, a battered alien would not receive a registration document until at least 7.5 months after the initial filing of the Form I-360. With the exception of the EAD, no form or document used in the deferred action process is included in the registration regulations.

9. Accordingly, a battered alien who is in the United States, regardless of immigration status, and who is has filed such a VAWA self petition and is awaiting an adjudication, generally will not -- by virtue of this federal immigration process -- have submitted or obtained a form satisfying the registration regulations.

10. **Asylum.** Subject to certain statutory limitations, an alien who is physically present in the United States, regardless of immigration status, may apply for asylum under section 208 of the Immigration and Nationality Act (8 U.S.C. § 1158). To apply for asylum, applicants submit a Form I-589 (Application for Asylum and Withholding of Removal). The registration regulations do not designate the Form I-589 as a form by which aliens may comply with registration requirements.

11. Under current DHS policy, arriving aliens who have established a credible fear of persecution and who are paroled from the custody of U.S. Immigration and Customs Enforcement (ICE) are provided with an approved Form I-94 (Arrival/Departure Record) reflecting parole status. Although the Form I-94 is designated as evidence of registration, not all asylum applicants are arriving aliens paroled from ICE custody.

12. For aliens affirmatively applying for asylum with USCIS, as opposed to defensively in removal proceedings before the U.S. Department of Justice's Executive Office for Immigration Review (EOIR), the applicant receives written confirmation of USCIS' receipt of

5

the application as well as directions for providing fingerprints. As a general matter, DHS concludes its asylum adjudication process before undertaking enforcement of immigration consequences against the alien. The applicant will then be interviewed by an asylum officer. Where a USCIS asylum officer, following an interview, determines that an alien is not eligible for asylum and the alien is not currently in a lawful immigration status, the alien is referred, typically through a Form I-862 (Notice to Appear (NTA)), for further consideration of the asylum application in removal proceedings before EOIR. If a USCIS asylum officer determines that an alien is not eligible for asylum and the alien is in a lawful immigration status, the alien is denied asylum. Any alien whose application for asylum has been pending before USCIS or EOIR at least 150 days may file a DHS Form I-765. USCIS may approve the Form I-765 as a matter of discretion if the application for asylum has been pending at least 180 days, which will result in issuance of an EAD. But before the issuance of the EAD, the alien would not necessarily possess evidence of registration. An alien whose application for asylum has been granted is issued a Form I-94, and also may file a Form I-765, which will result in issuance of an EAD. Except for the Form I-94 and EAD, which the registration regulations designate as evidence of registration, none of the forms or documents used in the USCIS asylum process are designated in those registration regulations as an application for, or evidence of, registration. USCIS granted 11,933 individuals asylum in fiscal year 2009.

13.     Accordingly, an alien who is in the United States, regardless of immigration status, and who has filed a pending application for asylum with DHS, generally will not -- by virtue of this federal immigration process -- have submitted or obtained a federal form satisfying the registration regulations, except as stated above with respect to the EAD for certain applicants whose applications have been pending more than 180 days..

6

14.     **T and U nonimmigrant status.**   Federal law provides for the grant of "T" nonimmigrant status to certain victims of trafficking and their family members in the United States (8 U.S.C. § 1101(a)(15)(T)).  In order to establish eligibility for T nonimmigrant status, aliens must establish, in part, that they are or have been a victim of a severe form of trafficking in persons, which means sex trafficking in which a commercial sex act was induced by force, fraud, or coercion, or the obtaining of a person for labor or services through the use of force, fraud, or coercion.  Aliens seeking T nonimmigrant status must submit Form I-914 (Application for T Nonimmigrant Status), which generates written confirmation of receipt of the application. Written confirmation of receipt of the application does not, however, constitute evidence of registration under the registration regulations.  The applicant must comply with fingerprinting requirements and may be interviewed, and all applications are subject to detailed review to determine eligibility and whether DHS will exercise its discretionary authority to waive applicable grounds of inadmissibility.  Approval of an application for T nonimmigrant status automatically generates an EAD and a Form I-94.  Except for the EAD and Form I-94, no form or document used in the T nonimmigrant application process is included in the registration regulations.  The current processing time for applications for T nonimmigrant status is 6 months. USCIS granted 710 individuals T nonimmigrant status in fiscal year 2009.

