# EXHIBIT 29

# EXHIBIT K

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

THE UNITED STATES OF AMERICA,

     Plaintiff,

     v.

THE STATE OF ARIZONA, et al.,

     Defendants.

Civil Action No.

## <u>DECLARATION OF DAVID C. PALMATIER</u>

Pursuant to 28 U.S.C. § 1746, I, David C. Palmatier, declare and state as follows:

1.     I am the Unit Chief for the Law Enforcement Support Center (LESC) within U.S. Immigration and Customs Enforcement (ICE), an agency within the Department of Homeland Security (DHS). I have served in this position since March 16, 2008. Prior to my current position, I served as the Assistant Special Agent in Charge in Boston, Massachusetts, from December 2005 to March 2008. Prior to that, I served as the Director of the Office of Investigations Training Division from November 2000 to December 2005. I make this declaration based on personal knowledge of the subject matter acquired by me in the course of the performance of my official duties. I am aware that the State of Arizona has enacted new immigration legislation, known as Senate Bill 1070 (SB 1070), and I have read and reviewed SB 1070 as amended.

2.     The purpose of my declaration is to describe the adverse effects of Arizona SB 1070 on the LESC's ability to respond, supervise, and monitor requests from law enforcement

partners in an effort to provide accurate and timely alien status determinations for subjects arrested or under investigation.

3. As the LESC Unit Chief, I have direct managerial and supervisory authority over all sections that comprise the LESC, including three Operations Sections, the National Crime Information Center (NCIC) Section, the Communications Center Section, the Tip-line Section, the Training Section, and the Administration Section. The Operations Sections respond to requests for alien status determinations sent to the LESC via computer. The NCIC Section enters and validates all ICE lookout records in the NCIC computer system for immigration absconders (those who have been ordered removed but have absconded), previously deported aggravated felons, and fugitives sought for criminal violations of customs and immigration laws investigated by ICE. The Communications Center Section responds to phone requests for information and assistance by our state, local, and federal law enforcement partners. The Tip-line Section handles phone tips from the public relating to the full range of crimes enforced by DHS. The Training Section provides basic and advanced training to LESC employees. The Administration Section provides personnel, budget, and logistical support for the LESC.

4. The LESC also responds to FBI requests for alien status determinations on non-U.S. citizens seeking to purchase firearms; responds to U.S. Secret Service alien status determinations for aliens seeking access to a protected area (*e.g.*, the White House Complex); and responds to alien status determinations related to employment issues at national security related locations that could be vulnerable to sabotage, attack, or exploitation.

5. Congress established the LESC to provide alien status determination support to federal, state, and local law enforcement on a 24-hours-a-day, seven-days-a-week basis. The enabling legislation is codified in 8 U.S.C. §§ 1226(d)(1)(A) & 1252 Note.

2

6.      The core mission of the LESC is to receive and respond to Immigration Alien Queries (IAQ) from law enforcement partners in an effort to provide accurate and timely alien status determinations for subjects arrested or under investigation.  Biographic queries are routed to the LESC via the International Justice and Public Safety Information Sharing Network (NLETS).  Biometric queries are routed to the LESC via state information bureaus and the FBI Criminal Justice Information Services (CJIS).  Both biographic and biometric queries are sent and received via computer systems.  Queries contain basic information such as name, date of birth, place of birth, sex, and other identifying information.  LESC Law Enforcement Specialists query as many as ten DHS, FBI, and Interpol databases in order to produce a written alien status determination for the requesting agency.

7.      Like other components within DHS, the LESC prioritizes its efforts in order to focus on criminal aliens and those most likely to pose a potential threat to their communities. For example, criminal violations of the Immigration and Nationality Act (INA) are given priority over administrative violations.  The goal is to invest our finite resources on the criminals who pose the largest threat to public safety or national security risks.  In addition, LESC supervisors monitor incoming requests for information and prioritize those that are time sensitive, such as roadside traffic stops and subjects that are about to be released from police custody.  The LESC also conducts "enhanced responses" for IAQs that are associated with crimes such as murder, sexual assault, terrorism, gang-related crimes, and other serious crimes.  As a general practice, IAQs are processed in the order they are received at the LESC.  Older queries are generally completed before work is completed on new queries.  However, there are exceptions made in an effort to respond to time-sensitive queries and those queries that involve serious offenders; one example, listed above, would be traffic stops, where a highway patrolman has a limited amount

3

of time to detain a suspected illegal alien. Likewise, illegal aliens arrested for serious crimes such as homicide are made a priority in the queue if the subject will be released on bail or bond. This prioritization ensures that aliens arrested for particularly serious or violent crimes are not released into the general public if LESC's verification allows for the further detention of the alien. But the two priorities (responding on illegal aliens arrested for particularly serious crimes and responding to time sensitive inquiries, such as traffic stops) compete with each other, meaning that a surge in time-sensitive inquiries from the enforcement of the Arizona law will adversely affect responses regarding aliens arrested for particularly serious crimes. Additionally, the LESC has several queues that allow for the prioritization of queries based upon originating agency. Examples of unique queues include interoperability queries based upon fingerprints, biographical queries sent via NLETS, and Brady Act queries for firearms purchasers. The LESC does not currently have the ability to separate queries from Arizona as they arrive. Furthermore, creating an Arizona queue would not prioritize queries based upon the risk posed by the violator or the seriousness of the charge. Separating data in that manner is not currently possible using the data fields provided in the current IAQ formatted messages

8.     Currently, the average query waits for approximately 70 minutes before a Law Enforcement Specialist is available to work on the request. On average, it takes an additional 11 minutes per query to research DHS data systems and to provide the written alien status determination.

9.     Over the years, the LESC has experienced continuous and dramatic increases in alien status determination queries. IAQs from fiscal year (FY) 2007 to date were:

| | |
|---|---|
| FY 2007 | 727,903 |
| FY 2008 | 807,106 |
| FY 2009 | 1,064,261 |
| FY 2010 | 726,275 (through May 31, 2010) |

4

10. From FY 08 to FY 09, the LESC had a 20% increase in the number of IAQs. Although FY 10 is not over yet, LESC personnel project there will be at least a 10% increase in IAQs from FY 09 to FY 10.

11. The internal LESC computer system (ACRIMe) is dynamically updated as records are added or deleted. ACRIMe alien status determination records are retained for 75 years. Law Enforcement Specialists also access approximately six to ten other federal databases, depending on the circumstances regarding the subject, in order to determine alien status. The ACRIMe computer system randomly selects approximately 5% of all alien status determination responses for quality assurance. Quality assurance reviews determine if the search protocols were followed and if the correct status determination was made. LESC employees do not typically review alien files in order to provide alien status determinations. If an alien file review is required, that review will have to be completed by the ICE field office, and depending on the physical location of the alien file, the review may take two days or more.

12. Many U.S. citizens, if queried through the LESC, result in a "no match" response to the requesting agency, meaning that the Law Enforcement Specialist was unable to locate any records or prior encounters in the DHS databases queried. However, to arrive at the no match response for U.S. citizens requires the same level of investment in staffing resources to determine the subject is a no match. And, notably, a "no match" response would not guarantee that the subject of the search was an American citizen—it would simply reflect an absence of records in the LESC system.

13. The LESC has 153 Law Enforcement Specialists (LES) assigned to respond to IAQs from all partner agencies. If queries come to the LESC in a consistent and steady manner,

5

a fully trained and experienced LES can process approximately 10,000 IAQs per year. Based on current LES staffing, the LESC theoretically has the capacity to handle approximately 1.5 million IAQs per year. However, the number of queries that come to the LESC at any given time is not consistent. This makes it difficult to predict and staff in a manner that accounts for temporary spikes in activity. On a weekly basis, the LESC experiences activity spikes that require the use of overtime in order to handle the incoming IAQs from LESC partners. In addition, personnel from other LESC sections are routinely diverted from other critical missions to deal with IAQ activity spikes.

14.    The LESC also performs a significant role in supporting the ICE Secure Communities Program by producing alien status determinations based on biometric (fingerprint) booking information. Secure Communities was created to improve, modernize, and prioritize ICE's efforts to identify and remove criminal aliens from the United States. Secure Communities arranges for willing jurisdictions to access biometric technology so they can simultaneously check a person's criminal and immigration history when the person is charged criminally. Once illegal aliens are identified, ICE must then determine how to proceed and whether to lodge a detainer or otherwise pursue the alien's detention and removal from the United States upon the alien's release from criminal custody. ICE first deployed the technology in October of 2008, and as of June 8, 2010, has deployed it to 281 jurisdictions. ICE plans to deploy the technology nationwide to more than 3,000 jurisdictions by the end of FY 2013. The LESC has already experienced an increase in processing times since the establishment of the Secure Communities Program due to the receipt of extensive criminal records and previous DHS encounters with more serious criminal aliens. As our support for Secure Communities continues to grow, we anticipate an increased workload due to the need for more complex queries that will

6

further increase LESC response times. Thus, the expansion of the Secure Communities Program alone will likely utilize much of the capacity of the LESC.

15.     In my professional judgment, Arizona SB 1070 will inevitably result in a significant increase in the number of IAQs. The LESC processed just over 1,000,000 IAQs in FY 09. According to the FBI Criminal Justice Information Services (CJIS), in FY 09 criminal justice agencies in Arizona submitted 563,474 arrest records to CJIS, but just over 80,000 IAQs originated from all agencies within the state of Arizona in FY 09. Thus, Arizona SB 1070's requirement that "[a]ny person who is arrested shall have the person's immigration status determined before the person is released" could, by itself, dramatically increase the LESC's workload. Moreover, because Arizona's law calls for status verifications for lawful stops— whether or not such stops result in an arrest—the number of IAQ's will increase dramatically. If even a small percentage of these stops, detentions, and arrests lead to new IAQs, the LESC will be forced to process thousands of additional IAQs annually. Moreover, Arizona's new law will result in an increase in the number of U.S. citizens and lawful permanent residents being queried through the LESC, reducing our ability to provide timely responses to law enforcement on serious criminal aliens.

16.     This increase in queries from Arizona will delay response times for all IAQs and risks exceeding the capacity of the LESC to respond to higher priority requests for criminal alien status determinations from law enforcement partners nationwide. Furthermore, the potential increase in queries by Arizona along with the possibility of other states adopting similar legislation could overwhelm the system.

17.     If the LESC's capacity to respond to requests for assistance is exceeded, the initial impact would be delays in responding to time-sensitive inquiries from state, local, and federal

7

law enforcement, meaning that very serious violators may well escape scrutiny and be released before the LESC can respond to police and inform them of the serious nature of the illegal alien they have encountered. If delays continue to increase at the LESC, ICE might have to divert personnel from other critical missions to serve the needs of our law enforcement partners. The LESC directly supports both the public safety and national security missions of DHS. These are critical missions which cannot be allowed to fail.

18. I expect no increase in LESC resources in terms of personnel. As such, I anticipate an increase in inquiries will slow response times for inquiries without respect to the priority level of the subject in question. Based on my professional experience, slower response times result in an increased likelihood that the subject of an inquiry, including subjects who are high-priority, will be released, potentially resulting in the commission of additional violent crimes, greater difficulty in locating the alien to initiate removal proceedings, and further impediments to ICE's ability to efficiently obtain removal orders and remove criminal aliens from the United States.

19. It is important to note that LESC's responses to IAQs do not always provide a definitive answer as to an alien's immigration status. Indeed, almost 10,000 of the 80,000 IAQs the LESC processed from Arizona in FY 2009 resulted in an indeterminate answer (for comparison, just over 15,000 of the IAQs from Arizona in FY 2009 resulted in a response of lawful presence). Moreover, a U.S. citizen, when queried through the LESC, would likely be returned with a "no match" response. Many—if not most—U.S. citizens have no records contained in the databases available to the LESC. Experience has demonstrated that some police officers are confused in these types of situations and sometimes want to detain the suspected

8

illegal alien (actually a U.S. citizen) until they can call the LESC or their local ICE field office to confirm the subject's immigration status.

20.     This declaration has focused on the impact of SB 1070 on the LESC system.  If other populous states adopted similar laws, the LESC would be unable to respond to inquiries in a time frame which would be useful to law enforcement needs.

21.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed the 28th day of June, 2010 in Williston, Vermont.


David C. Palmatier
Unit Chief
Law Enforcement Support Center

# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF ARIZONA, et al., <br><br> Defendants. | Civil Action No. |

## DECLARATION OF DANIEL H. RAGSDALE

Pursuant to 28 U.S.C. § 1746, I, Daniel H. Ragsdale, declare and state as follows:

1.      I am the Executive Associate Director for Management and Administration at U.S. Immigration and Customs Enforcement (ICE) within the U.S. Department of Homeland Security (DHS). I have served in this position since January 2010. Before that, I served as a Senior Counselor to ICE's Assistant Secretary from November 2008 until October 2009, and, prior to that, as the Chief of the ICE Enforcement Law Division from October 2006 until November 2008. From September 1999 until September 2006, I served in several positions in ICE's Office of Chief Counsel in Phoenix, Arizona. I also was designated as a Special Assistant U.S. Attorney (SAUSA), which allowed me to prosecute immigration crimes.

2.      Under the supervision of ICE's Assistant Secretary, I have direct managerial and supervisory authority over the management and administration of ICE. I am closely involved in the management of ICE's human and financial resources, matters of significance to the agency, and the day-to-day operations of the agency. I make this declaration based on personal

knowledge of the subject matter acquired by me in the course of the performance of my official duties.

*Overview of ICE Programs*

3.      ICE consists of two core operational programs, Enforcement and Removal Operations (ERO), which handles civil immigration enforcement, and Homeland Security Investigations (HSI), which handles criminal investigations.  I am generally aware of the operational activities of all offices at ICE, and I am specifically aware of their activities as they affect and interface with the programs I directly supervise.

4.      HSI houses the special agents who investigate criminal violations of the federal customs and immigration laws.  HSI also primarily handles responses to calls from local and state law enforcement officers requesting assistance, including calls requesting that ICE transfer aliens into detention.  However, because of the policy focus on devoting investigative resources towards the apprehension of criminal aliens, the responsibility of responding to state and local law enforcement is shared with, and is increasingly transitioning to, ERO to allow HSI special agents to focus more heavily on criminal investigations.  On an average day in FY 2009, HSI special agents nationwide arrested 62 people for administrative immigration violations, 22 people for criminal immigration offenses, and 42 people for criminal customs offenses.

