**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **GEORGIA LATINO ALLIANCE** | * | |
| **FOR HUMAN RIGHTS, et al.,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **V.** | * | **1:11-CV-1804-TWT** |
| | * | |
| **NATHAN DEAL, Governor of the** | * | |
| **State of Georgia, et al.,** | * | |
| | * | |
| **Defendants.** | * | |

**DEFENDANTS DEAL, OLENS, REESE AND BEATTY'S BRIEF IN
SUPPORT OF THEIR MOTION TO DISMISS**

Come Now, Defendants, Deal, Olens, Reese and Beatty, through Counsel

and file this brief in support of their Motion to Dismiss.

Plaintiffs, a combination of organizations and individuals, filed this suit as a

facial challenge to HB87, entitled the "Illegal Immigration Reform and

Enforcement Act of 2011." (hereinafter HB87)(doc. 1, Ex. A).  Defendants move

that this case be dismissed in its entirety.

**A.    The Statute under review and the applicable legal theory**

While Plaintiffs' complaint is riddled with anecdotal accounts of racial profiling and improper early enforcement of the Bill, as the effective date of the Bill had not occurred as of the date the Complaint was filed, Plaintiffs can only pursue a facial challenge to the statute.

Facial challenges are disfavored in the law.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).  A facial challenge can succeed only when a plaintiff shows that "no set of circumstances exists under which the [statute] would be valid."  *Id.* at 449 (*quoting United States v. Salerno*, 481 U.S. 739, 745 (1987)).  To be facially invalid, the law must be unconstitutional in *all* of its applications.  *Id.*; *Village of Hoffman Estates v. The Flipside, Hoffman Estates*, 455 U.S. 489, 494 n.5 (1982) (a successful facial challenge means that the law is incapable of any valid application).

A statute "should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts."  *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975).  A court may choose to adopt a narrowing construction if that construction is "reasonable" and "readily apparent."  *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000).

"An as-applied challenge, by contrast, addresses whether 'a statute is constitutional on the facts of a particular case or to a particular party.'" *Harris v. Mexican Speciality Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) *quoting* Black's Law Dictionary.  "The practical effect of holding a statute unconstitutional 'as applied' is to prevent its future application in a similar context, but not to render it utterly inoperative." *Ada v. Guam Society of Obstetricians and Gynecologists*, 506 U.S. 1011 (1992) (Scalia, J., dissenting).  As Plaintiffs seek to invalidate portions of the statute and render it uniformly inoperative, they have clearly brought a facial challenge.  (doc. 1, p. 180 "Prayer for relief" b and c).[1]

### 1.  The legal framework for statutory challenges

"The starting point for all statutory interpretation is the language of the statute itself."  *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999).  The court is to "read the statute to give full effect to each of its provisions."  *Id.; see also Samantar v. Yousuf*, ___U.S.___; 130 S. Ct. 2278, 2289 (2010) ("we read statutes as a whole").  The court does not look at terms or phrases in isolation, but instead "look[s] to the entire statutory context."  *DBB, Inc.*, 180 F.3d at 1281; *see also Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a

---

[1] Defendants note that while Plaintiffs' prayer for relief asks to enjoin enforcement of the entire statute they only express claims related to parts 7, 8, 17, 18 and 19 thus Defendants presume these are the only portions that Plaintiffs seek to enjoin.

fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"); *Woodard v. Wainwright*, 556 F.2d 781, 785 (5th Cir. 1977) (when assessing the constitutionality of a statute, it "must be read as a whole.").

Federal courts should be hesitant to declare a state statute unconstitutional. *Cotton States Mutual Ins. Co. v. Anderson*, 749 F.2d 663, 667 (11th Cir. 1984). When ruling on the constitutionality of a state statute, federal courts may only consider the plain meaning of the statute and constructions given by state courts. *Id.* The Supreme Court has repeatedly instructed that federal courts are required to construe state statutes in a manner to "avoid constitutional difficulties." *Frisby v. Schultz*, 487 U.S. 474, 483 (1988); *see also Hooper v. Calif.*, 155 U.S. 648, 657 (1895) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality").

*2. The Statute under review*

HB87

Plaintiffs reference the Bill as HB87 throughout their complaint but in reality appear to limit their challenge to specific provisions of the Bill. The only provisions referenced in the complaint are sections 7, 8, 17, 18 and 19. Since these

4

are the only provisions specifically referenced by Plaintiffs, Defendants limit their argument to these specific provisions.

Section 7 of the act provides criminal penalties for individuals who have committed another criminal offense and who knowingly and intentionally transport, harbor or entice an illegal alien to enter the state.   Generally, Plaintiffs complain that Section 7 improperly restricts their ability to transport, house, or assist illegal aliens and express concern that the provisions will result in racial profiling. All provisions define illegal alien as, "a person who is verified by the federal government to be present in the United States in violation of federal immigration law." O.C.G.A. § 16-11-200 (a)(1); 16-11-201 (2); 16-11-202(a); O.C.G.A. § 17-5-100(a)(2).

The complained of provisions in Section 7 are codified in 3 different statutes, the relevant portions are as follows:

(b) A person who, while committing another criminal offense, knowingly and intentionally transports or moves an illegal alien in a motor vehicle for the purpose of furthering the illegal presence of the alien in the United States shall be guilty of the offense of transporting or moving an illegal alien….

Specifically excluded from this provision are:

(1)     a government employee transporting or moving an illegal alien as a part of his or her official duties or to any person acting at the direction of such employee;

(2)     A person who transports an illegal alien to or from judicial or administrative proceeding when such illegal alien is required to appear pursuant to a summons, subpoena, court order, or other legal process;

(3)     A person who transports an illegal alien to a law enforcement agency or a judicial officer for official government purposes;

(4)     An employer transporting an employee who was lawfully hired; or

(5)     A person providing privately funded social services. O.C.G.A. § 16-11-200.

Next O.C.G.A. § 16-11-201 provides for penalty when an individual harbors an illegal alien.  "'Harboring or harbors' means any conduct that tends to substantially help an illegal alien to remain in the United States in violation of federal law but shall not include a person providing services to infants, children, or victims of a crime; a person providing privately funded social services; a person providing emergency medical service; or an attorney or his or her employees for the purpose of representing a criminal defendant." O.C.G.A. § 16-11-201 (1).

6

This provision provides that, "A person who is acting in violation of another criminal offense and who knowingly conceals, harbors, or shields an illegal alien from detection in any place in this state, including any building or means of transportation, when such person knows that the person being concealed, harbored, or shielded us an illegal alien, shall be guilty of the offense of concealing or harboring an illegal alien." *Id.* (b).

Lastly, O.C.G.A. § 16-11-202 provides that, "A person who is acting in violation of another criminal offense and who knowingly induces, entices, or assists an illegal alien to enter into this state, when such person knows that the person being induced, enticed or assisted to enter into this state is an illegal alien, shall be guilty of the offense of inducing an illegal alien to enter into this state." *Id.* (b).

All three provisions require the commission of another criminal offense prior to being charged and specific knowledge by the offender of the alien status of the person transported, harbored or induced.  The statutes do not provide for additional identification checks of passengers or cohabitants nor do they provide for an enforcement mechanism against the illegal alien but rather against the individual who transports, harbors or induces the illegal alien.  Importantly, the statutes specifically **exclude** from criminal liability persons who perform a

prohibited act as part of the provision of social services under O.C.G.A. § 16-11-200 and 16-11-201. (emphasis added).

Next, Plaintiffs appear to complain about the provisions in Section 8 of the Bill. Section 8 is codified as O.C.G.A. § 17-5-100. This provision allows a peace officer who has probable cause to believe an individual has committed a criminal offense to verify an individual's immigration status through a variety of means. If the individual is determined to be an illegal alien, the statute permits the officer to take any action he is authorized to take under state or federal law. Plaintiffs complain that this provision could lead to prolonged investigatory stops and racial profiling.

Plaintiffs also complain about sections 17, 18 and 19 of the Bill. These provisions address individuals who need to produce valid identification when seeking a public benefit or service. Specifically, section 17 requires public agencies to require proof of identification and verification of lawful presence in the United States prior to providing a public benefit; section 18 provides a criminal penalty for a failure to comply with section 17; and section 19 defines the scope of acceptable documentation and provides the Attorney General with direction to create a list of such documents.

**B.      Plaintiffs fail to state a claim with sufficient particularity to entitle them to any relief**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint is subject to dismissal if it does not "state a claim upon which relief can be granted." When reviewing the sufficiency of a complaint, the question to be answered is whether the well-pleaded factual allegations give rise to a "plausible" suggestion of unlawful conduct. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 565-66 (2007). Conclusory allegations are insufficient to meet the plausibility standard. *Id.* at 555; *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009). Unsupported conclusory allegations are entitled to no presumption of truth and should be disregarded when deciding a motion to dismiss. *Iqbal*, 129 S. Ct. at 1950.

The Supreme Court has sanctioned a two-step approach for reviewing the sufficiency of a complaint. First, conclusory allegations should be separated from well-pleaded factual allegations. *Id.*, 129 S. Ct. 1949-50. If well-pleaded facts remain, the court should assume them to be true and "determine whether they plausibly give rise to an entitlement of relief." *Id.*, 129 S. Ct. at 1950. The facts necessary to meet the plausibility standard will depend on the constitutional provision at issue. *Id.*, 129 S. Ct. at 1948. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*, 129 S.

