IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHEN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| Georgia Latino Alliance for Human | ) | |
| Rights, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | Case No. 1:11-cv-1804-TWT |
| v. | ) | |
| Governor Nathan Deal, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AMICUS CURIAE *GALEO* BRIEF IN SUPPORT OF THE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS - INDEX

STATEMENT OF INTEREST OF GEORGIA ASSOCIATION OF LATINO ELECTED OFFICIALS..................................................................................1

INTRODUCTION ...............................................................................................2

ARGUMENT ......................................................................................................4

  A. HB 87 Will Disproportionately Harm Certain Communities of Color and Encourage Racial Profiling. .........................................................................4

    2. Local law enforcement officials are unequipped to enforce HB 87...........8

    3. Enforcement of HB 87 will disproportionately affect communities of color. ................................................................................................. 12

  B. HB 87 Threatens Public Safety in Georgia.................................................. 14

    1. Enforcement of HB 87 will erode trust between communities of color and law enforcement.......................................................................................... 15

    2. HB87 will produce a chilling effect on the reporting of crime and cooperation in police investigations, jeopardizing the public safety of all Georgians. ...................................................................................... 18

    3. HB 87 will also chill cooperation in court cases and criminal investigations. ................................................................................................. 22

    4. HB 87 will particularly undermine community safety by increasing minorities' vulnerability to hate crimes. ......................................................... 23

CONCLUSION ................................................................................................. 25

# TABLE OF CONTENTS - AUTHORITY

Cases                                                                                                      Pages

Terry v. Ohio,
    392 U.S. 1 (1968)..................................................................................................4

STATUTES

111th Cong. 77-78 (2009).......................................................................................9

8 U.S.C. §§ 1101 et seq...........................................................................................9

The Commerce Clause, Art. I, Sec. 8, cl. 3 of the U.S. Constitution ...........................................2

U.S. Const., Art. 1, § 8, cl. 3, 4.............................................................................9

U.S. Constitution...................................................................................................2

OTHER AUTHORITIES

Anita Khashu, The Role of Local Police: Striking a Balance Between Immigration Enforcement
    and Civil Liberties (Mary Malina ed., 2009), available at
    http://www.policefoundation.org/pdf/strikingabalance/Narrative.pdf..................................14

Anthony E. Mucchetti, Driving While Brown: A Proposal for Ending Racial Profiling in
    Emerging Latino Communities Harv. Latino L. Rev. 1, 22 (2005) .....................................22

Associated Press, Salt Lake Police Chief Chris Burbank to Congress: Some Utah
    legislatures push racist agenda, DESERET NEWS, June 18, 2010 ........................................11

Caroline Wolf Harlow, Bureau of Justice Statistics, Hate Crime Reported by Victims and
    Police 4 (Nov. 2005), available at http://bjs.ojp.usdoj.gov/content/pub/pdf/hcrvp.pdf........23

Carrie Arnold, Racial Profiling in Immigration Enforcement: State and Local
    Agreements to Enforce Federal Immigration Law, 49 ARIZ. L. REV. 113, 134-135
    (2007)..............................................................................................................7

Craig E. Ferrell Jr., Immigration Enforcement: Is It a Local Issue?, The Police Chief: The
    Professional Voice of Law Enforcement (Feb. 2004), available at

http://www.lwvil.org/downloadimm/lwvil_immigration_study_second_packet_police_chief _magazine.pdf.................................................................................................................19, 20

D.L. Hawley, The Powers of Local Law Enforcement to Enforce Immigration Laws ...................7

David A. Harris, The Stories, the Statistics, and the Law: Why "Driving While Black" Matters, 84 Minn. L. Rev. 265, 326 (1999)..............................................................................21

Enforcing Immigration Law: The Role of State, Tribal, and Local Law Enforcement, International Assoc. of Chiefs of Police, Nov. 30, 2004, available at http://www.theiacp.org/Portals/0/pdfs/Publications/ImmigrationEnforcementconf.pdf ........10

Gail Pendleton, Local Police Enforcement of Immigration Laws and its Effects on Victims of Domestic Violence, Domestic Violence and Immigration in the Criminal Justice System, ABA Commission on Domestic Violence, available at http://www.mcadsv.org/webinars/IR-2007-April/VI/BI%20Law%20Enforcement%20CJS.pdf ..............................................18, 21

Heidi Beirich, S. Poverty Law Ctr., The Year in Nativism, Intelligence Report, Spring 2010, available at http://www.splcenter.org/get-informed/intelligence-report/browse-all-issues/2010/spring/the-year-in-nativism ..............24

Huyen Pham, The Inherent Flaws in the Inherent Authority Position:  Why Inviting Local Enforcement of Immigration Laws Violates the Constitution, 31 FLA. ST. U. L. REV. 965 (2004)……………………………………………………………….………………….12

Davidson & Francisco Dueñas, Arizona Law Hurts Us All, Advocate, May 5, 2010, available at http://advocate.com/Politics/Commentary/Lambda_Legal_Arizona_Law_Hurts_Us_All/......24

Jones Moy and Brent Archibald, Reaching English as a Second Language Communities: Talking with the Police, The Police Chief Magazine (Vol. 72, No. 6, June 2005), available at http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display_arch&article_ id=614&issue_id=62005 ..........................................................................................................21

Keith Aoki, "Foreign-ness" & Asian American Identities: Yellowface, World War II Propaganda, and Bifurcated Racial Stereotypes....................................................................6

Kevin R. Johnson, ESSAY: How Racial Profiling in America Became the Law of the Land: United States v. Brignoni-Ponce and Whren v. United States and the Need for Truly Rebellious Lawyering, 98 Geo. L.J. 1005, 1039 (April 2010) ......................................6

Kevin R. Johnson, Some Thoughts on the Future of Latino Legal Scholarship...........................5

iv

King County Dep't of Pub. Health, Safety and Hate Crimes, Oct. 7, 2008, http://www.kingcounty.gov/healthservices/health/personal/glbt/HateCrime.aspx ............... 24

