**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| Georgia Latino Alliance for Human Rights, *et al.*, | ) ) ) ) |  |
| Plaintiffs, | ) ) ) | Case No. 1:11-cv-1804-TWT |
| v. | ) ) |  |
| Governor Nathan Deal, *et al.*, | ) ) ) |  |
| Defendants. | ) ) ) |  |

***AMICUS CURIAE* BRIEF SUBMITTED BY THE SOUTHERN CENTER
FOR HUMAN RIGHTS AND OTHER AMICUS CURIAE**

*Amicae* file this brief in support of Plaintiffs' motion for preliminary

injunction. The Statements of Interest of *amicae* are attached hereto as Exhibit A.

If allowed to take effect, Georgia's Illegal Immigration Reform and

Enforcement Act of 2011 ("HB 87") will sanction Georgia's subversion of federal

law and create its own brand of immigration law, running afoul of the United

States Constitution. The conflict between Georgia law and federal law and policy

is clear. As President Barack Obama stated earlier this year, "We can't have 50

1

different immigration laws around the country.  Arizona tried this, and a federal court already struck them down."[1]

Immigration is a federal policy issue between the United States government and other countries and falls solely under the federal government's jurisdiction pursuant to our Constitution.[2]  The passage of HB 87 directly contradicts this constitutional mandate by giving local law enforcement agencies the right to question and arrest people for perceived immigration violations, as well as creating new classes of state immigration crimes for persons who interact with undocumented individuals.

HB 87's nickname as the "show me your papers" law accurately describes the substance of the law: it compels all people within Georgia—residents, visitors, and tourists alike—to carry identification papers at all times to prove their American citizenship or immigration status.  Without papers, a person risks extensive investigation and protracted detention until her status is verified.  HB 87 allows police to demand immigration identification documents from anyone the police have probable cause to suspect has committed any criminal violation.  If satisfactory identification documents are not immediately produced, she is subject

---

[1] Jeremy Redmon, *Law Opens Door to Court Challenges*, Atlanta J.-Const., May 14, 2011, at 1A.

[2] U.S. Const. art. I, § 8, cl. 3 (the Commerce Clause), art. I, § 8, cl. 4 (the Naturalization Clause), art. I, § 9, cl. 1 (the Migration and Importation Clause), art. I, § 8, cl. 11 (the War Powers Clause).

to a prolonged stop and interrogation as to her legal status wholly apart from normal rules of criminal procedure and release from detention.  HB 87 threatens the civil rights of all persons in Georgia.  HB 87 also contradicts the legacy of the civil rights movement in the South and Georgia.

This Amicus Brief highlights the adverse effects that enforcement of HB 87 will inevitably have, including: (1) the further increase of overcrowding in Georgia's jails and prisons; (2) encouragement of racial profiling and a disparate impact on communities of color; (3) erosion of public safety in Georgia for everyone; and (4) a dramatic step back in Georgia's long march toward civil rights for all.

For these reasons, this Court should grant a preliminary injunction and bar enforcement of those provisions of HB 87 addressed in Plaintiffs' motion.

## ARGUMENT

**A.    HB 87 Will Increase Overcrowding in Georgia's State Prisons and Jails.**

Of all the states in the Nation, Georgia has the highest percentage of residents under correctional control, with one in thirteen individuals involved in the criminal justice system.[3]  The state ranks fourth in incarceration rates, locking

---

[3] The Pew Center on the States, *One in 31: The Long Reach of American Corrections* 45 (2009), *available at* http://www.pewcenteronthestates.org/ uploadedFiles/PSPP_1in31_report_FINAL_WEB_3-26-09.pdf.

up one in every seventy people.[4]   Yet, Georgia's prison and jail population continues to grow, which has led to persistent overcrowding in detention facilities across the state.[5]

Overcrowding, as the Supreme Court recently observed in *Brown v. Plata*, "creates unsafe and unsanitary living conditions that hamper effective delivery of medical and mental health care. . . . [and]  promote[s] unrest and violence, making it difficult for prison officials to monitor and control the prison population."[6]   Human Rights Watch has reported on overcrowding in Georgia, explaining that detainees report sleeping on the floor and being confined in cells built for half the number of people assigned to them.[7]

HB 87 will exacerbate the problems posed by overcrowded jails and prisons. Although HB 87 provides that individuals detained under Section 8 may be

---

[4] *Id.* at 43.

[5] The Pew Center on the States, *Prison Count 2010: State Population Declines for the First Time in 38 Years* 1–2 (2010), *available at* http://www. pewcenteronthestates.org/uploadedFiles/Prison_Count_2010.pdf?n=880. Overcrowding in Fulton County Jail alone has prompted at least three class action lawsuits alleging constitutional violations in the past two decades.  The resulting costs of a high rate of incarceration recently led Governor Nathan Deal to establish the 2011 Special Council on Criminal Justice Reform. *See* HB 265.

[6] 131 S. Ct. 1910, 1933 (2011).  *See also* Susanna Y. Chung, Note, *Prison Overcrowding: Standards in Determining Eighth Amendment Violations*, 68 Fordham L. Rev. 2351, 2353 (2000) ("Prison overcrowding has . . . resulted in . . . deleterious physical conditions, inadequate sanitation, and decreased availability of basic necessities such as staff supervision and medical services.")

[7] Human Rights Watch, *Undue Punishment: Abuses Against Prisoners in Georgia* 20 (2006).  One Georgia prison, for example, was holding 3,559 prisoners in a facility built for 1,800 men.  *Id.*

transported to an authorized federal facility,[8] Immigration and Customs Enforcement ("ICE") officials state that space in Georgia detention centers is severely limited. The Atlanta Field Office Director for ICE Enforcement and Removal Operations, Felicia Skinner, said that there are only about 3,000 beds available in detention centers in the entire state: "It is not possible for us to go out and arrest all [undocumented immigrants] or to detain all of them."[9] As Sandy Springs Police Chief Terry Sult has noted of suspected undocumented immigrants, "Unless [federal officials] are willing to take them, we don't have the authority to do anything with them."[10]

Generally, a person held in a jail solely on an immigration detainer must be released within 48 hours, if the detainee is not picked up by ICE.[11] However, HB 87 makes no provision for the release of an individual detained solely because of immigration status if local authorities cannot transfer custody to ICE officials.[12] An increasing population of individuals held in jail on immigration detainers, with no provision detailing how they will be released from state or local detention facilities, will pose an additional administrative burden on jail administrators and

---

[8] O.C.G.A. § 17-5-100(e).
[9] Jeremy Redmon, *Illegal Immigration: Impact of Law Subject to Feds*, Atlanta J.-Const., May 18, 2011, at 1A.
[10] *Id.* at 1A.
[11] 8 C.F.R. § 287.7.
[12] *See* O.C.G.A. § 17-5-100(e).

may lead to illegal detention.  HB 87's creation of new crimes will also likely entangle greater numbers of people in Georgia's criminal justice system.

