**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **GEORGIA LATINO ALLIANCE FOR HUMAN RIGHTS, et al.,** | * | |
| | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **V.** | * | **1:11-CV-1804-TWT** |
| | * | |
| **NATHAN DEAL, Governor of the State of Georgia, et al.,** | * | |
| | * | |
| | * | |
| **Defendants.** | * | |

**DEFENDANTS DEAL, OLENS, REESE AND BEATTY'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

COME NOW Defendants Deal, Olens, Reese and Beatty, by and through counsel, the Attorney General for the State of Georgia, and file their response to Plaintiffs' Motion for Preliminary Injunction.

## I.    STATEMENT OF FACTS

Plaintiffs are comprised of a group of individuals and organizations united to challenge the constitutionality of HB 87.  HB 87, entitled the "Illegal Immigration Reform and Enforcement Act of 2011" is comprehensive legislation, "relating to security and immigration compliance."

The portions of HB 87 relevant to this Motion provide for criminal penalties for individuals who, while committing another criminal offense, knowingly transport illegal aliens, harbor illegal aliens or entice illegal aliens to enter the state. HB 87 part 7.  The Bill further provides that where an officer has probable cause for another crime that the officer is authorized to verify the suspect's immigration status and, if it is determined the suspect is an illegal alien arrest the suspect in accordance with state and federal law.  Plaintiffs' motion for preliminary injunction is limited to sections 7 and 8 of the Bill. (Plaintiff's brief p. 3 fn. 1). Specifically, Plaintiffs claim that HB 87 violates the Supremacy Clause, the Fourth Amendment to the United States Constitution, the constitutional right to travel and the separation of powers safeguards of the Georgia Constitution.  The individual Plaintiffs define their irreparable harm by claiming that if they are stopped as a result of a minor traffic offense, they could be subject to extended detention, discriminatory treatment and unwarranted police scrutiny.  The organizational Plaintiffs claim that they will have to divert organizational resources from their core mission to address issues related to HB 87.  Lastly, they claim that the balance of interests and the public interest weigh in favor of the injunction.  Defendants Deal, Olens, Reese and Beatty now file their response.

2

## II. ARGUMENT AND CITATION OF AUTHORITY

### The Standard For Granting A Preliminary Injunction

"[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). The "sole purpose is to preserve the relative positions of the parties until a trial on the merits can be held." *Institute of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "The movant must show (1) a substantial likelihood of prevailing on the merits; (2) that Plaintiff will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damages the proposed injunction may cause the opposing party; and (4) that if issued, the injunction would not be adverse to the public interest." *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988); *Levi Strauss and Company v. Sunrise International Trading Inc.*, 51 F.3d 982 (11th Cir. 1995). Plaintiffs carry the burden of persuasion on all four standards. *Untied States v. Jefferson County*, 720 F.2d 1511, 1519(1983). *See also*, *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986).

When, as here, a movant seeks to enjoin a government agency, "his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own affairs." *Rizzo v. Goode*, 423

3

U.S. 362, 378 (1976).  This well-established rule bars the federal courts from "interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury."  *Martin Metro. v. Atlanta Rapid Transit Auth.*, 225 F.Supp. 1362, 1372 (N.D. Ga. 2002)(quoting *Midgett v. Tri County Metro. Dist. Of Or.*, 74 F.Supp. 2d 1008, 1012 (D.Or. 1999), *aff'd* 254 F.3d 846 (9th Cir. 2001)).  "[A]n injunction requiring detailed and continuous supervision over the conduct of a political subdivision is not congenial to equitable principles and practices and will not usually be granted."  *Brown v. Bd. Of Trustees of LaGrange Indep. Sch. Dist.*, 187 F.2d 20, 24 (5th Cir. 1951).  If an injunction is granted, it must be narrowly tailored to "fit the nature and extent of the established violation." *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984); *accord Dayton Bd. Of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977).

