**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| Georgia Latino Alliance for Human Rights, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 1:11-cv-1804-TWT ) |
| Governor Nathan Deal, *et al.*, | ) ) |
| Defendants. | ) ) ) |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page No(s)**

INTRODUCTION ...............................................................................................1

I.     PLAINTIFFS' COMPLAINT MEETS AND EXCEEDS THE PLEADING
       REQUIREMENTS OF RULE 8...................................................................2

II.      PLAINTIFFS HAVE STANDING TO RAISE ALL OF THEIR CLAIMS 2

A.     Harms to Plaintiff Organizations .................................................................4

       1.  The Organizational Plaintiffs Have Standing in Their Own Right............5

       2.  The Organizational Plaintiffs Have Standing on Behalf of Their
           Members ……………………………………………………………10

B.     Harms to Plaintiffs Related to Interrogation and Extended Detentions
       Pending Immigration Status Verification.....................................................12

C.     Harms to Plaintiffs based on Threat of Criminal Prosecution.......................17

III.   PLAINTIFFS HAVE PROPERLY STATED A PREEMPTION CLAIM...21

IV.    PLAINTIFFS HAVE PROPERLY STATED A CLAIM UNDER THE
       FOURTH AMENDMENT .........................................................................27

V.     PLAINTIFFS HAVE PROPERLY STATED A CLAIM CONCERNING
       THE RIGHT TO TRAVEL .......................................................................36

VI.    PLAINTIFFS HAVE PLED A VALID EQUAL PROTECTION CLAIM..38

VII.    PLAINTIFFS HAVE STATED A VALID DUE PROCESS CLAIM .........39

VIII.  PLAINTIFFS HAVE STATED A CLAIM UNDER 42 U.S.C. SECTIONS
       1981 AND 1983.........................................................................................41

IX.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS: THE
       ELEVENTH AMENDMENT BAR DOES NOT APPLY TO THE
       DEFENDANTS .........................................................................................41

X.     PLAINTIFFS' STATE CONSTITUTIONAL CLAIM ...............................43

CONCLUSION...............................................................................................43

i

# TABLE OF AUTHORITIES

**Page No(s)**

CASES

*Adickes v. S.H. Kress & Co.,*
  398 U.S. 144 (1970)...................................................................................41

*Am. Fed'n of Gov't Employees Local 1 v. Stone,*
  502 F.3d 1027 (9th Cir. 2007) .................................................................11

*Arizona v. Johnson,*
  129 S. Ct. 781 (2009).................................................................................31

*Arrington v. Helms,*
  438 F.3d 1336 (11th Cir. 2006) ...............................................................23

*Ashcroft v. Iqbal,*
  556 U.S. __, 129 S.Ct. 1937 (2009)...........................................................2

*Asseo v. Pan Am. Grain Co.,*
  805 F.2d 23 (1st Cir.1986).........................................................................24

*Att'y Gen. of N.Y. v. Soto-Lopez,*
  476 U.S. 898 (1986).......................................................................... 38, 39

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979)...............................................................................1, 4

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................1, 2

*Bernal v. Fainter*,
467 U.S. 216 (1984)...................................................................................................40

*Betancourt v. Ingram Park Mall, L.P.*,
735 F.Supp. 2d 587 (W.D. Tex. 2010) ...............................................................25

*Blessing v. Freestone,*
520 U.S. 329 (1997)...................................................................................................23

*Board of Regents v. Roth,*
408 U.S. 564 (1972)...................................................................................................42

*Brown v. City of Huntsville*,
608 F.3d 724 (11th Cir. 2010) ............................................................................34

*Butts v. County of Volusia,*
222 F.3d 891 (11th Cir. 2000) ............................................................................43

*Chamber of Commerce v. Whiting*,
___ U.S. ___, 131 S. Ct. 1968 (2011)........................................................... *passim*

*Church v. City of Huntsville,*
30 F.3d 1332 (11th Cir. 1994) …………………………………………………17

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983).................................................................................... 17, 18

*Common Cause/ Georgia v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ................................................................. *passim*

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)...................................................................................................26

*Doe v. Stincer*,
    175 F.3d 879 (11th Cir. 1999) ......................................................................5, 11

*Elk Grove Unified Sch. Dist. v. Newdow*,
    542 U.S. 1 (2004)....................................................................................................4

*Ex parte Young*,
    209 U.S. 123 (1908)........................................................................... 43, 44

*Fl. State Conference of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) .................................................... *passim*

*Flast v. Cohen*,
    392 U.S. 83 (1968).................................................................................................4

*Gonzaga University v. Doe,*
    536 U.S. 273 (2002)..............................................................................................23

*Gonzalez v. Pingree*,
    821 F.2d 1526 (11th Cir. 1987) ...........................................................................23

*Graham v. Richardson*,
    403 U.S. 365 (1971)..............................................................................................40

*Gulf Coast Commercial Corp. v. Gordon River Hotel Assocs.*,
    No. 2:05-cv-564-FtM-33SPC, 2006 WL 1382072 (MD. Fla. May 18, 2006) .....24

*Gulf USA Corp. v. Federal Ins. Co.*,
    259 F.3d 1049 (9th Cir. 2001) .............................................................................25

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................................6,9

*Heideman v. South Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003) ........................................................................25

*Hines v. Davidowitz,*
   312 U.S. 52 (1941)................................................................................... 25, 26

*Holder v. Humanitarian Law Project*,
   130 S. Ct. 2705 (2010)...................................................................................4, 12

*Home Oil Co., Inc. v. Sam's East, Inc.*,
   252 F.Supp. 2d 1302 (M.D. Fla. 2003)...............................................................24

*Hunt v. Wash. State Apple Adver. Com'n.*,
   432 U.S. 333 (1977)......................................................................................5, 11

*Illinois v. Caballes*,
   543 U.S. 405 (2005).........................................................................................34

*In re Infolink Group, Inc.,* Bankr. Nos. 10-26423-AJC 10-26436-AJC, 2011 WL
   1655882 (S.D. Fla. Bkrtcy. May 2, 2011) ..........................................................24

*Johnson v. Housing Authority of Jefferson Parish*,
   442 F.3d 356 (5th Cir. 2006) ............................................................................23

*Lee v. Ferraro*,
   284 F.3d 1188 (11th Cir. 2002) ........................................................................37

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
   51 F.3d 982 (11th Cir. 1995) ............................................................................24

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...........................................................................................3

*M.K.B. v. Eggelston*,
    445 F.Supp. 400 (S.D.N.Y. 2006) .......................................................................23

*Marx v. Gumbinner*,
    905 F.2d 1503 (11th Cir. 1990) ...........................................................................33

*McNally v. Eve*,
    2008 WL 1931317 (M.D. Fla. May 2, 2008) .......................................................37

*Medvar v. State*,
    286 Ga. App. 177 (2007) .....................................................................................35

*Muehler v. Mena*,
    544 U.S. 93 (2005)...............................................................................................31

*Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*,
    357 U.S. 449, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958) ......................................10

*Pennsylvania v. West Virginia*,
    262 U.S. 553 (1923)................................................................................................4

*R.B. ex rel. Parent v. Mastery Charter School*,
    762 F.Supp. 2d 745 (E.D. Pa. 2010)....................................................................25

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
    993 F.2d 800 (11th Cir. 1993) ...............................................................................2

*Saenz v. Roe*,
    526 U.S. 489 (1999)..............................................................................................39

*Sierra Club, Lone Star Chapter v. Fed. Dep. Ins. Corp.*,
    992 F.2d 545 (5th Cir. 1993) ...............................................................................24

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976)........................................................................................3

*State v. Grant*,
  195 Ga. App. 859 (1990) ............................................................................35

*Summit Med. Assocs., P.C. v. Pryor*,
  180 F.3d 1326 (11th Cir. 1999) .................................................................44

*United States v. Arizona*,
  __ F.3d __, 2011 WL 1346945  (9th Cir. APri. 11, 2011), *aff'g* 703 F. Supp. 2d
  980 (D. Ariz. 2010)......................................................................................23

*United States v. Arizona*,
  703 F. Supp. 2d 980 (D. Ariz. 2010) .........................................................24

*United States v. Blair*,
  524 F.3d 740 (6th Cir. 2008) ......................................................................32

*United States v. Brigoni-Ponce*,
  422 U.S. 873 (1975)............................................................................. 34, 35

*United States v. Choudhury*,
  461 F.3d 1097 (9th Cir. 2006) ....................................................................37

*United States. v. Cruz-Hernandez*,
  62 F.3d 1353 (11th Cir. 1995) ....................................................................15

*United States v. Guerrero-Espinoza*,
  462 F.3d 1302 (10th Cir. 2006) ..................................................................32

*United States v. Hardy*,
  855 F.2d 753 (11th Cir. 1988) ....................................................................35

*United States v. Hernandez*,
  418 F.3d 1206 (11th Cir. 2005) ....................................................... 31, 33

*United States v. Holloman*,
  113 F.3d 192 (11th Cir. 1997) ...............................................................31

*United States v. Montero-Camargo*,
  208 F.3d 1122 (9th Cir. 2000) ..............................................................15

*United States v. Montoya de Hernandez*,
  473 U.S. 531 (1985)...............................................................................34

*United States v. O'Connell*,
  890 F.2d 563 (1st Cir. 1989)..................................................................25

*United States v. Peralez*,
  526 F.3d 1115 (8th Cir. 2007) ......................................................... 33, 36

*United States v. Pruitt*,
  174 F.3d 1215 (11th Cir. 1999) .............................................................31

