IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGIA LATINO ALLIANCE
FOR HUMAN RIGHTS, et al.,

    Plaintiffs,

      v.

NATHAN DEAL
Governor of the State of Georgia, in
his official capacity, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:11-CV-1804-TWT

ORDER

This is a constitutional challenge to Georgia's new illegal immigration law.  It is before the Court on the Plaintiffs' Motion for Preliminary Injunction [Doc. 29] and the Defendants' Motion to Dismiss [Doc. 47].  For the reasons set forth below, the Court GRANTS the Plaintiffs' Motion for Preliminary Injunction [Doc. 29] and GRANTS in part and DENIES in part the Defendants' Motion to Dismiss [Doc. 47].

I.  Background

On April 14, 2011, the Georgia General Assembly enacted House Bill 87, the Illegal Immigration Reform and Enforcement Act of 2011 ("HB87").  Most provisions of HB87 are scheduled to take effect on July 1, 2011.  The Act was designed to

address the "very serious problem of illegal immigration in the State of Georgia." (Debt. on HB87 Before the Georgia Senate (April 14, 2011); Lauterback Decl., Ex. B.)

Section 8 of HB87 authorizes Georgia law enforcement officers to investigate the immigration status of criminal suspects where the officer has probable cause to believe the suspect committed another criminal offense. O.C.G.A. § 17-5-100(b). The suspect may show legal immigration status by providing one of five types of identification.[1] If, however, the suspect fails to present one of the five listed forms of identification, the officer may use "any reasonable means available to determine the immigration status of the suspect." O.C.G.A. § 17-5-100(c). If the officer determines

---

[1]The forms of identification include:
(1) A secure and verifiable document as defined in Code Section 50-36-2;
(2) A valid Georgia driver's license;
(3) A valid Georgia identification card issued by the Department of Driver Services;
(4) If the entity requires proof of legal presence in the United States before issuance, any valid driver's license from a state or district of the United States or any valid identification document issued by the United States federal government;
(5) A document used in compliance with paragraph (2) of subsection (a) of Code Section 40-5-21; or
(6) Other information as to the suspect's identity that is sufficient to allow the peace officer to independently identify the suspect.
O.C.G.A. § 17-5-100(b). HB87 in effect requires all individuals in Georgia to carry a state-approved identity document in order to avoid extended questioning each time they encounter law enforcement.

that the suspect is in the United States illegally, he may detain the suspect, transport him to a state or federal detention facility, or notify the United States Department of Homeland Security.  O.C.G.A. § 17-5-100(e).

Section 7 of HB87 prohibits "transporting or moving an illegal alien," "concealing or harboring an illegal alien," or "inducing an illegal alien to enter into [Georgia]" while committing another criminal offense.  O.C.G.A. § 16-11-200; O.C.G.A. § 16-11-201; O.C.G.A. § 16-11-202.  Finally, Section 19 of HB87 requires Georgia agencies and political subdivisions to accept only "secure and verifiable" identity documents for official purposes and provides criminal penalties for those who "knowingly accept[ ]" documents that are not secure and verifiable.  O.C.G.A. § 50-36-2(c) & (d).  HB87 defines secure and verifiable documents as those "approved and posted by the Attorney General."  O.C.G.A. § 50-36-2(b)(3).  Consular identification cards are specifically excluded.  Id.

The Plaintiffs are nonprofit organizations, business associations, and individuals.  The Plaintiff organizations claim that HB87 will cause them to divert resources from their traditional missions in order to educate the public on the effects of the new law.  The individual Plaintiffs claim that they will be subject to investigation, detention, and arrest under HB87 because of their status as, or association with, unauthorized aliens.  The Plaintiffs filed this class action lawsuit on

June 2, 2011 [Doc. 1].  On June 8, 2011, the Plaintiffs filed a Motion for Preliminary Injunction [Doc. 29].  The Plaintiffs seek to enjoin enforcement of the portions of HB87 that will go into effect on July 1, 2011.[2]  The Plaintiffs argue that HB87 violates the Supremacy Clause, the Fourth Amendment, the Fourteenth Amendment, and the constitutional right to travel.[3]  The Defendants have filed a Motion to Dismiss [Doc. 47].  The Defendants contend that the Plaintiffs lack standing and that the Court lacks jurisdiction over the Plaintiffs' claims. The Court held a hearing on the motions on June 20, 2011.

## II.  Legal Standards

### A.     Preliminary Injunction Standard

A "preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." Northeastern Fla. Chapter v. Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990).  In order to obtain a preliminary injunction, a movant must demonstrate: "(1) a substantial likelihood that he will ultimately prevail on the merits;

---

[2]The Plaintiffs also object to other portions of HB87 that are not scheduled to go into effect until January 2012.  The Motion for Preliminary Injunction, however, only addresses Sections 7, 8, and 19.

[3]The Plaintiffs have withdrawn their claim for violations of the Georgia Constitution.  (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss, at 45.)

(2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest." Zardui-Quintana v. Richard, 768 F.2d 1213, 1216 (11th Cir. 1985); Gold Coast Publications, Inc. v. Corrigan, 42 F.3d 1336, 1343 (11th Cir. 1994). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Id. "At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" Levi Strauss & Co. v. Sunrise Intern. Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995).

        B.      Motion to Dismiss Standard

        A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a

plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) (citations and quotations omitted).  In ruling on a motion to dismiss, the court must accept factual allegations as true and construe them in the light most favorable to the plaintiff.  See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983).  Generally, notice pleading is all that is required for a valid complaint.  See Lombard's, Inc. v. Prince Mfg., Inc., 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986).  Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  See Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citing Twombly, 550 U.S. at 555).

## III.  Discussion

### A.  Standing

The Defendants argue that the Plaintiffs do not have standing to sue.  "Standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'"  CAMP Legal Defense Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)).  "A plaintiff who invokes the jurisdiction of a federal court bears the burden to show '(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or

imminent, (2) a causal connection between the injury and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision.'" Id. (quoting Granite State Outdoor Adver., Inc. v. City of Clearwater, 351 F.3d 1112, 1116 (11th Cir. 2003)).  Further, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."  Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979).  The Plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." Id. (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)). However, "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." Younger v. Harris, 401 U.S. 37, 42 (1971).  "[W]hen lack of standing is raised in a motion to dismiss, the issue is properly resolved by reference to the allegations of the complaint." Church v. City of Huntsville, 30 F.3d 1332, 1336 (11th Cir. 1994).

      1.    The Individual Plaintiffs

The Defendants claim that the individual Plaintiffs do not have standing because the Plaintiffs' injuries are too speculative.  In City of Los Angeles v. Lyons, 461 U.S. 95 (1983), the plaintiff sued to enjoin the use of chokeholds by California police officers.  The plaintiff argued that he faced a realistic danger of being choked

by police officers in the future.  The defendants argued that the plaintiff lacked standing because his potential injury was too speculative.  The United States Supreme Court agreed, reasoning that "[i]n order to establish an actual controversy in this case, [the plaintiff] would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner." Id. at 105-106.  The Court further noted that "assuming that [the plaintiff] would again be stopped for a traffic or other violation in the reasonably near future, it is untenable to assert . . . that strangleholds are applied by the Los Angeles police to every citizen who is stopped or arrested regardless of the conduct of the person stopped." Id. at 108.  Thus, "the 'odds,' that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever" were not sufficiently high to support equitable relief. Id. at 108. See also Rizzo v. Goode, 423 U.S. 362, 382-83 (1976) (no standing where plaintiff alleged possibility of future harm from unconstitutional acts of small, unnamed minority of policemen).

By contrast, in Church v. City of Huntsville, 30 F.3d 1332, 1336 (11th Cir. 1994), homeless plaintiffs sued to enjoin the defendant from arresting, harassing, or removing them from the city limits.  The defendant argued that there was no realistic threat that the plaintiffs would be arrested or removed in the future.  The court, however, held that the plaintiffs had standing to sue.  Further, the court noted that, unlike in Lyons, the plaintiffs had alleged a "custom, practice and policy of arresting, harassing and otherwise interfering with homeless people for engaging in the ordinary and essential activities of daily life."  Id. at 1339.

Here, as in Church, HB87 represents a formal policy that the Plaintiffs allege is unconstitutional.  See id. at 1339 (distinguishing Lyons on grounds that "plaintiffs have alleged that it is the custom, practice, and policy of the City to commit the constitutional deprivations of which they complain.").  For example, Jane Doe # 2 is in violation of federal civil immigration law, but has been given deferred status by the federal government.   (See Compl. ¶ 58; Decl. of Jane Doe # 2, Doc. 29-5.) Nevertheless, Jane Doe #2 would be subject to investigation, detention, and potential arrest under Section 8 of HB87 because she does not have paperwork to establish her deferred federal status.[4]   Similarly, Plaintiff David Kennedy is an immigration

---

[4]There are other individual Plaintiffs who, like Jane Doe #2, claim potential injury under Section 8 of HB87.  (See Ali-Beik Decl. ¶ 8.)

attorney. (Kennedy Decl. ¶ 4; Doc. 29-6.)  He regularly represents undocumented aliens.  In the course of this representation, Kennedy meets with clients in his office and gives them rides.  (Id.)  Despite HB87's exception for criminal attorneys, Kennedy may be subject to prosecution under Section 7 of HB87 for transporting or harboring illegal aliens in the course of his representation of them in civil matters. (See also Compl. ¶¶ 43-60.)

The Defendants stress, however, that local police must find probable cause of a separate criminal offense before investigating the Plaintiffs' immigration status or charging a suspect under Section 7.  This condition does not make the Plaintiffs' injury unrealistic, however. See Babbitt, 442 U.S. at 298 (plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.").  First, the Plaintiffs need not actually commit any criminal offense to trigger an immigration investigation under HB87.  Rather, probable cause will suffice.  Second, the Plaintiffs will be subject to such allegedly unconstitutional investigations based on probable cause that they committed *any* criminal violation, including (and perhaps most commonly) minor traffic violations.[5] Significantly, probable cause to

---

[5]HB87 excludes violations of county and municipal law, regulation, and ordinance as a basis for an immigration status investigation.  O.C.G.A. § 17-5-100(a)(1).

suspect transporting or harboring (Section 7) would justify interrogation and detention (Section 8).

Further, unlike Lyons, the Court *may* assume that police officers will investigate the Plaintiffs' immigration status each time there is probable cause to believe the Plaintiffs have committed a crime.  See Lyons, at 461 U.S. at 108 ("[A]ssuming that [the plaintiff] would again be stopped for a traffic or other violation in the reasonably near future, it is untenable to assert . . . that strangleholds are applied by the Los Angeles police to every citizen who is stopped or arrested regardless of the conduct of the person stopped.").  Unlike in Lyons, no attenuated series of events is required to provoke the allegedly unconstitutional conduct.  Indeed, the underlying offense need not result in arrest and the suspect need not resist to trigger an investigation.  Section 8 will convert many routine encounters with law enforcement into lengthy and intrusive immigration status investigations.  Thus, the individual Plaintiffs have shown a realistic threat of injury as a result of HB87.

    2.    The Plaintiff Organizations

The Defendants also argue that the Plaintiff organizations lack standing.  An organization may have standing in its own right or based on the rights of its members.  Warth v. Seldin, 422 U.S. 490, 511 (1975).  To sue in its own right, the Court must consider whether the Plaintiffs have "'alleged such a personal stake in the outcome

of the controversy' as to warrant [their] invocation of federal-court jurisdiction." Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982) (quoting Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 261 (1977)).   The organization may establish such an interest by showing that the challenged statute would cause it to "divert resources from its regular activities."   Common Cause/Georgia v. Billups, 554 F.3d 1340, 1350 (11th Cir. 2009).  In Billups, the plaintiffs challenged a statute requiring voters to present photo identification.  The organizational plaintiff alleged that it had traditionally directed resources toward voter registration.  The challenged statute, however, would force it to "divert resources from its regular activities to educate and assist voters in complying with the statute that requires photo identification."  Id.; see also Havens, 455 U.S. at 379 (organization had standing where defendants' racial steering practices frustrated plaintiff's efforts and forced plaintiff to "devote significant resources to identify and counteract" the defendants' actions.).

