[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13044

_____

D.C. Docket No. 1:11-cv-01804-TWT

GEORGIA LATINO ALLIANCE FOR HUMAN RIGHTS,
SERVICE EMPLOYEES INTERNATIONAL UNION,
SOUTHERN REGIONAL JOINT BOARD OF WORKERS' UNITED,
DREAM ACTIVIST.ORG,
TASK FORCE FOR THE HOMELESS, et al.,

Plaintiffs - Appellees,

versus

GOVERNOR OF GEORGIA,
ATTORNEY GENERAL, STATE OF GEORGIA,

Defendants - Appellants,

COMMISSIONER OF THE DEPARTMENT OF HUMAN
SERVICES OF THE STATE OF GEORGIA, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 20, 2012)

Before WILSON and MARTIN, Circuit Judges, and VOORHEES,[*] District Judge.

WILSON, Circuit Judge:

In April 2011, Georgia lawmakers enacted House Bill 87, the Illegal Immigration Reform and Enforcement Act of 2011 (H.B. 87), to address the problem of illegal immigration within the state.  Although the provisions of H.B. 87 seek to tackle numerous issues, only two sections are at issue in this appeal of the district court's grant of a preliminary injunction.

Section 7 codifies three separate crimes for interactions with an "illegal alien," defined as "a person who is verified by the federal government to be present in the United States in violation of federal immigration law."  O.C.G.A. §§ 16-11-200(a)(1), 201(a)(2), 202(a).  The first provision of section 7 creates the offense of "transporting or moving an illegal alien," which applies to "[a] person who, while committing another criminal offense, knowingly and intentionally

_____

[*] Honorable Richard L. Voorhees, United States District Judge for the Western District of North Carolina, sitting by designation.

2

transports or moves an illegal alien in a motor vehicle for the purpose of furthering the illegal presence of the alien in the United States." *Id.* § 16-11-200(b). Excepted from this criminal provision are, among others, persons providing privately funded social services. *Id.* § 16-11-200(d)(5).

The second provision creates the offense of "concealing or harboring an illegal alien," which applies to "[a] person who is acting in violation of another criminal offense and who knowingly conceals, harbors, or shields an illegal alien from detection in any place in [Georgia], including any building or means of transportation, when such person knows that the person being concealed, harbored, or shielded is an illegal alien." *Id.* § 16-11-201(b). No criminal liability attaches to certain acts committed by government employees or persons acting at the direction of a government employee that would otherwise fall within the scope of the prohibited conduct. *Id.* § 16-11-201(d).

The third provision creates the offense of "inducing an illegal alien to enter into [Georgia]," which applies to "[a] person who is acting in violation of another criminal offense and who knowingly induces, entices, or assists an illegal alien to enter into [Georgia], when such person knows that the person being induced, enticed, or assisted to enter into [Georgia] is an illegal alien." *Id.* § 16-11-202(b).

Section 8 of H.B. 87 authorizes Georgia law enforcement officers to

3

investigate the immigration status of an individual if the officer has probable cause

to believe the individual has committed another crime and the individual cannot

provide one of the pieces of identification listed in the statute.  O.C.G.A.

§ 17-5-100(b).  If the officer verifies that the individual is not lawfully present in

the United States, the officer "may take any action authorized by state and federal

law," including detaining the person, transporting the person to a detention

facility, or notifying the Department of Homeland Security (DHS).  *Id.*

§ 17-5-100(e).  Section 8 prohibits consideration of "race, color, or national

origin" in implementing its requirements "except to the extent permitted by the

Constitutions of Georgia and of the United States."  *Id.* § 17-5-100(d).  It also

prohibits investigation into the immigration status of persons who witness or

report criminal activity, where the reason for investigation is based on information

arising from that contact.  *Id.* § 17-5-100(f).

On June 2, 2011, Plaintiffs filed a preenforcement constitutional challenge

to sections 7 and 8 claiming that, among other things, they were preempted by the

Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*[1]  Shortly

---

[1] Plaintiffs also claimed that these sections violated the Fourth and Fourteenth
Amendments and burdened their constitutional right to travel.  The district court denied an
injunction on these alleged constitutional violations, *Ga. Latino Alliance for Human Rights v.
Deal*, 793 F. Supp. 2d 1317, 1336–39 (N.D. Ga. 2011), and those rulings are not at issue on
appeal.

thereafter, Plaintiffs moved to preliminarily enjoin enforcement of these sections.

The district court granted Plaintiffs' motion and preliminarily enjoined

enforcement of sections 7 and 8 on the ground that each was preempted by federal

law. *Ga. Latino Alliance for Human Rights v. Deal*, 793 F. Supp. 2d 1317 (N.D.

Ga. 2011). Defendants (hereafter referred to as the State Officers) appeal the

district court's order, and the central issue we face is whether Plaintiffs are likely

to succeed on the merits of their challenge to the constitutionality of sections 7 and

8.

