# IN THE UNITED STATES DISTRICT COURT
# FOR THENORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| Georgia Latino Alliance for Human Rights; Service Employees International Union; Southern Regional Joint Board of Workers' United; DREAM Activist.org; Task Force for the Homeless Asian American Legal Advocacy Center; Alterna; Coalition of Latino Leaders; Instituto de Mexico, Inc. of Atlanta; Coalition for the People's Agenda; Paul Bridges; Benjamin Speight; Everitt Howe; Paul J. Edwards; Sharon Gruner; Jane Doe #1; Jaypaul Singh; Ernesto Pinion; John Doe #1; John Doe #2; and Jane Doe #2, | |
| Plaintiffs, | Civil Action File No. 1:11-CV-1804 |
| v. | |
| Nathan Deal, Governor of the State of Georgia, in His official capacity; Samuel s. Olens, Attorney General of the State of Georgia, in his official Capacity; Clyde L. Reese, III, Commissioner of The Department of Human Services of the State Of Georgia, in his official capacity; Mike Beatty, Commissioner of the Department of Community Affairs of the State of Geoergia, in his official capacity; and Falecia Stewart, Executive Director of the Housing Authority of Fulton County, Georgia, in her official capacity, | |
| Defendants. | |

**STATE DEFENDANTS' AMENDED ANSWER TO COMPLAINT FOR**

# DECLARATORY AND INJUNCTIVE RELIEF[1]

# CLASS ACTION

Come Now, Defendants, Deal, Olens, Reese and Beatty, through Counsel and file this, their answer and defenses to Plaintiffs' complaint.

## FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

Defendants deny that Plaintiffs have been or will be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution or laws of the United States or the State of Georgia.

## THIRD DEFENSE

Plaintiffs lack standing to bring this action.

## FOURTH DEFENSE

Plaintiffs' claims are barred in whole or part by the Eleventh Amendment to the United States Constitution.

---

[1] For purposes of this Pleading, State Defendants refers to all Defendants except Falicia Stewart who is represented by other Counsel.

## FIFTH DEFENSE

Plaintiffs' claims are barred in whole or part by the doctrine of sovereign immunity.

## SIXTH DEFENSE

The Defendants reserve the right to raise any other defenses allowed by law at such time as the allegations are more specifically pled or developed.

## SEVENTH DEFENSE

Plaintiffs cannot bring a private right of action for alleged violations of the Supremacy Clause.

## EIGHTH DEFENSE

Without waiving any of the foregoing defenses, the Defendants respond to the numbered paragraphs of the Complaint as follows:

## PRELIMINARY STATEMENT

1. This action challenges Georgia's comprehensive immigration law, House Bill 87 ("HB 87," attached as Exhibit A), In HB 87, Georgia creates a punitive and comprehensive immigration system that, among other things: (1) authorizes state and local law enforcement officers to investigate the immigration status of individuals who do not carry one of a limited set of

documents prescribed by the state, and to arrest individuals on suspicion that they have violated federal civil immigration laws (Section 8); (2) creates new criminal immigration laws specific to and wholly administered by the State of Georgia (Section 7); (3) denies public benefits to anyone unable to provide one of several enumerated documents that Georgia deems sufficient proof of identity (hereinafter "qualifying identity documents") (Section 17); and (4) outlaws the use of consular identification cards, which several foreign governments issue to their citizens, for any official purpose (Section 19).

**Defendants admit that a true and correct copy of HB 87 is attached to Plaintiffs' complaint and state that the document speaks for itself. Defendants deny Plaintiffs' preliminary statement to the extent that the statement differs from the language stated in the bill.**

2. Governor Nathan Deal signed HB 87 on May 13, 2011. The law is scheduled to take effect on July 1, 2011, excepting the benefits provision (Section 17) and the ban on consular identification cards (Section 19(c)), which are scheduled to take

4

effect on January 1. 2012.

**Defendants admit that Governor Deal signed HB 87 on May 13, 2011 and parts of the bill were set to take effect on July 1, 2011 with additional portions to take effect on January 1, 2012. Defendants deny the characterization of the bill to the extent that the characterization differs from the plain language presented in the bill.**

3.    If allowed to take effect, HB 87 will significantly harm Georgians, and particularly Georgians of color, for at least three reasons:

**Defendants deny the allegation in paragraph 3.**

4.    First, as confirmed by law enforcement officials in Georgia and elsewhere, HB 87 will subject Georgians—including countless U.S. citizens and non-citizens who have permission from the federal government to remain in the United States—to unlawful interrogations, searches, seizures, and arrests and will result in widespread racial profiling. All Georgians, and particularly those of color, will be compelled to carry additional paperwork prescribed by the State of Georgia at all times. This is because HB 87 makes individuals who do not carry the prescribed

5

documentation subject to lengthy investigations into immigration status that last over 80 minutes on average under the best case scenario. This documentation requirement amounts to a state alien registration scheme incorporated into Georgia criminal procedure.

**Defendants deny the allegations in paragraph 4.**

5. <u>Second</u>, HB 87 will cause countless Georgians—including U.S. citizens and non-citizens with federal permission to remain in the United States—to be erroneously deprived of the public benefits that they need and are lawfully entitled to receive. These deprivations will force individuals and families, including those with young children, to be without food and shelter, simply due to an inability to produce a qualifying identity document.

**Defendants deny the allegations in Paragraph 5.**

6. <u>Third</u>, HB 87 will thwart the ability of potentially hundreds of thousands of Georgians to conduct basic daily tasks with ease—such as gaining admission to a state building or enrolling a child in public school—by prohibiting the use of

6

their consular-issued identification for any "official purpose."

**Defendants deny the allegations in Paragraph 6.**

7.   HB 87 constitutes a sweeping and comprehensive state scheme regulating immigration and the conditions under which immigrants can reside in Georgia.   The state system includes provisions: creating new state documentation requirements that transform ordinary police encounters into immigration status investigations; inventing new *state* immigration crimes; restricting the ability of U.S.  citizens and lawful immigrants to obtain benefits that they are entitled to under federal law; invalidating documentation that foreign governments offer to their own citizens; and addressing many other issues relating to non-citizens' presence and activities in Georgia, including the transportation of suspected unauthorized immigrants by law enforcement officials, the availability of bail to non-citizens in criminal proceedings, and the creation of a new public body to oversee and enforce several of HB 87's provisions.

**Defendants deny the allegations in Paragraph 7.**

8. The State of Georgia's intent to displace federal immigration authority is apparent not only from the scope and design of HB 87's immigration regulations, but also from the express statements of the members of the Georgia General Assembly who drafted and supported the law.

**Defendants deny the allegations in Paragraph 8.**

9. HB 87 interferes with the core federal interests of setting a uniform national immigration scheme and speaking for the entire nation in conducting foreign relations with other nations. The President of the United States directly invoked these federal interests in condemning **HB** 87 on April 26, 2011: "It is a mistake for states to try to do this piecemeal.  We can't have 50 different immigration laws around the country.  Arizona tried this and a federal court already struck them down." *See* Matthew Bigg, "Obama criticizes new Georgia immigration law," REUTERS, Apr.  26, 2011.

**Defendants deny the allegations in Paragraph 9.**

10. HB 87 is unconstitutional in myriad ways.  It violates the Supremacy Clause and core civil rights and liberties secured by

the U.S. Constitutionincluding the Fourth Amendment's right to freedom from unreasonable searches and seizures, the Right to Travel, and the Fourteenth Amendment's guarantees to equal protection and due process under the law. It also violates separation-ofpowers safeguards in the Georgia Constitution.

**Defendants deny the allegations in Paragraph 10 but admit that the law of the case as defined by the Eleventh Circuit Court of Appeals shows that Section 7 of HB 87 violates the Supremacy Clause.**

11. The Plaintiffs in this action will suffer serious and irreparable violations of their constitutional rights and civil liberties if FIB 87 is allowed to take effect. The individually named Plaintiffs bring this action on behalf of themselves and a class of all others similarly situated to obtain preliminary and pen-nanent injunctive relief and a declaration that HB 87 is unconstitutional.

**Defendants deny the allegations in Paragraph 11.**

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. §§

9

1331 and 1343 over Plaintiffs' claims under the U.S. Constitution, which are brought both directly and under 42 U.S.C. §§ 1981 and 1983.

**Defendants deny that this action can be brought pursuant to 42 U.S.C. §§ 1981, 1983 or the Supremacy Clause. If the action can be brought pursuant any of these provisions, Defendants admit that jurisdiction is properly before this Court.**

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights and to secure equitable or other relief for the violation of those rights.

**Defendants deny that this action can be brought under 42 U.S.C. §§ 1981, 1983 or the Supremacy Clause. In the action can be brought pursuant to any of these provisions, Defendants admit that jurisdiction is properly before this Court.**

14. This Court has supplemental jurisdiction over Plaintiffs' state

10

law claim pursuant to 28 U.S.C. § 1367 because it is so related to the federal claims that it forms part of the same case or controversy under Article III of the U.S. Constitution.

**Defendants deny that the Court may exercise supplemental jurisdiction of claims brought pursuant to state law.**

15. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure Rule 57.

**Defendants deny that this action may be brought pursuant to 42 U.S.C. §§ 1981, 1983 and the Supremacy Clause. To the extent the claims may be brought pursuant to these provisions, the Court has jurisdiction to entertain claims for declaratory relief.**

16. Venue is proper in this District under 28 U.S.C. § 1391(b). Defendants are sued in their official capacity and their residences are all located within this District and this Division. All of the events giving rise to this Complaint occurred within this District.

**Defendants admit venue is properly before this court.**

**PARTIES**

11

## Organizational Plaintiffs

17. Plaintiff **Georgia Latino Alliance for Human Rights** ("GLAHR") is a statewide, grassroots membership organization founded in 1999 that emphasizes community outreach to immigrant communities in Georgia in order to ease their transition into a new culture. One key way that GLAHR achieves its goal of easing transition into a new culture is by educating the community about city ordinances of which they would otherwise be unaware. Other GLATIR functions include: providing leadership training, conducting community organizing for immigrants' rights, holding community forums on a range of issues, and hosting monthly meetings on issues facing the Georgia immigrant community. If implemented, HB 87 would harm GLAHR by causing the organization to divert significant resources away from activities central to its mission. For example, if HB 87 takes effect, GLAHR will no longer be able to conduct education around local ordinances, and instead will have to focus all of its educational efforts on determining the effects of HB 87 and educating its members

12

about it.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 17 and therefore deny same.**

18. Since HB 87 passed, GLAHR has experienced a steep drop in attendance at its events and meetings, by both its members and other interested community participants. Members have reported that they are too afraid to attend these events because they believe that they will be targeted by the police based on their ethnic appearance.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 18 and therefore deny same.**

19. GLAHR's ability to pursue its mission is directly threatened by implementation of HB 87. To carry out its mission, GLAHR provides transportation for its members to activities and forums related to the organization's activities and goals. GLAHR provides this transportation for all of its members, some of whom are undocumented. GLAHR will need to continue to provide transportation for its members if HB 87 takes effect and, therefore, would be subject to criminal liability

13

under the law. In addition, to advance its mission, GLAHR often assists individual immigrants to remain in the state by advocating on their behalf with detention centers or by helping them find attorneys. These vital organizational activities would also expose GLAHR to criminal liability if HB 87 is implemented. Finally, GLAHR's members have already been subject to increased stops and interrogation by police since HB 87 passed based on their Latino appearance and/or English language ability. Because many of GLAHR's members lack the identity documents prescribed by HB 87, they will be harmed if HB 87 takes effect by being subjected to increased police scrutiny, interrogation, and detention.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 19 and therefore deny same.**

20. Plaintiff **Service Employees International Union** ("SEIU") is one of the largest labor organizations in the world, representing 2.2 million men and women who work primarily in the public sector and in the janitorial, health services, long-term care, and security industries. Many of SEIU's

14

members are recent immigrants to the United States and many of its members come from racial minority groups. SEIU has long called for and worked toward comprehensive reform of U.S. immigration laws. Another priority for SEIU is fighting discrimination against minorities, women, and other groups in the workplace and society in general. In Georgia, SEIU has a local affiliate, the Southern Regional Joint Board of Workers' United. This affiliate represents about 4,000 employees, of whom approximately 60 percent are members. These employees work in 28 different work sites across the state with about 75 percent residing in the Atlanta metropolitan area. Between 15 and 20 percent of the employees the Joint Board represents are Latino and the majority of the remainder are other racial minorities. In Georgia, SEIU works in partnership with the Southern Regional Joint Board and other groups to combat discrimination and mobilize for immigration reform at the national level.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 20 and therefore deny same.**

21. The implementation of **HB** 87 will have a severe impact on SEIU's organizational mission.  Some of **SEIU's** Latino members or their families have already been subjected to stops by local law enforcement where they have been asked to produce proof of immigration status.  SEIU will be harmed if **HB** 87 is implemented because its minority members will be even more likely to be stopped, detained, arrested, and questioned by state and local police.  This will cause hardship for members of SEIU.  In addition, SEIU will be harmed if **MB** 87 is implemented because its members and potential members, regardless of nationality and immigration status, will refrain from exercising their rights to attend rallies, demonstrations, and union meetings or to engage in leafleting or other traditional labor activities because of the possibility of being stopped by police under HB 87.  This will significantly affect the ability of SEIU to protect its existing members.  In addition, the Latino community is one of the fastest growing in the states and is heavily represented in the industries in which Workers' United is concentrated-- manufacturing, industrial laundries,

16

and distribution.    Finally, HB 87 has created a fear of government officials and has already led to reluctance on the part of members of this community to join the union *and* to take the perceived risk of supporting new organizing in unorganized workplaces, where the National Labor Relations Board is often involved.    SEIU joins this lawsuit to preserve its ability to organize new members and to protect the rights and interests of its members and prospective members.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 21 and therefore deny same.**

22.    Plaintiff **Southern Regional Joint Board of Workers' United** ("Joint Board") is a labor union and an affiliate of Plaintiff SEIU.    The Joint Board represents approximately 4,000 workers in Georgia.    Over 15 percent of the Joint Board's Georgia membership is Latino.    The primary mission of the Joint Board is to organize, represent, and empower employees in Georgia.    In addition, the Joint Board works in partnership with **SEIU** and other groups to combat discrimination and mobilize for immigration reform at the national level.

