**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| Georgia Latino Alliance for Human Rights, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Governor Nathan Deal, *et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 1:11-cv-1804-TWT <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR RECONSIDERATION**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

LEGAL STANDARD.....................................................................................1

ARGUMENT ..................................................................................................2

   I.  Defendants' *Salerno* argument was not properly before the Court, as
       Defendants raised it for the first time in their reply memorandum...................3

   II.  The Court should grant reconsideration on the merits, as *Salerno* does not bar
       Plaintiffs' facial challenge to Section 8. .........................................................6

     A.  As in *Arizona*, basic uncertainty about what Section 8 authorizes precludes
         evaluating its ultimate constitutionality at this time. ...................................7

     B.  Whether Section 8 is preempted ultimately turns on whether it authorizes
         state and local officers to take actions that conflict with federal law, not
         whether every action taken pursuant to Section 8 so conflicts. ..................14

   III. Discovery and certification are appropriate vehicles to determine what
       Section 8 means...............................................................................................20

CONCLUSION .............................................................................................25

**TABLE OF AUTHORITIES**

**Cases**

*Am. Federation of State, County and Mun. Employees Council 79 v. Scott*, 717 F.3d 851 (11th Cir. 2013) ..................................................... 2, 7

*American Insurance Association v. Garamendi*, 539 U.S. 396 (2003) ............. 15

*Anderson v. Edwards*, 514 U.S. 143 (1995) ....................................... 16

*Arizona v. United States*, 132 S. Ct. 2492 (2012).................................. passim

*Arizonans for Official English*, 520 U.S. 43 (1997) ........................................ 22

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)........................................... 13

*Bauknight v. Monroe County, Fla.*, 446 F.3d 1327 (11th Cir. 2006) ..................5

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) .................................... 13

*Bellotti v. Baird*, 428 U.S. 132 (1976) ....................................... 22, 24

*Blue Cross & Blue Shield of Ala., Inc. v. Nielsen*, 116 F.3d 1406 (11th Cir. 1997)................................................................... 23

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)................................... 7, 8

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985) ....................................7

*Bruce v. PharmaCentra, LLC*, No. 1:07-cv-3053, 2008 WL 1902090 (N.D. Ga. Apr. 25, 2008) .....................................................................5

*Carter ex rel. Carter v. United States*, 780 F.2d 925 (11th Cir. 1986).................2

*Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011).............................. 15

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) .................... 15

*Frascona v. Minnesota Mut. Life Ins. Co.*, 53 F. Supp. 2d 1282 (N.D. Ga. 1998)..................................................................................2

*Freeman v. Barnhart*, 220 F. App'x 957 (11th Cir. 2007) ..................................5

*Fults v. Upton*, No. 3:09-CV-86-TWT, 2011 WL 530384
(N.D. Ga. Feb. 4, 2011) ................................................................................. 1, 2

*Ga. Latino Alliance for Hum. Rights v. Gov. of Ga.*, 691 F.3d 1250
(11th Cir. 2012) ........................................................................................... passim

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) .................3

*Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*,
399 F.3d 1276 (11th Cir. 2005) ..................................................................... 23

*Lehman Brothers v. Schein*, 416 U.S. 386 (1974) ........................................... 22

*Lozano v. City of Hazleton*, ___F.3d ___, No. 07-3531, 2013 WL 3855549
(3d Cir. July 26, 2013) ....................................................................... 12, 15, 18

*Mosher v. Speedstar Div. of AMCA Int'l, Inc.*, 52 F.3d 913 (11th Cir. 1995) .. 23

*Obester v. Lucas Associates, Inc.*, No. 1:08-CV-3491, 2010 WL 8292401
(N.D. Ga. Aug. 2, 2010) ...................................................................................5

*Perrymond v. Lockheed Martin Corp.*, No. 1:09-CV-1936-TWT,
2010 WL 987218 (N.D. Ga. Feb. 3, 2010) .......................................................5

*Pittman v. Cole*, 267 F.3d 1269 (11th Cir. 2001) ................................. 22, 23, 25

*Secretary of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) .................... 18

*Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013) ...................... 17, 18

*United States v. Arizona*, 641 F.3d 339 (9th Cir. 2011) ........................ 15, 16, 17

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................... 3, 4, 7

*United States v. Stevens*, 130 S. Ct. 1577 (2010) ......................................... 7, 21

*United States v. Williams*, 553 U.S. 285 (2008) ...............................................7

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ................. 24

**Statutes**

Ga. Code Ann. § 15-2-9 .................................................................................. 24

iii

**Other Authorities**

Fallon, *Fact & Faction About Facial Challenges*, 99 Cal. L. Rev. 915 (2011) 11

Ga. Const. art. VI, § 6 ...................................................................... 24

**Rules**

Fed. R. Civ. P. 59(e)............................................................................1

Fed. R. Civ. P. 8(a)(2) ...................................................................... 12

Ga. R. Sup. Ct. 46 ............................................................................ 24