15.     Federal law provides for the grant of "U" nonimmigrant status to certain crime victims and their family members in the United States (8 U.S.C. § 1101(a)(15)(U)).  In order to establish eligibility for U nonimmigrant status, aliens must establish, in part, that they suffered substantial physical or mental abuse as a result of being a victim of certain delineated crimes. Those crimes include rape, torture, trafficking, incest, domestic violence, sexual exploitation, and other similarly serious crimes.  Applicants seeking U nonimmigrant status must submit a

7

Form I-918 (Petition for U Nonimmigrant Status). Submission of the application does not, however, provide an alien with evidence of registration designated under the registration regulations. Although an interview is not required, applicants are subject to fingerprinting and capture of other biometric indices, and applications are subject to detailed review to determine eligibility. Approval of an application for U nonimmigrant status automatically generates an EAD and Form I-94, which, as noted above, satisfy the proof of registration requirement. Except for the EAD and Form I-94, no form or document used in the U nonimmigrant application process is included in the registration regulations. The current average processing time for petitions for U nonimmigrant status is 6.1 months. U nonimmigrant status was granted to 8,663 individuals in fiscal year 2009.

16. DHS may grant an administrative stay of a final order of removal to aliens with pending applications or petitions for T or U nonimmigrant status who have set forth a prima facie case for approval (8 U.S.C. § 1227(d)(1)). Approval of an application for a stay of removal does not automatically generate an EAD and no form or document used in the stay of removal application process is included in the registration regulations. So an alien who received a stay of removal might still not possess evidence of registration, notwithstanding an administrative order authorizing the alien's temporary presence.

17. Accordingly, an alien who is in the United States, regardless of immigration status, and who is in the process of seeking "T" or "U" nonimmigrant status, generally will not -- by virtue of this federal immigration process -- have submitted or obtained a federal form satisfying the registration regulations.

18. **Temporary Protected Status.** Under 8 U.S.C. § 1254a, the Secretary of Homeland Security may designate foreign states whose nationals in the United States may apply

8

for Temporary Protected Status (TPS) in certain cases where conditions in the foreign state prevent such aliens from being returned. Eligible nationals cannot be detained and removed on the basis of immigration status during the period in which they have TPS. The eligible alien must apply using DHS Form I-821 (Application for Temporary Protected Status) and DHS Form I-765. Pursuant to the statute an alien is entitled to temporary treatment benefits, including an EAD, if the alien is prima facie eligible for TPS pending final adjudication. An alien applying for TPS can request an EAD, which may be granted based either on a prima facie determination of eligibility or upon a final adjudication granting TPS. Except for the EAD, no document used in the TPS application process is included in the registration regulations. As of June 3, 2010, USCIS has approved 23,475 applications for TPS under the designation of Haiti made by the Secretary of Homeland Security on January 15, 2010 in response to the devastating earthquake in that country three days before. The following other countries are currently within a period of designation for TPS: El Salvador; Honduras; Nicaragua; Somalia; and Sudan.

19. Accordingly, an alien who is in the United States, regardless of immigration status, and who is in the process of seeking TPS or has applied for TPS, generally will not -- by virtue of this federal immigration process -- have submitted or obtained a federal form satisfying the registration regulations.

20. **Visa Waiver Program:** The Visa Waiver Program (VWP) is administered by U.S. Customs and Border Protection (CBP), an agency of DHS. The only proof of admission currently issued to VWP travelers is the I-94W, and after implementation of the Electronic System for Travel Authorization (ESTA) is complete, the only proof of admission issued to most VWP travelers will be the entry stamp on his or her passport reflecting the date of admission. Although the registration regulations designate the Form I-94 generally as both the application

9

for registration and the evidence of registration for nonimmigrant aliens, the registration regulations do not refer specifically to the Form I-94W. Moreover, the ESTA process is not designated in those registration regulations as an application for, or evidence of, registration.