5.      ERO is responsible for detaining and removing aliens who lack lawful authority to remain in the United States.  On an average day, ERO officers nationwide arrest approximately 816 aliens for administrative immigration violations and remove approximately 912 aliens, including 456 criminal aliens, from the United States to countries around the globe. As of June 2, 2010, ICE had approximately 32,313 aliens in custody pending their removal proceedings or removal from the United States.

2

6. In addition to HSI and ERO, ICE has the Office of State and Local Coordination (OSLC) which focuses on outreach to state, local, and tribal law enforcement agencies to build positive relationships with ICE. In addition, OSLC administers the 287(g) Program, through which ICE enters into agreements with state, local, and tribal law enforcement agencies for those agencies to perform certain federal immigration enforcement functions under the supervision of federal officials. Each agreement is formalized through a Memorandum of Agreement (MOA) and authorized pursuant to Section 287(g) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1357(g).

7. Consistent with its policy of focusing enforcement efforts on criminal aliens, ICE created the Secure Communities program to improve, modernize, and prioritize ICE's efforts to identify and remove criminal aliens from the United States. Through the program, ICE has leveraged biometric information-sharing to ensure accurate and timely identification of criminal aliens in law enforcement custody. The program office arranges for willing jurisdictions to access the biometric technology so they can simultaneously check a person's criminal and immigration history when the person is booked on criminal charges. When an individual in custody is identified as being an alien, ICE must then determine how to proceed with respect to that alien, including whether to lodge a detainer or otherwise pursue the alien's detention and removal from the United States upon the alien's release from criminal custody. ICE does not lodge detainers or otherwise pursue removal for every alien in custody, and has the discretion to decide whether lodging a detainer and / or pursuing removal reflects ICE's policy priorities.

*ICE Initiatives and Activities in Arizona and at the Southwest Border*

8.      ICE has devoted substantial resources to increasing border security and combating smuggling of contraband and people.  Indeed, 25 percent of all ICE special agents are stationed in the five Southwest border offices.  Of those, 353 special agents are stationed in Arizona to investigate crimes, primarily cross-border crimes.  ERO currently has 361 law enforcement officers in Arizona.  Further, the ICE Office of the Principal Legal Advisor (OPLA) has 147 attorneys stationed in the areas of responsibility on the Southwest border, including 37 attorneys in Arizona alone to prosecute removal cases and advise ICE officers and special agents, as well as one attorney detailed to the U.S. Attorney's Office for the District of Arizona to support the prosecution of criminals identified and investigated by ICE agents.  Two additional attorneys have been allocated and are expected to enter on duty as SAUSAs in the very near future.

9.      ICE's attention to the Southwest Border has included the March 2009 launch of the Southwest Border Initiative to disrupt and dismantle drug trafficking organizations operating along the Southwest border.  This initiative was designed to support three goals:  guard against the spillover of violent crime into the United States; support Mexico's campaign to crack down on drug cartels in Mexico; and reduce movement of contraband across the border.  This initiative called for additional personnel, increased intelligence capability, and better coordination with state, local, tribal, and Mexican law enforcement authorities.  This plan also bolstered the law enforcement resources and information-sharing capabilities between and among DHS and the Departments of Justice and Defense.  ICE's efforts on the Southwest border between March 2009 and March 2010 have resulted in increased seizures of weapons, money, and narcotics along the Southwest border as compared to the same time period between 2008 and 2009.  ICE also

increased administrative arrests of criminal aliens for immigration violations by 11 percent along the Southwest border during this period.

10. ICE has focused even more closely on border security in Arizona. ICE is participating in a multi-agency operation known as the Alliance to Combat Transnational Threats (ACTT) (formerly the Arizona Operational Plan). Other federal agencies, including the Department of Defense, as well as state and local law enforcement agencies also support the ACTT. To a much smaller degree, ACTT receives support from the Government of Mexico through the Merida initiative, a United States funded program designed to support and assist Mexico in its efforts to disrupt and dismantle transnational criminal organizations, build capacity, strengthen its judicial and law enforcement institutions, and build strong and resilient communities.

11. The ACTT began in September 2009 to address concerns about crime along the border between the United States and Mexico in Arizona. The primary focus of ACTT is conducting intelligence-driven border enforcement operations to disrupt and dismantle violent cross-border criminal organizations that have a negative impact on the lives of the people on both sides of the border. The ACTT in particular seeks to reduce serious felonies that negatively affect public safety in Arizona. These include the smuggling of aliens, bulk cash, and drugs; document fraud; the exportation of weapons; street violence; homicide; hostage-taking; money laundering; and human trafficking and prostitution.

12. In addition to the ACTT, the Federal Government is making other significant efforts to secure the border. On May 25, 2010, the President announced that he will be requesting $500 million in supplemental funds for enhanced border protection and law enforcement activities, and that he would be ordering a strategic and requirements-based

5

deployment of 1,200 National Guard troops to the border. This influx of resources will be utilized to enhance technology at the border; share information and support with state, local, and tribal law enforcement; provide intelligence and intelligence analysis, surveillance, and reconnaissance support; and additional training capacity.

13.     ICE also is paying increasing attention to alien smuggling, along with other contraband smuggling, with the goal of dismantling large organizations. Smuggling organizations are an enforcement priority because they tend to create a high risk of danger for the persons being smuggled, and tend to be affiliated with the movement of drugs and weapons. ICE has had success of late in large operations to prosecute and deter alien smugglers and those who transport smuggled aliens. During recent operations in Arizona and Texas, ICE agents made a combined total of 85 arrests, searched 18 companies, and seized more than 100 vehicles and more than 30 firearms.

14.     This summer, ICE launched a surge in its efforts near the Mexican border. This surge was a component of a strategy to identify, disrupt, and dismantle cartel operations. The focus on cartel operations is a policy priority because such cartels are responsible for high degrees of violence in Mexico and the United States—the cartels destabilize Mexico and threaten regional security. For 120 days, ICE will add 186 agents and officers to its five Southwest border offices to attack cartel capabilities to conduct operations; disrupt and dismantle drug trafficking organizations; diminish the illicit flow of money, weapons, narcotics, and people into and out of the U.S.; and enhance border security. The initiative, known as Operation Southern Resolve, is closely coordinated with the Government of Mexico, as well as Mexican and U.S. federal, state and local law enforcement to ensure maximum impact. The initiative also includes

targeting transnational gang activity, targeting electronic and traditional methods of moving illicit proceeds, and identifying, arresting, and removing criminal aliens present in the region.

15. Although ICE continues to devote significant resources to immigration enforcement in Arizona and elsewhere along the Southwest border, ICE recognizes that a full solution to the immigration problem will only be achieved through comprehensive immigration reform (CIR). Thus, ICE, in coordination with DHS and the Department's other operating components, has committed personnel and energy to advancing CIR. For example, ICE's Assistant Secretary and other senior leaders have advocated for comprehensive immigration reform during meetings with, and in written letters and statements to, advocacy groups, non-governmental organizations, members of the media, and members of Congress. Other ICE personnel have participated in working groups to develop immigration reform proposals to include in CIR and to prepare budget assessments and projections in support of those proposals.

*ICE Enforcement Priorities*

16. DHS is the federal department with primary responsibility for the enforcement of federal immigration law. Within DHS, ICE plays a key role in this enforcement by, among other functions, serving as the agency responsible for the investigation of immigration-related crimes, the apprehension and removal of individuals from the interior United States, and the representation of the United States in removal proceedings before the Executive Office for Immigration Review within the Department of Justice. As the department charged with enforcement of federal immigration laws, DHS exercises a large degree of discretion in determining how best to carry out its enforcement responsibilities. This discretion also allows ICE to forego criminal prosecutions or removal proceedings in individual cases, where such forbearance will further federal immigration priorities.

7

17.    ICE's priorities at a national level have been refined to reflect Secretary Napolitano's commitment to the "smart and tough enforcement of immigration laws." Currently, ICE's highest enforcement priorities—meaning, the most important targets for apprehension and removal efforts—are aliens who pose a danger to national security or a risk to public safety, including: aliens engaged in or suspected of terrorism or espionage; aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders; certain gang members; and aliens subject to outstanding criminal warrants.

18.    Other high priorities include aliens who are recent illegal entrants and "fugitive aliens" (*i.e.*, aliens who have failed to comply with final orders of removal). The attention to fugitive aliens, especially those with criminal records, recognizes that the government expends significant resources providing procedural due process in immigration proceedings, and that the efficacy of removal proceedings is undermined if final orders of removal are not enforced. Finally, the attention to aliens who are recent illegal entrants is intended to help maintain control at the border. Aliens who have been present in the U.S. without authorization for a prolonged period of time and who have not engaged in criminal conduct present a significantly lower enforcement priority. And aliens who meet certain humanitarian criteria may not be an "enforcement" priority at all—in such humanitarian cases, federal immigration priorities may recommend forbearance in pursuing removal.

19.    ICE bases its current priorities on a number of different factors. One factor is the differential between the number of people present in the United States illegally—approximately 10.8 million aliens, including 460,000 in Arizona—and the number of people ICE is resourced to remove each year—approximately 400,000. This differential necessitates prioritization to ensure that ICE expends resources most efficiently to advance the goals of protecting national security,

8

protecting public safety, and securing the border. Another factor is ICE's consideration of humanitarian interests in enforcing federal immigration laws, and its desire to ensure aliens in the system are treated fairly and with appropriate respect given their individual circumstances. Humanitarian interests may, in appropriate cases, support a conclusion that an alien should not be removed or detained at all. And yet another factor is ICE's recognition that immigration detainees are held for a civil purpose—namely, removal—and not for punishment. Put another way, although entering the United States illegally or failing to cooperate with ICE during the removal process is a crime, being in the United States without authorization is not itself a crime. ICE prioritizes enforcement to distinguish between aliens who commit civil immigration violations from those commit or who have been convicted of a crime.

20.     Consequently, ICE is revising policies and practices regarding civil immigration enforcement and the immigration detention system to ensure the use of its enforcement personnel, detention space, and removal resources are focused on advancing these priorities. For example, ICE has two programs within ERO designed to arrest convicted criminal aliens and alien fugitives. These are the Criminal Alien Program (CAP) and the National Fugitive Operations Program (fugitive operations). ICE officers assigned to CAP identify criminal aliens who are incarcerated within federal, state, and local prisons and jails, as well as aliens who have been charged or arrested and remain in the custody of the law enforcement agency. ICE officers assigned to fugitive operations seek to locate and arrest aliens with final orders of removal. These officers also seek to locate, arrest, and remove convicted criminal aliens living at large in communities and aliens who previously have been deported but have returned unlawfully to the United States. They also present illegal reentry cases for prosecution in federal courts to deter such recidivist conduct.

9

21.     Likewise, in keeping with the Secretary's policy determination that immigration enforcement should be "smart and tough" by focusing on specific priorities, ICE issued a new strategy regarding worksite enforcement. This strategy shift prioritized the criminal investigation and prosecution of employers and de-emphasized the apprehension and removal of illegal aliens working in the United States without authorization. Although Federal law does not make it a distinct civil or criminal offense for unauthorized aliens merely to seek employment in the U.S., such aliens may be removed for being in the U.S. illegally. ICE's new strategy acknowledges that many enter the United States illegally because of the opportunity to work. Thus, the strategy seeks to address the root causes of illegal immigration and to do the following: (i) penalize employers who knowingly hire illegal workers; (ii) deter employers who are tempted to hire illegal workers; and (iii) encourage all employers to take advantage of well-crafted compliance tools. At the same time, the policy recognizes that humanitarian concerns counsel against focusing enforcement efforts on unauthorized workers. The strategy permits agents to exercise discretion and work with the prosecuting attorney to assess how to best proceed with respect to illegal alien witnesses. One of the problems with Arizona Senate Bill 1070 (SB 1070) is that it will divert focus from this "smart and tough" focus on employers to responses to requests from local law enforcement to apprehend aliens not within ICE's priorities.

22.     In addition to refocusing ICE's civil enforcement priorities, ICE has also refocused the 287(g) program so that state and local jurisdictions with which ICE has entered into agreements to exercise federal immigration authority do so in a manner consistent with ICE's priorities. The mechanism for this refocusing has been a new MOA with revised terms and conditions. Jurisdictions that already had agreements were required to enter into this revised MOA in October of 2009. Also, ICE opted not to renew 287(g) agreements with task force

officers with the Maricopa County Sheriff's Office and officers stationed within the Los Angeles County Sheriff's Office's jail. These decisions were based on inconsistency between the expectations of the local jurisdiction and the priorities of ICE.

23. ICE communicates its enforcement priorities to state and local law enforcement officials in a number of ways. With respect to the 287(g) program, the standard MOA describes the focus on criminals, with the highest priority on the most serious offenders. In addition, when deploying interoperability technology through the Secure Communities program, local jurisdictions are advised of ICE's priorities in the MOA and in outreach materials.

24. In addition to the dissemination of national civil enforcement priorities to the field, the refocusing of existing ICE programs, and other efforts to prioritize immigration enforcement to most efficiently protect the border and public safety, the Assistant Secretary and his senior staff routinely inform field locations that they have the authority and should exercise discretion in individual cases. This includes when deciding whether to issue charging documents, institute removal proceedings, release or detain aliens, place aliens on alternatives to detention (*e.g.,* electronic monitoring), concede an alien's eligibility for relief from removal, move to terminate cases where the alien may have some other avenue for relief, stay deportations, or defer an alien's departure.

25. The Assistant Secretary has communicated to ICE personnel that discretion is particularly important when dealing with long-time lawful permanent residents, juveniles, the immediate family members of U.S. citizens, veterans, members of the armed forces and their families, and others with illnesses or special circumstances.

26. ICE exercises prosecutorial discretion throughout all the stages of the removal process—investigations, initiating and pursuing proceedings, which charges to lodge, seeking

11

termination of proceedings, administrative closure of cases, release from detention, not taking an appeal, and declining to execute a removal order. The decision on whether and how to exercise prosecutorial discretion in a given case is largely informed by ICE's enforcement priorities. During my tenure at ICE as an attorney litigating administrative immigration cases, as well as my role as a SAUSA prosecuting criminal offenses and in my legal and management roles at ICE headquarters, I am aware of many cases where ICE has exercised prosecutorial discretion to benefit an alien who was not within the stated priorities of the agency or because of humanitarian factors. For example, ICE has released an individual with medical issues from detention, terminated removal proceedings to allow an alien to regularize her immigration status, declined to assert the one year filing deadline in order to allow an individual to apply for asylum before the immigration judge, and terminated proceedings for a long-term legal permanent resident who served in the military, among numerous other examples.