9

Ct. at 1950.   Importantly, if the well-pleaded allegations are consistent with lawful behavior, the complaint must be dismissed.  *Twombly*, 550 U.S. at 557.

In this case, as pled, Plaintiffs have presented this Court with an 82 page, 195 paragraph complaint.  The first 39 and ½  pages define the parties, the next section enumerated as "Facts" sets forth, legislators' commentary, legal authority and conclusory rubric.  The conclusory allegations continue until Plaintiffs state their first claim on page 74 at which point Plaintiffs set forth 7 counts to support their causes of action.  Within those counts Plaintiffs do nothing to tie the "facts" or other conclusory statements to their claims nor do they allege how the statute itself violates the provisions specified in each count.  Rather, Plaintiffs state in a conclusory fashion the constitutional and/statutory provision at issue and declare the Bill to be violative of the provision.  *Danow v. Borack*, 197 Fed. Appx. 853, 855 (11th Cir. 2006).  Plaintiffs make no attempt to connect the Plaintiffs to the facts or to the various claims for relief.  *See id.; see also Anderson v. District Board of Trustees of Central Florida Community College*, 77 F.3d 364, 366-67 (11th Cir. 1996).  As Plaintiffs claims are based solely upon conclusory declarations unsupported with related factual averments tied to the claims, they are due to be dismissed.

## C.      Plaintiffs lack standing

"Standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Camp Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006) (quotations and citations omitted). The party invoking federal jurisdiction has the burden of proving standing. *National Alliance for the Mentally Ill*, 376 F.3d 1292, 1294 (11th Cir. 2004). To establish standing, the plaintiff, whether an individual or an organization, must demonstrate three constitutional requirements "(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *Camp Legal Defense Fund, Inc.*, 451 F.3d at 1269 (quotations and citations omitted); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).

To meet the actual injury requirement, there must be a realistic danger of sustaining a direct injury as a result of the statutory enforcement. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979). The plaintiff is required to allege both "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Id*. The fear of prosecution must be more than imaginary

11

or speculative.  *Id.*  Abstract harm is insufficient; the litigant must establish actual or threatened injury that is not hypothetical or conjectural. *Warth v. Seldon*, 422 U.S. 490, 508 (1975); *Florida State Conference of the National Association for the Advancement of Colored People v. Browning*, 522 F.3d 1153, 1161 (11th 2008) 1161; *E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 984 (11th Cir. 1990).  To be imminent, the harm must be "one that is likely to occur immediately," meaning, "within some fixed period of time in the future."  *Browning*, 522 F.3d at 1160-61.

In addition to showing an injury in fact, the plaintiffs must also show that the injury is fairly traceable to the alleged unlawful conduct.  *Lujan v.  Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Finally, the plaintiffs must demonstrate that the requested relief likely will redress the injury.  *E.F. Hutton & Co.*, 901 F.2d at 984 (*citing*, *Valley Forge Christian College v. Americans United For Separation Of Church And State*, 454 U.S. 464, 472 (1982)).  It is not sufficient for the party to speculate that the alleged injury would be redressed.  *Lujan*, 504 U.S. at 561.

1. *The individual plaintiffs lack standing to bring this lawsuit.*

First, none of the individual plaintiffs have standing to bring challenges against Section 7 (setting forth criminal offenses) or Section 8 (verification of immigration status during investigation of criminal suspect) of HB87 because both sections demand either the commission of a criminal offense or probable cause to

12

believe a person has committed a criminal violation, which undermines any suggestion that the alleged harm in enforcing the statute is imminent or likely to occur. Instead, the injury asserted by plaintiffs is speculative and hypothetical. This point is best illustrated by the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), where the Court concluded that a plaintiff lacked standing to enjoin the police from using a choke hold on suspects absent a threat of deadly force to resist arrest because he failed to sufficiently demonstrate an injury in fact.

More specifically, the plaintiff's purported injury of being subjected to unlawful choke holds in *Lyons* amounted to nothing more than "conjecture and speculation" because it required an open-ended sequence of improbable events to occur. *Browning*, 522 F.3d at 1162 (explaining that the plaintiff would have to cause a police encounter, the city would have to authorize unnecessary choke holds, and police would have to use an unnecessary choke hold in a specific encounter). Moreover, the injury alleged "was predicated on the plaintiff first doing something that would at least give an officer probable cause to detain or arrest him" but the Supreme Court was hesitant to assume a plaintiff would routinely violate the law. *Id.* Finally, the plaintiff in *Lyons* had an adequate

remedy at law for any threatened injury because he could sue for damages if the police unconstitutionally applied a choke hold against him.  *Id.*

Before any offense set forth in Section 7 could be enforced against an individual, he or she would have to be "committing another criminal offense" or "acting in violation of another criminal offense."  HB87, Section 7, Article 5, 16-11-200(b), 16-11-201(b), 16-11-201(b).  Similarly, in order to be subjected to verification of immigration status pursuant to Section 8, the officer would have to be investigating a criminal suspect and have "probable cause to believe that a suspect has committed a criminal violation."  HB87, Section 8, Article 5, 17-5-100(b).  As a result, just as with the plaintiff in *Lyons*, the individual plaintiffs' purported fears are too speculative.  *Browning*, 522 F.3d at 1162.  Moreover, in the event the statute was applied in an unconstitutional manner, the individual plaintiffs could address those violations in a lawsuit for damages.  *Id.*

Furthermore, although some individual plaintiffs allege a fear of criminal liability because they and their associated organizations provide transportation to illegal aliens to attend medical appointments, church or classes, or provide housing to those in need, HB87 expressly exempts any such conduct from liability.  More specifically, under Section 7, the offenses for transporting and harboring an illegal alien do not apply to a "person providing privately funded social services."  HB 87,

Section 7, Article 5, 16-11-200(d)(5), 16-11-201(a)(1).  Similarly, while some individual plaintiffs allege that HB 87 causes them fear of racial profiling or deters them from reporting crimes, the statute itself expressly indicates otherwise.  In particular, HB87 provides that "race, color, or national origin" should not be considered to implement Section 8 except as permitted by the Georgia and U.S. Constitutions.  HB 87, Section 8, Article 5, 17-5-100(d).  In addition, the verification of immigration status provided for in Section 8 expressly states that no status investigations may be based on good faith contact regarding witnessing a crime, reporting criminal activity or seeking assistance as a crime victim.  HB 87, Section 8, Article 5, 17-5-100(f).  As a result, the individual plaintiffs can have no reasonable fear of prosecution under HB87, and thus, no actual or imminent injury sufficient to establish standing.  *See Babbit*, 442 U.S. at 298.

Additionally, while some individual plaintiffs also allege fears for others in the community, such as a decrease in public safety, the disruption of families, increased costs to the town and economic impact on businesses, none of these allegations are specific enough to take the purported injury beyond the realm of speculation and conjecture, *Browning*, 522 F.3d at 1162, nor do individuals typically have standing to raise claims for injuries suffered by third parties, *Warth*, 422 U.S. at 499.  Further, the purported fears asserted by some of the individual

15

plaintiffs with regard to "secure and verifiable documents" are speculative and unfounded because, despite alleged concerns about visiting public places, securing utilities, seeking police assistance, securing services for children and infants, or receiving treatment at a hospital, "secure and verifiable documents" are only demanded by state agencies or political subdivisions and, even when dealing with state entities, the requirement does not apply when reporting a crime, providing emergency medical services or providing services to infants, children or victims of a crime.  HB 87, Section 19, 50-36-2(e)(1).  In sum, the individual plaintiffs' claimed injuries are too speculative and conjectural to amount to an injury in fact. Further, for the same reasons outlined above, Plaintiffs cannot establish that their claimed future injuries would be caused by HB87 (particularly where their desired actions are not precluded by the statute) or that any such injuries would be redressed by a favorable decision.  Accordingly, they lack standing to challenge HB87 and should be dismissed.

2.      *The organizational plaintiffs lack standing to bring this lawsuit.*

An organizational plaintiff may bring a lawsuit either in its own right or based on the rights of its members.  *Warth*, 422 U.S. at 511.  The organizational plaintiffs in the present action lack standing under either framework.

16

**a.** **The organizational plaintiffs lack standing to bring claims in their own right.**

To establish standing to bring claims in its own right, an organization must allege, and ultimately prove, the same requirements discussed above with respect to the individual plaintiff. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 177 (2000); *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1329 (11th Cir. 2000). Thus, as an initial matter, the organizational plaintiffs must allege that they have suffered a tangible injury. *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972). It is not sufficient for the organization to claim that it has an ideological or abstract social interest that has been adversely affected. *Id.* at 739-40 (explaining that "a mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself"); *Havens*, 455 U.S. at 379. Rather, the injury must be concrete and demonstrable. *Havens*, 455 U.S. at 379.