L.A. Police Dep't, Chief of Police Special Order No. 40 (Nov. 27, 1979), available at http://www.lapdonline.org/get_informed/pdf_view/44798 ................................................. 16

L.A. Police Dep't, LAPD Manual Vol. 4 § 264.50, available at http://www.lapdonline.org/lapd_manual/volume_4.htm#264.50 (last visited May 9, 2011) ............................................................................................................................... 16

Los Angeles Police Department's Special Order No. 40 ...................................................... 15, 16

M.C.C. homepage, available at http://www.majorcitieschiefs.org/ ........................................... 10

M.C.C. Position Statement.......................................................................................................... 10

Nancy Morawetz & Alina Das, Legal Issues in Local Police Enforcement of Federal Immigration Law, paper presented at the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21, 2008 ....................................................................... 13

Nat'l Network for Immigrant & Refugee Rights, Over-Raided, Under Siege: U.S. Immigration Laws and Enforcement Destroy the Rights of Immigrants 36 (2008) ............... 19

Natsu Taylor Saito, Alien and Non-Alien Alike: Citizenship, "Foreignness," and Racial Hierarchy in American Law ................................................................................................... 6

New Americans in the Beehive State, IMMIGRATION POLICY CENTER, July 1, 2010, available at http://www.immigrationpolicy.org/just-facts/new-americans-beehive-state ...................................................................................................................................... 10

Portrait of Injustice: the Impact of Raids on Families, Workers and Communities, Report from the National INS Raids Task Force of the National Network for Immigrants and Refugee Rights, at 33 (1997) ............................................................................................... 21

Race & Justice, COPS Evaluation Brief No. 1: Promoting Cooperative Strategies to Reduce Racial Profiling 21 (2008) ......................................................................................... 15

Randall Kennedy, RACE, CRIME AND LAW (1997) ...................................................................... 7

S. Poverty Law Ctr., Under Siege Life for Low-Income Latinos in the South 6 (Apr. 2009), available at http://www.splcenter.org/sites/default/files/downloads/UnderSiege.pdf ...................................................................................................................................... 19

S. Poverty Law Ctr., Nativist Extremist Groups 2010, http://www.splcenter.org/get-informed/intelligence-report/browse-all-issues/2011/spring/the-year-in-nativism/nativist-extremists ......................................................................................................................23

S. Poverty Law Ctr., New SPLC Report: "Patriot" Groups, Militias Surge in Number in the Past Year, Mar. 2, 2010, http://www.splcenter.org/get-informed/news/splc-report-number-of-patriot-groups-militias-surges-by-244-in-past-year ............................................................23

Secure Communities, U.S. Immigration and Customs Enforcement, http://www.ice.gov/secure_communities/ (last visited May 19, 2011) ................................16

Susan Shah, Insha Rahman, and Anita Khashu, Overcoming Language Barriers:  Solutions for Law Enforcement (Vera Institute of Justice, 2007), available at http://www.justice.gov/crt/lep/resources/vera_translating_justice_final.pdf ......................20

Value Georgia, available at http://www.valuegeorgia.com/....................................................2

Thomas M. Guterbock et al., Evaluation Study of Prince William County Illegal Immigration Enforcement Policy, at xi, 76-78 (2009).....................................................................................16

Trevor Gardner II & Aarti Kohli, The C.A.P. Effect: Racial Profiling In The Ice Criminal Alien Program,  The Chief Justice Earl Warren Institute on Race, Ethnicity and Diversity, UC Berkeley School of Law (Sept. 2009) ............................................................11

U.S. Census Bureau, American Factfinder, Subject Table S0501, Georgia, available at available at http://quickfacts.census.gov/qfd/states/13000.html............................................................12

"We're Not Feeling Any Safer": Survey Results Show Negative Impacts from ICE Involvement with Local Police, California Immigrant Policy Center, University of California, Berkeley Law (Summer 2010), available at http://caimmigrant.org/document.html?id=322/...................................................................17

vi

## STATEMENT OF INTEREST OF GEORGIA ASSOCIATION OF LATINO ELECTED OFFICIALS

The Georgia Association of Latino Elected Officials ("GALEO"), is a statewide non-profit and non-partisan organization dedicated to greater civic engagement and leadership development of the Latino community across Georgia.[1] www.galeo.org. GALEO submits this brief in support of Plaintiff's motion for preliminary injunction because Georgia's House Bill ("HB") 87, the "Illegal Immigration Reform and Enforcement Act of 2011," will create dangerous precedent and undermine the constitutional and civil rights of all people within Georgia.

The impact of HB 87's state-law system for the regulation of immigration will be extensive and pervasive. HB 87 creates a vehicle for immigration enforcement that is not only unconstitutional, but that encourages egregious violations of the rights of Georgia's residents and visitors. Amici write with particular concern about the disproportionate and damaging effect on Georgia's communities of color, who will be unfairly targeted and alienated by HB 87.

1

**INTRODUCTION**

"Immigration is a complex policy issue and should be addressed at the federal level… Georgia is the birthplace of civil rights and we value our traditions of inclusion, equality and justice. Our faiths teach us to welcome and love our neighbors, and we live by those teachings. We are bound by our long history of social justice to adopt a humane approach to immigration."[1]   This quote from the Value Georgia—a statement of values meant to address the problems with adopting an immigration reform on the state level— succinctly captures the clear demarcation of authority over immigration enforcement, which falls solely under the federal government's jurisdiction pursuant to the U.S. Constitution.[1] However, the recent passage of HB 87 directly contradicts this constitutional mandate by giving local law enforcement agencies the right to question and arrest people for perceived immigration violations.