**B.    HB 87 Will Encourage Racial Profiling.**

**1.    HB 87 cannot be enforced in a race-neutral fashion.**

The Supreme Court has held that reasonable suspicion should not be based on "irrelevant personal characteristics such as race."[13]  HB 87 directly violates this fundamental constitutional rule.

HB 87 invites law enforcement to target people based on race, ethnicity, and other disparate factors due to assumptions that members of certain minority groups are more likely to be unlawfully present in the United States and/or to engage in illegal behavior.  The statute's arguably facially neutral language fails to adequately mitigate this harm.[14]

Section 8 allows officers to demand that any individual subject to "an investigation" produce one of five specified types of documents.[15]  If an individual cannot produce one of the listed documents, Section 8 allows the person to provide

---

[13] *United States v. Sokolow*, 490 U.S. 1, 12 (1989).

[14] *See* O.C.G.A. §§ 17-5-100(b)–(d).

[15] The five types of documents enumerated in Section 8 are: (1) a "secure and verifiable document" as defined by Section 19 of HB 87; (2) a valid Georgia driver's license; (3) a valid Georgia identification card; (4) a driver's license from a state or United States district that requires proof of legal presence, or a valid identification card issued by the federal government; or (5) a valid driver's license issued to a nonresident by his home state or country accompanied by proof of citizenship or legal residency.  *Id.* §§ 17-5-100(b)(1)–(5).

6

other information "sufficient to allow the peace officer to independently identify the suspect,"[16] but does not give officers guidance as to what information is sufficient and invites race-based criteria.

If an officer has probable cause to believe that a person has committed any crime, and if that individual cannot produce the required documents, Section 8 empowers officers broadly "to use any reasonable means available to determine the immigration status of the suspect."[17]  In the officer's uncabined discretion, a stop can be substantially prolonged, even for violations such as speeding, jaywalking, and littering.  Moreover, state and local law enforcement officers are left to decide what "reasonable means" may be employed and what types of information are sufficient to assess immigration status under <u>federal</u> laws unfamiliar to them.

As a practical matter, the law opens the door to selective enforcement against people who look or sound "foreign."[18]  Many people, particularly those of color, will face further investigation and detention during routine encounters with

---

[16] *Id.*; § 17-5-100(b)(6).

[17] *Id.*; § 17-5-100(c).

[18] *See*  Kevin R. Johnson, *Some Thoughts on the Future of Latino Legal Scholarship*, 2 Harv. Latino L. Rev. 101, 117–29 (1997); Keith Aoki, *"Foreign-ness" & Asian American Identities: Yellowface, World War II Propaganda, and Bifurcated Racial Stereotypes*, 4 Asian Pac. Am. L. J. 1, 9–13 (1996) (analyzing legal significance of treatment of person of Asian ancestry as "foreigners"); Charles J. Ogletree, Jr., *America's Schizophrenic Immigration Policy: Race, Class, and Reason*, 41 B.C. L. Rev. 755, 756–57 (2000) (discussing the role of race in the U.S. immigration policy toward Haiti in the 1990s).  *Cf. Orhorhaghe v. INS*, 38 F.3d 488, 492 (9th Cir. 1994) (ruling "Nigerian-sounding name" was insufficient to justify immigration stop).

law enforcement officials.[19]  Although HB 87 contains a provision that directs law enforcement not to take race, color, or national origin into account, the lack of standards to guide enforcement will certainly result in exactly the kind of discriminatory impact the law purports to forbid.

Many lawful residents, visitors, and immigrants will be unable to provide one of the requisite forms of identification to avoid investigation and detention.  A national survey sponsored by the Brennan Center for Justice revealed that millions of Americans do not have documentary proof of citizenship that falls under one of these categories readily available.[20]  Faced with many who may not be able to produce permissible documents, local officers will be forced to become

---

[19] *See* Carrie Arnold, *Racial Profiling in Immigration Enforcement: State and Local Agreements to Enforce Federal Immigration Law*, 49 Ariz. L. Rev. 113, 134–35 (2007) (describing the problem with providing officers unguided authority to enforce immigration will transform "every traffic stop [] [into] an immigration-papers stop, leading to potential civil rights violations against members of ethnic groups") (citing D.L. Hawley, *The Powers of Local Law Enforcement to Enforce Immigration Laws*, 99-06 Immigr. Briefings 1, 13 (June 1999)); Kevin R. Johnson, *Essay: How Racial Profiling in America Became the Law of the Land:* United States v. Brignoni-Ponce *and* Whren v. United States *and the Need for Truly Rebellious Lawyering*, 98 Geo. L.J. 1005, 1039 (April 2010) ("The authorization to rely on race, combined with much discretion, has resulted in even greater abuses of racial minorities in immigration enforcement than ordinary law enforcement.").

[20] Brennan Center for Justice, *Citizens Without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification*, at 2 (Nov. 2006), *available at* http://www.brennancenter.org/page/-/d/download_file_39242.pdf.  Approximately 13 million American citizens do not have ready access to citizenship documents, and about 21 million American have no valid government-issued photo identification.  *Id.*

"immigration police," but will lack the tools or training to perform that task. The very lack of standards invites discrimination based on skin color, accent, or race.

Moreover, many people affected by HB 87 will be American citizens.[21] For example, in 2009, 34.5 percent of immigrants in Georgia were naturalized citizens eligible to vote.[22] These groups will face prolonged detention and investigation if stopped without proper identification.[23]

**2.     Local law enforcement officials are unequipped to enforce HB 87.**

One cannot readily ascertain a person's lawful presence in the United States from external characteristics. Instead, this assessment requires a comprehensive evaluation of numerous factors, including complex federal laws, regulations, and procedures.[24] Congress enacted the Immigration and Nationality Act[25], which

---

[21] Nationally, about 70 percent of immigrants are legal permanent residents or American citizens. Nancy Morawetz & Alina Das, *Legal Issues in Local Police Enforcement of Federal Immigration Law*, paper presented at the Police Foundation Conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, Aug. 21, 2008.