## A. PLAINTIFFS CANNOT PREVAIL ON THE MERITS.

As stated in Defendants' Motion to Dismiss, Plaintiffs do not have a substantial likelihood of prevailing on the merits in this action.  In support of this position, Defendants rely on their Motion to Dismiss and hereby adopt and incorporate it herein.  (doc.47). Defendants' believe that their brief in support of their motion adequately addresses Plaintiffs' arguments.  Since Plaintiffs do not have

a substantial likelihood of prevailing on the merits, the Motion for Preliminary Injunction should be denied.

**B.   PLAINTIFFS CANNOT SHOW THAT THEY WILL SUFFER IRREPARABLE HARM ABSENT THE GRANTING OF A PRELIMINARY INJUNCTION.**

Plaintiffs characterize their harm as "the risk of unconstitutional and extended detention," … "risk of discriminatory treatment, unwarranted police scrutiny, prolonged detentions, and arrest every time they come into contact with Georgia law enforcement." (doc. 29 pp. 44-45).  They further contend that since they have "experienced racial profiling in the past"… they are worried that they "will be subjected to repeated stops, questioning, detention, arrest and even criminal prosecution."  They conclude that as a result of these worries they "will fear contact with law enforcement,"… which will, "make them vulnerable targets for criminals and undermining (sic) public safety in their communities." (doc. 29 pp. 45-46).  Next, they contend that the failure to accept out of state licenses as conclusive evidence of citizenship, when the issuing state does not require evidence of citizenship prior to issuance, will cause "severe burdening of several Plaintiffs' right to travel…" as they will reduce "travel to avoid police interrogation." (doc. 29 p. 47).  Lastly, they claim that the organizational Plaintiffs will be frustrated because their members "will be afraid to gather in public places, attend marches and

meetings, and engage in other advocacy and organizing activities that might bring them into contact with law enforcement." (doc.29 p. 48).

A showing of irreparable injury is "the *sine qua non* of injunctive relief." *Siegel v. LaPore*, 234 F.3d 1163 (11th Cir. 2000). It cannot be presumed, even where there is a violation of constitutional rights. *See Siegal*, 234 F.3d at 1177. In all cases, a movant for a preliminary injunction against a state or local government must present facts that show a "real and immediate" threat of substantial, irreparable harm before a federal court will intervene. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *See also*, *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994)("[A] party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate-as opposed to a merely conjectural or hypothetical-threat of future injury"). The Eleventh Circuit has "emphasized on many occasions, the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Siegel* 234 F.3d at 1176-77(quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).

The Eleventh Circuit has stressed that the threat of irreparable harm is an absolute prerequisite to the issuance of injunctive relief.

An injury is **"**irreparable**"** only if it cannot be undone through monetary

6

remedies. "The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray,* 415 U.S. 61, 90 (1974); *Northeastern Florida Chapter v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990). *See Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1449 (11th Cir. 1991); *Spiegel v. City of Houston,* 636 F.2d 997, 1001 (5th Cir. 1981). Here, the individual Plaintiffs aver that they might have to wait for their immigration status to be verified and they worry about the impact of the detention during this process. First, as HB 87 requires another criminal offense prior to any subsequent action and where there is cause to detain, the act of questioning does not amount to separate seizure so Plaintiffs' fear and worry are insufficient to show harm and are too speculative to justify relief. *Ashcroft v. Al-Kidd*, No. 10-98, *slip op.* pp. 3-9 (U.S. May 31, 2011)(courts will not look to subjective intent when determining validity of detention); *See also Muehler v. Mena*, 544 U.S. 93 (2005)(questioning about immigration status when individual is already legally detained does not amount to a separate seizure).

A prayer for injunctive and declaratory relief requires an assessment of whether the plaintiff has sufficiently shown a real and immediate threat of future harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105, (1983). "The binding precedent in this circuit is clear that for an injury to suffice for prospective relief, it must be imminent." *Elend v. Basham*,  471 F.3d 1199, 1207 (11th Cir. 2006). The focus of the inquiry is on prospective conduct. Therefore, it follows that past exposure to illegal conduct does not show a present case or controversy regarding injunctive relief  "if unaccompanied by any continuing, present adverse effects." *Id.* There must be a credible threat that the injury will be repeated imminently to justify declaratory or injunctive relief. *Id.* at 1208.