*United States v. Purcell*,
  236 F.3d 1274 (11th Cir. 2001) .............................................................31

*United States v. Santillanes*,
  848 F.2d 1103 (10th Cir. 1988) .............................................................38

*United States v. Tapia*,
  912 F.2d 1367 (11th Cir. 1990) .............................................................32

*United States v. Urrieta*,
  520 F.3d 569 (6th Cir. 2008) .................................................................32

*United States v. Viezca*,
    555 F.Supp. 2d 1254 (M.D. Ala. 2008)................................................................31

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981).............................................................................................24

*Victorian v. Miller*,
    813 F.2d 718 (5th Cir. 1987) ..............................................................................23

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988)...............................................................................................4

*Von Stein v. Brescher*,
    904 F.2d 572 (11th Cir. 1990) ............................................................................37

*Watt v  Energy Action Educ. Found.*,
    454 U.S. 151 (1981)...............................................................................................3

*Whren v. United States*,
    517 U.S. 806 (1996).............................................................................................37

*Wright v. City of Roanoke Redevelopment & Housing Authority*,
    479 U.S. 418 (1987).............................................................................................22

## CONSTITUTIONAL PROVISIONS

Ga. Const. Art. 5 § 2, ¶ 2 ..........................................................................................44

## STATUTES

24 CFR
    § 5.216................................................................................................................28

42 U.S.C.

  § 1981.................................................................................................................43

  § 1983............................................................................................... 22, 42

  § 3543.................................................................................................................28

7 C.F.R.

  § 273.2(f)(1)(vii) ............................................................................. 26, 28

7 U.S.C.

  § 2020(e)(3) ……………………………………………………………....  28

8 U.S.C.

  § 1324a(h)(2) ...................................................................................................23

  § 1625............................................................................................... 26, 27

  § 1642............................................................................................... 26, 28

A.R.S.

  § 11-1051(B)(4) ...............................................................................................23

  § 2-11-7(8)(B)(4) .............................................................................................24

O.C.G.A.

  § 17-1-2.............................................................................................................44

  § 17-5-100(d) ...................................................................................................15

  § 17-5-100(e) ...................................................................................................37

  § 36-50-1(e)(1)..................................................................................................27

**RULES**

Federal Rules of Civil Procedure

  § 8(a)(2) .............................................................................................................2

  § 12(b)(1) ...........................................................................................................1

  § 12(b)(6) ...........................................................................................................1

**OTHER AUTHORITIES**

Brennan Center for Justice, *Citizens without Proof: A Survey of America's Possession of Documentary Proof of Citizenship and Photo Identification*, Nov. 2006 ...................................................................................................28

David A. Harris, *"Driving While Black" and All Other Traffic Offenses*, 87 Crim. L. Criminology 544 (1997)...............................................................20

M. V. Hood III & Charles S. Bullock, III, *Worth a Thousand Words? An Analysis of Georgia's Voter Identification Statute* (2007)...................................................28

Sonji Jacobs & Megan Clarke, *No ID? Votes Cast Can Become Castoffs*, Atl. J. Const., Nov. 2, 2007 ......................................................................28

**LEGISLATIVE MATERIALS**

Food Stamp Act and the Housing and Community Development Act....................22

Housing Choice Voucher Program ……………………………………………45

Legal Arizona Workers Act.................................................................23

**INTRODUCTION**

Plaintiffs in this action include 10 organizations with thousands of diverse immigrant and citizen members and clients throughout Georgia and 12 individual Plaintiffs.  Defendants' motion under Federal Rules of Civil Procedure 12(b)(1) must be denied because the pleadings unquestionably demonstrate that the individual and organizational Plaintiffs face specific, concrete, and objective harms under HB 87 and all of the other requisites for standing are met.  This is precisely the sort of case where, as the Supreme Court has recognized, "a plaintiff need not first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute."  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979).  Similarly, there is no merit to Defendants' motion under Rule 12(b)(6), which simply ignores allegations in Plaintiffs' well-pled Complaint.  Plaintiffs' claims are amply supported under the standard for Rule 12(b)(6) motions.  Defendants' motion should be denied in its entirety.

## I.  PLAINTIFFS' COMPLAINT MEETS AND EXCEEDS THE PLEADING REQUIREMENTS OF RULE 8

Defendants incorrectly assert that the allegations in the Complaint fail to "give rise to a 'plausible' suggestion of unlawful conduct."  Defs. Deal Olens, Reese and Betty's Br. in Supp. of their Mot. to Dismiss (hereinafter "Defs.' Br.") at 9 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 565-66 (2007)).

1

Notably, Fed. R. Civ. P. 8(a)(2) requires a "short and plain statement of the claim," but "does *not* require detailed factual allegations." *Ashcroft v. Iqbal,* 556 U.S. __, 129 S.Ct. 1937, 1949 (2009) (emphasis added). Although a "blanket assertion" of a right to relief is insufficient, a plaintiff need only allege sufficient facts to raise his right to relief "above the speculative level." *Twombly,* 550 U.S. at 555. Moreover, in determining the sufficiency of a pleading for purposes of a motion to dismiss, the court must "take all of the factual allegations in the Complaint as true." *Iqbal*, 129 S.Ct. at 1949-50. *See also Twombly,* 550 U.S. at 556 (allegations in Complaint must be "taken as true" and "a well-pleaded Complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable"). Plaintiffs' 82-page Complaint far exceeds these standards.[1]

## II. <u>PLAINTIFFS HAVE STANDING TO RAISE ALL OF THEIR CLAIMS</u>

Defendants contend that Plaintiffs lack standing to bring their claims in federal court. Defs.' Br. at 11-24. Because Defendants challenge standing through a motion to dismiss, Plaintiffs rely on their Complaint and supporting

---

[1] Defendants attempt to discount the first 40 pages of Plaintiffs' Complaint because they "define the parties." Defs.' Br. at 10. But, within those 40 pages, Plaintiffs set forth precisely how they are injured by provisions of HB 87 and explain why they have standing. Compl. at 1-40.

declarations,[2] which contains more than sufficient factual allegations of injury resulting from HB 87 to establish standing at this stage of the litigation. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (noting that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct" is sufficient). Moreover, the Court must "presume that general allegations [in the Complaint] embrace those specific facts that are necessary to support the claim." *Id.*

As an initial matter, Plaintiffs have sufficiently demonstrated the three elements of standing: (1) that the plaintiffs will suffer an "injury in fact" that is "concrete and particularized," and "actual or imminent, not 'conjectural' or 'hypothetical;'" (2) a causal connection between the injury and the conduct complained of; and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 560-61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). Each of the Plaintiffs in this case meets these requirements, although once the Court finds that one plaintiff has standing, it need not address the standing of other plaintiffs raising the same claim. *See, e.g., Watt v. Energy Action Educ. Found.*, 454 U.S.

---

[2] Moreover, in making its determination, the Court is not restricted to the face of the complaint—it may rely on affidavits submitted in support of the complaint. *See Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993).

151, 160 (1981).

As a constitutional requirement, "the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."[3] *Flast v. Cohen*, 392 U.S. 83, 101 (1968). Notably, while "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement [citation omitted] . . . '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" *Babbitt*, 442 U.S. at 298 (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)). In such circumstances, courts have routinely found that plaintiffs have standing to bring facial challenges to statutes and ordinances that have not yet been applied to them. *See Babbitt*, 442 U.S. at 298-302; *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2716 (2010); *Fl. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008).

---

[3] Defendants do not contest Plaintiffs' standing on a prudential basis, nor could they as none of the bases for restraint on the exercise of federal jurisdiction arise here. *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004) (noting "prudential standing encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked") (internal quotations omitted).

4

### A. Harms to Plaintiff Organizations

An organization may establish standing in its own right if a challenged law hinders it from providing services or from otherwise carrying out its mission. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  For example, an organization has standing where the challenged statute frustrates the organization's goals and requires the organization to "divert resources from its regular activities" *Common Cause/ Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009); *see also Browning*, 522 F.3d at 1161.

In addition, an organization has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Com'n.*, 432 U.S. 333, 343 (1977); *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999). Both forms of standing apply to the organizational Plaintiffs in this case.

### 1. The Organizational Plaintiffs Have Standing in Their Own Right

All of the Plaintiff organizations have alleged concrete and imminent injuries on their own behalf regarding HB 87's provisions.  Defendants contend that the Plaintiff organizations lack standing because they have failed to allege that

HB 87, if implemented, would adversely impact their particular organizational missions. Defs.' Br. at 19. This contention lacks merit. The Complaint clearly alleges that HB 87 will impair the ability of Plaintiff organizations to carry out their organizational missions. *See Havens*, 455 U.S. at 379; *Common Cause/ Georgia*, 554 F.3d at 1350. For example, Plaintiff Coalition of Latino Leaders (CLILA) is a community-based organization whose mission is to develop grassroots Latino leadership. The organization provides "citizenship classes; English-language classes; Homework Club for children whose parents do not speak English; computer classes; and assistance in completing applications for legal residency and naturalization." Compl. ¶ 36. Due to the passage of HB 87, "CLILA's resources, both in terms of funding and staff and volunteer time, have been diverted from organizational priority projects." *Id.* Specifically, the number of calls CLILA receives daily has increased by 400 percent since HB 87 was passed, and the vast majority of these calls are from community members who have questions about the new law and how it will affect them. *Id.* at ¶ 37. As a result, "CLILA has been forced to put on hold its citizenship classes in order to respond to this increase in calls and to answer questions about HB 87." *Id.*

In addition, since the passage of HB 87, Plaintiff Task Force for the Homeless (TFH) has "diverted resources from other organizational priorities to