Here, the Plaintiff organizations have alleged that HB87 will cause them to "divert resources from [their] regular activities to educate and assist" members in complying with the new law.  Billups, 554 F.3d at 1350. Indeed, the Coalition of Latino Leaders ("CLL") traditionally provides "citizenship classes; English-language classes; Homework Club for children whose parents do not speak English; computer

classes; and assistance in completing applications for legal residency and naturalization." (Compl. ¶ 36.) Since the passage of HB87, CLL has received 400 percent more calls per day. (Id. ¶ 37.) CLL has already been forced to cancel its citizenship classes to respond to questions about HB87. (Id.) There is a realistic danger that this trend will worsen when HB87 takes effect.

Similarly, Plaintiff Task Force for the Homeless ("TFH") traditionally encourages people to apply for food stamps and public housing. (Id. ¶ 32.) TFH has already "diverted resources from other organizational priorities to educate its volunteers and residents about the law." (Id. ¶ 30.) If HB87 takes effect, "TFH will be overburdened by requests from residents for help with overcoming problems caused by [HB87's] new document requirements" and related criminal penalties. (Id. ¶ 32.) Thus, the Plaintiff organizations have sufficiently alleged that HB87 will cause them to divert resources from regular activities. For this reason, the Plaintiff organizations have standing to sue in their own right.[6]

---

[6]The Plaintiff organizations may also have standing to assert the rights of their members. Having found that the organizations have standing in their own right, however, the Court will not address this issue.

B.    <u>Jurisdiction</u>

The Defendants argue that the Plaintiffs have not properly stated a preemption claim under 42 U.S.C. § 1983.[7]  To establish a claim under § 1983, "the plaintiff must assert the violation of a federal right."  <u>Golden State Transit Corp. v. City of Los Angeles</u>, 493 U.S. 103, 106 (1989).  Further, "even when the plaintiff has asserted a federal right, the defendant may show that Congress 'specifically foreclosed a remedy under § 1983.'"  <u>Id.</u> (quoting <u>Smith v. Robinson</u>, 468 U.S. 992, 1005 n.9 (1984)).  The Supremacy Clause "is not a source of any federal rights," and thus cannot support § 1983 liability.  <u>Id.</u>

Nevertheless, a federal statute may create a right enforceable under § 1983.  "In all cases, the availability of the § 1983 remedy turns on whether the statute, by its terms or as interpreted, creates obligations 'sufficiently specific and definite' to be within 'the competence of the judiciary to enforce,' is intended to benefit the putative plaintiff, and is not foreclosed 'by express provision or other specific evidence from the statute itself.'"  <u>Id.</u> (quoting <u>Wright v. City of Roanoke Redevelopment and Housing Auth.</u>, 479 U.S. 418, 432 (1987)).  The statutorily created right must be "unambiguously conferred."  <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 282 (2002).

_____

[7]The Defendants do not assert that the Plaintiffs' other constitutional claims cannot be brought under § 1983.

In <u>Playboy Enters., Inc. v. Public Serv. Comm'n of Puerto Rico</u>, 906 F.2d 25 (1st Cir. 1990), the plaintiffs brought a § 1983 action claiming that the Cable Act preempted a state obscenity statute. The court held that the Cable Act, while preempting state law, also created a right enforceable under § 1983. The First Circuit reasoned that "the protection from liability provided cable operators by [the Cable Act] for the content of leased access channel programming is an 'immunity' created by federal law and enforceable by the courts." <u>Id.</u> at 32.

Here, Congress has adopted a comprehensive statutory framework regulating aliens and immigration. <u>See</u> 8 U.S.C. § 1101 *et seq.* Determinations of legal residency can be legally and factually complex. The varieties of immigration statuses are numerous and include many categories of individuals who have technically violated the immigration law but who are nonetheless present in the United States with the permission of the United States government, as well as many people who are awaiting adjudication of their removability or claims to asylum or other relief from removal. Indeed, 8 U.S.C. § 1101 defines "special immigrants" who may be in violation of federal immigration law, but are authorized to be in the United States under federal law. <u>See</u> 8 U.S.C. § 1101(a)(27)(J).

For example, Jane Doe #2 is an unauthorized alien who has been given deferred status by the federal government. Like the plaintiffs in <u>Playboy</u>, she is entitled to

"protection from liability provided [aliens] by" federal law.  Similarly, "special immigrants," as defined by § 1101, are entitled to the specific and definite protections provided by the Immigration and Naturalization Act.  This protection "is an 'immunity' created by federal law and enforceable by the courts."  Playboy, 906 F.2d at 32.  Thus, the Immigration and Naturalization Act, 8 U.S.C. § 1101 *et seq*., creates a right enforceable under § 1983.  For this reason, the Court has jurisdiction over the individual Plaintiffs' preemption claims under 42 U.S.C. § 1983.

In addition, the United States Supreme Court has upheld federal jurisdiction over preemption claims under 28 U.S.C. § 1331.  See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14 (1983); Playboy Enters., Inc. v. Public Serv. Comm'n of Puerto Rico, 906 F.2d 25, 29-30 (1st Cir. 1990) (exercising jurisdiction federal jurisdiction over claim that Puerto Rican criminal statute was preempted by federal regulatory law).  In Shaw, the plaintiff airlines argued that the Employee Retirement Income Security Act preempted two New York laws.  The Court found that it had jurisdiction to hear the plaintiffs' preemption challenge.  The Court noted "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights."  Shaw, 463 U.S. at 96 n.14 (citing Ex parte Young, 209 U.S. 123, 160-162 (1908)).  "A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the

Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." Id. Here, the Plaintiffs seek injunctive relief from HB87, "on the ground that such regulation is pre-empted by a federal statute."[8] Id. Thus, the Court has jurisdiction of the Plaintiffs' preemption claims under § 1331.

C.     Preemption

The Plaintiffs argue that HB87 is unconstitutional because it violates the Supremacy Clause of the United States Constitution. See U.S. CONST. art. VI, cl. 2. Federal law preempts state law in two circumstances. First, "[w]hen Congress intends federal law to 'occupy the field,' state law in that area is preempted." Crosby v. National Foreign Trade Council, 530 U.S. 363, 372 (2000) (quoting California v. ARC America Corp., 490 U.S. 93, 100 (1989)). Second, "even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute." Id. Conflict preemption, in turn, occurs "where it is impossible for a private party to comply with both state and federal law . . . [or] where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle

---

[8]The Defendants recognize that courts have exercised federal jurisdiction over preemption claims, but dispute the wisdom and clarity of such decisions. (See Defs.' Mot. to Dismiss, at 28 n.4.)   Regardless of any inconsistencies in this line of precedent, the Court is bound by Ex parte Young and Shaw.

to the accomplishment and execution of the full purposes and objectives of Congress.'" Id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  Finally, the preemption analysis "must be guided by two cornerstones."  Wyeth v. Levine, 129 S. Ct. 1187, 1194 (2009).  "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" Id. (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)).  Second, where "Congress has 'legislated ... in a field which the States have traditionally occupied,'" there is a presumption against preemption without clear Congressional intent.  Id.

Seventy years ago the United States Supreme Court declared that the federal government had the exclusive right to legislate in the general field of foreign affairs, including power over immigration, naturalization and deportation.   Hines v. Davidowitz, 312 U.S. 52, 67 (1941):

> When the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land. No state can add to or take from the force and effect of such treaty or statute, for Article VI of the Constitution provides that 'This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' The Federal Government, representing as it does the collective interests of the ... states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties. 'For local interests the several states of the Union exist, but for national purposes, embracing our relations

with foreign nations, we are but one people, one nation, one power.' Our
system of government is such that the interest of the cities, counties and
states, no less than the interest of the people of the whole nation,
imperatively requires that federal power in the field affecting foreign
relations be left entirely free from local interference.

Id. at 62-63(footnotes deleted).  In striking down a state alien registration law, the

Court emphasized the close connection between foreign relations and regulation of

immigration:

One of the most important and delicate of all international relationships,
recognized immemorially as a responsibility of government, has to do
with the protection of the just rights of a country's own nationals when
those nationals are in another country. Experience has shown that
international controversies of the gravest moment, sometimes even
leading to war, may arise from real or imagined wrongs to another's
subjects inflicted, or permitted, by a government. This country, like other
nations, has entered into numerous treaties of amity and commerce since
its inception-treaties entered into under express constitutional authority,
and binding upon the states as well as the nation. Among those treaties
have been many which not only promised and guaranteed broad rights
and privileges to aliens sojourning in our own territory, but secured
reciprocal promises and guarantees for our own citizens while in other
lands. And apart from treaty obligations, there has grown up in the field
of international relations a body of customs defining with more or less
certainty the duties owing by all nations to alien residents-duties which
our State Department has often successfully insisted foreign nations must
recognize as to our nationals abroad. In general, both treaties and
international practices have been aimed at preventing injurious
discriminations against aliens. Concerning such treaties, this Court has
said: 'While treaties, in safeguarding important rights in the interest of
reciprocal beneficial relations, may by their express terms afford a
measure of protection to aliens which citizens of one or both of the
parties may not be able to demand against their own government, the
general purpose of treaties of amity and commerce is to avoid injurious
discrimination in either country against the citizens of the other.'

Id. at 64-65.  Accordingly, the states are not permitted to subject aliens to burdens that are unique to them:

> Legal imposition of distinct, unusual and extraordinary burdens and obligations upon aliens-such as subjecting them alone, though perfectly law-abiding, to indiscriminate and repeated interception and interrogation by public officials-thus bears an inseparable relationship to the welfare and tranquillity of all the states, and not merely to the welfare and tranquillity of one. Laws imposing such burdens are not mere census requirements, and even though they may be immediately associated with the accomplishment of a local purpose, they provoke questions in the field of international affairs. And specialized regulation of the conduct of an alien before naturalization is a matter which Congress must consider in discharging its constitutional duty 'To establish an uniform Rule of Naturalization * * *.' It cannot be doubted that both the state and the federal registration laws belong 'to that class of laws which concern the exterior relation of this whole nation with other nations and governments.'  Consequently the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it.' And where the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.

Id. at 66-67. That remains the law of the land.

> 1.   Section 8

The Plaintiffs argue that Section 8 of HB87 conflicts with federal immigration law.  Section 8 provides that "when [an] officer has probable cause to believe that a

suspect has committed a criminal violation, the officer shall be authorized to seek to verify such suspect's immigration status when the suspect is unable to provide one of" five specified identity documents. O.C.G.A. § 17-5-100(b). Officers are "authorized to use any reasonable means available to determine the immigration status of the suspect." O.C.G.A. § 17-5-100(c). There are no time limits on the immigration status investigations. Further, where state officers determine that a suspect is an illegal alien, Section 8 authorizes officers to "take any action authorized by state and federal law, including, but not limited to detaining such suspected illegal alien, securely transporting such suspect to any authorized federal or state detention facility." See O.C.G.A. 17-5-100(e).

First, mere presence in this country without authorization is not a federal crime. Enforcement of civil immigration offenses is not "a field which the States have traditionally occupied." Wyeth v. Levine, 129 S. Ct. at 1194. Thus, the Court will not apply a presumption against preemption. Federal law authorizes the Attorney General of the United States to enter into written agreements with states "pursuant to which an officer or employee of the State . . . who is determined by the Attorney General to be qualified" to enforce federal civil immigration laws may do so. 8 U.S.C. § 1357(g)(1). Further, 8 U.S.C. § 1103 provides that in the event of a mass influx of illegal aliens, "the Attorney General may authorize any State or local law enforcement

officer . . . to perform or exercise any of the powers, privileges, or duties" of federal immigration officers.  8 U.S.C. § 1103(a)(10).