## I.  Standard of Review

We review *de novo* whether plaintiffs have standing to bring a suit, *Bochese

v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005), and whether a cause of

action exists to bring suit, *see Miller v. Chase Home Fin., LLC*, 677 F.3d 1113,

1115 (11th Cir. 2012) (per curiam). We review a district court's grant of a

preliminary injunction for abuse of discretion. *McDonald's Corp. v. Robertson*,

147 F.3d 1301, 1306 (11th Cir. 1998). Legal determinations underlying the grant

of an injunction are reviewed *de novo*, and factual determinations are reviewed for

clear error. *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d

1167, 1171–72 (11th Cir. 2002).

## II.  Discussion

A.      Standing

Before considering the merits of the challenge to H.B. 87, we confront the threshold issue of whether Plaintiffs may properly challenge the law at all.  First, we must address the State Officers' contention that Plaintiffs lack standing to challenge the provisions at issue.  The State Officers argue that Plaintiffs fail to satisfy the standing requirement of Article III, which limits federal jurisdiction to actual cases and controversies.  To invoke our jurisdiction, a plaintiff must demonstrate that he has suffered an "injury in fact," meaning "an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Bennett v. Spear*, 520 U.S. 154, 167, 117 S. Ct. 1154, 1163 (1997).  In addition to a cognizable injury, "a causal connection" must exist that links the injury to the complained-of conduct, requiring in essence that the injury be "fairly traceable to the challenged action of the defendant" rather than "the result of the independent action of some third party not before the court." *Id.*  Finally, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

When, as here, plaintiffs file a preenforcement, constitutional challenge to a state statute, the injury requirement may be satisfied by establishing "'a realistic danger of sustaining direct injury as a result of the statute's operation or

enforcement.'" *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1245 (11th Cir. 1998) (quoting *Am. Civil Liberties Union v. The Fla. Bar* (*ACLU*), 999 F.2d 1486, 1492 (11th Cir. 1993)).  A plaintiff may meet this standard in any of three ways: "(1) [the plaintiff] was threatened with application of the statute; (2) application is likely; or (3) there is a credible threat of application."  *Id.* (citing *ACLU*, 999 F.2d at 1492).  While it is unnecessary for a plaintiff to "expose himself to actual arrest or prosecution" to challenge a statute, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 2309 (1979), we will not accept as plaintiffs "persons having no fears of state prosecution except those that are imaginary or speculative," *Younger v. Harris*, 401 U.S. 37, 42, 91 S. Ct. 746, 749 (1971).

The State Officers contest the standing of all plaintiffs, individual and organizational.  Finding jurisdiction proper, we first identify the individuals who may challenge provisions of H.B. 87 and then turn to the organizations.  To hear the case, we must find that "at least one plaintiff has standing to raise each claim." *Florida v. U.S. Dep't of Health & Human Servs.*, 648 F.3d 1235, 1243–44 (11th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. ___, 132 S. Ct. 2566 (2012).

### 1.    Injury to Individual Plaintiffs

We agree with the district court that plaintiff David Kennedy faces a

"credible threat of application" of section 7.  *Socialist Workers Party*, 145 F.3d at 1245.  Kennedy is a civil immigration attorney who has alleged and declared that he regularly transports undocumented immigrants to and from court hearings, meets with immigrant clients in his law office, gives legal advice to undocumented immigrants who wish to remain in Georgia, and helps undocumented immigrants to enter Georgia for court business and hearings.  These actions fall within the plain language of the section 7 prohibitions on transporting, harboring, and inducing undocumented immigrants.  Although section 7 contains an exception for transportation to or from judicial proceedings that require the undocumented individual's presence, O.C.G.A. § 16-11-200(d)(2), that does not exempt Kennedy's activities undertaken pursuant to representation of undocumented individuals in civil immigration matters where presence is not required.  *See also id.* § 16-11-201(a)(1) (exempting from the harboring provision an attorney providing services "for the purpose of representing a criminal defendant"); *id.* § 16-11-201(d) (exempting from the harboring provision certain government employees or persons acting at the express direction of a government employee).

Similarly, we agree that plaintiff Jane Doe #2 satisfies the standing requirement to challenge section 8.  Jane Doe #2 is an undocumented immigrant

currently classified under "deferred action" status.[2]  As a result of this status, Jane

Doe #2 remains permissibly in the United States but has not acquired the requisite

documentation to stave off the investigatory detention permitted by section 8.  *See*

O.C.G.A. § 17-5-100(b) (listing acceptable documentation to prove lawful status

and thereby prevent further detention).  Thus, Jane Doe #2 faces a credible threat

of detention under section 8, as she possesses none of the listed documentation to

prove that she has permission to remain temporarily in the United States.  *See id.*

§ 17-5-100(e) (authorizing peace officers, after verification of illegal status, to

"take any action authorized by state and federal law," including "detaining [the]

suspected illegal alien").  This is sufficient to meet the injury requirement.