17

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 22 and therefore deny same.**

23. The Joint Board will be harmed by HB 87 because its minority members, including U.S. citizens and lawful immigrants, are likely to be unlawfully stopped, detained, arrested, and questioned by state and local police after HB 87 goes into effect. This will cause hardship for members of the Joint Board. In addition, the Joint Board will be harmed if HB 87 **is** implemented because its members and potential members will refrain from exercising their rights to attend rallies, demonstrations, and union meetings or to engage in leafleting or other traditional labor activities because of the possibility of being stopped by police under HB 87.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 23 and therefore deny same.**

24. Members have already told the Joint Board that they have faced additional police scrutiny and questioning since HB 87 was

18

passed.  They believe this additional police scrutiny was based solely on their ethnic appearance and/or English speaking ability.  This discriminatory treatment by law enforcement will significantly impede the ability of the Joint Board to protect its current members and to organize new members.  Some members of the Joint Board lack the identity documents required by **HB** 87 or do not regularly carry these documents with them when traveling through the state, and are therefore at risk of lengthy detention and investigation under the new law.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 24 and therefore deny same.**

25.   The Joint Board will also be harmed if HB 87 is implemented because employers in the state will refrain from hiring members and potential members of the Joint Board that they believe look or sound "foreign" out of a fear that they will be subject to increased liability under **HB** 87.  This will have a serious impact on the ability of the Joint Board to recruit new members.  The Joint Board will also be harmed if HB 87 takes effect because of the provision criminalizing the

transporting of undocumented immigrants. This provision will have a chilling effect on the Joint Board's efforts to give rides to people attending union meetings and other events. The Joint Board will have a more difficult time organizing transportation to these key union activities because people will be afraid to associate with someone whose racial/ethnic appearance might result in getting the driver stopped for a minor traffic offense leading to further police scrutiny and possible criminal prosecution under the law. In addition, if HB 87 is implemented, the Joint Board will need to spend significant new time educating members and potential members about the law. This will divert the Joint Board's resources from other core organizational priorities. The Joint Board joins this lawsuit to preserve its ability to organize new members and to protect the rights and interests of its members and prospective members.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 25 and therefore deny same.**

26. Plaintiff **DREAM Activist.org** (DREAM) is a multicultural,

20

migrant-youth-led movement to pass the DREAM Act, also known as the Development, Relief, and Education for Alien Minors Act. The DREAM Act is a bipartisan bill that seeks to address the situation faced by many young students who were brought to the United States as young infants. Under the most recent version of the DREAM Act, students with good moral character who came to the United States at age 15 or younger at least five years before the date of the legislation's enactment would qualify for "conditional permanent resident status" upon acceptance to college, graduation from a U.S. high school, or being awarded a GED in the United States or have served in the armed forces. DREAM is a national membership based organization with DREAM Act student members all over the country, including Georgia. DREAM provides campaign support to DREAM Act students facing removal from the United States in Georgia and all across the country.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 26 and therefore deny same.**

21

27.   If HB 87 takes effect, DREAM members are at risk of being subject to prolonged immigration status checks even if they are authorized by the federal government to remain in the United States.   DREAM has members, including Georgia members, who have been granted deferred action by federal immigration authorities.   Deferred action is a discretionary decision not to arrest or deport a person for immigration purposes.   Deferred action is often granted for one year time periods, but can be renewed.   However, the temporary and indefinite nature of deferred action means that a DREAM Act student granted deferred action would not be automatically eligible to obtain identity documents in Georgia, and such students often spend months out of each year with no identification while they wait for new documentation to prove that the federal government has extended their deferred action grant.   Under HB 87, these students are likely to be caught up in prolonged immigration status checks although they are authorized to remain in the United States.   DREAM members, including Georgia DREAM members, may also benefit from a private immigration bill

22

introduced by a local Senator or House of Representative preventing their removal from the United States. Upon introduction of a private bill, a DREAM Act student's removal is delayed at least until the end of the congressional session. A DREAM Act student with a private bill introduced may not have proof that the bill was introduced or an officer may be confused as to whether a DREAM Act student with a private bill can remain in the United States. Under HB 87, Georgia DREAM Act students with a private bill introduced but not passed in either the House or Senate may be targeted and arrested under the law.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 27 and therefore deny same.**

28.     If HB 87 takes effect, DREAM will be harmed in other ways, as well. DREAM harbors undocumented students in houses within the State of Georgia and provides transportation to undocumented students with and without deferred action grants. DREAM will continue to do so even if HB 87 takes effect. DREAM also has planned and will continue to plan

conferences and training sessions in Georgia that bring together undocumented students nationwide. Under HB 87, these actions could be considered assisting, transporting, and harboring undocumented students in Georgia which would expose DREAM members to criminal liability.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 28 and therefore deny same.**

29. Plaintiff **Task Force for the Homeless** (TFH) has served the needs of homeless men, women, and children in the Atlanta area for thirty years. Today, TFH is a non-profit organization that offers a homeless shelter that provides evening meals, a recovery program, a Resident Volunteer Program, a Transitional Housing Program, an emergency assistance hotline, support services, a day service center, permanent housing placement assistance, employment placement and assistance, computer classes, an art studio and gallery, a bike shop, a roof garden, and occasional transportation for residents. TFH serves more than 500 people a day—men, women, and children, including undocumented immigrants—in its shelter,

24

resident volunteer programs, and transitional housing programs. TFH provides its services to all, without regard to their immigration status.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 29 and therefore deny same.**

30. Since **HB** 87 has been enacted, TF/-1 has diverted resources from other organizational priorities to educate its volunteers and residents about the law. Volunteers and residents alike are fearful that HB 87 will have a serious impact on people of color statewide. If **HB** 87 takes effect, TFH will have to divert additional resources from priority areas to provide education about the law.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 30 and therefore deny same.**

31. If HB 87 takes effect, TFH will be harmed in several ways. First, TFH will be exposed to criminal liability for continuing to conduct emergency shelter and services core to its mission without regard to the immigration status of those it serves. Second, TFFI has assisted victims of racial profiling with

filing complaints in the past. If HB 87 takes effect, it will be more difficult for TFH **to** help the increased number of victims of racial profiling. In addition, TFH volunteers and residents—nearly all of whom are homeless—seldom carry the identity documents prescribed by HB 87. If HB 87 takes effect, these members would be unable to establish their identity to the satisfaction of local law enforcement and would face additional police scrutiny and detention while officers attempt to verify their immigration status. Moreover, TFH provides transportation to its residents occasionally without checking their immigration status; HB 87 will make any future service of that kind risky.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 31 and therefore deny same.**

32. TFH also encourages its residents to apply for food stamps and public housing assistance to which they are entitled. Currently, this process does not consume significant TFH staff time. But because many TFH residents lack the most common forms of identity documents, and in some cases lack any ID, the new

26

HB 87 requirement that applicants for public benefits present qualifying identity documents will cause many TFH residents and clients who are otherwise eligible for food stamps to be denied. Food stamps are essential for many TFH residents, and TFH will have to prioritize creating instructions and providing assistance for those who are turned away, including providing more direct food assistance. This diversion of resources will be a major impediment to TFH residents' access to essential services, and to TFH's work in other areas. TFH also tries to place individuals in public housing or to assist them in obtaining Section 8 housing vouchers when possible. Given that **HB** 87 creates the same identification restrictions for public housing as for food stamps, TFFI will be overburdened by requests from residents for help with overcoming problems caused by these new document requirements, including the time-consuming process of obtaining qualifying identity documents. Because fewer of TFH's residents will have access **to** food stamps and public housing assistance they will, by necessity, require additional food and housing assistance

27

directly from TFH.  They will remain homeless for longer and longer periods of time.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 32 and therefore deny same.**

33.    Plaintiff **Asian American Legal Advocacy Center** is the first not-for-profit law center focused on Asian Americans, Pacific Islanders, and Asian-ethnic refugees in Georgia and the Southeast.   AALAC's mission is to protect and promote the civil, social, and economic rights of Asian Americans through public policy, legal education, community organizing and leadership development.   AALAC's programs include immigration, youth and juvenile justice, language access, economic development, voter engagement and civic participation, and small business issues.   AALAC reaches approximately 3,000 people on an annual basis through its community forums and multilingual educational materials.  It provides bilingual materials in Chinese, Korean and Vietnamese.   Since the passage of HB 87, AALAC has exhausted staff and organizational resources to respond to the

law's impact the Asian American communities, immigrant communities, and small businesses.  For example, along with its community partners, AALAC helped to gather 4,000 signatures provided by Korean American residents of Gwinnett County urging key legislatures to vote no to **HB** 87.  HB 87 has already and will continue to impact AALAC's ability to satisfy its mission because members of **its community are looking to** AALAC for guidance on the impact of the law on their day-to-day lives.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 33 and therefore deny same.**

34.   Plaintiff **Alterna** is a faith-based, non-profit organization that was founded in 2006 and provides a variety of social services, primarily to the Latino immigrant community in LaGrange, Georgia.  Alterna is guided by the biblical teaching to love our neighbors and care for the marginal and vulnerable among us and it focuses on providing accompaniment, advocacy, and hospitality to and on behalf of those in need.   Alterna's services   include:   providing   crisis   intervention   case

29

management for families and individuals experiencing legal, medical, employment, or family-related crises; accompanying clients to medical, government, or school appointments; accompanying clients to appointments to apply for public benefits such as food stamps, income verification and Medicaid; sponsoring English-language classes; delivering community education on a range of issues; maintaining a housing facility near the immigration detention center in Lumpkin, Georgia for family and friends visiting detainees; providing transitional housing for families and individuals experiencing crises; advocating on immigration issues including detention conditions for immigrant detainees; and hosting educational trips to Guatemala with a focus on social justice. Alterna has three staff members and several volunteers. Alterna does not check the immigration status of its clients, but is aware that many of its clients and their family members are undocumented immigrants.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 34 and therefore deny same.**

30

35. If **HB** 87 takes effect, Alterna will be harmed in several ways. First, Alterna will be exposed to criminal liability for continuing to conduct services core to its mission—including transporting clients to various appointments and running its housing facility near the Lumpkin detention center and its transitional housing facility. Alterna is aware that many of the clients it transports to critical appointments or allows to use its housing facilities are undocumented. Second, Alterna has already experienced a significant drop in attendance at events as well as a decrease in clients since HB 87 passed. Indeed, Alterna has already been forced to cancel some of its English-language classes. This decrease in attendance and demand for services is directly attributable to fear resulting from the new law; many immigrants are too afraid to drive to any events out of fear of being stopped by law enforcement. If HB 87 takes effect, Alterna will suffer an even steeper decline in attendance and demand for services. Third, Alterna has had to alter its programming since FIB 87 passed. Clients are showing up for events or services with questions about their rights under the

31

new law and Alterna has had to divert resources to answer these questions, which detracts from the ability to provide services more central to Alterna's mission such as English-language instruction.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 35 and therefore deny same.**

36.    Plaintiff **Coalition of Latino Leaders** ("CLILA") is a not-for-profit, volunteer-based membership organization in Dalton, Georgia that was founded in 2006.  CLILA's mission is to develop competent, caring Latino grassroots leadership with the skills necessary to address the critical issues facing the Northwest Georgia Latino community.  CLILA has approximately 150 members and about 1,000 participants in various CLILA events throughout the year.  CLILA provides the following services: advocacy and community organizing for immigrants' rights; citizenship classes; English-language classes; Homework Club for children whose parents do not speak English; computer classes; and assistance in completing applications for legal residency and naturalization.  CLILA also

32

hosts community meetings on issues affecting the Latino community, provides educational information on various topics, and works on voter registration and education for the Latino community. In addition, CLILA identifies children, and sometimes parents, who are eligible for food stamps and instructs families on how to apply for these benefits. CLILA provides programs and services for the community living primarily in Whitfield and Murray counties. Its members are Latino immigrants, mainly from low-income families. CLILA accepts all members without regard to their immigration status, but is aware that approximately 60 percent of its members are undocumented immigrants.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 36 and therefore deny same.**

37. CLILA has already been harmed by the passage of HB 87—most notably due to a drop in attendance for its programs based on members' fears that their association with CLILA will cause them to be identified as undocumented immigrants by law enforcement. In addition, CLILA's resources, both in terms of

funding and staff and volunteer time, have been diverted from organizational priority projects due to the passage of HB 87. For example, the number of calls CLILA receives daily has increased by 400 percent since HB 87 was passed. The vast majority of these calls are from community members who have questions about the new law and how it will affect them. CLILA has been forced to put on hold its citizenship classes in order to respond to this increase in calls and to answer questions about HB 87. Finally, if implemented, CLILA will face criminal liability under HB 87 because it regularly provides transportation for its members—some of whom are undocumented—to attend events such as citizenship classes or rallies across the state.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 37 and therefore deny same.**

38.    Plaintiff **Instituto de Mexico, Inc. of Atlanta** ("Instituto") is a non-profit organization registered in the state of Georgia and