L.R. 7.2E ....................................................................................... 1, 2

Plaintiffs hereby move pursuant to Federal Rule of Civil Procedure 59(e) and Local Rule 7.2E for reconsideration of the Court's Opinion and Order dated July 19, 2013 (Doc. 154), which granted Defendants' Motion to Dismiss (Doc. 144). As explained below, reconsideration is necessary to correct clear error and to prevent injustice that resulted from incomplete briefing arising from Defendants asserting a new argument for dismissal in their reply memorandum. Plaintiffs additionally briefly respond to the scope of discovery this case would require, which was raised by Defendants in their reply brief and which the Court cited but did not rely upon in its Order.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) authorizes district courts upon motion to alter or amend a judgment. *See* Fed. R. Civ. P. 59(e); *Fults v. Upton*, No. 3:09-CV-86-TWT, 2011 WL 530384, at *1-2 (N.D. Ga. Feb. 4, 2011). Although "[t]he Federal Rules of Civil Procedure do not specifically authorize motions for reconsideration . . . such motions are common in practice," *Fults*, 2011 WL 530384, at *1, and are contemplated by Local Rule 7.2E. "A party may move for reconsideration only when one of the following has occurred: 'an intervening change in controlling law, the availability of new evidence, [or] the need to correct clear error or prevent manifest injustice.'" *Fults*, 2011 WL 530384, at *2 (citation

omitted, alteration in original). Such motions should not be used as a vehicle to present new arguments that should have been made earlier, *see id.*, but are intended "'to permit the trial judge to reconsider . . . matters so that he can correct obvious errors or injustices and so perhaps obviate the laborious process of appeal.'" *Carter ex rel. Carter v. United States*, 780 F.2d 925, 928 (11th Cir. 1986) (citation omitted, alteration in original).

Plaintiffs are mindful that motions for reconsideration should not be filed "as a matter of routine practice," L.R. 7.2E, but believe it necessary to do so now in order to correct a clear legal error and to prevent injustice. *See Frascona v. Minnesota Mut. Life Ins. Co*., 53 F. Supp. 2d 1282, 1283 (N.D. Ga. 1998) ("A motion for reconsideration should be granted if it is necessary to correct a clear error or to prevent manifest injustice.").

## ARGUMENT

The Court's July 19, 2013 order granting the Defendants' Motion to Dismiss held that the facial challenge to Section 8 of HB 87 (hereinafter, "Section 8") must fail because Plaintiffs cannot, as a matter of law, carry their "burden of proving that [Section 8] could never be applied in a constitutional manner." Op. & Order at 7 (quoting *Am. Federation of State, County and Mun. Employees Council 79* ("*AFSCME Council 79*") *v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013)). In other

2

words, the Court dismissed Plaintiffs' claim as to Section 8 by holding that Plaintiffs could not meet the *Salerno* test.  *See id.* ("To succeed on a facial challenge to a statute, a plaintiff must establish that no set of circumstances exists under which the statute would be valid."  (quoting *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1255 (11th Cir. 2012) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))).

As explained below, reconsideration of this decision is necessary for two reasons.  First, the ground upon which the Court granted Defendants' Motion to Dismiss was not properly before the Court, as Defendants only raised the *Salerno* argument in their reply memorandum; it was therefore error to dismiss on that basis.  Plaintiffs, further, were deprived of the opportunity to address Defendants' untimely argument, and so it would be unjust to dismiss Plaintiffs' claim on the basis of that argument.  Second, even if Defendants' untimely *Salerno* argument was properly raised before the Court, the decision on the merits was clearly erroneous as a matter of law, and Plaintiffs' claim should not have been dismissed.

I. **Defendants' *Salerno* argument was not properly before the Court, as Defendants raised it for the first time in their reply memorandum.**

In support of their Motion to Dismiss, Defendants initially advanced three arguments: (1) that the Eleventh Circuit has held that Section 8 is "facially constitutional," Mot. to Dismiss at 4; *id.* at 8 (same); (2) that because "this action

was brought preenforcement as a facial challenge[,] its actual enforcement is irrelevant," *id.* at 4; *id.* at 7 (same); and (3) that they are not the proper defendants "for engaging in discovery" or "for ensuring that the Act [i]s constitutionally implemented." *Id.* at 8-9. After Plaintiffs responded to Defendants' arguments and explained why each must fail, *see* Pls.' Opp'n to Mot. to Dismiss (Doc. 148), Defendants filed a reply memorandum that argued for the first time that Plaintiffs cannot meet the *Salerno* standard—i.e., that Plaintiffs could not "show that [Section 8] in [sic] unconstitutional in all its applications," Defs.' Reply Mem. (Doc. 149) at 1-2 (citing *Salerno*, 481 U.S. at 745), because "[t]he Eleventh Circuit has determined that the law can be applied in a constitutional manner." *Id.* at 2 (citation omitted). In granting Defendants' Motion to Dismiss, the Court adopted this argument. *See* Op. & Order at 8.