21. Accordingly, an alien who is admitted to the United States through the VWP and who abides by the terms of admission, will be lawfully present but will not -- by virtue of this federal immigration process -- have submitted or obtained a federal form satisfying the registration regulations.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed the 22nd day of June, 2010 in Washington, D.C.

Michael Aytes

10

# EXHIBIT J

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| |
|---|
| THE UNITED STATES OF AMERICA, |
| Plaintiff, |
| v. |
| THE STATE OF ARIZONA, et al., |
| Defendants. |

Civil Action No.

## DECLARATION OF DAVID V. AGUILAR

Pursuant to 28 U.S.C. § 1746, I, David V. Aguilar, declare and state as follows:

1.      I am employed by U.S. Customs and Border Protection (CBP), within the U.S. Department of Homeland Security, in the position of Deputy Commissioner. I have held this position since April 11, 2010. Prior to holding the position of Deputy Commissioner, I served as Acting Deputy Commissioner beginning on January 2, 2010, previously as the Chief of the Border Patrol for just short of six years and, prior to that, as the Chief Patrol Agent of the Tucson Sector. I began my service with the U.S. Border Patrol in 1978. I make this declaration based on personal knowledge of the subject matter acquired by me in the course of the performance of my official duties. I am aware that the State of Arizona has enacted new immigration legislation, known as Senate Bill 1070 (SB 1070).

2.      In deploying resources between the ports of entry, CBP seeks to incorporate the appropriate mix of personnel, infrastructure, and technology that will allow us to best advance our objectives: specifically, preventing the commission of crimes, apprehending those who have endangered or will endanger public safety, and securing the border. As explained below, our assets at

and between the ports of entry in Arizona are deployed to establish and maintain operational control of the border in the state of Arizona.

3.      CBP currently maintains six land ports of entry within the State of Arizona, found in the following locations:  Douglas, Lukeville, Naco, Nogales, San Luis, and Sasabe.  These ports of entry accommodate private and commercial vehicles, as well as pedestrians seeking entry or admission into the United States.  The Nogales Port of Entry also accommodates rail traffic.  CBP's port operations include seven air ports of entry in Douglas, Nogales, Phoenix, Scottsdale Air Force Base, Williams Gateway Air Force Base (Mesa), San Luis, and Tucson. CBP's Office of Field Operations (OFO) currently has 780 CBP Officers stationed in Arizona, both at these ports of entry and in the Arizona operational offices, as well as ninety-four agriculture specialists and fourteen import specialists.

4.      As of June 2, 2010, CBP has processed over 4,562,900 pedestrians, 3,918,000 personal vehicles, 246,600 commercial vehicles (for purposes of this declaration this number does not include rail), 10,745 private aircraft passengers and crew, and 456,459 commercial aircraft passengers and crew in Arizona this fiscal year alone.[1]  This traffic is processed through seventy-five lanes of traffic as well as those entering at the airports — thirty-one for personal vehicles inbound into the United States, ten for personal vehicles outbound from the United States, seventeen for pedestrians inbound to the United States, thirteen for commercial vehicles inbound to the United States, and four for commercial vehicles outbound from the United States. The volume for fiscal year 2010 is in keeping with the high volume that CBP has consistently processed in Arizona since 2005:

---

[1] These numbers and those in the subsequent bullets represent the number of crossings and may not be unique persons or vehicles, as individuals or vehicles may make repeated crossings.