27. ICE's exercise of discretion in enforcement decisions has been the subject of several internal agency communications. For example, Attachment A is a true and accurate copy of a November 7, 2007 memorandum from ICE Assistant Secretary Julie Myers to ICE Field Office Directors and ICE Special Agents in Charge. Pursuant to this memorandum, ICE agents and officers should exercise prosecutorial discretion when making administrative arrests and custody determinations for aliens who are nursing mothers absent any statutory detention requirement or concerns such as national security or threats to public safety. Attachment B is a true and accurate copy, omitting attachments thereto, of an October 24, 2005 memorandum from ICE Principal Legal Advisor William J. Howard to OPLA Chief Counsel as to the manner in which prosecutorial discretion is exercised in removal proceedings. Attachment C is a true and accurate copy of a November 17, 2000 memorandum from Immigration and Naturalization

12

Service (INS) Commissioner Doris Meissner to various INS personnel concerning the exercise of prosecutorial discretion. The Assistant Secretary also outlined in a recent memorandum to all ICE employees the agency's civil immigration enforcement priorities relating to the apprehension, detention, and removal of aliens (available at http://www.ice.gov/doclib/civil_enforcement_priorities.pdf).

28.     In sum, ICE does not seek to arrest, detain, remove, or refer for prosecution, all aliens who may be present in the United States illegally. ICE focuses its enforcement efforts in a manner that is intended to most effectively further national security, public safety, and security of the border, and has affirmative reasons not to seek removal or prosecution of certain aliens.

*International Cooperation with ICE Enforcement*

29.     ICE cooperates with foreign governments to advance our criminal investigations of transnational criminal organizations (such as drug cartels, major gangs, and organized alien smugglers) and to repatriate their citizens and nationals who are facing deportation. With respect to our criminal investigations, ICE's Office of International Affairs has 63 offices in 44 countries staffed with special agents who, among other things, investigate crime. In Mexico alone, ICE has five offices consisting of a total of 38 personnel. Investigators in ICE attaché offices investigate cross-border crime, including crime that affects Arizona and the rest of the Southwest. In addition, they work with foreign governments to secure travel documents and clearance for ICE to remove aliens from the United States. ICE negotiates with foreign governments to expedite the removal process, including negotiating electronic travel document arrangements. International cooperation for ICE is critical.

30.     International cooperation advances ICE's goal of making the borders more secure. To address cross-border crime at the Southwest border, ICE is cooperating very closely with the

13

Government of Mexico in particular. Two prime examples of ICE and Mexican cooperation include Operation Armas Cruzadas, designed to improve information sharing and to identify, disrupt, and dismantle criminal networks engaged in weapons smuggling, and Operation Firewall, as part of which Mexican customs and ICE-trained Mexican Money Laundering-Vetted Units target the illicit flow of money out of Mexico on commercial flights and in container shipments.

31.     Also to improve border security and combat cross-border crime, ICE is engaged in other initiatives with the Government of Mexico. For instance, ICE is training Mexican customs investigators. ICE also provides Mexican law enforcement officers and prosecutors training in human trafficking, child sexual exploitation, gang investigations, specialized investigative techniques, and financial crimes. ICE has recruited Mexican federal police officers to participate in five of the ICE-led Border Enforcement Security Task Forces (BESTs). The BEST platform brings together multiple law enforcement agencies at every level to combat cross-border crime, including crime touching Arizona. Sharing information and agents is promoting more efficient and effective investigations. ICE has benefited from the Government of Mexico's increased cooperation, including in recent alien smuggling investigations that resulted in arrests in Mexico and Arizona.

32.     In addition to the importance of cooperation from foreign governments in criminal investigations, ICE also benefits from good relationships with foreign governments in effecting removals of foreign nationals. Negotiating removals, including country clearance, to approvals and securing travel documents, is a federal matter and often one that requires the cooperation of the country that is accepting the removed alien. ICE removes more nationals of Mexico than of any other country. In FY 2009, ICE removed or returned approximately 275,000

14

Mexican nationals, which constitutes more than 70 percent of all removals and returns. Not all countries are equally willing to repatriate their nationals. Delays in repatriating nationals of foreign countries causes ICE financial and operational challenges, particularly when the aliens are detained pending removal. Federal law limits how long ICE can detain an alien once the alien is subject to a final order of removal. Therefore, difficulties in persuading a foreign country to accept a removed alien runs the risk of extending the length of time that a potentially dangerous or criminal alien remains in the United States. Thus, the efficient operation of the immigration system relies on cooperation from foreign governments.

### *Reliance on Illegal Aliens in Enforcement and Prosecution*

33. ICE agents routinely rely on foreign nationals, including aliens unlawfully in the United States, to build criminal cases, including cases against other aliens in the United States illegally. Aliens who are unlawfully in the United States, like any other persons, may have important information about criminals they encounter—from narcotics smugglers to alien smugglers and beyond—and routinely support ICE's enforcement activities by serving as confidential informants or witnesses. When ICE's witnesses or informants are illegal aliens who are subject to removal, ICE can exercise discretion and ensure the alien is able to remain in the country to assist in an investigation, prosecution, or both. The blanket removal or incarceration of all aliens unlawfully present in Arizona or in certain other individual states would interfere with ICE's ability to pursue the prosecution or removal of aliens who pose particularly significant threats to public safety or national security. Likewise, ICE can provide temporary and long-term benefits to ensure victims of illegal activity are able to remain in the United States.

34. Tools relied upon by ICE to ensure the cooperation of informants and witnesses include deferred action, stays of removal, U visas for crime victims, T visas for victims of human

15

trafficking, and S visas for significant cooperators against other criminals and to support investigations. These tools allow aliens who otherwise would face removal to remain in the United States either temporarily or permanently, and to work in the United States in order to support themselves while here. Many of these tools are employed in situations where federal immigration policy suggests an affirmative benefit that can only be obtained by not pursuing an alien's removal or prosecution. Notably, utilization of these tools is a dynamic process between ICE and the alien, which may play out over time. An alien who ultimately may receive a particular benefit—for example, an S visa—may not immediately receive that visa upon initially coming forward to ICE or other authorities, and thus at a given time may not have documentation or evidence of the fact that ICE is permitting that alien to remain in the United States.

35. Although ICE may rely on an illegal alien as an informant in any type of immigration or custom violation it investigates, this is particularly likely in alien smuggling and illegal employment cases. Aliens who lack lawful status in the United States are routinely witnesses in criminal cases against alien smugglers. For example, in an alien smuggling case, the smuggled aliens are in a position to provide important information about their journey to the United States, including how they entered, who provided them assistance, and who they may have paid. If these aliens were not available to ICE, special agents would not be positioned to build criminal cases against the smuggler. ICE may use a case against the smuggler to then build a larger case against others in the smuggling organization that assisted the aliens across the border.

36. ICE also relies heavily on alien informants and witnesses in illegal employment cases. In worksite cases, the unauthorized alien workers likewise have important insight and

16

information about the persons involved in the hiring and employment process, including who may be amenable to a criminal charge.

37. ICE also relies heavily on alien informants and cooperators in investigations of transnational gangs, including violent street gangs with membership and leadership in the United States and abroad. Informants and cooperating witnesses help ICE identify gang members in the United States and provide information to support investigations into crimes the gang may be committing. In some cases, this includes violent crime in aid of racketeering, narcotics trafficking, or other crimes.

38. During my years at ICE, I have heard many state and local law enforcement and immigration advocacy groups suggest that victims and witnesses of crime may hesitate to come forward to speak to law enforcement officials if they lack lawful status. The concern cited is that, rather than finding redress for crime, victims and witnesses will face detention and removal from the United States. To ensure that illegal aliens who are the victims of crimes or have witnessed crimes come forward to law enforcement, ICE has a robust outreach program, particularly in the context of human trafficking, to assure victims and witnesses that they can safely come forward against traffickers without fearing immediate immigration custody, extended detention, or removal. If this concern manifested itself—and if crime victims became reluctant to come forward—ICE would have a more difficult time apprehending, prosecuting, and removing particularly dangerous aliens.

***Potential Adverse Impact of SB 1070 on ICE's Priorities and Enforcement Activities***

39. I am aware that the State of Arizona has enacted new immigration legislation, known as SB 1070. I have read SB 1070, and I am generally familiar with the purpose and

17

provisions of that legislation. SB 1070 will adversely impact ICE's operational activities with respect to federal immigration enforcement.

40.     I understand that section two of SB 1070 generally requires Arizona law enforcement personnel to inquire as to the immigration status of any individual encountered during "any lawful stop, detention or arrest" where there is a reasonable suspicion to believe that the individual is unlawfully present in the United States. I also understand that section two contemplates referral to DHS of those aliens confirmed to be in the United States illegally.

41.     As a federal agency with national responsibilities, the burdens placed by SB 1070 on the Federal Government will impair ICE's ability to pursue its enforcement priorities. For example, referrals by Arizona under this section likely would be handled by either the Special Agent in Charge (SAC) Phoenix (the local HSI office), or the Field Office Director (FOD) Phoenix (the local ERO office). Both offices currently have broad portfolios of responsibility. Notably, SAC Phoenix is responsible for investigating crimes at eight ports of entry and two international airports. FOD Phoenix is responsible for two significant detention centers located in Florence and Eloy, Arizona, and a large number of immigration detainees housed at a local county jail in Pinal County, Arizona. FOD Phoenix also has a fugitive operations team, a robust criminal alien program, and it manages the 287(g) programs in the counties of Maricopa, Yavapai, and Pinal, as well as at the Arizona Department of Corrections.

42.     Neither the SAC nor the FOD offices in Phoenix are staffed to assume additional duties. Inquiries from state and local law enforcement officers about a subject's immigration status could be routed to the Law Enforcement Support Center in Vermont or to agents and officers stationed at SAC or FOD Phoenix. ICE resources are currently engaged in investigating criminal violations and managing the enforcement priorities and existing enforcement efforts,

18

and neither the SAC nor FOD Phoenix are scheduled for a significant increase in resources to accommodate additional calls from state and local law enforcement. Similarly, the FOD and SAC offices in Arizona are not equipped to respond to any appreciable increase in requests from Arizona to take custody of aliens apprehended by the state.

43. Moreover, ICE's detention capacity is limited. In FY 2009, FOD Phoenix was provided with funds to detain no more than approximately 2,900 detention beds on an average day. FOD Phoenix uses that detention budget and available bed space not only for aliens arrested in Arizona, but also aliens transferred from Los Angeles, San Francisco, and San Diego. Notably, the President's budget for FY 2011 does not request an increase in money to purchase detention space. And with increasing proportions of criminal aliens in ICE custody and static bed space, the detention resources will be directed to those aliens who present a danger to the community and the greatest risk of flight.

44. Thus, to respond to the number of referrals likely to be generated by enforcement of SB 1070 would require ICE to divert existing resources from other duties, resulting in fewer resources being available to dedicate to cases and aliens within ICE's priorities. This outcome is especially problematic because ICE's current priorities are focused on national security, public safety, and security of the border. Diverting resources to cover the influx of referrals from Arizona (and other states, to the extent similar laws are adopted) could, therefore, mean decreasing ICE's ability to focus on priorities such as protecting national security or public safety in order to pursue aliens who are in the United States illegally but pose no immediate or known danger or threat to the safety and security of the public.

45. An alternative to responding to the referrals from Arizona, and thus diverting resources, is to largely disregard referrals from Arizona. But this too would have adverse

19

consequences in that it could jeopardize ICE's relationships with state and local law enforcement agencies (LEAs). For example, LEAs often request ICE assistance when individuals are encountered who are believed to be in the United States illegally. Since ICE is not always available to immediately respond to LEA calls, potentially removable aliens are often released back into the community. Historically, this caused some LEAs to complain that ICE was unresponsive. In September 2006, to address this enforcement gap, the FOD office in Phoenix created the Law Enforcement Agency Response (LEAR) Unit, a unit of officers specifically dedicated to provide 24-hour response, 365 days per year. ICE's efforts with this project to ensure better response to LEAs would be undermined if ICE is forced to largely disregard referrals from Arizona, and consequently may result in LEAs being less willing to cooperate with ICE on various enforcement matters, including those high-priority targets on which ICE enforcement is currently focused.

46. In addition to section two of SB 1070, I understand that the stated purpose of the act is to "make attrition through enforcement the public policy of all state and local government agencies in Arizona," and that the "provisions of this act are intended to work together to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." To this end, I understand that section three of SB 1070 authorizes Arizona to impose criminal penalties for failing to carry a registration document, that sections four and five, along with existing provisions of Arizona law, prohibit certain alien smuggling activity, as well as the transporting, concealing, and harboring of illegal aliens, and that section six authorizes the warrantless arrest of certain aliens believed to be removable from the United States.

20

47.     The Arizona statute does not appear to make any distinctions based on the circumstances of the individual aliens or to take account of the Executive Branch's determination with respect to individual aliens, such as to not pursue removal proceedings or grant some form of relief from removal.  Thus, an alien for whom ICE deliberately decided for humanitarian reasons not to pursue removal proceedings or not to refer for criminal prosecution, despite the fact that the alien may be in the United States illegally, may still be prosecuted under the provisions of the Arizona law.  DHS maintains the primary interest in the humane treatment of aliens and the fair administration of federal immigration laws.  The absence of a federal prosecution does not necessarily indicate a lack of federal resources; rather, the Federal Government often has affirmative reasons for not prosecuting an alien.  For example, ICE may exercise its discretionary authority to grant deferred action to an alien in order to care for a sick child.  ICE's humanitarian interests would be undermined if that alien was then detained or arrested by Arizona authorities for being illegally present in the United States.

48.     Similarly, certain aliens who meet statutory requirements may seek to apply for asylum in the United States, pursuant to 8 U.S.C. § 1158, based on their having been persecuted in the past or because of a threat of future persecution.  The asylum statute recognizes a policy in favor of hospitality to persecuted aliens.  In many cases, these aliens are not detained while they pursue protection, and they do not have the requisite immigration documents that would provide them lawful status within the United States during that period.  Under SB 1070, these aliens could be subjected to detention or arrest based on the state's priorities, despite the fact that affirmative federal policy supports not detaining or prosecuting the alien.

49.     Additionally, some aliens who do not qualify for asylum may qualify instead for withholding of removal under 8 U.S.C. § 1231(b)(3).  Similar to asylum, withholding of removal

21

provides protection in the United States for aliens who seek to escape persecution. Arizona's detention or arrest of these aliens would not be consistent with the Government's desire to ensure their humanitarian treatment.