In *Havens*, the Supreme Court addressed standing under the Fair Housing Act where an organization alleged that unlawful racial steering practices had frustrated the organization's mission to assist with equal access and housing referral services because the organization was required to devote resources to counteract the racially discriminatory practices. *Havens*, 455 U.S. at 378-79. The Supreme Court concluded that the organization suffered an injury in fact because

17

the illegal practice of racial steering had "perceptibly impaired" the organization's ability to provide the services it was formed to provide.  *Id.* at 379.  The Supreme Court explained that "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract societal interests." *Havens*, 455 U.S. at 379 (*citing, Sierra Club*, 405 U.S. at 739).

This Circuit subsequently applied the *Havens* analysis outside the context of the Fair Housing Act in cases involving voting rights.  In *Browning*, the plaintiff organization alleged that because of an impending voter registration requirement, the organization had to divert resources away from voter registration drives to instead educate voters regarding compliance with the regulation and to assist those who encountered problems as a result on election day.  522 F.3d at 1165-66.  The Court found that the organization had alleged injuries sufficient to establish standing because it alleged an inability to conduct specific projects instead of "abstract societal interests" and the anticipated injuries satisfied the immediacy and likelihood requirements because they would all occur before the November 2008 election and it was likely that at least one injury would occur.  *Id.* at 1161-64, 1166.  The Court concluded that the organization "reasonably anticipated" the need to divert resources and provided that "an organization has standing to sue on its

18

own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Id.* at 1165. In *Billups*, this Circuit again applied *Havens* to analyze organizational standing in the voting rights context finding that the organization had established an injury in fact for purposes of standing because it was actively involved in voting rights activities and would be required to divert resources from its normal activities to educate and assist voters in complying with a new photo identification requirement. *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009).

In the present lawsuit, the organizational plaintiffs have not alleged facts sufficient to establish that HB87 impacts their particular missions in specific ways requiring them to divert resources in a manner that establishes the requisite injury in fact. First, the organizational plaintiffs largely make only conclusory assertions that they either have or will divert unspecified resources from nonspecific activities or projects in order to educate their members and the community concerning HB87. (*see, e.g.,* doc. 1 ¶¶ 25, 30, 33, 42). Thus, unlike the organizations in *Havens, Browning* and *Billups*, the organizational plaintiffs here seek only to service abstract societal interests, which is insufficient to establish standing under Article III. *Havens*, 455 U.S. at 379; *Sierra Club*, 405 U.S. at 735.

Additionally, the stated missions and purposes of the organizational

plaintiffs are not sufficiently related to the statute at issue.  In *Havens*, the

organization's purpose was to provide equal housing and referrals and the illegal

practice was racial discrimination; thus, the alleged harm and purported cause were

intimately related.  *See Havens*, 455 U.S. at 378-79.  In *Browning* and *Billups*, the

organizations identified specific voting projects interfered with in a distinct time

period by the imposition of additional voting requirements; thus, the alleged harms

and purported causes were intimately related.  *See Browning*, 522 F.3d at 1165-66;

*Billups*, 554 F.3d 1340.  The same cannot be said here where many of the

organizational plaintiffs simply serve causes related to the broad societal issues of

immigration that lack components or purposes directly related to the requirements

actually imposed by HB87.[2]  As such, the present case is distinguishable.  Further,

even in *Browning* where this Circuit found allegations of sufficient injuries, the

Court did not end its inquiry there, but rather, noted that the organizational

plaintiffs had also satisfied the requirements of immediacy and likelihood of

injury.  *Browning*, 522 F.3d at 1165-66. Comparatively, in the present action, there

---

[2] For example, one of the organizational plaintiffs, DREAM, describes itself as a youth-led movement seeking to pass a bill, the DREAM Act, which addresses issues faced by young students brought into the United States when they were infants or young children.  (doc. 1 ¶ 26). It is unclear how this organization's mission has any relation to the challenged provisions of HB87 other than through the broad societal interest involving issues of immigration generally.

is not the same immediacy or likelihood of injury as previously addressed at length.  *See* Section C.1, *supra*.  Rather, the organizational plaintiffs are speculating that an injury may or may not occur.  Therefore, the organizational plaintiffs do not have standing to bring this action in their own right.

Moreover, although some of the organizational plaintiffs assert that they have or may have a decreased membership or attendance at events because members will be targeted based on appearance and are scared to be stopped and interrogated by police in light of HB87, as already addressed above, any such fear is purely hypothetical and speculative in light of the clear terms of HB87 that prohibit unconstitutional racial profiling and require criminal conduct before any verification of immigration status would enter the realm of possibility.  *See* Section C.1, *supra*.  At a minimum, because HB87 does not allow or provide for the police conduct and actions the organizational plaintiffs purportedly fear, they cannot establish that their injury of diverting resources to educate about the bill is "fairly traceable" to the mere enactment of HB87.  *See Lujan*, 504 U.S. at 360.  Despite their characterizations otherwise, it appears that the plaintiffs do not fear enforcement of the terms of HB87, but rather, fear a misapplication of its requirements.  However, such fears fail to establish the redressability required for standing.  *See Lujan*, 504 U.S. at 561; *see, e.g., Mancha v. Immigration and*

*Customs Enforcement*, 2007 WL 4287766 (N.D. Ga. 2007) (finding no redressability where the plaintiff sought an injunction requiring defendants to obey the law).

Finally, as a matter of policy, the conclusory assertions by the organizational plaintiffs of varying missions and endeavors that they must divert resources away from to educate individuals about HB87 should not be deemed sufficient to establish the requisite injury for purposes of standing under Article III because it

would completely eviscerate the standing doctrine.  If an organization obtains standing merely by expending resources in response to a statute, then Article III standing could be obtained through nothing more than filing a lawsuit.  Such an interpretation flies in the face of well-established standing principles.

*Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 816-17 (S.D. Ind. 2006).

Accordingly, the organizational plaintiffs lack standing to challenge the statute in their own right.

**b.** **The organizational plaintiffs lack standing to bring claims on behalf of their members because their members would lack standing to sue.**

In the absence of injury to itself, an organization may still have standing solely as the representative of its members.  *Warth*, 422 U.S. at 511.  For an organization to have such representational standing, however, it must meet the three-part test articulated by the Supreme Court in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977).  Under the *Hunt* test, an association

has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of the individual members.  *Id.* at 343; *see also Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999).

Here, the members have no standing in their own right to challenge HB87. For instance, while some organizational plaintiffs allege that members have already been stopped and targeted because of their appearance, any such allegation lacks the required causation because if the members are already targeted, it cannot be the result of HB87, which has not yet gone into effect.  *See Lujan*, 504 U.S. at 560.  In any event, as already addressed, HB87 specifically provides that officers may not consider race, color or national origin except to the extent already permitted by the Georgia and U.S. Constitutions so any fear otherwise is unreasonable, and thus, insufficient to establish the required injury in fact.  *See* Section C.1, *supra*; *Babbit*, 442 U.S. at 298.  Similarly, although some organizational plaintiffs assert that members are fearful they will face scrutiny and additional stops by police because they do not have a form of identification acceptable under HB87, to be subjected to a verification of status, they would first

have to commit or give probable cause to believe they committed a criminal offense.  *See* Section C1, *supra*.  As already addressed, relying on an intentional commission of a criminal offense is too speculative to establish an injury.  *Id.*  The same is true for allegations that members fear criminal liability for transporting or providing housing to illegal aliens as both provisions first require a criminal offense.  *Id.*  In addition, these provisions expressly set forth exceptions for privately funded social services as already addressed at length above.  *Id.*  Thus, the organizational plaintiffs fail to establish that their members would have standing to challenge HB87.  Furthermore, the interests the organizational plaintiffs seek to protect are not germane to any of their stated purposes which, as already discussed, are largely unrelated to the subject matter of the specific provisions of HB87 at issue.  *See* Section C.2(a), *supra*.  Accordingly, the organizational plaintiffs fail to establish standing through their members and their claims should be dismissed.

**D.   Plaintiffs fail to show that HB87 is preempted by federal legislation**

Plaintiffs claim that HB 87 is preempted by federal law.  This claim is premised upon the Supremacy Clause of the U.S. Constitution (U.S. Const., Art. VI, cl 2) which provides:

> The Constitution, and the Laws of the United States which shall be made in Pursuance thereof,….shall be the supreme law of the Land;

24

and the Judges in every State shall be bound thereby, and Thing in the Constitution or Laws to the Contrary notwithstanding.

Initially it should be recognized that the Supremacy clause does not create rights enforceable under 42 U.S.C. § 1983. *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103 (1989). In *Golden State* the court recognized that the Supremacy clause is not a source of any federal rights, but only "secure[s] federal rights by according them priority whenever they come in conflict with state law." *Id.* at 107. *See also Pirolo v. City of Clearwater,* 711 F.2d 1006 (11th Cir. 1983) (a federal preemption claim premised upon a violation of the Supremacy Clause is not cognizable under 42 U.S.C. § 1983) [3] However, the fact that a federal statute has preempted certain state action does not preclude the possibility that the same federal statute may create a federal right for which § 1983 provides a remedy. The critical question is whether the particular federal statute creates rights enforceable under Section 1983. It has been stated that:

---

[3] It should also be noted that Plaintiffs claim for attorneys' fees pursuant to 42 U.S.C. § 1988 for alleged violation of the Supremacy Clause should likewise be dismissed. *See generally Scurlock v. City of Lynn Haven,* 858 F.2d 1521, 1529 n.9 (11th Cir. 1988) (a federal preemption claim premised upon a violation of the Supremacy Clause is not cognizable under 42 U.S.C. § 1983 and, as such, a plaintiff is not entitled to attorney's fees and costs under section 1988 for such a claim); *Gustafson v. City of Lake Angelus,* 76 F.3d 778 (6th Cir. 1996) (a federal preemption claim premised upon a violation of the Supremacy Clause is not cognizable under 42 U.S.C. § 1983 and, as such, a plaintiff is not entitled to attorney's fees and costs under section 1988 for such a claim).