HB 87's nickname as the "show me your papers" law accurately describes the substance of the law: it compels all people within Georgia—residents, visitors, and tourists alike—to carry identification papers at all times to prove

---

[1] The Value Georgia statement, which has been endorsed by many public leaders since early 2011, sets forth five values meant to guide Georgia's immigration discussion: storng economy, law enforcement, families, rule of law, and traditions.  See The Value Georgia, available at http://www.valuegeorgia.com/

[1] See The Commerce Clause, Art. I, Sec. 8, cl. 3 of the U.S. Constitution; see also the Naturalization Clause, Art. I, Sec. 8, cl. 4; the Migration and Importation Clause, Art. I, Sec. 9, cl. 1; and the War Power, Art I, Sec. 8, cl. 11.

their U.S. citizenship or immigration status.  Without papers, a person risks extensive investigation and protracted detention until his or her status is verified. HB 87 mandates police to request identification documents of all persons they stop or arrest.  The law further authorizes law enforcement officials to investigate and detain a person if they have "probable cause" to question the lawfulness of the person's immigration status.  HB 87 is unconstitutional and threatens the civil rights of all persons in Georgia.

The substance of this Amicus Brief denounces Georgia's Illegal Immigration Reform and Enforcement Act of 2011 and highlights the adverse effects that enforcement of HB 87 will inevitably impart on communities of color, demonstrating how the law will unfairly target and disproportionately affect them.  HB 87 creates dangerous precedent and fundamentally undermines the civil rights of those residing or traveling in Georgia for the following reasons:

- HB 87 encourages racial profiling and targets communities of color:  Since the criteria for "probable cause"[2] is not defined, HB 87 invites discrimination and profiling based on impermissible factors, such as race, ethnicity, or English-speaking ability.  Local law enforcement officials lack sufficient training to adequately enforce immigration at the local level.

---

3

- <u>HB 87 destroys trust in law enforcement and threatens to chill reporting of crimes</u>: The law will diminish public safety and trust in local law enforcement. Fearing that every encounter with authorities will lead to interrogation about their immigration status and possible detention, immigrants, non-residents, and people of color will hesitate to contact authorities with information about crimes committed against them or crimes they witnessed.

For these reasons, this Court should grant Plaintiff's motion for preliminary injunction to bar enforcement of Georgia's Illegal Immigration Reform and Enforcement Act of 2011.

## ARGUMENT

**A. HB 87 Will Disproportionately Harm Certain Communities of Color and Encourage Racial Profiling.**

**1. Enforcement of HB 87 cannot be executed in a race-neutral fashion.**

The U.S. Supreme Court has held that reasonable suspicion "may not apply merely because a person . . . is of a suspected race or ethnicity." Terry v. Ohio, 392 U.S. 1 (1968). HB 87, which cannot be applied in a non-discriminatory manner, directly violates this important judicial precedent.

4

HB 87 invites law enforcement to target certain people based on their race, ethnicity, and other disparate factors, due to assumptions that members of certain minority groups are more likely to be unlawfully present in the United States and/or to engage in illegal behavior.  The statute's arguably facially neutral language fails to mitigate the harm from the substantial bias that will occur if the law is enforced.

A discussion of HB 87's key provisions illustrates how the statute will inevitably lead to profiling and harassment of communities of color.  In Section 8 of HB 87, Chapter 5 of Title 17 of the Official Code of Georgia Annotated, relating to searches and seizures, is amended by adding a new article that permits law enforcement officials to verify immigration status at any investigation of a criminal suspect if they are unable to provide one of five delineated identification documents. The officer is given discretion as to when he has probable cause to suspect a criminal suspect might be an undocumented immigrant, and is also given discretion in using any reasonable means to determine a suspects immigration status.  .[3]

As a result, the vague and ambiguous nature of the law opens the door to selective enforcement against people presumed to look or sound "foreign," based

---

[3]. During any investigation of a criminal suspect by a peace officer, when such officer has probable cause to believe that a suspect has committed a criminal violation, the officer shall be authorized to seek to verify such suspect's immigration status when the suspect is unable to provide one of the following: (1) A secure and verifiable document as defined in Code Section 50-36-2; (2) A valid Georgia driver's license; (3) A valid Georgia identification card issued by the Department of Driver Services; (4) If the entity requires proof of legal presence in the United States before issuance, any valid driver's license from a state or district of the United States or any valid identification document issued by the United States federal government; (5) A document used in compliance with paragraph (2) of subsection (a) of Code Section 40-5-21; or (6) Other information as to the suspect's identity that is sufficient to allow the peace officer to independently identify the suspect  HB 87 § 17-5-100.

on impermissible external characteristics.[4] Many people, particularly those of color, will face further investigation and detention during routine encounters with law enforcement officials. [5] Even petty offenses (such as routine traffic stops) provide ample pretext to stop, investigate, and detain a person.

HB 87 Section § 17-5-100 (c) (Authorization to determine lawful presence in United States) provides that a law enforcement officer may use any reasonable method to determine immigration status including requiring the detained individual to present (1) one of the four officially prescribed documents to the law enforcement officer, or (2) "other information that is sufficient to allow the peace officer to independently identify the suspect." No guidelines are provided as to what other information would be sufficient and as such the determination is left entirely to the discretion of the detaining officers.

[4] 5 See Kevin R. Johnson, Some Thoughts on the Future of Latino Legal Scholarship, 2 HARV. LATINO L. REV. 101, 117-29 (1997).  Groups other than Latinos are designated as being "foreign." Asian Americans, at various times in U.S. history, have been subject to similar treatment.  See Keith Aoki, "Foreign-ness" & Asian American Identities: Yellowface, World War II Propaganda, and Bifurcated Racial Stereotypes, 4 ASIAN PAC. AM. L.J. 1, 9-13 (1996) (analyzing legal significance of treatment of persons of Asian ancestry as "foreigners"); Natsu Taylor Saito, Alien and Non-Alien Alike: Citizenship, "Foreignness," and Racial Hierarchy in American Law, 76 OR. L. REV. 261, 295-315 (1997) (same); see also Orhorhaghe v. INS, 38
F.3d 488, 492 (9th Cir. 1994) (ruling that "Nigerian-sounding name" was insufficient to justify immigration stop); supra text accompanying notes 156-57 (describing Orhorhaghe).