[22] U.S. Census Bureau, American Factfinder, Subject Table S0501, Georgia, *available at* http://factfinder.census.gov/servlet/STTable?_bm=y&-context=st&-qr_name=ACS_2009_1YR_G00_S0502&-ds_name=ACS_2009_1YR_G00_&-CONTEXT=st&-tree_id=307&-redoLog=false&-geo_id=04000US13&-format=&-_lang=en.

[23] *See* Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* 28 (Mary Malina ed., 2009), *available at* http://www.policefoundation.org/pdf/strikingabalance/Narrative.pdf [hereinafter Police Foundation Report].

[24] *See* Public Safety and Civil Rights Implications of State and Local Enforcement of Federal Immigration Laws: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties, and Subcomm. on Immigration, Citizenship,

provides a dense set of rules for immigration, deportation, and enforcement. Strictly reserving power to regulate immigration for the federal government, Congress reserved execution of these comprehensive guidelines for federal authorities trained in the policies and procedures of enforcement.   HB 87 impermissibly endows local law enforcement with federal immigration enforcement duties for which they are not trained or equipped.

The International Association of Chiefs of Police (IACP) recognizes that state and local police typically lack the training or knowledge to properly enforce complex federal immigration laws:

> Addressing immigration violations such as illegal entry or remaining in the country without legal sanction would require specialized knowledge of the suspect's status and visa history and the complex civil and criminal aspects of the federal immigration law and their administration . . . .   Whether or not a person is in fact remaining in the country in violation of federal civil regulations or criminal provisions is a determination best left to these agencies and the courts designed specifically to apply these laws and make such determinations after appropriate hearings and procedures.   Without adequate training, local patrol officers are not in the best position to make these complex legal determinations.[26]

---

Refugees, Border Security, and International Law of the H. Comm. on the Judiciary, 111th Cong. 77–78 (2009) ("Public Safety Hearing") (statement of David A Harris, Professor of Law, University of Pittsburgh School of Law) (comparing complexity of immigration laws to that of U.S. tax code).

[25] 8 U.S.C. §§ 1101 *et seq*. (2011).

[26] *Enforcing Immigration Law: The Role of State, Tribal, and Local Law Enforcement*, Int'l Assoc. of Chiefs of Police, Nov. 30, 2004, *available at* http://www.theiacp.org/Portals/0/pdfs/Publications/ImmigrationEnforcementsconf.pdf.

Many of the documents that foreign-born individuals possess to show their legal presence in the United States are complex, confusing, and entirely unfamiliar to untrained local officers.[27]

In 2008, the Georgia Association of Chiefs of Police adopted IACP's position on local law enforcement participation in immigration enforcement, and further noted that "[c]ommunity demands and pressure to do something about illegal immigration cannot justify focusing on or singling out suspected illegal immigrants.  There is a substantial difference between confronting an individual on the street because he/she appears to be an immigrant and determining the ethnicity of an arrestee post arrest in a jail or correctional setting."[28]  The Major Cities Chiefs'[29] (M.C.C.), which includes Atlanta, further explain:

> [I]mmigration violations are different from the typical criminal
> offenses that patrol officers face everyday on their local beats . . . .
> [T]he specific immigration status of any particular person can vary
> greatly and whether they are in violation of the complex federal

---

[27] Local authorities empowered to enforce immigration laws through agreements with ICE must complete a five-week training course to learn how to distinguish undocumented immigrants from refugees, people claiming asylum, legal non-immigrants, and legal immigrants; this course pales in comparison to the five months of training given to federal immigration officers. *See* Carrie L. Arnold, Note, *Racial Profiling in Immigration Enforcement: State and Local Agreements to Enforce Federal Immigration Law*, 49 Ariz. L. Rev. 113, 129 (2007).

[28] Ga. Ass'n of Chiefs of Police Ad Hoc Committee on Immigr., Immigr. Issues in Ga. 2008 (2008), *available at* http://www.gachiefs.com/pdfs/White%20Papers_ Committee%20Reports/Immigration%20Committee%20White%20Paper.pdf.

[29] The M.C.C. is a professional association of Chiefs and Sheriffs representing the largest cities in the United States and Canada.  *See* M.C.C. homepage, *available at* http://www.majorcitieschiefs.org.

immigration regulations would be very difficult if not almost impossible for the average patrol officer to determine.[30]

A study by the Chief Justice Earl Warren Institute on Race, Ethnicity & Diversity noted that "[w]hen officers use race as an indicator of illegal immigration status, it is virtually inevitable that Hispanic U.S. citizens and lawful residents will be funneled through this vetting process."[31]  A study of arrest data in Irving, Texas, which compared arrests for petty offenses before and after the city's approval of a collaboration with a federal-local immigrant investigation and detention program,[32] revealed that discretionary arrests of Latinos for Class-C petty misdemeanors rose dramatically.[33]  Local law enforcement are simply not positioned to carry out HB 87's mandates in a constitutional manner, nor is it their job to enforce federal law.

**3.    Enforcement of HB 87 will negatively impact persons of color in the community at large.**

Not only will the law encourage using pre-textual grounds to stop individuals and investigate their status, but it will also increase negative scrutiny of

---

[30] M.C.C. Position Statement.  The M.C.C. also noted that the complexity of federal immigration laws combined with the lack of local authority and state law limitations of authority render federal agencies the most equipped to tackle immigration enforcement.  *Id.*

[31] Trevor Gardner II & Aarti Kohli, *The C.A.P. Effect: Racial Profiling in the Ice Criminal Alien Program*, The Chief Justice Earl Warren Institute on Race, Ethnicity & Diversity, UC Berkeley School of Law (Sept. 2009).

[32] State immigration enforcement regimes such as HB 87 should be distinguished from formal federal-local partnerships for immigration enforcement like CAP.

[33] Gardner & Kohli, *supra* note 33.

certain communities of color.[34]   A report issued by the Consortium for Police Leadership in Equity, analyzing the causes and effects of Utah Senate Bill 81[35] similar to HB 87 found that support of the bill was "closely related to a dislike of Latino immigrants—both documented and undocumented" and that "the bill is conceptualized by civilians in terms of being pro- or anti-Latino—and not simply pro- or anti-immigration."[36]

Even prior to the passage of HB 87 and other "show me your paper" laws, the Pew Hispanic Center reported that nearly one in ten Hispanics reported being stopped and asked about their immigration status within the past year, with foreign-born and native-born Hispanics reporting equal rates.[37]   Approximately 32 percent of Hispanics surveyed reported that they, a family member, or close friend experienced racial or ethnic discrimination within the past five years.[38]

---

[34] *See* Huyen Pham, *The Inherent Flaws in the Inherent Authority Position: Why Inviting Local Enforcement of Immigration Laws Violates the Constitution*, 31 Fla. St. U. L. Rev. 965, 997–98 (2004) ("lack of training [and] lack of hands-on enforcement experience, may tempt local authorities to rely on racial profiling.").