Here, Plaintiffs surmise first that they will commit an illegal act and secondly that the officer will either exercise his discretion and verify citizenship or have probable cause to determine that they are knowingly, transporting, harboring or enticing an illegal alien and they will be arrested.  This was precisely the line of reasoning rejected by the United States Supreme Court in *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).  There, as here, there were too many factors to consider and too many "ifs" to presume that there was imminence to the alleged harm.  Moreover, even if the factors could be presumed, the individuals involved would have committed a federal crime and thus would otherwise be subject to

8

prosecution. *See* 8 U.S.C. § 1324. Indeed, Plaintiffs acknowledge that local law enforcement currently has authority to arrest under 8 U.S.C. § 1324 (Plaintiffs' brief p. 5) and that they are already at risk of the harm but are just more at risk of getting caught if they contemporaneously decide to commit another criminal act.[1] Essentially, Plaintiffs argue that they are committing a criminal offense but are more likely to get caught if HB 87 is allowed to come into effect.

Alternatively, they surmise that law enforcement will unconstitutionally enforce the statute and subject them to unconstitutional racial profiling. They conclude that these factors will cause a decrease in participation among their various groups as people will be afraid to gather to engage in various activities. These "harms" require speculation about the actual commission of another criminal act, presume that officers will engage in unconstitutional behavior and misapply the relevant provisions of the statute. As noted previously, no stop can occur absent a prior criminal act by the individual whose status is being checked. Secondly, while racial profiling undoubtedly occurs at times, the presumption is that law enforcement

---

[1] Remarkably, several of the Plaintiffs have admitted, under oath in this court, to committing this federal offense and as such could be prosecuted now or at any time within the statute of limitations period. *See* Plaintiffs' Brief Ex. 5, Declaration of Paul Bridges; Ex. 6, Declaration of Benjamin Speight; Ex. 7, Declaration of Everitt Howe (likely would be exempt under HB 87 but not under federal law); Ex. 8, Declaration of Paul Edwards; Ex. 9, Declaration of Sharon Gruner (likely would be exempt under HB 87 but not under federal law).

officers will conduct themselves in a constitutional manner.  Speculative anecdotal accounts and unsubstantiated worry do nothing to obviate this general presumption, and "past wrongs do not in themselves amount to that real and immediate threat of injury." *Lyons*, 461 U.S. at 103.  Moreover, as these incidents occurred prior to the effective date of HB 87, the harm cannot be traced to the Bill.  Lastly, this theory pre-supposes that law enforcement officers are going to act contrary to the law.  This presumption is improper.  Indeed, courts presume that public officials properly discharge their duties. *See Bracy v. Gramley*, 520 U.S. 899, 908 (1997)(quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

Plaintiffs also ignore the potential harm to individuals who enter this country illegally in hopes of a better life who are then victimized by their employers or others, forced to work in horrific conditions with inadequate pay and otherwise taken advantage of as result of their immigrant status. This potential was noted by the Supreme Court in *United States v. Brignoni-Ponce,* 422 U.S. 873, 879 (1975) ("The aliens themselves are vulnerable to exploitation because they cannot complain of substandard working conditions without risking deportation.").  Indeed, when Congress passed the Immigration and Naturalization Code (INC) it recognized that undocumented aliens had historically been victims of exploitation and deprivation of legal rights. One of the primary reasons for the passage of INC was that "(a)

10

subclass of people who cannot exercise their rights has been created." Cong. Rec.

H10598 (daily ed. Oct. 15, 1986) (remarks of Rep. McKinney). The House Judiciary

Committee expressed this concern in a report stating:

> These people live in fear, afraid to seek help when their rights are violated, when they are victimized by criminals, employers or landlords or when they become ill. . . . [Legalization] would help to prevent the exploitation of this vulnerable population in the work place.

H.R. Rep. No. 99-682 (I), 99th Cong., 2d Sess 49 (1986).[2]   While recognizing the

substantial impact of illegal immigrants on Georgia's economy, there is also a need

to protect the illegal immigrant from abuses.  By creating a legal mechanism where

individuals who transport, harbor and entice illegal aliens into the state are punished

and where employers are required to verify citizenship, Georgia protects these aliens

from these abuses.