6

educate its volunteers and residents about the law," a trend that will only accelerate if HB 87 takes effect. *Id.* at. ¶ 30.  Specifically, TFH encourages its residents to apply for food stamps and public housing, a process that has not traditionally consumed significant staff time. *Id.* at ¶ 32.  If Sections 17-19 of HB 87—the provisions mandating new public benefits identification document requirements and related criminal penalties—take effect, "TFH will be overburdened by requests from residents for help with overcoming problems caused by these new document requirements, including the time-consuming process of obtaining qualifying identity documents." *Id*.  In addition, when otherwise eligible residents are denied public benefits, due to HB 87's requirements, TFH will be forced to provide more direct food and housing assistance. *Id*.  "This diversion of resources will be a major impediment to TFH residents' access to essential services, and to TFH's work in other areas," such as providing a recovery program, an emergency assistance hotline, and employment placement assistance. *Id*. at ¶¶ 29, 32.  Similarly, if HB 87 takes effect, Plaintiff Georgia Latino Alliance for Human Rights (GLAHR) "will no longer be able to conduct education around local ordinances, and instead will have to focus all of its educational efforts on determining the effects of HB 87 and educating its members about it." *Id.* at ¶ 17.  Contrary to Defendants' claims, these allegations of harm to the organizational

Plaintiffs based on a diversion of resources and a frustration of organizational missions as a result of HB 87 are not speculative, unspecified, or abstract. *See* Defs.' Br.at 19-20. Instead, Plaintiffs have clearly alleged specific ways in which their core activities have already been undermined due to the passage of HB 87 and will be further undermined if it takes effect.

Nor are these the only examples of injuries to the organizational Plaintiffs. The Complaint also sets forth facts showing that the other Plaintiff organizations have had to divert resources from core mission priorities because of HB 87. *See* Compl. ¶¶ 20-21 (Service Employees International Union (SEIU)); 22-25 (Southern Regional Joint Board of Workers' United (Joint Board)); 33 (Asian American Legal Advocacy Center); 34-35 (Alterna); 40-42 (Georgia Coalition for the Peoples' Agenda (CPA)); *see also* Nicholls Decl. (Doc. 29-22) ¶¶ 7- 8, 17-18 (GLAHR); America Gruner Decl. (Doc. 29-20) ¶¶ 9-10 (CLILA); Beaty Decl. (Doc. 29-23) ¶¶ 9, 15-16 (TFH); Flores Decl. (Doc. 29-21) ¶¶ 6, 7, 13 (Alterna); Ho Decl. (Doc. 29-24) ¶ 7 (Asian American Legal Advocacy Center); Ali-Beik Decl. (Doc. 29-25) ¶¶ 4, 6-9 (DreamActivist.org); Gonzalez-Lamberson Decl. (Doc. 29-28) ¶ 8 (Instituto de Mexico, Inc. of Atlanta (Instituto)); Medina Decl. (Doc. 29-26) ¶¶ 9-10 (SEIU); Raynor Decl. (Doc. 29-27) ¶¶ 5, 9-10 (Joint Board). Under settled case law, each of the organizational Plaintiffs has standing to

8

challenge HB 87 because each is harmed by the diversion of resources from, and impediment to, its organizational mission due to HB 87. *See Havens Realty Corp.*, 455 U.S. at 379 (noting diversion of organizational resources caused by need to respond to discriminatory real estate practices); *Common Cause/Georgia,* 554 F.3d at 1350 (noting diversion of organizational resources caused by need to educate members about new photo identification voting requirements); *Browning*, 522 F.3d at 1165-66 ("The organizations reasonably anticipate that they will have to divert personnel and time to educating volunteers and voters on compliance with [challenged law]."). Defendants attempt to minimize the substantial harms the organizational Plaintiffs have already sustained due to HB 87's passage by claiming that these Plaintiffs only serve "causes related to the broad societal interests of immigration" and, therefore, that the stated purposes of these organizations are not sufficiently tied to HB 87 and its provisions. Defs.' Br. at 20. Nothing could be further from the truth. As just one example, Plaintiff TFH serves low-income Georgians and assists them in seeking public benefits. Their mission is directly undermined by HB 87 provisions that impose additional, and unlawful, requirements on benefits seekers in the state.

Furthermore, the organizational Plaintiffs are also concretely harmed by HB 87 because their missions have been and will continue to be frustrated as their

9

members and clients will be afraid to gather in public places, attend marches and meetings, and engage in other advocacy and organizing activities that might bring them into contact with law enforcement.  These Plaintiffs will face diminished membership and serve fewer clients if the law takes effect.  For example, Plaintiff Alterna "has already experienced a significant drop in attendance at events as well as a decrease in clients since HB 87 passed."  Compl. ¶ 35.  This faith-based social services group "has already been forced to cancel some of its English-language classes" and otherwise alter programming as a result.  *Id*.  If HB 87 takes effect, Alterna anticipates a steeper decline in attendance and demand for services.  *Id*. Other Plaintiff organizations are facing similar decreases.  *See Id.* at ¶¶ 18-19 (GLAHR), 21 (SEIU), 23-25 (Joint Board), 37 (CLILA), 39 (Instituto), 42 (CPA); *see also* Nicholls Decl. ¶ 9 (GLAHR); America Gruner Decl. ¶ 15 (CLILA); Flores Decl. ¶ 13 (Alterna); Ali-Beik Decl. ¶¶ 4, 6-9 (Dream Activist.org); Gonzalez-Lamberson Decl. ¶¶ 9-10 (Instituto); Raynor Decl. ¶¶ 5, 9-10 (Joint Board).  These kinds of harms to the missions of organizational Plaintiffs have routinely been deemed sufficient to establish standing.  *See NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 459-60 (1958) (holding that association has standing to enjoin statute that would cause association's membership to be diminished); *Browning*, 522 F.3d at 1166 (finding standing where organization had to cancel

10

specific projects in response to an allegedly unconstitutional statute); *see also Am. Fed'n of Gov't Employees Local 1 v. Stone*, 502 F.3d 1027, 1033 (9th Cir. 2007) ("an increased difficulty in recruiting union members qualifies as a concrete and demonstrable injury") (quotation omitted).

### 2. The Organizational Plaintiffs Have Standing on Behalf of Their Members

In addition to the harms that the Plaintiff organizations will suffer on their own behalf, a number of the Plaintiff organizations have standing to raise claims based on the additional ground that their members will be harmed by HB 87. *Hunt*, 432 U.S. at 343; *Stincer*, 175 F.3d at 882.  For several of the Plaintiff organizations, their members are at high risk of suffering specific harms from HB 87's unconstitutional provisions, including arrest and prosecution, for all the reasons set forth below in Sections II.B and II.C below.  Several of the organizational Plaintiffs have alleged that they do not condition membership on citizenship or immigration status, and their members or immediate family may be undocumented.  *See, e.g.*, Compl. ¶¶ 19 (GLAHR); 34 (Alterna); 26 (CLILA). Other organizational Plaintiffs have alleged that their members, even if lawfully present in the United States, do not have access to the identity documents prescribed by HB 87.  *See, e.g.*, Compl. ¶¶ 24 (some Joint Board members do not have access to prescribed identity documents); 27 (DREAM Activist.org. members

11

have lawful status but no access to prescribed identity documents); 31 (TFH volunteers and residents—nearly all of whom are homeless—seldom carry identity documents); 41 (many CPA members who are elderly or struggling to make ends meet do not have prescribed identity documents).  In addition, Plaintiff SEIU, through its local affiliate, the Joint Board, represents approximately 4,000 employees in the state, 60 percent of whom are members, 15 to 20 percent of whom are Latino, and some of whom are other racial minorities.  *Id.* at ¶ 20. Members or clients of these Plaintiffs are at imminent risk of unconstitutional prolonged detention, loss of access to services or benefits, or even prosecution under HB 87's sweeping provisions.  *See Humanitarian Law Project*, 130 S. Ct. 2713 at *13 (finding standing for plaintiffs to bring a pre-enforcement challenge to a criminal law where they "claimed that they wished to provide support for the humanitarian and political activities" of two organizations, "but that they could not do so for fear of prosecution" under the challenged law).

### B. Harms to Plaintiffs Related to Interrogation and Extended Detentions Pending Immigration Status Verification

Both the individual Plaintiffs and members of the organizational Plaintiffs are subject to unlawful stops and improper extension of stops by law enforcement for the purposes of questioning about their immigration status under Section 8 of HB 87.  Defendants assert that these fears are unfounded and that any potential

12

injuries from Section 8 are speculative.  Defs.' Br.. at 14-15; 23-24.  However,

Defendants ignore the plain purpose of Section 8:  to include within virtually every

encounter with state and local law enforcement an investigation of individuals'

immigration status.  HB 87's immigration verification provision constitutes a

departure from law enforcement norms, as immigration investigations do not

normally occur during routine encounters such as traffic stops, and its effects on

Plaintiffs are far from speculative.  For example, Plaintiffs such as Jane Doe #2 or

members of DREAM Activist.org who have deferred action from the federal

government are at great risk of being deemed to lack valid immigration status by

Georgia law enforcement officials, and therefore being subjected to prolonged

detention and arrest under Section 8, even though federal immigration officials are

aware of their presence in the country and have elected not to deport or detain

them.  *See* Compl. ¶ 58 (Jane Doe #2 was granted a deferred action by the federal

government, but has no paperwork to show her status and lacks the qualifying

identity documents enumerated by HB 87); Mohammad Abdollahi Ali-Beik Decl.