8 U.S.C. § 1252c does not contradict § 1357 or § 1103.  Rather, § 1252c authorizes state and local law enforcement to arrest an illegal alien who "has previously been convicted of a felony in the United States and deported or left the United States after such conviction, but only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual."  8 U.S.C. § 1252c.[9]  The statute does not authorize local law enforcement to detain individuals for mere illegal presence in the United States.  Rather "local law enforcement officers cannot enforce completed violations of civil immigration law (i.e., illegal presence) unless specifically authorized to do so by the Attorney General under special conditions."  United States v. Urrieta, 520 F.3d 569, 574 (6th Cir. 2008); see also United States v. Arizona, No. 10-16645, 2011 WL 1346945, at *17 (9th Cir. April 11, 2011) (finding that § 1252c did not authorize local officers to enforce civil immigration law).

---

[9]As discussed in the Court's analysis of Section 7, 8 U.S.C. § 1324(c) authorizes federal and state officers to make arrests "for a violation of any provision of this section."  8 U.S.C. § 1324(c).  8 U.S.C. § 1324, however, does not criminalize the civil offense of being in the United States illegally.  See 8 U.S.C. § 1324 (criminalizing transporting and harboring illegal alien or bringing an illegal alien into United States).

In <u>United States v. Arizona</u>, the United States brought an action to enjoin a state law similar to the one at issue here.  The Arizona law provided that where officers had reasonable suspicion to believe that a suspect who had been lawfully detained was an unauthorized immigrant, they "'shall' make 'a reasonable attempt ... when practicable, to determine the immigration status' of that person."  <u>United States v. Arizona</u>, 2011 WL 1346945, at *3 (quoting ARIZ. REV. STAT. ANN. § 11-1051(B)).  The Ninth Circuit held that the law was preempted by 8 U.S.C. § 1357.  The court reasoned that "Congress intended for state officers to systematically aid in immigration enforcement only under the close supervision of the Attorney General—to whom Congress granted discretion in determining the precise conditions and direction of each state officer's assistance."  <u>Id.</u> at *6.  Further, the court noted that "[b]y imposing mandatory obligations on state and local officers, Arizona interferes with the federal government's authority to implement its priorities and strategies in law enforcement, turning Arizona officers into state-directed DHS agents."  <u>Id.</u> at *8.

Here, Section 8 of HB87 authorizes local law enforcement officers to investigate a suspect's illegal immigration status and, if the officer determines the suspect has violated federal immigration law, detain and arrest the suspect without a warrant.  O.C.G.A. § 17-5-100.  Congress, however, has already addressed the circumstances in which local law enforcement personnel may enforce federal civil

immigration law.  8 U.S.C. § 1357 and § 1103 clearly express Congressional intent that the Attorney General should designate state and local agents authorized to enforce immigration law.  Indeed, Congress has provided that local officers may enforce civil immigration offenses only where the Attorney General has entered into a written agreement with a state, 8 U.S.C. § 1357(g)(1), or where the Attorney General has expressly authorized local officers in the event of a mass influx of aliens. 8 U.S.C. § 1103(a)(10).  See United States v. Arizona, 2011 WL 1346945, at *6 ("8 U.S.C. § 1357(g) demonstrates that Congress intended for state officers to systematically aid in immigration enforcement only under the close supervision of the Attorney General.").

Thus, Congress has established a system providing Executive Branch discretion to establish "immigration enforcement priorities and strategies."  United States v. Arizona, 2011 WL 1346945, at *8; see also Plyler v. Doe, 457 U.S. 202, 226 (1982) (with respect to federal discretion in immigration enforcement, Court noted that "there is no assurance that a[n] [illegal alien] subject to deportation will ever be deported. An illegal entrant might be granted federal permission to continue to reside in this country, or even to become a citizen.").  HB87 transfers this discretion to local law enforcement.  Indeed, Section 8 provides local law enforcement significant discretion to develop its own enforcement priorities and strategies. First, after finding probable

cause to believe that a suspect has committed a crime, local officers are "authorized," but not required, "to seek to verify [a] suspect's immigration status." O.C.G.A. § 17-5-100(b). This will undermine federal immigration enforcement priorities by vastly increasing the number of immigration queries to the federal government from Georgia. Second, during the investigation, the officer is "authorized to use any reasonable means available to determine the immigration status of the suspect." O.C.G.A. § 17-5-100(c). Finally, if, after investigation, the officer "receives verification" that the suspect is an illegal alien, the officer "*may* take any action authorized by state and federal law." O.C.G.A. § 17-5-100(e) (emphasis added). Thus, HB87 gives local officers discretion in determining whether to initiate an investigation, what "reasonable means" to take during an investigation, and how to proceed at the conclusion of the investigation if the suspect is confirmed to be an illegal alien. Such discretion poses a serious risk that HB87 will result in inconsistent civil immigration policies not only between federal and state governments, but among law enforcement jurisdictions within Georgia.[10] That risk is compounded by the threat of other states creating their own immigration laws. See United States v. Arizona, 2011 WL 1346945, at *10; Wisconsin Dep't of Indus., Labor and Human Relations

---

[10] This concern may be a reason Congress chose to craft such specific statutes governing the Attorney General's supervision of local law enforcement.

v. Gould Inc., 475 U.S. 282, 288-289 (1986) ("Each additional statute incrementally diminishes the [federal government's] control over enforcement of the [federal statute] and thus further detracts from the 'integrated scheme of regulation' created by Congress.").

The Defendants argue, however, that Section 8 "does not criminalize any activity . . . that isn't already criminal under federal statute." (Defs.' Br. in Opp'n to Pls.' Mot. for Prelim. Injunction, at 17.)  Rather, the Defendants contend, "it creates a mechanism by which the crime could be prosecuted at a local level." (Id.)[11]  That mechanism, however, conflicts with federal law.  Not only has Congress legislated the contours of civil immigration law, but it has also legislated a mechanism by which state and local officers may enforce those offenses.  HB 87 is state regulation of immigration.  Section 8 attempts an end-run–not around federal criminal law–but around federal statutes defining the role of state and local officers in immigration enforcement.

Conflict between state and federal law is especially acute where, as here, the "legislation is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to

---

[11]The Declaration of Lewis Smith (attached for convenience as Appendix A) outlines the problems that rural, small town Georgia law enforcement officers will have in trying to enforce Section 8.

demand broad national authority."  <u>Hines v. Davidowitz</u>, 312 U.S. 52, 68 (1941).

Indeed, both the United States government and several foreign nations have expressed

concern about the international relations impact of HB87.  In reference to HB87, the

President of the United States stated that "[i]t is a mistake for states to try to do this

piecemeal.  We can't have 50 different immigration laws around the country."

(Lauterback Decl., Ex. A, Doc. 29-29.)   Mexico has also filed an amicus brief

registering its concern that HB87 will impede bilateral negotiations, hinder trade and

tourism, and damage diplomatic relations between the United States and Mexico [<u>See</u>

Doc. 50].  These international relations concerns underscore the conflict between

HB87 and federal immigration law.  The conflict is not a purely speculative and

indirect impact on immigration.  It is direct and immediate.

　　　　Ultimately, Section 8 circumvents Congress' intention to allow the Attorney

General to authorize and designate local law enforcement officers to enforce civil

immigration law. The statute thus "stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress." <u>Crosby</u>, 530 U.S. at 373

(quoting <u>Hines</u>, 312 U.S. at 67).  For this reason, the Plaintiffs are likely to succeed

on their preemption claim with respect to Section 8.

　　　　2.　　<u>Section 7</u>

Section 7 of HB87 creates three criminal violations: (1) transporting or moving an illegal alien in a motor vehicle, O.C.G.A. 16-11-200(b); (2) concealing, harboring or shielding an illegal alien from detection, O.C.G.A. § 16-11-201(b); and (3) inducing, enticing, or assisting an illegal alien to enter Georgia, O.C.G.A. § 16-11-202(b).   All three crimes require knowledge that the person being transported, harbored, or enticed is an illegal alien.   Also, all three sections require that the defendant be engaged in another criminal offense.[12]   The Defendants' claim that the new criminal statutes will prevent exploitation of illegal aliens is gross hypocrisy. The apparent legislative intent is to create such a climate of hostility, fear, mistrust and insecurity that all illegal aliens will leave Georgia.

The Plaintiffs contend that Section 7 is preempted by 8 U.S.C. § 1324.   That statute provides criminal penalties for bringing an alien into the United States, transporting an alien within the United States, concealing, harboring or shielding an alien from detection, or encouraging or inducing an alien to enter or reside in the United States.   8 U.S.C. § 1324(a)(1)(A).

In <u>De Canas v. Bica</u>, 424 U.S. 351 (1976), the United States Supreme Court considered whether federal law preempted a state statute that assessed civil fines

---

[12]It appears that violation of 8 U.S.C. § 1324, discussed below, would be "another criminal offense" under Section 7.

against businesses employing unauthorized aliens.  The Court held that the state law was not preempted, reasoning that although the "[p]ower to regulate immigration is unquestionably . . . a federal power," id. at 354, "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." Id. at 356.  Further, the Court noted that the federal government had, at the time,[13] expressed only "a peripheral concern with [the] employment of illegal entrants." Id. at 360.

In Chamber of Commerce v. Whiting, 131 S. Ct. 1968 (2011), the Court revisited a state law regulating the employment of illegal aliens.  In Whiting, the plaintiff argued that federal law preempted an Arizona statute providing for suspension and revocation of business licenses for entities employing unauthorized aliens.  The statute also required employers to verify employees' immigration status using an online database.  The plaintiff argued that the Arizona law was preempted by 8 U.S.C. § 1324a, which expressly preempts "any State or local law imposing civil or criminal sanctions (*other than through licensing and similar laws*) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  8 U.S.C.

---

[13]Ten years after De Canas, Congress expressed a clear interest in the employment of illegal aliens by passing 8 U.S.C. § 1324a.  That statute makes it "unlawful for a person or other entity . . . to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien." 8 U.S.C. § 1324a(a).

§ 1324a(h)(2) (emphasis added).  The plaintiff argued that Congress intended for this federal system to be exclusive.  The Court, however, held that the Arizona statute was not preempted, reasoning that "Arizona's procedures simply implement the sanctions that Congress expressly allowed the States to pursue through licensing laws."  Whiting, 131 S. Ct. at 1971.  Indeed, "[g]iven that Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority."  Id.  Finally, the Court noted that Arizona acted in an area of traditional state concern, finding that "[r]egulating in-state businesses through licensing laws is not" an area of exclusive federal interest.  Id.

By contrast, in Hines v. Davidowitz, 312 U.S. 52 (1941), the plaintiffs challenged a Pennsylvania law that required aliens to obtain and carry alien identification cards.  The United States Supreme Court held that the state law was preempted by federal immigration law.  The Court reasoned that "where the federal government, in the exercise of its superior authority in [the immigration] field, has enacted a complete scheme of regulation . . . states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations."  Id. at 66-67.  The Court further noted that given the international relations implications, "[a]ny concurrent state power that

may exist is restricted to the narrowest of limits; the state's power here is not bottomed on the same broad base as is its power to tax." Id. at 68.

First, the Defendants argue that Section 7 simply reinforces § 1324's parallel provisions. Despite superficial similarities, however, Section 7 is not identical to § 1324. See Whiting, 131 S. Ct. at 1982 (noting that state law traces federal law). For example, O.C.G.A. § 16-11-202 prohibits knowingly inducing, enticing or assisting illegal aliens to enter *Georgia*. Section 1324's corresponding "inducement" provision prohibits inducing an alien to "come to, enter, or reside in the *United States*." 8 U.S.C. § 1324. Once in the United States, it is not a federal crime to induce an illegal alien to enter Georgia from another state.