The State Officers, relying on *City of Los Angeles v. Lyons*, 461 U.S. 95,

103 S. Ct. 1660 (1983), argue that the underlying probable cause requirement of

sections 7 and 8 renders their application sufficiently speculative to deprive the

individual plaintiffs of a realistic danger of injury.  In *Lyons*, the plaintiff sought to

enjoin the use of a chokehold technique that police officers allegedly used to

restrain arrestees.  *Id.* at 97–98, 103 S. Ct. at 1662–63.  However, in order to be

---

[2] "Deferred action status, also known as 'non-priority status,' amounts to, in practical application, a reprieve for deportable aliens.  No action (i.e., no deportation) will be taken . . . against an alien having deferred action status."  *Pasquini v. Morris*, 700 F.2d 658, 661 (11th Cir. 1983) (internal citation omitted).

subject to the chokehold at issue, the Court explained that Lyons would have to

allege a future police encounter along with "the incredible assertion either (1) that

all police officers in Los Angeles always choke any citizen with whom they

happen to have an encounter, whether for the purpose of arrest, issuing a citation,

or for questioning, or (2) that the City ordered or authorized police officers to act

in such manner." *Id.* at 106, 103 S. Ct. at 1667 (emphases omitted). We do not

agree with the State Officers that the probability of an officer's finding of probable

cause for *any violation of state or federal law* is comparable to the likelihood of

the "sequence of individually improbable events" held to be speculative in *Lyons*.

*See Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1162 (11th

Cir. 2008). The uncontradicted declarations from three experienced law

enforcement officers support this conclusion, as they confirm that any minor

traffic violation such as failure to use a turn signal or failure to come to a complete

stop can provide the requisite probable cause to trigger application of either

section.[3]

The State Officers further contend that we must assume that Plaintiffs "will

conduct their activities within the law and so avoid prosecution and conviction."

---

[3] Collectively, the relevant declarants have close to one-hundred years of law enforcement experience that informs their sworn statements in support of Plaintiffs' contention.

*O'Shea v. Littleton*, 414 U.S. 488, 497, 94 S. Ct. 669, 677 (1974). Whereas in

*Littleton* the alleged unconstitutional conduct could only result from an *actual*

legal violation, prosecution, and conviction for that crime, here all that is

necessary for application is an officer's finding of probable cause that a legal

violation has occurred. *See id.* at 497, 94 S. Ct. at 676 ("[T]he proposition is that

*if* respondents proceed to violate an unchallenged law and *if* they are charged, held

to answer, and tried in any proceedings before petitioners, they will be subjected

to the discriminatory practices that petitioners are alleged to have followed."). As

with *Lyons*, we find that the possible injury facing Plaintiffs is not sufficiently

similar to the attenuated chain of events required prior to the alleged injury in

*Littleton* so as to preclude an individual plaintiff from having standing.[4]

>        2.        Injury to Organizational Plaintiffs

"'[A]n organization has standing to sue on its own behalf if the defendant's

illegal acts impair its ability to engage in its projects by forcing the organization to

divert resources to counteract those illegal acts.'" *Common Cause/Ga. v. Billups*,

554 F.3d 1340, 1350 (11th Cir. 2009) (quoting *Browning*, 522 F.3d at 1165). In

---

[4] We are also reluctant to hold that a state could insulate a statute from a preenforcement constitutional challenge by simply adding a layer of probable cause that another crime has been committed. To endorse this result would undermine the longstanding principle that a plaintiff "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188, 93 S. Ct. 739, 745 (1973).

*Common Cause*, we found that an organizational plaintiff suffered cognizable injury when it was forced to "divert resources from its regular activities to educate and assist [affected individuals] in complying with the [challenged] statute." *Id.* *Browning* presented an injury similar to that in *Common Cause*, and we found organizational standing proper in that case on the ground that the organizations "reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and [affected individuals] on compliance" with the statute's requirements. 522 F.3d at 1165–66. Because several organizational plaintiffs here claim injuries analogous to those present in *Common Cause* and *Browning*, we are satisfied that they meet the minimum requirements of Article III.

First, plaintiff Coalition of Latino Leaders (CLL) has shown that H.B. 87 has strained its limited resources and will continue to do so. CLL provides services to the Latino community that include citizenship classes, language classes, and assistance in completing legal documents for residency and naturalization. The enactment of H.B. 87 caused CLL to receive an increased number of inquiries about the law, forcing it to divert volunteer time and resources to educating affected members of the community and fielding inquiries. As a result, CLL has cancelled citizenship classes to focus on these effects. According to CLL, "these problems will only get worse if the bill goes into effect." For

12

similar reasons, we find that plaintiffs Georgia Latino Alliance for Human Rights and Task Force for the Homeless also have standing because both organizations have diverted resources to educate their members, staff, and volunteers on the consequences of the law.

### 3.     Causation and Redressability

Finding that numerous plaintiffs have suffered cognizable injuries, we are also easily satisfied that the other two requirements of standing are met by each of the plaintiffs noted above. Each injury is directly traceable to the passage of H.B. 87 and would be redressed by enjoining each provision.[5] To the extent the State Officers rely on arguments that the probable cause requirement defeats these two aspects of standing, we reject that position for the reasons stated above in the discussion of injury.[6]

### B.     Cause of Action

We next consider the State Officers' argument that no cause of action

---

[5] The State Officers also argue that the named defendants lack enforcement authority over H.B. 87 and that, therefore, an injunction as to these parties will not redress the harm to Plaintiffs. Our binding precedent from *Luckey v. Harris* forecloses this argument. 860 F.2d 1012, 1015–16 (11th Cir. 1988) (holding that Georgia's Governor is a proper party in a challenge to the state's indigent defense program because he has sufficient, albeit indirect, contact with the program's enforcement); *see also Ex Parte Young*, 209 U.S. 123, 157, 161, 28 S. Ct. 441, 453, 454 (1908).