34

based in Atlanta. The Institute is dedicated to fostering the development of the Mexican community in Atlanta and to promoting the history and culture of Mexico in the United States. The Instituto was founded in 2002 and its mission is to promote understanding and to share Mexican customs and traditions with residents of Atlanta and surrounding areas. The Instituto places a special focus on educating youth with Mexican ancestry about their heritage and culture. Another central goal of the Instituto is to cultivate friendship ties and a mutual understanding of the cultural commonalities between the United States of America and Mexico. To fulfill its mission the Instituto organizes cultural programs, which are open to all Atlanta-region residents without regard to immigration status, nationality, or citizenship. The Instituto regularly holds large cultural events for the Atlanta community that range from celebrations for Mexico's Independence Day and the Day of the Dead; a variety of concerts; conferences; health fairs; expositions; and several educational and sports events. These events draw attendees from across Atlanta and the rest of the

35

state and regularly include thousands of participants. Although the Instituto's events are open to all, the majority of attendees are Latino—including U.S citizens and others in lawful immigration status.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 38 and therefore deny same.**

39. If HB 87 is implemented, the Instituto will be harmed because attendance at its events will drop drastically and this will undermine the Instituto's ability to achieve its central purpose as an organization—to promote understanding and educate the public about Mexican cultural heritage. Already, since HB 87 passed people have expressed fear of attending Instituto events. Individuals who regularly attend Instituto events have expressed that they are afraid to attend these events out of fear that they will be targeted by local police and will be subject to immigration status inquiries if they attend large group events with primarily Latino attendees. The passage of HB 87 has created an intense climate of fear for Latinos in Georgia and individuals of Latino descent are afraid

36

that any contact with law enforcement could result in extended interrogation, detention, and arrest regardless of their lawful immigration status.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 39 and therefore deny same.**

40.   Plaintiff **Georgia Coalition for the Peoples' Agenda** ("CPA") is a Georgia-based coalition of approximately 1000 individual and 50 organizational members representing a diverse spectrum of issues, interests, and constituencies, ranging from civil and human rights and women's and young people's rights to labor relations and environmental justice.  CPA defines its mission as improving the quality of governance in Georgia, creating a more informed and active electorate, and having responsive and accountable elected officials.  CPA tries to educate the public and encourage their participation through voter registration drives, town hall meetings and other events that provide information and a forum to voice community concerns on issues spanning health care, education, labor relations, the juvenile justice system, monitoring elected officials, and

37

environmental justice, to name a few.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 40 and therefore deny same.**

41. HB 87 will negatively impact CPA's members and organizational activities in several ways. Some CPA members, including U.S. citizens and individuals who have lawful immigration status, will be unable to provide the required documents for police inspection and will be at risk of being subject to lengthy detentions and investigations. For example, many elderly individuals do not have a Georgia driver's license or other document deemed acceptable under HB 87. For many families represented by CPA who already struggle to pay their bills and make ends meet, the costs of obtaining these documents will be a great and undue economic burden as well. In addition, CPA has already received many reports of racial profiling by the local police targeting individuals of color, for example, in a phenomenon known as "driving while black," whereby AfricanAmerican drivers who are seen driving more expensive cars are routinely stopped by the police for

interrogation even when they have not violated any traffic laws. CPA is very concemed that HB 87 will increase and aggravate these incidents of racial profiling and harassment.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 41 and therefore deny same.**

42. CPA also foresees a decrease in participation in its events and programs, such as town hall meetings, because of people's fear of immigration status investigations authorized by HB 87. The law will also negatively affect the organization by forcing CPA to divert its time, money, and resources from other important projects, such as initiatives to improve the educational and criminal justice systems, so that it can respond to HB 87.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 42 and therefore deny same.**

### Individual Plaintiffs

43. Plaintiff **Paul Bridges,** a supporter of the Republican Party, is the mayor of Uvalda, Georgia, a town of approximately 600 people in Montgomery County. Because he speaks Spanish and English and is well-known, he often assists with interpretation

39

in schools, doctors' offices, court, and other settings. He also provides transportation to undocumented individuals so that they can go to the Mexican Consulate in Atlanta, churches, the grocery store, appointments at doctors' and dentists' offices, and soccer tournaments in towns neighboring Uvalda, among other places. He gives rides to undocumented friends in Georgia on at least a daily basis and will continue to do so in the future. In addition, Bridges has traveled to Florida to pick up friends, including those who are undocumented, to give them rides to Georgia. Bridges will continue to do so in the future. Sometimes he exceeds the speed limit, or forgets to signal when changing lanes, when driving undocumented individuals.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 43 and therefore deny same.**

44. If HB 87 goes into effect, Bridges and the undocumented individuals traveling with him will be at risk of criminal prosecution. In the past, Bridges has opened his home to

40

undocumented individuals who needed a place to live as they traveled through the area, and he will continue to do so in the future. If HB 87 goes into effect, he fears that he could be prosecuted for sheltering these individuals in his home.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 44 and therefore deny same.**

45. As mayor of Uvalda, Bridges also wishes to inform the Court of the immense human and economic costs that HB 87 will inflict on his town. With HB 87, Bridges fears that families with mixed immigration status will be torn apart, as parents who are undocumented get picked up by immigration authorities, leaving their U.S. citizen children without anyone to care for them. If HB 87 goes into effect, Bridges worries that there simply will not be enough agricultural workers available and this will adversely impact Uvalda businesses and its tax base. Finally, Bridges fears that HB 87 will pose enormous costs to the town for housing those arrested under the law, costs that the town cannot afford.

**Defendants are without knowledge or information sufficient to form an**

41

**opinion as to the truth of Paragraph 45 and therefore deny same.**

46.   Plaintiff **Benjamin Speight** is the Organizing Director for the Teamsters Truck Drivers and Helpers Local 728.   Speight protects the rights of all workers, without regard to their immigration status.   He regularly transports undocumented students and other undocumented individuals in his union-issued twelve passenger van.   While driving, he often receives and sends text messages, and sometimes does not come to complete stops at stop signs and drives above the speed limit.   Although HB 87 will criminalize Speight's transportation of undocumented individuals, he will continue to do this even if the law takes effect.   Speight also will drive the van to organize non-compliance with and targeted opposition to HB 87 both inside and outside the state.   As a result of these activities, Speight fears that he will be subject to criminal prosecution under HB 87.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 46 and therefore deny same.**

47.   Plaintiff **Everitt Howe** is a retired Lieutenant Colonel in the

42

U.S. Air Force. He currently serves as the Vice President of the Fulton County chapter for Atlantans Building Leadership for Empowerment ("ABLE"), an interdenominational social justice organization composed of 27 congregations, and is a caseworker in a community service program at his church. This program serves about 100 families, including some undocumented immigrants, and offers a variety of services, including providing advice on legal or tax matters, English-language classes, food coupons, and direct financial aid to families and individuals in financial hardship. As part of the program, Howe regularly accompanies and transports families and individuals, including those who are undocumented, to hospital visits or other appointments. In the course of transporting and assisting these individuals, Howe has accidentally run a red light and has had problems with a troublesome tail light on his car, which make it likely that he will be stopped in the future for minor traffic violations. Howe fears that under HB 87, he could be found criminally liable.

**Defendants are without knowledge or information sufficient to form an**

**opinion as to the truth of Paragraph 47 and therefore deny same.**

48.   Plaintiff **Paul J. Edwards** is a devout Christian who strongly believes in helping all individuals in his community regardless of their immigration status. His religious beliefs encourage actions that will he labeled as criminal offenses if HB 87 is allowed to take effect. For example, as a part of his religious commitment, Edwards transports people, including those who are undocumented, to places of worship and to locations which provide medical assistance. When transporting individuals, he has on occasion exceeded the speed limit. His activities could subject him to criminal liability for assisting, transporting, and harboring undocumented individuals under HB 87. In addition, Edwards serves as a board member of Plaintiff Alterna and plans events that include housing undocumented individuals, which could be considered criminal harboring under HB 87. If HB 87 goes into effect, individuals in Edwards's community will be even more afraid to drive, and he will be criminally liable for transporting them to church and for non-emergency

44

medical care.  Also, HB 87 would make Edwards criminally liable for inviting out-of-state undocumented friends into his home.  From personal knowledge and experience, Edwards knows that laws such as HB 87 increase fear within the immigrant community and decrease the likelihood that immigrants—both those with and without legal status—will cooperate with law enforcement, which result in a community-wide decrease in public safety.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 48 and therefore deny same.**

49.   Plaintiff **Sharon Cruner** is a graduate student who resides in Dalton, Georgia, and spends her time volunteering with Plaintiff CLILA.  As part of her volunteer work, she regularly drives CLILA members—those with and without legal status—from English classes and meetings, and she will continue to do so.  While driving these members, Gruner has sometimes driven over the speed limit or failed to stop completely at a stop sign, and she has been stopped by police about once every three months because of a problem with the tail lights on her car.  To

45

date, she has received warnings during these stops. But she worries that, following the implementation of HB 87, a routine stop for the tail light problem or other minor traffic violation will result in her being prosecuted for transporting undocumented immigrants. In connection with her work for CLILA, Gruner also has provided shelter to undocumented immigrants and she will continue to do so in the future. The fines that Gruner would pay if she is found to be violating HB 87 by harboring or transporting undocumented immigrants are more than she can afford to pay as a graduate student.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 49 and therefore deny same.**

50. Plaintiff **Jane Doe #1 is** married to an undocumented immigrant. Her husband is currently participating in physical therapy and sees a doctor regularly as a result of an incapacitating injury he suffered that left him unable to operate an automobile. Jane Doe #1 has primary responsibility for

46

transporting her husband to and from his doctor visits and physical therapy, as well as anywhere else that their family frequents, and has on some occasions exceeded the speed limit, or failed to use her blinker properly. If HB 87 takes effect, she fears arrest by the police for transporting her husband to and from his medical appointments and other locations. She also fears being held criminally liable for harboring undocumented immigrants if she were to invite her undocumented in-laws from Florida to visit with her here in Georgia.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 50 and therefore deny same.**

51. Plaintiff **Jaypaul Singh,** a U.S. citizen of South Asian descent, permanently resides in the State of Washington. Singh is attending law school and will be residing in Atlanta, Georgia for the summer while he works as a law clerk in the city. He has a driver's license from the State of Washington, which he plans to use as his identification while living in Atlanta. Singh will not have with him any document that is required by HB 87 to prove that he is a U.S. citizen. He generally carries

47

his driver's license with him, but this document will be insufficient under HB 87 because the State of Washington does not verify immigration status prior to issuing driving licenses. Singh occasionally commits minor infractions, such as speeding, and he has sometimes been stopped by law enforcement officers for this in the past. He is fearful that he could be stopped again for committing a minor infraction while in Atlanta, and that he will be subject to extended detention as the local police try to confirm whether he is a U.S. citizen. If HB 87 goes into effect, Singh will avoid contact with law enforcement and will curtail some of his movement throughout the state to avoid the risk of detention.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 51 and therefore deny same.**

52. Plaintiff **Ernesto Pinion,** a U.S. citizen who is Latino, permanently resides in the State of Washington. He has dark skin and dark hair. He plans to travel to Georgia this year to visit his half-sister and her family, who live in Tucker, Georgia. Pinion has a driver's license issued by the State of

48

Washington, which is the only form of identification he carries when he travels. Pinion has been stopped by police in the past because, he believes, he looks Latino. He is worried that if he travels to Georgia to visit his sister, he will be stopped by police and detained because his Washington driver's license will not be accepted as proof that he is a U.S. citizen and because, due to his skin color and accent, officers will not believe that he is a U.S. citizen. If HB 87 goes into effect, he will be more afraid to travel in Georgia. When he visits his sister they will stay inside her home more than they would have before HB 87 to avoid encounter law enforcement officers.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 52 and therefore deny same.**

53. Plaintiff **John Doe #1,** now 19 years old, has been in the United States since he was a young child. He is a Mexican national who was brought to the United States by his parents when he was about nine years old. He is a high school graduate who, while in high school, was a member of the Junior Reserve

49

Officers' Training Corps (JROTC) and vice-president of his senior class. Although he applied to and was accepted at Kennesaw State University, he could not matriculate because he could not afford the tuition and did not qualify for loans or grants because of his immigration status. Nonetheless, his goal remains to eventually attend college. If HB 87 goes into effect, John Doe #1 will be afraid to leave his home and participate in community activities as he would otherwise, because of the increased risk that he will be subject to racial profiling. He has been subject to racial profiling in the past and, because of his dark skin and dark hair, fears that HB 87 will open the door to additional encounters where he is racially profiled. If HB 87 goes into effect, he will be very afraid to interact with the police, even if he is the victim of or witness to a crime, and he would likely not call the police for fear of being arrested because of his immigration status. John Doe #1 does not possess any of the documents HB 87 requires as proof of identification, and his only photo ID is a consular identification card ("matricula") issued by the Mexican

Consulate. John Doe #1 has used the matricula in the past to visit the State Capitol building and would like to continue doing so in the future, but believes that HB 87 will cause public places to refuse the matricula as a valid form of ID. Likewise, although his mother and sister have used their matriculas to establish their parental identity when obtaining Women Infant and Children ("WIC") services for their U.S. citizen children, he worries that if HB 87 takes effect, they will no longer be able to access these services, which in turn will adversely affect the health and well-being of his family members.

Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 53 and therefore deny same.