Defendants failed to raise the *Salerno* argument in their memorandum in support of their Rule 12(b)(6) motion, doing so only in their reply brief. That sandbagging prejudiced Plaintiffs by depriving them of the opportunity to explain why the remaining claim against Section 8 should not be dismissed based upon *Salerno*. For precisely that reason—and to avoid encouraging such sandbagging— courts routinely hold that arguments made for the first time in reply memoranda are not properly considered in resolving the motion in question. *See, e.g.*, *Freeman*

4

*v. Barnhart*, 220 F. App'x 957, 961 n.1 (11th Cir. 2007) ("Arguments raised for the first time in a reply brief are not properly before this court, and we will not consider them."); *Obester v. Lucas Associates, Inc.*, No. 1:08-CV-3491, 2010 WL 8292401, at *42 (N.D. Ga. Aug. 2, 2010) ("Courts generally do not consider issues raised for the first time in a reply brief.  Since [Defendant] improperly raised this issue for the first time in its reply, the Court holds that this argument is not properly before the[] Court." (citations omitted)); *Bruce v. PharmaCentra, LLC*, No. 1:07-cv-3053, 2008 WL 1902090, *1 (N.D. Ga. Apr. 25, 2008) ("The Court will not consider arguments raised for the first time in a reply brief."  (citing *Bauknight v. Monroe County, Fla.*, 446 F.3d 1327, 1330 n.2 (11th Cir. 2006)); *Perrymond v. Lockheed Martin Corp.*, No. 1:09-CV-1936-TWT, 2010 WL 987218, at *14 (N.D. Ga. Feb. 3, 2010) ("[Defendant]'s arguments in the reply brief that Plaintiff has not stated [a claim upon which relief could be granted] are entirely new arguments that are not properly before the Court."), *adopted in relevant part* 2010 WL 925178 (N.D. Ga. Mar. 9, 2010).

In sum, Defendants' *Salerno* argument was not properly before the Court when it considered Defendants' Motion to Dismiss.  That fact, along with the prejudice the untimely argument caused Plaintiffs by depriving them of opportunity to respond, is sufficient justification to grant reconsideration, to vacate

5

the Opinion and Order, and to resolve Defendants' Motion to Dismiss on the

grounds properly raised in support thereof.

## II.    The Court should grant reconsideration on the merits, as *Salerno* does not bar Plaintiffs' facial challenge to Section 8.

Even setting aside the untimeliness of Defendants' argument on reply, the

Court should grant reconsideration to correct an error in the application of *Salerno*

to this case. *Salerno* does not support dismissal in this case for two reasons. First,

the analysis for which *Salerno* calls cannot be applied at this stage in the case

because there is, based on the record before the Court, a fundamental uncertainty

about what Section 8 means.[1]   Therefore the Court cannot at this point determine

whether Section 8 exceeds constitutional bounds; however, at the motion to

dismiss stage, Plaintiffs' allegations that Section 8 will be interpreted in a

preempted manner are entirely plausible and adequately allege a claim upon which

relief can be granted. Second, the decisions of the Supreme Court and of multiple

Courts of Appeals demonstrate that, whatever effect *Salerno* might have in other

contexts, it would not support dismissal of the facial preemption claims at issue

here even if some possible applications of Section 8 might not directly interfere or

conflict with federal law.

---

[1] How to resolve this uncertainty is addressed more fully below in Section III.

A.      As in *Arizona*, basic uncertainty about what Section 8 authorizes precludes evaluating its ultimate constitutionality at this time.

Where it applies, the *Salerno* test places the ultimate burden on plaintiffs seeking to invalidate a statute to "'establish that no set of circumstances exists under which the Act would be valid.'" *AFSCME Council 79*, 717 F.3d at 863 (quoting *Salerno*, 481 U.S. at 745). Before a court can answer *Salerno*'s question—are there constitutional applications of the statute?—however, it must first determine what the statute actually means. *See United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers." (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). The Supreme Court has instructed, therefore, that "a federal court must determine what a state statute means before it can judge its facial constitutionality." *Broadrick v. Oklahoma*, 413 U.S. 601, 617 n.16 (1973); *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 508-09 (1985) ("[A]nalysis of the constitutional claims advanced by appellees necessarily requires construction of the [state] statute to assess its scope.").[2]

---

[2] As discussed in Section III, *infra*, when federal courts considering federal challenges to a state statute are unable to determine what the state law means, they frequently utilize certification procedures to get a definitive interpretation from the state's highest court.

The Defendants here argued, and this Court accepted, that the Supreme Court in *Arizona* and the Eleventh Circuit in this case effectively held that Section 8 *could* be applied in a constitutional manner. *See* Op. & Order at 9. From that premise, the Court concluded that Plaintiffs cannot demonstrate that no set of circumstances exists under which Section 8 would be valid. *See id.* ("Because the Eleventh Circuit concluded that there could be situations in which section 8 is applied constitutionally, albeit at the preliminary injunction stage, the Plaintiffs' facial challenge to section 8 must fail.").

Plaintiffs respectfully disagree with the premise that the Eleventh Circuit held that Section 8 could be applied constitutionally. The Eleventh Circuit simply did not reach that step, as it could not get past the analytically prior step of determining "what [the] state statute means." *Broadrick*, 413 U.S. at 617 n.16. What the Eleventh Circuit did, rather, is to hold that Section 8 is ambiguous, but could be *interpreted* in a constitutional manner. *See Ga. Latino Alliance for Hum. Rights v. Gov. of Ga.* ("*GLAHR*"), 691 F.3d 1250, 1268 (11th Cir. 2012) ("We are therefore reluctant to conclude that the state statute 'will be construed in a way that creates a conflict with federal law.'" (quoting *Arizona v. United States*, 132 S. Ct. 2492, 2510 (2012))).