2

a. In fiscal year 2009, CBP processed over 8,288,000 pedestrians, 7,416,700 personal vehicles, 341,100 commercial vehicles, 17,474 private aircraft passengers and crew, and 670,821 commercial aircraft passengers and crew.

b. In fiscal year 2008, CBP processed over 11,393,800 pedestrians, 7,938,000 personal vehicles, 381,100 commercial vehicles, 22,662 private aircraft passengers and crew, and 711,553 commercial aircraft passengers and crew.

c. In fiscal year 2007, CBP processed over 11,856,100 pedestrians, 8,282,500 personal vehicles, 368,100 commercial vehicles, 23,091 private aircraft passengers and crew, and 672,593 commercial aircraft passengers and crew.

d. In fiscal year 2006, CBP processed over 10,890,500 pedestrians, 9,117,300 personal vehicles, 367,300 commercial vehicles, 21,711 private aircraft passengers and crew, and 685,043 commercial aircraft passengers and crew.

e. In fiscal year 2005, CBP processed over 9,867,800 pedestrians, 10,025,600 personal vehicles, 341,300 commercial vehicles, 20,722 private aircraft passengers and crew, and 698,277 commercial aircraft passengers and crew.

5. CBP processed 357 trains in Arizona in fiscal year 2009. Moreover, at the rail port in Nogales, CBP implemented 100 percent screening of all outbound rail traffic as of March 16, 2009.

6. As of May 31, 2010, during CBP's processing of individuals at the ports of entry in Arizona, 5,975 were determined to be inadmissible into the United States under the Immigration and Nationality Act during fiscal year 2010, with another 5,358 withdrawing their applications for admission. Since the beginning of fiscal year 2005, 48,549 individuals have been found inadmissible at the Arizona Ports of Entry, with another 42,069 withdrawing their

applications for admission. In addition, from the beginning of fiscal year 2005 through the present the Office of Field Operations has arrested 9,428 individuals in Arizona and referred them for criminal prosecution for a variety of criminal violations.

7.      In 2009 CBP deployed additional canine teams to the Southwest Border to augment teams previously in place. Of these, forty-nine teams are permanently assigned to ports of entry within Arizona.

8.      In 2009, CBP deployed additional Z-Backscatter Van Units to the Southwest border to augment those previously in place, which help CBP identify anomalies in passenger vehicles—that is, a deviation from the normal reading which may be indicative of the presence of unlawful or undeclared merchandise, as well as potentially smuggled individuals. CBP deployed eight units at ports of entry within Arizona.

9.      CBP has also implemented the Western Hemisphere Travel Initiative (WHTI) for land and sea travel to the United States, including upgrades to the physical and technical capabilities at the ports of entry. Under WHTI, radio frequency identification (RFID) technology and next generation license plate readers were deployed, along with coordinate hardware and software updates. The new license plate readers (which provide CBP officers with pre-positioned traveler information) are ten percent more accurate than those they replaced, now reading at or above ninety percent accuracy, saving officers from manually correcting almost 10 million erroneous license plate queries per year. As a result, CBP is able to process travelers more efficiently. The technology deployed as part of WHTI allows law enforcement queries to proceed at a pace 60 percent faster than manual queries. These upgrades were completed at the Arizona land ports of entry, ending with Naco in February 2010 (though due to its size Sasabe has a hybrid solution in place with many, though not all, of these technical capabilities).

4

10.     CBP's Office of Border Patrol (Border Patrol) maintains a presence between the ports of entry in Arizona as well.  For operational purposes, the Border Patrol divides the United States into geographical areas known as "sectors."  Two of these Border Patrol sectors are located in Arizona.  The Tucson sector is located wholly within the State of Arizona.  The sector known as the Yuma sector largely covers area found within the State of Arizona, but also includes an unpopulated area of the southeastern portion of California along the border.  CBP's activities in the Yuma sector are based on a variety of factors and are not driven by the state—*i.e.*, Arizona versus California—where the activities take place.

11.     The Border Patrol nationwide is better staffed today than at any time in its eighty-five year history, having nearly doubled the number of agents from approximately 10,000 in 2004 to more than 20,000 in 2009.  As of May 22, 2010, there are over 4,000 agents stationed in Arizona alone.  This is an increase from the approximately 3,500 agents stationed during fiscal year 2007 in Arizona and the approximately 2,800 agents stationed in Arizona in fiscal year 2005.