50.     Further, there are many aliens in the United States who seek protection from removal under the federal regulatory provisions at 8 C.F.R. § 208.18 implementing the Government's non-*refoulement* obligations under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).  In many cases, these aliens are not detained while they pursue CAT protection.  Under SB 1070, these aliens could be subjected to detention or arrest based on the state's priorities.  The detention or arrest of such aliens would be inconsistent with the Government's interest in ensuring their humane treatment, especially where such aliens may have been subject to torture before they came to the U.S.

51.     Application of SB 1070 also could undermine ICE's efforts to secure the cooperation of confidential informants, witnesses, and victims who are present in the United States without legal status.  The stated purpose of SB 1070, coupled with the extensive publicity surrounding this law, may lead illegal aliens to believe, rightly or wrongly, that they will be subject to immigration detention and removal if they cooperate with authorities, not to mention the possibility that they may expose themselves to sanctions under Arizona law if they choose to cooperate with authorities.  Consequently, SB 1070 very likely will chill the willingness of certain aliens to cooperate with ICE.  Although ICE has tools to address those concerns, SB 1070 would undercut those efforts, and thus risks ICE's investigation and prosecution of criminal activity, such as that related to illegal employment, the smuggling of contraband or people, or human trafficking.

22

52.     Moreover, just as the ICE offices in Arizona are not staffed to respond to additional inquiries about the immigration status of individuals encountered by Arizona, or to and arrest or detain appreciably more aliens not within ICE's current priorities, the offices are not staffed to provide personnel to testify in Arizona state criminal proceedings related to a defendant's immigration status, such as a "Simpson Hearing" where there is indication that a person may be in the United States illegally and the prosecutor invokes Arizona Revised Statute § 13-3961(A)(a)(ii) (relating to determination of immigration status for purposes of bail). In some federal criminal immigration cases, Assistant United States Attorneys call ICE special agents to testify to provide such information as a person's immigration history or status. If ICE agents are asked to testify in a significant number of state criminal proceedings, as contemplated under SB 1070, they will be forced either to divert resources from federal priorities, or to refuse to testify in those proceedings, thus damaging their relationships with the state and local officials whose cooperation is often of critical importance in carrying out federal enforcement priorities.

53.     Enforcement of SB 1070 also threatens ICE's cooperation from foreign governments. For example, the Government of Mexico, a partner to ICE in many law enforcement efforts and in repatriation of Mexican nationals, has expressed strong concern about Arizona's law. On May 19, 2010, President Barack Obama and Mexican President Felipe Calderón held a joint news conference, during which President Calderón criticized the Arizona immigration law, saying it criminalized immigrants. President Calderón reiterated these concerns to a joint session of the United States Congress on May 20, 2010. Any decrease in participation and support from the Government of Mexico will hinder ICE efforts to prioritize and combat cross-border crime.

54.     The Government of Mexico is not the only foreign nation that has expressed concern about SB 1070.  Should there be any decreased cooperation from foreign governments in response to Arizona's enforcement of SB 1070, the predictable result of such decreased cooperation would be an adverse impact on the effectiveness and efficiency of ICE's enforcement activities, which I have detailed above.


        I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed the ___1st___ day of July 2010 in Washington, D.C.


_____
Daniel H. Ragsdale
Executive Associate Director
Management and Administration
U.S. Immigration and Customs Enforcement

# ATTACHMENT A



*Office of the Assistant Secretary*

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536

## U.S. Immigration and Customs Enforcement

NOV - 7 2007

MEMORANDUM FOR:    All Field Office Directors
                   All Special Agents in Charge

FROM:              Julie L. Myers
                   Assistant Secretary

SUBJECT:           Prosecutorial and Custody Discretion

This memorandum serves to highlight the importance of exercising prosecutorial discretion when making administrative arrest and custody determinations for aliens who are nursing mothers. The commitment by ICE to facilitate an end to the "catch and release" procedure for illegal aliens does not diminish the responsibility of ICE agents and officers to use discretion in identifying and responding to meritorious health related cases and caregiver issues.

The process for making discretionary decisions is outlined in the attached memorandum of November 7, 2000, entitled "Exercising Prosecutorial Discretion." Field agents and officers are not only authorized by law to exercise discretion within the authority of the agency, but are expected to do so in a judicious manner at all stages of the enforcement process.

For example, in situations where officers are considering taking a nursing mother into custody, the senior ICE field managers should consider:

- Absent any statutory detention requirement or concerns such as national security, threats to public safety or other investigative interests, the nursing mother should be released on an Order of Recognizance or Order of Supervision and the Alternatives to Detention programs should be considered as an additional enforcement tool;
- In situations where ICE has determined, due to one of the above listed concerns or a statutory detention requirement to take a nursing mother into custody, the field personnel should consider placing a mother with her non-U.S. citizen child in the T. Don Hutto or Berks family residential center, provided there are no medical or legal issues that preclude their removal and they meet the placement factors of the facility. For a nursing mother with a U.S. citizen child, the pertinent state social service agencies should be contacted to identify and address any caregiver issues the alien mother might have in order to maintain the unity of the mother and child if the above listed release condition can be met;
- The decision to detain nursing mothers shall be reported through the programs' operational chain of command.

Requests for Headquarters assistance to address arrests and custody determinations as they relate to this issue may be addressed to the appropriate Assistant Director for Operations within OI or DRO.

Attachment

www.ice.gov



U.S. Department of Justice
Immigration and Naturalization Service

HQOPP 50/4

Office of the Commissioner                   425 I Street NW
                                             Washington, DC 20536

NOV    7 2000

MEMORANDUM TO REGIONAL DIRECTORS
                DISTRICT DIRECTORS
                CHIEF PATROL AGENTS
                REGIONAL AND DISTRICT COUNSEL

FROM          Doris Meissner
              Commissioner
              Immigration and Naturalization Service

SUBJECT:      Exercising Prosecutorial Discretion

        Since the 1996 amendments to the Immigration and Nationality Act (INA) which limited
the authority of immigration judges to provide relief from removal in many cases, there has been
increased attention to the scope and exercise of the Immigration and Naturalization Service's
(INS or the Service) prosecutorial discretion. This memorandum describes the principles with
which INS exercises prosecutorial discretion and the process to be followed in making and
monitoring discretionary decisions. Service officers are not only authorized by law but expected
to exercise discretion in a judicious manner at all stages of the enforcement process—from
planning investigations to enforcing final orders—subject to their chains of command and to the
particular responsibilities and authority applicable to their specific position. In exercising this
discretion, officers must take into account the principles described below in order to promote the
efficient and effective enforcement of the immigration laws and the interests of justice.

        More specific guidance geared to exercising discretion in particular program areas
already exists in some instances,[1] and other program-specific guidance will follow separately

---

[1] For example, standards and procedures for placing an alien in deferred action status are provided in the Standard
Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal (Standard Operating
Procedures), Part X. This memorandum is intended to provide general principles, and does not replace any previous
specific guidance provided about particular INS actions, such as "Supplemental Guidelines on the Use of
Cooperating Individuals and Confidential Informants Following the Enactment of IIRIRA," dated December 29,
1997. This memorandum is not intended to address every situation in which the exercise of prosecutorial discretion
may be appropriate. If INS personnel in the exercise of their duties recognize apparent conflict between any of their
specific policy requirements and these general guidelines, they are encouraged to bring the matter to their
supervisor's attention, and any conflict between policies should be raised through the appropriate chain of command
for resolution.

Memorandum for Regional Directors, et al.                                    Page 2
Subject:  Exercising Prosecutorial Discretion

However, INS officers should continue to exercise their prosecutorial discretion in appropriate cases during the period before more specific program guidance is issued.

A statement of principles concerning discretion serves a number of important purposes. As described in the "Principles of Federal Prosecution,"[1] part of the U.S. Attorneys' manual, such principles provide convenient reference points for the process of making prosecutorial decisions; facilitate the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made.

Legal and Policy Background

"Prosecutorial discretion" is the authority of an agency charged with enforcing a law to decide whether to enforce, or not to enforce, the law against someone. The INS, like other law enforcement agencies, has prosecutorial discretion and exercises it every day. In the immigration context, the term applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions, including among others: Focusing investigative resources on particular offenses or conduct; deciding whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order.

The "favorable exercise of prosecutorial discretion" means a discretionary decision not to assert the full scope of the INS' enforcement authority as permitted under the law. Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an NTA (discussed in more detail below under "Initiating Proceedings"), not detaining an alien placed in proceedings (where discretion remains despite mandatory detention requirements), and approving deferred action.

---

[1] For this discussion, and much else in this memorandum, we have relied heavily upon the Principles of Federal Prosecution, chapter 9-27.000 in the U.S. Department of Justice's United States Attorneys' Manual (Oct. 1997). There are significant differences, of course, between the role of the U.S. Attorneys' offices in the criminal justice system, and INS responsibilities to enforce the immigration laws, but the general approach to prosecutorial discretion stated in this memorandum reflects that taken by the Principles of Federal Prosecution.

11/27/00   16:51   ☎202 514 1776          INS PRESS OFFICE                                    ☑004

Memorandum for Regional Directors, et al.                                              Page 3
Subject:  Exercising Prosecutorial Discretion

Courts recognize that prosecutorial discretion applies in the civil, administrative arena just as it does in criminal law.  Moreover, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  Heckler v. Chaney, 470 U.S. 821, 831 (1985).  Both Congress and the Supreme Court have recently reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activities, such as whether to place an individual in deportation proceedings.  INA section 242(g); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999).  The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to judicial review or reversal, except in extremely narrow circumstances.  Consequently, it is a powerful tool that must be used responsibly.

As a law enforcement agency, the INS generally has prosecutorial discretion within its area of law enforcement responsibility unless that discretion has been clearly limited by statute in a way that goes beyond standard terminology.  For example, a statute directing that the INS "shall" remove removable aliens would not be construed by itself to limit prosecutorial discretion, but the specific limitation on releasing certain criminal aliens in section 236(c)(2) of the INA evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist.  Personnel who are unsure whether the INS has discretion to take a particular action should consult their supervisor and legal counsel to the extent necessary.

It is important to recognize not only what prosecutorial discretion is, but also what it is not.  The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law.  Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given.  For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.

This distinction is not always an easy, bright-line rule to apply.  In many cases, INS decisionmaking involves both a prosecutorial decision to take or not to take enforcement action, such as placing an alien in removal proceedings, and a decision whether or not the alien is substantively eligible for a benefit under the INA.  In many cases, benefit decisions involve the exercise of significant discretion which in some cases is not judicially reviewable, but which is not prosecutorial discretion.

Prosecutorial discretion can extend only up to the substantive and jurisdictional limits of the law.  It can never justify an action that is illegal under the substantive law pertaining to the

11/27/00    16:51    ☎202 514 1776           INS PRESS OFFICE                              ☑005

Memorandum for Regional Directors, et al.                                              Page 4
Subject: Exercising Prosecutorial Discretion

conduct, or one that while legal in other contexts, is not within the authority of the agency or officer taking it. Prosecutorial discretion to take an enforcement action does not modify or waive any legal requirements that apply to the action itself. For example, an enforcement decision to focus on certain types of immigration violators for arrest and removal does not mean that the INS may arrest any person without probable cause to do so for an offense within its jurisdiction. Service officers who are in doubt whether a particular action complies with applicable constitutional, statutory, or case law requirements should consult with their supervisor and obtain advice from the district or sector counsel or representative of the Office of General Counsel to the extent necessary.

Finally, exercising prosecutorial discretion does not lessen the INS' commitment to enforce the immigration laws to the best of our ability. It is not an invitation to violate or ignore the law. Rather, it is a means to use the resources we have in a way that best accomplishes our mission of administering and enforcing the immigration laws of the United States.

Principles of Prosecutorial Discretion

Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations. The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals. These goals include protecting public safety, promoting the integrity of the legal immigration system, and deterring violations of the immigration law.

It is an appropriate exercise of prosecutorial discretion to give priority to investigating, charging, and prosecuting those immigration violations that will have the greatest impact on achieving these goals. The INS has used this principle in the design and execution of its border enforcement strategy, its refocus on criminal smuggling networks, and its concentration on fixing benefit-granting processes to prevent fraud. An agency's focus on maximizing its impact under appropriate principles, rather than devoting resources to cases that will do less to advance these overall interests, is a crucial element in effective law enforcement management.

The Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the concept of a "substantial Federal interest." A U.S. Attorney may properly decline a prosecution if "*no substantial Federal interest would be served by prosecution.*" This principle provides a useful frame of reference for the INS, although applying it presents challenges that differ from those facing a U.S. Attorney. In particular, as immigration is an exclusively Federal responsibility, the option of an adequate alternative remedy under state law is not available. In an immigration case, the interest at stake will always be Federal. Therefore, we must place particular emphasis on the element of substantiality. How important is the Federal interest in the case, as compared to other cases and priorities? That is the overriding question, and answering it requires examining a number of factors that may differ according to the stage of the case.

# ATTACHMENT B

*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

October 24, 2005

| | |
|---|---|
| MEMORANDUM FOR: | All OPLA Chief Counsel |
| FROM: | William J. Howard<br>Principal Legal Advisor |
| SUBJECT: | Prosecutorial Discretion |

As you know, when Congress abolished the Immigration and Naturalization Service and divided its functions among U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (CIS), the Office of the Principal Legal Advisor (OPLA) was given exclusive authority to prosecute all removal proceedings. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 442(c), 116 Stat. 2135, 2194 (2002) ("the legal advisor * * * shall represent the bureau in all exclusion, deportation, and removal proceedings before the Executive Office for Immigration Review"). Complicating matters for OPLA is that our cases come to us from CBP, CIS, and ICE, since all three bureaus are authorized to issue Notices to Appear (NTAs).

OPLA is handling about 300,000 cases in the immigration courts, 42,000 appeals before the Board of Immigration Appeals (BIA or Board), and 12,000 motions to reopen each year. Our circumstances in litigating these cases differ in a major respect from our predecessor, the INS's Office of General Counsel. Gone are the days when INS district counsels, having chosen an attorney-client model that required client consultation before INS trial attorneys could exercise prosecutorial discretion, could simply walk down the hall to an INS district director, immigration agent, adjudicator, or border patrol officer to obtain the client's permission to proceed with that exercise. Now NTA-issuing clients or stakeholders might be in different agencies, in different buildings, and in different cities from our own.