> [T]he availability of the § 1983 remedy turns on whether the [federal] statute, by its terms or as interpreted, creates obligations "sufficiently specific and definite" to be within "the competence of the judiciary to enforce[,]" is intended to benefit the putative plaintiff, and is not foreclosed "by express provision or other specific evidence from the statute itself." *Golden State* 493 U.S. at 108.

Thus, although it is clear that the supremacy clause does not create a cause of action under § 1983 this Court must determine whether the underlying federal statute is enforceable under § 1983. It has been recognized that not all federal statutory and regulatory violations under color of state law give rise to a § 1983 claim for relief. A number of United States Supreme Court cases from the 1980 decision in *Maine v. Thiboutot*, 448 U.S. 1 (1980) to the decisions in *Suter v. Artist M.*, 503 U.S. 347 (1992) and *Gonzaga University v. Doe,* 536 U.S. 273 (2002) have established a framework for making such a determination. A federal statute is enforceable under § 1983 unless (1) the statute was not intended to create enforceable rights or (2) the statute reflects a congressional intent to preclude its enforcement under § 1983. The analysis must include not only an examination of the underlying federal statute, but also must include an interpretation of § 1983 in light of said statute.

The statutory and regulatory scheme under Immigration and Naturalization Code (INC), does not create privately enforceable rights. Rather the

Commissioner of Immigration and Naturalization, in conjunction with the United States Attorney General and the Department of Justice, is responsible for enforcement of the INC.  *See* 18 U.S.C. § 1151 et. seq.   Defendants have been unable to ascertain any aspects of the aforesaid act or amendment which demonstrate that Congress intended to create rights in private individuals for anything alleged by Plaintiffs, that would either expressly or impliedly would authorize private enforcement under § 1983.

Arguably, Plaintiffs may be claiming that they have some entitlement to social programs that have been impacted by provisions in the Bill that extend beyond the scope of the federal requirement.  While Plaintiffs are not specific as to which programs they claim to have a federal right to that preempt the Bill, the Eleventh Circuit has disavowed the creation of such a federally enforceable right as to social programs where a federally created statutory scheme provides for funding and regulation of distribution of funds.  *See Arrington v. Helms*, 438 F.3d 1336 (11th Cir. 2006); *Am. Ass'n of People with Disabilities v. Harris,* 605 F.3d 1124 (11th Cir. 2010); *See also Shotz v. City of Plantation*, 344 F.3d 1161 (11th Cir. 2003); *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003).

Notwithstanding the fact that the INC imposes no basis for a claim under § 1983, the Plaintiffs still assert that the underlying statutes and regulations have

preempted Georgia's ability to enforce HB 87. [4]  Under the supremacy clause of

the U.S. Constitution, it has well been settled that state law that conflicts with

federal law is 'without effect.' " *Cipollone v. Liggett Group, Inc*. 505 U.S. 504,

[4] Defendants note that the Supreme Court has determined Federal-question jurisdiction over a preemption claim is proper, but the route to this conclusion is slightly more circuitous. Ordinarily, federal preemption is a federal defense to a state-law suit, and, as such, it does not create federal-question jurisdiction. *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63 (1987).  While unclear, the plaintiffs seem to be bringing their preemption claims directly under the federal statutes upon whose preemptive force they rely.  The specific statutes relied on to support this claim remain unclear but they appear generally to rely upon the INC and specific laws related to the provisions of social programs. The Court has also held that, once jurisdiction is properly established over the action for injunctive relief, the separate remedy available through a declaratory judgment may also be asserted before the federal court. *Franchise Tax Bd. v. Const. Laborers Vac. Trust,* 463 U.S. 1, 20 n. 20(1983); *see also Gay Student Services v. Texas A & M Univ.,* 612 F.2d 160, 166 (5th Cir. 1980), *cert. denied,* 449 U.S. 1034 (1980). The Supreme Court in these cases seems to assume that the plaintiff has a valid federal cause of action, although the Court has never identified the precise source of the plaintiff's claim in these kinds of preemption disputes. Most commentators have concluded that such causes of action arise directly under the Constitution, *see, e.g.,* A. Althouse, *When to Believe a Legal Fiction: Federal Interests and the Eleventh Amendment,* 40 Hastings L.J. 1123 (1989); 13B C. Wright, Federal Practice & Procedure § 3566 p. 102 (1984) ("The best explanation of *Ex Parte Young* and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal constitution or laws"), and at least one court has found that such claims are cognizable under § 1983, *Playboy Enterprises v. Public Service Com'n,* 906 F.2d 25, 31-33 (1st Cir. 1990), *cert. denied,* 498 U.S. 959(1990). In any event, the Supreme Court has not questioned the propriety of these types of claims even when the federal statute whose preemptive power is at issue cannot be the source of the plaintiff's cause of action. *See id.* While recognizing the Court's obligation to follow this precedent Defendants question its viability in light of the reasoning articulated in *Gonzaga* and its progeny.

516 (1992).  The Supreme Court has recognized three types of preemption: (1)

express preemption, where a federal statute contains "explicit preemptive

language"; (2) field preemption, where the federal regulatory scheme is "so

pervasive as to make reasonable the inference that Congress left no room for the

States to supplement it"; and (3) conflict preemption, where "compliance with both

federal and state regulations is a physical impossibility" or where state law

"stands as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress."  *Wisconsin Public Intervenor v. Mortier*, 501 U.S.

597, 604-05(1991). Congressional intent is the "ultimate touchstone" in a

preemption case, *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), and this intent

"governs our determination of whether federal law preempts state law." *Boyes v.*

*Shell Oil Prods. Co.*, 199 F.3d 1260, 1267 (11th Cir. 2000).  Preemption may be

either expressed, by a statute's language or implied by the statute's structure and

purpose.  *Id*. 505 U.S. at  516.  In the absence of an express command, federal law

will preempt state law if that law actually conflicts with federal law or if the

federal law "so thoroughly occupies a legislative field as to make reasonable the

inference that Congress left no room for the States to supplement it.  *Id*.;

*DeCanas v. Bica*, 424 U.S. 351 (1976); *See also Lohr*, 518 U.S. at 478-89

(explained that deference should be shown to state sovereignty and cautioned that

29

the purpose of Congress is the ultimate touchstone in every preemption case).

Congress does not "cavalierly pre-empt state-law causes of action." *Id.*, at 485.

The "presumption is that the state or local regulation of matters related to health

and safety is not invalidated under the Supremacy Clause." *Hillsborough County v.*

*Automated Med. Lab*, 471 U.S. 707 (1985); *See also Barnhill v. Teva*

*Phramaceuticals USA, Inc.*, 2007 U.S. Dist. LEXIS 44718 *6 (S.D. Ala. Apr. 24,

2007).

As Plaintiffs do not allege, nor have Defendants found, an explicit

preemption declaration in the INC, it appears that Plaintiffs in this case are

attempting to claim an implied field preemption and conflict preemption.  Where a

party alleges that Congress has legislated so comprehensively that federal law

occupies an entire field of regulation leaving no room for state law (field

preemption) or that federal law conflicts with state law (conflict preemption), the

party alleging preemption must "present a showing of implicit preemption of the

whole field, or a conflict between a particular local provision and the federal

scheme that is strong enough to overcome the presumption that state and local

regulation of health and safety matters can constitutionally coexist with federal

regulations. *Hillsborough County*, 471 U.S. at 716.  Plaintiffs have done neither.

Federal law preempts state law where it is impossible for a private party to comply simultaneously with both state and federal law, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citing *Hines,* 312 U.S. at 67). Defining what is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects. *Id.* The *Crosby* Court stated specifically that "For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished-if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect-the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* at 373 (citing *Savage v. Jones,* 225 U.S. 501, 533(1912)).

Here, the Plaintiffs must identify some specific requirement imposed that would preempt any conflicting or additional state requirement. The Supreme Court has held that a state statute that "mirrors federal objectives and furthers a legitimate state goal" is not preempted by the federal government's authority to regulate immigration. *Plyler*, 457 U.S. 202, 225 (1982). In *De Canas v. Bica*, 424

31

U.S. 351 (1976), the Court explained: Power to regulate immigration is unquestionably exclusively a federal power. . . . But the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se preempted by this constitutional power, whether latent or exercised. . ..” I*d.* at 355.

Plaintiffs appear to argue that HB87 is preempted in three ways.  Initially they claim that Congress has a comprehensive system that leaves no room for supplemental state law. (doc. 1 ¶ 111).  Secondly, they claim, without factual support, that HB87 will have an adverse impact on the federal immigration scheme and foreign policy. (doc. 1 ¶ 137-138).  Lastly they claim that by authorizing local law enforcement to make arrests and by failing to accept forms of identification that would ordinarily be accepted by the federal government that the Bill is preempted by federal law. (doc. 1 ¶ 128, 132, 133).