[5] See Kevin R. Johnson, ESSAY: How Racial Profiling in America Became the Law of the Land: United States v. Brignoni-Ponce and Whren v. United States and the Need for Truly Rebellious Lawyering, 98 Geo. L.J. 1005, 1039 (April 2010) ("The authorization to rely on race, combined with much discretion, has resulted in even greater abuses of racial minorities in immigration enforcement than ordinary law enforcement.")

6

"Reasonable means" is neither easily understood nor capable of a uniform application.[6]  HB 87 invites selective reliance upon impermissible factors, such as skin color, accent, religion or race, that make the officer question a person's lawful presence.[7]  The vague standard of "reasonable means", combined with the broad, undefined, ability of the law enforcement officer to use other information to determine immigration status, provides a loophole around the prohibition against using racially motivated factors in this determination.

Many lawful residents, visitors, and immigrants will be unable to provide one of the requisite forms of identification to avoid investigation and detention.[8]

---

[6] "Reasonableness . . . is not a definite, arithmetic, objective quality that is independent of aims and values.  It is a concept that is considerably more subtle, complex, malleable, and mysterious than the simplistic model of decision-making relied upon by those who accept at face value the "reasonableness" or "rationality" of conduct that expresses not only controversial moral and political judgments, but also deep-seated, perhaps unconscious, affections, fears and aversions. . . ."  Carrie Arnold, Racial Profiling in Immigration Enforcement: State and Local Agreements to Enforce Federal Immigration Law, 49 ARIZ. L. REV. 113, 134-135 (2007) (quoting Randall Kennedy, RACE, CRIME AND LAW, 144-145 (1997)).

[7] See id. (describing the problem with providing officers unguided authority to enforce immigration will transform "every traffic stop [into] an immigration-papers stop, leading to potential civil rights violations against members of ethnic groups") (citing D.L. Hawley, The Powers of Local Law Enforcement to Enforce Immigration Laws, 99-06 Immigr. Briefings 1, 13(June 1999)).

[8] HB 87 Section § 17-5-100 also provides a list of acceptable documents to create the presumption of lawful presence.  These documents are:(1) A secure and verifiable document as defined in Code Section 50-36-2; (2) A valid Georgia driver's license; (3) A valid Georgia identification card issued by the Department of Driver Services; (4) If the entity requires proof of legal presence in the United States before issuance, any valid driver's license from a state or district of the United States or any valid identification document

A national survey sponsored by the Brennan Center for Justice at the NYU School of Law ("Brennan Center Survey") revealed that millions of Americans do not have documentary proof of citizenship that falls under one of these categories readily available.[9]  Approximately 13 million U.S. citizens do not have ready access to citizenship documents.[10]  As many as 21 million Americans do not have valid government-issued photo identification.[11]  HB 87 does not specify how persons can otherwise prove their identity if they lack one of the prescribed forms of identification

**2. Local law enforcement officials are unequipped to enforce HB 87**

One cannot readily ascertain a person's lawful presence in the United States from external characteristics.  Instead, this assessment requires a comprehensive evaluation of numerous factors, including federal laws, regulations, and procedures.[12]  Congress enacted the Immigration and Nationality Act ("INA"

---

issued by the United States federal government; (5) A document used in compliance with paragraph (2) of subsection (a) of Code Section 417 40-5-21;  H.B. 87 § 17-5-100(b)(1)-(5).

[9] The Brennan Center for Justice, Citizens Without Proof:  A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification 2 (Nov. 2006), available at http://www.brennancenter.org/page/-/d/download_file_39242.pdf
[10] Id.
[11] Id.
[12] 13 See Public Safety and Civil Rights Implications of State and Local Enforcement of Federal Immigration Laws: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties, and Subcomm. on Immigration, Citizenship, Refugees, Border Security, and

found at 8 U.S.C. §§ 1101 et seq.), which provides a complex set of rules for immigration, deportation and enforcement.  Strictly reserving power to regulate immigration for the federal government, Congress reserved execution of these comprehensive guidelines for federal authorities trained in the policies and procedures of enforcement.  U.S. Const., Art. 1, § 8, cl. 3, 4.  HB 87 blurs the line between the roles of federal and state governments and impermissibly grants local law enforcement with immigration enforcement duties—duties that they are not trained or equipped to handle.

The risk of racial profiling dramatically increases when local agencies are tasked with enforcing immigration laws.  The International Association of Chiefs of Police asserts that state and local police typically lack the training or knowledge to properly enforce complex federal immigration laws:

> Addressing immigration violations such as illegal entry or remaining in the country without legal sanction would require specialized knowledge of the suspect's status and visa history and the complex civil and criminal aspects of the federal immigration law and their administration.  This is different from identifying someone suspected of the type of criminal behavior that local officers are trained to detect.  Whether or not a person is in fact remaining in the country in violation of federal civil regulations or criminal provisions is a determination best left to these agencies and the courts designed specifically to apply these laws and make such determinations after

International Law of the H. Comm. on the Judiciary, 111th Cong. 77-78 (2009) ("Public Safety Hearing") (statement of David A. Harris, Professor of Law, University of Pittsburgh School of Law) (comparing complexity of immigration laws to that of U.S. tax code).

9

appropriate hearings and procedures. Without adequate training, local patrol officers are not in the best position to make these complex legal determinations.[13]

The Major Cities Chiefs'[14] ("M.C.C.") Immigration Committee further explains that "immigration violations are different from the typical criminal offenses that patrol officers face everyday on their local beats . . . [T]he specific immigration status of any particular person can vary greatly and whether they are in violation of the complex federal immigration regulations would be very difficult if not almost impossible for the average patrol officer to determine."[15]

State and local law enforcement efforts are impacted greatly by immigration reform that requires police officers to detain and question individuals in regards to their immigration status. Salt Lake City Police Chief Chris Burbank has remarked on how HB 497, a recently passed Utah immigration reform similar to HB 87, affects state and local enforcement efforts.