[35] The full text of SB 81 can be found at http://le.utah.gov/~2008/bills/sbillenr/sb0081.htm.

[36] Phillip A. Goff, Liana Maris Epstein, Chief Chris Burbank & Division Chief Traci L. Keesee, *Deputizing Discrimination? Causes & Effects of Cross-Deputization Policy in Salt Lake City, Utah*, report issued by The Consortium for Police Leadership in Equity, Board of Directors, at 12.

[37] Pew Hispanic Center, Fact Sheet, *Hispanics and Arizona's New Immigration Law*, Apr. 29, 2010, *available at* http://pewhispanic.org/files/factsheets/68.pdf.

[38] *Id.*

Many persons of color will be impacted by the implementation of HB 87. More than 44 percent of Georgia's 9.69 million people define their race as something other than Caucasian.[39] Almost one in 10 Georgia residents are foreign-born.[40] More than one-third of foreign-born Georgians are naturalized citizens.[41]

**C.    HB 87 Threatens Public Safety in Georgia.**

Impacting every Georgian's public safety, the fear of discriminatory police treatment will erode the fragile trust between law enforcement and communities of color.  Crimes will go unpunished because immigrant victims or witnesses will refuse to report crime to police and/or will refuse to testify in criminal trials or participate in criminal investigations. As a result, crime rates against immigrants will rise, especially for hate crimes and domestic violence.

---

[39] U.S. Census Bureau, State and County QuickFacts, *available at* http://quickfacts.census.gov/qfd/states/13000.html.  Of this, 30.5 percent define themselves as African-American; 8.8 percent as Hispanic or of Latino origin, 3.2 percent as Asian, 0.3 as American Indian or Alaska Native; and 0.1 percent as Native Hawaiian or Pacific Islander.  *Id.*

[40] U.S. Census Bureau, *supra* note 22, at Subject Table S0501.  The census data shows that 54.6 percent of Georgia's immigrants were born in Latin America; 25 percent in Asia; 10 percent in Europe; 8.2 percent in Africa.  *Id.* at Subject Table S0502.   The total number of foreign-born residents has grown considerably, from 2.7 percent in 1990 to 9.4 percent in 2009. *Georgia: Social & Demographic Characteristics*, Migration Pol'y Inst. Data Hub, *available at* http://www. migrationinformation.org/datahub/state.cfm?ID=GA (last visited June 12, 2011).

[41] U.S. Census Bureau, *supra* note 22, at Subject Table S0501.

1.    **All of us will be more at risk because law enforcement will have lost valuable information to prosecute crime.**

Law enforcement and legal organizations are concerned about the impact on public safety.    A 2009 report by the Police Foundation—a non-partisan organization established to improve policing in the United States—states that "[i]mmigration enforcement by local police undermines their core public safety mission, diverts scarce resources, increases their exposure to liability and litigation, and exacerbates fear in communities already distrustful of police."[42]    As the President of Police Foundation testified before Congress:

> In communities where people fear the police, very little information is shared with officers, undermining the police capacity for crime control and quality services delivery.  As a result, these areas become breeding grounds for drug trafficking, human smuggling, terrorist activity, and other serious crimes.  As a police chief in one of our focus groups asked, "How do you police a community that will not talk to you?"[43]

Many police departments have adopted "community-based policing," requiring police to interact with members of the community to forge mutual trust.[44]

---

[42] Press Release, Police Foundation, *Enforcement Leaders to Discuss How Local Immigration Enforcement Challenges Public Safety Mission* (May 20, 2009), *available at* http://www.policefoundation.org/pdf/strikingRelease.pdf.

[43] Public Safety Hearing, at 81–82 (statement of Hubert Williams, President, Police Foundation) (recommending that local law enforcement not engage in immigration enforcement activities that directly involve the public, such as requesting documentation in connection with traffic stops).

[44] Police Foundation Report, at 24.

While community-based policing fosters—and relies upon—trust between the community and local police, HB 87 leads to the opposite. A statewide survey in a California community found that 95 percent of respondents reported a negative impact on their community after ICE collaborated with local police to enforce immigration laws.[45] Those respondents reported that their relationship with local police had been "very good" before ICE collaboration and that the relationship deteriorated to "very poor" since ICE collaboration.[46]

The Police Foundation found that a majority of respondents thought that aggressive enforcement of immigration laws would negatively impact community relationships.[47] Another study found that law enforcement officers expected that with the passage of bills such as Arizona's SB 1070, there would be less respect and trust from the communities they serve.[48] The Deputy Director and Administration General Counsel at the Houston Police Department detailed the chilling effects laws like HB 87 would have on immigrant cooperation:

[45] California Immigrant Policy Center, *"We're Not Feeling Any Safer": Survey Results Show Negative Impacts from ICE Involvement with Local Police*, University of California, Berkeley Law (2010), *available at* http://caimmigrant.org/ document.html?id=322.

[46] *Id.*

[47] *See* Police Foundation Report, at 24. Specifically, community relationships would be eroded by decreasing community trust of the police (74 percent), trust between community residents (70 percent), and reporting of both crime victimization (85 percent) and criminal activity (83 percent). *Id.*

[48] Phillip Atiba Goff, *et al., "Safe Because We Are Fair" How Cross-Deputization Undermines Police Officer and Community Safety,* The Consortium for Police Leadership in Equity (2010).

> Local police agencies depend on the cooperation of immigrants, legal and illegal, in solving all sorts of crimes and in the maintenance of public order.  Without assurances that they will not be subject to an immigration investigation and possible deportation, many immigrants with critical information would not come forward, even when heinous crimes are committed against them or their families.[49]

Legal groups have reached similar conclusions.  The American Bar Association reports that "[l]ocal police and prosecutors should be prepared for the predictable reduction in reporting of serious crimes if law enforcement officers choose to expand their duties to include the policing of immigration matters."[50]

As immigration enforcement becomes more aggressive, racial and ethnic minority victims may well feel compelled to let a particular incident go unreported rather than potentially expose themselves to interrogation and possible detention while their own immigration status is investigated—a process that takes more than an hour on average.[51]  This reluctance is even greater for English language learners, given the language barriers that already hinder their ability to

---

[49] Craig E. Ferrell Jr., *Immigration Enforcement: Is It a Local Issue?*, The Police Chief: The Professional Voice of Law Enforcement (Feb. 2004), *available at* http://www.lwvil.org/downloadimm/lwvil_immigration_study_second_packet_police_chief_magazine.pdf.