As further evidence of this concern, the Georgia legislature specifically

excluded those providing privately funded social services from the criminal

provisions involving harboring and transportation of illegal aliens.  O.C.G.A. §§ 16-

11-200 (b), (d)(5); 16-11-201(a)(1), (b).  In addition, the Bill does not allow for an

officer to arrest anyone other than the person who committed another criminal

---

[2] The stated purpose of 29 U.S.C. § 1801 et seq, is, "to remove the restraints in commerce caused by activities detrimental to migrant and seasonal agricultural workers; to require farm labor contractors to register under this chapter; and to assure necessary protections for migrant and seasonal agricultural workers, agricultural associations, and agricultural employers."  29 U.S.C. § 1801.

offense and who knowingly transports, harbors or entices an illegal alien. O.C.G.A. §§ 16-11-200, 201, 202. Thus, the targets of the criminal provisions are those most likely to exploit illegal aliens as well as those who commit crimes within the state.

## C. THE DAMAGE TO CITIZENS OF THE STATE OF GEORGIA OUTWEIGHS ANY ALLEGED INJURY TO PLAINTIFFS.

In balancing hardships, courts should be cautious, where, as here, the preliminary injunction would give Plaintiffs all or most of the relief to which they would be entitled if they were successful at trial on the merits, or where preliminary relief would be "excessively burdensome." Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.2, p. 181 (2d ed. 1995); *see also Knapp v. Walden*, 367 F. Supp. 385, 388 (S.D. N.Y. 1973) ("It is improper to issue a preliminary injunction where such a grant would effectively provide all the relief sought in the complaint").

Even "[g]reater caution" must be exercised where a government is involved, particularly where the injunction will require "'detailed and continuous supervision'" of the government's conduct. *Brown v. Bd. Of Trustees*, 187 F.2d 20 (5th Cir. 1951). This is true for at least two reasons. First, "[f]ederal courts operate according to institutional rules and procedures that are poorly suited to the management of state agencies." *Angela R. v. Clinton*, 999 F.2d 320, 326 (8th Cir. 1993). Second, as the Supreme Court of the United States has cautioned,

> Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.... When the frame of reference moves from a unitary court system....to a system of federal courts representing the Nation, subsisting side by side with 50 state judicial, legislative, and executive branches, appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief.

*Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)(citations omitted).  "[T]hese principles []have applicability where injunctive relief is sought, not against the judicial branch of state government, but against those in charge of an executive branch of an agency of state or local governments...." *Id.* at 380.

On a motion for preliminary injunction Plaintiffs bear the burden of showing that their perceived injuries outweigh the damage that the preliminary injunction might cause to Defendants. *Baker v. Buckeye Cellulose Corp.,* 856 F.2d 167, 169 (11th Cir. 1988).  Plaintiffs have failed to meet this burden.  Here the perceived injury to the Plaintiffs is largely speculative.  To the extent it is not speculative the "risk" is one that they endure anyway as they have either admitted to the commission of a federal offense, may be subject to racial profiling and may be subject to deportation whether or not HB 87 is enjoined.  The public's interest in the enforcement of the law, however, is much greater.  As discussed in greater detail below, the public has a significant interest in the conservation of its resources for those who are legally in the country.  While not every illegal immigrant will need to

13

visit an emergency room, commit a criminal offense or otherwise need government care, there is a risk that every illegal immigrant will utilize some of the scarce resources available to government. Every day that passes with passive enforcement of the federal law is a day that drains the state coffers to the detriment of the citizens of this state. This interest far outweighs the interests of those who commit criminal acts in the state while in the act of transporting, harboring or enticing illegal aliens. It also far outweighs the interest of individuals who commit criminal acts and might be detained for a short to determine citizenship. Finally, it outweighs the speculative impact to the organizational Plaintiffs who are largely exempt from the provisions of HB 87.

## D.  THE PRELIMINARY INJUNCTION WILL NOT SERVE THE PUBLIC INTEREST.

Plaintiffs also bear the burden of showing that the preliminary injunction would serve the public interest. *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988). The mere fact that Georgia adopted this legislation speaks to the validity and importance of the public interest. *See Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 239 (1984) (the state legislature not the courts is to determine whether there is a substantial public interest in determining when to exercise eminent domain authority). Plaintiffs have failed to overcome that interest.