¶ 8 (DREAM Activist.org members have been granted deferred action but lack

qualifying identity documents).

The individual Plaintiffs and members of the organizational Plaintiffs will be

subjected to extended police stops and detention based on their race or ethnicity if

13

HB 87 takes effect because the law authorizes investigation of immigration status. Indeed, individual Plaintiffs and members of the organizational Plaintiffs have been subjected to unfounded police stops and faced questioning regarding their identity or immigration status in Georgia jurisdictions where officers have already implemented the procedures mandated as a matter of state law by HB 87. *See* Compl. ¶ 21 (Latino SEIU members and their families have already been stopped by local law enforcement and asked for proof of status); ¶ 24 (Joint Board members have reported additional police scrutiny since HB 87 passage; some members lack qualifying identity documents and are at risk of lengthy detention); ¶ 53 (John Doe #1 has been subject to racial profiling in the past and fears future racial profiling because of his dark hair and skin); ¶ 56 (John Doe #2 has been subject to racial profiling in the past and now drives as little as possible because he fears future racial profiling).[4]  It is especially evident that such individuals should expect yet more stops and questioning *statewide* if HB 87 goes into effect.  Eliseo Medina Decl. (Doc. 29-26) ¶ 8; Harris Raynor Decl. ¶¶ 4, 6-7; Speight Decl. (Doc. 29-8) ¶¶ 7-11; Kennedy Decl. (Doc. 29-6) ¶¶ 5-9; Piñon Decl. (Doc. 29-16) ¶¶ 5-8;

---

[4] While Defendants attempt to argue that racial profiling prior to the effective date of HB 87 has no relevance to the case (Defs.' Br. at 49), the fact that such misconduct is already occurring in jurisdictions that, even before HB 87's implementation, are inappropriately attempting to verify immigration status lends substantial weight to Plaintiffs' fears that similar misconduct will occur if HB 87 is implemented and will cause even greater injury.

Howe Decl. (Doc. 29-9) ¶¶ 5–7, 11; Jane Doe #1 Decl. (Doc. 29-12) ¶¶ 3-4, 7-8; Jane Doe #2 Decl. (Doc. 29-5) ¶¶ 8-11; Singh Decl. (Doc. 29-17) ¶¶ 4, 6-7; John Doe #1 Decl. (Doc. 29-18) ¶¶ 8, 10-11; John Doe #2 Decl. (Doc. 29-19) ¶¶ 3-6, 8; Bridges Decl. (Doc. 29-7) ¶¶ 9-16; Edwards Decl. (Doc. 29-10) ¶¶ 6- 8; Sharon Gruner Decl. (Doc. 29-11) ¶¶ 3-8; see also Silva America Gruner Decl. ¶¶ 15-17 (noting same fear in community); Anton Flores Decl. ¶¶ 8-12 (same); Adelina Nicholls Decl. ¶¶ 12, 14, 18-21 (same).

The Defendants attempt to dismiss these concrete injuries by claiming that use of race or ethnicity is specifically barred by HB 87's text.  This ignores the fact that that provision has a broad exception allowing consideration of race or ethnicity "to the extent permitted by the Constitutions of Georgia and the United States," O.C.G.A. § 17-5-100(d), and that some courts have suggested that factors such as race or ethnicity can be relevant in the immigration enforcement context, notwithstanding the fact that there is also strong authority prohibiting reliance on racial and ethnic appearance in this context.  *See United States v. Cruz-Hernandez*, 62 F.3d 1353, 1356 (11th Cir. 1995) (permitting consideration of Hispanic appearance by a Border Patrol officer to establish reasonable suspicion that an individual lacked immigration status); *cf. United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) (Hispanic appearance is "of such little probative

15

value that it may not be considered as a relevant factor where particularized or individualized suspicion is required."). For this reason, the boilerplate language in HB 87 that simply states that law enforcement officers may not consider "race, color, or national origin" except to the extent permitted by the Georgia and U.S. Constitutions provides no meaningful protection against the use of these factors in the enforcement of HB 87. Moreover, as described in Plaintiffs' law enforcement declarations, law enforcement officials implementing HB 87 are likely to rely on factors such as race, ethnicity, national origin, language ability, accent, and appearance in deciding whether to verify immigration status under Section 8. George Gascón Decl. (Doc. 29-13) ¶¶ 8-9; Eduardo Gonzalez Decl. (Doc. 29-14) ¶¶ 16-17; Lewis Smith Decl. (Doc. 29-15) ¶ 8.

The Defendants do not contest Plaintiffs' standing for their right to travel claim, nor could they. Plaintiffs Piñon and Singh hold Washington State driver licenses and reside in or plan to reside in Georgia soon. Compl. 51-52; *see also* Piñon Decl. ¶¶ 2-3, 7; Singh Decl. ¶ 2. They will regularly drive in Georgia, and will curtail their travel in Georgia out of fear of being stopped by law enforcement and subject to prolonged questioning and detention since their validly issued Washington State driver licenses do not entitle them to a presumption that they are lawfully present in the United States under HB 87. *See* Piñon Decl. ¶¶ 2-3, 7;

16

Singh Decl. ¶ 2.  Plaintiffs Piñon and Singh will suffer irreparable harm due to the limitation on their freedom of movement and their reduction in travel in order to avoid police interrogation.  *See* Piñon Decl. ¶ 8; Singh Decl. ¶¶ 4-7.  This fear is neither speculative nor conjectural.

As Defendants admit, Defs.' Br. at 12, Plaintiffs need not violate any law or ordinance to come within the reach of Section 8's verification of immigration status, and an officer investigating a *potential* violation of law (including HB 87's new criminal provisions) may opt to detain individuals in order to verify immigration status under Section 8.  Under Section 8, law enforcement officers may verify immigration status in the course of any criminal investigation, whether or not anyone is ever charged with violating the law.

Defendants characterize the individual Plaintiffs' allegations of threatened harm from HB 87 as mere generalized or hypothetical fears, relying principally on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).  Defs.' Br. at 13-14.  However, unlike in *Lyons,* where the plaintiff could not establish that the next time he was stopped he would again be subjected to a chokehold, in this case when individual plaintiffs are again stopped there is a statute that specifically authorizes officers to prolong their detention to verify their immigration status.  *See Church v. City of Huntsville*, 30 F.3d 1332, 1339 (11th Cir. 1994) (city's alleged "custom, practice

17

and policy of arresting, harassing and otherwise interfering with homeless people"

for engaging in ordinary activity "is therefore distinguishable from *Lyons*, where

the alleged policy did not necessarily authorize the constitutional deprivation

Lyons suffered"). Moreover, for the organizational Plaintiffs with many members,

the likelihood of suffering such harm is greater. The chain of events required

before the plaintiff in *Lyons* would have been subjected to an unconstitutional

chokehold again is simply not analogous to the implementation of a statewide law

that would allow any law enforcement officer to verify immigration status during

the course of any criminal investigation—no matter how minor.

For all of these reasons, the likelihood that Plaintiffs will be injured by HB

87 Section 8, if it goes into effect, is neither hypothetical nor merely subjective, but

certainly sufficient to satisfy Article III's "case or controversy" requirement.

## C. Harms to Plaintiffs based on Threat of Criminal Prosecution

Most of the organizational Plaintiffs and several of the individual Plaintiffs

also have standing to challenge the provisions of HB 87, including Section 7, that

create new state law immigration offenses. Section 7 creates state criminal

offenses for transporting, harboring, or concealing "illegal aliens." As

demonstrated by the fact that the state legislature considered it necessary to create

specific exemptions to the law for "person[s] providing privately funded social

18

services," these provisions sweep broadly and cover the conduct of many persons who provide assistance to non-citizens without federal authorization to remain in the United States. For example, Plaintiff DREAM Activist.org "harbors undocumented students in houses within the State of Georgia and provides transportation to undocumented students with and without deferred action grants" for conferences and trainings sessions in Georgia which are fundamental to their mission of legal reform. Compl. ¶ 28. DREAM Activist.org will continue to conduct such activities, including providing transportation to meetings in Georgia for undocumented students from around the nation. *Id.* If HB 87 takes effect, these activities could expose DREAM Activist.org members to criminal liability. *Id.* at ¶¶ 31, 35, 37. These provisions also apply to the current activities of individual Plaintiffs and some organizational Plaintiffs. *Id*. at ¶¶ 43-44 (Plaintiff Bridges gives rides to undocumented friends in Georgia on a daily basis, has driven undocumented friends into Georgia from Florida, and has housed undocumented individuals in his home, and he will continue each of these activities in the future); *Id*. at ¶ 46 (Plaintiff Speight regularly transports undocumented students and other undocumented individuals in his union-issued van); *Id*. at ¶ 47 (Plaintiff Howe, through his church community service program, transports families and individuals, including those who are undocumented, to

19

hospital visits or other appointments); *Id*. at ¶ 48 (Plaintiff Edwards transports people, including those who are undocumented, to places of worship and to locations which provide medical assistance; he also helps to plan events that include housing undocumented individuals); *Id*. at ¶ 49 (Plaintiff Gruner transports and shelters undocumented individuals as part of her volunteer work); *Id*. at ¶ 50 (Plaintiff Jane Doe #1 drives her incapacitated husband, who lacks legal status, to doctor's appointments and physical therapy); *Id*. at ¶ 60 (Plaintiff Kennedy, an immigration lawyer, meets with, gives legal advice to, and transports undocumented persons); *Id*. at ¶ 25 (Plaintiff SEIU transports potential members to union meetings and events, but will be chilled from doing so if HB 87 takes effect). Defendants do not assert that all of this conduct is exempted from liability under Section 7.