Similarly, O.C.G.A. § 16-11-201 defines "harboring" as "any conduct that tends to substantially help an illegal alien to remain in the United States in violation of federal law," subject to several exceptions. Under § 1324, federal courts have also discussed the bounds of "harboring," developing a significantly different definition. See Hall v. Thomas, 753 F. Supp. 2d 1113, 1158 (N.D. Ala. 2010) ("The plain language reading of 'harbor' to require provision of shelter or refuge, or the taking of active steps to prevent authorities from discovering that the employee is unauthorized or illegally remaining in the country, should control."); United States v. Kim, 193 F.3d 567, 573-74 (2d Cir. 1999) (harboring defined as "conduct tending substantially to

facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence."); Edwards v. Prime, Inc., 602 F.3d 1276, 1298-99 (11th Cir. 2010) (discussing whether hiring illegal alien constituted harboring under § 1324).  The Defendants wildly exaggerate the scope of the federal crime of harboring under § 1324 when they claim that the Plaintiffs are violating federal immigration law by giving rides to their friends and neighbors who are illegal aliens.  This is a good reason to require federal supervision of any attempts by Georgia to enforce federal immigration law.

Still, the Defendants contend that HB87 does not create new crimes, but rather "creates a mechanism by which [immigration crimes] could be prosecuted at a local level." (Defs.' Br. in Opp'n to Pls.' Mot. for Prelim. Injunction, at 17.)  No doubt the Defendants believe such a mechanism is necessary.  Indeed, the Defendants assert that "every day that passes with passive enforcement of the federal law is a day that drains the state coffers."  (Id. at 14.)  In response to this concern, Section 7 creates a state system for prosecuting and interpreting immigration law, just as Section 8 creates a state system for policing civil immigration offenses.  Under Section 7, state agents will exercise prosecutorial discretion.  Decisions about when to charge a person or what penalty to seek for illegal immigration will no longer be under the control of the federal government.  Similarly, Georgia judges will interpret Section 7's provisions,

unconstrained by the line of federal precedent mentioned above.  Thus, although Section 7 appears superficially similar to § 1324, state prosecutorial discretion and judicial interpretation will undermine federal authority "to establish immigration enforcement priorities and strategies."  United States v. Arizona, 2011 WL 1346945, at *8.

The widespread belief that the federal government is doing nothing about illegal immigration is the belief in a myth.  Although the Defendants characterize federal enforcement as "passive," that assertion has no basis in fact.  On an average day, Immigration and Customs Enforcement officers arrest approximately 816 aliens for administrative immigration violations and remove approximately 912 aliens, including 456 criminal aliens, from the United States.  (Declaration of Daniel H.  Ragsdale ¶ 5) (Attached for convenience as Appendix B).  In 2010, immigration offenses were prosecuted in federal court more than any other offense.  U.S. SENTENCING COMMISSION–2010 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS 11-12 (2010).  Of the 83,946 cases prosecuted under the federal sentencing guidelines, 28,504, or 34% involved immigration offenses.  Id.  In 2010, of 81,304 criminal cases prosecuted in federal court, 38,619 (47.5%) were non-United States citizens.  It is true that there are thousands of illegal immigrants in Georgia that are here because of the insatiable demand in decades gone by for cheap labor in agriculture and certain industries such

as construction and poultry processing.  The federal government gives priority to prosecuting and removing illegal immigrants that are committing crimes in this country and to those who have previously been deported for serious criminal offenses such as drug trafficking and crimes of violence. (Declaration of Daniel H. Ragsdale ¶¶ 16-28.) To the extent that federal officers and prosecutors have priorities that differ from those of local prosecutors, those priorities are part of the flexibility that "is a critical component of the statutory and regulatory framework" under which the federal government pursues the difficult (and often competing) objectives, of "protecting national security, protecting public safety, and securing the border." United States v. Arizona, 2011 WL 1346945, at *8.

Further, whereas the Arizona statute in Whiting imposed licensing laws specifically authorized by a statutory savings clause, HB87 imposes additional criminal laws on top of a comprehensive federal scheme that includes no such carve out for state regulation.  See Whiting, 131 S. Ct. at 1981 (noting that Congress "specifically preserved" states' authority to enact licensing laws).  Finally, unlike in De Canas and Whiting, HB87 does not address an area traditionally subject to state regulation.  See Whiting, 131 S. Ct. at 1971; De Canas, 424 U.S. at 356 ("[T]o prohibit the knowing employment by California employers of persons not entitled to lawful residence in the United States, let alone to work here, is certainly within the

mainstream of such police power regulation."). Rather, unlike concurrent state and federal regulations in other areas, the movement of unauthorized aliens is not a traditional area of state regulation. Thus, "[a]ny concurrent state power that may exist is restricted to the narrowest of limits; the state's power here is not bottomed on the same broad base as is its power to tax." Id. at 68. Indeed, the same international relations concerns mentioned with respect to Section 8 apply equally to Section 7 [see Doc. 50]. Thus, "where the federal government, in the exercise of its superior authority in [the immigration] field, has enacted a complete scheme of regulation . . . states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or *complement*, the federal law, or enforce additional or auxiliary regulations." Hines, 312 U.S. at 66-67 (emphasis added).

Unlike De Canas, Congress has expressed much more than "peripheral concern" with the transportation, harboring, and inducement of illegal aliens. See De Canas at 424 U.S. at 360. That concern is expressed in the text of § 1324. Section 7 seeks not only to replace and complement the text of § 1324 with its own criminal provisions, but to replace the discretionary and interpretive mechanisms of the federal government as well. For these reasons, the Plaintiffs have shown a likelihood of success on the merits as to their claim that Section 7 of HB87 is preempted.

D.      Fourth Amendment

The Plaintiffs assert that Section 8 of HB87 violates the Fourth Amendment of the United States Constitution.  As discussed above, Section 8 authorizes state and local police officers to check the immigration status of suspects where there is probable cause that the suspect has committed another crime.  O.C.G.A. § 17-5-100. Initially, the Court notes that this is a facial challenge to HB87.  "Facial challenges are disfavored" in the law.  Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008).  "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e., that the law is unconstitutional in all of its applications."  Id. at 449 (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).  "In determining whether a law is facially invalid, [the Court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." Id. at 449-50.

In Muehler v. Mena, 544 U.S. 93 (2005), police detained the plaintiff during a search of her home.  While detained during the search, the officers interrogated the plaintiff regarding her immigration status.  The Court held that the interrogation did not violate the Fourth Amendment.  Noting that "mere police questioning does not constitute a seizure," id. at 101, the Court reasoned that no reasonable suspicion was

required because the questioning did not prolong the plaintiff's detention. Importantly, the Court "noted that a lawful seizure 'can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" Id. (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (quoting United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997)) ("The traffic stop may not last 'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity.").

Here, the Plaintiffs contend that Section 8 allows for seizures without probable cause while officers investigate a suspect's immigration status. The Plaintiffs suggest that such investigations could take between 80 minutes and two days.  Where, after processing a minor violation, police detain a suspect without probable cause while investigating the suspect's immigration status, a Fourth Amendment violation has occurred.  See Holloman, 113 F.3d at 196.  Where, however, the officer conducts the immigration investigation while the suspect is lawfully detained based on probable cause, the Fourth Amendment is not violated.  See Muehler, 544 U.S. at 101 (finding no Fourth Amendment violation where police engaged in immigration investigation without reasonable suspicion while suspect was lawfully detained).  Indeed, there are many "circumstances . . . under which the [HB87] would be valid," Washington, 552

U.S. at 449 (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)), including circumstances in which officers arrest a suspect based on probable cause and investigate the suspect's immigration status while in custody.  The scenarios posed by the Plaintiffs, although unconstitutional, are also "hypothetical" and "imaginary." Id. at 450.  "The State has had no opportunity to implement [HB87], and its courts have had no occasion to construe the law in the context of actual disputes . . . or to accord the law a limiting construction to avoid constitutional questions."  Id.  For these reasons, the Defendants' Motion to Dismiss the Plaintiffs' Fourth Amendment claim is granted.

      E.     Right to Travel

The Plaintiffs argue that HB87 violates the constitutional right to travel.  The right to travel is grounded in the Privileges and Immunities Clause of the United States Constitution.  See Edwards v. California, 314 U.S. 160, 169 (1941); U.S. CONST. art IV, § 2, cl. 1.  "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right."  Attorney Gen. of New York v. Soto-Lopez, 476 U.S. 898, 903 (1986) (citations omitted).

The Plaintiffs contend that HB87 violates the right to travel because Georgia does not accept driver's licenses issued by states that do not require confirmation of

legal residence as proof of immigration status.  Thus, Plaintiffs assert, that HB87 "facially discriminates against certain out-of-state drivers by denying them a presumption enjoyed by drivers from all other states."  (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss, at 39.)  HB87, however, does not *facially* discriminate against drivers from any particular state.  HB87's distinction is clearly related to investigating immigration status.  Driver's licenses issued by states that do not confirm legal presence in the United States have no bearing on immigration status.  Georgia has not violated the Constitution by refusing to accept documents that have nothing to do with immigration status as proof of legal immigration status.  Indeed, the federal government does not accept such driver's licenses as proof of citizenship.  <u>See</u> 42 C.F.R. § 435.407(4).  Further, residents of states that do not confirm immigration status can produce any of the other forms of identification listed in O.C.G.A. § 17-5-100.  Thus, HB87 is clearly related to the state's interest in confirming immigration status and does not "penalize the exercise" of the right to travel.  For these reasons, the Plaintiffs' right to travel claim is dismissed.

F.    <u>Fourteenth Amendment</u>

The Plaintiffs argue that HB87 violates the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment.

1.    <u>Equal Protection</u>

The Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race." <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996). Where the law is facially neutral, the Equal Protection Clause does not prohibit laws that impact one race more than another. <u>Harris v. McRae</u>, 448 U.S. 297, 324 n.26 (1980) (quoting <u>Personnel Administrator of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979) ("when a facially neutral federal statute is challenged on equal protection grounds, it is incumbent upon the challenger to prove that Congress 'selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'")); <u>see also</u> <u>Washington v. Davis</u>, 426 U.S. 229, 248 (1976) (requiring discriminatory purpose to challenge facially neutral statute that has disparate impact on protected class).

Here, the Plaintiffs do not contend that HB87 was motivated by racial discrimination. (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss, at 40.)  Rather, the Plaintiffs contend that HB87 restricts access to government services on the basis of national origin because Section 19 excludes consular identification cards from the definition of "secure and verifiable" documents.  <u>See</u> O.C.G.A. § 50-36-2(b)(3). Although some countries issue consular identification cards, HB87 does not *facially*

discriminate against citizens of those countries.[14]  The Plaintiffs must therefore show

*not only* that Section 19 has an adverse effect on foreign nationals, but that the

Defendants "selected or reaffirmed a particular course of action at least in part

'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

(Harris, 448 U.S. at 324 n.26 (quoting Feeney, 442 U.S. at 279)).  The Plaintiffs have

not alleged facts showing that the Defendants did so here.  For these reasons, the

Plaintiffs' Equal Protection claim is dismissed.

2.    Due Process

The Plaintiffs claim that HB87 violates the Due Process Clause of the

Fourteenth Amendment.  Specifically, the Plaintiffs contend that Section 19 of HB87

denies them the right to use Consular Identification Documents for any official

purpose.  This, the Plaintiffs claim, deprives them of a property interest protected

under the Fourteenth Amendment.  Property interests, however, are not created by the

United States Constitution.  Board of Regents v. Roth, 408 U.S. 564, 577 (1972).