[6] Having found that multiple plaintiffs possess standing, we do not address associational standing of the plaintiff organizations to assert claims on behalf of their members.

permits private plaintiffs to challenge H.B. 87 under the Supremacy Clause or 42

U.S.C. § 1983.  Under precedent of the Supreme Court, this circuit, and other

courts of appeals, these arguments cannot succeed.

The propriety of bringing a challenge for injunctive and declaratory relief

on the grounds that a state law is preempted by virtue of the Supremacy Clause has

gone largely unquestioned.  *See, e.g.*, *Chamber of Commerce of the United States*

*v. Whiting*, 563 U.S. ___, 131 S. Ct. 1968 (2011) (upholding state statute against

private organizational plaintiffs' preemption challenge); *Hines v. Davidowitz*, 312

U.S. 52, 61 S. Ct. 399 (1941) (finding state law preempted in a suit brought by a

private plaintiff against state officials).  In *Shaw v. Delta Air Lines, Inc.*, the

Supreme Court resolved claims in which plaintiffs alleged that federal

employment law preempted several state statutes.  463 U.S. 85, 92, 103 S. Ct.

2890, 2897 (1983).  The Court plainly stated that "[a] plaintiff who seeks

injunctive relief from state regulation, on the ground that such regulation is

pre-empted by a federal statute which, by virtue of the Supremacy Clause of the

Constitution, must prevail, . . . presents a federal question which the federal courts

have jurisdiction under 28 U.S.C. § 1331 to resolve."  *Id.* at 96 n.14, 103 S. Ct. at

2899; *see also Lawrence Cnty. v. Lead-Deadwood Sch. Dist.*, 469 U.S. 256, 259

n.6, 105 S. Ct. 695, 697 (1985) (noting error in the lower court's dismissal on

14

jurisdictional grounds of an action for declaratory judgment based on the Supremacy Clause). We have similarly resolved claims for injunctive relief where the asserted right of action sounded in the Supremacy Clause and have no reason to arrive at a contrary conclusion now.[7] *See, e.g.*, *Sims v. Fla., Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1454, 1455 (11th Cir. 1989) (en banc) (addressing a claim that federal law preempted Florida state law and enjoining enforcement of the law); *Scurlock v. City of Lynn Haven*, 858 F.2d 1521, 1525 (11th Cir. 1988) (enjoining a city ordinance claimed to be preempted by federal law); *see also BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1296 (11th Cir. 2003) (en banc) (Tjoflat, J., dissenting) (noting that *Shaw* held that plaintiffs may assert a private action for preemption under the Supremacy Clause).

Other circuits have more explicitly identified the right of action that permits

---

[7] The State Officers rely on the recent dissenting opinion of Chief Justice Roberts in *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, where four members of the Supreme Court concluded that the Supremacy Clause did not provide private plaintiffs a cause of action to enforce federal Medicaid law that was allegedly at odds with a California reimbursement-reduction statute. 565 U.S. ___, 132 S. Ct. 1204, 1212 (2012) (Roberts, C.J., dissenting). In dissent, Chief Justice Roberts did not purport to disturb the federal courts' power grounded in *Ex Parte Young* to address the "pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law." *Douglas*, 132 S. Ct. at 1213 (citing *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. ___, 131 S. Ct. 1632, 1642 (2011) (Kennedy, J., concurring)). Because that is the precise situation we face today, Chief Justice Roberts's dissent is not in tension with our resolution of this issue. *See also Douglas*, 132 S. Ct. at 1212 ("It is not even necessary to decide whether the Supremacy Clause can ever provide a private cause of action.").

private challenges to state actors' enforcement of state statutes allegedly preempted by federal law. In 2006, then-judge Sotomayor proclaimed that a plaintiff's "right to bring an action seeking declaratory and injunctive relief from municipal regulation on the ground that federal law preempts that regulation is undisputed." *Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 149 (2d Cir. 2006); *see also Local Union No. 12004, USW v. Massachusetts*, 377 F.3d 64, 75 (1st Cir. 2004) ("[I]n suits against state officials for declaratory and injunctive relief, a plaintiff may invoke the jurisdiction of the federal courts by asserting a claim of preemption, even absent an explicit statutory cause of action."); *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1269 (9th Cir. 1994). Like the other circuits to address the issue head on, we "have little difficulty in holding that [Plaintiffs] have an implied right of action to assert a preemption claim seeking injunctive . . . relief." *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 334 n.47, 335 (5th Cir. 2005).[8]

C.    Preliminary Injunction

We next must address the appropriateness of the district court's grant of a preliminary injunction prohibiting enforcement of sections 7 and 8. A preliminary

---

[8] Because we are satisfied that Plaintiffs' claim for relief is permissible under the Supremacy Clause, we need not address the propriety of their action under 42 U.S.C. § 1983.

16

injunction may be granted to a moving party who establishes "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). We review each aspect of this standard in turn.