54. There does not appear to be a Paragraph 54 in Plaintiffs' complaint therefore no response is required.

55. Plaintiff **John Doe** #2, a Mexican national, has lived in Georgia for years and considers this state his home. He speaks limited English. If HB 87 takes effect, it will harm John Doe #2 in a

51

number of ways. For example, John Doe #2 does not possess any of the documents required by HB 87 and he is very afraid of encountering local and state law enforcement officers after HB 87 takes effect. He has been a victim of racial profiling in the past and now drives as little as possible because he fears encounters with law enforcement officers. For transportation, he now relies on his bicycle, walking, or asking friends for car rides. But if HB 87 is implemented, John Doe #2 fears that officers will stop him even while he is riding his bicycle or walking and subject him to an immigration status check. As a result, if HB 87 takes effect, John Doe #2 plans to stay in his house as much as possible and give up on daily activities, such as walking in the park. If HB 87 takes effect, John Doe #2 also will have difficulty convincing his friends to give him rides to the grocery store because they will be subject to criminal liability for transporting him. In addition, John Doe #2 has been robbed several times in the past. While he has reported these incidents to the police, he may not do

so if HB 87 is implemented because he is fearful of getting arrested for lacking the documents required by **HB** 87.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 55 and therefore deny same.**

56.  If HB 87 takes effect, John Doe #2 will also be harmed because he will be prohibited from relying on the matricula consular issued to him by the Mexican government.  John Doe #2 currently uses the matricula consular for identification on a regular basis.  For example, he has used the matricula to open accounts at City Hall for water and electricity service to his home; to seek police assistance when he was the victim of robberies; and for identification at a hospital in Rome.  If HB 87 is implemented, John Doe #2 will not be able to use his matricula consular for these and other official purposes.

Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 56 and therefore deny same.

57.  Plaintiff **Jane Doe** #2, a Mexican national, is a twenty-three year old Georgia resident.  She came to the United States with

53

her parents about twelve years ago. She graduated high school and college in Georgia. About two years ago, she was pulled over by police for a traffic infraction and charged with driving without a license, and then transferred to an Immigration and Customs Enforcement (ICE) detention center and detained for more than a month while awaiting removal from the United States. She was granted deferred action until May 2011. Her deferred action grant has subsequently been extended until May 2012, but she has no paperwork documenting this extension.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 57 and therefore deny same.**

58. When Jane Doe #2 first obtained deferred action, she applied for and obtained a Georgia driver's license. That license expired in May 2011, when her first grant of deferred action ended. Currently, Jane Doe #2 does not have any of the identity documents required by HB 87, nor does ICE issue identity cards or documents to those granted deferred action. Jane Doe #2 cannot apply for a Georgia driver's license now

because she has no paperwork to demonstrate to the State of Georgia that she is permitted to remain in the United States. Jane Doe #2 is currently seeking federal work authorization, but that will not be granted for months. Once that is granted, Jane Doe #2 intends to apply for a Georgia's driver's license using her work authorization as proof of federal permission to remain in the United States. In the interim period of time, Jane Doe #2 does not have and cannot obtain any of the identity documents required by HB 87.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 58 and therefore deny same.**

59. If HB 87 goes into effect while she lacks a driver's license or other Georgia-issued ID, Jane Doe #2 will be at high risk of detention for immigration status investigation. Even if she is able to obtain a Georgia driver's license, she will limit her driving to avoid encounters with the police. In addition, she will avoid interacting with law enforcement officers, even if she is the victim of or witness to a crime for fear of being arrested because of her immigration status. She will avoid police

contact in these circumstances even though she knows that doing so may lead to an increase in crime in the community.

**Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 59 and therefore deny same.**

60.   Plaintiff **David Kennedy** is an immigration lawyer in Gainesville, Georgia.  He frequently meets with and gives legal advice to individuals who are undocumented and/or who have violated their immigration status.  He also occasionally drives these individuals to immigration court hearings, and has on some of these occasions exceeded the speed limit or failed to use his blinker properly.  If HB 87 takes effect, Kennedy will be subject to arrest and criminal liability for providing legal advice to his clients and for harboring, transporting, and inducing or enticing them to enter Georgia.

Defendants are without knowledge or information sufficient to form an opinion as to the truth of Paragraph 60 and therefore deny same.

## Defendants

61.   Defendant Nathan Deal is the Governor of Georgia.  According

56

to the Georgia Constitution, "Nile chief executive powers" are "vested in the Governor." Ga. Const. art. 5 § 2, I. Under Georgia law, the Governor "shall provide for the defense of any action ... the result of which is of interest to the state because of any claim inconsistent with the state's sovereignty, jurisdiction, or rights." O.C.G.A. § 45-12-26. As such, Defendant Deal is responsible for the enforcement of HB 87 in the State of Georgia and is an appropriate defendant in this case. Defendant Deal is sued in his official capacity.

**Defendants admit that Nathan Deal is the Governor of the State of Georgia. Defendants further admit that the Governor of the State of Georgia in his official capacity is the proper defendant for a facial challenge to a statute. Defendants admit that the statutes and constitutional provisions are accurately quoted. Defendants deny any remaining allegations in Paragraph 61.**

62.   Defendant Samuel S. Olens is the Attorney General of Georgia. According to the Georgia Constitution, the Attorney General is "the legal advisor of the executive

department" and "shall perform such … duties as shall be required by law." Ga. Const. art. 5, § 3, ¶ IV; *see also* O.C.G.A. § 45-15-3 (detailing Attorney General's powers and duties). As such, Defendant Olens is responsible for the enforcement of HB 87 in the State of Georgia and is an appropriate defendant in this case. Defendant Olens issued in his official capacity.

**Defendants admit that Sam Olens is the Attorney General for the State of Georgia and that the referenced statutes depict his responsibilities in accordance with his office. Defendants admit that General Olens is the appropriate Defendant for a facial challenge to the statute but deny the remaining allegations in Paragraph 62.**

63. Defendant Clyde L. Reese, III is the Commissioner of the Georgia Department of Human Services. In this role, Mr. Reese oversees public assistance programs, including the Food Stamp program in Georgia. Defendant Reese is responsible for implementing and enforcing provisions of HB 87 related to public benefits provided through the Georgia Department of

Human Services. Defendant Reese issued in his official capacity.

**Defendants admit that Clyde Reese is the Commissioner of the Georgia Department of Human Services. Defendants deny the remaining allegations in Paragraph 63 as written. Commissioner Reese's duties are defined by state law.**

64. Defendant Mike Beatty is the Commissioner of the Georgia Department of Community Affairs. The Georgia Department of Community Affairs administers the Housing Choice Voucher Program. This is a tenant-based assistance program that assists low income individuals and families to rent safe, decent, and sanitary dwelling units in the private rental market. The program was created by the Housing and Community Development Act of 1974 and is funded by the United States Department of Housing and Urban Development (HUD). Defendant Beatty is responsible for implementing and enforcing provisions of HB87 related to public benefits provided through the Georgia Department of Community Affairs. Defendant Beatty is sued in his official capacity.

**Defendants admit that Mike Beatty is the Commissioner of the Georgia Department of Community Affairs. Defendants further admit that DCA is in part responsible for the administration of the a housing choice voucher program that assists individuals with obtaining rental property in the private housing market and that one such program is funded in part by HUD. The remaining allegations in Paragraph 64 are denied as written.**

65. Defendant Falecia Stewart is the Executive Director of the Housing Authority of Fulton County, Georgia. Defendant Stewart is responsible for overseeing the operations of the Housing Authority of Fulton County. The Housing Authority of Fulton County administers vouchers under the Housing Choice Voucher Program. This is a tenant-based assistance program that assists low income individuals and families to rent safe, decent, and sanitary dwelling units in the private rental market. The program was created by the Housing and Community Development Act of 1974 and is funded by the United States Department of Housing and Urban Development (HUD). The Housing Authority of Fulton County also provides project-based public housing. Defendant

60

Stewart is responsible for implementing and enforcing provisions of HB87 related to public benefits provided through the Housing Authority of Fulton County. Defendant Stewart is sued in her official capacity.

**Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65 and therefore deny same.**

## FACTS

### History and Intent of HB 87

66. On April 14, 2011, the Georgia General Assembly enacted HB 87, a comprehensive law that touches numerous aspects of immigration regulation. The full text of HB 87 is attached hereto as Exhibit A.

**Paragraph 66 is admitted**.

67. In enacting **HB** 87, Georgia legislated in an area committed exclusively to the federal government under the U.S. Constitution.

**Paragraph 67 is denied.**

68. Indeed, Georgia expressly intended not only to intrude into an area of exclusive federal control, but to supplant the federal

61

government in key respects.

**Paragraph 68 is denied.**

69. The legislative record makes clear that a primary motivating factor in passing this law was the Georgia General Assembly's disagreement with federal immigration policy.

**Paragraph 69 is denied.**

70. In September 2010, Lieutenant Governor Casey Cagle and House Speaker David Ralston announced the creation of the "Special Joint Committee on Immigration Reform," a 14-member committee co-chaired by Representative Matt Ramsey and Senator Jack Murphy to draft legislation to "stem[] the flow of illegal immigration activity in Georgia." Speaker Ralston noted that the committee was "inspired by the federal government's continued failure to deal with the problem of illegal immigration and its drain on taxpayer resources in Georgia," and sought to "pick[] up where Washington D.C. has let us down." Press Release, Office of the Lieutenant Governor Casey Cagle, Speaker Ralston and Lt. Gov. Cagle Announce the Creation of the Special Joint Committee on Immigration

62

Reform       (Sept.       29,       2010)       (available       at

http://www.georgia.gov/00/pressidetail/0,2668,2199618_

130107341_163595867,00.html)

**Defendants admit that the statements attributed to the various actors are stated as reported in the citation.   Defendants are without knowledge or information sufficient to know whether the statements were made, the purpose of the statements or the context of any statements and therefore deny same.   Defendants further note that no legislator has the authority to speak as to the purpose or thought process behind the process of passing legislation. The remaining allegations in Paragraph 70 are denied.**

71.   During the debate, multiple legislators expressly stated that they intended for the State of Georgia to wrest control over immigration regulation away from the federal government. For example, Senator Renee Unterman remarked that, with respect to comprehensive immigration regulation, "[u]nfortunately the federal government won't step up to the plate; the states are having to do it." Debate on HB 87 Before the Senate (April 14, 201 1) (remarks of Sen. Renee Unterman).       Similarly, Representative Matt Ramsey

commented: "If we want to effectively address illegal immigration we can't wait for our federal government to act — we've got to do it ourselves." Debate on HB 87 Before the House (Mar. 3, 2011) (remarks of Rep. Matt Ramsey). Representative Rich Golick also explained that: "where Congress fails it is inevitable. It is *inevitable* that states will step into the breach and 'lead." Debate on HB 87 Before the House (Mar. 3, 2011) (remarks of Rep. Rich Golick). Representative Wendell Willard, the Chair of the House Judiciary Committee, likewise remarked, "[O]ur federal government has failed on the issue [of immigration]. . . . it's a federal versus state issue. When the federal government displays its inertia over the course of time, states notice that and states act." Debate on HB 87 Before the H. Comm. on the Judiciary (Feb. 8, 2011) (remarks of Rep. Wendell Willard). Representative Willard continued: "Doing nothing is not an option. And relying to our detriment on a federal government that is not going to do anything anytime soon is not a realistic alternative.. . [W]hen we hear someone say it's a

64

federal issue, let the federal government do it, that's really just a euphemism for do nothing.   And that's not an option." *Id.* Senator Seth Harp also commented:

[I]f you look at the US Constitution there are precious few things that our federal government is supposed to do, but one of the things it is expressly commanded to do, is to secure our borders and provide for a common defense, and I submit to you, Ladies and Gentlemen of the Senate, that the federal government has failed miserably in that constitutional obligation it has abdicated its responsibility, they have walked off the job, and so what are we supposed to do? We're supposed to just throw up our hands and say "Well, the federal government is not exercising its responsibilities, so we are just going to suffer the consequences." At a certain point, you have to take action, and that's what happened in Arizona.  ...  we are not doing anything but enforcing the federal law on the books that the federal government refuses to enforce, . . .  and that is what this debate is about.  .  .  .  There is no question in my mind that adoption of this legislation is going to address in a meaningful way, the very serious problem of illegal immigration in the State of Georgia.

Debate on HB 87 Before the Senate (Apr.  14, 2011) (remarks of Sen.  Seth Harp).  Senator Harp was apparently referring to Arizona's SB 1070, the major parts of which have never gone into effect because they have been enjoined by the federal courts. *United States v. Arizona,*   F.3d  , 2011   WL 1346945, at *4-*10, *15- *19 (9th Cir.  Apr.  11, 2011), *aff'g* 703 F.  Supp.  2d 980 (D.  Ariz.  2010).

**Defendants admit that the statements attributed to the various actors are**

**stated as reported in the citations. Defendants are without knowledge or information sufficient to know whether the statements were made, the purpose of the statements or the context of any statements and therefore deny same. Defendants further note that no legislator has the authority to speak as to the purpose or thought process behind the process of passing legislation. The remaining allegations in Paragraph 71 are denied.**

71.     Contrary to long-settled law about the federal government's exclusive role in regulating immigration, multiple legislators expressed the view that the State of Georgia should regulate immigration on its own without any role, or only a limited role, for the federal government. For example, Representative Bobby Franklin remarked: "I don't see anything in the United States Constitution where the states authorize the federal government to have any policy on immigration. Which would mean under the Tenth Amendment that immigration is reserved to the states. Wouldn't you agree, then, that immigration is a state issue, not a federal issue?" Debate on HB 87 Before the H. Comm. on the Judiciary (Feb. 8, 2011) (remarks of Rep. Bobby Franklin). Likewise, Representative

> Ed Setzler commented: "we as a state legislature have to make sure we're dosing loopholes and gaps [in federal law] . . . . there are elements in the immigration debate that are specifically state issues that the federal government alone can't handle without some involvement by the legislature." Debate on HB 87 Before the H. Comm. on the Judiciary (Feb. 8, 2011) (remarks of Rep. Ed Setzler).