8

This is the same approach that the Supreme Court took with regard to the analogous provision in *Arizona*, wherein the Court stated that "[t]here is a basic uncertainty about what [§ 2(B)] means," *Arizona*, 132 S. Ct. at 2510, and hesitated to hold the statute preempted based on the ambiguous text. *Id.* at 2509-10 (explaining that "at this stage and on this record," and in the absence of a definitive state court interpretation, "it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law"). The Supreme Court offered examples of both a preempted and a likely non-preempted interpretation of § 2(B). Under the possible preempted interpretation, § 2(B) would authorize Arizona officers to "[d]etain[] individuals solely to verify their immigration status" and to "hold[] aliens in custody for possible unlawful presence without federal direction and supervision." *Id.* at 2509. Under the possible non-preempted interpretation, § 2(B) would "only require[] . . . a status check during the course of an authorized, lawful detention or after a detainee has been released." *Id.* at 2509. [3]

From there, the Supreme Court held—as did the Eleventh Circuit in *GLAHR*—that, given the possibility of a non-preempted interpretation and federalism concerns at issue, it would not assume the state had chosen a prohibited

---

[3] The Supreme Court was careful to point out that even if § 2(B) were interpreted in this manner, the statute could still be preempted upon "some showing that it has other consequences that are adverse to federal law and its objectives." *Id.* at 2509.

interpretation absent record evidence or a definitive state court decision evincing such a prohibited interpretation.  *See Arizona*, 132 S. Ct. at 2509-10; *GLAHR*, 691 F.3d at 1268 (noting that the State argued for a narrow interpretation of Section 8 and therefore expressing "reluctan[ce] to conclude that the state statute 'will be construed in a way that creates a conflict with federal law'" (quoting *Arizona*, 132 S. Ct. at 2510)).

Neither *GLAHR* nor *Arizona*, however, could attach a particular interpretation to the statutes at hand, and therefore did not reach the question whether the facial challenges to § 8 of the Georgia law and § 2(B) of the Arizona law met the *Salerno* standard—or even how or whether the *Salerno* standard applies to those challenges.

To say that an ambiguous state statute could be interpreted in multiple mutually-exclusive ways, and that some of those interpretations likely would not be preempted—as *Arizona* and *GLAHR* did—is subtly but crucially distinct from saying that a statute with a settled meaning has permissible non-preempted applications.  In the former situation, the insufficient record and absence of a definitive state-court interpretation prevents the court from reaching the merits of

10

the preemption claim.[4]  Thus, if a state law is fairly and readily susceptible to interpretation *A*, which would make the statute preempted; *and* interpretation *B*, in which the statute likely would not be preempted, a federal court—absent good reasons to do so—hesitates to assume that the operative interpretation is *A*.  But even then, dismissal under Rule 12(b)(6) is not the proper outcome, as discussed in Section III.

As the Supreme Court put it in *Arizona*, "[t]he nature and timing of this case"—in particular, the ambiguity of the statutory text, the absence of a record or a state-court interpretation, and the fact that the procedural posture was pre-enforcement—"counsel caution in evaluating the validity of § 2(B)."  132 S. Ct. at 2510; *see also GLAHR*, 691 F.3d at 1267-68 ("The Court also explained in Arizona that a preenforcement challenge to the scope of detention authorized by the state statute is *premature*."  (citation omitted, emphasis added)).  As the Third Circuit recently explained in a case holding that a municipal ordinance was facially preempted because it conflicted with federal immigration law:

---

[4] *See* Fallon, *Fact & Faction About Facial Challenges*, 99 Cal. L. Rev. 915, 960 (2011) ("In order to rule on a facial attack on the merits, a court must first construe, or specify the meaning of, a statute.  It must then apply a test of constitutional validity that may, sometimes, require an assessment of a challenged statute's practical effects.  With regard to both of these analyses, a court may sometimes doubt its capacity to judge wisely in the absence of a richer factual record than it has before it."  (footnote omitted)).

> The Court [in *Arizona*] vacated a preliminary injunction against § 2(B) and remanded for further fact finding because the provision, on its face, was ambiguous, and Arizona's courts may construe § 2(B) in a way that would preclude *any* unconstitutional applications of the law. The Court, however, did not reject a facial challenge against the provision pursuant to the City's theory, *i.e.*, because implementation of § 2(B), in *some* circumstances may be in harmony with federal law.

*Lozano v. City of Hazleton*, ___F.3d ___, No. 07-3531, 2013 WL 3855549, at *12 n.22 (3d Cir. July 26, 2013) (citing *Arizona*, 132 S. Ct. at 2509-10).