12.     The Border Patrol utilizes various technologies to assist in locating, identifying, and apprehending those attempting to cross the border illegally. Nearly every piece of technology utilized between the ports of entry is found in northern, southern, and coastal border operations. Technology deployments are based on operational need and the technology's ability to fit within that area's operating environment.  The following technologies, among others, are being used between ports of entry:  night vision and thermal imaging equipment; magnetometers; infrared and seismic sensors; mobile x-ray, gamma ray and backscatter nonintrusive inspection systems; and additional remote video and sensing equipment.

13. The Border Patrol participates in a program known as Immigration Quick Court. This is a program in which an Immigration Judge holds hearings at the Border Patrol Tucson Sector Processing Center. The Quick Court is an initiative that works to ease the dockets of the traditional immigration courts. The process expedites the formal removal proceedings of illegal aliens arrested within the Tucson Sector. As of April 2010, the Court has presided over 3,153 cases for fiscal year 2010.

14. The Border Patrol operates check-points at twenty-five locations in Arizona, though given the nature of checkpoints these are not all operational at any one given time.

15. The United States has also erected approximately 305.7 miles of border fence in Arizona. Of that, 123.2 miles is pedestrian fence and 182.5 miles consist of vehicle fence.

16. The work performed by CBP's Office of Air and Marine augments these operations. In addition to the technology described above, the Office of Air and Marine conducts continuous operations along our borders nationally with more than 290 aircraft, including Unmanned Aircraft Systems (UAS), and 253 vessels. As of this date, eight fixed winged aircraft, thirty rotary wing aircraft, three unmanned aerial systems, as well as 125 Air Interdiction Agents are based in Arizona. The Office of Air and Marine is an integral part of the overall efforts of CBP and in fiscal year 2009 participated in over 34,800 apprehensions nationally and flew over 45,679 sorties for a total of 100,639 flight hours.

17. Another CBP effort is the Operation Against Smugglers Initiative on Safety and Security (OASISS), a bi-national initiative designed to increase the ability of the U.S. and Mexican governments to prosecute alien smugglers and human traffickers on both sides of the border. The OASISS program was established because, among other reasons, the prosecution of smugglers and human traffickers is a high immigration priority and because DHS has recognized

6

the need for international cooperation in pursuit of this goal. Conducted in cooperation with Mexico's Attorney General's Office, under OASISS select alien smuggling cases that are declined by United States Attorney's Offices are subsequently turned over to the Government of Mexico for prosecution under Mexico's judicial system. Since its inception on August 17, 2005, the OASISS program has generated 2,031 cases and led to the prosecution of 2,290 principal defendants in Mexico. During fiscal year 2009, 261 alien smuggling cases originating in Arizona were referred to Mexico.

18. CBP also conducts a program known as Operation Streamline, which is a geographically focused prosecution initiative that targets aliens who illegally enter the U.S. through a designated focus area. Currently, approximately seventy (70) illegal aliens are criminally prosecuted each court day. The illegal aliens are prosecuted for violation of 8 U.S.C. § 1325, 8 U.S.C § 1326, or both. Currently, CBP has two attorneys who are full time Special Assistant United States Attorneys for the District of Arizona dedicated to Operation Streamline prosecutions.

19. As of May 28, 2010, approximately 10,700 prosecutions have been brought under Operation Streamline in the Tucson Sector for fiscal year 2010. In fiscal year 2009 over 15,500 prosecutions were brought, which was an increase from the approximately 9,600 prosecutions which were brought in fiscal year 2008.