Since the NTA-issuing authorities are no longer all under the same roof, adhering to INS OGC's attorney-client model would minimize our efficiency. This is particularly so since we are litigating our hundreds of thousands of cases per year with only 600 or so attorneys; that our case preparation time is extremely limited, averaging about 20 minutes a case; that our caseload will increase since Congress is now providing more resources for border and interior immigration enforcement; that many of the cases that come to us from NTA-issuers lack supporting evidence like conviction documents; that we must prioritize our cases to allow us to place greatest emphasis on our national security and criminal alien dockets; that we have growing collateral duties such as

All OPLA Chief Counsel
Page 2 of 9

assisting the Department of Justice with federal court litigation; that in many instances we lack sufficient staff to adequately brief Board appeals or oppositions to motions to reopen; and that the opportunities to exercise prosecutorial discretion arise at many different points in the removal process.

To elaborate on this last point, the universe of opportunities to exercise prosecutorial discretion is large. Those opportunities arise in the pre-filing stage, when, for example, we can advise clients who consult us whether or not to file NTAs or what charges and evidence to base them on. They arise in the course of litigating the NTA in immigration court, when we may want, among other things, to move to dismiss a case as legally insufficient, to amend the NTA, to decide not to oppose a grant of relief, to join in a motion to reopen, or to stipulate to the admission of evidence. They arise after the immigration judge has entered an order, when we must decide whether to appeal all or part of the decision. Or they may arise in the context of DRO's decision to detain aliens, when we must work closely with DRO in connection with defending that decision in the administrative or federal courts. In the 50-plus immigration courtrooms across the United States in which we litigate, OPLA's trial attorneys continually face these and other prosecutorial discretion questions. Litigating with maximum efficiency requires that we exercise careful yet quick judgment on questions involving prosecutorial discretion. This will require that OPLA's trial attorneys become very familiar with the principles in this memorandum and how to apply them.

Further giving rise to the need for this guidance is the extraordinary volume of immigration cases that is now reaching the United States Courts of Appeals. Since 2001, federal court immigration cases have tripled. That year, there were 5,435 federal court cases. Four years later, in fiscal year 2004, that number had risen to 14,699 federal court cases. Fiscal year 2005 federal court immigration cases will approximate 15,000. The lion's share of these cases consists of petitions for review in the United States Courts of Appeal. Those petitions are now overwhelming the Department of Justice's Office of Immigration Litigation, with the result that the Department of Justice has shifted responsibility to brief as many as 2,000 of these appellate cases to other Departmental components and to the U.S. Attorneys' Offices. This, as you know, has brought you into greater contact with Assistant U.S. Attorneys who are turning to you for assistance in remanding some of these cases. This memorandum is also intended to lessen the number of such remand requests, since it provides your office with guidance to assist you in eliminating cases that would later merit a remand.

Given the complexity of immigration law, a complexity that federal courts at all levels routinely acknowledge in published decisions, your expert assistance to the U.S. Attorneys is critical.[1] It is all the more important because the decision whether to

---

[1]   As you know, if and when your resources permit it, I encourage you to speak with your respective United States Attorneys' Offices about having those Offices designate Special Assistant U.S. Attorneys from OPLA's ranks to handle both civil and criminal federal court immigration litigation. The U.S.

proceed with litigating a case in the federal courts must be gauged for reasonableness, lest, in losing the case, the courts award attorneys' fees against the government pursuant to the Equal Access to Justice Act, 28 U.S.C. 2412. In the overall scheme of litigating the removal of aliens at both the administrative and federal court level, litigation that often takes years to complete, it is important that we all apply sound principles of prosecutorial discretion, uniformly throughout our offices and in all of our cases, to ensure that the cases we litigate on behalf of the United States, whether at the administrative level or in the federal courts, are truly worth litigating.

* * * * * * * * * *

With this background in mind, I am directing that all OPLA attorneys apply the following principles of prosecutorial discretion:

## 1) Prosecutorial Discretion Prior to or in Lieu of NTA Issuance:

In the absence of authority to cancel NTAs, we should engage in client liaison with CBP, CIS (and ICE) via, or in conjunction with, CIS/CBP attorneys on the issuance of NTAs. We should attempt to discourage issuance of NTAs where there are other options available such as administrative removal, crewman removal, expedited removal or reinstatement, clear eligibility for an immigration benefit that can be obtained outside of immigration court, or where the desired result is other than a removal order.

It is not wise or efficient to place an alien into proceedings where the intent is to allow that person to remain unless, where compelling reasons exist, a stayed removal order might yield enhanced law enforcement cooperation. See Attachment A (Memorandum from Wesley Lee, ICE Acting Director, Office of Detention and Removal, Alien Witnesses and Informants Pending Removal (May 18, 2005)); see also Attachment B (Detention and Removal Officer's Field Manual, Subchapters 20.7 and 20.8, for further explanation on the criteria and procedures for stays of removal and deferred action).

Examples:

- **Immediate Relative of Service Person**- If an alien is an immediate relative of a military service member, a favorable exercise of discretion, including not issuing an NTA, should be a prime consideration. Military service includes current or former members of the Armed Forces, including: the United States Army, Air Force, Navy, Marine Corps, Coast Guard, or National Guard, as well as service in the Philippine Scouts. OPLA counsel should analyze possible eligibility for citizenship under

Attorneys' Offices will benefit greatly from OPLA SAUSAs, especially given the immigration law expertise that resides in each of your Offices, the immigration law's great complexity, and the extent to which the USAOs are now overburdened by federal immigration litigation.

sections 328 and 329. <u>See</u> Attachment C (Memorandum from Marcy M. Forman, Director, Office of Investigations, Issuance of Notices to Appeal, Administrative Orders of Removal, or Reinstatement of a Final Removal Order on Aliens with United States Military Service (June 21, 2004)).

- **Clearly Approvable I-130/I-485**- Where an alien is the potential beneficiary of a clearly approvable I-130/I-485 and there are no serious adverse factors that otherwise justify expulsion, allowing the alien the opportunity to legalize his or her status through a CIS-adjudicated adjustment application can be a cost-efficient option that conserves immigration court time and benefits someone who can be expected to become a lawful permanent resident of the United States. <u>See</u> Attachment D (Memorandum from William J. Howard, OPLA Principal Legal Advisor, Exercising Prosecutorial Discretion to Dismiss Adjustment Cases (October 6, 2005)).

- **Administrative Voluntary Departure**- We may be consulted in a case where administrative voluntary departure is being considered. Where an alien is eligible for voluntary departure and likely to depart, OPLA attorneys are encouraged to facilitate the grant of administrative voluntary departure or voluntary departure under safeguards. This may include continuing detention if that is the likely end result even should the case go to the Immigration Court.

- **NSEERS Failed to Register**- Where an alien subject to NSEERS registration failed to timely register but is otherwise in status and has no criminal record, he should not be placed in proceedings if he has a reasonable excuse for his failure. Reasonably excusable failure to register includes the alien's hospitalization, admission into a nursing home or extended care facility (where mobility is severely limited); or where the alien is simply unaware of the registration requirements. <u>See</u> Attachment E (Memorandum from Victor Cerda, OPLA Acting Principal Legal Advisor, Changes to the National Security Entry Exit Registration System (NSEERS)(January 8, 2004)).

- **Sympathetic Humanitarian Factors**- Deferred action should be considered when the situation involves sympathetic humanitarian circumstances that rise to such a level as to cry for an exercise of prosecutorial discretion. Examples of this include where the alien has a citizen child with a serious medical condition or disability or where the alien or a close family member is undergoing treatment for a potentially life threatening disease. DHS has the most prosecutorial discretion at this stage of the process.

2) **Prosecutorial Discretion after the Notice to Appear has issued, but before the Notice to Appear has been filed:**

We have an additional opportunity to appropriately resolve a case prior to expending court resources when an NTA has been issued but not yet filed with the immigration court. This would be an appropriate action in any of the situations

Case 1:11-cv-01804-TWT Document 29-31 Filed 06/08/11 Page 48 of 72
Case 2:10-cv-01413-KJW Document 6-4 Filed 07/06/10 Page 37 of 95

identified in #1. Other situations may also arise where the reasonable and rational decision is not to prosecute the case.

Example:

- **U or T visas**- Where a "U" or "T" visa application has been submitted, it may be appropriate not to file an NTA until a decision is made on such an application. In the event that the application is denied then proceedings would be appropriate.

## 3) Prosecutorial Discretion after NTA Issuance and Filing:

The filing of an NTA with the Immigration Court does not foreclose further prosecutorial discretion by OPLA Counsel to settle a matter. There may be ample justification to move the court to terminate the case and to thereafter cancel the NTA as improvidently issued or due to a change in circumstances such that continuation is no longer in the government interest.[2] We have regulatory authority to dismiss proceedings. Dismissal is by regulation without prejudice. See 8 CFR §§ 239.2(c), 1239.2(c). In addition, there are numerous opportunities that OPLA attorneys have to resolve a case in the immigration court. These routinely include not opposing relief, waiving appeal or making agreements that narrow issues, or stipulations to the admissibility of evidence. There are other situations where such action should also be considered for purposes of judicial economy, efficiency of process or to promote justice.

Examples:

---

[2] Unfortunately, DHS's regulations, at 8 C.F.R. 239.1, do not include OPLA's attorneys among the 38 categories of persons given authority there to issue NTAs and thus to cancel NTAs. That being said, when an OPLA attorney encounters an NTA that lacks merit or evidence, he or she should apprise the issuing entity of the deficiency and ask that the entity cure the deficiency as a condition of OPLA's going forward with the case. If the NTA has already been filed with the immigration court, the OPLA attorney should attempt to correct it by filing a form I-261, or, if that will not correct the problem, should move to dismiss proceedings without prejudice. We must be sensitive, particularly given our need to prioritize our national security and criminal alien cases, to whether prosecuting a particular case has little law enforcement value to the cost and time required. Although we lack the authority to sua sponte cancel NTAs, we can move to dismiss proceedings for the many reasons outlined in 8 CFR § 239.2(a) and 8 CFR § 1239.2(c). Moreover, since OPLA attorneys do not have independent authority to grant deferred action status, stays of removal, parole, etc., once we have concluded that an alien should not be subjected to removal, we must still engage the client entity to "defer" the action, issue the stay or initiate administrative removal.

- **Relief Otherwise Available**- We should consider moving to dismiss proceedings without prejudice where it appears in the discretion of the OPLA attorney that relief in the form of adjustment of status appears clearly approvable based on an approvable I-130 or I-140 and appropriate for adjudication by CIS. See October 6, 2005 Memorandum from Principal Legal Advisor Bill Howard, supra. Such action may also be appropriate in the special rule cancellation NACARA context. We should also consider remanding a case to permit an alien to pursue naturalization.[3] This allows the alien to pursue the matter with CIS, the DHS entity with the principal responsibility for adjudication of immigration benefits, rather than to take time from the overburdened immigration court dockets that could be expended on removal issues.

- **Appealing Humanitarian Factors**- Some cases involve sympathetic humanitarian circumstances that rise to such a level as to cry for an exercise of prosecutorial discretion. Examples of this, as noted above, include where the alien has a citizen child with a serious medical condition or disability or where the alien or a close family member is undergoing treatment for a potentially life threatening disease. OPLA attorneys should consider these matters to determine whether an alternative disposition is possible and appropriate. Proceedings can be reinstituted when the situation changes. Of course, if the situation is expected to be of relatively short duration, the Chief Counsel Office should balance the benefit to the Government to be obtained by terminating the proceedings as opposed to administratively closing proceedings or asking DRO to stay removal after entry of an order.

- **Law Enforcement Assets/CIs**- There are often situations where federal, State or local law enforcement entities desire to have an alien remain in the United States for a period of time to assist with investigation or to testify at trial. Moving to dismiss a case to permit a grant of deferred action may be an appropriate result in these circumstances. Some offices may prefer to administratively close these cases, which gives the alien the benefit of remaining and law enforcement the option of calendaring proceedings at any time. This may result in more control by law enforcement and enhanced cooperation by the alien. A third option is a stay.

4) **Post-Hearing Actions**:

Post-hearing actions often involve a great deal of discretion. This includes a decision to file an appeal, what issues to appeal, how to respond to an alien's appeal, whether to seek a stay of a decision or whether to join a motion to reopen. OPLA

---

[3] Once in proceedings, this typically will occur only where the alien has shown prima facie eligibility for naturalization and that his or her case involves exceptionally appealing or humanitarian factors. 8 CFR §1239.1(f). It is improper for an immigration judge to terminate proceedings absent an affirmative communication from DHS that the alien would be eligible for naturalization but for the pendency of the deportation proceeding. Matter of Cruz, 15 I&N Dec. 236 (BIA 1975); see Nolan v. Holmes, 334 F.3d 189 (2d Cir. 2003) (Second Circuit upholds BIA's reliance on Matter of Cruz when petitioner failed to establish prima facie eligibility.).

Case 1:11-cv-01804-TWT Document 29-31 Filed 06/08/11 Page 50 of 72
Case 2:10-cv-09413-KJW Document 8-4 Filed 07/06/10 Page 39 of 95

attorneys are also responsible for replying to motions to reopen and motions to reconsider. The interests of judicial economy and fairness should guide your actions in handling these matters.

Examples:

- **Remanding to an Immigration Judge or Withdrawing Appeals**- Where the appeal brief filed on behalf of the alien respondent is persuasive, it may be appropriate for an OPLA attorney to join in that position to the Board, to agree to remand the case back to the immigration court, or to withdraw a government appeal and allow the decision to become final.

- **Joining in Untimely Motions to Reopen**- Where a motion to reopen for adjustment of status or cancellation of removal is filed on behalf of an alien with substantial equities, no serious criminal or immigration violations, and who is legally eligible to be granted that relief except that the motion is beyond the 90-day limitation contained in 8 C.F.R. § 1003.23, strongly consider exercising prosecutorial discretion and join in this motion to reopen to permit the alien to pursue such relief to the immigration court.

- **Federal Court Remands to the BIA**- Cases filed in the federal courts present challenging situations. In a habeas case, be very careful to assess the reasonableness of the government's detention decision and to consult with our clients at DRO. Where there are potential litigation pitfalls or unusually sympathetic fact circumstances and where the BIA has the authority to fashion a remedy, you may want to consider remanding the case to the BIA. Attachments H and I provide broad guidance on these matters. Bring concerns to the attention of the Office of the United States Attorney or the Office of Immigration Litigation, depending upon which entity has responsibility over the litigation. See generally Attachment F (Memorandum from OPLA Appellate Counsel, U.S. Attorney Remand Recommendations (rev. May 10, 2005)); see also Attachment G (Memorandum from Thomas W. Hussey, Director, Office of Immigration Litigation, U.S. Department of Justice, Remand of Immigration Cases (Dec. 8, 2004)).