As to the first two theories, the recent Supreme Court case of *Chamber of Commerce v. Whiting*, No. 09-115, slip. op. p. 15; 463 U.S. ____ (U.S. May, 26 2011), clearly resolves these issues adverse to Plaintiffs. As to the last issue, Plaintiffs fail to acknowledge the plain language of the statute and the scope of the federal and state partnership in the provision of public benefits.  Moreover, the scope of the law mirrors rather than contradicts federal requirements and further

supports the stated federal objective of ensuring federal, state and local monies are not used to provide public services to individuals not in the country legally.

The federal government has made it an express requirement that the states not allow illegal aliens to obtain public assistance in all but a few circumstances that would be considered the provision of emergency care.  8 U.S.C. §§ 1611 and 1621 prohibit the use of federal, state or local funds to provide public benefits to an alien who is not a "qualified alien." 8 U.S.C. § 1611(a) (stating that "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit"); 8 U.S.C. § 1621(a) (same with regard to "any State or local public benefit").

Public benefits have been defined to include any grant, contract or loan secured by appropriated federal, state or local funds, as well as welfare, health, public or assisted housing, postsecondary education, food assistance, "or any other similar benefit," secured by appropriated federal, state or local funds.  8 U.S.C. §§ 1611(c)(1), 1621(c).  The definition of a "qualified alien" does not include unlawful aliens.  *See* 8 U.S.C. § 1641(b) (identifying aliens that are deemed to be "qualified aliens").  In addition, § 1621 provides that an unlawful alien may be eligible for a State or local public benefit if a State law "affirmatively provides for such eligibility."  8 U.S.C § 1621(d).  Georgia, has expressly stated that unlawful aliens who are 18 years of age or older are *not* entitled to *any* such benefits, with

the exception of treatment for an "emergency medical condition," non-monetary and short-term disaster relief, public health assistance with immunizations, programs such as short-term shelters or soup kitchens that meet specified conditions, prenatal care and postsecondary education that is in compliance with federal law.  *See* O.C.G.A. § 50-36-1(a).

As part of this statutory scheme 8 U.S.C. § 1625 specifically provides that, "A state or political subdivision of a State is authorized to require an applicant for State and local public benefits (as defined in section 1621(c) of this title) to provide proof of eligibility.

Plaintiffs complain that the identification requirements of HB87 regarding the provision of public service is usurped by federal law by failing to accept forms of identification that would be accepted by the federal government.  As HB87 merely implements the process which Congress preserved for the states, there is no preemption.  *Whiting*, slip. op. at 15.  Moreover, just as with the Arizona law at issue in *Whiting*, HB87 specifically provides for an exclusion where "required by federal law." HB-87 Part 19; O.C.G.A. § 50-36-2 (c) further adopts the definition of illegal alien as one who "is verified by the federal government to be present in the United States in violation of federal immigration law." O.C.G.A. §§ 16-11-200

34

(a)(1); 16-11-201 (a)(2); 16-11-202 (a); 17-5-11(a)(2).  As with the Arizona law where there is agreement there can be no preemption.  *Whiting*, slip op. at 15-16.

Plaintiffs also argue that allowing states to support federal enforcement of immigration laws will create an "adverse impact" on the United States' ability to conduct foreign relations and "undermine federal enforcement priorities." (doc. 1 ¶¶ 136-138).  Setting aside that Plaintiffs have failed to factually support this conclusory allegation, *Whiting*, rejects such a proposition. Indeed, the Court in *Whiting*, recognized the balancing employed by Congress in the development of the INC and the interests of the federal government in regulating immigration issues when it found that there is no conflict if the federal "program operates unimpeded by the state law." Slip op. at 20; *See also De Canas*, 424 U.S. at 355-63 (as long as regulations address harm to the state and does not conflict with federal law there's no preemption).  It is indisputable that allowing anyone to transport, harbor or entice illegal aliens into the state and/or utilize public resources once they are here adversely impacts the state and as such the prevention of those actions is for the benefit of the state.  Plaintiffs have pointed to no provision of HB87 which impedes the federal enforcement scheme and as such have failed to state a valid preemption claim.

35

Plaintiffs argue that criminalizing behaviors that are also prohibited and subject to criminal penalties under federal law violates the supremacy clause.[5] Dual sovereignty has long been recognized between the federal and state governments in a variety of criminal matters. *United States v. Lanza*, 260 U.S. 377 (1922). *See also Bartkus v. Illinois*, 359 U.S. 121 (1959) (due process clause does not prohibit a state from prosecuting a defendant for the same act for which he was acquitted in federal court). The "dual sovereignty" doctrine rests on the premise that, where both sovereigns legitimately claim a strong interest in penalizing the same behavior, they have concurrent jurisdiction to vindicate those interests and neither need yield to the other. Such is the case here. These statutes support rather than conflict with their federal counterparts. Indeed 18 U.S.C. § 1324 specifically criminalizes the transportation of an illegal alien within the United States, harboring an illegal alien within or enticing an alien to illegally enter the United States. *Id*. at (a)(1)(A)(ii), (iii), (iv). Significant differences between the state and

---

[5] It certainly cannot be argued that criminalization of behaviors that are subject to federal criminal enforcement violate the preemption clause as there are many such enforcement schemes represented in state and federal code. *Compare* 18 U.S.C. § 1028 to O.C.G.A. § 16-9-4 (identification fraud); 18 U.S.C. § 1461 to O.C.G.A. § 16-12-100, 100.1 (distribution of obscenity); 18 U.S.C. § 1961-64 to O.C.G.A. § 16-14-2, 3, 4, 5 (R.I.C.O.); 18 U.S.C. § 2421 to O.C.G.A. § 16-5-46 (trafficking of persons); 21 U.S.C. § 851-865 to O.C.G.A. § 16-13-20-56 (controlled substances); 18 U.S.C. § 921-931 to O.C.G.A. § 16-11-101.1 through 16-11-106 (firearms).

the federal code are that the state code requires the action to be taken in conjunction with another criminal offense and the state provides for exclusions for culpability which are not provided for in the federal code.[6]  Neither of these differences, conflicts with the federal law.  As such, there is no preemption issue.

In conclusion, Defendants assert that Plaintiffs' preemption argument fails because HB87 has established no requirements which are in conflict with any "requirements" established under the INC.  Moreover, regarding Plaintiffs' § 1983 cause of action, Plaintiffs have not established that Congress intended that a private right of action exists under § 1983 based upon any alleged violation of the INC.

**E.      Plaintiffs have failed to state a fourth amendment claim**

Plaintiffs complain that Sections 7 and 8 of the Bill violate the Fourth Amendment by authorizing "officers to seize individuals, and prolong seizures, in violation of the Fourth Amendment." (doc. 1 ¶ 174).  Presumably, Plaintiffs are complaining about the Bill provision that allows (but does not require) officers to check the immigration status of persons where the officer already has probable

---

[6] As no inquiry into immigration status can be made absent the existence of probable cause, HB87 codifies a mechanism by which state and local law enforcement can utilize the dictates of the federal code which require that state and local governments be allowed to communicate with the federal government regarding an individual's immigration status.  8 U.S.C. § 1644; 8 U.S.C. § 1373.

cause to believe that another crime has been committed.  O.C.G.A § 17-5-100.

Alternatively, Plaintiffs might be complaining about the portions of the Bill that

make it a crime to knowingly transport or harbor or induce into the state illegal

aliens while engaged in the commission of another criminal offense. O.C.G.A.

§ 16-11-200; 16-11-201; 16-11-202.  Despite the Plaintiffs attempts to repaint the

landscape of the Bill, the statute does not:

> 1) provide an officer with authority to detain anyone where there is no
> probable cause to believe he/she has already committed a criminal offense;
> or
>
> 2) give any authority to arrest anyone beyond that which is already provided
> under existing federal and state law ;
> or
>
> 3) give authority to question others who may be traveling or with the
> individual for whom the officer has probable cause beyond that which is
> already provided for under the United States Constitution.  O.C.G.A § 17-5-
> 100(b); O.C.G.A. § 16-11-200(b); 16-11-201(b); 16-11-202(b).[7]

---

[7] As noted, in note 5, the Federal Code already allows for state and local governments to communicate with federal authorities on matters related to immigration.  HB87 provides state and local officials with guidance of how and when such action can be taken.

Fourth Amendment protections occur when a government actor restrains the liberty of a person by a show of physical force or authority. *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968). The Fourth Amendment prohibits unreasonable seizures. *Virginia v. Moore*, 553 U.S. 164, 168 (2008). The *Virginia* court noted that:

> [w]hen history has not provided a conclusive answer, we have analyzed a search or seizure in light of traditional standards of reasonableness "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." . . . In a long line of cases, we have said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable.