> By increasing our role in civil immigration action, state and local law enforcement is placed in the untenable position of potentially engaging in unconstitutional racial profiling, while attempting to maintain trust within the communities we protect. . . . Officers are forced to detain and question individuals for looking or speaking differently from the majority, not for their

[13] Enforcing Immigration Law: The Role of State, Tribal, and Local Law Enforcement, International Assoc. of Chiefs of Police, Nov. 30, 2004, available at http://www.theiacp.org/Portals/0/pdfs/Publications/ImmigrationEnforcementconf.pdf.
[14] The M.C.C. is a professional association of Chiefs and Sheriffs representing the largest cities in the United States and Canada. See M.C.C. homepage, available at http://www.majorcitieschiefs.org/
[15] M.C.C. Position Statement. The M.C.C. also noted the complexity of federal immigration laws combined with the lack of local authority and state law limitations of authority render federal agencies the most equipped to tackle immigration enforcement.

10

criminal behavior.  How is a police officer to determine status without detaining and questioning anyone who speaks, looks or acts as if they might be from another nation?[2]

A study by The Chief Justice Earl Warren Institute on Race, Ethnicity & Diversity noted that "[w]hen officers use race as an indicator of illegal immigration status, it is virtually inevitable that Hispanic U.S. citizens and lawful residents will be funneled through this vetting process."[16]  Examining arrest data in Irving, Texas, the study compared arrests for petty offenses before and after the city's collaboration with the Criminal Alien Program ("CAP"), a federal- local immigrant investigation and detention program.[17]  The data revealed that discretionary arrests of Hispanics for Class-C petty misdemeanors rose dramatically (and in significantly higher numbers than for Whites and African-Americans) once CAP was implemented.  The data marked compelling evidence that CAP indirectly encouraged local police to arrest Hispanics for petty offenses in order to purge undocumented immigrants from the city—the more arrests made led to a bigger the pool of detainees, which ensured that more

---

[2] Associated Press, Salt Lake Police Chief Chris Burbank to Congress:  Some Utah legislatures push racist agenda, DESERET NEWS, June 18, 2010.

[16] Trevor Gardner II & Aarti Kohli, The C.A.P. Effect: Racial Profiling In The Ice Criminal Alien Program, The Chief Justice Earl Warren Institute on Race, Ethnicity and Diversity, UC Berkeley School of Law, (Sept. 2009).

[17] State immigration enforcement regimes such as HB 497 should be distinguished from formal federal-local partnerships for immigration enforcement like CAP

undocumented immigrants would be removed from the city via CAP's screening system.

**3. Enforcement of HB 87 will disproportionately affect communities of color.**

Not only does the law encourage pre-textual grounds to stop individuals and investigate their status, but it will also increase negative scrutiny of certain communities of color.[18] Since Georgia's communities of color comprise a substantial portion of the state's population, many people will face inevitable scrutiny.  According to the U.S. Census Bureau, nearly 40.3 percent of Georgia's 9.7 million people define their race as something other than Caucasian.[19]  Of this, 8.8 percent define themselves as Hispanic or of Latino origin; 3.2 percent as Asian; 30.5 percent as African American; 0.3 percent as American Indian or Alaska Native; and 0.1 percent as Native Hawaiian or Pacific Islander.[20]  Overall Georgia's foreign-born population is also increasing. Approximately one in 11 Georgia Residents are foreign-born.[21]

---

[18] See Huyen Pham, The Inherent Flaws in the Inherent Authority Position:  Why Inviting Local Enforcement of Immigration Laws Violates the Constitution, 31 FLA. ST. U. L. REV. 965 at 997-
 998 (2004) ("this lack of training, coupled with lack of hands-on enforcement experience, may tempt local authorities to rely on racial profiling . . . And to the extent that there exists anti-immigrant sentiments within a community . . . these sentiments may more likely be expressed by local authorities who live within those communities, rather than outside federal authorities").
[19] U.S. Census Bureau, State and County QuickFacts, available at http://quickfacts.census.gov/qfd/states/13000.html.
[20] Id.
[21] Id.

The likelihood of error in attempting to enforce the law with HB 87's documentation requirements will inevitably be higher for minority communities. The Brennan Center Survey revealed that millions of American citizens do not have government-issued identification, and minority citizens are less likely to have photo identification.[22]  More than 25 percent of African Americans and 16 percent of Hispanics lack current government-issued photo identification, compared to only eight percent of Caucasians. Id.  More than 32 million women do not have citizenship documents that reflect their current name.  Id.

Moreover, many people affected by HB 87 will be U.S. citizens.[23] Approximately 70 percent of immigrants in the United States are legal permanent residents or U.S. citizens.[24]  Of the remaining 30 percent, many have some form of lawful status.[25]  However, since there is no national database of citizens available to quickly verify status, these groups will face

---

[22] The Brennan Center for Justice, Citizens Without Proof:  A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification 2 (Nov. 2006), available at http://www.brennancenter.org/page/-/d/download_file_39242.pdf

[23] For example, in 2008, 32 percent of immigrants in Utah were naturalized citizens and eligible to vote.  Id

[24] Nancy Morawetz & Alina Das, Legal Issues in Local Police Enforcement of Federal Immigration Law, paper presented at the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21, 2008.

[25] Id.

prolonged detention and investigation if stopped without proper identification.[26]

## B. HB 87 Threatens Public Safety in Georgia

The threat and likely occurrence of discriminatory police treatment will erode the already fragile trust of law enforcement by the community it is working to protect. HB 87 will instill fear and mistrust in Georgia's communities of color and drastically chill the reporting of crime and cooperation in criminal investigations by minorities. A number of detrimental effects will likely occur because immigrants and persons of color will avoid the police out of fear that any interaction could lead to immigration status inquiries: (1) Georgia law enforcement officers will not get the critical assistance they need to prosecute crimes because of the erosion of trust between them and the community; (2) crimes will go unpunished because immigrant victims or witnesses will refuse to report the crime to police; (3) immigrant victims or witnesses will refuse to testify in criminal trials or participate in criminal investigations; and (4) crime rates against immigrants will rise, especially for hate crimes and domestic violence.