[50] Gail Pendleton, *Local Police Enforcement of Immigration Laws and its Effects on Victims of Domestic Violence,* Domestic Violence and Immigration in the Criminal Justice System, ABA Comm. on Domestic Violence, at 1.

[51] *See* Police Foundation Report, at 23.

17

communicate with government officials.[52]  They may also likely avoid government contact due to unfamiliarity with American laws.[53]

Reluctance to cooperate with law enforcement is also inevitable for the significant number of people who may themselves have legal status but live with relatives or friends who do not.[54]  Because many families with undocumented family members also include legal immigrant members, this would drive a potential wedge between police and portions of the legal immigrant population as well.[55]  This ripple effect will facilitate HB 87's widespread consequences of

---

[52] *See* Susan Shah, Insha Rahman, & Anita Khashu, *Overcoming Language Barriers: Solutions for Law Enforcement*, Vera Inst. Just. 4 (2007) *available at* http://www.justice.gov/crt/lep/resources/vera_translating_ justice_final.pdf ("The obstacles associated with language barriers are often complicated by the fact that many [limited English proficient] persons fear the police and go to great lengths to avoid contact with them.").

[53] Jones Moy & Brent Archibald, *Reaching English as a Second Language Communities: Talking with the Police*, The Police Chief Magazine, June 2005, *available at* http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction =display_arch&article_id=614&issue_id=62005 ("Response to domestic calls are often complicated by the families' limited English and even more so by their lack of understanding of American laws and legal ramifications of domestic violence.").

[54] The Police Foundation Report notes that 85 percent of families are mixed-status families—families with a combination of citizens, undocumented immigrants, and documented immigrants; it similarly noted that a majority of Latinos in the U.S. worry about deportation of themselves, a family member, or a close relative. Police Foundation Report, at 24.  HB 87's protection for witnesses or victims of crimes does not extend to that individual's friends or family.  *See* O.G.C.A. § 17-5-100(f).

[55] Craig E. Ferrell Jr., *Immigration Enforcement: Is It a Local Issue?*, The Police Chief: The Professional Voice of Law Enforcement, Feb. 2004, *available at* http://www.lwvil.org/downloadimm/lwvil_immigration_study_second_packet_poli ce_chief_magazine.pdf.

chilling reporting of crime and eroding the trust between law enforcement and the community.

While HB 87 includes language that purports to protect members of the public who witness a crime, report criminal activity, or seek assistance as a victim,[56] Frank V. Rotondo, Executive Director of the Georgia Association of Chiefs of Police, questions whether that language will have any practical effect: "It's a nice statement to make, but I don't know how effective it is in the real world."[57] Especially in a time of financial cutbacks, law enforcement needs all persons to be its eyes and ears. HB 87 robs law enforcement of important information needed to protect us all.

### 2. HB 87 will have particularly harmful effects on immigrant women.

Immigrant women are particularly likely to suffer abuse, violence, and other crimes. Abusers, who are often citizens or lawful permanent residents and control their wives' and children's immigration status, use threats of deportation and separation of mothers from children to keep them from seeking help or calling the

---

[56] O.G.C.P. § 17-5-100(f). The provision specifies that the individuals who contact local law enforcement for these purposes will not have their immigration statuses investigated "based on such contact or based on information arising from such contact." *Id.*

[57] Patrick Rodgers, *The Arizona Syndrome*, Connect Savannah, Feb. 8, 2011, *available at* http://www.connectsavannah.com/news/article/103659/.

19

police.[58]   Immigrant women are also specially affected by workplace abuse: 77 percent of Latina immigrants report sexual harassment at work.[59]

Immigration status significantly affects immigrant women's willingness to seek law enforcement help.  "If police are seen as [federal immigration agents] . . . many battered immigrants will be reluctant to call the police and take the initial steps necessary to become independent of the abuser out of fear of being asked about her immigration status."[60]   Women with permanent immigration status are more than twice as likely as women with temporary immigration status to call police for help in domestic violence cases, and the rate is even lower if the woman is undocumented.[61]   These reporting rates are much lower than rates for battered women generally in the U.S.[62]

In 1994, Congress enacted the Violence Against Women Act (VAWA) to protect the rights and well being of immigrant women and encourage them to

---

[58] *See, e.g.*, Nawal H. Ammari et al., *Calls to Police and Police Response: A Case Study From the Latina Immigrant Women*, 7 U.S. J. Int'l Police Sci. & Mgmt. 230, 239 (2005).

[59] Southern Poverty Law Center, *Under Siege Life for Low-Income Latinos in the South* 28 (2009), *available at* http://www.splcenter.org/sites/default/files/ downloads/UnderSiege.pdf.

[60] Pendleton, *supra* note 50, at 1.

[61] Ammari, *supra* note 58, at 236.

[62] Martha L. Coulter et al., *Police-Reporting Behavior and Victim-Police Interactions as Described by Women in a Domestic Violence Shelter*, 14 J. Interpersonal Violence 1290, 1293 (1999).

report crimes and abuse regardless of immigration status.[63]   In 2000, Congress broadened these protections by creating two visas for victims who cooperate with law enforcement:  the "T Visa" for human trafficking victims, and the "U Visa" for victims of domestic violence, sexual assault, and other crimes.[64]   The T and U Visa programs require coordination with local law enforcement and endorsement of the victims' cooperation in investigations and prosecutions.[65]

HB 87 contradicts federal law and policy and destroys the protections guaranteed by VAWA.   Women who might otherwise come forward will remain silent in the face of abuse, because to report crimes carries the risk of investigation into their own legal status, or that of friends or family.

Congress also authorizes organizations funded by the Legal Services Corporation to represent immigrant victims of domestic violence, sexual assault, trafficking, or other crimes in matters related to the victimization, even if immigration status otherwise precludes representation.[66]   Ironically, these same organizations specifically protected by Congress may now be guilty of a crime for

---

[63] Violent Crime Control and Law Enforcement Act of 1994, H.R. 3355 (1994).