According to a recent article released by the Congressional Budget Office, approximately 5 % of the population of Georgia is in the country illegally, which represents a 9% average annual increase from 2000 to 2009.  (Ex. #,  *A Description of the Immigrant Population: An Update*,  June 2011; p. 17).  The impact that this population has on state and local governments is hard to quantify but is notably significant, particularly in areas related to health care, law enforcement and education.  (Ex. B, *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments*, December 2007, pp.7-11).[3]

In *De Canas v. Bica*, 424 U.S. 351, 354 (1976), the Court found that a California statute prohibiting an employer from knowingly employing an alien not entitled to lawful residence in the United States was not unconstitutional as being preempted under the Supremacy Clause by the INC. Justice Brennan, writing for the court, recognized the vital state interests sought to be protected by the California statute:

> Employment of illegal aliens in times of high unemployment deprives citizens and legally admitted aliens of jobs; acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens; and employment of illegal aliens under such conditions can diminish

---

[3] Plaintiffs appear to rely on floor debates and statements from legislators as evidence of the state's purpose for adopting HB 87.  Such statements, however, are not evidence of legislative intent in Georgia.  *See Stewart v. Atlanta Beef Co.*, 93 Ga. 12 (1893); *Jackson v. Delk*, 257 Ga. 541 (1987).

the effectiveness of labor unions. These local problems are particularly acute in California in light of the significant influx into the State of illegal aliens from neighboring Mexico. In attempting to protect California's *fiscal interests and lawfully resident labor force from the deleterious effects on its economy resulting from the employment of illegal aliens, § 2805(a) focuses directly upon these essentially local problems and is tailored to combat effectively the perceived evils*.

Id. at 357(emphasis supplied).

These problems are equally present in Georgia where unemployment is at 9.8%, which exceeds the national average of 9.1%. (Ex. C. ¶ 3). The jobs where there are most likely to be positions available are: Farmworkers and Crop Laborers, Truck Drivers, Heavy and Tractor-Trailer; Production Workers; Janitors and Cleaners; Laborers and Freight, Stock, and Material Movers. (Ex. C ¶ 4). These are the types of jobs most likely to be filled by illegal aliens. Since many Georgians are out of work, reducing the number of illegal aliens in the workforce would help decrease the number of Georgians who are unemployed. (Ex. C ¶ 5).

No one can dispute the shortage of government resources in light of the recession, which in turn has resulted in budget cuts to a number of services in the state. Georgia has cut funding to education, public health, the elderly and the disabled. (Ex. D). *Center of Budget and Policy Priorities, An Update of State Budget Cuts,* February 9, 2011, Nicholas Johnson, Phil Oliff and Erica Williams. Overall the state budget has seen a decrease in the last several years. (Ex. E) Total

16

available state revenues in Fiscal Year 2007 (July 1, 2006 through June 30, 2007) were $19,895,976,559. Those revenues declined $19,799,134,318 in FY 2008 to $16,251,244,424 in FY 2010. (FY 2011 will not close until June 30, 2011, and so final numbers are not yet available.) Projected numbers for FY 2011 and FY 2012 are revenues of $18,063,622,184 in FY 2011, and $18,295,831,853 in FY 2012. (Ex. E, ¶ 3). The drop in revenue has resulted in significant budget cuts.

From the original FY 2009 budget to the FY 2012 budget, Education has fallen from $11,786,997,371 to $9,973,726,081, a drop of 15.38%; Healthcare has fallen from $4,201,549,981 to 4,068,522,916, a drop of 3.17%; Public Safety has fallen from $1,783,300,947 to 1,576,553,071, a drop of 11.59%; General Government has dropped from $1,341,291,667 to $793,695,401, a drop of 40.83%; Economic Development has dropped from $186,850,974 to $94,881,049, a drop of 49.22%; and Transportation has dropped from $856,216,563 to $723,260,906, a drop of 15.53%. (Ex. E, ¶ 4).[4]