While Defendants note that Plaintiffs would have to "be 'committing another criminal offense' or 'acting in violation of another criminal offense'" to establish standing to be subject to Section 7 (Defs.' Br.. at 14), this prerequisite is very broad.  As law enforcement experts explain, it is virtually impossible to avoid committing minor traffic offenses and police officers wishing to stop certain individuals need wait only a limited time in order to have a pretextual reason to stop that individual.  *See* David A. Harris, *"Driving While Black" and All Other*

*Traffic Offenses*, 87 Crim. L.  Criminology 544, 545 (1997) ("In the most literal sense no driver can avoid violating some traffic law during a short drive, even with the most careful attention."); *see also* Gascón Decl. ¶ 9 ("[A]n officer motivated by racial or ethnic discrimination or by race-based stereotypes of what an illegal immigrant looks like can easily find a pretext for stopping an individual, for example, by following a car until a minor traffic violation occurs.").

For all of these reasons, the Plaintiffs clearly have standing to challenge Section 7.  Because of the broad authority that HB 87, including Section 7, gives to law enforcement officers, the application of these provisions to Plaintiffs is beyond the Plaintiffs' control.

The Defendants also question Plaintiffs' ability to challenge Section 19's "secure and verifiable documents" requirement as "speculative and unfounded." Defs.' Br. at 16.  Defendants downplay the injury from Section 19 and fail to recognize the injury to Plaintiffs who will be prohibited from using a validly issued identification document from a foreign government for a range of basic daily functions such as accessing public services and buildings.  *See* Compl. ¶¶ 54 (John Doe #1 worries that his family will no longer be able to use consular identification documents to access WIC services for his U.S. citizen siblings and relatives); ¶ 56 (John Doe #2 will be harmed because HB 87 prohibits him from relying on his

21

matricula to do such routine activities as open utilities accounts in his name, seek police assistance, and present identification at a hospital in Rome, all of which he has done in the past); *see also* Nicholls Decl. ¶ 16 (many GLAHR members use matriculas to enroll their children in school or to gain admission to public buildings).  These are concrete and non-speculative harms.

In sum, at this state of the litigation, Plaintiffs have more than sufficiently established standing for all of their claims.

## III.   PLAINTIFFS HAVE PROPERLY STATED A PREEMPTION CLAIM

We have previously explained, in our Motion for a Preliminary Injunction, why HB 87 is preempted by federal immigration law and the federal government's exclusive authority to regulate immigration.  We incorporate that explanation here and offer the following additional points in response to defendants' brief:

1.      Defendants argue at length that Plaintiffs' federal preemption claims cannot be brought under 42 U.S.C. § 1983.  But as defendants go on to concede, even if § 1983 does not provide the cause of action, "the Supreme Court has determined Federal-question jurisdiction over a preemption claim is proper" and this Court is "obligat[ed] to follow this [Supreme Court] precedent."  Defs.' Br. at 28 n.4.  Thus, even if it were correct, the State's § 1983 argument as to preemption

22

would not result in dismissal of any of Plaintiffs' claims or causes of action.[5]

      2.      Defendants also fundamentally misconstrue the plurality opinion in *Chamber of Commerce v. Whiting*, ___ U.S. ___, 131 S. Ct. 1968 (2011) (cited in Defs.' Br. at 32, 34, 35). *Whiting* involved an Arizona statute, the Legal Arizona Workers Act, that was enacted pursuant to an explicit authorization in federal law for state "licensing" laws relating to unauthorized workers and that does not resemble HB 87 in any respect. *Id.* at 1993 (citing 8 U.S.C. § 1324a(h)(2)).[6] In

---

[5] Accordingly, it is unnecessary to resolve this question on this motion. Nevertheless, Plaintiffs note that Defendants vastly overstate the holding of *Arrington v. Helms*, 438 F.3d 1336 (11th Cir. 2006). In *Arrington*, the Court of Appeals did not "disavow" § 1983 claims with respect to social programs, but instead explained that the tests in *Blessing v. Freestone,* 520 U.S. 329 (1997), and *Gonzaga University v. Doe,* 536 U.S. 273 (2002) must be applied to determine whether there is an enforceable right under the particular statute at issue. Courts have repeatedly found that the provisions in the statutes at issue in this litigation, including the Food Stamp Act and the Housing and Community Development Act, provide such a right. *See, e.g., Gonzalez v. Pingree*, 821 F.2d 1526 (11th Cir. 1987) (Food Stamp Act); *Victorian v. Miller*, 813 F.2d 718 (5th Cir. 1987) (same*); M.K.B. v. Eggelston*, 445 F.Supp. 400 (S.D.N.Y. 2006) (same); *Johnson v. Housing Authority of Jefferson Parish,* 442 F.3d 356 (5th Cir. 2006) (Housing Act and implementing regulations); *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987) (Housing Act and implementing regulations).

[6] Of course, the later Arizona law that *does* resemble HB 87, SB 1070, has been found largely preempted by the same lower courts that found the Legal Arizona Workers Act non-preempted. *See United States v. Arizona*, __ F.3d __, 2011 WL 1346945, at *4-*10, *15-*19 (9th Cir. Apr. 11, 2011), *aff'g* 703 F. Supp. 2d 980 (D. Ariz. 2010). It is this later Arizona law that includes a provision discriminating against certain out-of-state licenses – not the statute at issue in *Whiting*. *See* 703 F. Supp. at 993 (describing A.R.S. § 11-1051(B)(4), enacted by SB 1070); *cf.* Defs.'

this case, Defendants have not claimed any federal authorization for any of HB 87's provisions other than, perhaps, the public benefits provisions in Sections 17 and18, which is addressed below. *See* Defs.' Br. at 32-37.

*Whiting* does not undermine any of the decisions Plaintiffs rely on in their brief, and it certainly does not "clearly resolve . . . adverse to Plaintiffs," Defs.' Br. at 34, any claim that HB 87 interferes with federal immigration authority, foreign policy, or federal law. Rather, *Whiting* underscores the federal government's primary role in multiple ways: first, by looking to federal *authorization* as the touchstone of the Court's preemption analysis, and second, by carefully analyzing whether even an explicitly authorized state law contained provisions that could interfere with federal programs, goals, or objectives. *Whiting,* 131 S. Ct. at 1977-81.

Indeed, the conclusion that Defendants cite from *Whiting*—that the federal employer sanctions program "operates unimpeded by the state law," Defs.' Br. at 23—comes only after that careful analysis and only in light of Congress' express authorization of the state law. *Whiting,* 131 S. Ct. at 1977-81. Here, there is ample factual and legal basis for the conclusion that Georgia's unauthorized immigration

---

Br. at 44 n.11 (referring to nonexistent A.R.S. § 2-11-7(8)(B)(4) as "virtually identical" to HB 87 driver's license provision and stating that it is included in *Whiting* statute).

provisions interfere with the federal program of immigration regulation.  *See* Compl. ¶¶ 114-119, 122 (complexity of immigration status; individuals in intermediate statuses); 120-21 (federal verification procedures); 136 (Presidential criticism); 137 (interference with federal immigration priorities); 138-39 (interference with foreign affairs); Pls.' P.I. Br. 7-31.

Defendants' theory that the state may institute its own criminal laws governing interactions with unauthorized immigrants because such laws fall into an area where both the state and federal government "have concurrent jurisdiction . . . and neither need yield to the other," Defs.' Br. at 36-37, finds no support in *Whiting* and flies directly in the face of the Supreme Court's clear holding in *Hines v. Davidowitz,* 312 U.S. 52 (1941).  *Whiting* leaves *Hines*' longstanding holding untouched and does not explicitly or implicitly suggest that the state and federal governments have concurrent authority in immigration matters, especially in the matter of immigration-related crimes, which are both defined and enforced sparingly and selectively by the federal government.

Indeed, in *Hines* the Supreme Court struck down a state criminal statute relating to immigration, explaining that where "the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard," "states cannot, inconsistently with

25

the purpose of Congress, conflict or interfere with, curtail *or complement*, the federal law, *or enforce additional or auxiliary regulations*." 312 U.S. at 66-67 (emphases added). The fact that the state and federal laws in *Hines* addressed "identical" subjects weighed in favor of preemption, not against it. As the Supreme Court has since reiterated, "conflict is imminent when two separate remedies are brought to bear on the same activity." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000) (internal citations omitted). In *Whiting*, the same concern is not presented because the explicit federal *authorization* for the creation of state remedies implies that "Congress did not intend to prevent the States from using appropriate tools to exercise that authority." *Whiting*, 131 S. Ct. at 1981. By contrast, there is no authorization for the criminal provisions in HB 87 Section 7.

3.      Finally, Defendants' broad invocation of federally authorized public benefit eligibility restrictions entirely fails to address the specific conflict between HB 87's requirement that public benefits applicants produce an identification document approved by the state Attorney General, on the one hand, and federal statutes and regulations governing the Supplemental Nutritional Assistance Program ("SNAP") and federally subsidized housing, on the other. Plaintiffs

specifically raised these conflicts in the Complaint at ¶¶ 131-34.[7]

Section 17 of HB 87 is not focused on the verification of lawful presence as it related to *eligibility* for benefits.  Prior state law already accomplished that. Rather, Section 17 specifically requires that applicants for public benefits provide at least one approved identity document, O.C.G.A. § 36-50-1(e)(1), from an exclusive list to be published by the Attorney General, § 36-50-2(b)(3).  This additional requirement, which applies to citizens as well as non-citizens applying for federally funded food and housing assistance, is not authorized by any of the federal provisions Defendants cite.  Defendants' attempt to rely on 8 U.S.C. § 1625 is unavailing, since it pertains only to state and local public benefits.  Moreover, Congress specifically maintained federal control over verification of lawful presence for federal public benefits, delegating authority to the Attorney General to promulgate regulations specifying the procedures, and requiring that "a State that administers a program that provides a Federal public benefit shall have in effect a verification system that complies with the regulations," 8 USC § 1642.[8]  HB 87

---

[7] Plaintiffs did not specifically address public benefits in their Preliminary Injunction brief given the January 1, 2012 effective date of the relevant provisions. P.I. Br. at 3 n.1.