Rather, property rights "are created and their dimensions are defined by existing rules

or understandings that stem from an independent source such as state law." Id.  Here,

---

[14]Georgia's Attorney General, however, has yet to determine what documents
will be considered "secure and verifiable."  The Plaintiffs seem to argue that citizens
from countries that issue consular identification cards will be unlikely to have another
form of "secure and verifiable" identification.

the Plaintiffs note that they regularly use Consular Identification Documents as a form of identification.  (See Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss, at 42.)  The Plaintiffs do not, however, cite any state law that creates a property interest in using Consular Identification Documents as official forms of identification.  See Cheek v. Gooch, 779 F.2d 1507, 1508 (11th Cir. 1986) (finding no due process violation where state law did not grant property interest in opportunity to acquire liquor license).  The Plaintiffs cannot create a constitutionally protected property interest simply by showing that they have used Consular Identification Documents in the past.  For these reasons, the Plaintiffs' due process claim is dismissed.

G.    Georgia Constitution

The Plaintiffs have withdrawn their claim that Section 19 of HB87 violates the Georgia Constitution.  (Defs.' Br. in Opp'n to Pls.' Mot. to Dismiss, at 45.)  For this reason, the Plaintiffs' state constitutional claim is dismissed.

H.    Deal and Olens

The Defendants contend that Governor Nathan Deal and Attorney General Sam Olens are not proper parties.  The Defendants admit, however, that "Governor Deal and Attorney General Olens, in their official capacities are the correct parties for the purpose of defending the constitutionality of the Statute under the Federal Constitution."  (Defs.' Br. in Supp. of Defs.' Mot. to Dismiss, at 54.)  Further, under

the Georgia Constitution, the Governor must "take care that the laws are faithfully executed and shall be the conservator of the peace." GA. CONST. art. V, § 2, par. 2. Finally, the Attorney General has authority to initiate prosecutions under HB87. <u>See</u> O.C.G.A. § 45-15-35. For these reasons, the Governor and Attorney General are proper parties to this lawsuit.

I.    <u>Equitable Factors</u>

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v. National Resources Defense Council, Inc.</u>, 555 U.S. 7 (2008). A preliminary injunction is especially appropriate where, as here, it would "preserve the status quo and prevent allegedly irreparable injury until the court had the opportunity to decide whether to issue a permanent injunction." <u>Schiavo ex rel. Schindler v. Schiavo</u>, 403 F.3d 1261, 1262 (11th Cir. 2005) (quoting <u>Klay v. United Healthgroup, Inc.</u>, 376 F.3d 1092, 1101 n.13 (11th Cir. 2004)).

As discussed above, the Plaintiffs are likely to succeed on the merits of their Supremacy Clause claim. The Court must therefore determine whether the Plaintiffs are likely to suffer irreparable harm. "[A]n alleged constitutional infringement will often alone constitute irreparable harm." <u>United States v. Arizona</u>, 2011 WL

1346945, at *19; see also KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1271-72 (11th Cir. 2006) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (finding "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")).  Here, the Plaintiffs will be subject to criminal penalties under laws that are allegedly preempted by federal law and the Supremacy Clause of the United States Constitution.  Thus, the Court finds that the Plaintiffs are likely to suffer irreparable injury.

Further, the balance of equities favors the Plaintiffs.  First, an injunction will only slightly burden the state.  Indeed, by merely preserving the status quo, an injunction will impose no new and onerous burdens on the Defendants.  Also, the state's interest in preserving its resources is not determinative.  Although HB87 may prevent some unauthorized aliens from obtaining state benefits, it will not completely stem the tide unless it has the effect of driving all non citizens (along with many citizen family members) from Georgia.  By contrast, as discussed above, the Plaintiffs face irreparable injury if HB87 takes effect.

Finally, the public interest weighs in favor of issuing a preliminary injunction.  Where civil rights are at stake, an injunction "protect[s] the public interest by protecting those rights to which it too is entitled."  National Abortion Fed'n v. Metro Atlanta Rapid Transit Auth., 112 F. Supp. 2d 1320, 1328 (N.D. Ga. 2000).  Further,

"the public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law." Scott v. Roberts, 612 F.3d 1279, 1297 (11th Cir. 2010). For these reasons, the Court finds that a preliminary injunction is proper. The enforcement of Sections 7 and 8 of HB87 is preliminarily enjoined. State and local law enforcement officers and officials have no authorization to arrest, detain or prosecute anyone based upon Sections 7 and 8 of HB87 while this injunction remains in effect.

## IV.  Conclusion

For the reasons set forth above, the Court GRANTS the Plaintiffs' Motion for Preliminary Injunction [Doc. 29] and GRANTS in part and DENIES in part the Defendants' Motion to Dismiss [Doc. 47].

SO ORDERED, this 27 day of June, 2011.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

**Appendix A**

# DECLARATION OF LEWIS SMITH

I, LEWIS SMITH, hereby declare:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

1. I am the Chief of Police for the town of Uvalda, Georgia. Uvalda is a town of approximately 600 people in southeast Georgia. It is in Montgomery County.

2. I have been the Chief of Police in Uvalda since February of this year (2011). Before that, I was the Chief of Police in Rhine, Georgia for about a year and a half and prior to that was a Major and Assistant Chief in the Willacoochee Police Department in Willacoochee, Georgia.

3. I was born in Bacon County, Georgia and raised as a farmer. Growing up my family did row crop and cattle farming. I continued to farm until about three or four years ago, when my father passed away. In 1987 I decided to go into law enforcement to supplement my income and raise my young family. I graduated from the Abraham Baldwin Police Academy in Tifton, Georgia in 1988.

4. I have been certified in law enforcement in Southeast Georgia for 23 years. From 1997 to 2004 I ran a trucking company with my kids, but have always

done at least part time law enforcement work.  Over the years I have
received extensive training and certifications through the Georgia Peace
Officer Standards and Training Council, including Chief Executive training,
training in fire arms, responding to domestic violence, Driving Under the
Influence ("DUI") and sobriety, intoxication, radar detection, working with
canine drug dogs and court room demeanor, among other things.  I have also
testified in court several times related to cases I was involved in.

5.  My responsibility as Chief of Police is to ensure the public safety of
everyone living in and travelling through Uvalda, regardless of their race or
where they are from.  My focus as Chief of Police is to be able to patrol my
city and prevent all crime.  I do this by being highly visible.  I want to let
everybody see my police car ride by their house.  In my experience, this
deters crime.

6.  I have read over HB 87 and based on my experience as a police officer and
Chief in rural southeastern Georgia, I am worried about the impact this law
will have on my community and other communities like mine and I am
unsure how we will have the resources or ability to carry it out.

7.  HB 87 authorizes law enforcement officers to verify immigration status of
anyone they stop upon suspicion of any criminal activity if that person is not

able to produce one of the listed documents, like a Georgia driver's license or identification card. I say "criminal activity," but of course this includes even very minor conduct like an improper lane change, failing to use a turn signal, or going even two miles over the speed limit. Although the law does not literally require immigration status verification, in my opinion that is how it will be interpreted by law enforcement in southeast Georgia and I think that is exactly what the law intends, which after all is named the "Illegal Immigration Reform and Enforcement Act of 2011." This is going to be devastating to my community, and to many other areas in rural Georgia.

8. I believe this law will open the door for a lot of racial profiling, if it is implemented. There are a lot of good police officers, but there are also some bad ones out there too and if the bad ones don't like Hispanics, for whatever reason, they will have the ability to try to verify that person's immigration status. I believe that officers in many small towns will rely on physical appearance or way of talking (accent) to determine whether to stop someone and attempt to verify the person's immigration status.

9. I am also concerned HB 87 will negatively affect my communities' safety. Like many communities in southeastern Georgia, neither Uvalda nor

Montgomery County has its own jail. The detention facility we use is 40 miles away in Soperton, Georgia, at the Treutlen County Jail. Soperton is a 40-minute drive from Uvalda. That means an hour drive there and an hour drive back. The booking process at the jail can take anywhere from 15 minutes to over an hour, depending on how busy the jail is. This means that every time I take someone to the jail I'm gone at least two hours and fifteen minutes, if not longer.

10. Every time I have to transport someone to the jail, my town is left unguarded. Because Uvalda is such a small town, everyone in town knows when I've left town and the criminal element often takes advantage of this time to commit crimes. Because immigration status is not something that police can always verify from their police cruisers, status checks under HB 87 would result in me spending more time transporting people to jail to have their immigration status verified and less time patrolling my town and preventing crime. For this reason, I can't fully enforce HB 87 because it would make my town less safe. But I expect, based on my conversations with other law enforcement officers in communities close to Uvalda and throughout the state, that police in many towns will feel compelled to always

exercise their authority to ask about immigration status, making many communities less safe and stretching already thin police forces to their limit.

11. The criminal element in Uvalda does not include the population HB 87 targets. In Uvalda, even though we are a small town, we have a big prescription drug problem resulting in break-ins, burglaries and even suicides. Hispanics, and in particular Hispanic immigrants, in Uvalda are law-abiding people. In my experience they are more conscious about obeying the law because they could lose everything if they were arrested. I currently have a good relationship with the Hispanic community, but HB 87 is going to erode the communities' trust in me. In small towns like Uvalda, life is more personal. As Chief I get to know people for who they are, rather than just a statistic or a word such as "illegal." The immigrants in my community have children and they need a chance, just like everyone else does.

12. I'm also concerned that HB 87 will take up already limited jail space that we need for violent offenders and drug dealers and will fill it with otherwise law-abiding people who are just trying to better themselves and take care of their families.

13. Because there are so few jails near Uvalda, the facilities we do have are

often filled to capacity and unable to accept new prisoners. The Treutlen

County Jail holds 46 people, but often houses more. If I show up to the jail

and they are full, they put my prisoner in a holding room until I can get

someone in there to bond them out. If they are unable to be bonded out

quickly and have nowhere to house them, they have to let them go. Because

of this I often call the jail before I transport to find out whether there is space

for a new prisoner. If there isn't space at the jail in Treutlen County, then I

have to call the jails in Hazlehurst or Jeff Davis County to find out if there is

space elsewhere. HB 87 is going to make this problem worse. If the jail in

Treutlen County is full because of HB 87, I will have to travel even farther,

and leave my town exposed for even longer, to get the person into a jail.

14. I am also very concerned about how HB 87 will usurp local police officers'

decision-making authority when we stop individuals for minor infractions.

Because of the limited jail space we have, and because of the limited law

enforcement resources I have to keep Uvalda safe, I routinely issue citations

for minor crimes when I determine that a citation will effectively deter the

crime at issue and will keep Uvalda safe. A citation is often preferable to an

arrest when the violation is minor because an arrest will take me out of

service for over two hours, which is time that I am off the streets of Uvalda.
For example, I routinely issue citations for all traffic offenses.  In 2010, I
issued approximately thirty to forty citations per month. That's an average of
over four hundred citations a year. On average, it takes me about ten minutes
to issue a citation, if everything goes well.  In my experience, I expect many
officers will view HB 87 as depriving us of the ability to make these
decisions to issue citations in lieu of physical arrest, which will make all of
our communities less safe.  Again, though the law does not literally require
this, in practice it often will because officers do not want to appear to not be
fully enforcing the laws passed by the legislature.

15. I think this law unfairly targets Hispanic people. The Hispanic people living
in my community are law-abiding citizens. They have family and kids.  This
law will result in many people many people having their immigration status
checked if they don't have the right documents, even if they are just trying to
get to work.  I don't like the idea of having to call ICE every time I take
someone in and I don't believe that ICE is going to move quickly to come to
Uvalda, in rural southeast Georgia, to pick up suspected immigrants. It
generally takes seven to ten days for ICE to come pick someone up in South
Georgia.  In the meantime that person is housed at a cost of hundreds of

dollars during that period and then, oncee someone has an ICE hold on them, they're not going to pay their ticket. It's completely fruitless for us. It takes us away from our community, making it less safe and in the meantime we don't even get the revenue we depend on from the citation.