> 1.   Likelihood of Success on Preemption Claim

Our Constitution provides Congress with the power to preempt state law, *see* U.S. Const. art. VI, cl. 2, and that preemption may be express or implied. Although preemption law cannot always be neatly categorized, we generally recognize three classes of preemption. *See Browning*, 522 F.3d at 1167 (recognizing the doctrines of express, field, and conflict preemption). The first, express preemption, is not at issue in this appeal.[9] The second, field preemption, "occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146,

---

[9] The absence of an express preemption provision in federal law does not bear on the question of whether a challenged state statute is impliedly preempted. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386–88, 120 S. Ct. 2288, 2301–02 (2000).

1152 (1947)).  To determine the boundaries that Congress sought to occupy within the field, we look to "'the federal statute itself, read in the light of its constitutional setting and its legislative history.'"  *De Canas v. Bica*, 424 U.S. 351, 360 n.8, 96 S. Ct. 933, 938 (1976) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 78–79, 61 S. Ct. 399, 410 (1941) (Stone, J., dissenting)).

The third, conflict preemption, may arise in two ways.  First, conflict preemption can occur "when it is physically impossible to comply with both the federal and the state laws."  *Browning*, 522 F.3d at 1167.  It  may also arise "when the state law stands as an obstacle to the objective of the federal law."  *Id.*  The court utilizes its judgment to determine what constitutes an unconstitutional obstacle to federal law, and this judgment is "informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294 (2000).

In determining the extent to which federal statutes preempt state law, we are "guided by two cornerstones."  *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194 (2009).  First, "'the purpose of Congress is the ultimate touchstone in every pre-emption case.'"  *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250 (1996)).  Second, we presume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was

18

the clear and manifest purpose of Congress." *Id.* at 565, 116 S. Ct. at 1194–95

(internal quotation marks and alterations omitted); *see also Arizona v. United*

*States*, 567 U.S. ___, 132 S. Ct. 2492, 2501 (2012).

With these considerations in mind, we turn to the merits of whether sections

7 and 8 are preempted by federal law.

a.      Section 7

As explained previously, section 7 creates three distinct state criminal

violations: (1) transporting or moving an illegal alien, O.C.G.A. § 16-11-200(b);

(2) concealing or harboring an illegal alien, *id.* § 16-11-201(b); and (3) inducing

an illegal alien to enter the state of Georgia, *id.* § 16-11-202(b).  Each of these

offenses requires that the accused also be engaged in another criminal activity, and

each further requires that the accused know of the illegal status of the subject.  The

State Officials argue that the district court erred in finding that section 7 is

preempted by the criminal provisions of the INA, particularly 8 U.S.C. § 1324.

We disagree.

To determine the intent of Congress, we first look to the text of the relevant

federal statutes.  The INA provides a comprehensive framework to penalize the

transportation, concealment, and inducement of unlawfully present aliens.

Pursuant to 8 U.S.C. § 1324(a)(1)(A)(ii)–(iv), it is a federal crime for any person

19

to transport or move an unlawfully present alien within the United States; to

conceal, harbor, or shield an unlawfully present alien from detection; or to

encourage or induce an alien to "come to, enter, or reside in the United States."[10]

Any person who conspires or aids in the commission of any of those criminal

activities is also punishable. *Id.* § 1324(a)(1)(A)(v).  Section 1324(c) permits local

law enforcement officers to arrest for these violations of federal law, but the

federal courts maintain exclusive jurisdiction to prosecute for these crimes and

interpret the boundaries of the federal statute. *See id.* § 1329.  Subsection (d) of

§ 1324 further dictates evidentiary rules governing prosecution of one of its

enumerated offenses, and subsection (e) goes so far as to mandate a community

outreach program to "educate the public in the United States and abroad about the

penalties for bringing in and harboring aliens in violation of this section."  Rather

than authorizing states to prosecute for these crimes, Congress chose to allow state

officials to arrest for § 1324 crimes, subject to federal prosecution in federal court.

---

[10] As early as 1917, Congress determined that it was necessary to enter the field of regulating the harboring and concealment of unlawfully present aliens. *See United States v. Sanchez-Vargas*, 878 F.2d 1163, 1168 (9th Cir. 1989).  By 1952, Congress expanded its regulation to cover both the transport of unlawfully present aliens and the inducement of their entry into the country. *See id.* at 1169; *see also* Pub. L. No. 82-283, 66 Stat. 26; Pub. L. No. 82-414, 66 Stat. 163, 228.  Since then, the federal interest has not diminished through repeal of the provisions or any additional legislation that detracts from its original force. *See Pennsylvania v. Nelson*, 350 U.S. 497, 502–04, 76 S. Ct. 477, 480–81 (1956) (chronicling the history of federal sedition law to support an inference that the field was dominated by federal regulation).

*See id.* §§ 1324(c), 1329.  In the absence of a savings clause permitting state regulation in the field, the inference from these enactments is that the role of the states is limited to arrest for violations of federal law.  *See De Canas*, 424 U.S. at 363, 96 S. Ct. at 940.

The comprehensive nature of these federal provisions is further evident upon examination of how § 1324 fits within the larger context of federal statutes criminalizing the acts undertaken by aliens and those who assist them in coming to, or remaining within, the United States.  Regarding the aliens themselves, § 1325, for example, imposes civil and criminal penalties for unlawful entry into the United States.  Congress has similarly authorized criminal penalties for individuals who bring aliens into the United States, *id.* § 1323, aid the entry of an inadmissible alien, *id.* § 1327, and import an alien for an immoral purpose, *id.* § 1328.  In enacting these provisions, the federal government has clearly expressed more than a "peripheral concern" with the entry, movement, and residence of aliens within the United States, *see De Canas*, 424 U.S. at 360–61, 96 S. Ct. at 939, and the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field.