**Defendants admit that the statements attributed to the various actors are stated as reported in the citation. Defendants are without knowledge or information sufficient to know whether the statements were made, the purpose of the statements or the context of any statements and therefore deny same. Defendants further note that no legislator has the authority to speak as to the purpose or thought process behind the process of passing legislation. The remaining allegations in Paragraph 72 are denied.**

72. Other legislators observed that HB 87 would create a "police state" in Georgia aimed at immigration enforcement in light of an alleged absence of federal action. *See, e.g.,* Debate on HB 87 Before the Senate (April 14, 2011) (remarks of Sen. Jason Carter) ("one aspect of this bill . . [is] agreeing to put a police state in force to enforce what

is undeniably a broken federal system.").

**Defendants admit that the statements attributed to the various actors are stated as reported in the citation. Defendants are without knowledge or information sufficient to know whether the statements were made, the purpose of the statements or the context of any statements and therefore deny same. Defendants further note that no legislator has the authority to speak as to the purpose or thought process behind the process of passing legislation. The remaining allegations in Paragraph 73 are denied.**

73. In short, the legislative history leaves no question that the General Assembly enacted HB 87 as a comprehensive solution to the perceived problem of the federal government's failure to regulate immigration to Georgia's liking.

**The allegations in Paragraph 73 are denied.**

74. In signing the bill, Governor Deal made clear his disapproval of the federal government's immigration policy, stating: "Today, we are taking action to uphold the rule of law. This legislation is a responsible step toward in the absence of federal action." *See* Elizabeth Llorente, *Georgia Governor Signs Strictest Immigration Law in Nation,* Fox News Latino, May 13, 2011,

68

at   http://latino.   foxnel,vs.com/latino/politics/20   I

1/05/13/georgia-gov-nathan-deal-expected-signarizona-style-

law-noon-strictest-nation AᵗixzzlNIZe0oUlf (statement made at

signing ceremony).

**Defendants admit that the statements attributed to the Governor are stated as reported in the citation.   Defendants admit that Governor Deal made a statement similar to that which is quoted.   Defendants deny the remaining allegations in Paragraph 75.**

## Key Provisions of HB 87

76.   The following are some of the key features **of HB** 87's comprehensive state system of immigration regulation_

### Section 8

**It does not appear that Paragraph 76 requires a response.   To the extent that a response is required Defendants state that the plain language of the bill speaks for itself.   To the extent the statement is Paragraph 76 differs from the plain language of the statute, it is denied.**

77.   Section 8 of HB 87 authorizes Georgia peace officers to demand   certain   identity   documents   of   individuals   they

investigate and to investigate the immigration status of those persons unable to produce such a document during many routine encounters, converting these encounters into lengthy and intrusive immigration status investigations.

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement is Paragraph 77 differs from the plain language of the statute, it is denied.**

78. Section 8 effectively requires all persons in Georgia to carry one of a prescribed list of identity documents in order to avoid being detained for a prolonged period without legal justification while an officer attempts to determine his or her immigration status in the course of a routine stop or other encounter.

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement is Paragraph 78 differs from the plain language of the statute, it is denied.**

79. Section 8 fundamentally changes the primary role and day-to-day operations of peace officers. Under Georgia law, peace

officers—who include state and local police officers, railroad officers, transportation officers, correctional officers, and officers affiliated with the Department of Juvenile Justice—are responsible for "enforc[ing] the criminal or traffic laws through the power of arrest and [their] duties include the preservation of public order, the protection of life and property, and the prevention, detection, or investigation of crime." O.C.G.A. § 35- 8-2(8)(A). HB 87 undermines these state goals and duties by injecting civil immigration enforcement authority into every stop, detention, or arrest made by peace officers.

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement is Paragraph 79 differs from the plain language of the statute, it is denied.**

80.  Section 8 authorizes peace officers to demand that any person subject to *"any* investigation"—i.e., a consensual encounter, stop, detention, or arrestproduce one of five enumerated types of identity documents.  O.C.G.A.  § 17-5- 100(b)  (emphasis added).  Only individuals who can produce a document from this

71

list receive a presumption of lawful status. *Id.* Individuals who cannot are subject to a verification scheme unique to Georgia that will subject numerous individuals to lengthy and intrusive immigration status investigations.

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement is Paragraph 80 differs from the plain language of the statute, it is denied.**

81. The five documents enumerated in Section 8 are: (1) a so-called "secure and verifiable document" as defined in Section 19 of HB 87; (2) a valid Georgia driver's license; (3) a valid Georgia identification card; (4) a valid driver's license from an entity requiring proof of legal presence or a valid identification card issued by the federal government; or (5) a valid driver's license issued to a nonresident by her home state or country accompanied by proof of citizenship or legal residency. O.C.G.A. §§ 17-5-100(b)(1)-(5). The statute thus excludes reliance on driver's licenses issued by states such as New Mexico and Washington that do not require such proof.

**Defendants state that the plain language of the bill speaks for itself. To the**

**extent the statement is Paragraph 81 differs from the plain language of the statute, it is denied.**

82. In cases where a person does not have one of the five enumerated documents, he may provide "1⁻olther information that is sufficient to allow the peace officer to independently identify [him]." O.C.G.A. § 17-5-100(b)(6). The law provides no guidance whatsoever on what that "other information" might be and thus no direction for Georgia law enforcement officers charged with enforcing it.

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement is Paragraph 82 differs from the plain language of the statute, it is denied.**

83. Where a person cannot provide an enumerated document or sufficient "other information," Section 8 authorizes the officer to "determine [the person's] immigration status" by "any reasonable means available," including by relying on: (1) a "federal identification data base"; (2) "[i]dentification methods authorized by federal law"; (3) electronic fingerprint readers or "similar devices"; or (4) "[c]ontacting an appropriate

73

federal agency." O.C.G.A. § 17-5-100(c).

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement is Paragraph 83 differs from the plain language of the statute, it is denied.**

84.    HB    87    authorizes    this    immigration    status investigation when an "officer has probable cause to believe that a suspect has committed a criminal violation." O.C.G.A. § 17-5-100(b) (emphasis added). This includes a wide range of individuals, including a motorist pulled over for a possible traffic ticket (a Class C misdemeanor), or a child in the custody of the Department of Juvenile Justice who throws a significant tantrum (*e.g.* involving hitting, a Class C misdemeanor).  In each of these instances, HB 87 authorizes immigration status investigations.

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement is Paragraph 84 differs from the plain language of the statute, it is denied.**

85.    The immigration status verification process authorized by HB 87 will greatly prolong ordinary police stops.

74

**The allegation in Paragraph 85 is denied.**

86.    The federal government takes over 80 minutes on average to respond to immigration status queries from state and local police—under the best case scenario.  If a manual file review is required in response to an inquiry on an individual, this process can take over two days.  During this time, the civilian would be detained by state or local law enforcement officers, and denied access to bond or release from custody.

**The allegations in Paragraph 86 are denied.**

87.    If HB 87 goes into effect, many ordinary police encounters will be extended beyond constitutional bounds while police officers investigate immigration status.

**The allegations in Paragraph 87 are denied.**

88.    For example, peace officers throughout Georgia regularly issue citations for minor offenses such as traffic offenses.  Issuing these citations is a quick process, taking only a matter of minutes, on average.  But these traffic citations constitute criminal violations under Georgia law and open the door to immigration investigations under section 17-5-100(b) and (c).

75

Those investigations would substantially prolong detentions for the individuals being investigated.

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement in Paragraph 88 differs from the plain language of the statute, it is denied.**

89.  Immigration status queries also impose a substantial burden on federal authorities, who will be required to respond to an enormous increase in the number of immigration status inquiries because of HB 87 and will have less ability to prioritize among their tasks according to federal regulations and policies.

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement in Paragraph 89 differs from the plain language of the statute, it is denied.**

90.  Moreover, HB 87 opens the door to racial profiling in at least two ways. First, the law authorizes an officer to determine the immigration status of an individual who is unable to provide one of the five identity documents. O.C.G.A. § 17-5-100(b). However, the law leaves it entirely up to an officer's individual discretion when to verify the

76

immigration status of a person who is unable to provide one of those identity documents. This unrestricted discretion systematically ensures that individual officers will engage in discrimination in determining whose immigration status to check based on an individual's appearance, language choice, or English-language ability.

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement in Paragraph 90 differs from the plain language of the statute, it is denied.**

91. Second, HB 87 invites racial profiling by permitting officers to consider so-called "[o]ther information" that is "sufficient" to establish an individual's identity. O.C.G.A. § 17-5-100(b)(6). But the law fails to enumerate any criteria for what "sufficient" "other information" might be. That determination is also left entirely to an officer's discretion and increases the likelihood that an officer will engage in discrimination in determining whose "other information" is not "sufficient" based on an individual's appearance, language choice, or English-language ability.

**Defendants state that the plain language of the bill speaks for itself. To the**

77

**extent the statement in Paragraph 91 differs from the plain language of the statute, it is denied.**

92.   HB 87 also authorizes peace officers to arrest and detain individuals solely on the basis that they are suspected to be in violation of federal civil immigration laws.  Section 8 provides that "[i]f ... a peace officer receives verification that [a] suspect is an illegal alien" during an investigation into his immigration status also provided for under this section, "such peace officer may take any action authorized by state and federal law, including ... detaining such suspected illegal alien." O.C.G.A. § 17-5-100(e).

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement in Paragraph 92 differs from the plain language of the statute, it is denied.**

93.   Peace officers throughout Georgia face institutional pressure to enforce all laws to the fullest extent possible.

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement in Paragraph 93 differs from the plain language of the statute, it is denied.**

78

94.   Under HB 87, numerous peace officers will be compelled to exercise their authority to carry out immigration status checks during routine encounters with civilians, even for minor offenses such as traffic violations.

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement in Paragraph 94 differs from the plain language of the statute, it is denied.**

95.   HB 87 is designed to and will in fact result in peace officers detaining individuals for the purpose of carrying out immigration status checks where they otherwise would not have done so.

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement in Paragraph 95 differs from the plain language of the statute, it is denied.**

96.   Notably, HB 87's immigration investigation and arrest provisions suffer from the same constitutional defects as provisions in Arizona and Utah's similar immigration laws, which have been preliminarily enjoined by the federal district court in Arizona and the Ninth Circuit, and temporarily enjoined by the federal district

court in Utah, respectively. *United States v. Arizona,* 703 F. Supp. 2d 980, 1006 (D. Ariz. 2010), *aff'd,* F.3d , 2011 WL 1346945, at * 4-*10, *15-*19 (9th Cir. Apr. 11, 2011); *Utah Coalition of La Raza v. Herbert,* No. 11-cv-401, slip op. (D. Utah May 11, 2011).

**The allegations in Paragraph 96 are denied as written.**

Section 7

97. In Section 7, **HB 87** creates new state law crimes that penalize, with fines and/or imprisonment, "transporting or moving an illegal alien," O.C.G.A. § 16-11- 200; "concealing or harboring an illegal alien," § 16-11-20 1; and "inducing an illegal alien to enter into this state," § 16-11-202.

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement in Paragraph 97 differs from the plain language of the statute, it is denied.**

98. Federal law already establishes penalties for transporting and harboring illegal aliens, and inducing illegal aliens to enter the United States. 8 U.S.C. § 1324(a). Moreover, federal and state law already grants Georgia law enforcement officers explicit

80

authority to arrest anyone who violates these federal provisions. 8 U.S.C. § 1324(c); Ga. Code § 35-1-16(d).

**Defendants state that the plain language of the bills speak for themselves. To the extent the statements in Paragraph 98 differ from the plain language of the statute, it is denied.**

99. Georgia passed its own version of these provisions in HB 87 precisely to bypass the federal government's prosecutorial and adjudicatory processes for these federal crimes and impose its own views in these areas.

**The allegations in Paragraph 99 are denied as written.**

100. The new state immigration crimes created by HB 87 criminalize routine behavior undertaken on a daily basis by U.S. citizens and those with legal status in Georgia. Because of HB 87, Georgians—such as Plaintiffs Bridges, Kennedy, Speight, Howe, Edwards, Gruner, and Jane Doe #1—who give a lift to a neighbor, a client, or fellow congregant or invite a friend or family member to visit from out of state, are subject to prosecution, fines, and incarceration if state authorities

decide that they knew the other person was an "illegal alien" within the meaning of the Georgia criminal code.

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement in Paragraph 100 differs from the plain language of the statute, it is denied.**

### Section 17

101.   Section 17 of HB 87 limits public benefits to those individuals able to provide a "secure and verifiable" identity document appearing on a list to be specified and posted by the Attorney General.  Ga.  Ann.  Code § 36-50-1(e).  But countless Georgians—both U.S.  citizens and non-citizens with permission from the federal government to remain in the United States—who need and are entitled to receive public benefits in Georgia will not have a qualifying identity document.  Low-income citizens disproportionately lack identity documentation, including these qualifying identity documents.  For example, among non-citizens, many victims of abuse petitioning for immigration relief under the federal Violence Against Women Act, victims of

82

human trafficking, individuals granted withholding of deportation or removal, or Cuban or Haitian entrants will not have a qualifying identity document.

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement in Paragraph 101 differs from the plain language of the statute, it is denied.**

102. If implemented, FIB 87 will force numerous Georgians to be deprived of critical public benefits erroneously. These deprivations will force individuals and families, including those with young children, to be without food and shelter.