Thus, neither *Arizona* nor *GLAHR*—nor *Salerno* or any other case—holds that plaintiffs cannot as a matter of law succeed on a facial challenge to a state statute with an ambiguous meaning.[5] Nor do they impose a heightened pleading standard above the "short and plain statement of the claim" required by Rule 8(a)(2). In fact, *Arizona* specifies precisely what a plaintiff must plead and prove to succeed on a claim that a § 2(B)-type state statute is preempted: that the state law authorizes state officials to "[d]etain[] individuals solely to verify their immigration status" and/or to "hold[] aliens in custody for possible unlawful presence without federal direction and supervision." 132 S. Ct. at 2509; *see also GLAHR*, 691 F.3d at 1268 (noting the "the potential problems with a state statute that would permit detention 'solely to verify [an individual's] immigration status'" (quoting *Arizona*, 132 S. Ct. at 2509) (alteration in original)).

---

[5] Such a rule, moreover, would be unwise, as it would encourage legislatures to draft ambiguous statutes for later reformation by courts or executive officials.

12

Although Plaintiffs' complaint was filed well before the Supreme Court decided *Arizona*, it contains all the allegations necessary to state a facial preemption claim against Section 8 post-*Arizona*. *See* Compl. (Doc. 1):

> ¶ 85: "The immigration status verification process authorized by HB 87 will greatly prolong ordinary police stops."

> ¶ 86: "During this time [required to verify immigration status], the civilian would be detained by state or local law enforcement officers, and denied access to bond or release from custody."

> ¶ 87: "If HB 87 goes into effect, many ordinary police encounters will be extended beyond constitutional bounds while police officers investigate immigration status."

> ¶ 92: "HB 87 also authorizes peace officers to arrest and detain individuals solely on the basis that they are suspected to be in violation of federal civil immigration laws."

> ¶ 95: "HB 87 is designed to and will in fact result in peace officers detaining individuals for the purpose of carrying out immigration status checks where they otherwise would not have done so."

On a motion to dismiss, all of these factual allegations must be accepted as true, even if the Court believes it is "improbable" that the Plaintiffs can prove them and "even if the possibility of recovery is extremely 'remote and unlikely.'" Op. & Order at 5 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007)).

These allegations, moreover, plainly state a "'plausible' claim for relief." *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). Not only did the Supreme Court hold that one "plausible" interpretation of statutes like Section 8 is

13

that they unconstitutionally authorize detaining individuals solely upon suspicion that they lack lawful immigration status, *see Arizona*, 132 S. Ct. at 2509, but this Court has already said that such an interpretation is the most natural one. *See* Order (Doc. 93) at 23 ("Section 8 of HB87 authorizes local law enforcement officers to investigate a suspect's illegal immigration status and, if the officer determines the suspect has violated federal immigration law, detain and arrest the suspect without a warrant."); Op. & Order at 4 n.1 ("On its face, [Section 8 of] HB 87 conflicts with [federal law].").

In sum, while *Arizona* and *GLAHR* hold that statutes like Section 8 could be interpreted in a constitutional manner, they also hold that such laws could be interpreted in a manner that makes them preempted. Plaintiffs here have alleged that Section 8 authorizes impermissible enforcement of immigration laws by state and local law officials, and therefore have stated a claim upon which relief can be granted. It was erroneous for the Court to dismiss Plaintiffs' claim against Section 8 absent a developed factual record as to what the law means or, as discussed in Section III, *infra,* a definitive state court interpretation of the law.

      B.     <u>Whether Section 8 is preempted ultimately turns on whether it authorizes state and local officers to take actions that conflict with federal law, not whether every action taken pursuant to Section 8 so conflicts.</u>

Moreover, the decisions of the Supreme Court and circuit courts underline that, even if the meaning of the law were clear, *Salerno* would not bar consideration of Plaintiffs' claim that Section 8 is facially preempted even if there were conceivable non-preempted applications of the statute.

As an initial matter, *Salerno* simply does not apply in the preemption context. As the Third Circuit recently noted, "no part of the majority opinion in *Arizona*, and no part of *Whiting*,[6] references *Salerno* at all." *Lozano*, 2013 WL 3855549, at *12 n.22. This is entirely consistent with the Supreme Court's approach to facial preemption challenges decided after *Salerno*. *See United States v. Arizona*, 641 F.3d 339, 345 n.3 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded*, 132 S. Ct. 2492 (observing that that the Supreme Court's analogous facial preemption decisions in *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000), and *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), "[n]either cite[] *Salerno* nor mention[] its standard in the opinions, concurrences, or dissents.").[7] Similarly, the Eleventh Circuit in this case did not

---

[6] *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011), held that an Arizona statute requiring employers to enroll in E-Verify—an online system for determining the work eligibility of employees run by the federal government—was not facially preempted by federal law.

[7] The Ninth Circuit noted that "the only Supreme Court preemption case that we have found which references the *Salerno* standard is *Anderson v. Edwards*, 514

15

cite or apply *Salerno* in either its holding that Section 7 is preempted or that Plaintiffs were not sufficiently likely to succeed on the merits to justify a preliminary injunction of Section 8, *see GLAHR*, 691 F.3d at 1262-68, even though the State argued on appeal that *Salerno* barred enjoining either provision as a facial matter.  *See* State's Br. on Appeal at 50-51; State's Reply Br. on Appeal at 12.  In fact, Plaintiffs' counsel have been unable to find <u>any</u> Eleventh Circuit case applying *Salerno* to a facial challenge based on preemption.