20. Consistent with DHS's prioritization of enforcement efforts that focus on the promotion of public safety, CBP initiated the Operation Alliance to Combat Transnational Threats (ACTT) in September 2009. ACTT is a multi-agency operation in the Sonora-Arizona Corridor involving over fifty (50) Federal, tribal, state, and local law enforcement and public safety organizations. The ACTT works collaboratively to deny, degrade, disrupt, and ultimately

dismantle criminal organizations and their ability to operate; engage communities to reduce their tolerance of illegal activity; and establish a secure and safe border environment, which will ultimately improve the quality of life of affected communities. Examples of the coordinated operations taken to date to target aliens affiliated with drug trafficking and prevent the expansion of these criminal organizations include the enhanced targeting associates of drug trafficking organizations and, in conjunction with Immigration and Customs Enforcement, the strategic removal of aliens to locations in the interior of Mexico to minimize the recruitment of inadmissible aliens by criminal organizations operating in the border environment.

21.    CBP also participates in Operation Stonegarden. The intent of the operation is to provide funding to designated localities to enhance cooperation and coordination between federal, state, local, and tribal law enforcement agencies to secure the United States Southwest Border. In 2009, DHS provided $90 million in funding for Operation Stonegarden to border law enforcement agencies, a record amount. Eighty-five percent of this funding went to the Southwest border—up from fifty-nine percent in fiscal year 2008. The fiscal year 2011 budget request focuses Stonegarden funding solely on the Southwest border.

22.    At times, certain state and local law enforcement entities may contact CBP, either through the Office of Field Operations or the Office of Border Patrol, to verify or ascertain the citizenship or immigration status of an individual within the jurisdiction of that agency. Responding to these inquiries takes the time of officers and agents at our ports of entry, offices, and stations.

23.    CBP has seen the overall apprehensions of illegal aliens by Border Patrol decrease from our highest point of over one million apprehensions in FY 2000. These numbers

8

demonstrate the effectiveness of our layered approach to security, comprised of a balance of tactical infrastructure, technology, and personnel at our borders.

    a. Specifically, in the Yuma sector the Border Patrol apprehended 138,419 individuals in fiscal year 2005. In fiscal year 2009, Border Patrol apprehended 6,949 individuals, down ninety-four percent from 2005.

    b. In the Tucson Sector 439,005 individuals were arrested in fiscal year 2005. In fiscal year 2009, Border Patrol apprehended 241,558 individuals, down forty-five percent from 2005.

24. As part of CBP's processing of individuals for admissibility, it administers the inspection and admissions process for aliens seeking admission to the United States under the Visa Waiver Program (VWP). The VWP enables eligible nationals from thirty-six (36) designated countries to travel to the United States temporarily for business or pleasure for up to ninety (90) days without obtaining a visa. In fiscal year 2009, more than 14 million aliens were admitted to the United States under the VWP. Historically, upon arrival in the United States and during the inspection and admission process, VWP travelers signed and submitted Form I-94W (Nonimmigrant Visa Waiver Arrival/Departure Form), which was stamped by a CBP Officer to reflect the date of admission and authorized period of stay as a nonimmigrant visitor (as described in 8 U.S.C. § 1101(a)(15)(B)). The lower portion of the Form I-94W was retained by the alien.

25. As of January 12, 2009, VWP travelers must complete an Electronic System for Travel Authorization (ESTA) application prior to initiating travel by air or sea carrier to the United States when they intend to apply for admission under the VWP. The ESTA application contains the questions that appeared on the Form I-94W. Approval of the ESTA application

represents a determination by CBP that an alien may travel (absent a subsequent revocation by CBP) to the United States under the VWP for the duration of the validity of the authorization, which generally is two years. CBP, however, retains authority to make the determination as to the alien's admissibility upon the alien's arrival and inspection at a port of entry, as well as the period of each VWP admission, not to exceed 90 days.

26.     On May 25, 2010, the Secretary of Homeland Security began the process of eliminating the paper Form I-94W requirement for VWP travelers whose ESTA applications are approved prior to boarding a carrier to travel by air or sea to the United States. The transition to paperless processing of ESTA-compliant travelers is expected to be completed by the end of June 2010. As a result, the only proof of admission issued to most VWP travelers will be the entry stamp on his or her passport reflecting the date of admission.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief. Executed the _27th_ day of June, 2010 in Washington, D.C.

David V. Aguilar

10