- **In absentia orders.** Reviewing courts have been very critical of in absentia orders that, for such things as appearing late for court, deprive aliens of a full hearing and the ability to pursue relief from removal. This is especially true where court is still in session and there does not seem to be any prejudice to either holding or rescheduling the hearing for later that day. These kinds of decisions, while they may be technically correct, undermine respect for the fairness of the removal process and cause courts to find reasons to set them aside. These decisions can create adverse precedent in the federal courts as well as EAJA liability. OPLA counsel should be mindful of this and, if possible, show a measured degree of flexibility, but

only if convinced that the alien or his or her counsel is not abusing the removal court process.

5) **Final Orders- Stays and Motions to Reopen/Reconsider**:

Attorney discretion doesn't cease after a final order. We may be consulted on whether a stay of removal should be granted. See Attachment B (Subchapter 20.7). In addition, circumstances may develop whether the proper and just course of action would be to move to reopen the proceeding for purposes of terminating the NTA.

Examples:

- **Ineffective Assistance**- An OPLA attorney is presented with a situation where an alien was deprived of an opportunity to pursue relief, due to incompetent counsel, where a grant of such relief could reasonably be anticipated. It would be appropriate, assuming compliance with Matter of Lozada, to join in or not oppose motions to reconsider to allow the relief applications to be filed.

- **Witnesses Needed, Recommend a Stay**- State law enforcement authorities need an alien as a witness in a major criminal case. The alien has a final order and will be removed from the United States before trial can take place. OPLA counsel may recommend that a stay of removal be granted and this alien be released on an order of supervision.

* * * * * * * * * *

Prosecutorial discretion is a very significant tool that sometimes enables you to deal with the difficult, complex and contradictory provisions of the immigration laws and cases involving human suffering and hardship. It is clearly DHS policy that national security violators, human rights abusers, spies, traffickers both in narcotics and people, sexual predators and other criminals are removal priorities. It is wise to remember that cases that do not fall within these categories sometimes require that we balance the cost of an action versus the value of the result. Our reasoned determination in making prosecutorial discretion decisions can be a significant benefit to the efficiency and fairness of the removal process.

**Official Use Disclaimer**:

This memorandum is protected by the Attorney/Client and Attorney Work product privileges and is for Official Use Only. This memorandum is intended solely to provide legal advice to the Office of the Chief Counsels (OCC) and their staffs regarding the appropriate and lawful exercise of prosecutorial discretion, which will lead to the efficient management of resources. It is not intended to, does not, and may not be relied upon to create or confer any right(s) or benefit(s), substantive or procedural, enforceable at law by any individual or other party in

All OPLA Chief Counsel
Page 9 of 9

removal proceedings, in litigation with the United States, or in any other form or manner. Discretionary decisions of the OCC regarding the exercise of prosecutorial discretion under this memorandum are final and not subject to legal review or recourse. Finally this internal guidance does not have the force of law, or of a Department of Homeland Security Directive.

# ATTACHMENT C



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPP 50/4

---

Office of the Commissioner

*425 I Street NW*
*Washington, DC 20536*

NOV 17 2000

MEMORANDUM TO REGIONAL DIRECTORS
DISTRICT DIRECTORS
CHIEF PATROL AGENTS
REGIONAL AND DISTRICT COUNSEL

FROM: Doris Meissner
Commissioner
Immigration and Naturalization Service

SUBJECT: <u>Exercising Prosecutorial Discretion</u>

Since the 1996 amendments to the Immigration and Nationality Act (INA) which limited the authority of immigration judges to provide relief from removal in many cases, there has been increased attention to the scope and exercise of the Immigration and Naturalization Service's (INS or the Service) prosecutorial discretion. This memorandum describes the principles with which INS exercises prosecutorial discretion and the process to be followed in making and monitoring discretionary decisions. <u>Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process–from planning investigations to enforcing final orders–subject to their chains of command and to the particular responsibilities and authority applicable to their specific position. In exercising this discretion, officers must take into account the principles described below in order to promote the efficient and effective enforcement of the immigration laws and the interests of justice.</u>

More specific guidance geared to exercising discretion in particular program areas already exists in some instances,[1] and other program-specific guidance will follow separately.

---

[1] For example, standards and procedures for placing an alien in deferred action status are provided in the <u>Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal</u> (Standard Operating Procedures), Part X. This memorandum is intended to provide general principles, and does not replace any previous specific guidance provided about particular INS actions, such as "Supplemental Guidelines on the Use of Cooperating Individuals and Confidential Informants Following the Enactment of IIRIRA," dated December 29, 1997. This memorandum is not intended to address every situation in which the exercise of prosecutorial discretion may be appropriate. If INS personnel in the exercise of their duties recognize apparent conflict between any of their specific policy requirements and these general guidelines, they are encouraged to bring the matter to their supervisor's attention, and any conflict between policies should be raised through the appropriate chain of command for resolution.

Memorandum for Regional Directors, et al.                                                                Page 2
Subject:  Exercising Prosecutorial Discretion

However, INS officers should continue to exercise their prosecutorial discretion in appropriate cases during the period before more specific program guidance is issued.

A statement of principles concerning discretion serves a number of important purposes. As described in the "Principles of Federal Prosecution," [2] part of the U.S. Attorneys' manual, such principles provide convenient reference points for the process of making prosecutorial decisions; facilitate the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made.

**Legal and Policy Background**

"Prosecutorial discretion" is the authority of an agency charged with enforcing a law to decide whether to enforce, or not to enforce, the law against someone. The INS, like other law enforcement agencies, has prosecutorial discretion and exercises it every day.  In the immigration context, the term applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions, including among others:  Focusing investigative resources on particular offenses or conduct; deciding whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order.

The "favorable exercise of prosecutorial discretion" means a discretionary decision not to assert the full scope of the INS' enforcement authority as permitted under the law.  Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an NTA (discussed in more detail below under "Initiating Proceedings"), not detaining an alien placed in proceedings (where discretion remains despite mandatory detention requirements), and approving deferred action.

---

[2] For this discussion, and much else in this memorandum, we have relied heavily upon the Principles of Federal Prosecution, chapter 9-27.000 in the U.S. Department of Justice's United States Attorneys' Manual (Oct. 1997). There are significant differences, of course, between the role of the U.S. Attorneys' offices in the criminal justice system, and INS responsibilities to enforce the immigration laws, but the general approach to prosecutorial discretion stated in this memorandum reflects that taken by the Principles of Federal Prosecution.

Memorandum for Regional Directors, et al.                                              Page 3
Subject:  Exercising Prosecutorial Discretion

Courts recognize that prosecutorial discretion applies in the civil, administrative arena just as it does in criminal law.  Moreover, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  Heckler v. Chaney, 470 U.S. 821, 831 (1985).  Both Congress and the Supreme Court have recently reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activities, such as whether to place an individual in deportation proceedings.  INA section 242(g); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999).  The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to judicial review or reversal, except in extremely narrow circumstances.  Consequently, it is a powerful tool that must be used responsibly.

As a law enforcement agency, the INS generally has prosecutorial discretion within its area of law enforcement responsibility unless that discretion has been clearly limited by statute in a way that goes beyond standard terminology.  For example, a statute directing that the INS "shall" remove removable aliens would not be construed by itself to limit prosecutorial discretion, but the specific limitation on releasing certain criminal aliens in section 236(c)(2) of the INA evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist.  Personnel who are unsure whether the INS has discretion to take a particular action should consult their supervisor and legal counsel to the extent necessary.

It is important to recognize not only what prosecutorial discretion is, but also what it is not.  The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law.  Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given.  For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.

This distinction is not always an easy, bright-line rule to apply.  In many cases, INS decisionmaking involves both a prosecutorial decision to take or not to take enforcement action, such as placing an alien in removal proceedings, and a decision whether or not the alien is substantively eligible for a benefit under the INA.  In many cases, benefit decisions involve the exercise of significant discretion which in some cases is not judicially reviewable, but which is not prosecutorial discretion.

Prosecutorial discretion can extend only up to the substantive and jurisdictional limits of the law.  It can never justify an action that is illegal under the substantive law pertaining to the

Memorandum for Regional Directors, et al.                                    Page 4
Subject:  Exercising Prosecutorial Discretion

conduct, or one that while legal in other contexts, is not within the authority of the agency or officer taking it.  Prosecutorial discretion to take an enforcement action does not modify or waive any legal requirements that apply to the action itself.  For example, an enforcement decision to focus on certain types of immigration violators for arrest and removal does not mean that the INS may arrest any person without probable cause to do so for an offense within its jurisdiction.  Service officers who are in doubt whether a particular action complies with applicable constitutional, statutory, or case law requirements should consult with their supervisor and obtain advice from the district or sector counsel or representative of the Office of General Counsel to the extent necessary.

Finally, exercising prosecutorial discretion does not lessen the INS' commitment to enforce the immigration laws to the best of our ability.  It is not an invitation to violate or ignore the law.  Rather, it is a means to use the resources we have in a way that best accomplishes our mission of administering and enforcing the immigration laws of the United States.

**Principles of Prosecutorial Discretion**

Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations.  The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals.  These goals include protecting public safety, promoting the integrity of the legal immigration system, and deterring violations of the immigration law.

It is an appropriate exercise of prosecutorial discretion to give priority to investigating, charging, and prosecuting those immigration violations that will have the greatest impact on achieving these goals.  The INS has used this principle in the design and execution of its border enforcement strategy, its refocus on criminal smuggling networks, and its concentration on fixing benefit-granting processes to prevent fraud.  An agency's focus on maximizing its impact under appropriate principles, rather than devoting resources to cases that will do less to advance these overall interests, is a crucial element in effective law enforcement management.

The Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the concept of a "substantial Federal interest."  A U.S. Attorney may properly decline a prosecution if "*no substantial Federal interest would be served by prosecution.*"  This principle provides a useful frame of reference for the INS, although applying it presents challenges that differ from those facing a U.S. Attorney.  In particular, as immigration is an exclusively Federal responsibility, the option of an adequate alternative remedy under state law is not available.  In an immigration case, the interest at stake will always be Federal.  Therefore, we must place particular emphasis on the element of substantiality.  <u>How important is the Federal interest in the case, as compared to other cases and priorities</u>?  That is the overriding question, and answering it requires examining a number of factors that may differ according to the stage of the case.

Memorandum for Regional Directors, et al.                                                  Page 5
Subject: Exercising Prosecutorial Discretion

As a general matter, INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial.[3] Except as may be provided specifically in other policy statements or directives, the responsibility for exercising prosecutorial discretion in this manner rests with the District Director (DD) or Chief Patrol Agent (CPA) based on his or her common sense and sound judgment.[4] The DD or CPA should obtain legal advice from the District or Sector Counsel to the extent that such advice may be necessary and appropriate to ensure the sound and lawful exercise of discretion, particularly with respect to cases pending before the Executive Office for Immigration Review (EOIR).[5] The DD's or CPA's authority may be delegated to the extent necessary and proper, except that decisions not to place a removable alien in removal proceedings, or decisions to move to terminate a proceeding which in the opinion of the District or Sector Counsel is legally sufficient, may not be delegated to an officer who is not authorized under 8 C.F.R. § 239.1 to issue an NTA. A DD's or CPA's exercise of prosecutorial discretion will not normally be reviewed by Regional or Headquarters authority. However, DDs and CPAs remain subject to their chains of command and may be supervised as necessary in their exercise of prosecutorial discretion.

*Investigations*

Priorities for deploying investigative resources are discussed in other documents, such as the interior enforcement strategy, and will not be discussed in detail in this memorandum. These previously identified priorities include identifying and removing criminal and terrorist aliens, deterring and dismantling alien smuggling, minimizing benefit fraud and document abuse, responding to community complaints about illegal immigration and building partnerships to solve local problems, and blocking and removing employers' access to undocumented workers. Even within these broad priority areas, however, the Service must make decisions about how best to expend its resources.

Managers should plan and design operations to maximize the likelihood that serious offenders will be identified. Supervisors should ensure that front-line investigators understand that it is not mandatory to issue an NTA in every case where they have reason to believe that an alien is removable, and agents should be encouraged to bring questionable cases to a supervisor's attention. Operational planning for investigations should include consideration of appropriate procedures for supervisory and legal review of individual NTA issuing decisions.

---

[3] In some cases even a substantial immigration enforcement interest in prosecuting a case could be outweighed by other interests, such as the foreign policy of the United States. Decisions that require weighing such other interests should be made at the level of responsibility within the INS or the Department of Justice that is appropriate in light of the circumstances and interests involved.

[4] This general reference to DDs and CPAs is not intended to exclude from coverage by this memorandum other INS personnel, such as Service Center directors, who may be called upon to exercise prosecutorial discretion and do not report to DDs or CPAs, or to change any INS chains of command.

[5] Exercising prosecutorial discretion with respect to cases pending before EOIR involves procedures set forth at 8 CFR 239.2 and 8 CFR Part 3, such as obtaining the court's approval of a motion to terminate proceedings.

Memorandum for Regional Directors, et al.                                                    Page 6
Subject:  Exercising Prosecutorial Discretion

Careful design of enforcement operations is a key element in the INS' exercise of prosecutorial discretion.  Managers should consider not simply whether a particular effort is legally supportable, but whether it best advances the INS' goals, compared with other possible uses of those resources.  As a general matter, investigations that are specifically focused to identify aliens who represent a high priority for removal should be favored over investigations which, by their nature, will identify a broader variety of removable aliens.  Even an operation that is designed based on high-priority criteria, however, may still identify individual aliens who warrant a favorable exercise of prosecutorial discretion.[6]

### *Initiating and Pursuing Proceedings*

Aliens who are subject to removal may come to the Service's attention in a variety of ways.  For example, some aliens are identified as a result of INS investigations, while others are identified when they apply for immigration benefits or seek admission at a port-of-entry.  While the context in which the INS encounters an alien may, as a practical matter, affect the Service's options, it does not change the underlying principle that the INS has discretion and should exercise that discretion appropriately given the circumstances of the case.

Even when an immigration officer has reason to believe that an alien is removable and that there is sufficient evidence to obtain a final order of removal, it may be appropriate to decline to proceed with that case.  This is true even when an alien is removable based on his or her criminal history and when the alien–if served with an NTA–would be subject to mandatory detention. The INS may exercise its discretion throughout the enforcement process.  Thus, the INS can choose whether to issue an NTA, whether to cancel an NTA prior to filing with the immigration court or move for dismissal in immigration court (under 8 CFR 239.2), whether to detain (for those aliens not subject to mandatory detention), whether to offer an alternative to removal such as voluntary departure or withdrawal of an application for admission, and whether to stay an order of deportation.