*Virginia v. Moore*, 553 U.S. at 171 (citations omitted). Reasonableness of a seizure is determined by the presence or absence of probable cause. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) (citation omitted). A seizure or a warrantless arrest is reasonable under the Fourth Amendment if probable cause exists. *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003). The existence of probable cause is an absolute bar to claim under the Fourth Amendment for a violation of a right against unreasonable searches and seizures. *Kingsland v. City*

39

*of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) (false arrest); *Kjellsen v. Mills*, 517

F.3d 1232, 1237 (11th Cir. 2008)(malicious prosecution).[8]

Plaintiffs appear to claim that this provision will improperly cause extended

detentions of persons committing minor traffic offenses.[9]   Even if this

unsubstantiated fear bears true, the United States Supreme Court has conclusively

determined that officers can arrest individuals where they have probable cause to

believe they have committed a minor traffic offense.  *See Atwater v. City of Lago*

*Vista*, 532 U.S. 318 (2001).    As the individual involved could not only be

detained as a result of the traffic offense but could be arrested and booked into a

corrections facility, this argument is of no merit.  Moreover, the law is clear that

the validity of a stop without probable cause is a case specific inquiry such that

Plaintiffs presumption that an 80 minute wait would equate to an unreasonable

search is without merit.  *See United States v. Montoya de Hernandez*, 473 U.S. 531

(1985) (16 hour detention does not constitute an arrest and was not unreasonable in

light of the case specific inquiry); *United States v. Hardy*, 855 F.2d 753 (11th Cir.

---

[8] Moreover, the United States Supreme Court held in *Muehler v. Mena*, 544 U.S. 93 (2005) specifically determined that questioning someone about immigration status does not amount to a separate detention within the meaning of the Fourth Amendment.

[9] Defendants note that violations of county or municipal law, regulation or ordinance are specifically excluded as a basis for checking identification. O.C.G.A. § 17-5-100 (a)(1).  Defendants also acknowledge that the State of Georgia has codified its traffic code with Title 40 of its official code.

1988)(51 minute detention after the issuance of a traffic ticket which took over 25 minutes to issue was not an unreasonable seizure); *Medvar v. State*, 286 Ga. App. 177 (2007)(58 minute detention for a traffic stop not unreasonable); *State v. Grant*, 195 Ga.App. 859 (1990)(90 minute detention of passenger and luggage not sufficient to amount to an unlawful arrest).[10]

Plaintiffs also appear to argue that officers may use the Bill as a means to racially profile individuals and have an improper motive when effectuating an arrest for a minor traffic offense. The United States Supreme Court has just ruled that where there is probable cause to arrest, regardless of an alleged improper motive, that there is no Fourth Amendment violation. *Ashcroft v. Al-Kidd*, No. 10-98, *slip.op.* at 3-9 (U.S. May 31, 2011). Thus, regardless of the motive involved, if there's probable cause to believe a crime was committed, as is required under

---

[10] Officers can also stop a vehicle when they have reasonable suspicion that it may contain illegal aliens, "[W]hen an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the  car briefly and investigate the circumstances that provoke suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975). Although "[t]he reasonable suspicion must be more than an inchoate and unparticularized suspicion or hunch," *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000) (internal quotation marks omitted), "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). The officer's reasonable suspicion  must be based on "specific articulable facts, together with rational inferences from those facts." *Brignoni-Ponce,* 422 U.S. at 884.

HB87, then the motive of the officer involved is irrelevant from a Fourth Amendment perspective.  It should also be noted that as this is a facial challenge, the Court, "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).  The speculative nature of Plaintiffs' complaint is further evidenced by their claim that such profiling is already occurring.  Since the statute was not in effect at the time the suit was filed, it can hardly be responsible for such action.

**F.     Plaintiffs have failed to state a claim under the privileges and immunities clause**

As an initial matter, only individuals can seek protection from the Privileges and Immunities Clause.  While Plaintiffs do not specify, Defendants presume that they are only pursuing this claim on behalf of individuals. *See, e.g., W. & S. Life Ins. Co. v. Bd. Of Equalization*, 451 U.S. 648, 656 (1981).  To the extent that they pursue the claim on behalf of the associational Plaintiffs, these claims should be dismissed.  Plaintiffs maintain that HB87 interferes with the "fundamental right to travel" and that the right includes the right to be "treated as a welcome visitor rather than an unfriendly alien when temporarily present in another state, without a rational or compelling justification." (doc. 1 ¶ 179).  Once again, Plaintiffs claims

42

are far from clear but presumably they are criticizing the prohibition against the use of driver's licenses as proof of immigration status from states that do not verify citizenship prior to the issuance of the license. *See* O.C.G.A. § 17-5-100(b)(4).

Admittedly, the Supreme Court has clearly determined that there is a constitutional right to interstate travel, although the source of the right is undetermined. Defendants are willing to accept, for the purposes of argument, that the claim would be premised upon the Privileges and Immunities Clause to the United States Constitution. *See Edwards v. California*, 314 U.S. 160 (1941) Article IV, Section 2, Clause 1 of the Constitution provides that "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States. "The purpose of this provision is to protect non-residents from discrimination "where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other states." *Saenz v. Roe*, 526 U.S. 489, 502 (1999) (citing *Toomer v. Witsell*, 334 U.S. 385, 396 (1948)). HB87 in no way impedes that right. There is nothing in the statute which prohibits any citizen or other person who is legally in the country from entering into the state. To the

43

contrary, as noted previously, HB87 does not authorize an officer to investigate immigration status unless he/she otherwise has probable cause.

Plaintiffs appear to contend that since certain driver's licenses will not be accepted as conclusive evidence of citizenship that HB87 that the citizens of those states will be unfairly burdened.[11]  There is no merit to the contention that where a state does not require citizenship as a condition of obtaining a license that another state must accept the identification for that purpose.  Simply put, there is no legal support for the proposition that Georgia is required to accept a driver's license from another state as proof of citizenship especially where there is no requirement to be a citizen in order to obtain the license.[12]

Statutes that have been found to violate this right, have required tenure in a state for a period of time prior to obtaining some benefit.  *See Shapiro v. Thompson*, 394 U.S. 618 (1969); *Memorial Hospital v. Maricopa County,* 415 U.S. 250 (1974).  Nothing in HB87 confers a benefit to residents of the state that is not being given to non-residents.  Rather, all are

---

[11] Recognizing the issue was not specifically addressed by the United States Supreme Court, it should be noted that the Arizona statute at issue in *Whiting* has a virtually identical provision.  Ariz. Rev. Stat. Ann. § 2-11-7 (8)(B)(4) (2007).

[12] Importantly, the federal government does not accept licenses from these states as proof of citizenship.  *See* 42 CFR § 435.407(4)

subject to the same requirement should they commit a crime and an officer

decides to verify citizenship.  This does not impede interstate travel, as the

license at issue could not be accepted as proof of citizenship in the state of

origin.  Georgia is simply recognizing the limits of the forms of

identification used, what is factually supported by the document and what is

not.  The recognition of different interstate policies is not an impediment to

interstate travel, merely an acknowledgement of what a document does or

does not evidence.

**G.     Plaintiffs have failed to state a valid equal protection claim**

The Equal Protection Clause of the Fourteenth Amendment does "prohibit[]

selective enforcement of the law based on considerations such as race." *Whren v.*

*United States*, 517 U.S. 806, 813 (1996).  In *Washington v. Davis*, the Supreme

Court rejected the idea that a law that is facially neutral but impacts one race more

than another violates equal protection.  426 U.S. 229, 248 (1976).  In other words,

the Equal Protection Clause guarantees equal laws, not equal results.  *Personnel*

*Administrator of Mass. v.Feeney,* 442 U.S. 256, 273 (1979).  The law requires

more than a claim that one race of person may suffer a harsher impact then others.

*See Harris* v. *McRae*, 448 U.S. 297, 324, n. 26,  (1980) ("The equal protection

component of the Fifth Amendment prohibits only purposeful discrimination, and

when a facially neutral federal statute is challenged on equal protection grounds, it is incumbent upon the challenger to prove that Congress selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group" (internal quotation marks and citations omitted)).

Simply showing that the intent was to discriminate against illegal aliens is insufficient as illegal aliens, are not a suspect class.  In *Plyler*, the Court held that a Texas statute that denied a free public education to the children of illegal immigrants violated the Equal Protection Clause. In reaching its decision, the Court applied what some commentators have called intermediate scrutiny based on the special circumstances of the children. The Court specifically drew a distinction, however, between the children and their parents:

> We reject the claim that 'illegal aliens' are a 'suspect class.'  No case in which we have attempted to define a suspect class. . . has addressed the status of persons unlawfully in our country. Unlike most of the classifications that we have recognized as suspect, entry into this class, by virtue of entry into this country, is the product of voluntary action. Indeed, entry into the class is itself a crime. In addition, it could hardly be suggested that undocumented status is a 'constitutional irrelevancy.'

*Plyler*, 457 U.S. at 219 n.19.  In other words, "illegal alien" is not a constitutionally suspect class.