---

[26] See Anita Khashu, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, 2009 at 28 (Mary Malina ed., 2009) ("Police Foundation Report"), available at http://www.policefoundation.org/pdf/strikingabalance/Narrative.pdf.

14

## 1. Enforcement of HB 87 will erode trust between communities of color and law enforcement.

HB 87 fundamentally changes the primary role and operations of local law enforcement and amounts to a mandatory immigration status check for all officers in the field.  Hubert Williams, President of Police Foundation—a non-partisan organization established to improve policing in the United States—testified before Congress:

> The reluctance of local police to enforce federal immigration law grows out of the difficulty of balancing federal and local interests in ways that do not diminish the ability of the police to maintain their core mission of maintaining public safety, which depends on the public trust.  In communities where people fear the police, very little information is shared with officers, undermining the police capacity for crime control and quality services delivery.  As a result, these areas become breeding grounds for drug trafficking, human smuggling, terrorist activity, and other serious crimes.  As a police chief in one of our focus groups asked, "How do you police a community that will not talk to you?"[27]

Law enforcement agencies have recognized how critical it is to have the community's trust.[28]  Many police departments have adopted "community-based policing," requiring police to interact with members of the community to

---

[27] Public Safety Hearing, at 81-82 (statement of Hubert Williams, President, Police Foundation) (recommending that local law enforcement not engage in immigration enforcement activities that directly involve the public, such as requesting documentation in connection with traffic stops).
[28] See Jack McDevitt et al., Ne. Univ. Institute on Race & Justice, COPS Evaluation Brief No. 1: Promoting Cooperative Strategies to Reduce Racial Profiling 21 (2008) ("Being viewed as fair and just is critical to successful policing in a democracy.").

forge mutual trust[29] and engaging communities in a working partnership to reduce crime and promote public safety.  Id.  To encourage cooperation between police and the public, some localities have adopted policies similar to the Los Angeles Police Department's Special Order No. 40, which prohibits police officers from "initiat[ing] police action with the objective of discovering the alien status of a person."[30]

While community-based policing fosters—and relies upon—trust between the community and local police, HB 87 will ensure precisely the opposite.  The concern that community trust will decline if local officials enforce immigration laws is not merely theoretical. A 2009 report concluded that a Virginia police department's enforcement of immigration laws caused a 15-percent decrease in the level of trust in government among Hispanics in the community, and a two-point drop (on a ten-point scale) in their quality of life.[31] A statewide survey of California community groups found that ninety-five percent of respondents reported a negative impact on their community after U.S. Immigration and

---

[29] Police Foundation Report, at 24.

[30] L.A. Police Dep't, LAPD Manual Vol. 4 § 264.50, available at http://www.lapdonline.org/lapd_manual/volume_4.htm#264.50 (last visited May 9, 2011); see also L.A. Police Dep't, Chief of Police Special Order No. 40 (Nov. 27, 1979) (adopting policy located in LAPD Manual at Vol. 4 § 264.50 because "effective law enforcement depends on a high degree of cooperation between the Department and the public is serves"), available at http://www.lapdonline.org/get_informed/pdf_view/44798.

[31] Thomas M. Guterbock et al., Evaluation Study of Prince William County Illegal Immigration Enforcement Policy, at xi, 76-78 (2009), available at http://www.pwcgov.org/docLibrary/PDF/10636.pdf.

Customs Enforcement ("ICE") collaborated with local police to enforce immigration laws.[32]  Those respondents reported that their relationship with local police had been "very good" before ICE collaboration and that the relationship deteriorated to "very poor" since ICE collaboration.  Id.

Other studies yield similar results.  With data derived from nationwide focus groups, the Police Foundation found that a majority of respondents thought that aggressive enforcement of immigration laws would negatively impact community relationships.[33] Another report found that law enforcement officers expected that with the passage of bills such as Arizona's SB 1070, there would be decreased respect and trust from the communities they serve.44 When the community loses faith in its protectors, the communication and trust necessary for optimally effective local law enforcement is obstructed.  And as immigration

---

[32] "We're Not Feeling Any Safer":  Survey Results Show Negative Impacts from ICE Involvement with Local Police, California Immigrant Policy Center, University of California, Berkeley Law (Summer 2010), available at http://caimmigrant.org/document.html?id=322/. One type of ICE collaboration with local police is known as Secure Communities.  See, e.g., Secure Communities, U.S. Immigration and Customs Enforcement, http://www.ice.gov/secure_communities/ (last visited May 19, 2011).  Under this program, ICE conducts an immigration check along with the U.S. Department of Homeland Security and the Department of Justice to identify aliens who are arrested for a crime and booked into local law enforcement custody.  Id.

[33] See Police Foundation Report at 24.  Specifically, community relationships would be eroded by decreasing community trust of the police (74 percent), trust between community residents (70 percent), and reporting of both crime victimization (85 percent) and criminal activity (83 percent).  Compounding these concerns was a belief that aggressive enforcement of immigration laws would weaken public trust initiatives (77 percent), community-policing efforts (77 percent), youth outreach (74 percent), intelligence/information gathering (63 percent), criminal investigations (67 percent), and even recruitment (31 percent), thereby impacting operations significantly.

enforcement becomes more aggressive, the community is less likely to cooperate with police.

**2. HB87 will produce a chilling effect on the reporting of crime and cooperation in police investigations, jeopardizing the public safety of all Georgians.**

The American Bar Association has reported that: "[l]ocal police and prosecutors should be prepared for the predictable reduction in reporting of serious crimes if law enforcement officers choose to expand their duties to include the policing of immigration matters."[34]  Because its provisions target communities of color, HB 87 will thwart the willingness of Georgians to report and cooperate in the investigation of crimes.