[64] VAWA 2000 §§ 1501–13; VAWA 2000 § 1513(a)(1)(B); Immigration and Nationality Act §§ 101(a)(15)(T), 101(a)(15)(U), 214(o), 214(p), 245(l), 245(m); 73 Fed. Reg. 75540 (Dec. 1, 2008).

[65] VAWA 2000 §§ 1501–13.

[66] Legal Services Corporation Appropriations Act of 1997, Pub. L. No. 104-208 § 504(a)(11), 110 Stat. 3009 (1997).

knowingly harboring an illegal alien or assisting an illegal alien to enter into the state, both misdemeanors under HB 87.[67]

### 3.    HB 87 will impact reporting of Hate Crimes.

Members of minority groups are the disproportionate victims of hate crimes.[68]   If HB 87 takes effect, victims of hate crimes will likely feel less comfortable reporting crimes to law enforcement.[69]

The Federal Bureau of Justice estimates that only 44 percent of hate crimes are reported to the police.[70]   One explanation is that victims fear that calling attention to the crime will lead to further targeting, whether by the perpetrator or by the police.[71]   Reports of confrontation and harassment from "nativist extremist

---

[67] O.C.G.A. §§ 16-11-200(b), 16-11-201(b), 16-11-202(b).  These provisions of HB 87 criminalize charitable acts like giving an undocumented individual a ride to the grocery store, or offering shelter to a battered undocumented woman.  HB 87 also threatens a deep tradition of service through church and other centers of faith in Georgia.  *See* Pew Forum on Religion & Public Life, *U.S. Religious Landscape Survey*, *available at* http://religions.pewforum.org/maps (last visited June 15, 2011) (noting that 68 percent of Georgian residents surveyed reported that religious beliefs and practices were "very important" in their lives).

[68] For example, one Northeastern city police chief stated: "They [undocumented immigrants] refer to themselves as walking ATMs because everybody knows that they don't have documentation enough to get bank accounts, checking accounts, and those kinds of things, and that their savings and whatever they have is on their person, not anywhere else."  Police Foundation Report, at 25.

[69] *See generally* Pendleton, *supra* note 50.

[70] Caroline Wolf Harlow, Bureau of Justice Statistic, *Hate Crime Reported by Victims and Police* 4 (Nov. 2005), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/hcrvp.pdf.

[71] Police Foundation Report, at 23.

groups" have more than doubled.[72] In such a climate, minority groups need to be able to trust in law enforcement to ensure their safety.[73]

## D. HB 87 Falls on the Wrong Side of History.

HB 87 not only violates Supreme Court precedent, but also flies in the face of progress Georgia has made toward racial and social equality. Throughout our history, landmark court decisions have invalidated statutes aimed at excluding certain minority groups from the rights granted to those in the majority.[74] Even facially neutral statutes are unconstitutional when discriminatorily applied.[75]

---

[72] Heidi Beirich, S. Poverty Law Ctr., *The Year in Nativism*, Intelligence Report, Spring 2010, *available at* http://www.splcenter.org/get-informed/intelligence-report/browse-all-issues/2010/spring/the-year-in-nativism.

[73] The danger of underreporting of hate crimes exists for all minorities. For example, law enforcement organizations have recognized that LGBT communities are often reluctant to report hate crimes to officials perceived as unsympathetic. King County Dep't of Pub. Health, *Safety and Hate Crimes*, Oct. 7, 2008, *available at* http://www.kingcounty.gov/healthservices/health/personal/glbt/HateCrime.aspx.

[74] *Plyler v. Doe*, 457 U.S. 202 (1982) (forbidding states from denying elementary education to undocumented children); *Holmes v. Danner*, 191 F.Supp. 394 (M.D. Ga. 1961) (finding Georgia's refusal to consider applications to state universities from African-Americans unconstitutional); *see also Batson v. Kentucky*, 476 U.S. 79 (1986) (ruling that prosecutors may not challenge potential jurors solely on account of their race); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (overturning laws prohibiting the teaching of German in schools until eighth grade).

[75] *See Gomillion v. Lightfoot*, 364 U.S.339 (1960) (ordinance redefining political boundaries unconstitutional because although facially neutral, it effectively deprived African-Americans of their right to vote); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (enforcement of local ordinance unconstitutional because statute disproportionately affected Chinese residents).

HB 87 should be similarly struck down because it will likely be discriminatorily applied and have a disparate impact on minorities and persons of color. While HB 87 is not worded to apply to a specific group, the array of harms inherent in the detention, interrogation, and arrest authorized under HB 87 will be disproportionately imposed on racial and ethnic minorities, including English language learners and many who are American citizens and legal residents.

HB 87 also contradicts Georgia's long struggle for equality. Throughout the civil rights movement, the Southern Christian Leadership Conference, based in Atlanta, the NAACP and its Georgia chapters, and many others led efforts to uproot entrenched legal and social barriers to equality throughout the state.[76] HB 87 is a dramatic step back in Georgia's march toward equal justice.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Southern Center for Human Rights and fellow *Amicae* request that this Court grant the Plaintiffs' motion for preliminary injunction to bar the enforcement of the challenged sections of the Illegal Immigration Reform and Enforcement Act of 2011. Public interest requires that HB 87 be enjoined because it is incapable of being executed in an impartial and constitutional manner.

---

[76] Indeed, Georgia—from Atlanta to Albany to Savannah—has been host to many civil rights milestones. *See* Alice Fleming, *Martin Luther King, Jr.: A Dream of Hope* (2008).

Respectfully submitted this 16th day of June, 2011.

/s/ *Gerry Weber*
GERALD WEBER
Ga. Bar No. 744878
SOUTHERN CENTER FOR HUMAN RIGHTS
83 Poplar Street, N.W.
Atlanta, Georgia 30303-2122
Telephone: (404) 688-1202
Fax: (404) 688-9440

*Attorney for Amicus Curiae*

25

**Exhibit 1**

**List and Description of Amicus Curiae**

The **Southern Center for Human Rights** (SCHR) is a non-profit, public interest law firm dedicated to enforcing the civil and human rights of people in the criminal justice system throughout the Southeast United States. To enforce the state's constitutional duty to provide adequate care in jails and prisons, SCHR has brought class action lawsuits, issued investigative reports, and advocated for legislative reforms on behalf of prisoners across the state. SCHR writes this amicus brief and joins in this amicae because Georgia's House Bill 87 ("HB 87") encourages racial profiling, and will have dramatic and negative impacts on public safety and the criminal justice system as a whole.