Moreover, HB 87 does not criminalize any activity in sections 7 & 8 that isn't already criminal under federal statute. *See* 8 U.S.C. § 1324. Rather, it creates a mechanism by which the crime could be prosecuted at a local level. Indeed, HB 87

---

[4] In addition, the state has depleted reserves, furloughed employees and significantly trimmed expenditures in order to account for the budget shortfalls. (Ex. E, ¶ 5-6).

does not make it a crime to be an illegal alien.  Rather, Georgia largely targets the people who are facilitating illegal aliens coming into or staying in Georgia and utilizing the resources of the state.  HB 87 specifically targets those who transport, harbor, entice or employ illegal aliens within the state.  If individuals, citizens or not, stop transporting, harboring, enticing and employing illegal aliens in Georgia it is likely that there will be fewer illegal aliens in the state, thus conserving state and local resources for residents lawfully in the Country.

Illegal aliens are utilizing these valuable resources in several ways. One area of significant impact is the burden illegal aliens have on Georgia's prisons and jails. Plaintiffs contend that the impact on law enforcement will be significant.  In making this argument they ignore the impact that illegal immigrants already have on the prisons and jails.  Admittedly, there may be an initial increase due to arrests for those violating the provisions of HB 87.  However, there will likely be a deterrent effect as, by Plaintiffs' own admissions, the people targeted by the bill, those that encourage, transport and harbor illegal aliens, will be afraid of arrest and thus will not transport, harbor and entice illegal aliens to enter the state.  (See Plaintiffs' Ex. 8 ¶ 6-8; Ex. 10, ¶ 4-6; Ex. 14 ¶ 8-9; Ex. 16, ¶ 5,9).

Over the last 12 months the Georgia Department of Corrections housed an average of approximately 1100 illegal aliens.  (Ex. F, Affidavit Ronald Henry ¶ 3).

At an average cost of 41.25 per day, the annual cost is approximately $16,561,875. (Ex. F, ¶ 4).

Similarly, local jails also bear the impact of the illegal immigrant population. Gwinnett County housed an average of 507.4 illegal immigrants in the last year for a total of 185,200 detention days for illegal immigrants at a cost of $45 per day.  Ex. G, ¶ 4, 5, 6 and attachment). The cost for this detention in Gwinnett County was approximately $8,344,000.  (Ex. G, ¶ 5).  Cobb County has also expended significant resources housing illegal immigrants within their jails.  They house approximately 255 inmates per month who are illegal aliens.  At a cost of $53 per inmate per day that amounts to $4,932,975 per year.  (Ex. H, ¶ 4).  In contrast, the state and local governments collectively spend and average of 42.49 per child per day in school.  (Ex. I, ¶ 4).

As a further example of the illegal immigrant's potential for daily impact on state and local government, last year an illegal alien inmate housed in Douglas County required medical treatment that cost over $400,000. (Ex. J, ¶ 5).

Admittedly, there is no guarantee that with proper enforcement of HB 87, no illegal immigrant will commit a crime warranting incarceration.  However, if people are concerned about enforcement of the HB87 for actions related to transporting, harboring or enticing an illegal alien, by their own admission it will be more difficult

19

for illegal immigrants to remain in this state and thus reduce the cost.  Indeed, as the sheriff in Cobb County noted, once there was greater enforcement of 287g[5] within the county, the arrests of illegal aliens within the county reduced 43.8% over time. (Ex. H ¶ 4)  It stands to reason that the State would see similar reductions.

Another area of significant cost to the State is in the provision of medical care.  While generally illegal immigrants are not entitled to Medicaid, an exception is made for emergency medical care. (Ex. K , ¶3).  In FY 2007, total Medicaid expenses incurred in Georgia by illegal immigrants was $31,922,225.69.  In FY 2008, total Medicaid expenses incurred in Georgia by illegal immigrants was $23,795,818.47.  In FY 2009, total Medicaid expenses incurred in Georgia by illegal immigrants was $25,876,282.60.  In FY 2010, total Medicaid expenses incurred in Georgia by illegal immigrants was $28,601,668.82.  In FY 2011, Medicaid expenses to date incurred in Georgia by illegal immigrants is $53,234,092.15. The State of Georgia was responsible for 50% of each of these amounts. (Ex. K, ¶ 4).  Not only are these expenditures significant, they almost doubled in this past fiscal year.