[8] The federal laws and regulations that HB 87 conflicts with ensure that the most vulnerable citizens and lawful residents can receive basic food and housing assistance.  Low-income and elderly individuals frequently lack identity documents that others think of as commonplace, and homelessness, disability,

conflicts with the requirements of federal law.

In a final attempt to avoid conflict, Defendants note without elaboration that HB 87 provides for an exclusion where "required by federal law."  Defs.' Br. at 34. This exclusion, however, appears in a separate section.  Moreover, Defendants do not offer specific assurance that this exclusion and the others that appear in Section 19 (pertaining to the use of designated documents for official purposes) will be interpreted to apply to Section 17, nor do they specifically state that federal rules governing verification of identity for SNAP at 7 C.F.R. § 273.2(f)(1)(vii) (implementing 7 USC § 2020(e)(3)) and federally subsidized housing, 24 CFR § 5.216 (implementing 42 USC § 3543) will be interpreted to meet this exclusion.

---

incapacity, or the need to flee domestic violence only exacerbate the problem.  *See, e.g.,* Sonji Jacobs & Megan Clarke, *No ID? Votes Cast Can Become Castoffs*, Atl. J. Const., Nov. 2, 2007, at 1A, *available at* http://archive.fairvote.org/?page=9& articlemode=showspecific&showarticle=2856 (198,000 registered Georgia voters lack a driver's license or alternate state photo identification document); *Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005) (one in four registered voters older than 65 owns no driver's license or Georgia ID card); Anita Beatty Decl. ¶15 (Doc. 29-23); Brennan Center for Justice, *Citizens without Proof: A Survey of America's Possession of Documentary Proof of Citizenship and Photo Identification*, Nov. 2006 (low-income citizens twice as likely to lack photo identification).  The burdens of a new identification requirement fall particularly heavily on certain groups of citizens.  A study of registered voters in Georgia found that African-Americans and Latinos were approximately twice as likely as Whites to lack a driver's license or other state-issued photo identification document.  M. V. Hood III & Charles S. Bullock, III, *Worth a Thousand Words? An Analysis of Georgia's Voter Identification Statute* (2004), Dept. of Political Science, Univ. of Georgia, Figure 1.

Were they to do so, Plaintiffs' conflict preemption claims regarding Section 17 would be resolved.

## IV.    PLAINTIFFS HAVE PROPERLY STATED A CLAIM UNDER THE FOURTH AMENDMENT

Plaintiffs have previously explained why HB 87 violates Plaintiffs' Fourth Amendment rights.  Pls. P.I. Br. (Doc. 29-1) 31-36.  That explanation is incorporated herein, and Plaintiffs raise the following additional arguments in response to Defendants' motion to dismiss.

Strikingly, Defendants do not deny any of Plaintiffs' central allegations regarding the Fourth Amendment claim.  Defendants do not deny that:  (1) HB 87 grants officers broad authority to extend detentions in order to investigate immigration status, beyond the time justified by the original stop (Defs.' Br.. at 8; Compl. ¶¶ 77, 78, 80); (2) Section 8 establishes an immigration status verification process that will greatly prolong ordinary police stops (Compl. ¶¶ 83, 85); (3) on average it would take the federal government over 80 minutes to respond to an immigration query from peace officers and, in some cases, it could take more than two days to respond (Compl. ¶ 86); (4) individuals who are not required to carry any state-approved documentation, such as pedestrians, passengers in cars, and drivers from Washington State, are subject to immigration status investigation if apprehended on probable cause (Compl. ¶¶ 51-52, 81); and (5) a large number of

29

individuals, including several individual Plaintiffs and members of the organizational Plaintiffs, are at significant risk of extended detention under Section 8 because they cannot produce a state-approved identity document even though they are citizens or foreign nationals residing in the United States with the permission of the federal government (Compl. ¶¶ 51-52, 57-58). *See generally* P.I. Br. at 31-36.

Instead of disputing any of these allegations that establish a clear Fourth Amendment violation, Defendants argue that HB 87 only operates to extend detention where initially there is probable cause to believe the individual apprehended has engaged in criminal activity. Defs.' Br.. at 38. And because an officer can not only detain but also ultimately arrest and book an individual where probable cause exists to believe that he or she has committed even a minor criminal offense, Defendants argue that the fact that HB 87 prolongs detention for some otherwise invalid reason, such as investigating immigration status, is of no consequence. Defs.' Br.. at 40. Defendants' theory misses the point that Supreme Court precedents specifically forbid the unreasonable extension of initially valid seizures, absent new suspicion that justifies the additional detention.

Bedrock Fourth Amendment principles provide that, while an officer may ask questions unrelated to the original purpose of a stop, such questioning must not

30

unreasonably prolong the stop.  *See Muehler v. Mena*, 544 U.S. 93, 100-01 (2005); *Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009); *United States v. Hernandez*, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005) (extending *Muehler* to the traffic stop context).  Once the purpose of an initial apprehension has been effectuated, the stop "may not last 'any longer than necessary to process the [original] violation' unless there is articulable suspicion of other illegal activity."  *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing *United States v. Holloman,* 113 F.3d 192, 196 (11th Cir. 1997)); *United States v. Pruitt*, 174 F.3d 1215 (11th Cir. 1999); *United States v. Viezca*, 555 F. Supp. 2d 1254, 1262 (M.D. Ala. 2008) ("The officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong[ ] beyond the time reasonably required to complete that mission.") (internal citation omitted).

Thus, Defendants' theory is contrary to well-established Supreme Court and Eleventh Circuit limitations on warrantless detention.  An officer cannot extend a stop without additional suspicion of unlawful activity; the fact that he could have arrested the individual for the original offense—but actually decided to, for example, issue only a citation for such offense and release the individual—does not justify any additional detention for a different purpose.  If the rule were otherwise,

31

there would be no need for courts to ever require additional suspicion to lawfully extend an initially valid stop.  That is not the law.

Indeed, courts have found Fourth Amendment violations when officers prolong stops without the necessary additional suspicion.  *See, e.g.*, *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990) (finding that officer's further investigation of a driver originally stopped for speeding unlawfully prolonged the detention because of lack of suspicion of criminal activity beyond a speeding citation); *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308 n.6 (10th Cir. 2006) (although trooper's initial stop of driver for speeding was lawful, his further questioning unconstitutionally prolonged the detention, since there was no dispute that the traffic stop had ended prior to the additional inquiry); *United States v. Urrieta*, 520 F.3d 569 (6th Cir. 2008) (finding that although the officer lawfully stopped plaintiff for lacking a valid registration sticker and non-working taillights, the officer did not have reasonable suspicion to continue to detain plaintiff to investigate whether he was involved in a drug-related crime based on among other things his Mexican driver's license, inability to locate Mexican passport, and a "fully packed" car); *United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008) ("holding that the remainder of the stop violated the Fourth Amendment" where "action extended the scope and duration of the stop beyond that necessary to issue

32

a citation for a tag-light violation" and without "develop[ment of] reasonable, articulable suspicion of criminal activity by that point"); *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2007) (while the "traffic stop for an obstructed license was lawful at its inception," "[t]he off-topic questions more than doubled the time [plaintiff] was detained" and the "extent and duration of the trooper's focus on non-routine questions prolonged the stop 'beyond the time reasonably required' to complete its purpose"). *Cf. United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2005) ("Even *if* the duration of the pre-consensual detention in this case did extend beyond what might have been reasonable for just a routine traffic stop, the facts that came to light from the beginning of the stop—*facts giving rise to reasonable suspicion that an additional crime was being committed*—were more than sufficient to justify this detention of no more than seventeen minutes.") (emphasis added).

Defendants' suggestion that the existence of probable cause at the time of a stop or arrest is an absolute bar to any Fourth Amendment claim relating to a subsequent Fourth Amendment violation based on unreasonable prolonging of the stop, Def. Br. at 39, finds no support in the law. Although the existence of probable cause at the time of an arrest might be a bar to a challenge to the lawfulness of that arrest, *see Marx v. Gumbinner*, 905 F.2d 1503, 1505-06 (11th

33

Cir. 1990), a finding of probable cause at the inception of a stop clearly does not immunize officers from any unlawful conduct taken after the arrest. *See, e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); *Brown v. City of Huntsville*, 608 F.3d 724 (11th Cir. 2010) (finding that probable cause was an absolute bar as to a claim of false arrest, but declining to grant summary judgment on claim of excessive force following the lawful arrest).

Defendants are also incorrect to suggest that Section 8's validity under the Fourth Amendment must be considered on a case-by-case basis. Def. Br. at 40-41. Plaintiffs' claim here is that HB 87 is *categorically* unconstitutional for authorizing additional investigations unrelated to the original stop without any further reasonable suspicion of unlawful conduct. None of the cases cited by Defendants involve such a claim. In fact, all of the cases that Defendants cite as examples of reasonably prolonged stops involve circumstances in which the court found that the extended period of time beyond the original purpose for the stop was otherwise lawfully justified.[9] *See United States v. Montoya de Hernandez*, 473 U.S. 531

---

[9] Defendants also purport to justify these extended investigations based on reasonable suspicion that a vehicle may contain illegal aliens under the Supreme Court's decision in *United States v. Brigoni-Ponce*, 422 U.S. 873 (1975).