16. HB 87 is not going to make anyone safer or bring more jobs to Georgia. HB 87 is going to bankrupt small towns like Uvalda because in practice it will divert scarce manpower and fiscal resources to detaining and jailing law abiding people that are part of our community just because they lack the proper identification documents. I believe our borders should be secured, but I do not think that HB 87 or police officers acting as immigration officers will make Georgia any safer.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this _____7_____ day of June, 2011 in Uvalda, Georgia.

_____
Chief Lewis Smith

**Appendix B**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

THE UNITED STATES OF AMERICA,

      Plaintiff,

    v.

THE STATE OF ARIZONA, et al.,

      Defendants.

Civil Action No.

## DECLARATION OF DANIEL H. RAGSDALE

Pursuant to 28 U.S.C. § 1746, I, Daniel H. Ragsdale, declare and state as follows:

1.      I am the Executive Associate Director for Management and Administration at U.S. Immigration and Customs Enforcement (ICE) within the U.S. Department of Homeland Security (DHS). I have served in this position since January 2010. Before that, I served as a Senior Counselor to ICE's Assistant Secretary from November 2008 until October 2009, and, prior to that, as the Chief of the ICE Enforcement Law Division from October 2006 until November 2008. From September 1999 until September 2006, I served in several positions in ICE's Office of Chief Counsel in Phoenix, Arizona. I also was designated as a Special Assistant U.S. Attorney (SAUSA), which allowed me to prosecute immigration crimes.

2.      Under the supervision of ICE's Assistant Secretary, I have direct managerial and supervisory authority over the management and administration of ICE. I am closely involved in the management of ICE's human and financial resources, matters of significance to the agency, and the day-to-day operations of the agency. I make this declaration based on personal

knowledge of the subject matter acquired by me in the course of the performance of my official duties.

***Overview of ICE Programs***

3.  ICE consists of two core operational programs, Enforcement and Removal Operations (ERO), which handles civil immigration enforcement, and Homeland Security Investigations (HSI), which handles criminal investigations. I am generally aware of the operational activities of all offices at ICE, and I am specifically aware of their activities as they affect and interface with the programs I directly supervise.

4.  HSI houses the special agents who investigate criminal violations of the federal customs and immigration laws. HSI also primarily handles responses to calls from local and state law enforcement officers requesting assistance, including calls requesting that ICE transfer aliens into detention. However, because of the policy focus on devoting investigative resources towards the apprehension of criminal aliens, the responsibility of responding to state and local law enforcement is shared with, and is increasingly transitioning to, ERO to allow HSI special agents to focus more heavily on criminal investigations. On an average day in FY 2009, HSI special agents nationwide arrested 62 people for administrative immigration violations, 22 people for criminal immigration offenses, and 42 people for criminal customs offenses.

5.  ERO is responsible for detaining and removing aliens who lack lawful authority to remain in the United States. On an average day, ERO officers nationwide arrest approximately 816 aliens for administrative immigration violations and remove approximately 912 aliens, including 456 criminal aliens, from the United States to countries around the globe. As of June 2, 2010, ICE had approximately 32,313 aliens in custody pending their removal proceedings or removal from the United States.

2

6.      In addition to HSI and ERO, ICE has the Office of State and Local Coordination (OSLC) which focuses on outreach to state, local, and tribal law enforcement agencies to build positive relationships with ICE.  In addition, OSLC administers the 287(g) Program, through which ICE enters into agreements with state, local, and tribal law enforcement agencies for those agencies to perform certain federal immigration enforcement functions under the supervision of federal officials.  Each agreement is formalized through a Memorandum of Agreement (MOA) and authorized pursuant to Section 287(g) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1357(g).

7.      Consistent with its policy of focusing enforcement efforts on criminal aliens, ICE created the Secure Communities program to improve, modernize, and prioritize ICE's efforts to identify and remove criminal aliens from the United States.  Through the program, ICE has leveraged biometric information-sharing to ensure accurate and timely identification of criminal aliens in law enforcement custody.  The program office arranges for willing jurisdictions to access the biometric technology so they can simultaneously check a person's criminal and immigration history when the person is booked on criminal charges.  When an individual in custody is identified as being an alien, ICE must then determine how to proceed with respect to that alien, including whether to lodge a detainer or otherwise pursue the alien's detention and removal from the United States upon the alien's release from criminal custody.  ICE does not lodge detainers or otherwise pursue removal for every alien in custody, and has the discretion to decide whether lodging a detainer and / or pursuing removal reflects ICE's policy priorities.

3

***ICE Initiatives and Activities in Arizona and at the Southwest Border***

8.       ICE has devoted substantial resources to increasing border security and combating

smuggling of contraband and people.  Indeed, 25 percent of all ICE special agents are stationed

in the five Southwest border offices.  Of those, 353 special agents are stationed in Arizona to

investigate crimes, primarily cross-border crimes.  ERO currently has 361 law enforcement

officers in Arizona.  Further, the ICE Office of the Principal Legal Advisor (OPLA) has 147

attorneys stationed in the areas of responsibility on the Southwest border, including 37 attorneys

in Arizona alone to prosecute removal cases and advise ICE officers and special agents, as well

as one attorney detailed to the U.S. Attorney's Office for the District of Arizona to support the

prosecution of criminals identified and investigated by ICE agents.  Two additional attorneys

have been allocated and are expected to enter on duty as SAUSAs in the very near future.

9.       ICE's attention to the Southwest Border has included the March 2009 launch of

the Southwest Border Initiative to disrupt and dismantle drug trafficking organizations operating

along the Southwest border.  This initiative was designed to support three goals:  guard against

the spillover of violent crime into the United States; support Mexico's campaign to crack down

on drug cartels in Mexico; and reduce movement of contraband across the border.  This initiative

called for additional personnel, increased intelligence capability, and better coordination with

state, local, tribal, and Mexican law enforcement authorities.  This plan also bolstered the law

enforcement resources and information-sharing capabilities between and among DHS and the

Departments of Justice and Defense.  ICE's efforts on the Southwest border between March 2009

and March 2010 have resulted in increased seizures of weapons, money, and narcotics along the

Southwest border as compared to the same time period between 2008 and 2009.  ICE also

4

increased administrative arrests of criminal aliens for immigration violations by 11 percent along the Southwest border during this period.

      10.     ICE has focused even more closely on border security in Arizona. ICE is participating in a multi-agency operation known as the Alliance to Combat Transnational Threats (ACTT) (formerly the Arizona Operational Plan). Other federal agencies, including the Department of Defense, as well as state and local law enforcement agencies also support the ACTT. To a much smaller degree, ACTT receives support from the Government of Mexico through the Merida initiative, a United States funded program designed to support and assist Mexico in its efforts to disrupt and dismantle transnational criminal organizations, build capacity, strengthen its judicial and law enforcement institutions, and build strong and resilient communities.

      11.     The ACTT began in September 2009 to address concerns about crime along the border between the United States and Mexico in Arizona. The primary focus of ACTT is conducting intelligence-driven border enforcement operations to disrupt and dismantle violent cross-border criminal organizations that have a negative impact on the lives of the people on both sides of the border. The ACTT in particular seeks to reduce serious felonies that negatively affect public safety in Arizona. These include the smuggling of aliens, bulk cash, and drugs; document fraud; the exportation of weapons; street violence; homicide; hostage-taking; money laundering; and human trafficking and prostitution.

      12.     In addition to the ACTT, the Federal Government is making other significant efforts to secure the border. On May 25, 2010, the President announced that he will be requesting $500 million in supplemental funds for enhanced border protection and law enforcement activities, and that he would be ordering a strategic and requirements-based

deployment of 1,200 National Guard troops to the border. This influx of resources will be utilized to enhance technology at the border; share information and support with state, local, and tribal law enforcement; provide intelligence and intelligence analysis, surveillance, and reconnaissance support; and additional training capacity.

13.     ICE also is paying increasing attention to alien smuggling, along with other contraband smuggling, with the goal of dismantling large organizations. Smuggling organizations are an enforcement priority because they tend to create a high risk of danger for the persons being smuggled, and tend to be affiliated with the movement of drugs and weapons. ICE has had success of late in large operations to prosecute and deter alien smugglers and those who transport smuggled aliens. During recent operations in Arizona and Texas, ICE agents made a combined total of 85 arrests, searched 18 companies, and seized more than 100 vehicles and more than 30 firearms.

14.     This summer, ICE launched a surge in its efforts near the Mexican border. This surge was a component of a strategy to identify, disrupt, and dismantle cartel operations. The focus on cartel operations is a policy priority because such cartels are responsible for high degrees of violence in Mexico and the United States—the cartels destabilize Mexico and threaten regional security. For 120 days, ICE will add 186 agents and officers to its five Southwest border offices to attack cartel capabilities to conduct operations; disrupt and dismantle drug trafficking organizations; diminish the illicit flow of money, weapons, narcotics, and people into and out of the U.S.; and enhance border security. The initiative, known as Operation Southern Resolve, is closely coordinated with the Government of Mexico, as well as Mexican and U.S. federal, state and local law enforcement to ensure maximum impact. The initiative also includes

targeting transnational gang activity, targeting electronic and traditional methods of moving illicit proceeds, and identifying, arresting, and removing criminal aliens present in the region.

15.     Although ICE continues to devote significant resources to immigration enforcement in Arizona and elsewhere along the Southwest border, ICE recognizes that a full solution to the immigration problem will only be achieved through comprehensive immigration reform (CIR).  Thus, ICE, in coordination with DHS and the Department's other operating components, has committed personnel and energy to advancing CIR.  For example, ICE's Assistant Secretary and other senior leaders have advocated for comprehensive immigration reform during meetings with, and in written letters and statements to, advocacy groups, non-governmental organizations, members of the media, and members of Congress.  Other ICE personnel have participated in working groups to develop immigration reform proposals to include in CIR and to prepare budget assessments and projections in support of those proposals.

***ICE Enforcement Priorities***

16.     DHS is the federal department with primary responsibility for the enforcement of federal immigration law.  Within DHS, ICE plays a key role in this enforcement by, among other functions, serving as the agency responsible for the investigation of immigration-related crimes, the apprehension and removal of individuals from the interior United States, and the representation of the United States in removal proceedings before the Executive Office for Immigration Review within the Department of Justice.  As the department charged with enforcement of federal immigration laws, DHS exercises a large degree of discretion in determining how best to carry out its enforcement responsibilities.  This discretion also allows ICE to forego criminal prosecutions or removal proceedings in individual cases, where such forbearance will further federal immigration priorities.

7

17.     ICE's priorities at a national level have been refined to reflect Secretary

Napolitano's commitment to the "smart and tough enforcement of immigration laws."  Currently,

ICE's highest enforcement priorities—meaning, the most important targets for apprehension and

removal efforts—are aliens who pose a danger to national security or a risk to public safety,

including:  aliens engaged in or suspected of terrorism or espionage; aliens convicted of crimes,

with a particular emphasis on violent criminals, felons, and repeat offenders; certain gang

members; and aliens subject to outstanding criminal warrants.

18.     Other high priorities include aliens who are recent illegal entrants and "fugitive

aliens" (*i.e.*, aliens who have failed to comply with final orders of removal).  The attention to

fugitive aliens, especially those with criminal records, recognizes that the government expends

significant resources providing procedural due process in immigration proceedings, and that the

efficacy of removal proceedings is undermined if final orders of removal are not enforced.

Finally, the attention to aliens who are recent illegal entrants is intended to help maintain control

at the border.  Aliens who have been present in the U.S. without authorization for a prolonged

period of time and who have not engaged in criminal conduct present a significantly lower

enforcement priority.  And aliens who meet certain humanitarian criteria may not be an

"enforcement" priority at all—in such humanitarian cases, federal immigration priorities may

recommend forbearance in pursuing removal.