The Supreme Court's recent decision in *Arizona v. United States* provides an instructive analogy.  Section 3 of Arizona's Senate Bill 1070 (S.B. 1070) added

a "state-law penalty for conduct proscribed by federal law"—the failure to complete and carry alien registration documents as required by 8 U.S.C. §§ 1304(e), 1306(a). *Arizona*, 132 S. Ct. at 2501. The Court explained the comprehensive nature of the current federal registration scheme, which holds aliens to certain standards of conduct and penalizes their willful failure to register with the federal government. *Id.* at 2502. Based on the breadth of federal regulation, the Court concluded that "the Federal Government has occupied the field of alien registration" and therefore found impermissible "even complementary state regulation" within that field. *Id.*; *see also id.* ("Even if a State may make violation of federal law a crime in some instances, it cannot do so in a field . . . that has been occupied by federal law."). The Supreme Court dismissed the state's argument that its goal of concurrent enforcement was appropriate in a field occupied by federal regulation. *Id.* at 2502–03. Like the federal registration scheme addressed in *Arizona*, Congress has provided a "full set of standards" to govern the unlawful transport and movement of aliens. *Id.* at 2502. The INA comprehensively addresses criminal penalties for these actions undertaken within the borders of the United States, and a state's attempt to intrude into this area is prohibited because Congress has adopted a calibrated framework within the INA to address this issue. *See id.* at 2502–03.

Our conclusion also finds support in the Supreme Court's decision in

*Pennsylvania v. Nelson*, 350 U.S. 497, 76 S. Ct. 477 (1956).  In *Nelson*, the Court

held that Pennsylvania's sedition act, which "proscribe[d] the same conduct" as

the federal sedition statute, was preempted by federal law.  *Id.* at 499, 76 S. Ct. at

479.  As it did in *Arizona*, the Court rejected the state's argument that its purported

supplementation of federal law shielded the state statute from federal preemption.

*See id.* at 504, 76 S. Ct. at 481; *see also Charleston & W. Carolina Ry. Co. v.*

*Varnville Furniture Co.*, 237 U.S. 597, 604, 35 S. Ct. 715, 717 (1915) ("When

Congress has taken the particular subject-matter in hand, coincidence is as

ineffective as opposition, and a state law is not to be declared a help because it

attempts to go farther than Congress has seen fit to go.").  The Court later

discussed that the federal statute's preemptive effect was implied  because it

occupied "the specific field which the States were attempting to regulate." *De*

*Canas*, 424 U.S. at 362, 96 S. Ct. at 940.  The finding of preemption in *Nelson* was

further justified because, like here, Congress had not sanctioned concurrent state

legislation "on the subject covered by the challenged state law." *Id.* at 363, 96 S.

Ct. at 940.

We are further convinced that section 7 presents an obstacle to the

execution of the federal statutory scheme and challenges federal supremacy in the

23

realm of immigration.[11]  By confining the prosecution of federal immigration crimes to federal court, Congress limited the power to pursue those cases to the appropriate United States Attorney.  *See* 8 U.S.C. § 1329; *Arizona*, 132 S. Ct. at 2503 (explaining that if the state provision came into force, states would have "the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies").  As officers of the Executive Branch, U.S. Attorneys for the most part exercise their discretion in a manner consistent with the established enforcement priorities of the Administration they serve.  The terms of section 7, however, are not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish.  *See* Department of Homeland Security Appropriations Act 2010, Pub. L. No. 111-83, 123 Stat. 2142, 2149 (2009) (requiring the Secretary of Homeland Security to "prioritize the

---

[11] We reject the State Officers' characterization of section 7 as an exercise of its police power wholly removed from the federal immigration scheme.  Even if we accept this basic premise (which is problematic given (1) the criminal provisions of section 7 are modeled after those found in the federal *Immigration* and Nationality Act and (2) the Georgia legislature codified them in a new article entitled "Offenses Involving *Illegal Aliens*"), legislation in a field where states traditionally have power does not defeat a claim of federal preemption.  *E.g. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350, 121 S. Ct. 1012, 1018 (2001) (holding that federal law preempted state tort regulation); *see also Charleston & W. Carolina Ry. Co.*, 237 U.S. at 604, 35 S. Ct. at 717 ("The legislation is not saved by calling it an exercise of the police power . . . .").

identification and removal of aliens convicted of a crime by the severity of that

crime").  Indeed, the State Officers have taken the position that an individual

driving an unlawfully present alien to the supermarket could be prosecuted under

section 7 and under the similar provisions of the INA.  (There has been, to our

knowledge, no reported federal conviction premised on that type of ordinary

conduct.)  This contention illustrates the State Officers' misunderstanding of the

nature of federal immigration law and the reach of state authority in the realm of

immigration-related law enforcement.