### Section 19

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement in Paragraph 102 differs from the plain language of the statute, it is denied.**

103. Section 19 of HB 87 creates the "Secure and Verifiable Identity Document Act."

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement in Paragraph 103 differs from the plain language of the**

**statute, it is denied.**

104. Section 19 defines certain documents as "Secure and verifiable document[s]." The definition of "secure and verifiable document" specifically excludes "a Matricula Consular de Alta Seguridad, matricula consular card, consular matriculation card, consular identification card, or similar identification card issued by a foreign government regardless of the holder's immigration status" (hereafter "consular identification cards" or "matriculas").

**Defendants state that the plain language of the bill speaks for itself. To the extent the statement in Paragraph 104 differs from the plain language of the statute, it is denied.**

105. Consular identification cards are issued by foreign governments as a way to provide their nationals a secure and verifiable form of identification.

**Paragraph 105 is denied as written.**

106. Section 19 criminalizes using a consular identification card for "any official purpose." O.C.G.A. 50-36-2(d), It provides that,

"[u]nless required by federal law, on or after January 1, 2012, no agency or political subdivision shall accept, rely upon, or utilize an identification document for any official purpose that requires the presentation of identification ...  unless it is a secure and verifiable document." *Id.*

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement in Paragraph 106 differs from the plain language of the statute, it is denied.**

107.   The section exempts certain persons from liability for the acceptance of documents not considered to be "secure and verifiable," including "[a]n attorney or his or her employees for the purpose of representing a *criminal defindant." Id.*  (emphasis added).

**Defendants state that the plain language of the bill speaks for itself.  To the extent the statement in Paragraph 107 differs from the plain language of the statute, it is denied.**

108.   Under this provision, countless Georgians—including security guards, immigration lawyers, school officials, and public workers—risk criminal liability for allowing a person to use a

consular identification card to identify herself, even if she is in the country lawfully.

**Paragraph 108 is denied as written.**

### Comprehensive Federal Immigration System

109. The federal government has exclusive power over immigration matters. The U.S. Constitution grants the federal government the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. 1, § 8, el. 3. In addition, the Supreme Court has held that the federal government's power to control immigration is inherent in the nation's sovereignty.

**Paragraph 109 is admitted.**

110. Congress has created a comprehensive system of federal laws regulating and enforcing immigration in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 *et seq.*

**Paragraph 110 is admitted.**

111. The extensive statutory scheme created by the INA leaves no room for supplemental state immigration laws.

**Paragraph 111 is denied.**

112. The federal government has also issued numerous regulations, policies, and procedures interpreting the provisions of the INA and has established large and complex administrative apparatuses to carry out its mandate.

**Paragraph 112 is admitted.**

113. The INA carefully calibrates the nature (criminal or civil) and degree of penalties applicable to each possible violation of its terms.

**Paragraph 113 is admitted.**

114. The INA contains complex and exclusive procedures for determining immigration and citizenship status, deciding whether the civil provisions of the immigration laws have been violated, and determining whether an individual may lawfully be removed from the United States.

**Paragraph 114 is admitted.**

115. Under the INA, a non-citizen's immigration status commonly may be subject to change over time. A non-citizen who enters the United States with authorization, with a student visa for example, may remain in the country past his period of authorized

stay and thus no longer be in status. (Alternatively, he may overstay his original visa yet remain in status, for example, if he is eligible to change into a different visa classification.) Conversely, a non-citizen who enters the United States without authorization, for example by crossing into the country by foot while evading border authorities, may subsequently gain lawful status, such as through a successful asylum application or U-visa application.

**Paragraph 115 is admitted.**

116. The fluidity of immigration status is a fundamental feature of federal immigration law; it is a direct and unavoidable consequence of the system of immigration regulation that Congress has prescribed to accommodate many important national interests including, for example, the nation's humanitarian and international-law obligations regarding asylum seekers.

**Paragraph 116 is denied as written.**

117. Under federal law, there is no single, readily ascertainable category or characteristic that establishes whether a particular

person may or may not remain in the United States.  The answer to that question is a legal conclusion that can only be reached through the processes set forth in the INA and may depend on the discretionary determinations of federal officials.

**Paragraph 117 is admitted.**

118.   There are many non-citizens who are present in the United States without formal permission who would not be removed if placed in federal removal proceedings or who actually have temporary permission from the federal government to be in the United States.  For example, an individual without federal immigration status may be eligible for a form of immigration relief, such as asylum, adjustment of status, or withholding of removal.  Some of these individuals are known to the federal government; others will not be identified until they are actually placed in proceedings by the federal government and their cases are adjudicated.  In addition, some individuals, such as those granted Temporary Protected Status due to turmoil or natural disasters in their native countries, have permission to be in the United States, but are unlikely to have one of the enumerated

identity documents under HB 87.

**Defendants are without knowledge or information sufficient to know the truth of the allegations in Paragraph 118 and therefore deny same.**

119. The fact that some persons have permission to remain in the United States without having a formal immigration status or despite being technically removable is also a fundamental feature of federal immigration law and the system of immigration regulation that Congress has prescribed.  It accommodates many important national interests including, for example, Congress's desire to allow certain individuals to obtain relief from removal, and statutory limits on the detention of individuals ordered removed, *see Zadvydas v.  Davis,* 533 U.S.  678 (2001 ).

**Defendant denies Paragraph 119 as written.**

120. Given these complexities, federal agencies do not and cannot determine definitively, in response to a demand from a state or local official, whether an individual is subject to removal.  *Cf* O.C.G.A.  § 17-5-100(e).  And, it is equally impossible to make a determination of whether an individual is lawfully able **to** remain in the United States based upon a search of the federal

90

databases that are checked for an immigration status query. Such determinations involve complex questions of fact and law and are made through a. federal administrative and judicial process that may take years. Moreover, the federal government often exercises its prosecutorial discretion not to pursue removal in order to prioritize certain cases for action. At best, federal agencies can respond to a query with a snapshot of what they believe to be an individual's current immigration status, which may not correspond to the ultimate finding on whether she is subject to removal. Thus, not all inquiries to the federal government regarding immigration status yield a clear response. Pls.' Mot. for Prelim. Inj., Ex. 3, *U.S. v. Arizona,* No. 10-1413 (D. Ariz., July 7, 2010).

**Defendants deny Paragraph 120 as written.**

121. As of June 2010, inquiries into the federal database took an average of 81 minutes to process and in some cases took two days or more when a review on an individual's file was required. *Id.*

**Defendants are without knowledge or information sufficient to know the truth of Paragraph 121 and therefore deny same.**

91

122. Furthermore, determining whether a person is a citizen of the United States can be a complex and counterintuitive process. U.S. citizens are not required to carry documentary proof of their citizenship. There is no national database that contains information about every U.S. citizen. Some people are actually unaware of their U.S. citizenship because they may have acquired U.S. citizenship at birth by operation of law due to their parents' citizenship, despite not being born in the United States. *See, e.g.,* 8 U.S.C. § 1433. Others obtain citizenship automatically when their parents become naturalized U.S. citizens.

*See, e.g.,* 8 U.S.C. § 1431.

**The allegations in Paragraph 122 are denied as written.**

123. HB 87's creation of a state immigration system fundamentally conflicts with the INA's statutory scheme, impermissibly encroaches on the federal government's exclusive power to regulate immigration, and will lead to erroneous determinations and unlawful detention by state and local officials.

**Defendants deny the allegations in Paragraph 123.**

92

124. Moreover, HB 87 conflicts with and is preempted by provisions of the INA that set forth comprehensive federal schemes addressing the participation of state and local law enforcement in immigration enforcement.

**Defendants deny the allegation in Paragraph 124. Defendants note further that on the date this answer is filed, the ruling of the Eleventh Circuit Court of Appeals has determined that Section 7 is facially preempted and Section 8 is not facially preempted.**

125. Mere presence inside the United States without federal immigration status is not a criminal offense. Rather, it is a civil violation under federal immigration law.

**The allegations in Paragraph 125 are admitted.**

126. State and local law enforcement officers have no general authority to enforce federal civil immigration law. Federal law specifically authorizes state officers to assist in immigration enforcement only in narrowly defined circumstances, and otherwise reserves immigration enforcement authority to the federal government.

**Paragraph 126 is denied.**

127. Section 1357(g) of Title 8 of the U.S. Code allows the federal government to "enter into a written agreement with a State, or any political subdivision" to carry out "function[s] of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g). These agreements are commonly referred to as "287(g) agreements" after the section of the INA in which they are codified. Such agreements, however, may be entered into only if the federal government determines the state officers are "qualified to perform a function of an immigration officer," *id,* and the federal government must train and supervise each officer who is authorized under such an agreement. Currently, only 4 of Georgia's 159 counties—the Cobb County Sheriff's Office, the Gwinnett County Sheriff s Office, the Hall County Sheriff s Office, and the Whitfield County Sheriff s Office—have agreements pursuant to this statutory provision, as does the Georgia Department of Public Safety. *See* U.S. Immigration and Customs Enforcement, Fact Sheet: Delegation of Immigration Authority Section 287(g) Immigration and

94

Nationality Act.

**Defendants state that the plain language of the statutes speak for themselves. To the extent the statement is Paragraph 127 differs from the plain language of the statutes, it is denied. Defendants further admit that the four enumerated counties have 287(g) status and state that the agreements speak for themselves. Defendants deny the allegations to the extent that they differ from the language within those agreements. The remaining allegations in Paragraph 127 are denied.**

128. HB 87 violates the U.S. Constitution by granting state and local law enforcement officers authority to make immigration determinations, civil arrests, and investigations without and outside of the authority provided by a 287(g) agreement. In addition, two of the four counties in Georgia with current 287(g) agreements limit state officers to making immigration status inquiries of individuals who are already in local jails. HB 87's provisions authorizing immigration status investigation and determination by all law enforcement officials in the field conflicts with the limited manner in which the federal

government has allowed Georgia law enforcement agencies to engage in the enforcement of federal immigration law.

**Defendants deny Paragraph 128 as written. Defendants note further that on the date this answer is filed, the ruling of the Eleventh Circuit Court of Appeals has determined that Section 7 is facially preempted and Section 8 is not facially preempted under the Supremacy Clause.**

129. The other provisions in federal law authorizing state or local participation in immigration enforcement are also carefully constrained. Federal immigration statutes expressly authorize state and local police to make arrests for exactly two immigration crimes     smuggling, transporting, or harboring criminal aliens, and illegal entry by a previously deported felon.  8 U.S.C. §§ 1324(c), 1252c.  Another provision, 8 U.S.C.  § 1103(a)(10), allows the U.S.  Attorney General to authorize "any State or local law enforcement officer" to enforce immigration laws upon certification of "an actual or imminent mass influx of aliens," but no such certification has ever occurred.

**Defendants state that the plain language of the statutes speak for themselves. To the extent the statement is Paragraph 129 differs from the plain language of**

96

**the statutes, it is denied.  Defendants are without knowledge or information sufficient to know if the United States Attorney General has ever authorized State or local law enforcement to act pursuant to the stated statutes and therefore denies same.   The remaining allegations in Paragraph 129 are denied.**

130. Congress's intent that state and local officers are generally prohibited from enforcing civil immigration laws is clear both from the statutory scheme and from the statements of its members.

**The allegations in Paragraph 130 are denied.**

## Federal Law on Public Benefits

131. Federal law governs the rules and procedures for verifying eligibility for federally funded food stamps and federally subsidized housing.

**The allegations in Paragraph 131 are admitted however Defendants note that federal law provides states with flexibility related to the enforcement of the relevant provisions.**

132. Federal law governing food stamps (the Supplemental Nutrition Assistance Program, "SNAP"), for example, mandates that states

accept any documents that reasonably establish an applicant's identity. 7 C.F.R. § 273.2(f)(1)(vii), implementing 7 U.S.C. § 2020(e)(3). The federal regulations prohibit the state from requiring any specific document as verification of identity. *Id.* Where documentary evidence is unavailable, the federal rules allow a collateral contact communication between the SNAP agency and a third party that can reasonably be relied upon to verify identity. *Id.* This flexibility enables the country's most vulnerable citizens--including those who due to homelessness, disability, or incapacity, or **to** having fled domestic violence, may lack the most secure or reliable forms of identity documentation—to participate in a program that prevents hunger.

**Defendants state that the plain language of the statutes speak for themselves. To the extent the statement is Paragraph 132 differs from the plain language of the statutes, it is denied. Defendants deny the remaining allegations in Paragraph 132 as written.**

133. Federal laws governing federally subsidized housing programs do not mandate inspection of identification documents, but require that state and local agencies administering programs obtain and

98

verify the Social Security Number (SSN) of citizens and immigrants who assert an eligible status.  42 U.S.C.  § 3543; 24 C.F.R.  § 5.216.  Verification of the applicant's SSN is independent from the verification of citizenship or immigration status and serves multiple purposes, including establishing identity.  States may not impose an additional eligibility requirement for these programs that is not authorized by, and is inconsistent with, federal rules.

**Defendants state that the plain language of the statutes speak for themselves. To the extent the statement is Paragraph 133 differs from the plain language of the statutes, it is denied.**

134. In addition, federal housing law prohibits the imposition of any liability upon state and local government officials for implementing the federal system governing immigrant eligibility for housing in a manner consistent with the rules and regulations of the Department of Housing and Urban Development.  42 U.S.C.  § 1436a(f)(1); 24 C.F.R.  § 5.526.  This verification system does not include an independent identity document requirement.  The civil and criminal sanctions established by

Section 18 directly conflict with these federal regulations and the federal government's goal of ensuring access to the federal benefits for all eligible persons.