But even if *Salerno* has any application to facial preemption challenges, the proper question is not whether there exists some hypothetical set of circumstances under which a preempted statute would not interfere with federal law.  Instead, the question is whether the *statute itself* conflicts with congressional intent regarding the allocation of power between the state and federal governments.  Plaintiffs' claim is that Section 8 purports to *authorize* state and local action in conflict with federal law and Congress's intent; the hypothetical possibility that state and local officers might not choose to exercise that state-law authority does not save the state law.  More specifically, if Georgia has passed a law that directly conflicts with federal law by "permit[ting] detention 'solely to verify [an individual's] immigration status,'" *GLAHR*, 691 F.3d at 1268 (quoting *Arizona*, 132 S. Ct. at

U.S. 143[, 115] (1995)," which "does not cite *Salerno* in the preemption section of the opinion." *Arizona*, 641 F.3d at 345 n.3.

16

2509), it does not save the statute if some police officers in some circumstances happen to apply the law without actually impermissibly prolonging an individual's detention. This is because "there can be no constitutional application of a statute that, on its face, conflicts with Congressional intent and therefore is preempted by the Supremacy Clause." *Arizona*, 641 F.3d at 346.

Indeed, the Supreme Court has made clear that *Salerno* poses no bar to a challenge based on a law's inherent constitutional infirmity, even if under certain circumstances application of the law does not result in constitutional harm. Most recently, in *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), the Supreme Court upheld a facial challenge to the federal Voting Rights Act (VRA) in spite of the possibility that the challenging county had *itself* engaged in voting discrimination, and therefore was properly subject to the VRA's preclearance requirement. Rejecting the argument that "in light of voting discrimination in Shelby County, the county cannot complain about the provisions that subject it to preclearance," the Court explained that a facial challenge to a law does not turn on whether an individual application of the law is harmless, explaining:

> But that is like saying that a driver pulled over pursuant to a policy of stopping all redheads cannot complain about that policy, if it turns out his license has expired. Shelby County's claim is that the coverage formula here is unconstitutional in all its applications, because of how it selects the jurisdictions subjected to preclearance. The county was selected based on that formula, and may challenge it in court.

17

*Id.* at 2629-30.  *See also Secretary of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 966 (1984) ("The flaw in the statute is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud.  That the statute in some of its applications actually prevents the misdirection of funds from the organization's purported charitable goal is little more than fortuitous.").

It is precisely for these reasons that the majority opinion in *Arizona* did not so much as suggest that *Salerno* would require rejection of the facial challenge to S.B. 1070 if it could be shown that single police officer could apply S.B. 1070 on a single occasion without directly conflicting with federal law—or, for that matter, if numerous police officers could do so on numerous occasions.  As the Third Circuit recently explained, *Salerno* does not require rejection of

> a conflict preemption claim in a facial challenge whenever a defendant can conjure up just one hypothetical factual scenario in which implementation of the state law would not directly interfere with federal law. Indeed, if this were the standard governing the Supreme Court's review of Arizona's S.B. 1070 law, many of the sources of conflict with federal law described by the Court would have been irrelevant to the Court's conflict pre-emption analysis.

*Lozano*, 2013 WL 3855549 at *12 n.22.

18

The apparent irrelevance of *Salerno* to facial challenges of this nature is further illustrated by *Arizona*'s treatment of § 6 of SB 1070, which authorized officers to make warrantless arrests of removable aliens. *See Arizona*, 132 S. Ct. at 2505-07. In holding that § 6 of SB 1070 was preempted as a facial matter, the *Arizona* majority paid no heed to Justice Alito's dissent, which pointed out that there are plainly circumstances under which the arrest of a particular removable alien by a state or local officer would not, in that instance, conflict with federal law. *See id.* at 2534-35 (Alito, J., dissenting in relevant part). "The point," Justice Alito said, "is that there are plenty of permissible applications of § 6," *id.* at 2534, and that fact, in his view, should have meant that, in light of *Salerno*, the statute could not be struck as a facial matter. *See id.* ("As to § 6, I do not believe the United States has carried [*Salerno*'s] heavy burden."). The majority, while acknowledging that Congress permits state officers to "make warrantless arrests of aliens based on possible removability . . . in specific, limited circumstances," nonetheless held that § 6 was preempted because it "authorize[ed] state and local officers to engage in these enforcement activities as a general matter," and therefore "create[d] an obstacle to the full purposes and objectives of Congress." *Arizona*, 132 S. Ct. at 2507.

19

*Arizona*'s treatment of § 6 of SB 1070 underlines that the proper inquiry as to whether Section 8 of HB 87 is preempted is not, as Defendants seemingly argue, whether it conceivably could be applied by officers in a way that does not prolong detentions.  The relevant question, rather, is whether Section 8 "authorize[s] state and local officers" to engage in activities that "create[] an obstacle to the full purposes and objectives of Congress."  *Id.*  As mentioned above, *Arizona* identified two scenarios in which a statute like Section 8 would pose an obstacle to "[t]he program put in place by Congress": if the law authorizes state and local officers to "[d]etain[] individuals solely to verify their immigration status" and/or if it authorizes them to "hold[] aliens in custody for possible unlawful presence without federal direction and supervision."  *Id.* at 2509.  Therefore, and as explained previously, the merits of Plaintiffs' claim that Section 8 is preempted will ultimately turn on what exactly it purports to authorize.