The decision to exercise any of these options or other alternatives in a particular case requires an individualized determination, based on the facts and the law.  As a general matter, it is better to exercise favorable discretion as early in the process as possible, once the relevant facts have been determined, in order to conserve the Service's resources and in recognition of the alien's interest in avoiding unnecessary legal proceedings.  However, there is often a conflict

---

[6] For example, operations in county jails are designed to identify and remove criminal aliens, a high priority for the Service.  Nonetheless, an investigator working at a county jail and his or her supervisor should still consider whether the exercise of prosecutorial discretion would be appropriate in individual cases.

Memorandum for Regional Directors, et al.                                          Page 7
Subject:  Exercising Prosecutorial Discretion

between making decisions as soon as possible, and making them based on evaluating as many relevant, credible facts as possible.  Developing an extensive factual record prior to making a charging decision may itself consume INS resources in a way that negates any saving from forgoing a removal proceeding.

Generally, adjudicators may have a better opportunity to develop a credible factual record at an earlier stage than investigative or other enforcement personnel.  It is simply not practicable to require officers at the arrest stage to develop a full investigative record on the equities of each case (particularly since the alien file may not yet be available to the charging office), and this memorandum does not require such an analysis.  Rather, what is needed is knowledge that the INS is not legally required to institute proceedings in every case, openness to that possibility in appropriate cases, development of facts relevant to the factors discussed below to the extent that it is reasonably possible to do so under the circumstances and in the timeframe that decisions must be made, and implementation of any decision to exercise prosecutorial discretion.

There is no precise formula for identifying which cases warrant a favorable exercise of discretion.  Factors that should be taken into account in deciding whether to exercise prosecutorial discretion include, but are not limited to, the following:

- Immigration status: Lawful permanent residents generally warrant greater consideration. However, other removable aliens may also warrant the favorable exercise of discretion, depending on all the relevant circumstances.
- Length of residence in the United States:  The longer an alien has lived in the United States, particularly in legal status, the more this factor may be considered a positive equity.
- Criminal history: Officers should take into account the nature and severity of any criminal conduct, as well as the time elapsed since the offense occurred and evidence of rehabilitation. It is appropriate to take into account the actual sentence or fine that was imposed, as an indicator of the seriousness attributed to the conduct by the court.  Other factors relevant to assessing criminal history include the alien's age at the time the crime was committed and whether or not he or she is a repeat offender.
- Humanitarian concerns:  Relevant humanitarian concerns include, but are not limited to, family ties in the United States; medical conditions affecting the alien or the alien's family; the fact that an alien entered the United States at a very young age; ties to one's home country (e.g., whether the alien speaks the language or has relatives in the home country); extreme youth or advanced age; and home country conditions.
- Immigration history:  Aliens without a past history of violating the immigration laws (particularly violations such as reentering after removal, failing to appear at hearing, or resisting arrest that show heightened disregard for the legal process) warrant favorable consideration to a greater extent than those with such a history.  The seriousness of any such violations should also be taken into account.

Memorandum for Regional Directors, et al.                                       Page 8
Subject: Exercising Prosecutorial Discretion

- Likelihood of ultimately removing the alien: Whether a removal proceeding would have a reasonable likelihood of ultimately achieving its intended effect, in light of the case circumstances such as the alien's nationality, is a factor that should be considered.
- Likelihood of achieving enforcement goal by other means: In many cases, the alien's departure from the United States may be achieved more expeditiously and economically by means other than removal, such as voluntary return, withdrawal of an application for admission, or voluntary departure.
- Whether the alien is eligible or is likely to become eligible for other relief: Although not determinative on its own, it is relevant to consider whether there is a legal avenue for the alien to regularize his or her status if not removed from the United States. The fact that the Service cannot confer complete or permanent relief, however, does not mean that discretion should not be exercised favorably if warranted by other factors.
- Effect of action on future admissibility: The effect an action such as removal may have on an alien can vary–for example, a time-limited as opposed to an indefinite bar to future admissibility–and these effects may be considered.
- Current or past cooperation with law enforcement authorities: Current or past cooperation with the INS or other law enforcement authorities, such as the U.S. Attorneys, the Department of Labor, or National Labor Relations Board, among others, weighs in favor of discretion.
- Honorable U.S. military service: Military service with an honorable discharge should be considered as a favorable factor. See Standard Operating Procedures Part V.D.8 (issuing an NTA against current or former member of armed forces requires advance approval of Regional Director).
- Community attention: Expressions of opinion, in favor of or in opposition to removal, may be considered, particularly for relevant facts or perspectives on the case that may not have been known to or considered by the INS. Public opinion or publicity (including media or congressional attention) should not, however, be used to justify a decision that cannot be supported on other grounds. Public and professional responsibility will sometimes require the choice of an unpopular course.
- Resources available to the INS: As in planning operations, the resources available to the INS to take enforcement action in the case, compared with other uses of the resources to fulfill national or regional priorities, are an appropriate factor to consider, but it should not be determinative. For example, when prosecutorial discretion should be favorably exercised under these factors in a particular case, that decision should prevail even if there is detention space available.

Obviously, not all of the factors will be applicable to every case, and in any particular case one factor may deserve more weight than it might in another case. There may be other factors, not on the list above, that are appropriate to consider. The decision should be based on the totality of the circumstances, not on any one factor considered in isolation. General guidance such as this cannot provide a "bright line" test that may easily be applied to determine the "right" answer in every case. In many cases, minds reasonably can differ, different factors may point in different directions, and there is no clearly "right" answer. Choosing a course of action in difficult

Memorandum for Regional Directors, et al.                                                  Page 9
Subject:  Exercising Prosecutorial Discretion

cases must be an exercise of judgment by the responsible officer based on his or her experience, good sense, and consideration of the relevant factors to the best of his or her ability.

There are factors that may <u>not</u> be considered.  Impermissible factors include:

- An individual's race, religion, sex, national origin, or political association, activities or beliefs;[7]
- The officer's own personal feelings regarding the individual; or
- The possible effect of the decision on the officer's own professional or personal circumstances.

In many cases, the procedural posture of the case, and the state of the factual record, will affect the ability of the INS to use prosecutorial discretion.  For example, since the INS cannot admit an inadmissible alien to the United States unless a waiver is available, in many cases the INS' options are more limited in the admission context at a port-of-entry than in the deportation context.

Similarly, the INS may consider the range of options and information likely to be available at a later time.  For example, an officer called upon to make a charging decision may reasonably determine that he or she does not have a sufficient, credible factual record upon which to base a favorable exercise of prosecutorial discretion not to put the alien in proceedings, that the record cannot be developed in the timeframe in which the decision must be made, that a more informed prosecutorial decision likely could be made at a later time during the course of proceedings, and that if the alien is not served with an NTA now, it will be difficult or impossible to do so later.

Such decisions must be made, however, with due regard for the principles of these guidelines, and in light of the other factors discussed here.  For example, if there is no relief available to the alien in a removal proceeding and the alien is subject to mandatory detention if

---

[7] This general guidance on factors that should not be relied upon in making a decision whether to enforce the law against an individual is not intended to prohibit their consideration to the extent they are directly relevant to an alien's status under the immigration laws or eligibility for a benefit.  For example, religion and political beliefs are often directly relevant in asylum cases and need to be assessed as part of a prosecutorial determination regarding the strength of the case, but it would be improper for an INS officer to treat aliens differently based on his personal opinion about a religion or belief.  Political activities may be relevant to a ground of removal on national security or terrorism grounds.  An alien's nationality often directly affects his or her eligibility for adjustment or other relief, the likelihood that he or she can be removed, or the availability of prosecutorial options such as voluntary return, and may be considered to the extent these concerns are pertinent.

Memorandum for Regional Directors, et al.                                    Page 10
Subject:  Exercising Prosecutorial Discretion

placed in proceedings, that situation suggests that the exercise of prosecutorial discretion, if appropriate, would be more useful to the INS if done sooner rather than later.  It would be improper for an officer to assume that someone else at some later time will always be able to make a more informed decision, and therefore never to consider exercising discretion.

Factors relevant to exercising prosecutorial discretion may come to the Service's attention in various ways.  For example, aliens may make requests to the INS to exercise prosecutorial discretion by declining to pursue removal proceedings.  Alternatively, there may be cases in which an alien asks to be put in proceedings (for example, to pursue a remedy such as cancellation of removal that may only be available in that forum).  In either case, the INS may consider the request, but the fact that it is made should not determine the outcome, and the prosecutorial decision should be based upon the facts and circumstances of the case.  Similarly, the fact that an alien has not requested prosecutorial discretion should not influence the analysis of the case.  Whether, and to what extent, any request should be considered is also a matter of discretion.  Although INS officers should be open to new facts and arguments, attempts to exploit prosecutorial discretion as a delay tactic, as a means merely to revisit matters that have been thoroughly considered and decided, or for other improper tactical reasons should be rejected.  There is no legal right to the exercise of prosecutorial discretion, and (as stated at the close of this memorandum) this memorandum creates no right or obligation enforceable at law by any alien or any other party.

**Process for Decisions**

*Identification of Suitable Cases*

No single process of exercising discretion will fit the multiple contexts in which the need to exercise discretion may arise.  Although this guidance is designed to promote consistency in the application of the immigration laws, it is not intended to produce rigid uniformity among INS officers in all areas of the country at the expense of the fair administration of the law.  Different offices face different conditions and have different requirements.  Service managers and supervisors, including DDs and CPAs, and Regional, District, and Sector Counsel must develop mechanisms appropriate to the various contexts and priorities, keeping in mind that it is better to exercise discretion as early in process as possible once the factual record has been identified.[8]  In particular, in cases where it is clear that no statutory relief will be available at the immigration hearing and where detention will be mandatory, it best conserves the Service's resources to make a decision early.

Enforcement and benefits personnel at all levels should understand that prosecutorial discretion exists and that it is appropriate and expected that the INS will exercise this authority in appropriate cases.  DDs, CPAs, and other supervisory officials (such as District and

---

[8] DDs, CPAs, and other INS personnel should also be open, however, to possible reconsideration of decisions (either for or against the exercise of discretion) based upon further development of the facts.

Memorandum for Regional Directors, et al.                                          Page 11
Subject:  Exercising Prosecutorial Discretion


Sector Counsels) should encourage their personnel to bring potentially suitable cases for the
favorable exercise of discretion to their attention for appropriate resolution.  To assist in
exercising their authority, DDs and CPAs may wish to convene a group to provide advice on
difficult cases that have been identified as potential candidates for prosecutorial discretion.

It is also appropriate for DDs and CPAs to develop a list of "triggers" to help their
personnel identify cases at an early stage that may be suitable for the exercise of prosecutorial
discretion.  These cases should then be reviewed at a supervisory level where a decision can be
made as to whether to proceed in the ordinary course of business, to develop additional facts, or
to recommend a favorable exercise of discretion.  Such triggers could include the following facts
(whether proven or alleged):

Lawful permanent residents;
Aliens with a serious health condition;
Juveniles;
Elderly aliens;
Adopted children of U.S. citizens;
U.S. military veterans;
Aliens with lengthy presence in United States (i.e., 10 years or more); or
Aliens present in the United States since childhood.

Since workloads and the type of removable aliens encountered may vary significantly
both within and between INS offices, this list of possible trigger factors for supervisory review is
intended neither to be comprehensive nor mandatory in all situations.  Nor is it intended to
suggest that the presence or absence of "trigger" facts should itself determine whether
prosecutorial discretion should be exercised, as compared to review of all the relevant factors as
discussed elsewhere in these guidelines.  Rather, development of trigger criteria is intended
solely as a suggested means of facilitating identification of potential cases that may be suitable
for prosecutorial review as early as possible in the process.

*Documenting Decisions*

When a DD or CPA decides to exercise prosecutorial discretion favorably, that decision
should be clearly documented in the alien file, including the specific decision taken and its
factual and legal basis.  DDs and CPAs may also document decisions based on a specific set of
facts not to exercise prosecutorial discretion favorably, but this is not required by this guidance.

The alien should also be informed in writing of a decision to exercise prosecutorial
discretion favorably, such as not placing him or her in removal proceedings or not pursuing a
case.  This normally should be done by letter to the alien and/or his or her attorney of record,
briefly stating the decision made and its consequences.  It is not necessary to recite the facts of
the case or the INS' evaluation of the facts in such letters.  Although the specifics of the letter

Memorandum for Regional Directors, et al.                                    Page 12
Subject:  Exercising Prosecutorial Discretion

will vary depending on the circumstances of the case and the action taken, it must make it clear to the alien that exercising prosecutorial discretion does not confer any immigration status, ability to travel to the United States (unless the alien applies for and receives advance parole), immunity from future removal proceedings, or any enforceable right or benefit upon the alien. If, however, there is a potential benefit that is linked to the action (for example, the availability of employment authorization for beneficiaries of deferred action), it is appropriate to identify it.

The obligation to notify an individual is limited to situations in which a specific, identifiable decision to refrain from action is taken in a situation in which the alien normally would expect enforcement action to proceed.  For example, it is not necessary to notify aliens that the INS has refrained from focusing investigative resources on them, but a specific decision not to proceed with removal proceedings against an alien who has come into INS custody should be communicated to the alien in writing.  This guideline is not intended to replace existing standard procedures or forms for deferred action, voluntary return, voluntary departure, or other currently existing and standardized processes involving prosecutorial discretion.

### *Future Impact*

An issue of particular complexity is the future effect of prosecutorial discretion decisions in later encounters with the alien.  Unlike the criminal context, in which statutes of limitation and venue requirements often preclude one U.S. Attorney's office from prosecuting an offense that another office has declined, immigration violations are continuing offenses that, as a general principle of immigration law, continue to make an alien legally removable regardless of a decision not to pursue removal on a previous occasion.  An alien may come to the attention of the INS in the future through seeking admission or in other ways.  An INS office should abide by a favorable prosecutorial decision taken by another office as a matter of INS policy, absent new facts or changed circumstances.  However, if a removal proceeding is transferred from one INS district to another, the district assuming responsibility for the case is not bound by the charging district's decision to proceed with an NTA, if the facts and circumstances at a later stage suggest that a favorable exercise of prosecutorial discretion is appropriate.