46

The Supreme Court has established two elements for determining whether a superficially neutral law violates the Equal Protection Clause: "discriminatory effect" and "purposeful discrimination." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (citing *Whitus v. Georgia*, 385 U.S. 545, 550 (1967); *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

All Plaintiffs have shown is a desire by the state to ensure that the resources of the state are utilized for those lawfully present by ensuring that there is a penalty for those who employ, transport, harbor or entice illegal aliens. As these are all related to the legitimate government purpose of preserving jobs and resources for individuals lawfully in the state, the Bill does not violate the Equal Protection Clause. *See Schweiker v. Wilson*, 450 U.S. 221, 230 (1981). This rational basis for legislative action may be wholly notional; it need only be conceivable by a court, not actually contemplated by lawmakers. *See United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (quoting *Flemming v. Nestor*, 363 U.S. 603 (1960)) ("Where . . . there are plausible reasons . . . our inquiry is at an end. It is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.")

Plaintiffs appear to allege that HB87 will lead to racial profiling and thus selective enforcement of the law—in other words a discriminatory effect.

47

However, a plaintiff must do more than make the conclusory allegation that a defendant has engaged in racially discriminatory profiling. "Plaintiffs must present evidence that individuals of a different race could have been . . . arrested for the same crime, but were not." *Urbanique Prod. v City of Montgomery*, 428 F. Supp. 2d 1193, 1224 (M.D. Ala. 2006); *Swint v. City of Wadley*, 51 F.3d 988, 1000 (11th Cir. 1995).   Here Plaintiffs speculate that they might get stopped as a result of their race, because of the individual they help or because of the individuals they are transporting.  They offer selective anecdotal accounts of incidents where they believe police interaction occurred as a result of profiling and ask the court to conclude that as a result of these incidents that the statute will be improperly enforced and should be enjoined.

Plaintiffs however fail to show how, on its face, the statute compels racial profiling.  A statutory classification that does not burden a suspect class or infringe upon the exercise of a fundamental right must be upheld against equal protection challenge "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Federal Communications Commission v. Beach Communications, Inc.*, 508 U.S. 307 (1993).  Here on its face, the statute does not reference a suspect class.  Indeed, the law specifically treats anyone,

48

where the officer has probable cause to believe another criminal offense has been committed, the same.

Lastly, Plaintiffs claim that since they were subject to profiling before the prior to the effective date of the statute, then it is a foregone conclusion that they will be subject to racial profiling after the statute comes into effect.  In fact what Plaintiffs have shown, assuming their perception is accurate, is that racial profiling is not caused by HB87 but rather that it occurred, in isolation, prior to HB87.  It should also be noted that the Supreme Court rejected a similar argument in *Whiting* where they found that it could not be presumed that employers would act in a discriminatory fashion in order to comply with statutory dictates related to the verification of immigration status.  *Whiting, supra* at slip op. 21.  HB87 is rationally related to a legitimate government interest and thus does not violate the equal protection clause.

## H.    Plaintiffs have failed to state a valid due process claim

The Due Process Clause of the Fourteenth Amendment states "nor shall any State deprive any person of life, or property, without due process of law."  U.S. Const. XIV, § 1.  "[T]he core of the concept [of due process is] to be protect[ed] against arbitrary action."  *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).  Arbitrary conduct, in the constitutional sense, is conduct that "shocks the

conscience." *Id.* at 1716-1717 (*quoting Rochin v. California*, 342 U.S. 165, 172-3 (1952)). Two kinds of constitutional protections are derived from the Fourteenth Amendment: procedural due process and substantive due process. *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (*en banc*). Here, Plaintiffs claim that they have been deprived of property without due process of law. Namely they claim to have been denied the use of their consular-issued identity documents (CID), "for any official purpose for which identification is required." (doc. 1 ¶ 186). A successful § 1983 claim "alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes,* 345 F.3d 1225, 1232 (11th Cir. 2003). Since Plaintiffs do not have a constitutionally-protected liberty or property interest in the use of their CID's, they have no claim for a due process violation.

Essentially Plaintiffs are claiming, without support, that they have a property right in the CID's and that since they cannot use them for identification that the statute causes them to lose their property right. As an initial matter Plaintiffs fail to acknowledge that the statute provides for the acceptance of the documents if "required by federal law." O.C.G.A. § 50-36-2 (c). Further the scope of a property interest under § 1983 is defined by state law. *Bishop v. Wood*, 426 U.S. 341, 344

(1976).  Plaintiffs point to no state statute which provides for the creation of a property interest related to the use of a CID.  Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972);*Cheek v. Gooch,* 779 F.2d 1507, 1508 (11th Cir. 1986) (holding no violation of due process where Georgia state law does not grant Plaintiff a property interest in the opportunity to acquire a license).  Plaintiffs have not alleged nor have Defendants found any provision in state or federal law which creates a private property right for identification from a foreign country let alone a property right in the ability to use foreign issued documents for the provision of public services or other official business.  Even if such a right did exist, the Bill still would not violate due process as there is nothing making it illegal for Plaintiffs to possess CID's and/or use them for other than "official" business.  Private entities are not prohibited from accepting the CID's for whatever purpose they deem appropriate.  As Plaintiffs have not been deprived of use of the CID's they can allege no taking.  *See Penn Central Trans. Co. v. New York City*, 438 U.S. 104 (1978).

It is further worth noting that the Defendants have not found any authority for the proposition that foreign governments tie any property right to the CID's.

51

Indeed the reliability of the cards for purposes of identification has been the topic of concern for many years.  They have been heralded as unreliable and subject to fraud.  *See* Steve McCraw, Testimony at the House Judicial Subcommittee on Immigration, Border Security, and Claims Of the Committee on the Judiciary, House of Representatives, One Hundred Eighth Congress, First Session, June 19 and June 26, 2003. (transcript available at http://judiciary.house.gov/Legacy/mccraw062603.htm); *See also* Hearing on Consular Identification Cards (transcript available http://judiciary.house.gov/Legacy/87813.PDF).  Regardless of their reliability, there is no legal or evidentiary support for the proposition that these cards create a property right and thus Plaintiffs fail to state a valid due process claim.

## I.   Plaintiffs do not have a separate and distinct claim under 42 U.S.C. § 1981

In Count Six of their complaint, Plaintiffs claim that § 19 of HB 87 operates "in such a manner as to deny access to governmental services and to deny the securing of governmental licenses and to deny entry into contracts with governmental entities on the basis of the national origin of the identification documentation of the presenter." Plaintiffs claim further that § 7 of the Bill impermissibly prohibits the right of association based upon, "the alienage of those with whom they wish to associate." (doc. 1 ¶ 191).  Plaintiffs then summarily aver

that the Bill discriminates "on the basis of alienage and national origin and race." (doc. 1 ¶ 192). While the heading of Count Six delineates the claim as brought under § 1981 and § 1983, the count only describes § 1981. *See* doc. 1 ¶ 190-191. § 1981, does not create a private right of action against state actors. *Butts v. County of Volusia*, 222 F. 3d 891 (11th Cir. 2000). Since there is no other basis stated for a claim under Count Six, this claim should be dismissed.

**J.     Plaintiffs do not have a cause of action under the Vienna Convention**

While not entirely clear, Plaintiffs appear to contend that they have a federally protected right to use Consular identification cards to establish identification and as proof of legitimate presence in the Country. They state no basis for this proposition other then to suggest that the use of these cards, assists in assuring that the notification provisions of the Vienna Convention are complied with. The violation of these provisions, however, is not actionable under § 1983. *Gandara v. Bennett*, 528 F.3d 823 (11th Cir. 2008). Consequently, there could be no right of action for ensuring ease of compliance with the provision.

**K.     Defendants Deal and Olens do not have direct enforcement authority for the Statute, and therefore, are not the proper parties for Plaintiffs' requested injunctive relief.**

Plaintiffs claim, in part, is that local law enforcement will improperly utilize HB87 to engage in racial profiling. Neither the Governor nor the Attorney General

53

have authority to direct local law enforcement.  While Governor Deal and Attorney General Olens, in their official capacities are the correct parties for the purpose of defending the constitutionality of the Statute under the Federal Constitution, they are not the proper parties to enjoin against its enforcement.  The Georgia Constitution generally provides that it is the Governor's responsibility to, "take care that the laws are faithfully executed and shall be the conservator of the peace. . . ."  The Governor is vested with, "The chief executive powers . . . ."  Ga. Const. art. IV, § 2, P 1.  Under the Georgia Constitution, "[t]he Attorney General shall act as the legal advisor of the executive department, shall represent the State in the Supreme Court in all capital felonies and in all civil and criminal cases in any court when required by the Governor, and shall perform such other duties as shall be required by law."  Ga. Const. art. V, § 3, P 4.  There is, however, no constitutional or statutory provision that allows the Governor or the Attorney General to dictate to independently elected officials or to locally appointed law enforcement officers what law enforcement action may or may not be taken.

Instead, the Georgia Constitution provides for the "self-government of municipalities."  Ga. Const. art. IX, § 2, P 1, 2.  Counties are authorized to provide police and fire protection.  Id. at P 3.  The county police are under the control of the county governing authority and have law enforcement powers, including the

power to make arrests and execute and return criminal warrants in the county of appointment.  O.C.G.A. § 36-8-5.  Sheriffs are constitutional "county officers" who are "elected by the qualified voters of their respective counties" and who "have such qualifications, powers, and duties as provided by the general law."  Ga. Const. art. IX, § 1, P III(a).