Craig Ferrell, the Deputy Director and Administration General Counsel at the Houston Police Department, details the chilling effects laws like HB 87 would have on immigrant cooperation:

> Local police agencies depend on the cooperation of immigrants, legal and illegal, in solving all sorts of crimes and in the maintenance of public order.  Without assurances that they will not be subject to an immigration investigation and possible deportation, many immigrants with critical information would not come forward,

---

[34] Gail Pendleton, Local Police Enforcement of Immigration Laws and its Effects on Victims of Domestic Violence, Domestic Violence and Immigration in the Criminal Justice System, ABA Commission on Domestic Violence ("ABA Domestic Violence Report"), at 3, available at http://www.mcadsv.org/webinars/IR-2007-April/VI/BI%20Law%20Enforcement%20CJS.pdf.

18

even when heinous crimes are committed against them or their families.[35]

Racial and ethnic minority victims may well feel compelled to let a particular incident go unreported rather than potentially expose themselves to interrogation and possible detention while their own immigration status is investigated—a process that takes more than an hour on average.[36] This reluctance is even greater for individuals who are undocumented.  Fear of reporting crimes and cooperating with police investigations has been prevalent among the undocumented, which often makes them vulnerable to crimes.[37]

Reluctance to cooperate with law enforcement is also inevitable for the significant number of people who may themselves have legal status but who may live with relatives or friends who do not.[38] For those who fear that they or a loved one will be deported, reporting a crime or providing witness information to

---

[35] Craig E. Ferrell Jr., Immigration Enforcement: Is It a Local Issue?, The Police Chief: The Professional Voice of Law Enforcement (Feb. 2004), available at http://www.lwvil.org/downloadimm/lwvil_immigration_study_second_packet_police_chief_magazine.pdf.

[36] See Police Foundation Report at 23

[37] 50  See, e.g., Nat'l Network for Immigrant & Refugee Rights, Over-Raided, Under Siege: U.S. Immigration Laws and Enforcement Destroy the Rights of Immigrants 36 (2008), http://www.nnirr.org/resources/docs/UnderSiege_web2.pdf (noting that many crimes committed against immigrants go unreported because immigrants fear deportation if they report any incident to the police); S. Poverty Law Ctr., Under Siege Life for Low-Income Latinos in the South 6 (Apr. 2009), available at http://www.splcenter.org/sites/default/files/downloads/UnderSiege.pdf (noting that 41 percent of migrant workers in survey reported wage theft).

[38] The Police Foundation Report notes that 85 percent of families are mixed-status families—families with a combination of citizens, undocumented immigrants, and documented immigrants. Police Foundation Report at 24.

law enforcement officials may be too great a risk to take.[39]  Because many

families with undocumented family members also include legal immigrant

members, this would drive a potential wedge between police and huge portions

of the legal immigrant population as well.[40]  This ripple effect will facilitate HB

87's widespread consequences of chilling reporting of crime and eroding the

trust between law enforcement and the community.

English language learners are particularly reluctant to cooperate in such

instances, given the language barriers that already hinder their ability to

communicate with government officials.[41]  Not only may English language

learners hesitate to contact officials because of their limited English proficiency,

---

[39] The Police Foundation Report describes a recent Pew Hispanic survey, which found that the majority of Latinos in the United States worry about deportation of themselves, a family member, or a close relative.  Police Foundation Report at 24

[40] Craig E. Ferrell Jr., Immigration Enforcement: Is It a Local Issue?, The Police Chief: The Professional Voice of Law Enforcement (Feb. 2004), available at http://www.lwvil.org/downloadimm/lwvil_immigration_study_second_packet_police_chief_mag azine.pdf.

[41] See Susan Shah, Insha Rahman, and Anita Khashu, Overcoming Language Barriers: Solutions for Law Enforcement (Vera Institute of Justice, 2007) at 4, available at: http://www.justice.gov/crt/lep/resources/vera_translating_justice_final.pdf ("The obstacles associated with language barriers are often complicated by the fact that many [limited English proficient] persons fear the police and go to great lengths to avoid contact with them. Especially in a political environment where immigrants' legal status is a prominent issue of national debate, more and more immigrants—particularly those who do not speak fluent English—are staying away from public services and government institutions. As community members often explain, 'Even with immigrants who are here legally, they are suspicious of and fear the police.'")

but they are also likely to avoid government contact due to unfamiliarity with U.S. laws.[42]

Finally, HB 87 presents a particularly profound risk for domestic violence victims. "If police are seen as [federal immigration agents] in the eyes of the community, many battered immigrants will be reluctant to call the police and take the initial steps necessary to become independent of the abuser out of fear of being asked about her immigration status."[43]  According to an advocate at the St. Paul Domestic Abuse Intervention Project, local police involvement in immigration matters increases fear in "already vulnerable communities: 'Most immigrants in battered women shelters are too afraid to call police, even if they have been badly assaulted by their partner.'"[44]

---

[42] Jones Moy and Brent Archibald, Reaching English as a Second Language Communities: Talking with the Police, The Police Chief Magazine (Vol. 72, No. 6, June 2005), available at http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display_arch&article_id=614&issue_id=62005 ("The [Monterey Park Police] Department observed numerous misunderstandings in the basics: recognizing law enforcement officers (some residents do not know the difference between police officers, security guards, and firemen), using the emergency 911 system, responding to a traffic stop (some people stop right in the middle of the road rather than pull to the curb, whereas others refuse to sign the traffic citation). Response to domestic calls are often complicated by the families' limited English and even more so by their lack of understanding of American laws and legal ramifications of domestic violence.")

[43] ABA Domestic Violence Report at 1.

[44] 57 Portrait of Injustice: the Impact of Raids on Families, Workers and Communities, Report from the National INS Raids Task Force of the National Network for Immigrants and Refugee Rights, at 33 (1997).