The **National Asian Pacific American Bar Association** (NAPABA) is the national association of Asian Pacific American attorneys, judges, law professors, and law students. NAPABA represents the interests of over 40,000 attorneys and 62 local Asian Pacific American bar associations. NAPABA's members include solo practitioners, large firm lawyers, corporate counsel, legal service and nonprofit attorneys, and lawyers serving at all levels of government. Since its inception in 1988, NAPABA has served as the national voice for Asian Pacific Americans in the legal profession and has promoted justice, equity and opportunity for Asian Pacific Americans. NAPABA engages in civil rights advocacy on various fronts and has a particular interest in ensuring that HB 87 is not enforced

2

because individuals should not be subjected to heightened police scrutiny and should not be burdened with a presumption of illegality on the basis of their perceived "foreignness" in appearance.

The **National Guestworker Alliance** (NGA) is a membership organization representing thousands workers across sector and industry who enter the United States through the U.S. guestworker program including members in Georgia.  The NGA was formed as the Alliance of Guestworkers in the aftermath of Hurricane Katrina, when thousands of guestworkers were brought to the United States to work in the Gulf Coast, and subjected to forced labor. Organizing in labor camps across the Gulf Coast, guestworkers formed a vehicle for building power and shifting the national understanding of the guestworker program.  Today, NGA is a national organization with guestworker members working across many industries including metal workers, construction workers, landscapers, factory workers, food processing workers, janitors, and hotel workers.  Our members frequently engage in local and national policy development to protect civil, labor, and constitutional rights, combat discrimination, and support dignified work and just migration. Should HB 87 go forward, our members in Georgia would be directly affected and subjected to racial profiling and discrimination.

The **New Orleans Workers' Center for Racial Justice** (Workers' Center) is a membership organization that was founded in the aftermath of Hurricane

3

Katrina in response to the structural exclusion of African Americans and the brutal exploitation of immigrants within the new Gulf Coast economy. Workers' Center members include African-American workers, including many hurricane survivors, as well as immigrant workers. Workers' Center members include those who have worked, currently work, and who seek jobs in agriculture. The Workers' Center is dedicated to organizing workers across lines of race and industry to advance racial justice and build worker power and participation to achieve a just reconstruction of New Orleans. This includes organizing and advocacy against racial profiling and discrimination against communities of color.

The **Asian American Justice Center** (AAJC), a member of the Asian American Center for Advancing Justice, is a national non-profit, non-partisan organization working to advance the human and civil rights of Asian Americans and build and promote a fair and equitable society for all. Founded in 1991 and based in Washington, D.C., AAJC engages in litigation, public policy, advocacy, and community education and outreach on a range of issues, including anti-discrimination. AAJC is committed to defending the rights of all Americans, particularly underserved populations such as immigrants, communities of color, and other minorities.

**Asian American Institute** (AAI)**, Member of Asian American Center for Advancing Justice**, is a pan-Asian, non-partisan, non-profit organization located

4

in Chicago, Illinois, whose mission is to empower the Asian American community through advocacy, coalition-building, education, and research.  AAI's programs include legal advocacy, community organizing, and leadership development. AAI strives to eradicate the illegal and unjust discrimination that Asian Americans face, including discrimination against those who look or sound foreign.  The enforcement of laws such as HB 87 worsens discrimination against communities of color.  Accordingly, AAI has a strong interest in the outcome of this case and in the enforcement of HB 87.

**ASISTA Immigration Assistance** (ASISTA) co-chairs the National Network to End Violence Against Immigrant Women, which worked with Congress to create and expand routes to secure immigration status for survivors of domestic violence, sexual assault and other crimes, incorporated in the 1994 Violence Against Women Act (VAWA) and its progeny. ASISTA serves as liaison for the field with Department of Homeland Security personnel charged with implementing these laws, most notably Citizenship and Immigration Services (CIS), Immigration and Customs Enforcement (ICE), and DHS' Office on Civil Rights and Civil Liberties. ASISTA also trains and provides technical support to local law enforcement officials, civil and criminal court judges, domestic violence and sexual assault advocates, and legal services, non-profit, pro bono and private attorneys working with immigrant crime survivors.  The Department of Justice's

Office on Violence Against Women funds ASISTA to provide training and technical assistance to its grantees, which include all of the above entities.

The **Organization of Chinese Americans** (OCA) is a national organization dedicated to advancing the social, political, and economic well-being of Asian Pacific Americans. Headquartered in Washington, D.C., OCA represents members and associates in over 80 chapters and affiliates across the country, including a chapter in Georgia based in metropolitan Atlanta.  OCA has worked in coalition with other national and local groups to defend the rights of the Asian Pacific American and immigrant communities and ensure that they are accorded the rights guaranteed to them under the Constitution and federal, state, and local law. OCA supports this brief because HB 87 is detrimental to the Asian Pacific American immigrant community because it sanctions discrimination based on outward appearance.

The **Asian Pacific American Legal Center of Southern California** (APALC), a member of the Asian American Center for Advancing Justice, was founded in 1983 and is the nation's largest non-profit public interest law firm devoted to the Asian Pacific Islander community. APALC provides direct legal services and uses impact litigation, public advocacy, and community education to obtain, safeguard, and improve the civil rights of the Asian Pacific Islander community. APALC serves 15,000 individuals and organizations each year

6

through direct services, outreach, training, and technical assistance. Its primary areas of work include workers' rights, anti-discrimination, immigrant welfare, immigration and citizenship, voting rights, and hate crimes. APALC advocates for the full and equal integration of immigrant communities in a variety of contexts and focuses particularly on the needs of Asian and Pacific Islander immigrants.

Founded in 2001, **Arte Sana** (art heals) is a national Latina-led training and advocacy agency committed to ending sexual violence and other forms of gender-based aggressions, and engage marginalized communities as agents of change.  As part of its efforts to eliminate victim assistance barriers for survivors who are English language learners, Arte Sana collaborated with hundreds of victim advocates across the nation to develop the recently-released Existe Ayuda (Help Exists) Toolkit that was developed through a grant from the Office for Victims of Crime. Arte Sana opposes policies that are counter-productive to the promotion of crime victim rights, drive immigrant communities and families underground, and encourage the targeting of immigrant women and girls as victims of sexual harassment, rape, sex trafficking, and other forms of sexual exploitation. We believe that HB 87  "Georgia Illegal Immigration Reform and Enforcement Act" will undermine trust between law enforcement and immigrant communities resulting in law enforcement's diminished ability to keep all communities safe.