Lastly, as noted previously, the potential for abuse of those in the country is significant.  Indeed, recently a woman was convicted for illegally bringing two

[5]  An agreement under 8 U.S.C. § 1357 (g) between local government and the federal governments to process illegal aliens entering the criminal justice system.

Nigerian women to the country, mistreating them and keeping them as slaves. Had this statute been in effect, she might have been caught committing another offense before she had held these women captive for almost three years. (Ex. L)

It is indisputable that there are significant state and local costs incurred as a result of a substantial illegal alien population. Plaintiffs must meet the burden that these costs are outweighed by their potential harm. As Plaintiffs have offered, at most, speculative injury, Plaintiffs have failed to meet this burden.

### E. DEFENDANTS THE GOVERNOR AND THE ATTORNEY GENERAL DO NOT HAVE DIRECT ENFORCEMENT AUTHORITY FOR THIS STATUTE.

Plaintiffs have limited this motion to seeking an injunction against the enforcement of Sections 7, 8 and 19 of HB 87 (doc. 29-1 pp. 4-6). These provisions relate to the arrest of individuals who have committed another criminal act and who are also knowingly transporting, harboring or enticing illegal aliens. Section 8 also provides for local law enforcement to check the immigration status of an individual who has committed another criminal act and, if the individual is determined to be illegal, the officer may take "any action **as authorized by state or federal law**." O.C.G.A. § 17-5-100(e)(emphasis added). The Supreme Court has explained that the "irreducible constitutional minimum" of standing under Article III consists of three elements: an actual or imminent injury, causation, and

21

redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992);  *see also Dermer v. Miami-Dade Cnty.*, 599 F.3d 1217, 1220 (11th Cir. 2010); *Steele v. Nat'l Firearms Act Branch*, 755 F.2d 1410, 1413-14 (11th Cir. 1985).

The causation element of Article III standing  requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan,* 504 U.S. at 560  (alterations and internal quotation marks omitted); *See also Doe v. Pryor,* 344 F.3d 1282, 1285 (11th Cir. 2003), (held that a plaintiff's injuries were not fairly traceable to a public official because the plaintiff had failed to allege how that official had caused those injuries).  The element of redressability requires that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). "Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010) (alteration and internal quotation marks omitted). We must be able "to ascertain from the record whether the relief requested is likely to redress the alleged injury," *Steele,* 755 F.2d at 1415. *See DiMaio v. Dem. Nat'l*

22

*Com*, 520 F.3d 1299, 1303 (11th Cir. 2008)(dismissing complaint for lack of standing because it did not "suggest in any way how [the] 'injury' could be redressed by a favorable judgment"). "It is the plaintiff's burden to plead and prove . . . redressability," *Steele*, 755 F.2d at 1414,

Governor Deal and Attorney General Olens acknowledge and accept that they are the proper parties for the purposes of defending the constitutionality of this statute.  They are not, however, the proper parties to enjoin against its enforcement.  The Georgia Constitution generally provides that it is the Governor's responsibility to, "take care that the laws are faithfully executed and shall be the conservator of the peace...."  Indeed, the Governor is vested with, "The chief executive powers...." Art. 5 § 2 ¶ 1.  However, there is no constitutional or statutory provision that allows the Governor to dictate to independently elected officials or to locally appointed law enforcement officers what law enforcement action may or may not be taken.

According to the Georgia Constitution, "The Attorney General shall act as the legal advisor of the executive department, shall represent the State in the Supreme Court in all capitol felonies and in all civil and criminal cases in any court when required by the Governor, and shall perform such other duties as shall be required by law."  Ga. Const. Art. 5, § 3, ¶ 4.  There is no provision which provides

23

that the Attorney General has the authority to direct that laws are, or are not, to be enforced by local authorities.