(1985) (finding plaintiff's "detention for the period of time necessary to either

verify or dispel the [officer's original] suspicion was not unreasonable"); *United*

*States v. Hardy*, 855 F.2d 753 (11th Cir. 1988) (finding that the officer "had

probable cause to believe that the driver of the vehicle had violated a Georgia

traffic law" to justify the original stop, and that the "gaps and inconsistencies

observed [by the officer] created a reasonable suspicion justifying the investigative

stop" to determine whether the individual was transporting drugs); *Medvar v. State*,

286 Ga. App. 177, 178 (2007) ("[W]e find that the deputy had a reasonable

suspicion of criminal activity warranting the additional questions asked and the

continuance of the detention."); *State v. Grant*, 195 Ga. App. 859 (1990) (finding

reasonable suspicion existed that the plaintiffs was a drug courier and that the

Defendants' interpretation of *Brigoni-Ponce* is mistaken. *Brigoni-Ponce* held that only under specific circumstances of the region within 100 miles of an internal border where agents might actually observe facts giving rise to probable cause to believe that a person has committed the federal *crime* of illegal entry, *federal Border Patrol agents* may stop a vehicle if they have reasonable suspicion to believe the vehicle may contain undocumented immigrants. *Id.* at 877. As discussed above, HB 87 goes far beyond reasonable suspicion to believe that a person has committed a federal crime and permits state and local officers to investigate immigration status which, unlike the federal crime of illegal entry, is not readily observable by officers in the field and far from the border. And state and local officers do not have the authority to enforce civil immigration violations under these circumstances. In any event, Defendants argument is inconsequential. Section 8 of HB 87 does not require any reasonable suspicion of even a civil immigration violation. Instead, Section 8 is triggered in situations in which a person simply does not have a specific identity document, which is not in itself evidence of any wrongdoing, much less criminal activity.

35

detention was not unreasonably prolonged while officers diligently awaited the arrival of a narcotics dog).

Here, Section 8 will unavoidably operate to extend ordinary police encounters beyond what is constitutionally authorized.  Compl. ¶ 87.  To take just one common scenario, peace officers throughout Georgia regularly issue citations for minor offenses such as traffic offenses, which take, on average, only a matter of minutes.  *Id.* at ¶ 88.  Defendant does not deny that in these routine cases that otherwise ordinarily would be resolved rapidly, the immigration status investigation authorized by HB 87 will be the *only* basis for continuing to detain the individual in question.  HB 87's programmatic extension of detention for unrelated purposes simply cannot be squared with the Fourth Amendment.  *See United States v. Peralez*, 526 F.3d 1115, 1120 (8th Cir. 2008) ("[o]nce an officer has decided to permit a routine traffic offender to depart with a ticket, a warning, or an all clear, the Fourth Amendment applies to limit any subsequent detention or search").  And, in fact, HB 87 does not provide any time limits or constitutional restraints (and Defendants have not suggested that any limits exist) on the immigration status verification process authorized under Section 8.

Lastly, Defendants have not moved to dismiss Plaintiffs' claim that HB 87 authorizes peace officers to unlawfully arrest and detain individuals solely on the

36

basis that they are suspected to be in violation of federal civil immigration laws. Compl. ¶ 92 (citing O.C.G.A. § 17-5-100(e)). Such action is not limited to conduct already authorized by federal law. O.C.G.A. § 17-5-100(e) (specifically authorizing peace officers to "detain[] such suspected illegal alien"). In fact, as discussed in Plaintiffs' Motion for a Preliminary Injunction, HB 87 goes beyond any Congressional authorization to enforce civil immigration laws by allowing officers to broadly detain and arrest individuals for the civil violation of unlawful presence (Pls.' P.I. Br. 16-19), even though it is well established that "an arrest without probable cause to believe a *crime* ha[s] been committed" violates the Fourth Amendment.[10] *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (emphasis added); *Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002) (dismissing characterization of offense as non-criminal, and justifying a fully custodial arrest on a finding that the offense for which plaintiff was detained "*is* a criminal law") (emphasis in original); *McNally v. Eve*, 2008 WL 1931317, at *6 (M.D. Fla. May 2, 2008) ("[W]hether [officer] was entitled to effectuate a full

---

[10] The only exception to the requirement that the suspicion be of criminal activity is for civil traffic code violations. The Supreme Court has "carve[d] out an exception in the context of traffic stops, i.e., a stop is 'reasonable' where an officer suspects an individual has committed a traffic violation." *United States v. Choudhury*, 461 F.3d 1097, 1102 (9th Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). No similar exception has been created for civil immigration violations, such as unlawful presence in the United States.

custodial arrest hinges on whether the . . . noise ordinance is noncriminal in nature."); *United States v. Santillanes*, 848 F.2d 1103, 1107-10 (10th Cir. 1988) (holding that the initial stop and questioning of an individual for a non-criminal reason—a violation of a condition of pretrial release—violated the Fourth Amendment).

## V. <u>PLAINTIFFS HAVE PROPERLY STATED A CLAIM CONCERNING THE RIGHT TO TRAVEL</u>

Plaintiffs have already briefed this issue and incorporate those arguments here. This issue has been fully briefed. *See* Pls.' P.I. Br.in Plaintiffs' Brief in Support of Motion for Preliminary Injunction (hereinafter "P.I. Br."). Doc. No. 29-1 at 36-41. Plaintiffs agree that this claim is brought on behalf of a class of individual out-of-state Plaintiffs only.

As acknowledged by Defendants, a constitutional right to travel has been clearly established by the Supreme Court. Defs.' Br. at 43. Plaintiffs have properly pled a violation of the constitutional right to travel.

Defendants raise three arguments challenging this claim. They first argue that HB 87 does nothing to prohibit individuals from "entering into the state." Defs.' Br. at 43. This argument misunderstands the law on the constitutional right to travel, which does not require an outright prohibition on entry; an indirect manner of penalization is sufficient. *See Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S.

38

898, 902-03 (1986) (plurality); Pls.' P.I. Br. 37.  Plaintiffs have sufficiently pled such harm here.  Compl. ¶¶ 51, 52, 160, 178-80.

Defendants next argue that Georgia cannot be required to accept out-of-state driver's licenses as proof of citizenship if the foreign state does not require proof of citizenship before issuance.  Defs.' Br. at 44.  This argument also misses the mark.  The question raised in the right to travel claim is not whether Georgia must accept a certain form of identification, but rather whether HB 87 is discriminating against certain non-resident drivers.  It clearly is.  HB 87 facially discriminates against certain out-of-state drivers by denying them a presumption enjoyed by drivers from all other states.

Finally, Defendants argue that the right to interstate travel is violated only when states discriminate against new state residents in the provision of benefits.  Defs.' Br. at 44-45.  That is wrong.  The right to travel is infringed by "*any* classification which serves to penalize the exercise of that right" even in an "indirect manner," *Soto-Lopez*, 476 U.S. at 903 (emphasis added), or treats residents of other states as "unfriendly alien[s]" rather than "welcome visitor[s]," *Saenz v. Roe*, 526 U.S. 489, 500 (1999).  *See* Pls.' P.I. Br. 39-40.  Plaintiffs have adequately alleged such infringement in this case.

**VI.**  **PLAINTIFFS HAVE PLED A VALID EQUAL PROTECTION CLAIM**

Plaintiffs have properly stated a claim that HB 87 Section 19 violates the Equal Protection Clause of the Fourteenth Amendment because it impermissibly discriminates on the basis of alienage and national origin. *See* Comp. ¶¶ 191-92. Contrary to Defendants' contentions, Plaintiffs do not argue that HB 87 discriminates against undocumented persons, nor do they argue that HB 87 violates the Equal Protection Clause because it was motivated by or will result in racially discriminatory profiling. *See* Defs.' Br. 46-48. Rather, Plaintiffs argue that Section 19 impermissibly discriminates against—and among classes of—non-citizens who have the U.S. government's permission to reside in the United States. Section 19 violates the Equal Protection Clause because it operates in such a manner as to deny access to governmental services, the securing of governmental licenses, and contracting with governmental entities based on the national origin of the presenter of the identification. *See* Compl. ¶ 191.

State laws that discriminate on the basis of alienage violate the Equal Protection Clause unless the state can show that they are necessary to serve a compelling state interest and that there is no less restrictive alternative that would achieve that state goal. *See Bernal v. Fainter*, 467 U.S. 216 (1984) (state laws discriminating based on alienage subject to strict scrutiny); *see also Graham v. Richardson*, 403 U.S. 365, 376 (1971) (invalidating the state statute distinguishing

40

between citizens and non-citizens).  Georgia has not even approached that high bar with HB 87.

Section 7 of HB 87 also violates the Equal Protection Clause because it restricts the exercise of the right of association by citizens of Georgia and the United States on the basis of the alienage of those with whom they wish to associate.  *See* Compl. ¶ 191; *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 173-74 (1970) (noting that white woman who was denied service in defendant's restaurant because she was in company of African American would make out claim of deprivation of rights by showing state-enforced custom of segregating races in pubic eating places).