19.     ICE bases its current priorities on a number of different factors.  One factor is the

differential between the number of people present in the United States illegally—approximately

10.8 million aliens, including 460,000 in Arizona—and the number of people ICE is resourced to

remove each year—approximately 400,000.  This differential necessitates prioritization to ensure

that ICE expends resources most efficiently to advance the goals of protecting national security,

protecting public safety, and securing the border. Another factor is ICE's consideration of humanitarian interests in enforcing federal immigration laws, and its desire to ensure aliens in the system are treated fairly and with appropriate respect given their individual circumstances. Humanitarian interests may, in appropriate cases, support a conclusion that an alien should not be removed or detained at all. And yet another factor is ICE's recognition that immigration detainees are held for a civil purpose—namely, removal—and not for punishment. Put another way, although entering the United States illegally or failing to cooperate with ICE during the removal process is a crime, being in the United States without authorization is not itself a crime. ICE prioritizes enforcement to distinguish between aliens who commit civil immigration violations from those commit or who have been convicted of a crime.

20.     Consequently, ICE is revising policies and practices regarding civil immigration enforcement and the immigration detention system to ensure the use of its enforcement personnel, detention space, and removal resources are focused on advancing these priorities. For example, ICE has two programs within ERO designed to arrest convicted criminal aliens and alien fugitives. These are the Criminal Alien Program (CAP) and the National Fugitive Operations Program (fugitive operations). ICE officers assigned to CAP identify criminal aliens who are incarcerated within federal, state, and local prisons and jails, as well as aliens who have been charged or arrested and remain in the custody of the law enforcement agency. ICE officers assigned to fugitive operations seek to locate and arrest aliens with final orders of removal. These officers also seek to locate, arrest, and remove convicted criminal aliens living at large in communities and aliens who previously have been deported but have returned unlawfully to the United States. They also present illegal reentry cases for prosecution in federal courts to deter such recidivist conduct.

9

21.     Likewise, in keeping with the Secretary's policy determination that immigration enforcement should be "smart and tough" by focusing on specific priorities, ICE issued a new strategy regarding worksite enforcement. This strategy shift prioritized the criminal investigation and prosecution of employers and de-emphasized the apprehension and removal of illegal aliens working in the United States without authorization. Although Federal law does not make it a distinct civil or criminal offense for unauthorized aliens merely to seek employment in the U.S., such aliens may be removed for being in the U.S. illegally. ICE's new strategy acknowledges that many enter the United States illegally because of the opportunity to work. Thus, the strategy seeks to address the root causes of illegal immigration and to do the following: (i) penalize employers who knowingly hire illegal workers; (ii) deter employers who are tempted to hire illegal workers; and (iii) encourage all employers to take advantage of well-crafted compliance tools. At the same time, the policy recognizes that humanitarian concerns counsel against focusing enforcement efforts on unauthorized workers. The strategy permits agents to exercise discretion and work with the prosecuting attorney to assess how to best proceed with respect to illegal alien witnesses. One of the problems with Arizona Senate Bill 1070 (SB 1070) is that it will divert focus from this "smart and tough" focus on employers to responses to requests from local law enforcement to apprehend aliens not within ICE's priorities.

22.     In addition to refocusing ICE's civil enforcement priorities, ICE has also refocused the 287(g) program so that state and local jurisdictions with which ICE has entered into agreements to exercise federal immigration authority do so in a manner consistent with ICE's priorities. The mechanism for this refocusing has been a new MOA with revised terms and conditions. Jurisdictions that already had agreements were required to enter into this revised MOA in October of 2009. Also, ICE opted not to renew 287(g) agreements with task force

10

officers with the Maricopa County Sheriff's Office and officers stationed within the Los Angeles County Sheriff's Office's jail. These decisions were based on inconsistency between the expectations of the local jurisdiction and the priorities of ICE.

23. ICE communicates its enforcement priorities to state and local law enforcement officials in a number of ways. With respect to the 287(g) program, the standard MOA describes the focus on criminals, with the highest priority on the most serious offenders. In addition, when deploying interoperability technology through the Secure Communities program, local jurisdictions are advised of ICE's priorities in the MOA and in outreach materials.

24. In addition to the dissemination of national civil enforcement priorities to the field, the refocusing of existing ICE programs, and other efforts to prioritize immigration enforcement to most efficiently protect the border and public safety, the Assistant Secretary and his senior staff routinely inform field locations that they have the authority and should exercise discretion in individual cases. This includes when deciding whether to issue charging documents, institute removal proceedings, release or detain aliens, place aliens on alternatives to detention (*e.g.,* electronic monitoring), concede an alien's eligibility for relief from removal, move to terminate cases where the alien may have some other avenue for relief, stay deportations, or defer an alien's departure.

25. The Assistant Secretary has communicated to ICE personnel that discretion is particularly important when dealing with long-time lawful permanent residents, juveniles, the immediate family members of U.S. citizens, veterans, members of the armed forces and their families, and others with illnesses or special circumstances.

26. ICE exercises prosecutorial discretion throughout all the stages of the removal process—investigations, initiating and pursuing proceedings, which charges to lodge, seeking

11

termination of proceedings, administrative closure of cases, release from detention, not taking an

appeal, and declining to execute a removal order. The decision on whether and how to exercise

prosecutorial discretion in a given case is largely informed by ICE's enforcement priorities.

During my tenure at ICE as an attorney litigating administrative immigration cases, as well as

my role as a SAUSA prosecuting criminal offenses and in my legal and management roles at ICE

headquarters, I am aware of many cases where ICE has exercised prosecutorial discretion to

benefit an alien who was not within the stated priorities of the agency or because of humanitarian

factors. For example, ICE has released an individual with medical issues from detention,

terminated removal proceedings to allow an alien to regularize her immigration status, declined

to assert the one year filing deadline in order to allow an individual to apply for asylum before

the immigration judge, and terminated proceedings for a long-term legal permanent resident who

served in the military, among numerous other examples.

27.    ICE's exercise of discretion in enforcement decisions has been the subject of

several internal agency communications. For example, Attachment A is a true and accurate copy

of a November 7, 2007 memorandum from ICE Assistant Secretary Julie Myers to ICE Field

Office Directors and ICE Special Agents in Charge. Pursuant to this memorandum, ICE agents

and officers should exercise prosecutorial discretion when making administrative arrests and

custody determinations for aliens who are nursing mothers absent any statutory detention

requirement or concerns such as national security or threats to public safety. Attachment B is a

true and accurate copy, omitting attachments thereto, of an October 24, 2005 memorandum from

ICE Principal Legal Advisor William J. Howard to OPLA Chief Counsel as to the manner in

which prosecutorial discretion is exercised in removal proceedings. Attachment C is a true and

accurate copy of a November 17, 2000 memorandum from Immigration and Naturalization

12

Service (INS) Commissioner Doris Meissner to various INS personnel concerning the exercise of

prosecutorial discretion. The Assistant Secretary also outlined in a recent memorandum to all

ICE employees the agency's civil immigration enforcement priorities relating to the

apprehension, detention, and removal of aliens (available at

http://www.ice.gov/doclib/civil_enforcement_priorities.pdf).

      28.     In sum, ICE does not seek to arrest, detain, remove, or refer for prosecution, all

aliens who may be present in the United States illegally. ICE focuses its enforcement efforts in a

manner that is intended to most effectively further national security, public safety, and security of

the border, and has affirmative reasons not to seek removal or prosecution of certain aliens.

***International Cooperation with ICE Enforcement***

      29.     ICE cooperates with foreign governments to advance our criminal investigations

of transnational criminal organizations (such as drug cartels, major gangs, and organized alien

smugglers) and to repatriate their citizens and nationals who are facing deportation. With respect

to our criminal investigations, ICE's Office of International Affairs has 63 offices in 44 countries

staffed with special agents who, among other things, investigate crime. In Mexico alone, ICE

has five offices consisting of a total of 38 personnel. Investigators in ICE attaché offices

investigate cross-border crime, including crime that affects Arizona and the rest of the

Southwest. In addition, they work with foreign governments to secure travel documents and

clearance for ICE to remove aliens from the United States. ICE negotiates with foreign

governments to expedite the removal process, including negotiating electronic travel document

arrangements. International cooperation for ICE is critical.

      30.     International cooperation advances ICE's goal of making the borders more secure.

To address cross-border crime at the Southwest border, ICE is cooperating very closely with the

13

Government of Mexico in particular. Two prime examples of ICE and Mexican cooperation include Operation Armas Cruzadas, designed to improve information sharing and to identify, disrupt, and dismantle criminal networks engaged in weapons smuggling, and Operation Firewall, as part of which Mexican customs and ICE-trained Mexican Money Laundering-Vetted Units target the illicit flow of money out of Mexico on commercial flights and in container shipments.

31.    Also to improve border security and combat cross-border crime, ICE is engaged in other initiatives with the Government of Mexico. For instance, ICE is training Mexican customs investigators. ICE also provides Mexican law enforcement officers and prosecutors training in human trafficking, child sexual exploitation, gang investigations, specialized investigative techniques, and financial crimes. ICE has recruited Mexican federal police officers to participate in five of the ICE-led Border Enforcement Security Task Forces (BESTs). The BEST platform brings together multiple law enforcement agencies at every level to combat cross-border crime, including crime touching Arizona. Sharing information and agents is promoting more efficient and effective investigations. ICE has benefited from the Government of Mexico's increased cooperation, including in recent alien smuggling investigations that resulted in arrests in Mexico and Arizona.

32.    In addition to the importance of cooperation from foreign governments in criminal investigations, ICE also benefits from good relationships with foreign governments in effecting removals of foreign nationals. Negotiating removals, including country clearance, to approvals and securing travel documents, is a federal matter and often one that requires the cooperation of the country that is accepting the removed alien. ICE removes more nationals of Mexico than of any other country. In FY 2009, ICE removed or returned approximately 275,000

14

Mexican nationals, which constitutes more than 70 percent of all removals and returns. Not all countries are equally willing to repatriate their nationals. Delays in repatriating nationals of foreign countries causes ICE financial and operational challenges, particularly when the aliens are detained pending removal. Federal law limits how long ICE can detain an alien once the alien is subject to a final order of removal. Therefore, difficulties in persuading a foreign country to accept a removed alien runs the risk of extending the length of time that a potentially dangerous or criminal alien remains in the United States. Thus, the efficient operation of the immigration system relies on cooperation from foreign governments.

### *Reliance on Illegal Aliens in Enforcement and Prosecution*

33.     ICE agents routinely rely on foreign nationals, including aliens unlawfully in the United States, to build criminal cases, including cases against other aliens in the United States illegally. Aliens who are unlawfully in the United States, like any other persons, may have important information about criminals they encounter—from narcotics smugglers to alien smugglers and beyond—and routinely support ICE's enforcement activities by serving as confidential informants or witnesses. When ICE's witnesses or informants are illegal aliens who are subject to removal, ICE can exercise discretion and ensure the alien is able to remain in the country to assist in an investigation, prosecution, or both. The blanket removal or incarceration of all aliens unlawfully present in Arizona or in certain other individual states would interfere with ICE's ability to pursue the prosecution or removal of aliens who pose particularly significant threats to public safety or national security. Likewise, ICE can provide temporary and long-term benefits to ensure victims of illegal activity are able to remain in the United States.

34.     Tools relied upon by ICE to ensure the cooperation of informants and witnesses include deferred action, stays of removal, U visas for crime victims, T visas for victims of human

trafficking, and S visas for significant cooperators against other criminals and to support investigations. These tools allow aliens who otherwise would face removal to remain in the United States either temporarily or permanently, and to work in the United States in order to support themselves while here. Many of these tools are employed in situations where federal immigration policy suggests an affirmative benefit that can only be obtained by not pursuing an alien's removal or prosecution. Notably, utilization of these tools is a dynamic process between ICE and the alien, which may play out over time. An alien who ultimately may receive a particular benefit—for example, an S visa—may not immediately receive that visa upon initially coming forward to ICE or other authorities, and thus at a given time may not have documentation or evidence of the fact that ICE is permitting that alien to remain in the United States.