Along those same lines, interpretation of the section 7 crimes by state courts

and enforcement by state prosecutors unconstrained by federal law threaten the

uniform application of the INA.  Each time a state enacts its own parallel to the

INA, the federal government loses "control over enforcement" of the INA, thereby

"further detract[ing] from the integrated scheme of regulation created by

Congress."  *Wis. Dep't of Indus., Labor & Human Relations v. Gould, Inc.*, 475

U.S. 282, 288–89, 106 S. Ct. 1057, 1062 (1986) (quotation marks omitted); *see

also Arizona*, 132 S. Ct. at 2503 (addressing dilution of federal power in the

context of the alien registration scheme); *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261,

265, 49 S. Ct. 108, 110 (1929) ("The national purpose to establish uniformity

necessarily excludes state regulation.").  Given the federal primacy in the field of

25

enforcing prohibitions on the transportation, harboring, and inducement of unlawfully present aliens, the prospect of fifty individual attempts to regulate immigration-related matters cautions against permitting states to intrude into this area of dominant federal concern.

The conflict that exists is exacerbated by the inconsistency between section 7 and provisions of federal law.  For one, Georgia's enticement provision creates a new crime unparalleled in the federal scheme.  Federal law prohibits an individual from encouraging or inducing an alien to "come to, enter, or reside *in the United States*."  8 U.S.C. § 1324(a)(1)(A)(iv) (emphasis added).  Once inside the territory, though, it is not (and has never been) a federal crime for a person to encourage an alien to migrate into another state.  The Supreme Court has indicated that such additional regulation conflicts with federal law, at least when federal interests dominate.  *See Hines*, 312 U.S. at 66–67, 61 S. Ct. at 404 ("[W]here the federal government, in the exercise of its superior authority in th[e immigration] field, has enacted a complete scheme of regulation . . . , states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, *or enforce additional or auxiliary regulations*." (emphasis added)).  Similarly, the criminal acts of harboring and transporting unlawfully present aliens constitute an impermissible "complement" to the INA that is inconsistent with

26

Congress's objective of creating a comprehensive scheme governing the movement of aliens within the United States. *See id.*

Although the State Officers argue that the objectives of federal law and section 7 are the same, "[i]dentity of ends does not end our analysis of preemption." *Crosby*, 530 U.S. at 379 n.14, 120 S. Ct. at 2298 (citing *Gould*, 475 U.S. at 286, 106 S. Ct. at 1061). In *Crosby*, the Court found preempted a Massachusetts statute that, according to the state, shared the federal government's goal of economically pressuring the Burmese government. *Id.* at 378–79, 120 S. Ct. at 2297. The state law at issue there imposed restrictions on the capacity of state agencies to purchase goods and services from companies that conducted business with Burma, *id.* at 367, 120 S. Ct. at 2291, while federal law imposed both mandatory and conditional economic sanctions on Burma, *id.* at 368, 120 S. Ct. at 2291. The Court found no merit in the state's argument that the shared goals and the possibility of compliance with both federal and state law rendered the Massachusetts law a constitutional complement to federal law. *See id.* at 379–80, 120 S. Ct. at 2297–98. The Court also explained that a conflict between federal and state law "'is imminent' when 'two separate remedies are brought to bear on the same activity.'" *Id.* at 380, 120 S. Ct. at 2298 (quoting *Gould*, 475 U.S. at 286, 106 S. Ct. at 1061). That statement is instructive here, where section 7 imposes

27

criminal penalties on conduct that the INA in most instances already regulates. The end result of section 7 is to layer additional penalties atop federal law in direct opposition to the Court's direction in *Crosby*.

In light of the foregoing, we are convinced that Plaintiffs have met their burden to show a likelihood of success on the claim that section 7 is preempted by federal law.

> b.    Section 8

Section 8 authorizes police officers to investigate the immigration status of individuals who cannot produce adequate identification to prove citizenship, provided probable cause exists that the individual has committed a crime. O.C.G.A. § 17-5-100(b).  In implementing this investigatory provision, officers are not permitted to "consider race, color, or national origin . . . except to the extent permitted by" the United States and Georgia Constitutions.  *Id.* § 17-5-100(e).  In *Arizona v. United States*, the Supreme Court approved of a similar state provision, and in light of that holding we likewise conclude at this stage of litigation that Plaintiffs are not likely to succeed on the claim that section 8 is preempted by federal law.  *See Arizona*, 132 S. Ct. at 2507–10.

In *Arizona*, the Supreme Court rejected a preenforcement challenge to section 2(B) of S.B. 1070, which requires state officers to make a reasonable

attempt to determine the immigration status of a person stopped, detained, or arrested if there exists reasonable suspicion that the detained individual is an unlawfully present alien.  132 S. Ct. at 2507; *see* Ariz. Rev. Stat. § 11-1051(B). The Arizona statute contains three limitations: production of certain identification renders an individual presumptively lawfully present, Ariz. Rev. Stat. § 11-1051(B); officers may not consider race, color, or national origin except as authorized by the United States and Arizona Constitutions, *id.*; and the statute must be implemented consistently with federal law and in a manner protective of civil rights, *id.* § 11-1051(L).