**Defendants state that the plain language of the statutes speak for themselves. To the extent the statement is Paragraph 134 differs from the plain language of the statutes, it is denied.**

### HB 87 Interferes with the Federal Government's Interests in a Uniform Immigration System and Adversely Affects Foreign Relations

135. HB 87 interferes with the federal government's interests in setting a uniform federal immigration scheme, as well as in conducting foreign relations with other nations.

**The allegations in Paragraph 135 are denied.**

136. As noted *supra,* the President of the United States directly criticized HB 87 on this basis on April 26, 2011.

**Defendants note that the statements are accurately quoted from the source document but Defendants are without knowledge or information to know the truth of whether the statements were made, their context or their meaning. The remaining allegations in Paragraph 136 are denied.**

137. Georgia's immigration scheme will undermine federal

100

immigration enforcement priorities by subjecting countless individuals in Georgia to detention and referral to federal immigration officials without regard for whether they would fit within federal immigration enforcement priorities.

**The allegations in Paragraph 137 are denied.**

138. In addition, because immigration policy is inextricably intertwined with foreign relations, Georgia's attempt to regulate immigration through HB 87 will have an adverse impact on the United States' ability **to** conduct foreign relations.

**The allegations in Paragraph 138 are denied.**

139. Indeed, HB 87 will undermine the ability of the U.S. government to speak with a single voice about immigration, including communicating to foreign nations what their nationals can expect when they come to visit or reside in the United States. State attempts to interfere with these inherently federal issues can have severe impacts on foreign relations. Indeed, FIB 87 has already affected the foreign relations of the United States' foreign relations by upsetting a key ally. The Consul General of Mexico in Atlanta has publicly and forcefully criticized HB 87 twice: on

101

March 4, 2011, just after the House of Representatives passed an earlier version of the bill, and on April 15, 2011, when HB 87 passed the Senate.  In the latter statement, the Consul General expressed his concern that HB 87 "could have negative consequences on the human and civil rights of Mexican nationals living in [Georgia] ..  .." Press Release, Consulate General of Mexico in Atlanta reiterates its concern over the approval of an immigration bill in Georgia (Apr.  15, 2011).

**Defendants admit that the statements are accurately quoted from the source document.  Defendants are without knowledge or information sufficient to know whether the statements were actually made, their meaning or context and therefore deny same.  Defendants deny the remaining allegations of Paragraph 139.**

### HB 87 Promotes Racial Profiling and Endangers Georgians

140. HB 87 promotes an environment of rampant racial profiling by state and local law enforcement officials.  The law leaves immigration status investigation to the discretion of individual officers.  As a result, law enforcement officers will make decisions about whether to investigate a person's immigration

status based on the way she looks or speaks.  Law enforcement officers will investigate the immigration status of individuals they believe look or sound foreign.

**The allegations in Paragraph 140 are denied.**

141.   Law enforcement officials across the country have stated that HB 87 cannot be implemented in a race-neutral fashion and will inevitably lead law enforcement officers to rely inappropriately on race, ethnicity, and English- language ability in making decisions about whom to subject to additional scrutiny with questions regarding their immigration status.

**Defendants are without knowledge or information as to what law enforcement authorities across the country have said, the context of any such statements and the meaning of the statements and therefore deny same.**

142.   Implementation of HB 87 will have a significant negative impact on the ability of local law enforcement officers to protect immigrant communities and mixed-immigration status communities and families, *i.e.,* those that include individuals with and without legal status.  Because immigrants will avoid the police out of fear that any interaction could lead to

immigration status inquiries, Georgia law enforcement officers will not get the assistance they need to prosecute crimes.

**Defendants deny the allegations in Paragraph 142.**

## Consular Identification Documents

143. Consular identification documents ("CIDs") are issued by governments around the globe.  These CIDs serve several important purposes including providing expedient means for local law enforcement to identify individuals as well as helping facilitate nations' obligations under the Vienna Convention on Consular Relations, to which the United States is a signatory.

**Defendants admit that CID's are issued by various governments.  Defendants further admit that the United States is a signatory of the Vienna Convention. The remaining allegations in Paragraph 143 are denied as written.**

144. Under the Vienna Convention, a foreign national arrested or detained in the United States must be notified of their detention without delay.  *See* Vienna Convention on Consular Relations, art.  36, Apr.  24, 1963, [1970] 21 U.S.T.  77, T.I.A.S.  No. 6820.

104

**Defendants state that the Vienna Convention speaks for itself.  To the extent that the statement conflicts with the plain wording of the Convention, the allegation is denied.**

145. The U.S.  State Department has recognized the utility of CIDs in the facilitation of its treaty obligations under the Vienna Convention.  *See* Hearing on the Federal Government's Response to Consular Identification Cards Before the House Subcommittee on Immigration, Border Security, and Claims, House Committee on the Judiciary, 108th Cong.  44-45, at 114 (Jun. 26, 2003) (statement of Roberta Jacobson) (available at: http:// commdocs.house.                                    gov/committees/ judiciary/hju87813.000/hju87813_0fhtm (last visited May 24, 2011)).

**Defendant admits that the Hearing Transcript is accurately referenced. Defendants are without knowledge or information sufficient to know the truth of the remainder of the allegations in Paragraph 145 and therefore deny same.**

146. CIDs are also widely used for identification purposes with financial institutions, law enforcement agencies, and state and local governments in the United States.

**Defendants are without knowledge or information sufficient to know the truth of the allegations in Paragraph 146 and therefore deny same.**

147. There have been over 200,600 CIDs issued by the consulate of Mexico in Georgia since 2006.

**Defendants are without knowledge or information sufficient to know the truth of the allegations in Paragraph 147 and therefore deny same.**

148. Mexican law and regulations outline a detailed process for the issuance of these CIDs, which are referred to as "matriculas." These Mexican CIDs may only issue after an individual has produced an official Mexican identity document; a Mexican birth certificate or another official document establishing their Mexican nationality; and documentation of their residence in a particular area of the United States. These documents may not be issued by mail, but must be issued in-person by Mexican consular officials. Applicants for Mexican CIDs are also photographed and fingerprinted and all of the documents used to establish their eligibility for a consular ID are scanned and stored in a central database by the Mexican government. In addition, the card itself has several security features making the CID very

106

difficult to forge. First, these CDs expire within five years of issuance. Second, the card has several physical features making it difficult to forge, including a photo of the cardholder, the cardholder's signature, a unique bar code, optical character recognition, and an ultraviolet logo. Finally, local law enforcement officials are able to scan and verify the contents on the Mexican CID when they stop cardholders in the field.

**Defendants are without knowledge or information sufficient to know the truth of the allegations in Paragraph 148 and therefore deny same.**

149. CIDs have routinely been accepted as proof of identification in a wide range of public settings in Georgia. For example, parents enrolling children in Georgia public schools must present photo identification and CIDs have been widely accepted for this purpose. Similarly, admission to state buildings such as the State Capitol requires presentation of photo identification, and CIDs have routinely been accepted.

**Defendants are without knowledge or information to know the truth of the allegations in Paragraph 149 and therefore deny same.**

### CLASS ACTION

150. The Individual Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). The class, as proposed by Plaintiffs, consists of all persons:

(a) who as a result of their race, national origin, customary language, accent, or lack of enumerated identity documents are or will be subject to investigation of their citizenship or immigration status pursuant to the provisions of HB 87; or

(b) who are or will be deterred from living, associating, or traveling with immigrants in Georgia because of the provisions of HB 87; or

(c) who are or will be deterred from traveling into or through the State of Georgia because of the provisions of HB 87; or

(d)   who will be unable to secure public benefits for which they are otherwise eligible, due to the qualifying identity document provisions of HB 87; or

(e)   who are or will be barred from using their validly issued consular identification documents for any official purpose where identification is required because of the provisions of HB 87.

**Defendants are without knowledge or information sufficient to know why the Plaintiffs have brought suit and further deny that Plaintiffs have sufficiently defined a class or class members.**

151.   The requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2) are met here, in that the class is so numerous that joinder of all members is impracticable.

**Defendants deny the allegations in Paragraph 151.**

152.   There are questions of law and fact common to the proposed class, including: (1) whether HB 87 is preempted by the U.S. Constitution and federal law; (2) whether **HB** 87 violates the

109

Fourth Amendment of the U.S. Constitution; (3) whether HB 87 infringes on the Right to Travel of members of the proposed class; (4) whether HB 87 violates the Equal Protection clause of the U.S. constitution; (5) whether HB 87 violates the Due Process clause of the U.S. Constitution; and (6) whether HB 87 violates the separation-of-powers clause of the Georgia Constitution. These questions predominate over any questions affecting only the Individual Plaintiffs.

**Defendants deny the allegations in Paragraph 152.**

153. The claims of the Individual Plaintiffs are typical of the claims of the proposed class.

**Defendants deny the allegations in Paragraph 153.**

154. All of the Individual Plaintiffs will fairly and adequately represent the interests of all members of the proposed class because they seek relief on behalf of the class as a whole and have no interests antagonistic to other members of the class. The Individual Plaintiffs are also represented by *pro bono* counsel, including the ACLU of Georgia, the ACLU Foundation, the National Immigration Law Center, the Southern Poverty Law

110

Center, the Asian Law Caucus, Federal & Hasson, LLP, Kuck Immigration Partners, LLC, and G. Brian Spears, who collectively have extensive expertise in class action litigation, including litigation regarding the rights of immigrants and constitutional law. Finally, Defendants have acted and will act on grounds generally applicable to the class in executing their duties to enforce 1-1B 87, thereby making appropriate final injunctive relief with respect to the class as a whole.

**Defendants deny the allegations in Paragraph 154.**

## DECLARATORY AND INJUNCTIVE RELIEF

155. An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties. Plaintiffs contend that they face an imminent threat of harm if HB 87 is enforced, and that this law violates the U.S. and Georgia Constitutions, federal law, and state law. Defendants are obligated to enforce this law unless it is found to be illegal.

**Defendants deny the allegations in Paragraph 155.**

156. In violating Plaintiffs' rights under the U.S. and Georgia

111

Constitutions, federal law, and state law, Defendants have acted and will be acting under color of law.

**Defendants admit they are acting under color of law but deny the remaining allegations in Paragraph 156.**

157. If allowed to go into effect, HB 87 will cause irreparable injury to Plaintiffs.

**Defendants deny the allegations in Paragraph 157.**

158. Plaintiffs have no plain, speedy, and adequate remedy at law against HB 87 other than the relief requested in this Complaint.

**Defendants deny the allegations in Paragraph 158.**

159. If HB 87 takes effect, the Plaintiffs and other individuals of color in Georgia will be subject to unlawful detention, arrest, and harassment including plaintiffs Paul Bridges, Benjamin Speight, Everitt Howe, Paul J.  Edwards, Sharon Gruner, Ernesto Pirion, Jaypaul Singh, Jane Does #1 and #2, John Does #1 and #2, and members of the proposed plaintiff class.

**Defendants deny the allegations in Paragraph 159.**

160. If allowed to take effect, HB 87 would also violate the rights of plaintiffs Pinion and Singh, as well as members of the

proposed plaintiff class, to travel into and throughout Georgia.

**Defendants deny the allegations in Paragraph 160.**

161. If allowed to take effect, HB 87 would deny the right of members of plaintiffs Georgia Latino Alliance for Human Rights, Coalition of Latino Leaders, and the Task Force for the Homeless, as well as proposed class, to federal public benefits, for which they are otherwise eligible.

**Defendants deny the allegations in Paragraph 161.**

162. If allowed to take effect, I4B 87 would also violate the right of plaintiffs John Does #1 and #2, and Jane Doe #2, as well as members of the proposed plaintiff class, to due process and equal protection of law.

**Defendants deny the allegations in Paragraph 162.**

163. In addition, HB 87 will thwart the missions of organizational plaintiffs such as the Task Force for the Homelessness and Alterna by forcing them to divert their resources towards assisting applicants for benefits and services in overcoming the new identification impediment, and towards providing direct

goods, such as food and housing assistance, to individuals denied assistance.

**Defendants deny the allegations in Paragraph 163.**

164. In addition, HB 87 will thwart the missions of organizational Plaintiffs Georgia Latino Alliance for Human Rights, Service Employees International Union, Southern Regional Joint Board of Workers' United, Alterna, Coalition of Latino Leaders, Asian American Legal Advocacy Center, Task Force for the Homeless, DREAM Activist.org, Instituto de Mexico, and the Coalition for the People's Agenda by forcing them to continue to spend more time and resources on HB 87 and immigration enforcement matters rather than other pressing organizational priorities, and by deterring their members from participating in membership activities.

**Defendants deny the allegations in Paragraph 164.**

165. In doing the things alleged in this Complaint, Defendants will deny Plaintiffs' rights secured by the U.S.  and Georgia Constitutions, federal law, and state law.

**Defendants deny the allegations in Paragraph 165.  Defendants note that based**

114

**upon the decision of the Eleventh Circuit Court of Appeals that at the time this answer is filed the law of the case dictates that Section 7 is facially unconstitutional and Section 8 is constitutional on its face.**

166. Defendants' enforcement of HB 87 will constitute an official policy of the state of Georgia.

**Defendants deny the allegations in Paragraph 166 and further deny that they are responsible for the "enforcement" of the act.**

167. Plaintiffs are entitled to a declaration that HB 87 is unconstitutional on its face and to an order preliminarily and permanently enjoining its enforcement.

**Defendants deny the allegations in Paragraph 167. Defendants note further that based upon the decision of the Eleventh Circuit Court of Appeals it is the law of the case at the time this answer is filed that Section 7 is unconstitutional on its face and Section 8 is facially constitutional pursuant to the Supremacy Clause.**

## CAUSES OF ACTION

### COUNT ONE

### SUPREMACY CLAUSE; 42 U.S.C. § 1983

168. The foregoing allegations are repeated and incorporated as

though fully set forth herein.

**Defendants adopt and incorporate their responses as previously stated.**

169. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

**Defendants admit that Paragraph 169 accurately quotes the Supremacy Clause to the United States Constitution.**

170. HB 87 conflicts with federal laws, regulations and policies, usurps powers constitutionally vested in the federal government exclusively, attempts to legislate in fields occupied by the federal government, imposes burdens and penalties on legal residents not authorized by and contrary to federal law, and unilaterally imposes burdens on the federal government's resources and processes, each in violation of the Supremacy Clause.

**Defendants deny the allegations in Paragraph 170. Defendants note that based upon the decision of the Eleventh Circuit Court of Appeals that the law of the case at the time this answer is filed shows that Section 7 is unconstitutional on**

116

**its face and that Section 8 is facially constitutional.**

171. Plaintiffs move for relief on this claim directly under the Supremacy Clause and, as an action seeking redress of the deprivation of statutory rights under the color of state law, also under 42 U.S.C. § 1983.

**Defendants admit that based upon the ruling of the Eleventh Circuit Court of Appeals and the law of the case at the time this answer is filed that Section 7 is permanently enjoined. Defendants deny that Plaintiffs are entitled to any additional relief. Specifically Defendants further deny that Plaintiffs may pursue and action pursuant to 42 U.S.C. § 1983 for alleged violations of the Supremacy Clause. Defendants further deny that Plaintiffs may pursue an action directly under the Supremacy clause. Defendants note that based upon the decision of the Eleventh Circuit Court of Appeals that the law of the case at the time this answer is filed shows that Plaintiffs may pursue an action directly for alleged violations of the Supremacy Clause where, there is a threat of potential criminal prosecution.**

## COUNT TWO

## FOURTH AMENDMENT; 42 U.S.C. § 1983

117

172. The foregoing allegations are repeated and incorporated as though fully set forth herein.

**Defendants hereby adopt and incorporate their responses as outlined in the preceding paragraphs.**

173. The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures." The Fourth Amendment's guarantees are applied to the States through the Fourteenth Amendment.

**Defendants admit Paragraph 173 but deny that Plaintiffs' Fourth or Fourteenth Amendment rights have been violated.**

174. HB 87 authorizes officers to seize individuals, and prolong seizures, in violation of the Fourth Amendment.

**Defendants deny the allegations in Paragraph 174.**

## COUNT THREE

### PRIVILEGES AND IMMUNITIES; RIGHT TO TRAVEL; 42 U.S.C. § 1983

175. The foregoing allegations are repeated and incorporated as though fully set forth herein.

**Defendants hereby adopt and incorporate their responses to the preceding**

118

**Paragraphs.**

176. The Privileges and Immunities Clause of the U.S. Constitution, Article IV, Section 2, Clause 1, provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

**Defendants admit Paragraph 176 but deny that Defendants violated the Privileges and Immunities Clause to the United States Constitution.**

177. Similarly, the Privileges and Immunities Clause of the Fourteenth Amendment to the U.S. Constitution provides that Ink) State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

**Defendants admit Paragraph 177 but deny that Defendants violated the Privileges and Immunities Clause to the United States Constitution.**

178. All residents in the United States enjoy a fundamental right to travel, which has also been held to derive from the Equal Protection Clause of the U.S. Constitution as well as the Commerce Clause.

**Defendants deny Paragraph 178 as written.**

179. The constitutional right to travel prevents states from burdening,

119

penalizing, or infringing upon the right to travel, including the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in another state, without a rational or compelling justification.

**Defendants deny Paragraph 179 as written.**

180. HB 87 interferes with the rights of out-of-state citizens to travel freely through the State of Georgia without being detained.

**Defendants deny Paragraph 180.**

## COUNT FOUR

## EQUAL PROTECTION CLAUSE; 42 U.S.C. § 1983

181. The foregoing allegations are repeated and incorporated as though fully set forth herein.

**Defendants hereby adopt and incorporate their responses to the prior Paragraphs.**

182. The Fourteenth Amendment to the U.S. Constitution provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

**Defendants admit Paragraph 182 but deny that they violated Plaintiffs' right to equal protection.**

120

183. HB 87 impermissibly denies plaintiffs and other individuals lacking one of the preferred identity documents residing or traveling in Georgia the equal protection of the laws.

**Paragraph 183 is denied.**

## COUNT FIVE

### DUE PROCESS CLAUSE; 42 U.S.C. § 1983

184. The foregoing allegations are repeated and incorporated as though fully set forth herein.

**Defendants adopt and incorporate their responses to the preceding Paragraphs.**

185. The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law."

**Defendants admit Paragraph 185 but deny that Defendants violated Plaintiffs' due process rights.**

186. HB 87 impermissibly deprives Georgia residents of personal property by rending their consular-issued identity documents useless for any official purpose for which identification is

required.

**Defendants deny Paragraph 186.**

187.   There is no legitimate state interest justifying this property deprivation for state residents.

**Defendants deny Paragraph 187.**

188.   As a result, HB 87 deprives plaintiffs and other individuals who regularly use consular-issued identity documents in Georgia of due process under the law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

**Defendants deny Paragraph 188.**

## COUNT SIX

### 42 U.S.C. § 1981; 42 U.S.C. § 1983

189.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

**Defendants hereby adopt and incorporate their response to the preceding Paragraphs.**

190.   Section 1981 of Title 42 of the United States Code guarantees that persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and

122

equal benefit of all laws and proceedings for the security of persons and property." Section 1981 also provides that all persons "shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

**Defendants admit Paragraph 190 but deny they violated any provision of 42 U.S.C. § 1981.**

191. Section 1981 of Title 42 of the United States Code prohibits discrimination on the basis of alienage, national origin, and race. Section 19 of HB 87 operates in such a manner as to deny access to governmental services and to deny the securing of governmental licenses and to deny entry into contracts with governmental entities on the basis of the national origin of the identification documentation of the presenter of such documentation. Section 7 of HB 87 impermissibly prohibits the exercise of the right of association of citizens of Georgia and the United States on the basis of the alienage of those with whom they wish to associate.

**Defendants deny Paragraph 191.**

192. HB 87 impermissibly discriminates against persons within the State of Georgia on the basis of alienage and national origin and race.

**Defendants deny Paragraph 192.**

## COUNT SEVEN

## VIOLATION OF ARTICLE I, SECTION II, PARAGRAPH 3

## OF THE GEORGIA CONSTITUTION

193. Section 19 of HB 87, which creates a new Code section, 0.C.G.A. 50-36- 2 purporting to provide for "Secure and Verifiable Identity Documents," establishes a criminal prohibition against persons who "knowingly accept[] identification documents that are not secure and verifiable documents. Subsection (f) of the new criminal law delegates to the Attorney General the authority to establish and post a **"list** of acceptable secure and verifiable documents." Only those documents approved and posted by the Attorney General are to be considered "secure and verifiable documents."

**Defendants note that the statute listed in Paragraph 193 speaks for itself. Defendants deny the allegations in Paragraph 193 to the extent that it differs**

124

**from the plain language of the statute.**

194. Article I, Section II, Paragraph III of the Constitution of the State of Georgia provides that: "The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided."

**Defendants admit Paragraph 194.**

195. Delegation of the exercise of the legislative function to define the elements of any criminal offense to the Attorney General of the State of Georgia constitutes an unconstitutional delegation of legislative authority.

**Defendants deny Paragraph 195.**

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs request that the Court:

a. Assume jurisdiction over this matter;

b. Declare that HB 87 is unconstitutional in its entirety;

c. Enjoin Defendants from enforcing HB 87;

d. Grant Plaintiffs' costs of suit, and reasonable attorneys' fees and other

expenses pursuant to 28 U.S.C. § 1988; and

   e.   Grant such other relief as the Court may deem appropriate.

**Based upon the decision of the Eleventh Circuit and the law of the case at the time this answer is filed Defendants admit that Section 7 is permanently enjoined pursuant to a direct action under the Supremacy Clause to the United States Constitution. Defendants deny that Plaintiffs are entitled to any additional relief.**

   Respectfully submitted, this 21st day of December, 2012.


                              SAMUEL S. OLENS
                              Georgia Bar No. 551540
                              Attorney General

                              KATHLEEN M. PACIOUS
                              Georgia Bar No. 558555
                              Deputy Attorney General

                              /s/DEVON ORLAND
                              Georgia Bar No. 554301
                              Senior Assistant Attorney General

126

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2012 I electronically filed the foregoing **STATE DEFENDANTS AMENDED ANSWER TO PLAINTIFFS' COMPLAINT** with the Clerk of Court using CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

/s/Devon Orland
Assistant Attorney General
Georgia Bar No. 554301

Please Address All Communications To:
DEVON ORLAND
Senior Assistant Attorney General
Department of Law, State of Georgia
40 Capitol Square, S.W.
Atlanta, Georgia  30334-1300
Telephone: (404) 463-8850
Facsimile:  (404) 651-5304
E-mail: dorland@law.ga.gov

# CERTIFICATE OF SERVICE

I do hereby certify that I have this date served the within and foregoing

**BRIEF OF PETITIONERS** prior to filing same, by depositing a copy thereof,

postage prepaid, in the United States Mail, properly addressed upon:

Andre I Segura
American Civil Liberties Union
Foundation-NY
125 Broad Street
18TH Floor
New York, NY  10004

Karen C Tumlin
National Immigration Law Center
Suite 2850
3435 Wilshire Boulevard
Los Angeles, CA  90010

Cecillia D Wang
ACLU Immigrant's Rights Project
39 Drumm Street
San Francisco, CA  94111

Katherine Desormeau
ACLU Immigrant's Rights Project
39 Drumm Street
San Francisco, CA  94111

Elora Mukherjee
ACLU Racial Justice Program
18TH Floor
125 Broad Street
New York, NY  10004

Kenneth John Sugarman
ACLU Immigrant's Rights Project
39 Drumm Street
San Francisco, CA  94111

Jonathan Blazer
National Immigration Law Center
405 14th Street, Suite 1400
Oakland, CA  94612

Linton Joaquin
National Immigration Law Center
Suite 2850
3435 Wilshire Boulevard
Los Angeles, CA  90010

Nora Preciado
National Immigration Law Center
Suite 2850

Chara Fisher Jackson
ACLU of Georgia
Building 400, Suite 425

3435 Wilshire Boulevard
Los Angles, CA 90010

Samuel Brooke
Southern Poverty Law Center-Al
400 Washington Avenue
Montgomery, AL 36104

Sin Yen Ling
Asian Law Caucus
55 Columbus Avenue
San Francisco, CA 94111

Tanya Broder
National Immigration Law Center
Suite 1400
405 14th Street
Oakland, CA 94612

Andrew H Turner
Southern Poverty Law Center-AL
400 Washington Avenue
Montgomery, AL 36104

Azadeh N Shahshahani
Aclu of Georgia
Building 400, Suite 425
1900 the Exchange, SE
Atlanta, GA 30339

1900 the Exchange, SE
Atlanta, GA 30339

Charles H Kuck
Kuck Immigration Partners LLC
8010 Roswell Road
Suite 300
Atlanta, GA 30350

Daniel Werner
Immigrant Justice Project
Southern Poverty Law Center
Suite 2150
233 Peachtree Street, NE
Atlanta, GA 30303

Danielle M Conley
Kuck Immigration Partners LLC
Suite 300
8010 Roswell Road
Atlanta, GA 30350

George Brian Spears
Law Office of Brian Spears
1126 Ponce De Leon Avenue
Atlanta, GA 30306

Mary C Bauer
Southern Poverty Law Center-Al
400 Washington Avenue
Montgomery, AL 36104

129

Robert Keegan Federal , Jr
Federal & Hasson, LLP
Suite 1776
Two Ravinia Drive
Atlanta , GA  30346

Christopher R Clark
Dewey & Leboeuf, LLP-NY
1301 Avenue of He Americas
New York , NY  10019

Henry L Solano
Dewey & Leboeuf, LLP-NY
1301 Avenue of the Americas
New York , NY  10019

Emmet J Bondurant , II
Bondurant Mixson & Elmore, LLP
1201 West Peachtree Street, NW
3900 One Atlantic Center
Atlanta , GA  30309-3417

Dale M. Schwartz
Dale M Schwartz & Associates
5500 Interstate North Parkway
Riveredge One, Suite 450
Atlanta , GA  30328-4662

Gerald Jason Thompson
The Thompson Law Firm
Suite 101
200 East Crogan Street
Lawrenceville , GA  30046

Socheat Chea
Socheat Chea, PC
Bldg 300, 500 Duluth Park Lane
Duluth , GA  30096

Farrin Rose Anello
Immigration Clinic
University of Miami School of Law
1311 Miller Drive, E257
Coral Gables , FL  33146

Rebecca Ann Sharpless
Immigration Clinic
University of Miami School of Law
1311 Miller Drive, E257
Coral Gables , FL  33146

Carla Gorniak
Dewey & Leboeuf, LLP-NY
1301 Avenue of the Americas
New York , NY  10019

Pickens Andrew Patterson, Jr.
Smith, Gambrell & Russell, LLP
Promenade II, Suite 3100
1230 Peachtree Street, NE
Atlanta, GA  30309-3592

130

This 21st Day of December, 2012.


/s/ Devon Orland
Devon Orland Bar No. 554301
Counsel for Appellants