## III.   Discovery and certification are appropriate vehicles to determine what Section 8 means.

As explained above, one threshold requirement for ultimately resolving Plaintiffs' preemption claim is that the Court must be able to say what Section 8 actually means.  *GLAHR* held—and *Arizona* implicitly held—that such a determination cannot be made on the basis of Section 8's text alone, for the text admits of at least two mutually-exclusive interpretations, only one of which would

20

render the statute preempted.  What *Arizona*, *GLAHR*, and similar decisions require, moreover, is that in order to evaluate Plaintiffs' claim that Section 8 is preempted, the Court ultimately must have either a record upon which to determine the meaning of the statute or a definitive state court interpretation of it.  *Arizona*, for example, went to pains to say that it simply could not determine the meaning of the challenged statute "at this stage," "on this record," and "without the benefit of a definitive interpretation from the state courts."  132 S. Ct. at 2509-10.  In the instant case, the Eleventh Circuit, even while rejecting the "preenforcement challenge to [Section 8's] validity," noted that the Supreme Court had "left open the possibility" that once Arizona's comparable statute goes into effect, its "interpretation and application" could illuminate the law's meaning and permit a challenge to the provision in its clarified form.  691 F.3d at 1268 (citation omitted). In light of this precedent, Plaintiffs respectfully submit that they should be provided the opportunity to develop a sufficient record upon which the Court can determine what Section 8 means, because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."  *Stevens*, 130 S. Ct. at 1587 (citation omitted).

But if the Plaintiffs cannot produce a sufficient record upon which the Court can determine Section 8's meaning, or if the Court believes discovery would be too

21

onerous, dismissal would not be appropriate.  Instead, consistent with Supreme Court and Eleventh Circuit precedent, the most appropriate way forward would be to certify the question of Section 8's meaning to the Georgia Supreme Court.  *See Pittman v. Cole*, 267 F.3d 1269, 1285 (11th Cir. 2001).

Both the Supreme Court and the Eleventh Circuit have extolled the virtues of using certification procedures when a federal district court has to evaluate a federal claim that requires first resolving a novel issue of state law.  As the unanimous Supreme Court explained in 1997: "[t]hrough certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save 'time, energy, and resources and hel[p] build a cooperative judicial federalism.'"  *Arizonans for Official English*, 520 U.S. 43, 77 (1997) (quoting *Lehman Brothers v. Schein*, 416 U.S. 386, 391 (1974) (second alteration in original)).  "[T]o warrant district court certification, '[i]t is sufficient that the statute is susceptible of . . . an interpretation [that] would avoid or substantially modify the federal constitutional challenge to the statute.'"  *Id.* (quoting *Bellotti v. Baird*, 428 U.S. 132, 148 (1976) (all but first alteration in original)).

The Eleventh Circuit, too, has acknowledged certification's "substantial benefits," *Pittman*, 267 F.3d at 1289, explaining that:

22

> Only through certification can federal courts get definitive answers to unsettled state law questions. Only a state supreme court can provide what we can be assured are "correct" answers to state law questions, because a state's highest court is the one true and final arbiter of state law. From our perspective, state law is what the state supreme court says it is, and a state supreme court's pronouncements are binding on every state and federal judge.

*Mosher v. Speedstar Div. of AMCA Int'l, Inc.*, 52 F.3d 913, 917 (11th Cir. 1995) (citation omitted). "In light of the numerous benefits offered by the certification procedures,"

> [W]e [the Eleventh Circuit] have treated certification as a "valuable tool for promoting the interests of cooperative federalism," and we have not hesitated to pull it out of our toolbox. In fact, we have employed the certification procedure more than any other circuit, and we make no apologies for having done so.

*Pittman*, 267 F.3d at 1290 (quoting and citing *Blue Cross & Blue Shield of Ala., Inc. v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997)). "Where there is doubt in the interpretation of state law," the Eleventh Circuit has held repeatedly, "a federal court should certify the question to the state supreme court to avoid making unnecessary *Erie* 'guesses' and to offer the state court the opportunity to interpret or change existing law." *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 399 F.3d 1276, 1279 (11th Cir. 2005) (citation and quotation marks omitted).

23

The instant case is likely an ideal candidate for certification.  First, the Georgia Supreme Court has made a certification procedure available.[8]  Second, in light of *Arizona* and the Eleventh Circuit's decision in this case, there can be no question that "the statute is susceptible of . . . an interpretation that would avoid or substantially modify the federal constitutional challenge to the statute." *Bellotti*, 428 U.S. at 148; *cf. Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 395 (1988) ("Under these unusual circumstances, where it appears the State will decline to defend a statute if it is read one way and where the nature and substance of plaintiffs' constitutional challenge is drastically altered if the statute is read another way, it is essential that we have the benefit of the law's authoritative construction from the Virginia Supreme Court").

Third and finally, certification could significantly streamline the remainder of this case.  In moving to dismiss, for example, Defendants complained that they do not have "access to relevant discoverable enforcement plans of the multitude of potential 'enforcers.'"  Defs.' Mot. to Dismiss at 8.  And in their reply

---

[8] *See* Ga. R. Sup. Ct. 46 ("When it shall appear to . . . any District Court . . . of the United States . . . that there are involved in any proceeding before it questions or propositions of the laws of this State which are determinative of said cause and there are no clear controlling precedents in the appellate court decisions of this State, such court may certify such questions or propositions of the laws of Georgia to this Court for instructions."); *see also* Ga. Const. art. VI, § 6, para. 4; O.C.G.A. § 15-2-9.

memorandum, Defendants argued (for the first time) that the potential scope of discovery was reason alone to dismiss this case.  Defs.' Reply Mem. at 3. Defendants' protestations about discovery, which are not relevant to the question presented by their motion to dismiss, fail to take into account that certification could quickly resolve the uncertainty about Section 8's meaning.  *See Pittman*, 267 F.3d at 1289 (citing reducing delay and cutting costs as benefits of certification). And in Plaintiffs' view, the possibility of certification should certainly be discussed by the parties and the Court if the motion to dismiss is denied.

## CONCLUSION

For the reasons stated above, Plaintiffs request that the Court grant Plaintiffs' Motion for Reconsideration; vacate the Opinion and Order dated July 19, 2013 (Doc. 154) and the Clerk's Judgment (Doc. 156); and deny Defendants' Motion to Dismiss (Doc. 144).  Should this Motion be granted, Plaintiffs respectfully request that the Court set a case management conference to discuss discovery and certification.

25

Dated:  August 16, 2013

Respectfully submitted,[9]

/s/    Omar C. Jadwat

Omar C. Jadwat

*On behalf of Attorneys for Plaintiffs*

Linton Joaquin (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Nora A. Preciado (*pro hac vice*)
Melissa S. Keaney (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
T: (213) 639-3900
F: (213) 639-3911
*Joaquin@nilc.org*
*Tumlin@nilc.org*
*Preciado@nilc.org*
*Keaney@nilc.org*

Naomi Tsu (GSB No. 507612)
Michelle R. Lapointe (GSB No. 007080)
Daniel Werner (GSB No. 422070)
SOUTHERN POVERTY LAW CENTER
233 Peachtree St., NE, Suite 2150
Atlanta, Georgia  30303
T: (404) 521-6700
F: (404) 221-5857
*naomi.tsu@splcenter.org*
*michelle.lapointe@splcenter.org*
*daniel.werner@splcenter.org*

Samuel Brooke (*pro hac vice*)
SOUTHERN POVERTY LAW CENTER
400 Washington Ave.
Montgomery, Alabama 36104

Omar C. Jadwat (*pro hac vice*)
Andre Segura (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
T: (212) 549-2660
F: (212) 549-2654
*ojadwat@aclu.org*
*asegura@aclu.org*

Justin B. Cox (*GA bar admission pending*)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
233 Peachtree St., NE, Suite 2150
Atlanta, Georgia  30303
T: (404) 521-5854
*jcox@aclu.org*

Cecillia D. Wang (*pro hac vice*)
Katherine Desormeau (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
T: (415) 343-0775
F: (415) 395-0950
*cwang@aclu.org*
*kdesormeau@aclu.org*

---

[9] Counsel certifies this document has been prepared in accordance with L.R. 5.1.

26

T: (334) 956-8200
F: (334) 956-8481
*samuel.brooke@splcenter.org*

Tanya Broder (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
405 14th Street, Suite 1400
Oakland, California 94612
T: (510) 663-8282
F: (510) 663-2028
*Broder@nilc.org*

Winifred Kao (*pro hac vice*)
Carolyn Hsu (*pro hac vice*)
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, California 94111
T: (415) 896-1701  x 110
F: (415) 896-1702
*winifredk@asianlawcaucus.org*
*carolynh@asianlawcaucus.org*

Chara Fisher Jackson (GSB No. 386101)
Azadeh N. Shahshahani (GSB No. 509008)
ACLU OF GEORGIA
1900 The Exchange, Suite 425
Atlanta, Georgia  30339
T: (770) 303-8111
*cfjackson@acluga.org*
*ashahshahani@acluga.org*

G. Brian Spears  (GSB No. 670112)
1126 Ponce de Leon Ave., N.E.
Atlanta, Georgia 30306
T: (404) 872-7086
F: (404) 892-1128
*Bspears@mindspring.com*

R. Keegan Federal, Jr. (GSB No. 257200)
FEDERAL & HASSON, LLP
Two Ravinia Drive, Ste 1776
Atlanta, Georgia  30346
T: (678) 443-4044
F: (678) 443-4081

Charles H. Kuck  (GSB No. 429940)
Danielle M. Conley (GSB No. 222292)
KUCK IMMIGRATION PARTNERS LLC
8010 Roswell Road, Suite 300
Atlanta, Georgia  30350
T: (404) 816-8611
F: (404) 816-8615
*CKuck@immigration.net*
*DConley@immigration.net*

*Attorneys for Plaintiffs*

27

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing document was filed through the Court's CM/ECF system and served electronically on all parties registered through that system.  Parties may also access this filing through the court's CM/ECF system.

Dated August 16, 2013                    /s/ Omar C. Jadwat
                                         Omar C. Jadwat