Service offices should review alien files for information on previous exercises of prosecutorial discretion at the earliest opportunity that is practicable and reasonable and take any such information into account.  In particular, the office encountering the alien must carefully assess to what extent the relevant facts and circumstances are the same or have changed either procedurally or substantively (either with respect to later developments, or more detailed knowledge of past circumstances) from the basis for the original exercise of discretion. A decision by an INS office to take enforcement action against the subject of a previous documented exercise of favorable prosecutorial discretion should be memorialized with a memorandum to the file explaining the basis for the decision, unless the charging documents on their face show a material difference in facts and circumstances (such as a different ground of deportability).

Case 2:10-cv-01413-NVW Document 6-4 Filed 07/06/10 Page 55 of 95

Memorandum for Regional Directors, et al.                                      Page 13
Subject:  Exercising Prosecutorial Discretion

## Legal Liability and Enforceability

The question of liability may arise in the implementation of this memorandum.  Some INS personnel have expressed concerns that, if they exercise prosecutorial discretion favorably, they may become subject to suit and personal liability for the possible consequences of that decision.  We cannot promise INS officers that they will never be sued.  However, we can assure our employees that Federal law shields INS employees who act in reasonable reliance upon properly promulgated agency guidance within the agency's legal authority – such as this memorandum–from personal legal liability for those actions.

The principles set forth in this memorandum, and internal office procedures adopted hereto, are intended solely for the guidance of INS personnel in performing their duties.  They are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

## Training and Implementation

Training on the implementation of this memorandum for DDs, CPAs, and Regional, District, and Sector Counsel will be conducted at the regional level.  This training will include discussion of accountability and periodic feedback on implementation issues.  In addition, following these regional sessions, separate training on prosecutorial discretion will be conducted at the district level for other staff, to be designated.  The regions will report to the Office of Field Operations when this training has been completed.

# EXHIBIT M

## Proof of identity

When you apply for a Washington State driver license, instruction permit, or identification (ID) card, you must:

1. Be a Washington State resident.
2. Show us <u>proof of identity</u>.
3. Provide your <u>Social Security number</u> if you're applying for a **driver license**.
   - ○ **If you don't have a Social Security number when you apply for a driver license, photo instruction permit, or ID card**, you'll need to show <u>proof of Washington residence</u>.
4. Have <u>your photograph</u> taken.

### 1. Proof of identity
**What you'll need**

- If you're under 18 years:

    Show us **1** of the options from the list below:
    - **Option 1:** 1 "Stand-alone Document"
    - **Option 2:** 2 "A-List Documents"
    - **Option 3:** 1 "A-List Document" and **2** "B-List Documents"
    - **Option 4:** At least 4 "B-List Documents", including:
        - ○ **1** from the list that has your name and date of birth, **and**
        - ○ **1** that has your name and signature.

    - **Option 5:** A completed    Parental Authorization Affidavit.
        - ○ Your parent/guardian must come with you to sign the affidavit.
        - ○ Before signing the affidavit, your parent/guardian must show us **all** of the following:
            - ■ All documents required to prove their identity. (Their Washington state driver license or U.S. passport.)
            - ■ Proof that they're your parent/guardian. (Your certified birth certificate, adoption papers, or a school transcript with their name on it.)

        - ○ If your last name is different than your parent's or guardian's, **or** if their proof of identity is an out-of-state driver license **and** they don't have a Social Security number, we'll require more documents (A divorce decree or marriage certificate).

- If you're 18–25 years old:

    Show us **1** of the options from the list below:
    - **Option 1:** 1 "Stand-alone Document"
    - **Option 2:** 2 "A-List Documents"
    - **Option 3:** 1 "A-List Document" and **2** "B-List Documents"
    - **Option 4:** At least 4 "B-List Documents", including
        - ○ **1** from the list that has your name and date of birth, **and**
        - ○ **1** that has your name and signature.

    - **Option 5:** All of the following:
        - ○ 1 "B-List Document" with your **name and photo**, **or** your parent/guardian's verbal attestation.
        - ○ 1 "B-List Document" with your **name and date of birth.** (Your certified birth certificate, adoption papers, or Ward of the Court Decree/Order of Dependency.)
        - ○ Your Social Security number, **or** another 'B-List Document' with your **name and signature**.
        - ○ Your parent or guardian must prove their identity. (Washington state driver license or U.S. passport.)
        - ○ Your parent or guardian must prove they're your parent/guardian. (Your certified birth certificate, adoption papers, or a school transcript with the parent/guardian's name.)

- If you're over 25 years old:

    Show us **1** of the options from the list below:
    - **Option 1:** 1 "Stand-alone Document"

- **Option 2:** 2 "A-List Documents"
- **Option 3:** 1 "A-list Document" and **2** "B-List Documents"
- **Option 4:** At least **4** "B-List Documents" including:
  - **1** from the list of documents that have your name and date of birth, **and**
  - **1** showing your name and signature.

- If you're 18 or older and have been assigned court guardians:

  You may prove your identity by coming to a driver licensing office with your parent or guardian and showing us **all** of the following:
  - All documents required to prove your parent or guardian's identity. (Their Washington state driver license or U.S. passport.)
  - A court document assigning guardianship.
  - **1** "B-List Document" that has your name and date of birth. (Your certified birth certificate, adoption papers, or Ward of the Court Decree/Order of Dependency.)
  - Your Social Security number.

- If you're enrolled in Job Corps:

  Show us **1** of the options from the list below:
  - **Option 1:** 1 "Stand-alone Document"
  - **Option 2:** 2 "A-List Documents"
  - **Option 3:** 1 "A-List Document" and **2** "B-List Documents"
  - **Option 4:** At least 4 "B-List Documents", including
    - **1** from the list of documents that have your name and date of birth **and**
    - **1** showing name and signature.

  - **Option 5: All** of the following:
    - Your valid Job Corps ID card
    - Your Social Security number (we will verify it)
    - **1** "B-List Document" that has your name and date of birth (Your certified birth certificate, adoption papers, or Ward of the Court Decree/Order of Dependency).

**Acceptable documents**
- We only accept **original or certified copies** of the documents listed below.
- If you present multiple documents issued by a foreign government or organization, **and** we've approved of their issuance processes, we'll accept them as separate documents.
  - Currently, we accept multiple documents issued by:
    - Mexican government
    - Guatemalan government

- When necessary, we may ask for more documents.
- The list of acceptable documents may change without notice.

- Stand-alone Documents
  - **Washington State driver license, ID card, or instruction permit** — Valid or has expired within 1 year, has your signature, date of birth and photo.
  - **Out-of-state driver license, ID card, or instruction permit (if you have a Social Security number)** — Valid or expired within 60 days and has your photo. Also tell us your Social Security number so we can verify it.
  - **US armed services ID card with photo and signature**.
  - **US passport** — Valid, has your signature and photo (an emergency passport isn't acceptable).
  - **Immigration ID with signature** — Valid, from the United States Citizenship and Immigration Service, has your signature and photo (I-327, I-551, I-766) which are identifiable, or has a "Signature Waived" notation.
  - **U.S. Certificate of Citizenship or Naturalization** — An original with your signature and photo.
  - **Out-of-state Enhanced Driver License or Enhanced ID Card** — A valid US state other than Washington state, has your signature, date of birth, and photo.
  - **Department of Social and Health Services Children's Administration (DSHS CA) ID letter** —
    If you're in:

- ○ Court-ordered foster care with DSHS, **or**
- ○ Another supervising Washington agency as your legal custodian, **then**
- ○ You may prove your identity with an ID letter from DSHS CA.

- A-List Documents
  - **Out-of-state driver license, ID card or instruction permit (if you don't have a Social Security number)** — Valid or has expired within 60 days **and** has your photo.
  - **Driver license from a foreign country** — Valid or has expired within 60 days, has security features and is verifiable.
  - **Federal or state employee ID card** — Valid, shows your signature and photo.
  - **Foreign passport** — Valid and stamped US Customs and Border Protection (USCBP) entry form I-94/I94W or Temporary I-551 ADIT stamp.
  - **Tribal enrollment ID card** —
    - ○ Must be federally-recognized Indian tribal enrollment card, **or** US Bureau of Indian Affairs ID card
    - ○ Must have your signature and photo.
  - **Active-duty US military ID without signature** — Valid with no signature.
  - **Immigration ID with encrypted signature** — Valid, from the United States Citizenship and Immigration Service (USCIS), and in the new format where your signature is encrypted.
  - **Original US Certificate of Citizenship or Naturalization** Where your signature and photo aren't identifiable.
  - **Verification letter** — If you're on work release, supervised by an agency, or in one of their eligible programs, you may provide a verification letter from any of the following agencies (we won't accept letters from any other sources):
    - ○ Washington State Department of Corrections (electronic version only)
    - ○ US Federal correction authorities
    - ○ DSHS Juvenile Rehabilitation Administration
    - ○ DSHS Children and Family Services
  - **Washington city or county police employee ID card** — Valid, has your signature and photo.
  - **US Passport Card** — Has your name and photo.
- B-List Documents
  - **Documents that establish your name and date of birth**
  - Certified birth certificate.
  - Certified Washington birth registration card.
  - A valid concealed weapons permit issued by a Washington county.
  - Consular report of birth abroad.
  - Court-issued adoption papers.
  - Military DD 214.
  - US driver license or ID card (invalidated or expired within the past 5 years).
  - US passport (expired within the past 5 years).
  - Valid US visa.
  - Veteran Administration ID with your name, photo, and date of birth.
  - Ward of the Court decree/Order of Dependency.
  - Washington State driver license or ID card (invalidated or expired within the past 5 years).

  - **Other acceptable "B-List Documents" with your name and date of birth, signature, photo, or address**
  - Divorce decree that has your name and signature (filed with the county).
  - Driving record from another state issued within the past 30 days.
  - Foreign passport that has expired within 5 years, or without an I-94/I-94W form or temporary I-551 ADIT stamp.
  - Foreign driver license expired not more than 5 years. The license must have security features and be verifiable.
  - Valid Guatemala Consulate ID card.
  - Marriage license or certificate (filed with the county).

- Medicare card.
- Valid Mexican Matricula Consular ID card.
- Mexican Federal Electoral Card issued 1991 or later.
- Mexican school record with a seal and your photo at the age when issued.
- Mortgage document or mortgage coupon payment book.
- Professional license (nurse, physician, engineer, etc.)
- Property deed or title (filed).
- Property tax bill or statement issued within the last 12 months.
- Selective Service card.
- School transcript includes your date of birth.
- Form I-20 for foreign exchange students.
- School yearbook with your recognizable photo.
- Social Security card with your signature. We'll verify it.
- Transportation Worker Credential (TWIC).
- US Merchant Mariner's card (valid or expired within the past 5 years).
- Vehicle title (not a super service title with a tamper-proof tape over the VIN and title number).

### Foreign documents

If you present authentic foreign documents, we'll make every effort to read and interpret them. We may need to fax your document to another location. If no bilingual staff members are available, we may ask you to provide a certified English translation by an approved translator along with the original document.

### Unaccepted documents

If we can't accept your identification documents, you may request an additional document review by speaking with the driver licensing office ID Review Specialist. If the specialist is unable to determine positive identification, we may refer your documents for further evaluation.

<u>Back to top</u>

### 2. Social Security number

You **must** provide your <u>Social Security</u> number to get a driver license.

- If you **don't have a Social Security number**, you may sign a declaration form and provide proof of Washington residence.
- If you're applying for a **Commercial Driver License (CDL)**, you must provide your Social Security number. We can't issue you a CDL if you don't have one.

### Proof of Washington residence

If you **don't have a Social Security number**:

1. Bring **1 of the following documents** as proof you have a Washington residence address.
    - Home utility bill (gas, electric, water, garbage, land-line telephone, or ISTA. etc).
      **Not acceptable**: cable, internet or satellite TV bills.
    - A college or university document that has your current residential address on file.
    - For **off-campus students**: Bring the printout from the SEVIS database which has **all** of the following:
        - Your address
        - Is in a sealed envelope with the college return address
        - Proof it was printed by the "Designated School Official" or "Responsible Officer."
    - WA Department of Corrections (DOC) electronic ID Letter that has your current residential address.
    - Selective Service card with your current residential address.
    - Vehicle title (not a super service title with a tamper proof tape over the VIN and Title number).
    - Bank-issued documents, for the last 30 days which include your current residential address, such as:
        - Account statement
        - Credit card statement
        - Mortgage statement

**Note:** Your documents must include your **name** and **current Washington residential address**. **It's illegal to present fraudulent documents**. If we find that your documents are fraudulent, you won't be able to reapply for 364 days.

2. When you apply, you'll get a handout with instructions for completing the application process.
3. Within 2 weeks, we'll send you a letter and form to request an appointment with us to review your documents.
4. Complete the form and send it back to us by mail or fax following the instructions on the form.
5. We'll call you to schedule an appointment, and meet with you to verify your proof of Washington residence.
6. After we verify your Washington residence address, we'll issue your driver license, photo instruction permit, or ID card.

### How your Social Security number is used

Your Social Security number (SSN) is used to help enforce child support laws. We'll verify your SSN with the Social Security Administration. Your SSN doesn't appear on your driver license.

### Related laws

- RCW 26.23.150: Recording of social security numbers — Compliance with federal requirement — Restricted disclosure.
- RCW 46.25.070: Application — Change of address — Residency — Hazardous materials endorsement.
- 42 CFR 405: Evidence, procedure, and certification for payments.
- 42 CFR 666(a)(13): Recording of social security numbers in certain family matters.
- 49 CFR 383.153: Commercial driver's license document; Information on the document and application.

### 3. Your photograph

Your new license, instruction permit, or ID card will include a photo of the front view of your face.

Before we take your photo, we'll ask you to remove anything that covers your face or head (like a hat or sunglasses). If you choose not to remove it, your license will be marked "Not Valid for Identification." We'll make exceptions for medical and religious reasons.

Back to top

Proof of citizenship, identity, and residence: EDL/EID (for enhanced driver license or enhanced ID card)

| CONTACT US | ABOUT US | DO MORE ONLINE | DRIVER GUIDE | STAY CONNECTED |
|---|---|---|---|---|
| Office locations | What we do | Renew your tabs | English | |
| Contact us | Rulemaking activity | Replace your license or ID card | 中文 | |
|  | News center | Report the sale of vehicle | Español | |
| | Reports and data | Check the status of a driver license | Việt | |
| | Jobs | Get a form | Русский | |
| | …more | …more | 한국어 | |
| | | | 日本語 | |

Home | Privacy | Conditions of Use | Copyright © 2011