As independently elected officials, the local sheriffs have specific duties, including the enforcement of State laws.  Sheriffs do not act under the supervision or direction of the Governor or the Attorney General.  O.C.G.A. §§ 15-16-9, 15-16-10.  Thus, it is the responsibility of local law enforcement to manage the specific enforcement of the provisions of the Statute and Governor Deal and Attorney General Olens in their official capacities are not the proper Defendants to carry Plaintiffs' objective.

Since neither the Governor nor the Attorney General have enforcement authority over local law enforcement, these claims, against them are barred by the Eleventh Amendment.  The *Ex Parte Young* exception does not apply when the defendant has no connection to the enforcement of the challenged act.  *Summit Med. Assoc., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999).  Unless the state officer has some responsibility to enforce the provision in question, the fiction of *Ex Parte Young* does not apply and the claim is barred by the Eleventh

Amendment. *Id.* Because the Governor and Attorney General have no authority to enforce provisions of criminal statutes, the *Ex Parte Young* doctrine does not apply and Plaintiffs' claim seeking to enjoin enforcement of the Statute is barred by the Eleventh Amendment.

**L.    Plaintiffs' claim under the Georgia Constitution must be dismissed.**

This Court lacks jurisdiction to consider Plaintiffs' claim premised on the Georgia Constitution. (*See* Doc. 1, ¶¶ 193-195). Moreover, even if jurisdiction existed, such claims are barred by sovereign immunity. In the alternative, the Court should decline to exercise jurisdiction over the claims.

**1.    This Court lacks jurisdiction to consider Plaintiffs' claims under the Georgia Constitution.**

The Eleventh Amendment to the United States Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. By its own terms, the amendment affords states immunity from suits, both legal and equitable. *Id.* This Amendment has been interpreted to also bar suits against a state brought by that state's own citizens. *McClendon v. Georgia Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001). Accordingly, the Eleventh Amendment bars a federal court from exercising

56

jurisdiction over any lawsuit against a non-consenting state. *Vermont Agency of Natural Res. v. United States*, 529 U.S. 765, 778 (2000); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 97-102 (1984).

Because claims against public officials in their official capacities are merely another way of pleading an action against the entity of which an officer is an agent, "official capacity" claims against a state officer are included in the Eleventh Amendment's bar. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The Eleventh Amendment bars suit against a State's agencies, departments, or officials, absent a waiver by the State or a valid congressional override, when the State is the real party in interest or when any monetary recovery would be paid from State funds. *Kentucky*, 473 U.S. at 163; *Pennhurst*, 465 U.S. at 100-01.

The State of Georgia has specifically preserved its immunity against claims filed in federal court. The State of Georgia's Constitution and the Georgia Tort Claims Act clearly preserve the State's immunity from suit on federal claims and in federal court. O.C.G.A. § 50-21-23(b); Ga. Const. art. I, § II, P IX (f). As such, the Eleventh Amendment provides an absolute bar to actions against the State of Georgia, its entities, and its officials. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989); *Gamble v. Florida Dep't of Health & Rehab. Servs.*, 779 F.2d 1509, 1511-20 (11th Cir. 1986).

An exception to the Eleventh Amendment bar exists for suits against state officers in their official capacities seeking prospective equitable relief to end continuing violations of federal law. *Scott v. Taylor*, 405 F.3d 1251, 1255 (11th Cir. 2005); *Summitt Med. Assoc. P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999). Plaintiffs' request for prospective relief from alleged continuing violations of federal law – i.e., their request that this Court declare the Statute unconstitutional under the United States Constitution – is the only claim not barred by the Eleventh Amendment. As a result, their claim challenging the constitutionality of the Statute under the Georgia Constitution brought against the State Officials in their official capacities is barred by the Eleventh Amendment.

### 2.    Plaintiffs' state constitutional claim is barred by sovereign immunity.

Plaintiffs' state constitutional claim is also barred by sovereign immunity. The Georgia Constitution extends sovereign immunity to the State and all of its departments and agencies except as specifically provided in paragraph IX of article I, § II, which provides:

> Except as specifically provided in this Paragraph, sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.

Ga. Const. art I, § II, P IX(e). Thus the State is immune from suit except as specifically waived in the Georgia Constitution or except as provided by an act of the General Assembly specifically providing that sovereign immunity has been waived and the extent thereof. *Woodard v. Laurens County*, 265 Ga. 404, 405 (1995). "Under the doctrine of sovereign immunity, the State cannot be sued without its consent." *State Bd. of Educ. v. Drury*, 263 Ga. 429, 430 (1993). "Where the sovereign has sovereign immunity from a cause of action, and has not waived that immunity, the immunity rises to a constitutional right and cannot be abrogated by any court." *Tyson v. Bd. of Regents*, 212 Ga. App. 550, 551 (1994). The burden of demonstrating a waiver of sovereign immunity rests with the Plaintiff. *Balasco v. County of San Diego*, 140 Ga. App. 482, 487 (1976).

There is no state provision "equivalent to 42 U.S.C. § 1983," which provides a cause of action for violation of the state constitution. *Howard v. Miller*, 222 Ga. App. 868, 872 (1996); *accord Davis v. Standifer*, 275 Ga. App. 769, 772 n. 2 (2005); *Draper v. Reynolds*, 278 Ga. App. 401, 403 n. 2 (2006). Therefore, Plaintiffs cannot pursue a claim for injunctive relief for the alleged violation of state constitutional rights.[13]

---

[13] Plaintiffs are further precluded from raising alleged violations of state law under § 1983. *Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002).

**3. Alternatively, the Court should decline to exercise supplemental jurisdiction over claims brought under the Georgia Constitution.**

Even if jurisdiction existed over claims not barred by sovereign immunity, this Court should decline to exercise its supplemental jurisdiction.  Ordinarily, federal courts have supplemental jurisdiction over state law claims that are closely related to claims falling within the court's original jurisdiction.  28 U.S.C. § 1367(a).  District courts may decline to exercise such jurisdiction when the claim raises a novel or complex issue of state law.  28 U.S.C. § 1367(c)(1).  That is precisely the case here.

State courts, not federal courts, are the final interpreters of state law.  *Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1553 (11th Cir. 1992).  Indeed, the Georgia Constitution gives the Georgia Supreme Court the exclusive appellate jurisdiction over all cases involving the construction of the Georgia Constitution and the construction of laws where the constitutionality under the Georgia Constitution has been called into question.  Ga. Const. art. VI, § VI, P 2; *Methany v. Hammonds*, 216 F.3d 1307, 1313 (11th Cir. 2000).

This Court should decline Plaintiffs' invitation to consider the constitutionality of the Statute under the Georgia Constitution.  Consideration of such a claim involves a novel issue of state law that falls within the exclusive jurisdiction of the Georgia Supreme Court.

## CONCLUSION

For the above and foregoing reasons, Plaintiffs complaint should be

dismissed in its entirety.

Respectfully submitted,

SAMUEL S. OLENS        551540
Attorney General

KATHLEEN PACIOUS       558555
Deputy Attorney General

/s/   Devon Orland
DEVON ORLAND           554301
Sr. Assistant Attorney General

Please Address All
Communications To:

Devon Orland
40 Capitol Square, S.W.
Atlanta, GA  30334-1300
(404) 463-8850
(404) 651-5304

61

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 14-point New Times Roman type face.

This the  14th  day of June, 2011.

/s/ Devon Orland
DEVON ORLAND               554301
Sr. Assistant Attorney General

40 Capitol Square, S.W.
Atlanta, GA 30334-1300
(404) 463-8850 (Telephone)
(404) 651-5304 (Fax)
Email: Dorland@law.ga.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

with the Clerk of Court using the CM/ECF system which will automatically

send email notification of such filing to the following attorneys of record:

Andrew H. Turner

Chara Fisher Jackson

Charles H. Kuck

Daniel Werner

Danielle M. Conley

Georgia Brian Spears

Mary C. Bauer

Michelle R. Lapointe

Naomi Ruth Tsu

Robert Keegan Federal, Jr.

Samuel Brooke

I further certify that I have served, by U.S. mail, first class postage

prepaid, the following non-CM/ECF participants:

Andre I. Segura
Omar C. Jadwat
American Civil Liberties Union Foundation – NY
125 Broad Street, 18th Floor
New York, NY 10004

Azadeh N. Shahshahani
ACLU of Georgia
Building 400, Suite 425
1900 The Exchange, SE
Atlanta, GA 30339

Cecillia D. Wang
Katherine Desormeau
ACLU Immigrant's Rights Project
39 Drumm Street
San Francisco, CA 94111

Elora Mukherjee
ACLU Racial Justice Program
18th Floor, 125 Broad  Street
New York, NY 10004

Jonathan Blazer
Karen C. Tumlin
Linton Joaquin
Melissa S. Keaney
Nora Preciado
Tanya Broder
National Immigration Law Center
3435 Wilshire Blvd, Suite 2850
Los Angles, CA 90010

Sin Yen Ling
Asian Law Caucus
55 Columbus Avenue
San Fancisco, CA 94111

65

This 14th day of June, 2011.

<u>s/ Devon Orland</u>

State Law Department
40 Capitol Square SW
Atlanta, GA  30334
Tel: (404) 463-8850
Fax: (404) 651-5304
Email: dorland@law.ga.gov