21

**3. HB 87 will also chill cooperation in court cases and criminal investigations.**

Similarly, HB 87 may chill cooperation in a court cases or criminal investigations. "In the courtroom . . . minority victims and witnesses may be less willing to testify, and jurors may engage in nullification when they perceive that charges were unjustly brought against a minority defendant, regardless of the weight of the evidence."[45]  If targeted groups view law enforcement as discriminating against them, they will doubt the justice system's ability to function fairly— destroying "the ideal that holds us together as a nation: equal justice under the law."[46]  In one example, a Midwestern police chief recalled an incident where an unauthorized immigrant was a witness to a crime and agreed to testify in a criminal case.[47]  The witness's name was put on the witness list in preparation for trial.  Defense attorneys then discovered that the witness was undocumented.  A few days after the witness testified in the case, ICE arrested him and initiated deportation proceedings.  Word of the incident spread in the community, and, as a result, police have had difficulty securing cooperation of other immigrant witnesses.  Id.

---

[45] Anthony E. Mucchetti, Driving While Brown: A Proposal for Ending Racial Profiling in Emerging Latino Communities, 8 Harv. Latino L. Rev. 1, 22 (2005).
[46] David A. Harris, The Stories, the Statistics, and the Law: Why "Driving While Black" Matters, 84 Minn. L. Rev. 265, 326 (1999).
[47] See Police Foundation Report at 23.

**4. HB 87 will particularly undermine community safety by increasing minorities' vulnerability to hate crimes.**

Members of minority communities (including communities defined by color, faith, sexual orientation, gender, and national origin) are the disproportionate victims of hate crimes.[48]  They are also the most likely to bear the brunt of HB 87 enforcement.  If HB 87 takes effect, victims of hate crimes will likely feel less comfortable reporting crimes to law enforcement.[49]

Those who are most intimidated by the new law enforcement regime will be among those most in need of government protection against crimes of hate.  The Federal Bureau of Justice estimates that only 44 percent of hate crimes are reported to the police.[50]  One explanation for the significant underreporting of hate crimes may be similar to the reason that undocumented immigrants may underreport crimes: victims fear that calling attention to the crime will lead to further targeting, whether by the perpetrator or by the

---

[48] For example, one northeastern city police chief stated: "They [undocumented immigrants] refer to themselves as walking ATMs because everybody knows that they don't have documentation enough to get bank accounts, checking accounts, and those kinds of things, and that their savings and whatever they have is on their person, not anywhere else.  First of all, they live in an apartment with eight other people, so you can't leave it behind.  They carry it with them and the people who seek to victimize them take advantage of that."  Police Foundation Report at 25.

[49] See generally ABA Domestic Violence Report.

[50] Caroline Wolf Harlow, Bureau of Justice Statistics, Hate Crime Reported by Victims and Police 4 (Nov. 2005), available at http://bjs.ojp.usdoj.gov/content/pub/pdf/hcrvp.pdf.

23

police.[51]   Moreover, the level of vitriol around immigration issues has recently increased: in only two years the number of what the Southern Poverty Law Center terms "nativist extremist" groups"[52]—organizations that go beyond mere advocacy of restrictive immigration policy to actually confronting or harassing suspected immigrants,"[53]—more than doubled, from 144 groups in 2007 to 309 groups in 2009.[54]   In such a climate, all minority groups need to be able to trust in law enforcement to ensure their safety and maintain the well-being of their communities.[55]   HB 87 guarantees precisely the opposite and, as a result, will lead to increased hate crimes.

---

[51] Police Foundation Report at 23.

[52] A listing of nativist extremist groups in Georgia can be found at S. Poverty Law Ctr., Nativist Extremist Groups 2010, http://www.splcenter.org/get-informed/intelligence-report/browse-all-issues/2011/spring/the-year-in-nativism/nativist-extremists

[53] S. Poverty Law Ctr., New SPLC Report: "Patriot" Groups, Militias Surge in Number in the Past Year, Mar. 2, 2010, http://www.splcenter.org/get-informed/news/splc-report-number-of- patriot-groups-militias-surges-by-244-in-past-year (defining "nativist extremist").

[54] Heidi Beirich, S. Poverty Law Ctr., The Year in Nativism, Intelligence Report, Spring 2010, available at http://www.splcenter.org/get-informed/intelligence-report/browse-all-issues/2010/spring/the-year-in-nativism.

[55] The danger of the underreporting of hate crimes exists for all minorities, not just ethnic minorities, who may feel that law enforcement is not interested in advancing or maintaining the well-being of their communities.  For instance, law enforcement organizations have recognized that lesbian, gay, bisexual and transgender ("LGBT") communities are often reluctant to report hate crimes to officials perceived as unsympathetic.  King County Dep't of Pub. Health, Safety and Hate Crimes, Oct. 7, 2008, http://www.kingcounty.gov/healthservices/health/personal/glbt/HateCrime.aspx ("Minority groups, including [LGBT] communities, have historically had strained relations with law enforcement and fear that crimes against them will not be taken seriously or that the police reaction will be unsympathetic or hostile.").  Additionally, one study has found that LGBT undocumented immigrants are often doubly deterred from seeking justice after being victims of anti-LGBT discrimination or crime for fear of arrest or deportation, causing injustices to go unheeded and encouraging further wrongdoing.  See Jon Davidson & Francisco Dueñas,

24

## CONCLUSION

For the foregoing reasons, the Georgia Association of Latino Elected Officials request that this Court grant the Plaintiffs' motion for preliminary injunction to bar the enforcement of Georgia's Illegal Immigration Reform and Enforcement Act of 2011. Public interest requires that HB 87 be enjoined because it is incapable of being executed in an impartial and constitutional manner.

---

Arizona Law Hurts Us All, Advocate, May 5, 2010, available at http://advocate.com/Politics/Commentary/Lambda_Legal_Arizona_Law_Hurts_Us_All/ (while Arizona's SB 1070 is different from Georgia's HB 87, the two laws are similar and this article is instructive).

RESPECTFULLY SUBMMITTED THIS

DATED:  16th day of June, 2011                    ROHAN LAW, PC


*Douglas Rohan*
DOUGLAS B. ROHAN
GA BAR # 613515

Attorney for Amicus Curiae
GEORGIA ASSOCIATION OF LATINO
ELECTEDOFFICIALS

26