The **Alianza Latina en contra la Agresión Sexual** (ALAS) is the national Latina-led membership network of victim advocates working to address and prevent sexual violence in the United States. Since 2004, ALAS has created original outreach materials, tracked the availability of victim services in Spanish across the nation, and has developed nationally endorsed position statements that advocate for the rights of Spanish-speaking victims of sexual violence. According to the Sexual Assault Among Latinas (SALAS) Study findings published in 2010, while many Latinas suffer multiple forms of violence only 3.3 percent of  Latina victims utilize victim services. ALAS members who work and reside in 14 states, including Georgia, believe that HB 87 will not only lead to an increase in victims and crime, it will also promote the re-victimization of survivors of sexual violence, particularly those who are English language learners.

The **Japanese American Citizens League** (JACL) is the oldest and largest Asian American civil rights organization in the United States.  It was founded in 1929 and has thousands of members throughout the United States.  The JACL has advocated on behalf of the civil rights of all persons, including persons of Japanese ancestry.  During World War II, the JACL opposed the mass incarceration of persons of Japanese ancestry and, after the War, helped to repeal discriminatory state legislation known as 'alien land laws.'  The JACL has supported civil rights legislation to end discrimination in housing, employment, naturalization, and

8

voting.  The JACL was one of the principal organizations supporting federal legislation which provided monetary redress to Japanese Americans wrongly incarcerated during World War II due to racial stereotyping.  The JACL supports the brief because HB 87 is detrimental to the Asian Pacific Islander American (AAPI) community.

The **Alabama Women's Resource Network** (AWRN) is a non-profit whose mission it is to sustainably reduce women's imprisonment in Alabama.  AWRN and its supporters, as well as the women and families of the incarcerated (both male and female) AWRN serves, oppose the expansion of profiling, prosecuting, and imprisoning human beings.  HB 87, much like HB 56 in Alabama (now characterized as "the meanest immigration law in the country") does nothing to better the humanity or society; rather HB 87 will do much to exacerbate already under-funded public services, rob children of their parents and familial stability, incriminate Americans for extending a hand-up to those who need help, and position Georgia for numerous and expensive lawsuits.  As an advocacy organization dedicated to identifying and implementing community-based alternatives to imprisonment, AWRN knows first-hand the complete devastation incarceration brings and the extreme social and fiscal costs of laws implemented with disregard to their negative impact on public health and safety, as well as communities and families.

9

The **Center for Pan Asian Community Services, Inc.** (CPACS) is a private non-profit organization serving Georgia since 1980. Our mission is to create and deliver culturally and linguistically competent and comprehensive health and social services. We believe that all people have the right to be safe and healthy, to live in a thriving community with each other, and to live without fear regardless of immigration status.   CPACS supports the brief because HB 87 will negatively impact ALL immigrants, refugees and people of color.

10

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| Georgia Latino Alliance for Human Rights, *et al.*,<br><br>       Plaintiffs,<br><br>v.<br><br>Governor Nathan Deal, *et al.*,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)   Case No. 1:11-cv-1804-TWT<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing ***AMICUS CURIAE* BRIEF SUBMITTED BY THE SOUTHERN CENTER FOR HUMAN RIGHTS** AND **OTHER AMICUS CURIAE** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:


Linton Joaquin
Karen C. Tumlin
Nora A. Preciado
Melissa S. Keaney
National Immigration Law Center
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
Joaquin@nilc.org
Tumlin@nilc.org
Preciado@nilc.org
Keaney@nilc.org

Naomi Tsu
Michelle R. Lapointe
Daniel Werner
Southern Poverty Law Center
233 Peachtree Street, NE, Suite 2150
Atlanta, Georgia 30303
naomi.tsu@splcenter.org
michelle.lapointe@splcenter.org
daniel.werner@splcenter.org

Mary Bauer
Andrew H. Turner
Samuel Brooke
Southern Poverty Law Center
400 Washington Avenue
Montgomery, Alabama 36104
mary.bauer@splcenter.org
andrew.turner@splcenter.org
samuel.brooke@splcenter.org

Tanya Broder
Jonathan Blazer
National Immigration Law Center
405 14th Street, Suite 1400
Oakland, California 94612
Broder@nilc.org
Blazer@nilc.org

Sin Yen Ling
Asian Law Caucus
55 Columbia Avenue
San Francisco, California 94111
sinyenL@asianlawcaucus.org

Omar C. Jadwat
Andre Segura
Elora Mukherjee
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, New York 10004
ojadwat@aclu.org
asegura@aclu.org
emukherjee@aclu.org

Cecilia D. Wang
Katherine Desormeau
American Civil Liberties Union
Foundation Immigrants' Rights
Project
39 Drumm Street
San Francisco, California 94111
cwang@aclu.org
kdesormeau@aclu.org

Chara Fisher Jackson
Azadeh N. Shahshahani
ACLU of Georgia
1900 The Exchange, Suite 425
Atlanta, Georgia 30339
cfjackson@acluga.org
ashahshahani@acluga.org

G. Brian Spears
1126 Ponce de Leon Avenue, NE
Atlanta, Georgia 30306
Bspears@mindspring.com

R. Keegan Federal, Jr.
Federal & Hasson, LLP
Two Ravinia Drive, Suite 1776
Atlanta, Georgia 30346

Charles H. Kuck
Danielle M. Conley
Kuck Immigration Partners LLC
8010 Roswell Road, Suite 300
Atlanta, Georgia 30350
CKuck@immigration.net
DConley@immigration.net

*Attorneys for Plaintiffs*

Devon Orland
Office of State Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
dorland@law.ga.gov

*Attorney for Defendants Deal, Olens, Reese, and Beatty*

This is to certify that the foregoing *AMICUS CURIAE* **BRIEF SUBMITTED BY THE SOUTHERN CENTER FOR HUMAN RIGHTS** is being hand-delivered on this date to the following non-CM/ECF participant:

Falecia Stewart
Executive Director
Housing Authority of Fulton County
HAFC Headquarters
4273 Wendell Drive
Atlanta, Georgia 30336

Respectfully submitted this 16th day of June, 2011.

/s *Gerald Weber*
Gerald Weber
Ga. Bar No. 744878
SOUTHERN CENTER FOR
    HUMAN RIGHTS
83 Poplar Street, N.W.
Atlanta, Georgia 30303-2122
Tel: (404) 688-1202
Fax: (404) 688-9440
gweber@schr.org