The Constitution of the State of Georgia provides for the "self-government of municipalities." Ga. Const. Art. IX § 2 ¶ 1, 2. In addition, counties are authorized to provide police and fire protection. *Id.* at ¶ 3. The county police under the control of the county governing authority have law enforcement powers including the power to make arrests and execute and return criminal warrants in the county of appointment. O.C.G.A. § 36-8-5. Sheriffs are also employees of the county. The State of Georgia Constitution provides that sheriffs are constitutional "county officers":

> (a) The clerk of the superior court, judges of the probate court, sheriff, tax receiver, tax collector, and tax commissioner. . .shall be elected by the qualified voters of their respective counties for terms of four years and shall have such qualifications, powers, and duties as provided by the general law.

Ga. Const. Art. IX § 1 § III(a). As independent elected officials the local sheriffs have specific duties, including the enforcement of state laws, but do not act under the supervision or direction of either the Governor or the Attorney General. O.C.G.A. §§ 15-16-9; 15-16-10.

The Governor does have the authority under O.C.G.A. §§ 45-12-26 and 45-12-27 to see that the laws of this state are executed and to provide for the defense

24

of actions against the state.  However, it is the responsibility of local law enforcement, not the Governor or the Attorney General, to manage the specific enforcement of the law.

Plaintiffs seek to have a statewide injunction imposed preventing the enforcement of certain portions of the statute at issue.  However, they have not sued the proper defendants to carry out their objective.  An injunction against a single state official sued in his official capacity does not enjoin all state officials from the prohibited conduct.  *See Kentucky v. Graham*, 473 U.S. 159 (1985)("Official-capacity actions for prospective relief are not treated as actions against the State.")  As Plaintiffs have not sued the proper parties to redress the alleged wrongs, no injunction should issue.

### III. CONCLUSION

For the above and foregoing reasons and the reasons put forth in Defendants' Motion to Dismiss, Defendants urge that the Court deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

SAMUEL S. OLENS          551540
Attorney General

KATHLEEN PACIOUS         558555
Deputy Attorney General

S/DEVON ORLAND           554301
Sr. Assistant Attorney General

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 14-point New Times Roman type face.

This the 17th day of June, 2011.


/s/ Devon Orland         554301
Sr. Assistant Attorney General


40 Capitol Square, S.W.
Atlanta, GA 30334-1300
(404) 463-8850 (Telephone)
(404) 651-5304 (Fax)
Email:  Dorland@law.ga.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing

**RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY**

**INJUNCTION** with the Clerk of Court using the CM/ECF system which will

automatically send email notification of such filing to the following attorneys of

record:  I further certify that I have served, by U.S. mail, first class postage

prepaid, the following non-CM/ECF participants:  NONE.

Andrew H. Turner

Chara Fisher Jackson

Charles H. Kuck

Daniel Werner

Danielle M. Conley

Georgia Brian Spears

Mary C. Bauer

Michelle R. Lapointe

Naomi Ruth Tsu

Robert Keegan Federal, Jr.

Samuel Brooke

I further certify that I have served, by U.S. mail, first class postage prepaid,

the following non-CM/ECF participants:

Andre I. Segura
Omar C. Jadwat
American Civil Liberties Union Foundation – NY
125 Broad Street, 18th Floor
New York, NY 10004

Azadeh N. Shahshahani
ACLU of Georgia
Building 400, Suite 425
1900 The Exchange, SE
Atlanta, GA 30339

Cecillia D. Wang
Katherine Desormeau
ACLU Immigrant's Rights Project
39 Drumm Street
San Francisco, CA 94111

Elora Mukherjee
ACLU Racial Justice Program
18th Floor, 125 Broad  Street
New York, NY 10004

Jonathan Blazer
Karen C. Tumlin
Linton Joaquin
Melissa S. Keaney
Nora Preciado

Tanya Broder
National Immigration Law Center
3435 Wilshire Blvd, Suite 2850
Los Angles, CA 90010

Sin Yen Ling
Asian Law Caucus
55 Columbus Avenue
San Fancisco, CA 94111

This 17th day of June, 2011.

s/ Devon Orland

State Law Department
40 Capitol Square SW
Atlanta, GA  30334
Tel: (404) 463-8850
Fax: (404) 651-5304
Email: dorland@law.ga.gov