## VII.   <u>PLAINTIFFS HAVE STATED A VALID DUE PROCESS CLAIM</u>

In Count Five of the Complaint, Plaintiffs allege that HB 87 violates the Due Process Clause of the Fourteenth Amendment by depriving Plaintiffs of the use of their consular-issued identification documents ("CIDs") for any official purpose. Defendants mistakenly contend that Plaintiffs have no claim because they "do not have a constitutionally protected liberty or property interest in the use of their CIDs."  Defs.' Br. 50.  Defendants' error is in their misidentification of the property interest that is implicated.

Property interests "are created and their dimensions defined by existing rules

41

or understandings that stem from an independent source such as state-law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). In this case, Plaintiffs and many other individuals rely on CIDs as their only photo identification and means to access fundamental services. For example, Plaintiff John Doe #2 has used his CID to open accounts at City Hall for water and electrical service to his home, to seek police assistance, and for identification at a hospital in Rome. Compl. ¶ 56. Plaintiff John Doe #1 has used his CID, which is his only photo identification, to access the State Capitol building. *Id.* at ¶ 54. His mother and sister use their CIDs to establish their parental identity when obtaining basic nutrition assistance for their U.S. citizen children. *Id.* As these examples illustrate, photo identification has become a requirement in today's society in an ever-growing range of contexts. Plaintiffs and many similarly-situated Georgians are eligible for and entitled to these services, but since CIDs may be their only form of photo identification to access the services, HB 87 threatens to deprive them of the services. The deprivation of access to such fundamental services to which Plaintiffs are entitled under current law is the property interest that is at stake with respect to this count.

## VIII.   <u>PLAINTIFFS HAVE STATED A CLAIM UNDER 42 U.S.C. SECTIONS 1981 AND 1983</u>

42

Defendants erroneously characterize Count Six of the Complaint as asserting "a separate and distinct claim under 42 U.S.C. § 1981," and discount the reference to 42 U.S.C. § 1983 in the heading of the claim, in order to contend that Plaintiffs cannot assert a cause of action under § 1981.  However, Plaintiffs are not raising a separate cause of action under § 1981.  By referring to both §§ 1981 and 1983 in the heading of Count Six, Plaintiffs invoke § 1983 as the cause of action to raise the substantive claims under § 1981 that provisions of HB 87 impermissibly discriminate against persons within the State of Georgia on the basis of alienage, national origin and race, in violation of § 1981.  Compl. ¶¶ 189-192.  *See Butts v. County of Volusia,* 222 F.3d 891, 892  (11th Cir. 2000) ("§ 1983 contains the sole cause of action against state actors for violations of § 1981").  Count Six clearly puts defendants on notice regarding this claim.

## IX.  THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS: THE ELEVENTH AMENDMENT BAR DOES NOT APPLY TO DEFENDANTS

As Defendants concede, the Eleventh Amendment does not bar suits against state officers in their official capacities seeking prospective equitable relief to end continuing violations of federal law.  *Ex Parte Young*, 209 U.S. 123, 156 (1908). Def. Mot. Dismiss at 55, 58.  Plaintiffs seek to enjoin HB 87 on the ground that it violates the U.S. Constitution in several ways.  Under *Ex parte Young*, Defendants'

43

Eleventh Amendment argument fails.

In making an officer of the state a party-defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that the officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party. *Id.* at 157. In order for the *Ex Parte Young* exception to apply, the state officer must have some responsibility to enforce the statute. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999).

The Defendants contend that neither the Governor nor the Attorney General are the proper defendants because they lack any connection to the enforcement of HB 87, or the state crimes it creates. Defs.' Br. 55-56. This is flatly wrong under Georgia law. The Governor signed HB 87, and he is ultimately responsible for the enforcement of HB 87. Ga. Const. Art. 5 § 2, ¶ 2. The Governor also has the residual power to commence criminal prosecutions, including overseeing Section 7 of HB 87 which establishes new state crimes for transporting and harboring illegal aliens. O.C.G.A. § 17-1-2. At the Governor's direction, the Attorney General has the authority to institute and prosecute offenses under HB 87. § 45-15-35. The Commissioner of the Georgia Department of Human Services is responsible for implementing and enforcing Section 17 of HB 87 by limiting public benefits to

those individuals able to provide a "secure and verifiable" identity document.  The

Commissioner of the Georgia Department of Community Affairs administers the

Housing Choice Voucher Program and is funded by the United States Department

of Housing and Urban Development (HUD).  The Commissioner is, therefore,

responsible for implementing and enforcing the public housing benefits provisions

of HB 87.[11]  Defendants are therefore appropriate parties against whom prospective

relief could be ordered because their official responsibilities include enforcement

of HB 87's provisions, including the new state crimes created by HB 87.[12]

## X. **PLAINTIFFS' STATE CONSTITUTIONAL CLAIM**

Defendants argue that sovereign immunity bars Plaintiffs' state

constitutional claims.  *See* Def's Br. at 58-59.  On consideration, Plaintiffs

withdraw their claim under Count 7 of the complaint as to the moving parties.

## **CONCLUSION**

For the reasons stated above, Defendants Motion to Dismiss should be

denied in its entirety.

---

[11] Similarly, the Executive Director of the Housing Authority of Fulton County administers the Housing Choice Voucher Program, receives HUD funding, and has responsibility to enforce the public benefits provisions of HB 87.

[12] Defendants cite to no authority for the proposition that Plaintiffs need to sue every possible defendant to obtain injunctive relief.

Dated:  June 17, 2011

Respectfully submitted,[13]

/s/ Michelle Lapointe

Michelle Lapointe

*On behalf of Attorneys for Plaintiffs*

Linton Joaquin (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Nora A. Preciado (*pro hac vice*)
Melissa S. Keaney (*pro hac vice*)
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
T: (213) 639-3900
F: (213) 639-3911
*Joaquin@nilc.org*
*Tumlin@nilc.org*
*Preciado@nilc.org*
*Keaney@nilc.org*

Omar C. Jadwat (*pro hac vice*)
Andre Segura (*pro hac vice*)
Elora Mukherjee (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
T: (212) 549-2660
F: (212) 549-2654
*ojadwat@aclu.org*
*asegura@aclu.org*
*emukherjee@aclu.org*

Naomi Tsu (GSB No. 507612)
Michelle R. Lapointe (GSB No. 007080)
Daniel Werner (GSB No. 422070)
SOUTHERN POVERTY LAW CENTER
233 Peachtree St., NE, Suite 2150
Atlanta, Georgia  30303
T: (404) 521-6700
F: (404) 221-5857
*naomi.tsu@splcenter.org*
*michelle.lapointe@splcenter.org*
*daniel.werner@splcenter.org*

Cecillia D. Wang (*pro hac vice*)
Katherine Desormeau (*pro hac vice*)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
T: (415) 343-0775
F: (415) 395-0950
*cwang@aclu.org*
*kdesormeau@aclu.org*

Mary Bauer (GSB No. 142213)
Andrew H. Turner (*pro hac vice*)
Samuel Brooke (*pro hac vice*)
SOUTHERN POVERTY LAW CENTER

Chara Fisher Jackson (GSB No. 386101)
Azadeh N. Shahshahani (GSB No.
509008)
ACLU OF GEORGIA

---

[13] Counsel certifies this document has been prepared in accordance with L.R. 5.1.

46

400 Washington Ave.
Montgomery, Alabama 36104
T: (404) 956-8200
F: (404) 956-8481
*mary.bauer@splcenter.org*
*andrew.turner@splcenter.org*
*samuel.brooke@splcenter.org*

Tanya Broder (*pro hac vice*)
Jonathan Blazer (*pro hac vice*)
NATIONAL IMMIGRATION LAW
CENTER
405 14th Street, Suite 1400
Oakland, California 94612
T: (510) 663-8282
F: (510) 663-2028
*Broder@nilc.org*
*Blazer@nilc.org*

Sin Yen Ling (*pro hac vice*)
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, California 94111
T: (415) 896-1701  x 110
F: (415) 896-1702
*sinyenL@asianlawcaucus.org*

1900 The Exchange, Suite 425
Atlanta, Georgia  30339
T: (770) 303-8111
*cfjackson@acluga.org*
*ashahshahani@acluga.org*

G. Brian Spears  (GSB No. 670112)
1126 Ponce de Leon Ave., N.E.
Atlanta, Georgia 30306
T: (404) 872-7086
F: (404) 892-1128
*Bspears@mindspring.com*

R. Keegan Federal, Jr. (GSB No. 257200)
FEDERAL & HASSON, LLP
Two Ravinia Drive, Ste 1776
Atlanta, Georgia  30346
T: (678) 443-4044
F: (678) 443-4081

Charles H. Kuck  (GSB No. 429940)
Danielle M. Conley (GSB No. 222292)
KUCK IMMIGRATION PARTNERS
LLC
8010 Roswell Road, Suite 300
Atlanta, Georgia  30350
T: (404) 816-8611
F: (404) 816-8615
*CKuck@immigration.net*
*DConley@immigration.net*

*Attorneys for Plaintiffs*

47

# **CERTIFICATE OF SERVICE**

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorney for Defendants Deal, Olens, Reese, and Beatty:

> Devon Orland
> Office of State Attorney General
> 40 Capitol Square, S.W.
> Atlanta, GA 30334-1300
> dorland@law.ga.gov
> *Attorney for Defendants Deal, Olens, Reese and Beatty*

I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participant:

> Falecia Stewart
> Executive Director, Housing Authority of Fulton County
> HAFC Headquarters
> 4273 Wendell Drive
> Atlanta, GA 30336

This 17th day of June, 2011.

/s/ Michelle R. Lapointe

48