35.    Although ICE may rely on an illegal alien as an informant in any type of immigration or custom violation it investigates, this is particularly likely in alien smuggling and illegal employment cases. Aliens who lack lawful status in the United States are routinely witnesses in criminal cases against alien smugglers. For example, in an alien smuggling case, the smuggled aliens are in a position to provide important information about their journey to the United States, including how they entered, who provided them assistance, and who they may have paid. If these aliens were not available to ICE, special agents would not be positioned to build criminal cases against the smuggler. ICE may use a case against the smuggler to then build a larger case against others in the smuggling organization that assisted the aliens across the border.

36.    ICE also relies heavily on alien informants and witnesses in illegal employment cases. In worksite cases, the unauthorized alien workers likewise have important insight and

16

information about the persons involved in the hiring and employment process, including who may be amenable to a criminal charge.

37.    ICE also relies heavily on alien informants and cooperators in investigations of transnational gangs, including violent street gangs with membership and leadership in the United States and abroad.  Informants and cooperating witnesses help ICE identify gang members in the United States and provide information to support investigations into crimes the gang may be committing.  In some cases, this includes violent crime in aid of racketeering, narcotics trafficking, or other crimes.

38.    During my years at ICE, I have heard many state and local law enforcement and immigration advocacy groups suggest that victims and witnesses of crime may hesitate to come forward to speak to law enforcement officials if they lack lawful status.  The concern cited is that, rather than finding redress for crime, victims and witnesses will face detention and removal from the United States.  To ensure that illegal aliens who are the victims of crimes or have witnessed crimes come forward to law enforcement, ICE has a robust outreach program, particularly in the context of human trafficking, to assure victims and witnesses that they can safely come forward against traffickers without fearing immediate immigration custody, extended detention, or removal.  If this concern manifested itself—and if crime victims became reluctant to come forward—ICE would have a more difficult time apprehending, prosecuting, and removing particularly dangerous aliens.

***Potential Adverse Impact of SB 1070 on ICE's Priorities and Enforcement Activities***

39.    I am aware that the State of Arizona has enacted new immigration legislation, known as SB 1070.  I have read SB 1070, and I am generally familiar with the purpose and

17

provisions of that legislation. SB 1070 will adversely impact ICE's operational activities with respect to federal immigration enforcement.

40.      I understand that section two of SB 1070 generally requires Arizona law enforcement personnel to inquire as to the immigration status of any individual encountered during "any lawful stop, detention or arrest" where there is a reasonable suspicion to believe that the individual is unlawfully present in the United States. I also understand that section two contemplates referral to DHS of those aliens confirmed to be in the United States illegally.

41.      As a federal agency with national responsibilities, the burdens placed by SB 1070 on the Federal Government will impair ICE's ability to pursue its enforcement priorities. For example, referrals by Arizona under this section likely would be handled by either the Special Agent in Charge (SAC) Phoenix (the local HSI office), or the Field Office Director (FOD) Phoenix (the local ERO office). Both offices currently have broad portfolios of responsibility. Notably, SAC Phoenix is responsible for investigating crimes at eight ports of entry and two international airports. FOD Phoenix is responsible for two significant detention centers located in Florence and Eloy, Arizona, and a large number of immigration detainees housed at a local county jail in Pinal County, Arizona. FOD Phoenix also has a fugitive operations team, a robust criminal alien program, and it manages the 287(g) programs in the counties of Maricopa, Yavapai, and Pinal, as well as at the Arizona Department of Corrections.

42.      Neither the SAC nor the FOD offices in Phoenix are staffed to assume additional duties. Inquiries from state and local law enforcement officers about a subject's immigration status could be routed to the Law Enforcement Support Center in Vermont or to agents and officers stationed at SAC or FOD Phoenix. ICE resources are currently engaged in investigating criminal violations and managing the enforcement priorities and existing enforcement efforts,

18

and neither the SAC nor FOD Phoenix are scheduled for a significant increase in resources to accommodate additional calls from state and local law enforcement. Similarly, the FOD and SAC offices in Arizona are not equipped to respond to any appreciable increase in requests from Arizona to take custody of aliens apprehended by the state.

43.     Moreover, ICE's detention capacity is limited. In FY 2009, FOD Phoenix was provided with funds to detain no more than approximately 2,900 detention beds on an average day. FOD Phoenix uses that detention budget and available bed space not only for aliens arrested in Arizona, but also aliens transferred from Los Angeles, San Francisco, and San Diego. Notably, the President's budget for FY 2011 does not request an increase in money to purchase detention space. And with increasing proportions of criminal aliens in ICE custody and static bed space, the detention resources will be directed to those aliens who present a danger to the community and the greatest risk of flight.

44.     Thus, to respond to the number of referrals likely to be generated by enforcement of SB 1070 would require ICE to divert existing resources from other duties, resulting in fewer resources being available to dedicate to cases and aliens within ICE's priorities. This outcome is especially problematic because ICE's current priorities are focused on national security, public safety, and security of the border. Diverting resources to cover the influx of referrals from Arizona (and other states, to the extent similar laws are adopted) could, therefore, mean decreasing ICE's ability to focus on priorities such as protecting national security or public safety in order to pursue aliens who are in the United States illegally but pose no immediate or known danger or threat to the safety and security of the public.

45.     An alternative to responding to the referrals from Arizona, and thus diverting resources, is to largely disregard referrals from Arizona. But this too would have adverse

19

consequences in that it could jeopardize ICE's relationships with state and local law enforcement agencies (LEAs). For example, LEAs often request ICE assistance when individuals are encountered who are believed to be in the United States illegally. Since ICE is not always available to immediately respond to LEA calls, potentially removable aliens are often released back into the community. Historically, this caused some LEAs to complain that ICE was unresponsive. In September 2006, to address this enforcement gap, the FOD office in Phoenix created the Law Enforcement Agency Response (LEAR) Unit, a unit of officers specifically dedicated to provide 24-hour response, 365 days per year. ICE's efforts with this project to ensure better response to LEAs would be undermined if ICE is forced to largely disregard referrals from Arizona, and consequently may result in LEAs being less willing to cooperate with ICE on various enforcement matters, including those high-priority targets on which ICE enforcement is currently focused.

46.    In addition to section two of SB 1070, I understand that the stated purpose of the act is to "make attrition through enforcement the public policy of all state and local government agencies in Arizona," and that the "provisions of this act are intended to work together to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." To this end, I understand that section three of SB 1070 authorizes Arizona to impose criminal penalties for failing to carry a registration document, that sections four and five, along with existing provisions of Arizona law, prohibit certain alien smuggling activity, as well as the transporting, concealing, and harboring of illegal aliens, and that section six authorizes the warrantless arrest of certain aliens believed to be removable from the United States.

20

47.     The Arizona statute does not appear to make any distinctions based on the circumstances of the individual aliens or to take account of the Executive Branch's determination with respect to individual aliens, such as to not pursue removal proceedings or grant some form of relief from removal. Thus, an alien for whom ICE deliberately decided for humanitarian reasons not to pursue removal proceedings or not to refer for criminal prosecution, despite the fact that the alien may be in the United States illegally, may still be prosecuted under the provisions of the Arizona law. DHS maintains the primary interest in the humane treatment of aliens and the fair administration of federal immigration laws. The absence of a federal prosecution does not necessarily indicate a lack of federal resources; rather, the Federal Government often has affirmative reasons for not prosecuting an alien. For example, ICE may exercise its discretionary authority to grant deferred action to an alien in order to care for a sick child. ICE's humanitarian interests would be undermined if that alien was then detained or arrested by Arizona authorities for being illegally present in the United States.

48.     Similarly, certain aliens who meet statutory requirements may seek to apply for asylum in the United States, pursuant to 8 U.S.C. § 1158, based on their having been persecuted in the past or because of a threat of future persecution. The asylum statute recognizes a policy in favor of hospitality to persecuted aliens. In many cases, these aliens are not detained while they pursue protection, and they do not have the requisite immigration documents that would provide them lawful status within the United States during that period. Under SB 1070, these aliens could be subjected to detention or arrest based on the state's priorities, despite the fact that affirmative federal policy supports not detaining or prosecuting the alien.

49.     Additionally, some aliens who do not qualify for asylum may qualify instead for withholding of removal under 8 U.S.C. § 1231(b)(3). Similar to asylum, withholding of removal

provides protection in the United States for aliens who seek to escape persecution. Arizona's detention or arrest of these aliens would not be consistent with the Government's desire to ensure their humanitarian treatment.

50.     Further, there are many aliens in the United States who seek protection from removal under the federal regulatory provisions at 8 C.F.R. § 208.18 implementing the Government's non-*refoulement* obligations under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).  In many cases, these aliens are not detained while they pursue CAT protection.  Under SB 1070, these aliens could be subjected to detention or arrest based on the state's priorities.  The detention or arrest of such aliens would be inconsistent with the Government's interest in ensuring their humane treatment, especially where such aliens may have been subject to torture before they came to the U.S.

51.     Application of SB 1070 also could undermine ICE's efforts to secure the cooperation of confidential informants, witnesses, and victims who are present in the United States without legal status.  The stated purpose of SB 1070, coupled with the extensive publicity surrounding this law, may lead illegal aliens to believe, rightly or wrongly, that they will be subject to immigration detention and removal if they cooperate with authorities, not to mention the possibility that they may expose themselves to sanctions under Arizona law if they choose to cooperate with authorities.  Consequently, SB 1070 very likely will chill the willingness of certain aliens to cooperate with ICE.  Although ICE has tools to address those concerns, SB 1070 would undercut those efforts, and thus risks ICE's investigation and prosecution of criminal activity, such as that related to illegal employment, the smuggling of contraband or people, or human trafficking.

22

52.     Moreover, just as the ICE offices in Arizona are not staffed to respond to additional inquiries about the immigration status of individuals encountered by Arizona, or to and arrest or detain appreciably more aliens not within ICE's current priorities, the offices are not staffed to provide personnel to testify in Arizona state criminal proceedings related to a defendant's immigration status, such as a "Simpson Hearing" where there is indication that a person may be in the United States illegally and the prosecutor invokes Arizona Revised Statute § 13-3961(A)(a)(ii) (relating to determination of immigration status for purposes of bail). In some federal criminal immigration cases, Assistant United States Attorneys call ICE special agents to testify to provide such information as a person's immigration history or status. If ICE agents are asked to testify in a significant number of state criminal proceedings, as contemplated under SB 1070, they will be forced either to divert resources from federal priorities, or to refuse to testify in those proceedings, thus damaging their relationships with the state and local officials whose cooperation is often of critical importance in carrying out federal enforcement priorities.

53.     Enforcement of SB 1070 also threatens ICE's cooperation from foreign governments. For example, the Government of Mexico, a partner to ICE in many law enforcement efforts and in repatriation of Mexican nationals, has expressed strong concern about Arizona's law. On May 19, 2010, President Barack Obama and Mexican President Felipe Calderón held a joint news conference, during which President Calderón criticized the Arizona immigration law, saying it criminalized immigrants. President Calderón reiterated these concerns to a joint session of the United States Congress on May 20, 2010. Any decrease in participation and support from the Government of Mexico will hinder ICE efforts to prioritize and combat cross-border crime.

54.     The Government of Mexico is not the only foreign nation that has expressed concern about SB 1070.  Should there be any decreased cooperation from foreign governments in response to Arizona's enforcement of SB 1070, the predictable result of such decreased cooperation would be an adverse impact on the effectiveness and efficiency of ICE's enforcement activities, which I have detailed above.


        I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed the ___1st___ day of July 2010 in Washington, D.C.


Daniel H. Ragsdale
Executive Associate Director
Management and Administration
U.S. Immigration and Customs Enforcement