   *Arizona* clarified the principle that "[c]onsultation between federal and state officials is an important feature of the immigration system."  132 S. Ct. at 2508. Pursuant to 8 U.S.C. § 1357(g)(10), state officers may permissibly communicate with the federal government about "the immigration status of any individual," even absent a formalized agreement between the locality and federal government. Moreover, Congress has set up a system to provide assistance to state officers and has mandated that Immigration and Customs Enforcement (ICE) respond to state inquiries concerning the immigration status of individuals.  *Arizona*, 132 S. Ct. at 2508.  Above all, Congress has "encouraged the sharing of information about possible immigration violations," and federal law permits "a policy requiring state

29

officials to contact ICE as a routine matter." *Id.*  The state's failure to incorporate

or reference federal enforcement priorities in its immigration-inquiry statute is

irrelevant.  *Id.*

The Court also explained in *Arizona* that a preenforcement challenge to the

scope of detention authorized by the state statute is premature.  *Id.* at 2509–10.  It

noted the potential problems with a state statute that would permit detention

"solely to verify [an individual's] immigration status" but noted that the state's

interpretation of its statute could remedy these concerns.  *Id.* at 2509.  In sum, if

all the state statute requires is that state officers conduct an immigration inquiry

"during the course of an authorized, lawful detention or after a detainee has been

released, the provision likely would survive preemption—at least absent some

showing that it has other consequences that are adverse to federal law and its

objectives."  *Id.*  Notably, the Court left open the possibility that the interpretation

and application of Arizona's law could prove problematic in practice and refused

to foreclose future challenges to the law.  *Id.* at 2510.

The Supreme Court's holding and explanation apply with full force to

section 8, and we reject the current preenforcement challenge to its validity.  First,

we note that section 8 is less facially problematic than the provision at issue in

*Arizona*.  Unlike Arizona's section 2(B), which is a mandatory investigation

provision, section 8 authorizes—but does not require—state officials to conduct an inquiry into immigration status whenever a detained individual cannot produce satisfactory identification.[12]  Furthermore, section 8 has the same three built-in limitations as the Arizona statute.  *See* O.C.G.A. § 17-5-100(b) (providing that certain documentation is sufficient to establish immigration status); *id.* § 17-5-100(d) (prohibiting use of race, color, or national origin in implementing the provision); Ga. L. 2011, p. 794, § 1(c) (requiring implementation consistent with "federal laws governing immigration and civil rights").  Indeed, at oral argument, counsel for the state of Georgia emphasized that section 8 authorizes arrest and detention only to the extent permitted by federal law.  This interpretation is consistent with the plain language of O.C.G.A. § 17-5-100(e).  We are therefore reluctant to conclude that the state statute "will be construed in a way that creates a conflict with federal law."  *Arizona*, 132 S. Ct. at 2510.  As a result, Plaintiffs cannot establish that they are likely to succeed on the merits of their preemption argument in this preenforcement challenge to section 8.

---

[12] At the same time, we recognize arguments of Plaintiffs and amici that the nonmandatory nature of section 8 invites a host of other problems, namely racial profiling. Reliance on race, color, or national origin that is constitutionally prohibited, however, is expressly forbidden by the Georgia statute.  O.C.G.A. § 17-5-100(d).  It is inappropriate for us to assume that the state will disregard its own law, and we therefore reject the argument in this respect, keeping in mind that unconstitutional application of the statute could be challenged in later litigation.  *See Arizona*, 132 S. Ct. at 2510.

31

2.    Equitable Factors

The State Officers also argue that the district court was incorrect to determine that Plaintiffs meet the three additional requirements relevant to a preliminary injunction.[13]   More specifically, they contend that (1) Plaintiffs will suffer no irreparable harm in the absence of the injunction and (2) the equities favor enforcement of H.B. 87.   We find no clear abuse of discretion in the district court's resolution of these equitable issues.  *See Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000) (en banc) (per curiam).   Plaintiffs are under the threat of state prosecution for crimes that conflict with federal law, and we think enforcement of a state law at odds with the federal immigration scheme is neither benign nor equitable.   We therefore agree with the district court's conclusion that Plaintiffs have met their burden to enjoin enforcement of section 7.

### III.  Conclusion

The illegal-immigration issues that our country faces today are, no doubt, exceptionally important to both the state and federal governments.   As a federal court, we do not sit in judgment of the policy decisions of state legislatures, and we are usually reluctant to conclude that states are forbidden from enacting

---

[13] Because Plaintiffs are not likely to succeed on the merits of their challenge to section 8, the discussion of equitable factors relates only to section 7.

statutes related to activities within their borders.  However, when state laws intrude into areas of overwhelming federal interest and erode the discretion implicit in the sovereignty of the country, we must recognize the supremacy of federal law.  Here, section 7 of H.B. 87 cannot be reconciled with the federal immigration scheme or the individual provisions of the INA.  As a result, we affirm in part the district court's order preliminarily enjoining enforcement of section 7.  We reverse in part the portion of that order enjoining section 8.  This case is remanded to the district court for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 20, 2012

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 11-13044-FF
Case Style: Georgia Latino Alliance for Hu, et al v. Governor of Georgia, et al
District Court Docket No: 1:11-cv-01804-TWT

Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Janet K. Spradlin, FF at (404) 335-6178.

Sincerely,

JOHN LEY, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs